ORIGINAL

FILED
AUG - 8 2006
U.S. COURT OF FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 06-576 C

**COMPLAINT**

## SUMMARY

1. This is an action for money damages by Plaintiff, San Carlos Irrigation and Drainage District ("District"), against Defendant, United States of America, acting by and through the Department of the Interior ("DOI") and Bureau of Indian Affairs ("BIA"), for breach of contract and breach of the implied covenant of good faith and fair dealing. These damages have been caused by the United States' failure to meet its obligations under the San Carlos Project Act of June 7, 1924, 43 Stat. 475-76 (the "1924 Act") and its contracts with the District and its landowners to timely and correctly charges costs for the operation and maintenance of the San Carlos Irrigation Project ("Project"), located in Pinal County, Arizona.

2. The Project is a federal irrigation project authorized by Congress in the 1924 Act and constructed to provide irrigation water to 50,000 acres of public and private land within the District and 50,000 acres of land within the Gila River Indian Reservation ("Reservation"). The 100,000 acres of Project lands are located in the arid desert region of south central Arizona. Both the Indian and non-Indian economies and agricultural pursuits are dependent upon water from the Project for their success and survival.

3. In accordance with the 1924 Act, the Secretary of the Interior ("Secretary"), acting on behalf of the United States, executed agreements with the owners of lands within the District. *See* Landowners' Agreement with the Secretary of the Interior, San Carlos Project: Act of June 7, 1924 (attached hereto as Exhibit 1) ("Landowners' Agreement"). The Landowners' Agreement required the District's landowners to contribute their water rights for their lands to the United States for use by the Project; repay their pro rata share of the Project's original construction costs; and pay their pro rata share of the Project's annual operation and maintenance ("O&M") expenses. In return for these substantial considerations provided by the District's landowners, the United States promised to deliver available surface water, groundwater, and stored water to the landowners through the Project's facilities and to generally operate the Project in the landowners' best interests. These contractual commitments are reinforced and expanded upon in a subsequent repayment contract executed by the District and the Secretary. *See* Repayment Contract Between the United States and the San Carlos Irrigation and Drainage District, Arizona (attached hereto as Exhibit 2) ("Repayment Contract").

4. Project operations are funded by annual O&M assessments collected from landowners within the Project. The assessments charged to Indian lands in the Project are paid by the United States under the Leavitt Act. *See* An Act to authorize the Secretary of the Interior to adjust reimbursable debts of Indians and tribes of Indians, ch. 369, 47 Stat. 564 (July 1, 1932) (codified as amended at 25 U.S.C. § 386a). The assessments charged to District lands by the Project are collected by the District from its landowners through an annual process in which the District notifies the local county government of the charges for each parcel, the county assesses those charges as part of the annual property tax bill, and the landowners pay the charges with their property tax and other county assessments. To facilitate this process, the Repayment Contract requires the United States to fix the annual O&M charges by a set deadline. For the

Project's 2005, 2006 and 2007 fiscal years ("FY"), the United States did not meet this deadline, breaching its obligations to the District. Despite the fact that the United States' breach made it impossible for the District to collect the O&M charges and pay them to the Project by the contractual payment deadline, the United States forced the District to pay the charges under the threat that the Project would terminate water deliveries during the spring growing season. In one instance, the United States also assessed penalties for late payment, in violation of the agreements governing the Project.

5. The United States also is prohibited by statute and contract from charging the District and its landowners for any costs or expenses that are not true O&M costs for the fiscal year at issue. But for FY 2005, 2006, and 2007, the United States based its O&M charges on a Project budget that underestimated income, overestimated expenditures, included hundreds of thousands of dollars in unnecessary and unauthorized expenditures, and included hundreds of thousands of dollars in reserve and emergency funds that were unnecessary and unauthorized. As a result of its repeated breaches, the United States has collected annual Project budget surpluses of at least $4 million. During this same period, however, one of the worst droughts on record in Arizona has severely impacted agricultural operations throughout the District and reduced agricultural productivity to the lowest levels experienced in years.

6. As a direct, proximate, and foreseeable consequence of the United States' failure to meet its statutory and contractual obligations to timely fix an annual O&M rate based upon the true cost of operating the Project, the District's landowners have been forced to pay O&M charges and penalties that were not due or authorized and have been charged for personnel, activities, and equipment that are not contractually authorized. Also, the District has been forced to unnecessarily and prematurely draw down its reserve accounts to pay O&M charges and keep water flowing to its landowners. The United States' repeated breaches of the Project Agreements also have disrupted the business operations of the District and its landowners; made it impossible to maintain reasonable

budgets and fiscal plans; and resulted in other injuries and damages to the District and its landowners.

**JURISDICTION**

7. This is an action for money damages arising out of federal statutes and contracts between the District and the United States. The Court has jurisdiction under 28 U.S.C. § 1491.

**PARTIES**

8. The District is an irrigation and drainage district, a municipal corporation, and a political subdivision of the State of Arizona embracing 50,000 acres of irrigable public and private lands within the Project. The District is pursuing this action individually and on behalf of the lands and landowners within the District, whom the District represents in all dealings with the United States in regard to the Project.

9. The United States, through the Department of the Interior and its agency, the Bureau of Indian Affairs ("BIA"), operates and manages the Project for the benefit of the lands and landowners within the District and 50,000 acres of land within the Reservation. District and Reservation lands served by the Project are located in what is generally known as the Casa Grande Valley, approximately twenty miles south of Phoenix, in Pinal County, Arizona.

**THE 1924 ACT**

10. Congress authorized construction of the Project under the 1924 Act with the express intent of providing an adequate water supply to irrigate designated lands on the Reservation and within the District's boundaries.

11. Construction of Coolidge Dam, the Project's principal component, began in January 1927 and was substantially completed by 1931. Coolidge Dam impounds the waters of the Gila River and its tributaries to form the San Carlos Reservoir ("Reservoir"). When landowners within the District or the Reservation request water for irrigation, the Project releases available stored water from the Reservoir to travel

approximately fifty miles down the Gila River to Ashurst-Hayden dam, where it is routed into Project, Reservation, and District canals and laterals for delivery to the lands and landowners.

12. The 1924 Act directs that "the total cost of the project shall be distributed equally per acre among the lands in Indian ownership and the lands in private or public ownership that can be served from the waters impounded by [Coolidge] dam." 1924 Act, § 1. With the Leavitt Act, however, Congress deferred the collection of construction costs from Indian-owned lands while title to those lands remains in Indian ownership. 25 U.S.C. § 386a. For all practical purposes, then, the United States will only be repaid half of the Project's construction costs—the half attributable to District lands.

## THE LANDOWNERS' AGREEMENT

13. As required by the 1924 Act, the Secretary executed the Landowners' Agreement with the owners of irrigable land within the District. 1924 Act, § 4. The Landowners' Agreement incorporated the terms of the 1924 Act, imposing a first lien on each landowner's lands and water rights to secure to the United States full payment of the pro rata acreage share of the Project's costs, including all O&M costs. Landowners' Agreement, at 5. The District and its landowners, at all times relevant to the allegations of this complaint, have fully and timely complied with all obligations of the Landowners' Agreement.

14. As a condition of eligibility for Project benefits, the Landowner's Agreement required each of the District's landowners to convey the water rights appurtenant to their lands within the District to the United States. Landowners' Agreement, at 5. As a further condition to participate in the Project, each District landowner also agreed to forego their legal right to pump groundwater from beneath their lands for non-domestic uses. *Id.* at 8. As a result of the Landowners' Agreement, the United States exclusively holds and controls those surface water and groundwater rights. These water rights are a valuable property right and the United States has a fiduciary duty

to the District's landowners to control and manage those water rights reasonably and in the landowner's best interests.

15. The Landowners' Agreement further requires each District landowner to pay Project O&M charges in accordance with the 1924 Act, "based upon the total annual cost of the operation and maintenance of the said San Carlos project, and such charge shall be uniform throughout said project and made upon a per acre or acre-foot basis unless otherwise provided by agreement with said district and with the approval of the Secretary of the Interior." Landowners' Agreement, at 13 and 15. The United States may not include costs for Project betterments or improvements in the annual O&M charge without the District's approval. *Id.* at 15.

## THE REPAYMENT CONTRACT

16. The District was formed under Arizona law in 1928. The 1924 Act required non-Indian landowners coming into the Project to form the District so that the United States could deal with a single entity in the administration and operation of the Project.

17. On June 8, 1931, the District and the United States, acting through the Secretary, executed the Repayment Contract. The Repayment Contract supplements, but does not replace or supercede the Landowners' Agreement. The District and its Landowners, at all times relevant to the allegations of this complaint, have fully and timely complied with all obligations of the Repayment Contract.

18. The United States and the District intended that the two parties would work together cooperatively in the administration of the Project. The Repayment Contract requires the United States to keep full and accurate records and accounts of the Project's fiscal operations, receipts, and expenditures and to make the Project's books and accounts available to the District. The Repayment Contract further requires the United States to "consult with" the District regarding "contemplated future steps of importance." Repayment Contract, at 19.

19. All Project lands, Indian and non-Indian, share equally the annual O&M costs of those Project facilities that serve all landowners in the Project. These "Joint Works" facilities include Coolidge Dam, Ashurst-Hayden Dam, and certain other Project facilities. Thus, under the Repayment Contract, "the whole cost of operating and maintaining the works of the Project, after sums collected for excess water and other sums which may go to the operation and maintenance fund as provided herein have been deducted, shall be divided equally on a per acre basis among all of the lands of the project and regardless of whether they are irrigated or not." Repayment Contract, at 6-7. O&M costs associated with works operated and maintained solely by the District are paid only by District landowners. *Id.* The costs associated with works operated and maintained by the United States solely for the benefit of Project lands on the Reservation, on the other hand, are paid only by the United States. *Id.* at 9.

20. The Repayment Contract reiterates the 1924 Act's requirement that "[o]peration and maintenance charges shall be paid annually, in advance, not later than March 1st." Repayment Contract, at 15. But because the District must pay O&M costs in advance, the Repayment Contract also obligates the Secretary to "fix" the O&M charges "annually" so that the District will have notice of the charges it is expected to pay. *Id.*, at 8. The Secretary must estimate the annual O&M charge for the next fiscal year based upon "the annual cost of the operation and maintenance of the San Carlos Project." *Id.* at 16. Because the United States has an obligation of good faith and fair dealing under the Repayment Contract, this estimate of O&M costs must be fair and reasonable, based upon the United States' past experience in operating the Project and a reasonable estimate of the true cost of O&M for the coming year. The United States may not pass onto the District the costs of federal decisions and agency actions that are not true Project O&M costs. In addition, the Landowners' Agreement prohibits the United States from charging the District for costs associated with Project improvements, including activities and equipment not required to operate and maintain existing Project

facilities, that have not been pre-approved by the District. Landowners' Agreement, at 15.

21. The District is responsible for collecting the annual O&M charges from each landowner and paying the United States by the required deadline. To facilitate the District's collection of these charges, the Repayment Contract requires the Secretary to "give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts." Repayment Contract, at 8. If the District is delinquent in its payments to the United States, the Repayment Contract limits the District's penalty to one half of one percent of the amount owed for each month that the payment remains delinquent. *Id.*, at 20-21. If the District is delinquent for twelve months or more, the United States has the right to terminate Project water deliveries to the District's landowners. *Id.* at 20.

22. Since the 1920s, the District has collected Project O&M charges from its landowners as part of the District's annual property tax levy under Arizona law, which also includes charges for the District's own operating expenses. The District must provide its annual tax levy rate to the Pinal County Board of Supervisors by July 1 of each year for collection by the county treasurer as part of the county's annual property tax notices. The county treasurer collects property taxes in two installments, one in November and one in May. Thus, Project O&M charges included in the July tax levy are not collected in full from the District's landowners for payment to the United States until the following May.

23. The 1924 Act and the original terms of the Repayment Contract required full payment of O&M charges to the Project by March 1. 1924 Act, § 4; Repayment Contract, at 15. But under Arizona law, District landowners are not required to pay the District's property tax levy in full until May 1. As a result, in the District's first years of

existence the District was regularly late in paying Project O&M charges and incurred penalties as a result. To help address this problem, the United States and the District executed a supplement to the Repayment Contract in 1935. *See* First Supplement to the Repayment Contract Between the United States of America and the San Carlos Irrigation and Drainage District (November 12, 1935) (attached hereto as Exhibit 3) ("First Supplement"). The District and its Landowners, at all times relevant to the allegations of this complaint, have fully and timely complied with all obligations of the First Supplement.

24. Section Four of the First Supplement states that "under Arizona law the second half of tax payments do not become delinquent until the first Monday in May and as a consequence the District has encountered considerable difficulty and been placed at additional expense in complying with the provision of said Repayment Contract requiring payment in advance and not later than March first of each year . . .." The First Supplement then modifies the original Repayment Contract by allowing the District to pay the annual O&M charges to the Project on or before May 15 (rather than March 1) of each year without penalty.

## THE UNITED STATES' FAILURE TO PROVIDE TIMELY NOTICE OF O&M CHARGES

25. The Project's fiscal year begins on October 1. For the District to meet its advance payment obligation, the District must collect the annual O&M charges and pay the charges by the preceding May 15. To enable the District to collect the O&M charges by May 15 under Arizona's property tax system, the United States must notify the District of the O&M rate by the preceding July 1. As an example, the notice and payment schedule for FY 2005 was as follows:

- July 1, 2003: Deadline for United States to fix the FY 2005 O&M charges and give notice to the District of those charges so that the District could include the charges in its tax levy to the Pinal County Board of Supervisors.

- May 15, 2004: Deadline for the District's landowners to pay their property taxes and for the District to pay the FY 2005 O&M charges.
- October 1, 2004: FY 2005 begins.

Under the 1924 Act, Repayment Contract, and applicable federal law, only the Secretary or someone with authority delegated by the Secretary may fix the annual O&M charge. No employees or officials of the Project or the Western Regional Office of the BIA have been granted authority to fix the annual O&M charge.

26. The Secretary did not fix the FY 2005 O&M charges until April 30, 2004, ten months after the contractually-mandated deadline. Ignoring its own breach of the Repayment Contract and First Supplement, however, the United States maintained that the FY 2005 O&M charges were due and payable to the Project on March 1, 2004, two months *before* the Secretary actually fixed the O&M charges for that year. Furthermore, after years of maintaining the O&M charges at or around twenty dollars per acre, the Secretary raised the FY 2005 rate to thirty dollars per acre, a fifty percent increase over previous years. The United States' actions put the District in an impossible position. In the absence of a decision regarding the FY 2005 rate, the District assessed its landowners twenty dollars per acre in the July 1, 2003 property tax levy, in a good faith belief that the rate would remain unchanged from previous years. The Secretary's ultimate decision to raise the rate left the District unable to collect the full FY 2005 O&M charges by the May 15, 2004 deadline. In fact, because the additional charges could not be assessed until July 1, 2004, those charges could not be collected in full until May 15, 2005.

27. On February 8, 2005, the Project notified the District that it would terminate water deliveries to the District if the FY 2005 O&M charges were not paid in full by March 2, 2005. The Project asserted that the 2005 O&M charges would be one year past due on March 1, 2005, such that the United States could terminate water deliveries as provided in the Repayment Contract. Although the District immediately appealed the Project's decision as a violation of the United States' contractual obligations, the Acting Regional Director of the BIA affirmed the decision without

providing an opportunity for a hearing as required by federal law. *See* 25 C.F.R. Part 2. The Acting Regional Director's decision reaffirmed the Project's decision to terminate water deliveries and gave the District two days to pay $1 million of the FY 2005 charges and another thirty days to pay the remaining $500,000.

28. The Acting Regional Director's decision breached the Repayment Contract because the United States had not satisfied its contractual obligation to fix the O&M charges by the deadline required under the Repayment Contract and First Supplement. As a result, the District's payment was not overdue and the United States had no right to demand payment of the charges, charge penalty interest, or terminate water deliveries. The United States also interfered with the District's ability to meet its own obligations under these agreements, in violation of the United States' contractual duty of good faith and fair dealing. Nevertheless, because it was threatened with the economically devastating termination of its water deliveries, the District had no choice but to pay $1.5 million, plus $47,500 in penalty interest, to the United States by the Acting Regional Director's deadlines. The District made the payments under protest and with an express reservation of its rights to challenge the FY 2005 O&M charges.

29. For FY 2006, Project staff and the District agreed that a fifteen dollar per acre O&M charge would meet the Project's needs. Project staff recommended that rate to their superiors well in advance of the July 1, 2004 deadline for fixing the O&M rate mandated by the Repayment Contract. The District, believing in good faith that the BIA would accept the recommendations of Project staff, assessed its landowners at fifteen dollars per acre in the absence of a final decision from the Secretary on the FY 2006 rate. Ultimately, however, the recommendation of Project staff was ignored and the Secretary set the FY 2006 O&M rate at thirty dollars per acre on August 8, 2005, thirteen months after the United States' contractual deadline.

30. Ignoring this breach of its contractual obligations, the United States maintained that the FY 2006 O&M charges were due from the District on March 1, 2005,

over five months *before* the Secretary fixed the amount due. On February 2, 2006, the Acting Western Regional Director of the BIA, relying once again on the one-year default provision of the Repayment Contract, notified the District that water deliveries would be terminated on March 1, 2006 if the District had not paid the FY 2006 charges in full by that date.

31. At the District's request, the Acting Western Regional Director met with representatives of the District on February 13, 2006 to discuss the O&M budget process and the Director's decision to terminate water deliveries. The Director asked the District to submit a proposal to the BIA to address the District's concerns in general and the payment of the FY 2006 O&M charges in particular. The District submitted its proposal on February 17, 2006. The BIA rejected the District's proposal out-of-hand and demanded immediate payment to avoid termination of water deliveries. This action breached the Repayment Contract, the First Supplement, and the United States' duty of good faith and fair dealing because the United States had not satisfied its own contractual obligation to fix the O&M charges by the required deadline, such that payment was not overdue and the United States had no right to terminate water deliveries. Nevertheless, because it was once again faced with termination of water deliveries from the Project, the District paid $1,500,000 to the Project under protest and with an express reservation of its rights to challenge the FY 2006 O&M charges.

32. For FY 2007, the United States provided absolutely no information regarding the Project's budget needs or the potential O&M rate until October 2005, over three months after contractually-mandated deadline of July 1, 2005 for the Secretary to set the rate. The Secretary did not finally fix the O&M charge for FY 2007 until April 5, 2006, nine months after the contractual deadline. Despite this breach, however, the United States continues to maintain that payment of the FY 2007 O&M charges was due on March 1, 2006 and that payment will be one year past due on March 1, 2007.

33. The failure to timely fix the O&M charges for FY 2005 through FY 2007; the decisions to terminate water deliveries without legal right; the demands for payment of monies not yet due; and the assessment and collection of penalty interest by the United States violate the Repayment Contract, other laws and agreements governing the Project, and the United States' contractual duty to act fairly and in good faith in its dealings with the District.

34. The United States' breaches of contract have damaged the District and its landowners, who have been forced to pay unlawful penalties and who have been denied the use of funds through the United States' unlawful coercion of unauthorized and premature payments to the Project.

## THE UNITED STATES' EXCESSIVE O&M CHARGES

35. The Landowners' Agreement requires the Project to establish annual O&M charges "based upon the total annual cost of the operation and maintenance" of the Project. Landowners' Agreement, at 13 and 15. The United States may not include costs for Project betterments or improvements in the annual O&M charge without the District's approval. *Id.* at 15. Similarly, the Repayment Contract requires that annual O&M charges be based upon "the annual cost of the operation and maintenance of the San Carlos Project." *Id.* at 16. Thus, the United States is contractually obligated to fix the annual O&M rate based upon a reasonable estimate of the Project's true O&M expenses for the coming fiscal year.

36. Since at least the late 1990s, O&M charges were maintained around twenty dollars per acre. But for FY 2005, the BIA proposed a rate of thirty dollars per acre and refused the District's reasonable recommendations for lowering the rate. Despite numerous and repeated objections by the District, the Secretary fixed Project O&M charges at thirty dollars per acre, fifty percent more than had been charged for at least the previous seven years. This unwarranted increase came during a historic and ongoing

drought that has heavily impacted the ability of the District's landowners to successfully and profitably farm their lands.

37. The FY 2005 O&M charges were based upon a Project operating budget that underestimated Project revenues; overestimated Project expenses; and included charges for personnel, equipment, and activities that are not authorized O&M costs under the Repayment Contract. The budget included substantial sums for unnecessary projects that were never undertaken and maintained reserve accounts for unnecessary and unauthorized work and equipment. The United States also indicated that the fifty percent hike in O&M charges was necessitated by an alleged "double accounting error" of two million dollars, an error that the United States has never proven nor explained. Through either mismanagement or deliberate manipulation of Project income and expenses, the United States' FY 2005 budget and O&M rate failed to reflect the true actual cost of Project O&M, in breach of the United States' obligations under the Landowners' Agreement and Repayment Contract.

38. For FY 2006, Project staff—the United States' own employees responsible for operating and maintaining the Project—recommended O&M charges of only fifteen dollars per acre. The Project and the District agreed that this O&M rate would be more than adequate to meet the Project's actual operating expenses for the year. The District levied assessments on its landowners in July 2004 based upon its good faith belief that the United States would accept this recommendation and fix the FY 2006 O&M charges at $15 per acre. Several months later, however, the BIA's Western Regional Office unilaterally decided to maintain FY 2006 O&M charges at thirty dollars per acre. Without notice to the District, the Western Regional Director directed the Project Manager to revise the FY 2006 budget as necessary to justify a thirty dollar per acre O&M charge. The Secretary eventually fixed the FY 2006 O&M charges at thirty dollars per acre, in accordance with the revised budget.

39. The FY 2006 O&M rate of thirty dollars per acre was not based upon a good faith estimate of the actual "annual cost" of operating and maintaining the Project, as required by the Landowners' Agreement and Repayment Contract. Instead, the rate was based on arbitrary manipulation of various budget expense and cost items, at the direction of the Western Regional Director, to justify an O&M charge of thirty dollars per acre. The FY 2006 budget included numerous unauthorized, unnecessary, or inflated budget expense items, including funding for: (1) a well replacement program that was never implemented and has now been abandoned as unnecessary; (2) unidentified deferred maintenance that, on information and belief, has never been performed; (3) rehabilitation of China Flume, a Project facility, that has never been performed; and (4) reestablishment of a Heavy Equipment sinking fund to purchase equipment that is not authorized under the Repayment Contract. The budget also was manipulated to support a thirty dollar per acre O&M rate by underestimating Project revenues; overestimating Project expenses; and charging for personnel, equipment, and activities that are not authorized O&M costs under the Landowners' Agreement and Repayment Contract.

40. The Repayment Contract obligates the United States to consult with the District regarding each year's budget and other issues of importance in regard to the Project. But the United States did not meet with the District to discuss the FY 2007 O&M charges, as it had in the past, nor did it provide even a summary of its budget proposal. The Secretary simply proposed and finalized an O&M rate of thirty dollars per acre without any indication of how that rate was determined.

41. The FY 2007 budget included numerous charges that are not authorized O&M expenses. Among other things, the budget included funding of $475,000 to replace Project wells, under a program that apparently has now been abandoned, and funding for an archaeological survey at the Reservoir that is not an authorized O&M cost for which the District may be charged. The budget also included unexplained increases for various budget items and reserve funds that are not contractually authorized.

42. For FY 2005 through FY 2007, the Secretary did not fix the O&M charges based upon a reasonable estimate of the true "annual costs" of operating and maintaining the Project. The United States artificially inflated its budget to justify the thirty dollar per acre O&M charges for FY 2005 through FY 2007 by consistently overestimating required expenditures; consistently underestimating Project revenues; creating and maintaining unreasonably high reserve funds for projects or expenses that were never incurred or never approved by the District; charging the District for activities that do not constitute authorized Project O&M; and improper accounting practices. The United States also failed to consult with the District regarding O&M charges and failed to provide records and data to support its budget and O&M charges, as required by the Repayment Contract. The Secretary's failure to fix O&M charges for FY 2005 through FY 2007 based upon the true "annual cost" of operating and maintaining the Project is a breach of the 1924 Act, the Landowners' Agreement, the Repayment Contract, and other laws, orders, and agreements governing the Project; the United States' fiduciary duties to the District; and the United States' contractual duty to act fairly and in good faith in its dealings with the District.

43. As a direct and proximate result of the United States' failure to meet its statutory, fiduciary, and contractual obligations, the District and its landowners have been damaged because they have been required to pay unjustified and authorized O&M charges far in excess of the Project's actual needs. The District and its landowners also have been required to pay O&M charges before they are actually due under the relevant Project agreements and have been forced to pay penalty interest that the United States had no legal basis to demand. As a result of these payments, the District and its landowners have lost the use of significant sums of money, the District's cash reserves have been severely diminished, and the District has been denied its contractually agreed upon method of collecting O&M charges from its landowners in a regular and orderly manner.

## COUNT I

## BREACH OF CONTRACT

44. The District repeats and re-alleges here all the allegations set forth in paragraphs 1 through 43.

45. Under the Landowners' Agreement and Repayment Contract, the United States is obligated to fix O&M charges annually in time for the District to collect those charges from its landowners under the tax collection procedures and schedule mandated by Arizona law. The United States also is obligated to fix the O&M charges based upon the true annual cost of operating and maintaining the Project.

46. The United States has failed to perform its obligations under the Landowners' Agreement and Repayment Contract for FY 2005 through FY 2007. This failure to perform constitutes a breach of these contracts for which the District and its landowners are entitled to damages.

47. As a result of the United States' breaches, the District and its landowners have been forced to pay O&M charges and penalties that were not then due or authorized; been charged for personnel, activities, and equipment that are not authorized O&M under the Landowners' Agreement or Repayment Contract; and have incurred other costs and damages associated with the O&M budget process for FY 2005 through FY 2007.

## COUNT II

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

48. The District repeats and re-alleges here all the allegations set forth in paragraphs 1 through 47.

49. The Landowners' Agreement and Repayment Contract contain an implied covenant of good faith and fair dealing. This covenant requires the United States to cooperate with the District; to reasonably and in good faith perform its duties under these

agreements; and to refrain from actions that are detrimental to the contractual rights of the District and its Landowners.

50. The United States has breached the implied covenant of good faith and fair dealing through its unreasonable, unjustified, and unauthorized O&M budget and rate-setting practices, as described above.

51. As a direct and proximate result of the United States' breach of the implied covenant of good faith and fair dealing, the District and its landowners have suffered damages as alleged above.

52. For all counts contained herein, the District is entitled to its attorneys' fees and costs under the Equal Access to Justice Act. 28 U.S.C. § 2412.

**PRAYER FOR RELIEF**

WHEREFORE, the District, individually and on behalf of its landowners, prays for judgment against the United States as follows:

1. For damages in an amount to be established at trial;
2. For pre-judgment and post-judgment interest as permitted by law;
3. For the District's costs incurred, expended, and accruing in this action, including attorneys' fees; and
4. For such other relief as the Court may deem just and appropriate.

DATED this 4th day of August, 2006.

By [signature]

Riney B. Salmon II
SALMON, LEWIS & WELDON, P.L.C.
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016
(602) 801-9060 (office)
(602) 801-9070 (facsimile)

Of Counsel:
Ronnie P. Hawks
SALMON, LEWIS & WELDON, P.L.C.
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016

# EXHIBIT 1

# LANDOWNERS' AGREEMENT WITH THE SECRETARY OF THE INTERIOR SAN CARLOS PROJECT: ACT OF JUNE 7, 1924

WHEREAS the act of Congress approved May 18, 1916 (commonly called the Indian appropriation act for the fiscal year ending June 30, 1917, 30 Stat. L., 123-130), provides, among other things, as follows:

For beginning the construction by the Indian Service of a diversion dam and necessary controlling works for diverting water from the Gila River at a site above Florence, Arizona, as estimated by the Board of Engineer Officers of the United States Army in paragraph one hundred and thirty-eight of its report to the Secretary of War of February fourteenth, nineteen hundred and fourteen (House Document numbered seven hundred and ninety-one), $75,000. to remain available until expended, the total cost not to exceed $175,000: *Provided,* That said dam shall be constructed as a part of a project for the irrigation from the natural flow of the Gila River of Indian lands on the Gila River Indian Reservation and private and public lands in Pinal County, Arizona: *And provided further,* That the water diverted from the Gila River by said diversion dam shall be distributed by the Secretary of the Interior to the Indian lands of said reservation and to the private and public lands in said county in accordance with the respective rights and priorities of such lands to the beneficial use of said water as may be determined by agreement of the owners thereof with the Secretary of the Interior or by a court of competent jurisdiction: *And provided further,* That the construction charge for the actual cost of said diversion dam and other works and rights shall be divided equitably by the Secretary of the Interior between the Indian lands and the private and public lands in said county; and said cost as fixed for said Indian lands and shall be reimbursable, as provided in section two of the act of August twenty-fourth, nineteen hundred and twelve (Thirty-seventh Statutes at Large, page five hundred and twenty-two); but the construction charge as fixed for the private and public lands in said county shall be paid by the owner or entryman in accordance with the terms of an act extending the period of payment under reclamation projects, approved August

thirteenth, nineteen hundred and fourteen (Thirty-eight Statutes at Large, page six hundred and eight-six): *And provided further,* That said project shall only be undertaken if the Secretary of the Interior shall be able to make or provide for what he shall deem to be satisfactory adjustments of the rights to the water to be diverted by said diversion dam or carried in canals, and satisfactory arrangements for the inclusion of lands within said project and the purchase of property rights which he shall deem necessary to be acquired, and shall determine and declare said project to be feasible.

And whereas the act of Congress approved June 7, 1924, entitled "An Act For the continuance of construction work on the San Carlos Federal irrigation project in Arizona, and for other purposes" (43 Stat. 475-476), provides as follows:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior, through the Indian Service, is hereby authorized to construct a dam across the Canyon of the Gila River near San Carlos, Arizona, as a part of the San Carlos irrigation project, as contemplated in the report of the chief engineer of the Indian irrigation service submitted to the Commissioner of Indian Affairs on November 1, 1915, at a limit of cost of $5,500,000, for the purpose, first, of providing water for the irrigation of lands allotted to Pima Indians on the Gila River Reservation, Arizona, now without an adequate supply of water and, second, for the irrigation of such other lands in public or private ownership, as in the opinion of the said Secretary, can be served with water impounded by said dam without diminishing the supply necessary for said Indian lands: Provided, That the total cost of the project shall be distributed equally per acre among the lands in Indian ownership and the lands in public or private ownership that can be served from the waters impounded by said dam.

Sec. 2. That the construction charge assessed against the Indian lands shall be reimbursable to the Treasury of the United States on a per acre basis under such rules and regulations as the Secretary of the Interior may prescribe, and there is hereby created a lien against all such lands, which lien shall be recited in any patent issued therefor, prior to the reimbursement of the total amount chargeable against such land: Provided, That after said project is completed, the Secretary of the Interior is hereby authorized, in his discretion, with the approval of the Pima Indians, to sell, at public

auction, at not less than the appraised value thereof, such surplus lands not now allotted within said Gila River Indian Reservation as he may determine to be irrigable from return and drainage waters, the proceeds of such sales to be deposited in the Treasury to reimburse the United States in part for the construction charge assessed against the Indian lands.

Sec. 3. The Secretary of the Interior shall by public notice announce the date when water is available for lands in private ownership under the project, and the amount of the construction charge per irrigable acre against the same, which charge shall be payable in annual installments, the first installment to be 5 per centum of the total charge and be due and payable on the 1st day of December of the third year following the date of said public notice, the remainder of the construction charge, with interest on deferred amounts from date of said public notice at 4 per centum per annum, to be amortized by payment on each December 1st thereafter of 5 per centum of said remainder until the obligation is paid in full: Provided, That the operation and maintenance charges on account of land in private ownership or of land in Indian ownership operated under lease shall be paid annually in advance not later than March 1st, no charge being made for operation and maintenance for the first year after said public notice. It shall be the duty of the Secretary of the Interior to give such public notice when water is actually available for lands in private ownership.

Sec. 4. That no part of the sum provided for herein shall be expended for construction on account of any lands in private ownership until an appropriate repayment contract in accordance with the terms of this act and, in form approved by the Secretary of the Interior, shall have been properly executed by a district organized under State law, embracing the lands in public or private ownership irrigable under the project, and the execution thereof shall have been confirmed by decree of a court of competent jurisdiction, which contract, among other things, shall contain an appraisal approved by the Secretary of the Interior, showing the present actual bona fide value of all such irrigable lands fixed without reference to the proposed construction of said San Carlos Dam, and shall provide that until one-half of the construction charges against said lands shall have been fully paid, no sale of any such lands shall be valid unless and until the purchase price involved in such sale is approved by the Secretary of the Interior, and shall also provide that upon proof of fraudulent representation as to the

true consideration involved in any such sale, the Secretary of the Interior is authorized to cancel the water right attaching to the land involved in such fraudulent sale; and all public lands irrigable under the project shall be entered subject to the conditions of this section which shall be applied thereto: Provided further, That no part of any sum provided for herein shall be expended for construction on account of any lands in private ownership until all areas of land irrigable under the project and owned by any individual in excess of one hundred and sixty irrigable acres shall have been conveyed in fee to the United States free of encumbrance to again become a part of the public domain under a contract between the United States and the individual owner providing that the value as shown by said appraisal of the land so conveyed to the United States shall be credited in reduction of the construction charge thereafter to be assessed against the land retained by such owner; and lands so conveyed to the United States shall be subject to disposition by the Secretary of the Interior in farm units at the appraised price, upon such terms and conditions as he may prescribe.

Sec. 5. The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this act into full force and effect; and the money hereby authorized to be appropriated shall be available for the acquiring of necessary right of way by purchase or judicial proceedings and for other purposes necessary in successfully prosecuting the work to complete the project.

And Whereas the undersigned declares that he is the owner of approximately_____ acres of land in the Florence-Casa Grande Valley, Pinal County, Arizona_ which he wishes to have included in the San Carlos project under the conditions hereinafter stated and which land is hereinafter described and appraised.

Now, therefore, and in order to aid in the accomplishment of the purposes of said last-mentioned act, the said undersigned owner of the lands aforesaid covenants, promises, and agrees to and with the Secretary of the Interior and with all other landowners who may be included within said project, in consideration of the premises, the promises of said other landowners, and the work already done or which may hereafter be done by the United States in connection with said project, that if and when the Secretary of the Interior within three years from January 1, 1926, shall declare this agreement approved and shall include in said project the land of the

undersigned if any now forming a part of the Florence-Casa Grande project, at least to the extent of 160 acres thereof, or the full amount of such land owned by the undersigned if the same is less than 160 acres, and which the undersigned owns and is willing to have so included as hereinafter indicated, or if the undersigned has no land in the Florence-Casa Grande project, shall include in said San Carlos project all or any part of the land of the undersigned which he is willing to have so included as hereinafter indicated, then such of said lands of the undersigned as by order of the Secretary of the Interior, under the conditions herein stated, shall be included within said project and the water rights attached, appurtenant to, or used in connection therewith, whether vested or inchoate, except well-water rights, a subject to be hereinafter separately treated, shall be included in and become a part of said San Carlos project and said water rights shall at once be and become the property of the United States for use upon and in connection with said San Carlos project; and all of said lands so included in said project, together with the interest of the undersigned in the water rights of said project, shall at once be and become burdened with and subject to a first lien, so far as this agreement can make the same a first lien, to secure to the United States the full payment of a pro rata share of the entire cost of said project and all of the betterment, operation, and maintenance charges, and penalties in connection therewith; and the undersigned further hereby agrees that, if and when notified so to do by the Secretary of the Interior or his duly authorized agent or agents, he will promptly further convey or cause to be conveyed to the United States by good and sufficient deeds or other instruments satisfactory to the Secretary of the Interior, for use upon and in connection with the said project the water rights now appurtenant to said lands; and further agrees that he will by good and sufficient mortgages, deeds of trust, contracts, or other instruments of writing satisfactory to the Secretary of the Interior further cause the pro rata share of the entire cost of said San Carlos project, properly apportionable to said lands, and all betterment, operation, and maintenance charges upon said lands and upon his interest in the water rights of said project and of any water rights for said lands that he may hold individually or as against said project or as against other individuals in said project on account of said lands, except well-water rights which are hereinafter separately treated, to become a first lien so far as he can make it such upon said lands and said water rights; and the undersigned agrees that with respect to each

parcel of his lands which are hereinafter described and appraised the appraisement stated may be taken as the true appraisement and value of said parcel, fixed without reference to the proposed construction of the said Coolidge Dam for all purposes of said San Carlos Act; and the undersigned agrees that his lands described and appraised as follows: shall become a part of said project as and to the extent that they shall be so designated by the Secretary of the Interior, under the conditions aforesaid; and he agrees further that to the extent that said lands so designated shall exceed 160 acres, he will convey so much of such excess as still may be owned by him, when the repayment contract shall be approved as hereinafter provided, to the United States to become a part of the public domain thereof, as required by said San Carlos Act, and that the value of said lands so conveyed as shown by the said or any appraisal made hereunder, to the extent that it shall not exceed the construction charge assessed against the lands retained by him, shall be credited in reduction of such charges; and he agrees that in an endeavor to aid the Secretary of the Interior in disposing of said excess lands and in accounting to the undersigned for the value thereof which may exceed the construction charge to be assessed against the lands retained by him, he will try to assist the said Secretary to arrange sales thereof on long-time payments or otherwise, and in every way, so far as he is able, will endeavor to assist in the disposition of said lands.

The undersigned further agrees to comply in all respects with the said last-mentioned act of Congress and, so far as he is able, to cause the district, to be organized thereunder, so to comply; and should the appraisement hereinabove made fail to meet the approval of the Secretary of the Interior, he agrees that the value of his said lands may be fixed for all purposes of said act by a board of three appraisers consisting of one member who shall be appointed by the board of governors of the Florence-Casa Grande Water Users' Association and two members appointed by the Secretary of the Interior, one of whom, if he shall find it feasible, shall be an appraiser of the farm loan organization of the United States.

The said San Carlos project shall consist of and be constructed, operated, and controlled as follows:

The San Carlos project works and structure shall consist of the Ashurst-Hayden Diversion Dam and the canals and all other works and structures of the present

Florence-Casa Grande project to the extent that the same may be made available for the San Carlos project as herein and otherwise lawfully provided, and of the Coolidge Dam and Reservoir which are to be constructed; and they shall also consist of adequate extensions of the works and structures just described and a fitting system of lateral ditches to supply the white lands in said San Carlos project, with equivalent benefits for the Indian lands thereof, if such extensions and lateral systems shall be arranged for as hereinafter provided; and shall consist also of such other works and structures as may be in the future determined upon by the Secretary of the Interior with the approval of the owners of a majority of the acres of the white lands which may at any time be included in said project, or with the approval of the duly authorized board of directors or other proper officers of any district in which the lands of the undersigned may be included and which may have entered into a contract with the United States for the inclusion of the lands of said district in said project.

And the said works of said project shall further consist of such gates, drops, and other structures and appliances to make efficient and to be used in connection with said dams, canals, and reservoir as shall be determined upon as necessary or appropriate by the said Secretary of the Interior.

The water rights which shall be attached to and used in connection with said project shall consist of all water rights now appurtenant to or used in connection with the said Florence-Casa Grande project, to the extent that the same may be made available for the San Carlos project as herein or otherwise lawfully provided, whether said rights be vested or inchoate, and of all water rights appurtenant to or used in connection with the private lands not now in said Florence-Casa Grande project but which shall become a part of the said San Carlos project, except well-water rights which are hereinafter separately treated, and of all water rights reserved, appropriated, or otherwise held or acquired by the United States for said San Carlos project and also of so much of the water rights from the Gila River above the confluence therewith of the Salt River now owned by the United States or said Indians for or on account of or appurtenant to said Gila River Indian Reservation and the San Carlos Indian Reservation, except water rights in that tributary of the Gila River known as the San Carlos River, and except water rights of the Unites States or of the Indians in the Gila River, which shall be retained by the Secretary of the Interior for the use of the Indians of the said

San Carlos Reservation, and except well water rights, as together with all water rights of said project, shall be needed and available for use on or in connection with the lands embraced in said project. All underground and also all diffused surface water under, in or upon the white lands embraced in the said San Carlos project, except such as may from time to time be needed and utilized by the owners of such lands for their domestic water supply, shall at all times be available to said project for development and use as an irrigation water supply for said project; and the undersigned promises and agrees, in respect to his land which shall be taken into said project, to give to the United States or said project the necessary rights of way for the use of such waters and agrees further not to drill or operate wells in any other way or use or permit others to use said waters for irrigation contrary to any rules, orders, or regulations promulgated by the Secretary of the Interior with relation to said waters on said project.

The undersigned further agrees that any and all wells, pumps, or other means of using for irrigation underground or diffused surfaced waters, which are or may be upon the lands of the undersigned which shall be taken into the said project, may be purchased by the United States or by any district hereunder, with the approval of the Secretary of the Interior, for use in connection with said project, at a price to be fixed by a board of two appraisers, one to be appointed by the undersigned, and one as the Secretary of the Interior shall determine, and in the event that such appraisers can not agree, they may select a third and two of the three shall fix such price.

Such underground and diffused surface waters as may be under, in or upon Indian lands embraced in said project and the wells, pumps, and facilities in connection therewith, in so far as shall be permitted by law and in so far as the Secretary of the Interior shall deem proper, shall be devoted to the use and benefit of said project and the lands thereof.

The Secretary of the Interior shall have and he is hereby given the right to use for the San Carlos project the dam, the canals, and all other works and structures and all water rights of the Florence-Casa Grande project upon such terms and under such conditions as he shall deem fair to both of said projects and to the Indians and to the individuals having rights therein, provided however, that any lands in the Florence-Casa Grande project which for any reason are not taken into and do not become a part of the San Carlos project shall not be deprived in any way of irrigation under the said

Florence-Casa Grande project and owners thereof shall retain the right to have said lands irrigated under said Florence-Casa Grande project as fully as if the same were in no way merged into the San Carlos Project.

The lands to be embraced in said San Carlos project and to be irrigated thereunder, shall consist of: (1) Such allotted lands in the Gila River Indian Reservation as the Secretary of the Interior shall designate; said lands, however, shall not exceed 50,000 acres, but, within that limitation, may include all irrigable allotments on said reservation which the Secretary of the Interior shall decide are not already adequately supplied with gravity water for irrigation, and which, either as at present located or as the location thereof may be changed, can be irrigated under said project, and which he shall at any time, or from time to time, designate as temporarily or permanently entitled to the Indian water rights under said project; (2) the 27,000 acres, more or less, of privately owned lands in Pinal County, Arizona, which now constitute the white lands in said Florence-Casa Grande project, provided, and to the extent that the owners thereof place their respective lands in said San Carlos project in full compliance with the terms of said act of June 17, 1924, and under this agreement, and with the approval of the Secretary of the Interior; (3) such additional private and public lands as the Secretary of the Interior shall include in said project by making designations thereof within three years from January 1, 1926, and which shall be brought into said project full compliance with said last-mentioned act; (4) and all such other lands of any character whatsoever, as may be included in said project from time to time in compliance with law and in the manner hereinafter provided.

In order that the said San Carlos project may be susceptible of extension from time to time as occasion may demand, other lands than those mentioned in subdivisions (1), (2), and (3) in the foregoing paragraph may be included in said project by a duly authorized vote of the board of directors of the district to be organized as hereinafter provided. Said and all extensions of such project, however, shall be made only upon the approval of the Secretary of the Interior and the said Secretary shall be the judge of all proceedings in regard thereto, and his decision that such an extension has been made or has not been made, shall be final.

And the undersigned agrees that no lands of his which shall be included in said San Carlos project, shall, with his consent or without his consent if he can prevent it,

be included in any irrigation, power, drainage, or other district or be burdened with any improvement tax or other lien which shall displace or share with the lien or liens of the United States on account of said San Carlos project, except upon the approval of the Secretary of the Interior.

In the manner hereinabove provided for extending the area of said project, the said project's activities may be extended to include the building and operation of dams and reservoirs, and of transmission lines and all other accessories for the purpose of generating, selling, purchasing, and dealing in electric power; and may include the development of water and the use thereof by said project by pumping or other means and the drainage of the lands of said project and the selling of surplus power and water and water rights: and by the same procedure and without said procedure if the Secretary of the Interior shall deem it proper or shall be authorized or instructed so to do by any act of Congress, the Secretary of the Interior may acquire by condemnation or otherwise any canals, pumps, reservoirs, water rights, electric power, power lines, power rights, rights of way, or other property necessary or useful in connection with said project which now or hereafter may belong to the undersigned or to other owners of private lands in said project, and may extend the main canals of said San Carlos project acquired or made available from the Florence-Casa Grande project and thereby and by acquiring or building an adequate system of lateral ditches may provide for carrying the water of said project to the white lands thereunder, all as a part of the works of and at the cost of said project; but if the United States shall extend said canals or construct a system of lateral ditches for said white lands the Secretary of the Interior is hereby authorized at the cost of said project to expend a sum equivalent to the full cost thereof to said project, for the reimbursement of the United States for purchase or construction of ditches and canals on the Gila River Indian Reservation for the irrigation of Indian lands in said project; and if the United States shall expend money for the acquisition of pumps, wells, electric power, or other property or rights for the utilization of underground waters for the benefit of the white lands of said project, under the authority in this paragraph granted, the Secretary of the Interior is hereby authorized, at the cost of said project, to spend a like sum for a like benefit to the said Indian lands and said expenditures may in his discretion take the form of

reimbursing the United States or said Indians for pumps, wells, and electric power already in existence on said Indian reservation.

The Secretary of the Interior is hereby further authorized, in his discretion, and without further authority than that given hereby, to include in said project any lands he may deem it feasible so to include which may be above the Coolidge Reservoir, and to include them upon such terms as he thinks proper; and is authorized to permit such lands to use the unstored flow of the Gila River in so far as the said project may be entitled to use the same, to the extent that said Secretary shall deem proper and so long as there shall be, in his opinion, water sufficient for the irrigation of the other lands in said project, stored in said reservoir or other reservoirs for said project belonging to the United States or to said project.

There shall be attached and made appurtenant to the Indian and white lands in said project water rights of said project as follows:

All Indian and white lands which shall be in said San Carlos project and under said Coolidge Reservoir shall be entitled to share equally in all of the stored and pumped water of said project in so for as that shall be physically feasible, and said lands shall share equally in all of the water of said project of every nature as long as the stored and unstored water supply for said project shall be sufficient for the project's needs, and as far as that shall be physically feasible; but when, through lack of stored and pumped water, there shall be an insufficient supply of water for all of the lands of said project lying under said reservoir, the said lands so situated shall enjoy in addition to their proper share of such stored and pumped waters as may be available to the project, but within a proper duty of water allowance, the following rights in the unstored flow of the Gila River, and the Secretary of the Interior of his duly authorized agent shall determine when the stored and pumped supply of water for said project is insufficient as aforesaid: Until the Coolidge Dam is constructed and stored waters are thus made available for said project, and also after the stored and pumped waters of said project shall have been exhausted or depleted as hereinabove just stated, the unstored flow of the Gila River available and susceptible of being diverted for the Indian and white lands of the Florence-Casa Grande project shall be divided between the said Indian and white lands and distributed to such lands whether the same shall than be also included in the San Carlos project or not, in accordance with the so-called

Florence-Casa Grande agreement, and then any surplus that may remain in the said river and be available for other lands included in the San Carlos project shall first go to other Indian lands included in the San Carlos project, and then shall be divided as equitably as may be among the private and public lands of the San Carlos project, which are not also included in the Florence-Casa Grande project.

The Secretary of the Interior or his agents shall from time to time determine and fix the duty of water for all privately-owned lands in said San Carlos project and for said Indian lands, and he is hereby authorized to make reasonable rules and regulations for the use of water and for the management of said project.

The owners of the private lands which shall be included in said San Carlos project hereby authorize the Secretary of the Interior to carry in the canals of said project water other than that belonging to said project, whether the same comes from wells or otherwise, and generally to permit all uses of the facilities and works of said project, all upon such terms of compensation to be applied to the benefit of said project and under such conditions and restrictions as he shall decide to be for the best interests of said project.

Said owners furthermore agree and promise that they will, as soon as possible and under the general direction of the Secretary of the Interior, organize themselves into such a district as the Secretary of the Interior shall direct, so as to handle and control the privately-owned distributing systems leading from said project canals and be able to act as a unit in all dealings with the said Secretary, and said organization in form and nature shall be made in all respect satisfactory to the Secretary of the Interior, and such district which shall embrace the private lands irrigable under said project, shall enter into an appropriate repayment contract in accordance with the terms of the hereinbefore-mentioned act of Congress of June 7, 1924, the execution whereof shall be confirmed by the decree of a court of competent jurisdiction, and which contract, among other things, shall contain an appraisal approved by the Secretary of the Interior showing the actual bona fide value of all private and public lands in said project, fixed without reference to the proposed construction of the said Coolidge Dam, which appraisal may be the one herein made or the one herein provided for, and which contract shall provide that until one-half of the construction charge against said lands shall have been fully paid, no sale of any such lands shall be valid, unless and until the

purchase price involved in such sale is approved by the Secretary of the Interior and shall in all other respects fully conform to the said last-mentioned act of Congress.

It is further agreed that the time of determination of whether the undersigned or any owner of land irrigable under said project is the owner of more than 160 acres of irrigable lands in the said San Carlos project under the said San Carlos Act, shall be the date when the contract between the district to be organized under this agreement, and the Secretary of the Interior as hereinabove provided, shall be approved by a court of competent jurisdiction as in said act provided; and the undersigned hereby agrees to convey in fee to the United States free of all encumbrances to again become part of the public domain, all areas of his above-described lands in excess of 160 irrigable acres which shall have been brought into said project and which he may still own at said date. It is further agreed that any money, notes, or securities received by the United States in payment for such excess lands or made available by the United States to pay for the same, which may be in excess of the sum retained and properly held for the payment of reclamation charges on the lands still held by the undersigned in said project will be promptly paid or turned over to the undersigned by the Secretary of the Interior, if he is or shall be authorized so to do; and the undersigned on his part, agrees promptly to make up any deficiency there may be in reclamation charges on the land retained by him over such sums as the Secretary may withhold for the payment of said charges.

The undersigned and all owners of private or public lands under the said San Carlos project hereby agree that the construction and operation and maintenance charges for said San Carlos project shall be payable, and they agree to pay the same, in accordance with the said last-mentioned act of Congress.

The undersigned in case and to the extent that he is an owner of lands included in the Florence-Casa Grande project, which shall also be included in said San Carlos project, will pay the reclamation and all other charges of said Florence-Casa Grande project as provided in the first above-mentioned act of Congress and in the said Florence-Casa Grande project agreement, or that if now or hereafter authorized so to do will pay the same according to the provisions of the said San Carlos act, and he further agrees that as and to the extent that lands owned by him which are not in the Florence-Casa Grande project are included in the San Carlos project he will pay his full

share of the reclamation and other charges of the Florence-Casa Grande project as determined and in the way specified by the Secretary of the Interior.

The project works and water rights, subject to the individual rights in the San Carlos project and said Florence-Casa Grande project for which provision is herein made, until otherwise provided by Congress, shall be and remain the property of the United States. They shall be under the exclusive control and operation of the United States, except that their care and operation may be placed in the hands of the district herein provided for at the discretion and during the will of the Secretary of the Interior. The United States shall not be under any obligation to deliver water or to distribute the same otherwise than from said project reservoirs and canals. The Secretary of the Interior shall fix the site of the said Coolidge Dam and any other dams that may be built under said project and shall determine where all canals and other works of said project shall be situated and their capacity, and shall determine the kind of dams, canals, and other structures to be built, and he shall also operate and maintain the same and all project works in accordance with the provisions herein and of present and future acts of Congress.

All extensions of main canals and all distributing ditches used to carry the project water to the individual lands in said project shall be built according to, and old ditches shall be made to conform to, designs, specifications, and locations approved by the Secretary of the Interior and shall be made or remade in all respects satisfactory to him, and if he shall so direct shall be operated under rules and regulations made by him.

The Secretary of the Interior shall be under no obligation to deliver water to the various private canals for lands not ready to make beneficial use thereof for irrigation; and those in control of such private canals shall not deliver water to lands under said canals the owners whereof the Secretary of the Interior or his agent shall declare to be in default in any of their payments herein provided for, or which for other reasons shall not be entitled to water. If the owners of the private lands in said project shall fail to provide adequate canals and ditches to carry the water of said project to each legal subdivision of such private lands within two years from the time when water therefor shall be available in said project canals, then the owner or owners of such lands as said private ditches shall not reach within said time shall forfeit the right to have their said lands so situated remain in said project and the Secretary of the Interior may, at his

discretion, declare such forfeitures and exclude said lands from said project, and upon such terms as he shall consider just may substitute other private lands therefor.

In addition to the charge for the whole cost of said San Carlos project, which shall include the cost properly assessable to that project of the aforesaid Ashurst-Hayden Dam and all canals and works of every nature built or now building on account of the present Florence-Casa Grande project, as hereinabove provided, every owner of private lands under said San Carlos project shall also pay for the irrigation of his lands, whether or not has facilities for using said water on his land, or diverting it from said project canals thereto, or has actually so used or diverted it, an operation and maintenance charge to be fixed from time to time by the Secretary of the Interior, based upon the total annual cost of the operation and maintenance of the said San Carlos project, and such charge shall be uniform throughout said project and made upon a per acre or acre-foot basis unless otherwise provided by agreement with said district and with the approval of the Secretary of the Interior. The said operation and maintenance charges as far as the works of the said San Carlos project are concerned which are to be built in addition to those already built to now building for the Florence-Casa Grande project, shall be payable as is provided by the said last-mentioned act of Congress and the rules and regulations of the Secretary of the Interior which shall be made thereunder and under this agreement; but the operation and maintenance charges of said project as far as they appertain to the delivery of water available under the Florence-Casa Grande project shall be due and payable when determined by the Secretary of the Interior. Betterment charges may be added to operation and maintenance charges under said San Carlos project by the agreement between the Secretary of the Interior and the said district.

The undersigned further agrees to furnish the Secretary of the Interior or his agents, within 30 days from demand by any such agent, proper abstracts of title covering his said lands; and failing so to do hereby authorizes him or his agents to obtain the same at said owners expense. Said abstracts, after examination, shall be returned to their owners. The undersigned further agrees that if the Secretary of the Interior shall be of the opinion that the said undersigned is not the owner of the lands hereinabove described, or, being the owner, has been unable to place said lands in said project so that all project charges shall be a first lien thereon, then the Secretary of the

Interior, may, at his discretion, allow the true owner thereof to become a signer of this instruments and represent the said lands or allow other lands to be brought into said project in place thereof.

In case by new legislation Congress shall further facilitate the merging of the Florence-Casa Grande project into the San Carlos project and the organization of said last-named project the Secretary of the Interior is hereby authorized by proper agreements with the said district to comply with such new legislation and arrange for the compliance therewith by all landowners under the said San Carlos project and compliance so made or arranged for, shall be binding upon the undersigned and all parties hereto.

After the Secretary of the Interior shall have approved this agreement as hereinabove provided for, and until the said Coolidge Dam and other project works shall be built and in operation, and the Secretary of the Interior may determine when said project works are in operation for the purposes of this paragraph, the United States shall be under no obligation with regard to the distribution of water for said project, but the Secretary of the Interior through his duly authorized agents may if he finds it practicable and desirable so to do, distribute or provide for the distribution of the waters belonging to said project according to the principles of the foregoing agreement and with special regard to insuring the continuance and protection of present uses and of those contemplated under the San Carlos project and the Florence-Casa Grande project, until such other works are built, in the manner that he shall find feasible and just under the circumstances.

If the Secretary of the Interior shall not approve this agreement within the time hereinbefore limited, then the same shall be of now further effect.

This agreement may be expressed and executed in and by as many separate instruments in the foregoing form, as may be convenient, all of which said instruments shall be taken together as evidencing a joint and several agreement for the organization, construction, and operation of the San Carlos project and the same shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, and assigns of the parties hereto.

IN WITNESS WHEREOF the undersigned ha___ hereunto set__________ hand and seal this ______ day of ___________, 19__.

# EXHIBIT 2

OSM 458

JUN 12

REPAYMENT CONTRACT

BETWEEN THE UNITED STATES AND THE SAN CARLOS

IRRIGATION AND DRAINAGE DISTRICT, ARIZONA

1. THIS AGREEMENT, Made this 8th day of June, 1931, between the United States of America, hereinafter called the United States, acting through the Secretary of the Interior, party of the first part, and the San Carlos Irrigation and Drainage District, a public corporation, of Pinal County, organized and existing by virtue of the laws of the State of Arizona, hereinafter called the District, party of the second part,

EXPLANATORY RECITALS

WITNESSETH:

2. WHEREAS, the Act of Congress of June 7, 1924 (43 Stat. 475-476) commonly called the San Carlos Act, authorized further carrying on of the San Carlos Project, hereinafter referred to as the Project, and among other things required the formation of a District under State law and that an appropriate repayment contract in accordance with the terms of that Act and satisfactory to the Secretary of the Interior be executed by said District; and

3. WHEREAS, By the Act of Congress of March 7, 1928 (45 Stat. 200) the consolidation of the Florence-Casa Grande Project with the San Carlos Project was authorized, and by that Act and previous and subsequent legislation the erection, as part of the San Carlos Project, of a distributing, pumping and drainage system and of works for the development of power at the Coolidge Dam was provided for; and

4. WHEREAS, the requirements of these several Acts have been assented to and forwarded by the execution, by all owners or claimants of private lands whose property might come within the San Carlos Project, of the so-called Landowners' Agreement; said contract being here and hereinafter referred to for purposes of notice and otherwise, and, as may be applicable, made a part hereof; and

5. WHEREAS, in accordance with said acts of Congress and said agreement, the Secretary of the Interior, on the 25th day of April 1928, designated and provided for the inclusion of the public and private lands which are to be brought into said San Carlos Project, at this time and from and including which the District should be and now has been duly formed;

6. NOW THEREFORE, in consideration of the premises and the mutual covenants herein contained, and other valuable considerations, the parties hereto agree as follows:

PROJECT LANDS

A. The lands of the San Carlos Project shall consist of:

(1) such allotted lands in the Gila River Indian Reservation as the Secretary of the Interior under the following limitations, shall designate; said lands, however, under this number (1) of this paragraph A, shall not exceed 50,000 acres, but, within that limitation, may include all irrigable allotments on said reservation which the Secretary of the Interior shall decide are not already adequately supplied with gravity water for irrigation, or and, which, for the benefit of the Indians, their successors and assigns, shall be irrigated under said Project, or which, either as at present located or as the location thereof may be changed, can be feasibly irrigated thereunder, and which he shall from time to time designate as temporarily or permanently entitled to the Indian water rights under said Project; (2) the private and

public lands in Pinal County, Arizona, designated by the Secretary of the Interior under his order of April 25, 1928; (3) Such additional private and public lands as the Secretary of the Interior shall include in said Project by making designations thereof in order to include lands having water rights in the Florence-Casa Grande Project or which in his opinion are otherwise entitled to inclusion under this number (3) of this paragraph A, and which, by reason of not having been offered or for other reasons, thus far have not been included in said Project, but which the Secretary of the Interior may think should be so included. Such lands, however, together with those included in the aforesaid designation of April 25, 1928, shall not exceed 50,000 acres; (4) And such additional lands of any character or situation whatsoever, including Indian Reservation lands, as may be included in said Project from time to time in compliance with law and by agreement of the parties hereto.

B. No lands shall be included in or excluded from the District except upon approval of the Secretary of the Interior, and no private or public lands shall be included in either the District or the Project unless in accordance with all the requirements of law.

C. By agreements between the Secretary of the Interior and the Board of Directors of the District and with the consent of the individual land owners directly involved, corrections in the descriptions of lands in the District may be made; and in like manner the correction of errors, the making of needed eliminations and substitutions, with corresponding adjustments of obligations, the achievement of consolidations, or any other minor readjustments as the Secretary of the Interior may think necessary, may be made by him; and the District will facilitate and carry out,

so far as it lawfully may, any and all such changes.

WATER DISTRIBUTION

7. The stored and pumped water of the San Carlos Project shall be deemed a common Project water supply in which all lands in the project and under the San Carlos Reservoir shall be entitled to share equally, and all such waters shall be distributed to the lands of the project as equitably as the physical conditions permit. Apportionment of such water shall be made by the Secretary of the Interior at the beginning of each annual irrigation season and any increase of the water supply during a particular season may be apportioned likewise. All rights in apportionments theretofore made shall expire at the end of the irrigation season in which made; but the unstored flow of the Gila River to the extent needed to supply them, shall be available to and be divided between Indian and Non-Indian lands and distributed to them and to the lands of the Florence Casa-Grande Project and the San Carlos Project in accordance with their priorities in such unstored waters, which priorities are defined in the Florence-Casa Grande Agreement, (AGREEMENT OF LANDOWNERS TO INDUCE THE SECRETARY OF THE INTERIOR TO UNDERTAKE THE FLORENCE-CASA GRANDE IRRIGATION PROJECT, AND FOR THE BUILDING AND OPERATION THEREOF IN CASE THE SAME IS DECLARED FEASIBLE),.and in the order of designation made thereunder and also in the Land Owners' Agreement herein referred to. The foregoing determination of water rights shall control in regard to such rights belonging to said projects.

USE OF PROJECT WATERS

All water and water rights of the San Carlos Project and opportunities connected therewith shall be used for the advantage of that project.

## DISTRIBUTION LOSSES

In dividing the unstored waters between the Indian and private and public lands, losses of water in the Florence-Casa Grande Project Canals, and in them only, shall be prorated, but in distributing the stored and pumped water, losses in all project canals shall be borne by the project as a whole.

## PROJECT WORKS

8. The works of the San Carlos Project do and shall consist of the Coolidge Dam and the San Carlos Reservoir, and everything pertaining thereto, including the Power Plant and transmission line to Hayden; the Ashurst-Hayden Dam and the canals and other works of the Florence-Casa Grande Project, as said works are defined in the Florence-Casa Grande Agreement, subject only to interests therein outstanding on account of the few acres in that project which may not have been or be brought into the San Carlos Project; the Pima Lateral from that part of it which forms a portion of the works of the Florence-Casa Grande Project to the boundary of the Indian Reservation; the North Side Syphon and canal to the boundary of said reservation; the old and new Casa Grande Canals; the old Florence canal, the Picacho Reservoir and all other private irrigation works and structures, which have been or may be conveyed to and accepted by the United States on account of said Project; together with the laterals of the several said canals which do or shall serve the lands of the Project down to 160 acre units; the irrigation works within the Indian Reservation consisting of the North Side Canal from the Reservation line to its end, the Pima Lateral to the Sacaton Dam, the Little Gila Canal from the point where it leaves the Pima Lateral to its end about 2 miles below Sacaton, the Casa Blanca Canal from its heading at the end

of the Little Gila Canal to its end in Section 22, T. 4S., R. 4 E., that part of the Sacaton Dam which is used and useful as a diversion dam and conduit for irrigation water, the Santan Canal from its heading at the Sacaton Dam to its end in Section 14, T. 3S., R. 5 E., together with the laterals of the Several said canals which do or shall serve the Indian lands of said project down to 160 acre units, said laterals, however, not to extend west of the Southern Pacific Railway line from Maricopa to Phoenix; all pumping and drainage works now owned or to be acquired or constructed under existing appropriations; and, finally, all other works, built or acquired in the future for the Project under agreements between the Secretary of the Interior and the District.

OPERATION AND MAINTENANCE

9. The Government, through its duly appointed agencies, will continue to maintain all of the project works, and the District until December first of the year following the issuance of the public notice, fixing the construction charge of the Project, will continue to operate at the expense of the District such of the works of the Project within the limits of the District as the Secretary of the Interior, or his agents, think proper. Beginning December 1st of the year following the date of the issuance of the said public notice the Secretary of the Interior may from time to time designate and turn over to the Irrigation District the operation and/or maintenance of such works within the limits of the District, as may be deemed necessary for the irrigation of District lands, and the District agrees to accept the operation and/or maintenance of such works.

COST OF OPERATION AND MAINTENANCE

Except when certain works of the Project within the District shall be operated and/or maintained by the District and at its expense and works of

the Project used exclusively for distribution of water to the lands on the Indian Reservation shall be operated and/or maintained by the United States and at the expense of said lands or the United States, the whole cost of operating and maintaining the works of the Project, after sums collected for excess water and other sums which may go to the operation and maintenance fund as provided herein have been deducted, shall be divided equally on a per acre basis among all of the lands of the project and regardless of whether they are irrigated or not.

When one year after the public notice aforesaid shall have been issued, if the operation and/or maintenance of the works of the district is turned over to the district, the remaining works of the project not used exclusively for the distribution of water to the lands on the Indian Reservation shall be considered reserved or joint works and payment for the cost of the operation and maintenance of such reserved or joint works shall be divided equally on a per acre basis among all of the lands of the project and also a surcharge may be placed against all of the lands of the project for paying the cost of operating and maintaining the pumps and equipment used for pumping drainage or irrigation water, without reference to where such pumps are located; and if the United States permits certain works of the Project within the District to be operated by the District and at its expense while the United States retains the maintenance thereof the Secretary of the Interior may charge to the District the cost of such maintenance as determined by him, thereby requiring the District to pay the cost of maintaining the project's works within its borders thus turned over to it, and leaving the United States or the Indians to pay the cost of maintaining the Project works within the Indian Reservation. In addition to the payment of its proportionate

share of the whole cost of said San Carlos Project, the District agrees to collect a minimum operation and maintenance charge for each acre of land in the District, based upon a delivery of two acre feet of water per acre, additional water to be delivered upon payment of an additional charge, in accordance with the quantity of water used. Operation and maintenance for the reserved works and maintenance charges for works operated, but not maintained, by the District shall be fixed annually by the Secretary of the Interior and paid to the United States by the District. The Secretary of the Interior will give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts.

CONTROL AND MANAGEMENT

10. Ownership of the Project works shall remain in the United States unless and until otherwise provided by Congress. The Secretary of the Interior, under regulations made by him, may apportion the stored and pumped water and fix the duty of water and fix all charges for deliveries of water, and in order to prevent improvident uses of water and to provide an operation and maintenance fund a minimum or basic per acre quantity of water, to the extent that it may be needed, shall be delivered annually to and the same, as covered by the operation and maintenance charge or separately at a fixed basic price, shall be charged against and paid for on account of, each acre of private or public land in the project whether actually used or not, but any greater amount of water shall be paid for separately at the same or a higher or lower rate; and the Project managers under the control of the Secretary

of the Interior, when the situation warrants, may deliver excess water free on an equitable basis; but apart from such excess water, all water delivered by the Project to said lands including that delivered on account of priorities in the natural or unstored flow, as well as stored and pumped water, shall be charged for at the rates and upon the terms above provided, which rates and terms shall be announced from time to time by the Secretary of the Interior.

INDIANS SHARE OF OPERATION AND MAINTENANCE COST

11. The Secretary of the Interior agrees to use such means as are open to him and as he deems effective and expedient, to make available to the Project on account of the Indian lands included therein, their share of the total cost of operating and maintaining the Project, and also like charges for water for said lands as are herein provided to be paid on account of non-Indian lands.

LEASE OR SALE TO MUNICIPALITIES

12. The Secretary of the Interior may in accordance with law, and for the interests of the Project, supply water for irrigation and other purposes to the State or its subdivisions, municipalities, towns, and villages, whether incorporated or not, public institutions, and departments and agencies or enterprises of the United States, including agricultural experiment stations, Indian agency grounds and gardens; and may use the canals, and works of the Project for the storage, transport, and delivery of water belonging to others; all, however, upon terms to be fixed by the Secretary of the Interior at one time or from time to time as he may determine.

APPLICATION OF REVENUES - SALE OF WATER

13. The sums collected by or for the benefit of the Project except for the sale of a permanent water right on any and all of the foregoing accounts or upon any account not above or hereinafter otherwise specifically provided

for, shall go to pay a proper share of the cost of operating and maintaining the Project, however it may be operated or maintained. The sums collected for the sale of permanent water rights shall be applied to reduce the principal of the debt owed by the Project to the United States, in accordance with the repayment amortization plan hereinafter set forth.

EQUALIZATION OF EXPENDITURES

14. The provisions of the Landowners Agreement limiting Project expenditures for the extension of the distributing and pumping system for the Indian Reservation to sums expended for extension of the distributing and pumping system for the public and private lands of the project was and is not intended to establish a fixed policy of equal division of the Project expenditures between the Indian and non-Indian areas, it being realized that drainage, the utilization of drainage water, and other problems of a project nature, will necessarily transcend such limits, ~~and that the costs of their solution~~ should be borne by the Project as a whole, regardless of where they may arise. Provisions for undertaking such work at project expense, by the Secretary of the Interior and the District agreeing thereto, are made both in the Landowners' Agreement and in this instrument.

REPAYMENT OF EXPENDITURES

The costs of the Project incurred under appropriations already made, pursuant to the Act of June 7, 1924, and subsequent Acts and under the Land Owners'

Agreement, shall be repaid to the United States. These costs, to and including June 30th, 1930, are agreed to be as follows:

(a) The Coolidge Dam and San Carlos Reservoir and all other items connected therewith, including among other things railroad removal, payment for Indian lands, power development at said dam and the transmission line to Hayden, have cost $6,042,094.84, of which the power development alone has amounted to $475,840.09.

(b) The Ashurst-Hayden Dam and the canals and other works of the Florence-Casa Grande Project, have cost $966,453.86.

(c) The remaining costs of the San Carlos Project to said date of June 30, 1930, including maintenance and operation of the whole Project, amount to $1,456,556.61, which costs include those of the North Side Syphon and canal to the Indian Reservation which serves some 3000 acres of public and private lands and some 1500 acres of Indian lands and has cost $106,244.88; the Pima Lateral beyond that part of it which belongs to the Florence-Casa Grande Project to the boundary of the Indian Reservation which serves some 5000 acres of public and private lands and some 48,500 acres of Indian lands and has cost $163,992.09; and such costs also include the costs of the Casa Grande Canal from its beginning at the Picacho end of the Florence-Casa Grande Project canals to its terminus near the city of Casa Grande, together with its laterals, and the laterals from the Florence-Casa Grande Project, and those of all of the canals above mentioned, down to the boundary of the Indian Reservation and all operation and maintenance costs which are to be consolidated with construction costs, incurred, and also expenditures and allowances on the Indian Reservation as hereinafter defined.

The costs of the purely non-Indian distributing system and other items including Land Office surveys, etc., to the date above mentioned (June 30, 1930) have amounted to $602,400.95 and therefore the sum available at said last mentioned date for works or allowances on the Indian reservation to balance said purely non-Indian expenditures are a like amount, $602.400.95, and the purely Indian distribution system to said date as constructed out of appropriations made after June 7, 1924, has cost $431,509.69, leaving an allowance in favor of the Indian Reservation of $170,891.26.

In accordance with the foregoing, the cost of the San Carlos Project to June 30, 1930, has amounted to $8,494,205.03, which sum is made up of an actual expenditure of $8,323,313.77 plus said allowance for said Indian Reservation of $170,891.26.

Project costs in addition to the above shall include the sums expended for said Project under the appropriation acts for the Indian Service for the Project for the fiscal years ending June 30, 1931 and June 30, 1932 respectively (which appropriated in the aggregate $1,233,000), in the amounts thereof spent for operation and maintenance of said project from said June 30, 1930 to July 1, 1932; the sums spent for construction of works serving both Indian and public and private lands, including those spent for pumps, wells and equipment used for pumping of drainage or irrigation water, without reference to where such pumps are located; the sums spent for construction of the distribution system serving only public and private lands, plus an equal amount for construction of the distribution system serving only Indian lands, plus also the aforesaid allowance in favor of constructing the distributing system for the Indian lands of $170,891.26; ~~and such further appropriations for said project [illegible] made in accordance with recommendations of the Secretary~~

of the Interior with the assent of the District as expressed by its Board of Directors and shall be expended by said Secretary for said project, or shall be made without such assent in case the Secretary of the Interior or Congress thinks it necessary to expend money to safeguard the Project.

In accordance with the foregoing the costs of the San Carlos Project as fixed by the public notice to be issued as aforesaid, unless further sums shall be agreed to by the Secretary of the Interior and the District after the execution of this instrument, may amount to but shall not exceed the sum of $9,556,313.77, except that said total may be exceeded by the inclusion of any sums expended to safeguard the Project as hereinabove provided for, and any sums expended on account of contingent liabilities as in the next paragraph hereof provided.

The foregoing and subsequent statements of Project costs, the District's share of which are to be repaid hereunder, unless otherwise provided by Congress more favorably to the lands of the Project, may be increased by the addition of sums not now fixed as Project charges but which possibly constitute contingent Project liabilities incurred after the date of the San Carlos Act of June 7, 1924, or incurred on account of the Florence-Casa Grande Project, and so may become Project charges by the judgment of courts of competent jurisdiction or of other proper authority.

WHEN PUBLIC NOTICE ISSUED

The public notice required by the San Carlos Act shall be issued on December 1, 1931, unless the time therefor shall be extended by the Secretary of the Interior. When such notice is issued, it shall fix the costs of the Project so far as they have been incurred at that date, and as hereinabove provided, but in no wise shall relieve the lands of said Project or the owners thereof or the District, from the obligation to pay their proportionate

share of the full costs of the Project that may be incurred subsequent to that time.

FIRST PAYMENT OF CONSTRUCTION CHARGES

On the first day of December of the third year following the date of the public notice, the District shall pay to the United States for each acre in the District five percentum of the sum fixed as the per acre charge for construction of the said project to the date of and as defined by said public notice.

Thereafter the said District shall pay each year to the United States for each acre in the District five per centum of the remainder of the per acre sum determined in said public notice less the amount of such initial payment. Such sums shall be paid each year by the District until the entire indebtedness to the United States for the lands within the District on account of the sum fixed in the public notice and for additional expenditures made subsequent to the date of public notice as herein provided with interest shall have been discharged, such principal indebtedness being augmented by four per centum interest upon the District's share of all sums expended by the United States on account of said Project, said interest accruing from the date of said public notice; and the repayment part of the said San Carlos legislation of June 7, 1924, is interpreted by the parties hereto to mean that the yearly amortization payment from the beginning will go to pay the principal and interest of the remainder left after the deduction of the five per centum of the construction cost, which constitutes the first payment, and therefore that the interest accruing between the date of the public notice and the first year of payment of regular construction cost sums under the amortization plan shall be paid after all other payments due hereunder have been made and such

payments shall be made at the rate of the fixed annual amortization payments herein provided for.

As to all sums expended by the United States as hereinabove provided for, between the date of said public notice and the date of the first payment hereinabove provided for and thereafter, the District shall repay to the United States its share of such expenditures in full, and in the same general manner, and with interest at the same rate, as hereinabove provided for the repayment of the sums named in the public notice and as Congress or the Secretary of the Interior shall direct; the purpose being that all sums expended upon said Project, whether before or after the issuance of said public notice, shall be repaid to the United States with interest on deferred amounts at the rate stated and in accordance with the plan of the San Carlos Act, and that the specific manner and dates of payment of expenditures made after the first public notice shall be determined by further public notices.

NET POWER REVENUES

The net power revenue from the Coolidge Dam plant of the San Carlos Project shall be used as provided by the hereinabove mentioned Act of March 7, 1928, and shall in accordance with the plan of that Act reduce the sum to be paid thereunder which plan is hereby interpreted to make these power payments effect a reduction of principal during the fiscal year in which received, but the receipt of such revenues shall not reduce the annual sum to be paid by the land owners on account of their lands or the District until with the addition of these payments the entire debt is discharged. That is to say, the landowners and the District shall continue to pay each year their share of the sum initially fixed in the public notice, and of the sums fixed in subsequent notices or determinations; and the benefits to accrue to them through revenues from such

power shall shorten the time during which these payments shall be made, but shall not diminish these annual payments until the entire debt has been extinguished.

DATE OF BEGINNING PAYMENT, OPERATION AND MAINTENANCE

In addition to its proportion of the charge for the whole cost of said Project, the District shall also pay an operation and maintenance charge to begin one year after the issuance of the public notice and to be fixed from time to time in advance by the Secretary of the Interior, based upon the annual cost of the operation and maintenance of the San Carlos Project.

Operation and maintenance charges shall be paid annually, in advance, not later than March 1st, no separate charge being made, however, for operation and maintenance for the first year after the issuance of the said public notice; and the right is reserved to the Secretary of the Interior or his agent and to the District to refuse to deliver water to any one delinquent in paying such charges, or any charges due the United States or the District.

PROMPT PAYMENT OF CHARGES

The District shall, and hereby agrees to, repay to the United States that part of the cost of the San Carlos Project, due and payable on account of lands within the District, and will make such payments promptly as provided by the aforesaid acts of Congress, and this agreement.

POWER DEVELOPMENT

In anticipation of the development by the Project of power sites below the San Carlos Reservoir, the District agrees that in case such sites should not be developed through financing by the United States, and should be developed under the leadership of the District, the Indians of the Gila River

Indian Reservation whose lands are within the Project, as represented by the Federal Government, shall have an equal right with the owners of non-Indian lands, to participate in the expenditures for and receive the benefits of such power development to the extent that such participation is or may be made feasible by law and may be approved by the Secretary of the Interior, and when such developments are made or provided for by contract between the United States and the District.

POWER FOR SAN CARLOS RESERVATION

In compliance with the requirements of the Second Deficiency Act, of the fiscal year 1928, power shall be furnished by the San Carlos Project from the power plant at the Coolidge Dam for agency and school purposes and for pumping for irrigation by Indians on the San Carlos Reservation at a cost not exceeding 2 mills per kilowatt hour, delivered at the switch board at the Coolidge Dam.

APPRAISEMENT AND CONVEYANCES

The San Carlos Act having provided that an appraisement approved by the Secretary of the Interior of private and public lands irrigable under the Project should be made, "showing the present actual bona fide value of all such irrigable lands, fixed without reference to the proposed construction of said Coolidge Dam", and such appraisement now having been made, it is herein incorporated by reference, the original thereof being in the office of the Secretary of the Interior, with copies in the Project offices of the Indian Irrigation Service and of the San Carlos Irrigation and Drainage District in Arizona.

SALE OF LAND

Since the San Carlos Act among other things provides "that until one-

half of the construction charges against said lands (private and public lands) shall have been fully paid, no sale of any such lands shall be valid unless and until the purchase price involved in such sale is approved by the Secretary of the Interior," it is hereby agreed that the Secretary of the Interior will make all necessary and convenient arrangements for passing upon sales of that character; and it is further agreed, as said act provides, that "upon proof of fraudulent representation as to the true consideration involved in any such sale, the Secretary of the Interior is authorized to cancel the water right attached to the land involved in such fradulent sale."

Any land owner at any time may pay half of the reclamation charge against his land at that time, or pay the whole charge thus assessed; provided, however, that facilities for such payment exist or may be made and the same are sanctioned by law. Such payment, however, shall not relieve such owner or his lands of charges for operation and maintenance of the Project or any other costs or charges of any nature of a continuing character or which may be incurred after such payment.

DISTRICT TO USE TAXING POWER

Pursuant to the provisions of the laws of the State of Arizona, and of the United States, and regulations established thereunder, the District will cause to be levied and collected all necessary assessments against the tracts of land now or hereafter included in the District designated by the Secretary of the Interior, to meet the terms of this agreement, and will use all the powers and resources of the District, including the taxing power and the power to withhold delivery of water, to collect and pay to the United States all charges authorized under this agreement in full on or before the day that the same become due.

BOOKS OF ACCOUNTS

However the Project may be operated, whether entirely or partly by the United States, or entirely or partly by the District, full and accurate accounts shall be kept at all times by both the United States and The District of all receipts and expenditures and other fiscal operations in connection with the Project, and such accounts and the books showing them, and also all records, maps, plans, estimates, budgets and engineering data of the United States and the District concerning said Project, at all reasonable times, shall be open to the inspection of the United States and its agents, and of the District and its representatives and of all persons properly interested; and the United States and the District shall inform and consult with each other as to contemplated future steps of importance.

ALL BENEFITS CONDITIONAL UPON PAYMENT

Should any assessment, or assessments, authorized by the terms of this agreement and levied against any tract of land in the District be held illegal or void, or the District or its officers be enjoined or restrained from making or collecting any assessment provided for herein from any tract of land in the District at the instance of the owners or holders of such tract of land, then such tract shall have no right to any of the benefits of this contract and no water furnished through any works constructed by the United States shall be delivered to or for such tract, or tracts of land, until construction and operation and maintenance charges on the terms and conditions provided for herein shall have been paid by the landowners. It is further agreed and understood that the payment of construction and operation and maintenance charges on the terms and conditions provided for herein is a prerequisite to the right to

receive water from any of the works constructed by the United States and no irregularity in levying assessments by the District, or lack of authority in the District, whether affecting the validity of District assessments or not, shall be of any effect to authorize any landowner of the District to demand or receive water made available through irrigation works constructed by the United States unless construction and operation and maintenance charges, on the terms and conditions provided herein, have been paid by such landowner.

REFUSAL OF WATER BECAUSE OF DEFAULT

The United States reserves the right to refuse to deliver water to the District in the event of default by the District for more than twelve months in any of the payments due the United States hereunder. The provision of this article is not exclusive and shall not in any manner hinder the United States from exercising any other remedy to enforce collection of any amount due.

FAILURE OF THE DISTRICT TO LEVY ASSESSMENT

The United States reserves the right to cancel this contract if the District fails to levy any assessment called for herein. The provisions of this paragraph are not exclusive and shall not in any manner hinder the United States from exercising any other remedy to enforce collection of any amount due the United States under the terms of this contract.

PENALTY FOR DELINQUENCY IN PAYMENT

To every instalment of money required to be paid under this agreement which shall remain unpaid after the same shall have become due, there shall be added at once a penalty of one-half of one per centum thereof, and thereafter a like penalty of one-half of one per centum on the first day of each month so long as such default shall continue, and the District hereby agrees

to pay said penalty.

PUBLIC LAND SUBJECT TO ASSESSMENT

The unentered public lands and entered lands for which no final certificate has been issued, located within the District, and described in a statement marked Exhibit "A" attached hereto and made a part hereof, are hereby designated as subject to the provisions of the act of August 11, 1916 (39 Stat. 506); and made taxable thereunder, provided, however, that unentered public land, while in that status, shall not be assessed by the District for any purpose.

AGREEMENT SUBJECT TO APPROPRIATIONS BY CONGRESS

Where the operations of this contract extend beyond the current fiscal year, the contract is made contingent upon Congress making the necessary appropriations for expenditures hereunder after such current year shall have expired. In case such appropriation as may be necessary to carry out this contract is not made, the District hereby releases the United States from all liability due to the failure of Congress to make such appropriation.

CONFIRMATORY PROCEEDINGS

The execution of this contract shall be authorized by vote of the qualified electors of the District present and voting at an election held for that purpose as provided by law, and thereafter if the electorate of the District vote their approval of this contract, the Board of Directors of the District will file promptly in the Superior Court of Pinal County, Arizona, a petition praying, in effect, that this contract and the proceedings leading up to the execution of the same, as required by this contract, may be examined, approved, and confirmed by the court. The special proceeding herein agreed to be taken by the Board of Directors of the District shall in all things in manner and form be in strict compliance with the provisions of the laws of Arizona. The District shall furnish the United States for its files certified copies of all proceed-

ings relating to the authorization of this contract.

RULES AND REGULATIONS

There is given and reserved to the Secretary of the Interior the right to make regulations and to modify the same in his discretion, in general harmony, however, with the Land Owners' Agreement and this contract, to the end that the true intent of the law and of this contract and that agreement shall be carried into full effect.

CHANGE IN DISTRICT

While this contract is in effect no change shall be made in the organization of the District, by consolidation or merger with another district, by proceedings to dissolve, or otherwise, without the consent of the Secretary of the Interior; and the District shall not incur unusual obligations, or those which in the opinion of the Secretary of the Interior may impair the investment of the United States, and shall not undertake any major enterprises without the approval of the Secretary of the Interior.

LAND OWNERS' AGREEMENT FILED IN INDIAN OFFICE
AT COOLIDGE, ARIZONA

All owners of lands thus far designated to be included in the San Carlos Project and which are those included and are in the San Carlos Irrigation and Drainage District, have executed the Land Owners' Agreement hereinabove referred to. Said agreement is in form as shown by the originals which are in the office of the United States Indian Service, in the City of Coolidge, Arizona, and are there open to inspection, and is identical as executed by individuals except for variations as to owners, descriptions of lands, and waivers of mortgages and other liens in favor of the United States; and all lands within

said San Carlos Project of a private or public nature, being all except Indian lands, are subject to the liens and other obligations created by the execution of said Land Owners' Agreement, which agreement remains in full force and effect.

DISTRICT TO RECEIVE BENEFIT OF SUBSEQUENT LEGISLATION

The District shall receive the benefit of any future legislation enacted by Congress in the same manner and to the same extent as though this contract had not been made.

No member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

This agreement shall inure to the benefit of and be binding upon the District and its successors and assigns, and the United States and its assigns.

IN WITNESS WHEREOF the parties have hereto signed their names the day and year first above written.

THE UNITED STATES OF AMERICA

By ____________________
SECRETARY OF THE INTERIOR

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT

ATTEST:

____________________
SECRETARY

By ____________________
PRESIDENT

Approved as to form this

27th day of April, 1931.

Exhibit "A"

Department of the Interior
U. S. Land Office, Phoenix, Arizona.

March 18, 1931

SE$\frac{1}{4}$, Sec. 17, T-6S, R-8E.
SE$\frac{1}{4}$SE$\frac{1}{4}$ Sec. 6, T-5S., R-9E.
S$\frac{1}{2}$NW$\frac{1}{4}$ Sec. 28, T-5S., R-9E.
SE$\frac{1}{4}$ Sec. 35, T-6S., R-6E.
SE$\frac{1}{4}$ Sec. 13, T-6S., R-7E.
S$\frac{1}{2}$SE$\frac{1}{4}$ Sec. 26, T-6S., R-7E.
N$\frac{1}{2}$SE$\frac{1}{4}$ Sec. 33, T-6S., R-7E.
Lot 3 and NE$\frac{1}{4}$SW$\frac{1}{4}$ Sec. 30, T-6S., R-7E.
NW$\frac{1}{4}$ Sec. 31, T-6S., R-7E.
Lot 1, Sec. [illegible], T-6S., R-8E.
N$\frac{1}{2}$SW$\frac{1}{4}$ Sec. 21, T-6S., R-8E.
S$\frac{1}{2}$SW$\frac{1}{4}$ Sec. 21, T-6S., R-8E.
N$\frac{1}{2}$SE$\frac{1}{4}$ Sec. 29, T-6S., R-8E.
NW$\frac{1}{4}$ Sec. 30, T-6S., R-8E.
Lots 1, 2, 3 and 4 and E$\frac{1}{2}$W$\frac{1}{2}$ Sec. 7, T-6S., R-9E.
SW$\frac{1}{4}$ Sec. 1, T-7S., R-6E.

All of G. and S. R. B. & M.

I hereby certify that according to the tract books of this office all of the above described lands are in unperfected entries and that final certificates or patents have not issued for any of the lands.

Respectfully

(Signed) Henry A. Morgan,
Register.

# EXHIBIT 3

# FIRST SUPPLEMENT TO THE REPAYMENT CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND THE SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, PROVIDING FOR REPAYMENT OF CHARGES AND OPERATION OF WORKS OF THE SAN CARLOS PROJECT, ARIZONA

NOVEMBER 12, 1935

I-Sec.-192

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT
SAN CARLOS PROJECT, ARIZONA

1. THIS AGREEMENT, supplementary to the Repayment Contract between the United States of America and the San Carlos Irrigation and Drainage District, dated June 8, 1931, made this 12th day of November, 1935, between the United States of America, hereinafter called the United States, acting through the Secretary of the Interior, party of the first part, and the San Carlos Irrigation and Drainage District, a public corporation of Pinal County, organized and existing by virtue of the laws of the State of Arizona, hereinafter called the District, party of the second part.

EXPLANATORY RECITALS

WITNESSETH:

2. WHEREAS, by an Act of Congress approved June 5, 1934 (48 stat. 881), the Act of Congress approved June 7, 1924 (43 Stat. 475-476), and supplements thereto were amended by said Act, which reads as follows:

"BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED, That the Act of Congress approved June 7, 1924 (43 Stat. 475-476), commonly called the 'San carlos Act', and Acts supplementary thereto, including the Act of Congress approved March 7, 1928 (45 Stat. 210-212), and Acts

supplementary thereto, be, and the same are hereby, amended so as to provide that the construction cost of the San Carlos Project, including the cost of the power development at the Coolidge Dam and the transmission line or lines shall be repaid without interest and that part thereof to be paid on account of the lands in public or private ownership shall be repaid in forty equal annual installments beginning on December 1, 1935, the date fixed by the public notice heretofore issued by the Secretary of the Interior. The Secretary of the Interior, with the consent of the San Carlos Irrigation and Drainage District, is hereby authorized to modify the existing repayment contract in accordance herewith",

and,

3. WHEREAS, the said Repayment Contract provides that the Secretary of the Interior will give notice to the District of the amount of operation and maintenance charges to be paid annually in sufficient time to permit the District to make the annual tax levies or toll charges in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts, and, in addition requires that the operation and maintenance charge must be paid in advance, and not later than the first day of March of each year and provides a penalty of one-half of one per centum of the amount delinquent shall be added at once and that a like penalty of one-half of one per centum shall be added on the first day of each month thereafter so long as such default shall continue, and

4. WHEREAS, under Arizona law the second half of tax payments do not become delinquent until the first Monday in May and as a consequence the District has encountered considerable difficulty and been placed at additional expense in complying with the provision of said Repayment Contract requiring payment in advance and not later than March first of each year, and

5. WHEREAS, there exists a need to transfer lands and water rights on the non-Indian part of the San Carlos Project, so that poor lands or lands inconveniently situated within that Project may be eliminated therefrom and from the San Carlos Irrigation and Drainage District, and good and conveniently located lands now outside of said Project and District may be substituted therefor with appropriate transfers of water rights; and Project and district lands taken into towns, and lands used for industrial or other non-agricultural purposes, or lands acquired by Federal or State Government, may be eliminated with or without appropriate substitution, and,

6. WHEREAS, it is desirable that unless and until the Project area can safely be increased, the non-Indian lands shall be kept at 50,000 acres;

7. NOW, THEREFORE, in consideration of the promises and mutual agreements herein contained, and other valuable consideration, the parties hereto agree as follows:

(a) Construction costs of the San Carlos Project, as to lands contained in the San Carlos Irrigation and Drainage District, shall be paid as said statute approved June 5, 1934, provides, i.e. "without interest and in forty (40) equal annual

installments beginning on December 1, 1935"; and the District t agrees to make all payments and collections, levy all assessments as provided in the so-called Repayment Contract to which this is a supplement, except as such payments are changed by said Act approved June 5, 1934.

(b) In order to facilitate transfers of lands and water rights so as to eliminate poor land from the Project and District and substitute better land and make other substitutions for the benefit of the Project and the District, it is agreed that when such a transfer or substitution is made as between the landowners and the proper deeds and other papers are presented to the Project Engineer and the District and appropriate orders and approval of the Secretary of the Interior promulgated, the new land shall be entitled to take the place of the old Project lands with the same water right, and Project and District payments made on account of the old land shall inure to the benefit of such new land.

(c) Since by the terms of the San Carlos Act, operation and maintenance charges must be paid in advance and not later than on March 1 of each year, and since under Arizona law the second half of tax payments are not delinquent until the first Monday in May, and since at that time the irrigation season is not far advanced and the District is only able to collect such charges generally as when the farmers request water, and so is placed in default with the United States on March 1 for any delinquent amount, and must pay a penalty under the June 8, 1931 Repayment Contract, it is agreed that the penalty provision of that

Repayment Contract, in so far as operation and maintenance charges or assessments are involved, is hereby modified to provide that hereafter a penalty of one-half of one per cent per month shall attach for each and every month or fraction thereof during which any installment or part thereof of the operation and maintenance charges or assessments remain due and unpaid on and after May 15 of each year.

No Member of or Delegate to Congress or resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

Nothing herein shall be construed as in any way modifying or amending the original Repayment Contract except as herein specifically provided for; said original Repayment Contract otherwise remaining in full force and effect.

IN WITNESS WHEREOF the parties have hereto signed their names the day and year first above written.

ATTEST: 12th day of November, 1935.
LEON M. NOWELL, Secretary

THE UNITED STATES OF AMERICA

By: (Sgd.) CHARLES WEST,
Secretary of the Interior

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT

By: (Sgd.) R. W. KENWORTHY,
President.

Aug. 6, 1935.
Approved as to form:
(Sgd.) OSCAR L. CHAPMAN,
Assistant Secretary.

Resolution

At a special meeting of the Board of Directors of the San Carlos Irrigation and Drainage District held at Coolidge, Arizona on November 12th, 1935, all directors being present, the following was adopted:

WHEREAS, in accordance with the Act of Congress of June 7, 1924 (43 Stat. 475-476) commonly called the "San Carlos Act", and the Act of Congress of March 7, 1928 (47 Stat. 200), and previous

**NOTICE OF DIRECTLY RELATED CASES**

Pursuant to Rule 40.2, Rules of the United States Court of Federal Claims, the undersigned certifies that, on information and belief, there are no pending cases that involve the same parties, claims, contracts, or property as those alleged in this complaint.

DATED this 4th day of August, 2006.

By [signature]

Riney B. Salmon II
SALMON, LEWIS & WELDON, P.L.C.
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016
(602) 801-9060 (office)
(602) 801-9070 (facsimile)