FIELD LAWDAHL, PLLC
CERTIFIED PUBLIC ACCOUNTANTS

5727 NORTH 7TH STREET, SUITE 206
PHOENIX, ARIZONA 85014
OFFICE (602) 265-0200 FAX (602) 265-5101

# Expert Report of Lawrence Field, CPA

On Behalf of Field Lawdahl, PLLC

In the matter of Case No. 06-576C
Pending in the United States Court of Federal Claims

**November 29, 2007**

## GENERAL

This report has been prepared for use in Case No. 06-576C, hereinafter the "Case," pending in the United States Court of Federal Claims. Field Lawdahl, PLLC, hereinafter "we" or "our", was engaged in this Case by Salmon, Lewis & Weldon, P.L.C. on behalf of the Plaintiff in the case, San Carlos Irrigation and Drainage District ("SCIDD") via letter dated October 15, 2007. Our main contact in this matter has been Riney B. Salmon II of Salmon, Lewis & Weldon, P.L.C. We have also been in contact with Ronnie P. Hawks of Salmon, Lewis & Weldon, P.L.C. and have conducted an interview of Doug Mason, SCIDD's General Manager. We have utilized two professional staff on this engagement and a minimal amount of administrative staff. Our fees have been charged at standard hourly billing rates. Mr. Lawrence Field's ("Field") hourly billing rate for the duration of this project has been $300. Ms. Diane Burton's ("Burton") hourly billing rate for the duration of this project has been $185. We estimate that fees for services performed on this project, through the date of this report, will approximate $29,000.

## SCOPE OF SERVICES

In accordance with the engagement letter related to this Case (see Exhibit 1), Mr. Salmon informed us of the scope of services that were to be performed in this matter. We were requested to provide expert opinions on the propriety, accuracy and completeness of financial presentations being provided to SCIDD by the Bureau of Indian Affairs ("BIA") for the San Carlos Irrigation Project ("Project"). Mr. Salmon further requested, in the event that we concluded that any of the financial presentations provided by BIA to SCIDD were not accurate, complete or representative that we include information in this report supporting those conclusions. We were not requested to determine if any financial information included in the presentations provided by BIA to SCIDD included any individual expenses that were unnecessary or unreasonable.

## PROFESSIONAL STANDARDS / STAFF ASSIGNED

We performed our services in this engagement in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA"). These standards, as referenced in the AICPA's "Consulting Services Special Report 03-1" include complying with the AICPA "Code of Professional Conduct and Bylaws". The sections of the Code of Professional Conduct that have particular applicability to the performance of litigation consulting and expert witness services are the Rules in the Code of Professional Conduct, which are generally referred to as the ethical or ET standards, and the "Statement on Standards for Consulting Services", generally referred to as the consulting or CS standards. In adherence with this authoritative literature, we assigned Field and Burton to perform the services required on this engagement. Field's resume is attached hereto as Exhibit 2 and Burton's resume is attached hereto as Exhibit 3.

The opinions stated in this report are the opinions of Field Lawdahl, PLLC as expressed by Field. There were no disagreements between Field and Burton as to the opinions expressed in this report.

**QUALIFICATIONS TO PROVIDE EXPERT OPINIONS**

As is noted in the immediately preceding section of this report, Field's resume is attached to hereto as Exhibit 2. A more detailed review of Field's, hereinafter "I" or "my", qualifications to provide expert opinions on the subject matter defined within the "Scope Of Services" section of this portion of this report is as follows:

1) Twenty-six years as a licensed certified public accountant in the state of Arizona including twenty-two years in the practice of public accounting specializing in auditing, accounting services, forensic accounting services, litigation support services and investigative services.
2) Seventeen years of service to the certified public accounting profession through participation on the Governing Council of the AICPA, participation on the Board of Examiners of the AICPA and participation on the Board of Directors of the Arizona Society of Certified Public Accountants.
3) Three years as the Director of Finance, Treasurer and Chief Financial Officer of Swensen's, Inc, a publicly traded corporation.
4) Seventeen years as an investigative reviewer for the Arizona State Board of Accountancy. Assignments as an investigative reviewer have included numerous cases involving assessing the representational faithfulness of transactions and the compliance, or lack of compliance, with GAAP related to the accounting for various transactions included in an entity's financial statements.
5) Three years as an investigative reviewer for the Arizona Department of Racing. Assignments as an investigative reviewer have included assessing financial stability of race permit holders and analyzing financial reporting and specific transactions for completeness and accuracy of reporting.
6) Serving as an expert witness in several cases involving misrepresentation of financial information, including qualification as an expert and providing testimony in Federal court regarding the same.

**EXPERT OPINIONS**

Through the performance of our procedures, as is more fully described in the remaining sections of this report, and through reliance upon my experience, I have developed the following opinions:

1) Budget and financial presentations prepared by BIA for the Project for periodic reporting of income, operating and maintenance expenses ("OME") and sinking funds and reserve cash ("SFRC") has not been presented in accordance with the terms of the Repayment Contract between the United States and the San Carlos Irrigation and Drainage District dated June 8, 1931 as the information presented is inaccurate, incomplete and misrepresentative.
2) As of September 30, 2007, the financial presentation prepared by BIA for the Project shows a cash balance, as adjusted, in excess of the Project's required cash balance (normalized OME, less normalized other income, plus betterments agreed upon by SCIDD and a reasonable emergency reserve) in the amount of $3.3 million. One-half of this amount or $1.65 million represents damages or overpayments made by SCIDD as a result of BIA's collection of excess assessments as of September 30, 2007.
3) Estimates of annual assessments prepared by BIA for the Project should be in a maximum amount equal to the reasonably budgeted OME of the Project less any reasonably budgeted other income (interest income, excess pumping revenue and miscellaneous).
4) Budget and financial presentations prepared by BIA for the Project continue to be not in compliance with the Project's Acting District Director's Decision issued on January 10, 1997.
5) Financial presentations prepared by BIA for the Project are not presented in accordance with any specific set of rules or principles and fails to meet the foundational basis for accounting information which requires that it be reliable, relevant and representationally faithful.

**PROCEDURES PERFORMED**

My opinions as stated in the "Expert Opinions" section of this report were drawn after the performance of the following procedures:

1) Review of the Complaint in this Case as filed with the United States Court of Federal Claims during August 2006.
2) Review of the Joint Preliminary Status Report in this Case as filed with the United States Court of Federal Claims during December 2006.
3) Review of the San Carlos Project Act of June 7, 1924.
4) Review of the 1924 Landowners' Agreement with the Secretary of the Interior.

5) Review of the Repayment Contract Between the United States and The San Carlos Irrigation and Drainage District, Arizona dated June 8, 1931.
6) Review of the First Supplement to the Repayment Contract Between the United States of America and the San Carlos Irrigation and Drainage District, Providing for Repayment of Charges and Operation of Works of the San Carlos Project, Arizona, dated November 12, 1935.
7) Review of the decision of the BIA – Phoenix Area Office, Acting Area Director, regarding the Notice of Appeal on Fiscal Year 1998 Operation and Maintenance Budget and Assessment Rate dated January 10, 1997.
8) Review of the BIA "Irrigation Handbook" dated May 2002.
9) Review of various documents summarizing budget and financial presentations as prepared by the BIA related to the Project.
10) Review of various documents supporting or detailing budget and financial presentations as prepared by the BIA related to the Project.
11) Review of various documents provided by BIA in response to discovery requests.
12) Review of various documents provided by SCIDD to BIA in response to discovery requests.
13) Interview of Doug Mason, General Manager of SCIDD.

**BACKGROUND**

The Project is a federal irrigation project authorized by Congress under the San Carlos Project Act of June 7, 1924. The Project is managed by the BIA under the direction of the Secretary of the Interior pursuant to authority set forth in the 1924 Landowners' Agreement with the Secretary of the Interior, the Repayment Contract Between the United States and The San Carlos Irrigation and Drainage District, Arizona dated June 8, 1931 ("Repayment Contract") and the First Supplement to the Repayment Contract Between the United States of America and the San Carlos Irrigation and Drainage District, Providing for Repayment of Charges and Operation of Works of the San Carlos Project, Arizona, dated November 12, 1935. The Project generally provides irrigation water to 50,000 acres of public and private land within SCIDD and 50,000 acres of land within the Gila River Indian Irrigation and Drainage District. The rights and obligations of the owners of the 50,000 acres of public and private land are managed by SCIDD.

The Repayment Contract requires that the landowners reimburse BIA for the costs of operating the Project under certain terms and conditions. The terms and conditions that are pertinent to this Case are set forth as follows:

1) The landowners must pay the estimated amount of the Project's OME charges on a pro rata acre basis. The payment is to be estimated based upon "…the whole cost of operating and maintaining the works of the Project, after sums collected for excess water and other sums which may go to the operation and maintenance fund as provided herein have been deducted, shall be divided equally on a per

acre basis among all of the lands of the project and regardless of whether they are irrigated or not." (See Repayment Contract, page 7)

2) Project OME consisting of approved betterments must be reimbursed by the landowners "…in accordance with recommendations of the Secretary of the Interior with the assent of the District [SCIDD] as expressed by its Board of Directors and shall be expended by said Secretary for said project, or shall be made without such assent in case the Secretary of the Interior or Congress thinks it necessary to expend money to safeguard the Project." (See Repayment Contract, pages 12-13)
3) SCIDD is to receive notice from the Secretary of the Interior "…of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts." (See Repayment Contract, page 8)
4) "…full and accurate accounts shall be kept at all times by both the United States [BIA] and the District of all receipts and expenditures and other fiscal operations in connection with the Project, and such accounts and the books showing them, and also all records, maps, plans, estimates, budgets and engineering data of the United States and the District concerning said Project, at all reasonable times, shall be open to the inspection of the United States and its agents, and of the District and its representatives and of all persons properly interested; and the United States and the District shall inform and consult with each other as to contemplated future steps of importance." (See Repayment Contract, page 19)

**FINDINGS**

Inaccurate, Incomplete and Misrepresentative Budget and Financial Presentations Prepared by BIA

Budget and financial presentations prepared by BIA for the Project for periodic reporting of OME and SFRC has not been presented in accordance with the terms of the Repayment Contract as the information presented is inaccurate, incomplete and misrepresentative. The budget and financial presentations reported by BIA varies from year to year and within the year which provides no reliability. It is my opinion that a fair and reasonable preparer of budget and financial presentations would not provide information that is incomplete, inaccurate and misrepresentative.

My review of the documents listed in the preceding "Procedures Performed" section of this report indicated significant instances where budget and financial presentations were changed on a regular basis in significantly material amounts. Exhibit 4 attached to this report summarizes the varying Project budget information presented by BIA for the fiscal years ending in 2005, 2006 and 2007. A brief summary of these budgets is as follows:

1) There were a minimum of four different budgets presented by BIA for the fiscal year ending September 30, 2005. Unobligated cash at the beginning of the year varied on these budgets from a low point of $2.587 million to a high point of $4.35 million, assessment collections varied from a low point of $0 (zero) to a high point of $3 million, OME varied from a low point of $2.865 million to a high point of $3.327 million and unobligated cash at the end of the year varied from $0.681 million to $3.426 million.
2) There were a minimum of six budgets presented by BIA for the fiscal year ending September 30, 2006. Unobligated cash at the beginning of the year varied on these budgets from a low point of $1.9 million to a high point of $4.053 million, assessment collections varied from a low point of $2.0 million to a high point of $5.0 million, OME varied from a low point of $2.65 million to a high point of $4.178 million and unobligated cash at the end of the year varied from $1.55 million to $6.115 million.
3) There were a minimum of six budgets presented by BIA for the fiscal year ending September 30, 2007. Unobligated cash at the beginning of the year varied on these budgets from a low point of $1.05 million to a high point of $6.115 million, assessment collections varied from a low point of $2.1 million to a high point of $3.05 million, OME varied from a low point of $2.55 million to a high point of $3.412 million and unobligated cash at the end of the year varied from $1.14 million to $5.557 million.

It is my opinion that a preparer of budget and financial presentations would use their best effort to ensure a full and accurate summarization of the information involved. The variety of budgets submitted by BIA and the diverse nature of these budgets can lead to only one conclusion – that the presentations prepared by BIA related to the Project was so inaccurate, incomplete and misrepresentative as to indicate a lack of good faith.

From the documents reviewed in this Case. the latest multi-year budget and financial presentation from BIA to SCIDD was dated December 12, 2006. (See Exhibit 5). This financial presentation contained "Original Budget" and "Inc.[income] & Oblig. [obligations] End of Year" for each fiscal year ended between September 30, 1999 and September 30, 2006; an "Original Budget", "Adjusted Budget" and "As of 11/30/06" for the fiscal year ended September 30, 2007; and, a "Projected Budget" for each fiscal year ending between September 30, 2008 and September 30, 2011. This financial presentation contains numerous internal errors as well as discrepancies from prior budgets submitted by BIA. The discrepancies from prior budgets are well documented in the preceding paragraph of this section of this report. Some of the more material errors related to the financial information within the document are as follows:

1) Unobligated Cash at the beginning of a fiscal year does not tie out to ending unobligated cash from the end of the prior fiscal year. Cash ending on the last day of the fiscal year ended September 30, 2004 must be the same as the cash on the first day of the next fiscal year beginning October 1, 2004 and ending cash on the last day of the fiscal year ended September 30, 2005 must be the same as the cash on the first day the next fiscal year beginning October 1, 2005. As noted in Exhibit 6 to this report, the schedule dated December 12, 2006 (after the end of the September 30, 2006 fiscal year) shows ending cash on the last day of the fiscal year ended September 30, 2004 in the amount of $3.612 million and cash on the first day of the next fiscal year beginning October 1, 2004 in the amount of $2.587 million as if $1.025 million somehow disappeared between midnight on September 30, 2004 and 12:01 a.m. on October 1, 2004. Then, ending cash on the last day of the fiscal year ended September 30, 2005 was shown as being $4.090 million and cash on the first day of the next fiscal year beginning October 1, 2005 was shown as $4.559 million as if $0.469 million had somehow reappeared between midnight on September 30, 2005 and 12:01 a.m. on October 1, 2005.
2) The multi-year financial presentation dated December 12, 2006 double counted the funds obligated for the "China Wash Flume Rehab/Replacement" project for the year ended September 30, 2006. The "Inc. & Oblig. End of Year" column on this schedule shows that $492,275 was shown under "Obligations – Land Structures & Special Projects" and the exact same amount was shown under the SFRC detail as "China Wash Flume Rehab/Replacement". This multi-year financial presentation includes the $492,275 for the China Wash project as an obligation (see further explanation of BIA's practice of obligating amounts later in this section of this report) as if it pertained to the fiscal year ended September 30, 2006. Per my interview of Doug Mason, the actual China Wash project was completed in the fiscal year ending September 30, 2007. Continuing to show the $492,275 as an SFRC item in the "Inc. & Oblig. End of Year" column on this schedule after it was obligated is in error.
3) BIA prepared a schedule dated October 2, 2006 showing the financial activity for the month of September 2006 and an annual summation of financial activity for the Project for the fiscal year ended September 30, 2006 (see Exhibit 7). This financial presentation was prepared after the end of the fiscal year and did not show the China Wash project as obligated. This document verifies that the China Wash project was back-dated or obligated by the BIA sometime after the end of the September 30, 2006 fiscal year but before December 12, 2006.

These and other errors contained in the multi-year financial presentation dated December 12, 2006 are representative of the types of errors noted on most budget and financial presentation documents prepared by BIA. The errors listed above are so blatant, significant and obvious that a reasonable preparer of this financial presentation would

have to know that the information was inaccurate, incomplete and misleading requiring that the presentation be corrected.

The multi-year budget and financial presentation dated December 12, 2006 (see Exhibit 5) highlights the fact that in each year for the fiscal years ending September 30, 2003 through 2006, originally budgeted obligations were significantly and materially in excess of end of year obligations. The minimum over budgeted obligation amount was $453,697 for the fiscal year ended September 30, 2006 and the maximum over budgeted obligation amount was $1,305,323 for the fiscal year ended September 30, 2005. These amounts represented 13.4% and 39.2% of the original budget obligation amounts, respectively. It is my opinion that the purpose of showing these materially overestimated obligation budget amounts was to inaccurately present to SCIDD that the Project needed to carry a significant cash balance. A reasonable financial presentation preparer would base a budget upon historical information with adjustments for known future circumstances such as inflation, personnel additions, personnel cuts and changes in spending policies. While the budgeted obligation amounts for the fiscal year ended September 30, 2003 may have been justified based upon prior end of year obligation amounts, budget expenditures for the fiscal years ended 2004 through 2006 were not justifiable based upon historical information and were obviously inaccurate and misleading.

On October 1, 2007 BIA prepared a schedule showing the financial activity for the month of September 2007 and an annual summation of financial activity for the Project for the fiscal year ended September 30, 2007 (see Exhibit 8). This schedule shows the total income, obligations and ending cash balance for the Project as of September 30, 2007. This schedule also shows that $2.0 million was spent or obligated in September 2007 for "Well Replacements & Abandonment" which line item was footnoted as "Includes Coolidge Dam, San Carlos Reservoir & New Office Building". Per my interview of Mr. Mason, these betterments were never presented to SCIDD for approval. For BIA to show these funds as spent or obligated without the required approval of SCIDD results in this presentation being inaccurate and misleading.

The October 1, 2007 BIA prepared schedule is the most recently prepared financial presentation that I was able to locate. This schedule shows a cash balance at September 30, 2007 of $2,134,904. This stated cash balance is misleading for at least the following reasons:

1) BIA uses a concept referred to as "obligating funds" to reserve cash for planned expenditures. Once cash is obligated it is shown on the financial summaries as if it has been spent. Documents reviewed indicate that once cash is obligated it is then accounted for by BIA as an "undelivered order" until such funds are spent (see Exhibit 9). Per review of the documents reviewed, undelivered orders averaged approximately $326,000 at any one time during the fiscal years ended September 30, 2004 through 2006.

2) The cash balance does not include $2,100,000 in assessment collections that should have been paid during the fiscal year but were unpaid at September 30, 2007. While these amounts are noted as unpaid on the fiscal year summation schedule, not including them in the cash balance while deducting for amounts obligated but unspent, i.e. undelivered orders, provides a misleading view of the Project's financial stability.

Deducting for amounts to be spent in the future fiscal years (obligated funds) while not counting assessment collection income that is due but unpaid as of September 30, 2007, is incomplete, inaccurate and misrepresentative.

The true cash balance (or available to spend balance) at September 30, 2007 should have been reported as follows:

| | |
|---|---|
| Cash balance reported by BIA | $ 2,134,904 |
| Removal of Well, Replacement & Abandonment added in September 2007, not approved by SCIDD | 2,000,000 |
| Addition of assessment collections due in the fiscal year ended September 30, 2007 but unpaid | 2,100,000 |
| Available to spend balance at September 30, 2007 | $ 6,234,904 |

The annual budget and financial presentation provided by BIA for the Project includes estimated amounts to be spent on future betterment projects, SFRC. As noted in Exhibit 10 attached hereto, the amounts listed by BIA as SFRC were significantly and materially overstated on a recurring basis. While these SFRC amounts were not directly deducted from the Project's cash balance, as obligated funds, it is my opinion that the purpose of showing these materially overestimated amounts was to inaccurately present that the Project needed to carry a significant cash balance. If these listed SFRC amounts were not required then BIA would have no legitimate reason to carry significant cash balances. As noted on Exhibit 10, for most years SFRC was shown on the multi-year financial presentation in excess of $1.5 million and in no year was more than $1.0 million spent on SFRC type projects within the next three fiscal years. In fact the most significant SFRC expenditure during the nine year period from fiscal years ending September 30, 1999 to 2007 was the $492,275 obligated in the fiscal year ended September 30, 2006 for the China Wash project and it is readily apparent from the documents reviewed in this Case that BIA was aware of this project more than four years before the funds were obligated. Even with the China Wash project, BIA spent only $1,675,935 on SFRC projects during this nine year period. BIA's own "Irrigation Handbook" dated May 2002 states that for a project with a five year average annual OME of $3,000,000, an appropriate emergency reserve would be between $400,000 and $900,000 (Irrigation Handbook, pages 96-97). It should be noted that the Project's five year annual OME for the fiscal years ended September 30, 2002 to 2007 was approximately $2.5 million, excluding betterments (see

Exhibit 11). Giving consideration to a reasonable emergency reserve, as defined by BIA, and the funds required for the China Wash project, BIA's claiming the need for SFRC cash of $729,475 and $960,844 for the fiscal years ended September 30, 2004 and 2005 was reasonable. Conversely, BIA's claiming the need for SFRC cash between $1,497,000 and $2,348,000 for the fiscal years ended September 30, 1999 through 2003 and of $1,600,275 for the fiscal year ended September 30, 2006 is inaccurate, incomplete and misrepresentative.

As previously discussed in this section of this report, BIA follows the practice of obligating funds once they believe that the funds will be spent and the obligated funds are shown as deductions from the Project's cash balance despite the fact that the funds are not spent, i.e. undelivered orders. The latest multi-year financial presentation was dated December 12, 2006 (see Exhibit 5). This presentation noted that during the fiscal years ended between September 30, 1999 and 2003, $886,453 of cash was added to the Project's beginning cash balance as "Deoblig. [deobligated] Cash from Prior Year UDO's [undelivered orders]". Starting with the fiscal year ended September 30, 2004, BIA inexplicably showed $0 (zero) in deobligated undelivered orders for each future fiscal year. From a reasonable financial presentation preparer's view, it is not credible to assume that from October 1, 2004 through September 30, 2007 there were no amounts deobligated from undelivered orders. From the documents reviewed, it was not possible to ascertain the amount of deobligated undelivered orders during this four year period but it is reasonable to believe that such amount could be material to the Project's financial condition. BIA's failure to properly inform SCIDD of the disposition of deobligated undelivered orders results in an inaccurate and incomplete reporting.

During my interview of Mr. Mason, he informed me that BIA representatives have stated that the interest income listed in BIA's budget and financial presentations represents the interest earned on the Project's cash balances. As noted in Exhibit 12 attached hereto, the interest recorded in BIA's financial presentations varied from a low point of $39,214 for the fiscal year ending September 30, 2004 to a high point of $431,228 for the fiscal year ending September 30, 1999. Additionally, the low point annual average interest rate earned on the Project's funds was 1.5% and the high point annual average interest rate was 8.4%. Based upon the documents reviewed in this Case, I was unable to ascertain the average interest rate that should be paid on the Project's cash balance. Despite not knowing the actual interest rate that should be paid on the Project's cash balances, a reasonable preparer of a financial presentation would logically conclude that the interest income should be consistently recorded at some predetermined rate of interest. As noted from the chart included with Exhibit 12, the average interest rate earned on the Project's funds inexplicably range from 3.9% over the three month T-Bill rate to 1.3% below the three month T-Bill rate. Based on these facts, one can conclude that such financial presentations were not prepared by BIA in good faith as such presentations were inaccurate, incomplete and misrepresentative.

BIA's Financial Presentations for the Project Shows a Cash Balance, As Adjusted, in Excess of the Project's Required Cash Balance

The financial presentations prepared by BIA for the Project as of September 30, 2007 shows a cash balance, as adjusted, that is \$3.3 million in excess of the Project's required cash balance (normalized OME, less normalized other income and a reasonable emergency reserve). As discussed in the preceding portion of this "Findings" section of this report, the Project's cash balance at September 30, 2007 as adjusted for unapproved betterments and for assessment collections due prior to September 30, 2007 was \$6,234,904. This adjusted cash balance is in excess of the funds required by BIA to operate the project in an amount equal to no less than \$3,353,905 which is calculated as follows:

| | |
|---|---|
| Adjusted cash balance at September 30, 2007 | \$ 6,234,904 |
| Plus: Normalized interest and miscellaneous income for the five fiscal years ended September 30, 2007 | 241,964 |
| Less: | |
| Normalized OME for the five fiscal years ended September 30, 2007 (see Exhibit 11) | (2,472,963) |
| Jointly approved betterments not yet obligated at September 30, 2007 | -0- |
| Average emergency reserve per BIA | (650,000) |
| Project excess adjusted cash balance as of September 30, 2007 | \$ 3,353,905 |

In calculating the excess adjusted cash balance as of September 30, 2007, I have added what a reasonable financial presentation preparer would assume as an estimate of other income for the fiscal year ending September 30, 2008. It should be noted that I excluded consideration of excess pumping income from the normalized other income amount of \$241,964 as the income from this source ceased being reported by BIA in the fiscal year ended September 30, 2005. From the documents reviewed in this Case, it is unclear if there was an acceptable reason why excess pumping income was no longer being recorded in the Project's financial presentation. Additionally, I have deducted what a reasonable financial presentation preparer would assume as a logical estimate of OME for the fiscal year ending September 30, 2008. This amount must be deducted as the assessment collections for 2008 (\$2,100,000) were to have been paid during the fiscal year ended 2007 and have been included in the adjusted cash balance at September 30, 2007 of \$6,234,904.

Per my interview of Doug Mason, there have been no BIA recommended betterments that have been approved by SCIDD. As a result, a reasonable financial presentation preparer would assume that no funds will be spent on any betterment, except for emergency charges, in the fiscal year ended September 30, 2008. The stated emergency reserve of $650,000 is exactly the median of BIA's recommended range for an emergency reserve of an irrigation project similar in size to that of the Project. A reasonable financial presentation preparer would conclude that a $650,000 emergency reserve is more than adequate to provide for unforeseen expenses as (has been previously noted in this "Findings" section of this report) the Project has consistently been spending between $2.0 million and $2.8 million per year on OME and has only spent $1.184 million, excluding the China Wash project, on betterments in a nine year period. It is my opinion that excess funds have been held by BIA for the Project for a number of years. SCIDD's portion of the excess funds at September 30, 2007 is $1.65 million.

Estimates of Annual Assessments for the Project Should be Equal to Budgeted OME Less Budgeted Other Income

BIA's estimates of annual assessment for the Project should be in a maximum amount equal to the reasonably budgeted OME of the Project less any reasonably budgeted other income (interest income, excess pumping revenue and miscellaneous). As is noted in the preceding section of this "Findings" section of this report, a normalized OME budget for the Project is $2,472,963 and a normalized other income budget for the Project is $241,964. BIA's assessment to the Project's land owners should be based upon the net amount of these two numbers or $2,230,999. As a result, a reasonable budget and financial presentation preparer would conclude that an annual assessment in the amount of $22.30 per acre would be appropriate with two limiting conditions, as follows:

1) The Project did not have excess cash reserves which, at present, are in the amount of $3.3 million (see discussion in the preceding section of this "Findings" section of this report).
2) The Project's historically reported obligations for OME are necessary and reasonable. I was not asked to determine if any reported OME was unnecessary or excessive (see the preceding "Scope of Services" section of this report) and, accordingly, have assumed that the reported obligations for OME are fairly stated.

From the documents reviewed, BIA assessed $30.00 per acre in the fiscal years ending September 30, 2005 through 2007 with payment of such assessment due in the previous fiscal year, i.e. the fiscal years ended from September 30, 2004 to 2006, despite the continued protest of SCIDD. BIA's $30.00 per acre assessment is related to a misinterpretation of the Project's cash position and betterment needs and from an admitted lack of BIA recordkeeping for the Project (see February 28, 2006 letter from Allen Anspach, BIA acting regional director, to Mr. Salmon where Mr. Anspach admits that "…this detailed budget spreadsheet format was not maintained by the Project during

the last two years [fiscal years ended September 30, 2004 and 2005]. I have corrected this situation." It is telling that once BIA corrected its admitted recordkeeping inadequacies, the assessment rate for 2008, which would have been set sometime in 2006, was reduced to $21.00 per acre.

As noted in the previous section of this "Findings" section of this report, the Project has an excess cash balance of $3,353,905 as of September 30, 2007. One-half of this amount or $1.65 million represents damages or an overpayment made by SCIDD as a result of BIA's collection of excess assessments as of September 30, 2007.

<u>BIA Continues to be in Non-Compliance With the Project's Acting District Director's Decision issued on January 10, 1997</u>

The issues at interest in this Case are not new issues to BIA or SCIDD. Largely similar issues were appealed by SCIDD to the Acting Area Director for the Bureau of Indian Affairs, Phoenix Area Office on July 25, 1996. The Acting Area Director, Barry W. Welch, issued his decision regarding this appeal on January 10, 1997. Mr. Welch's decisions are telling when considering that they were issued approximately 11 years ago. Mr. Welch's decision states in part "The administrative record in this Appeal contains six different spreadsheets generated by the Project [BIA], at different points in time, showing projected and actual O&M budget expenditures for fiscal years 1993 through 1998.[33] [footnote omitted] Three of these budget spreadsheets were generated in calendar year 1996 for the purpose of identifying O&M budget needs for FY 1988.[34] [footnote omitted] An examination and comparison of all the budget spreadsheets reveal that from FY 1993 – 1996: (1) the Project consistently projected larger O&M budget expenditures than it actually expended; (2) the Project consistently underestimated its projected cash balance; (3) the Project's cash balance increased significantly each year for FY 1993-1996 to its present balance of $2,873,099.[35] [footnote omitted] Although the Project and SCIDD appear to agree that the Project's cash balance should be around $600,000[36] [footnote omitted] the Project continues to prepare O&M budget projections for FY 1997 and 1998 which include annual cash balances significantly in excess of $600,000. In addition, the Project has included in each of its FY 1997 and 1998 O&M budget a line item in the amount of $750,000 for special projects activities on which there is no agreement among the Project, SCIDD and the Indian Works [Gila River Indian Irrigation and Drainage District]. Based on the foregoing, it does not appear that the Project's FY 1998 O&M charges have been fixed based on an estimate of the total annual cost to the O&M of the Project.[38] [footnote omitted] Rather, it appears that the Project first estimated what its annual income will be in FY 1998 based on the $30/acre assessment and other projected revenues and then projected budget expenditures, in both its normal budget categories and in its newly created budget category for special projects, to spend down the projected revenues." (See pages 9 and 10 of Mr. Welch's letter)

In an earlier portion of the letter, Mr. Welch states "…I have determined that the FY 1998 O&M assessment rate and budget recommendation be remanded to the Project and the Project is directed, in consultation with SCIDD and the Indian Works and consistent with the findings and conclusions in this Decision, to: (1) review and evaluate the feasibility of an O&M assessment rate for FY 1998 that is less than $30 per acre, including the $20/acre O&M assessment rate and budget as proposed by SCIDD…" (see Mr. Welch's Decision letter, pages 8 and 9). Although the documents available in this Case did not indicate the final resolution of Mr. Welch's remanding the budget to the BIA for reconsideration, it is telling that BIA reduced the Project's assessment rate to $20.00 per acre starting in the fiscal year ending 2000 and this assessment rate was held constant until the assessment rate was raised to $30.00 per acre for the fiscal years ended September 30, 2005 through 2007 with payment of such assessments due in the previous fiscal year, i.e. the fiscal years ended September 30, 2004 through 2006.

Mr. Welch's decision also required the BIA to "Prepare a schedule, with deadlines, for review and completion of the annual O&M budget and assessment rate, including a reasonable period prior to Fact Finding meetings for the water users to review the Project's written materials and budget proposals …" (see Mr. Welch's Decision letter, pages 12 and 13). It is clear that BIA failed to carry out this portion of Mr. Welch's decision as Mr. Anspach noted in his February 28, 2006 letter, see the previous section of this "Findings" section of this report, that BIA had failed to maintain detailed budget spreadsheet information during the fiscal years ended September 30, 2004 and 2005.

The Decision issued by Mr. Welch on January 10, 1997 was not adhered to by BIA. If the decision had been adhered to, many of the issues existing in this Case would likely not have occurred.

<u>Financial Presentations Prepared by BIA for the Project Fails to Meet the Foundational Basis for Accounting Information Which Requires that the Information Be Reliable, Relevant and Representationally Faithful</u>

The financial presentations prepared by BIA fail to meet the foundational basis for accounting information which requires that it be reliable, relevant and representationally faithful. Further, the financial presentations prepared by BIA are not presented in accordance with any specific set of rules or principles. The AICPA publishes "Statements of Financial Accounting Concepts" ("SFAC") which have been authorized by the Financial Accounting Standards Board ("FASB"). SFAC No. 2 states, in part, that "This Statement of Financial Accounting Concepts is one in a series of publications in the Board's conceptual framework for financial accounting and reporting. Statements in the series are intended to set forth objectives and fundamentals that will be the basis for development of financial accounting and reporting standards. The objectives identify the goals and purposes of financial reporting. The fundamentals are the underlying concepts of financial accounting – concepts that guide the selection of transactions, events, and

circumstances to be accounted for, their recognition and measurement and the means of summarizing and communicating them to interested parties. Concepts of that type are fundamental in the sense that other concepts flow from them and repeated reference to them will be necessary in establishing, interpreting, and applying accounting and reporting standards." (See Exhibit 13 for a copy of pertinent portions of SFAC No. 2)

The FASB authorized SFAC No. 2 for issuance in May 1980. This statement notes in part "That information should be reliable as well as relevant is a notion that is central to accounting. It is, therefore, important to be clear about the nature of the claim that is being made for an accounting number that is described as reliable. The reliability of a measure rests on the faithfulness with which it represents what it purports to represent…representational faithfulness is correspondence or agreement between a measure or description and the phenomenon it purports to represent. In accounting, the phenomena to be represented are economic resources and obligations and the transactions and events that change those resources and obligations.[9]" [footnote omitted] (see Exhibit 13 for a copy of pertinent portions of SFAC No. 2)

The budget and financial presentations reviewed in connection with this Case as prepared by BIA are unreliable, irrelevant and lacked representational faithfulness. As such, these presentations failed the most basic foundational requirements for accounting information.

**CONCLUSION**

As is noted in the various sections of this report, based upon the procedures performed and my findings as detailed in this report, I have developed the opinions as stated in the "Expert Opinions" section of this report.

Respectfully submitted,

Lawrence Field, CPA
On behalf of
Field Lawdahl, PLLC

FIELD LAWDAHL, PLLC
CERTIFIED PUBLIC ACCOUNTANTS

5727 NORTH 7TH STREET, SUITE 206
PHOENIX, ARIZONA 85014
OFFICE (602) 265-0200 FAX (602) 265-5101

October 15, 2007

Mr. Riney B. Salmon II
Salmon, Lewis & Weldon PLC
2850 East Camelback Road
Suite 200
Phoenix, Arizona 85016-4316

VIA ELECTRONIC TRANSMISSION THEN U.S. MAIL SERVICE

Dear Mr. Salmon:

The purpose of this letter agreement is to set forth our understanding of the terms upon which your law firm, Salmon, Lewis & Weldon PLC, has retained Field Lawdahl, PLLC to provide consulting services with respect to a pending matter that you are handling. We understand that unless you direct otherwise, all of the work that we perform during this engagement should be considered part of your attorney work product and will be treated as confidential and protected from third party disclosure under the work product doctrine. If you should chose to utilize our services as an expert witness, you will notify us once that decision is made.

This engagement contemplates our performing services of a nature and quality which are necessarily related to your services as attorneys, but for which your law firm does not have the related accounting and consulting expertise to adequately discharge. Our responsibilities and objectives during this engagement will be identified by Salmon, Lewis & Weldon PLC and will then be subject to our approval. Salmon, Lewis & Weldon PLC may modify or terminate our services at any time for any reason.

Our charges for this engagement will be based upon our current hourly billing rates which are as follows:

| | |
|---|---|
| Lawrence Field - | $300 per hour |
| Professional staff - | $185 per hour |
| Administrative staff - | $ 45 per hour |

We agree that Salmon, Lewis & Weldon PLC is not responsible for paying our invoices. By signing this letter below, your client agrees to pay our prevailing hourly billing rates for all time spent on this engagement. In addition, your client agrees to reimburse us for any reasonable direct out-of-pocket expenses incurred in our engagement with the understanding that any out-of-town travel or entertainment costs must be approved in advance of incurring the same

Invoices will be sent to you for approval and forwarding to your client no more often than semi-monthly. Invoices are due upon receipt. If for any reason your client has not paid any Field Lawdahl, PLLC required invoice within 30 days of the invoice date; we shall have the option to cease work on this matter until all outstanding amounts are paid in full.

We would appreciate you and your client confirming your agreement to the foregoing by signing the enclosed copy of this agreement, as indicated, and returning it to us. We thank you for the opportunity to be of service to your firm.

Sincerely,

Lawrence Field
On Behalf of
Field Lawdahl, PLLC

Salmon, Lewis & Weldon PLC

Riney B. Salmon II

San Carlos Irrigation and Drainage District

Douglas Mason, General Manager

# RESUME OF LAWRENCE FIELD, CPA
Page 1 of 2

EDUCATION: Arizona State University, Bachelor of Science in Accounting, 1978

CURRENT: Managing member of Field Lawdahl, PLLC a certified public accounting firm specializing in litigation support engagements, forensic accounting and closely held business and tax consulting

PRIOR EXPERIENCE: Includes five years in the auditing department of national CPA firms (1978 – 1983), three years as the chief financial officer of Swensen's, Inc. (1983-1986), founding shareholder of Field, Sarvas & King, P.C. - responsible for the Firm's auditing and accounting practice (1986 – 1998), two years as the chief operating officer of Integrated Health Management Services, LLC (1999 – 2001)

EXPERTISE:

- Attest Services
- Auditing
- Business Consulting
- Compilations
- Forensic Accounting
- Insurance Loss Claims
- Litigation Support Projects
- Reviews

PROFESSIONAL ACTIVITIES:

Member of the American Institute of Certified Public Accountants – Current member of Board Of Examiners ("BOE"), current Chairman of the BOE's Practice Analysis Oversight Group, past representative from Arizona on Governing Council (2002 – 2005), prior At-Large Member of Governing Council (2000-2001)

Member of the Arizona Society of Certified Public Accountants – formerly held positions of Immediate Past Chair, Chair, Vice-President, Secretary/Treasurer and At-Large Board Member – recipient of Life Membership Award

COMMUNITY ACTIVITIES:

Ronald McDonald House Charities of Phoenix – Current Past President of the Board of Directors; formerly held positions of President, Vice-President and Treasurer of the Board of Directors, member of the Capital Campaign Cabinet and Chairman of the Leadership Gifts Committee for the Capital Campaign

Boys and Girls Clubs of Metropolitan Phoenix - Executive Council - Retired Member – during Active Member status held positions of Treasurer, Vice President - Projects, Vice President – Membership

Arizona Chapter of the National Committee for the Prevention of Child Abuse - Former Board Member - held position of Treasurer - recipient of award for Outstanding Volunteer Service

CERTIFICATION STATUS: Certified Public Accountant in the State of Arizona, Certificate Number 3355-E dated October 26, 1981

# RESUME OF LAWRENCE FIELD, CPA
Page 2 of 2

TESTIMONY OR DEPOSITION:

Testimony at trial in the last four years:

- In the Office of Administrative Hearings for the Arizona State Board of Accountancy - Case No. 98A-1998.229ACY in the matter of the Arizona State Board of Accountancy vs. Coopers & Lybrand, et al. – February 23 and 24, 2004
- In the Superior Court of the State of Arizona in and for the County of Maricopa - Case No. CV 2004-01240 in the matter of Adam Ruppel, et al. vs. Jean Marc Eloy, et al. – January 12, 2006 (Arbitration Hearing – no recorded testimony)

Depositions recorded in the last four years:

- In the Superior Court of the State of Arizona in and for the County of Maricopa - Case No. CV 2002-013176 in the matter of Sun Valley Ventures, Inc. vs. Kyoto Bowl, et al. – approximate date September 2003
- In the United States District Court for the District of Arizona - Case No. CIV-01-218-PGR and CIV-01-246-PHX-EHG in the matter of Gerald K. Smith, as Plan Trustee for and on behalf of Boston Chicken, et al. vs. Arthur Andersen LLP, et al. – October 15 and 16, 2003
- In the United States District Court for the Southern District of Texas Houston Division – MDL-1446 Civil Action No. H-01-3624 – Consolidated Cases in the Matter of Enron Corporation Securities Litigation Derivative and "ERISA" Litigation – September 25 and 26, 2006

PUBLICATIONS:

Publications written in the last ten years:

- Ten separate "President's Letter" written for the Arizona Society of Certified Public Accountants from May 2001 through April 2002
- Two separate "President's Letter" written for the Ronald McDonald House Charities Spring 2006 and Fall 2006 newsletter

# RESUME OF DIANE BURTON, CPA

**EDUCATION:**

Arizona State University, Bachelor of Science in Accounting, 1989

Western International University, Master of Business Administration in Finance, 2002

**PRIOR EXPERIENCE:**

Includes two years in the auditing department of a national CPA firm (1989-1991), four years as the controller of Photocomm, Inc. (1991-1995), six years as the assistant controller of Viad Corp, a MidCap 400 company (1995-2001), and one year as the director of financial reporting of Spirit Finance Corporation (2004-2005). Also a part-time accounting instructor at Arizona State University and Western International University (2002-present).

**EXPERTISE:**

Financial reporting
SEC regulatory reports
Registration statements
Consolidations
Real estate investment trusts (REITs)
Holding companies/conglomerates

Financial services
Manufacturing
Wholesale/distribution
Services
Employee benefit plans
Executive compensation

**PROFESSIONAL ACTIVITIES:**

Member of the Arizona Society of Certified Public Accountants.

Member of the American Institute of Certified Public Accountants.

Former member of the American Accounting Association (2002-2004) and the National Association of Stock Plan Professionals (2004-2005).

**CERTIFICATION STATUS:**

Certified Public Accountant in the State of Arizona, Certificate Number 7765-E dated January 13, 1992.

Exhibit 4
Page 1 of 1

Budget Comparisons
In Thousands

| Date of Schedule --> | FY 2005 Draft 4 Budget (5/22/03) | FY 2005 Budget (4/17/04) | FY 2005 Budget (6/22/04) | FY 2005 Orig. Budget (6/14/06) & (12/12/06) | FY 2006 Budget (4/17/04) | FY 2006 Budget (6/22/04) | FY 2006 Proposed Adj Budget #1 (2/27/06) | FY 2006 Proposed Adj Budget #1 (6/14/06) |
|---|---|---|---|---|---|---|---|---|
| Unobligated cash on 10/1 | 3,726 | 3,721 | 4,350 | 2,587 | 3,426 | 1,900 | 4,053 | 4,053 |
| Deobligated cash from prior year UDOs | 35 | | | - | | | | |
| Total unobligated cash | 3,761 | 3,721 | 4,350 | 2,587 | 3,426 | 1,900 | 4,053 | 4,053 |
| Income | | | | | | | | |
| Assessment collections | - | 2,150 | 1,500 | 3,000 | 2,745 | 2,000 | 5,000 | 5,000 |
| Interest | 19 | 35 | 35 | 19 | 45 | 45 | 90 | 200 |
| Excess pumping | - | 340 | 340 | | 310 | 210 | | |
| Miscellaneous | 52 | 45 | 45 | 34 | 55 | 45 | 34 | 55 |
| Total income | 71 | 2,570 | 1,920 | 3,053 | 3,155 | 2,300 | 5,124 | 5,255 |
| Obligations | | | | | | | | |
| Personnel and benefits | 1,135 | 1,020 | 1,020 | 1,135 | 970 | 970 | 920 | 920 |
| Travel | 7 | 5 | 5 | 7 | 5 | 5 | 5 | 5 |
| Utilities | 67 | 50 | 50 | 67 | 50 | 50 | 45 | 45 |
| Power for pumping | 435 | 500 | 500 | 500 | 500 | 500 | 619 | 619 |
| Services | 897 | 500 | 500 | 582 | 500 | 500 | 570 | 575 |
| Gila Water Commissioner | - | 380 | 375 | 367 | 400 | 395 | 365 | 365 |
| Supplies | 205 | 150 | 150 | 205 | 150 | 150 | 168 | 180 |
| Equipment | 52 | 10 | 10 | 52 | 80 | 80 | 66 | 64 |
| Land, structures and special projects | 351 | 250 | 260 | 410 | - | - | 1,418 | 418 |
| Deferred maintenance | - | - | - | - | - | | | |
| Other | 2 | - | - | 2 | - | - | 2 | 2 |
| Total obligations | 3,151 | 2,865 | 2,870 | 3,327 | 2,655 | 2,650 | 4,178 | 3,193 |
| Income less obligations | (3,081) | (295) | (950) | (274) | 500 | (350) | 946 | 2,062 |
| Estimated unobligated cash | 681 | 3,426 | 3,400 | 2,313 | 3,926 | 1,550 | 4,999 | 6,115 |
| Unobligated cash per spreadsheet, 9/30 | 680 | 3,426 | 1,900 | 2,313 | 3,926 | 1,050 | 4,999 | 6,115 |
| Sinking funds and reserve (SF&R) cash | | | | | | | | |
| Heavy equipment | 10 | - | | 10 | - | | 6 | 8 |
| Well replacement | - | - | | - | - | | - | 300 |
| China wash flume rehab/replacement | - | - | | - | - | | - | - |
| SCR arch survey of drawdown zone | - | - | | - | - | | - | - |
| Emergency reserve | 600 | 600 | | 600 | 600 | | 600 | 800 |
| Total SF&R cash | 610 | 600 | | 610 | 600 | | 606 | 1,108 |

| Date of Schedule --> | FY 2006 Budget (10/2/2006) | FY 2006 Original Budget (12/12/2006) | FY 2007 Budget (4/17/04) | FY 2007 Tentative Budget (6/22/04) | FY 2007 Proposed Adj Budget #1 (2/27/06) | FY 2007 Proposed Adj Budget #1 (6/14/06) | FY 2007 Adjusted Budget (12/12/06) | FY 2007 Budget (10/1/07) |
|---|---|---|---|---|---|---|---|---|
| Unobligated cash on 10/1 | 4,053 | 3,813 | 3,926 | 1,050 | 4,999 | 6,115 | 4,954 | 4,559 |
| Deobligated cash from prior year UDOs | - | - | | | | | - | |
| Total unobligated cash | 4,053 | 3,813 | 3,926 | 1,050 | 4,999 | 6,115 | 4,954 | 4,559 |
| Income | | | | | | | | |
| Assessment collections | 3,000 | 3,000 | 2,835 | 2,440 | 3,000 | 2,100 | 2,100 | 3,050 |
| Interest | 19 | 19 | 45 | 45 | 100 | 150 | 150 | 150 |
| Excess pumping | - | - | 310 | 110 | 100 | 100 | - | |
| Miscellaneous | 20 | 34 | 55 | 45 | 34 | 55 | 155 | 155 |
| Total income | 3,039 | 3,053 | 3,245 | 2,640 | 3,234 | 2,405 | 2,405 | 3,355 |
| Obligations | | | | | | | | |
| Personnel and benefits | 970 | 970 | 920 | 920 | 1,021 | 1,091 | 1,091 | 1,091 |
| Travel | 8 | 8 | 5 | 5 | 5 | 5 | 5 | 5 |
| Utilities | 70 | 70 | 50 | 50 | 76 | 76 | 76 | 76 |
| Power for pumping | 520 | 520 | 500 | 500 | 619 | 619 | 619 | 619 |
| Services | 495 | 495 | 500 | 500 | 443 | 422 | 422 | 422 |
| Gila Water Commissioner | 385 | 385 | 420 | 415 | 376 | 376 | 376 | 376 |
| Supplies | 215 | 215 | 150 | 150 | 101 | 113 | 113 | 113 |
| Equipment | 80 | 80 | 10 | 10 | 33 | 33 | 33 | 33 |
| Land, structures and special projects | 260 | 640 | - | - | - | 675 | 675 | 675 |
| Deferred maintenance | - | - | - | - | | | - | - |
| Other | 2 | 2 | - | - | 2 | 2 | 2 | - |
| Total obligations | 3,005 | 3,385 | 2,555 | 2,550 | 2,676 | 3,412 | 3,412 | 3,410 |
| Income less obligations | 34 | (332) | 690 | 90 | 558 | (1,007) | (1,007) | (55) |
| Estimated unobligated cash | 4,087 | 3,481 | 4,616 | 1,140 | 5,557 | 5,108 | 3,947 | 4,504 |
| Unobligated cash per spreadsheet, 9/30 | 3,481 | 3,481 | 4,616 | 700 | 5,557 | 5,108 | 3,947 | 4,500 |
| Sinking funds and reserve (SF&R) cash | | | | | | | | |
| Heavy equipment | | 262 | - | | 35 | 39 | 39 | |
| Well replacement | | - | - | | 500 | - | - | |
| China wash flume rehab/replacement | | - | - | | - | - | - | |
| SCR arch survey of drawdown zone | | 55 | | | 75 | 75 | 75 | |
| Emergency reserve | | 846 | 600 | | 600 | 800 | 800 | |
| Total SF&R cash | | 1,163 | 600 | | 1,210 | 914 | 914 | |

Exhibit 5
Page 1 of 1

San Carlos Irrigation Project - Joint Works
Irrigation Division
Operation & Maintenance Budget

Prepared by: R. Shaw BIA 5/19/2006
Modified by A. Rigas BIA 12/12/2006

| ITEM | FY 1999 Original Budget | FY 1999 Inc & Oblig End of Year | FY 2000 Original Budget | FY 2000 Inc & Oblig End of Year | FY 2001 Original Budget | FY 2001 Inc & Oblig End of Year | FY 2002 Original Budget | FY 2002 Inc & Oblig End of Year |
|---|---|---|---|---|---|---|---|---|
| UNOBLIGATED CASH | | | | | | | | |
| Unoblig Cash on 10/1 | $5,018,352 | $5,018,352 | $5,102,000 | $5,303,866 | $4,332,000 | $4,677,772 | $3,652,111 | $4,501,241 |
| Deoblig Cash from Prior Year UDOs | | $164,607 | | $277,444 | | $366,522 | $0 | $69,076 |
| TOTAL UNOBLIGATED CASH | $5,018,352 | $5,182,959 | $5,102,000 | $5,581,310 | $4,332,000 | $5,044,294 | $3,652,111 | $4,570,317 |
| INCOME | | | | | | | | |
| Assessment Collections Next FY ($/Acre) | $28.29 | $28.29 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 |
| Total Assessment Collections Next FY | $2,829,000 | $2,829,100 | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 |
| Assessment Collections Next FY (GRIDD) | | | | | | | | |
| Assessment Collections Next FY (SCIDD) | | | | | | | | |
| Unpaid Assessment Collections This FY (GRIDD) | | | | | | | | |
| Unpaid Assessment Collections This FY (SCIDD) | | | | | | | | |
| Interest | $360,000 | $431,228 | $380,000 | $352,334 | $310,000 | $289,681 | $162,500 | $76,642 |
| Excess Pumping | | $0 | | $248,721 | | $281,520 | | $0 |
| Miscellaneous | $69,648 | $217,631 | $40,000 | $70,437 | $40,000 | $2,312 | $40,000 | $263,618 |
| TOTAL INCOME | $3,258,648 | $3,477,959 | $2,420,000 | $2,671,494 | $2,350,000 | $2,573,513 | $2,202,500 | $2,340,260 |
| TOTAL CASH AND INCOME | $8,277,000 | $8,660,918 | $7,522,000 | $8,252,805 | $6,682,000 | $7,617,807 | $5,854,611 | $6,910,577 |
| OBLIGATIONS | | | | | | | | |
| Personnel (boc 11) & Benefits (boc 12) | $1,530,000 | $1,358,314 | $1,302,000 | $1,241,944 | $1,340,000 | $1,249,260 | $1,295,000 | $1,152,498 |
| Travel (boc 21) | $15,000 | $11,058 | $16,000 | $11,422 | $16,000 | $6,727 | $16,000 | $8,151 |
| Utilities (boc 23 less power for pumping) | $48,000 | $65,949 | $57,000 | $82,421 | $52,000 | $69,292 | $94,000 | $18,811 |
| Power for Pumping (boc 23 for SCIDD) | $500,000 | $553,484 | $700,000 | $568,116 | $700,000 | $536,475 | $541,000 | $630,810 |
| Services (boc 25 less Gila Water Commissioner) | $600,000 | $185,256 | $359,436 | $964,412 | $342,904 | $659,285 | $543,000 | $651,354 |
| Gila Water Commissioner (boc 25) | | | $320,564 | | $367,096 | $373,331 | $345,000 | $342,181 |
| Supplies (boc 26) | $230,000 | $227,164 | [illegible] | $398,850 | $250,000 | $163,634 | $175,000 | $139,111 |
| Equipment (boc 31) | $140,000 | $288,686 | $180,000 | $123,660 | $100,000 | $21,118 | $65,000 | $91,272 |
| Land & Structures & Special Projects (boc 32) | $110,000 | $61,874 | $0 | $116,504 | $200,000 | $75,953 | $0 | $0 |
| Deferred Maintenance | | | | | | | | |
| Other (boc 22, 24 & 42) | $2,000 | $3,041 | $2,000 | | $2,000 | $3,501 | $2,000 | $13,193 |
| TOTAL OBLIGATIONS | $3,175,000 | $3,355,416 | $3,190,000 | $3,507,879 | $3,370,000 | $3,164,958 | $3,178,000 | $3,098,319 |
| SINKING FUNDS AND RESERVE (SF&R) CASH | | | | | | | | |
| Heavy Equipment | $665,000 | $744,000 | $665,000 | $687,118 | $725,000 | $673,450 | $789,000 | $431,000 |
| Well Replacement | $300,000 | $300,000 | $600,000 | $600,000 | $900,000 | $900,000 | $1,200,000 | $1,200,000 |
| China Wash Flume Rehab/Replacement | | | | | $0 | $0 | $0 | $117,000 |
| SCR Arch Survey of Drawdown Zone | | | | | | | | |
| Emergency Reserve | $453,000 | $453,000 | $600,000 | $600,000 | $600,000 | $600,000 | $600,000 | $600,000 |
| SUBTOTAL SF&R CASH | $1,418,000 | $1,497,000 | $1,865,000 | $1,887,118 | $2,225,000 | $2,173,450 | $2,589,000 | $2,348,000 |
| TOTAL OBLIGATIONS AND SF&R CASH | $4,593,000 | $4,852,416 | $5,055,000 | $5,394,997 | $5,595,000 | $5,338,408 | $5,767,000 | $5,446,319 |
| END OF YEAR CASH | | | | | | | | |
| Cash Less Total Obligations (TO) | $5,102,000 | $5,305,502 | $4,332,000 | $4,745,126 | $1,312,000 | $4,452,852 | $2,676,611 | $3,812,257 |
| Cash Less TO and Next Year Assessment | $2,273,000 | $2,476,402 | $2,332,000 | $2,745,126 | $1,312,000 | $2,452,852 | $676,611 | $1,812,257 |
| Cash Less TO, Next Year Assess. and SF&R Cash | $835,000 | $979,402 | $467,000 | $857,808 | -$913,000 | $279,400 | -$1,912,389 | -$535,743 |

| ITEM | FY 2003 Original Budget | FY 2003 Inc & Oblig End of Year | FY 2004 Original Budget | FY 2004 Inc & Oblig End of Year | FY 2005 Original Budget | FY 2005 Inc & Oblig End of Year | FY 2006 Original Budget | FY 2006 Inc & Oblig End of Year |
|---|---|---|---|---|---|---|---|---|
| UNOBLIGATED CASH | | | | | | | | |
| Unoblig Cash on 10/1 | $3,480,064 | $3,827,873 | $2,497,206 | $2,597,248 | $2,586,687 | $2,586,687 | $3,813,187 | $4,558,612 |
| Deoblig Cash from Prior Year UDOs | $100,000 | $8,804 | $50,000 | $0 | $0 | $0 | $0 | $0 |
| TOTAL UNOBLIGATED CASH | $3,580,064 | $3,944,172 | $2,547,206 | $2,597,248 | $2,586,687 | $2,586,687 | $3,813,187 | $4,558,612 |
| INCOME | | | | | | | | |
| Assessment Collections Next FY ($/Acre) | $20.00 | $10.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 |
| Total Assessment Collections Next FY | $2,000,000 | $1,000,000 | $3,000,000 | $3,000,000 | $3,000,000 | $3,000,000 | | $3,000,000 |
| Assessment Collections Next FY (GRIDD) | | | | | | | $1,500,000 | |
| Assessment Collections Next FY (SCIDD) | | | | | | | $1,500,000 | |
| Unpaid Assessment Collections This FY (GRIDD) | | | | | | | | |
| Unpaid Assessment Collections This FY (SCIDD) | | | | | | | | |
| Interest | $185,000 | $145,523 | $81,000 | $19,214 | $19,000 | $49,544 | $19,000 | $233,249 |
| Excess Pumping | | $75,616 | | $463,283 | $0 | $333,216 | | $0 |
| Miscellaneous | $38,500 | $129,778 | $51,500 | $76,829 | $34,000 | $141,434 | $34,000 | $93,300 |
| TOTAL INCOME | $2,223,500 | $1,350,917 | $3,132,500 | $3,559,326 | $3,053,000 | $3,524,294 | $3,053,000 | $3,326,549 |
| TOTAL CASH AND INCOME | $5,803,564 | $5,295,089 | $5,679,706 | $6,156,574 | $5,639,687 | $6,110,981 | $6,866,187 | $7,885,161 |
| OBLIGATIONS | | | | | | | | |
| Personnel (boc 11) & Benefits (boc 12) | $1,249,000 | $1,092,445 | $1,267,000 | $934,587 | $1,135,000 | $818,563 | $970,000 | $819,648 |
| Travel (boc 21) | $15,000 | $8,179 | $7,000 | $0 | $7,000 | $3,562 | $8,000 | $2,707 |
| Utilities (boc 23 less power for pumping) | $66,000 | $64,321 | $83,000 | $31,718 | $67,000 | $26,597 | $70,000 | $26,377 |
| Power for Pumping (boc 23 for SCIDD) | $431,000 | $481,598 | $439,000 | $484,490 | $500,000 | $346,218 | $520,000 | $417,902 |
| Services (boc 25 less Gila Water Commissioner) | $591,000 | $619,213 | $518,929 | $421,181 | $581,408 | $377,868 | $495,000 | $588,418 |
| Gila Water Commissioner (boc 25) | $86,000 | $85,910 | $367,071 | $459,446 | $367,092 | $363,446 | $385,000 | $362,015 |
| Supplies (boc 26) | $215,000 | $215,866 | $178,000 | $227,905 | $205,000 | $80,713 | $215,000 | $158,159 |
| Equipment (boc 31) | $116,000 | $7,227 | $32,000 | $6,613 | $52,000 | $2,790 | $80,000 | $43,450 |
| Land & Structures & Special Projects (boc 32) | $0 | $0 | $351,000 | $0 | $410,000 | $0 | $640,000 | $492,275 |
| Deferred Maintenance | | | | | $0 | $0 | $0 | $0 |
| Other (boc 22, 24 & 42) | $2,000 | $0 | $2,000 | $0 | $2,000 | $0 | $2,100 | $452 |
| TOTAL OBLIGATIONS | $3,071,000 | $2,594,929 | $3,345,000 | $2,504,940 | $3,326,500 | $2,021,177 | $3,385,100 | $2,931,403 |
| SINKING FUNDS AND RESERVE (SF&R) CASH | | | | | | | | |
| Heavy Equipment | $535,450 | $436,000 | $441,950 | $26,975 | $9,844 | $9,844 | $262,000 | $8,000 |
| Well Replacement | $1,200,000 | $750,000 | $250,000 | $0 | $0 | $0 | $0 | $300,000 |
| China Wash Flume Rehab/Replacement | $234,000 | $234,000 | $0 | $351,000 | $0 | $351,000 | $0 | $492,275 |
| SCR Arch Survey of Drawdown Zone | | | | $51,500 | $0 | $0 | $55,000 | $0 |
| Emergency Reserve | $600,000 | $600,000 | $600,000 | $300,000 | $600,000 | $600,000 | $846,275 | $800,000 |
| SUBTOTAL SF&R CASH | $2,569,450 | $2,020,000 | $1,291,950 | $729,475 | $609,844 | $960,844 | $1,163,275 | $1,600,275 |
| TOTAL OBLIGATIONS AND SF&R CASH | $5,640,450 | $4,614,929 | $4,636,950 | $3,234,415 | $3,936,344 | $2,982,021 | $4,548,375 | $4,531,678 |
| END OF YEAR CASH | | | | | | | | |
| Cash Less Total Obligations (TO) | $2,732,554 | $2,700,160 | $2,334,706 | $3,511,634 | $2,313,187 | $4,089,804 | $3,481,087 | $4,953,758 |
| Cash Less TO and Next Year Assessment | $732,554 | $1,700,160 | $665,294 | $611,634 | -$686,813 | $1,089,804 | $481,087 | $1,953,758 |
| Cash Less TO, Next Year Assess. and SF&R Cash | -$1,836,886 | -$319,840 | $1,959,244 | -$117,841 | -$1,296,657 | $128,960 | -$682,188 | $353,483 |

| ITEM | FY 2007 Original Budget | FY 2007 Adjusted Budget | FY 2007 As Of 11/30/06 | FY 2008 Proposed Budget | FY 2009 Projected Budget | FY 2010 Projected Budget | FY 2011 Projected Budget |
|---|---|---|---|---|---|---|---|
| UNOBLIGATED CASH | | | | | | | |
| Unoblig Cash on 10/1 | $3,481,087 | $4,953,758 | $4,345,160 | $3,946,758 | $3,124,758 | $2,760,758 | $2,618,758 |
| Deoblig Cash from Prior Year UDOs | $0 | $0 | | $0 | $0 | $0 | $0 |
| TOTAL UNOBLIGATED CASH | $3,481,087 | $4,953,758 | $4,345,160 | $3,946,758 | $3,124,758 | $2,760,758 | $2,618,758 |
| INCOME | | | | | | | |
| Assessment Collections Next FY ($/Acre) | $30.00 | $23.00 | $21.00 | $21.00 | $23.00 | $29.00 | |
| Total Assessment Collections Next FY | | | | | | | |
| Assessment Collections Next FY (GRIDD) | $1,500,000 | $1,050,000 | $1,000,000 | $1,050,000 | $1,150,000 | $1,450,000 | |
| Assessment Collections Next FY (SCIDD) | $1,500,000 | $1,050,000 | | $1,050,000 | $1,150,000 | $1,450,000 | |
| Unpaid Assessment Collections This FY (GRIDD) | | | $500,000 | | | | |
| Unpaid Assessment Collections This FY (SCIDD) | | | $1,500,000 | | | | |
| Interest | $19,000 | $150,000 | $64,897 | $100,000 | $100,000 | $100,000 | $100,000 |
| Excess Pumping | $0 | $0 | $0 | $100,000 | $100,000 | $100,000 | $100,000 |
| Miscellaneous | $34,000 | $155,000 | $10,800 | $55,000 | $55,000 | $55,000 | $55,000 |
| TOTAL INCOME | $3,053,000 | $2,405,000 | $1,075,697 | $2,355,000 | $2,555,000 | $3,155,000 | $255,000 |
| TOTAL CASH AND INCOME | $6,534,087 | $7,358,758 | $5,420,857 | $6,301,758 | $5,679,758 | $5,915,758 | $2,873,758 |
| OBLIGATIONS | | | | | | | |
| Personnel (boc 11) & Benefits (boc 12) | $1,000,000 | $1,091,000 | $162,161 | $1,123,000 | $1,157,000 | $1,191,000 | $1,227,000 |
| Travel (boc 21) | $8,250 | $5,000 | $140 | $3,000 | $3,000 | $4,000 | $4,000 |
| Utilities (boc 23 less power for pumping) | $72,100 | $76,000 | $4,942 | $79,000 | $81,000 | $83,000 | $86,000 |
| Power for Pumping (boc 23 for SCIDD) | $546,000 | $619,000 | $26,815 | $619,000 | $619,000 | $619,000 | $619,000 |
| Services (boc 25 less Gila Water Commissioner) | $510,300 | $422,000 | $43,658 | $585,000 | $448,000 | $511,000 | $475,000 |
| Gila Water Commissioner (boc 25) | $404,300 | $376,000 | $0 | $387,000 | $399,000 | $411,000 | $423,000 |
| Supplies (boc 26) | $222,000 | $113,000 | $32,759 | $116,000 | $120,000 | $123,000 | $113,000 |
| Equipment (boc 31) | $70,000 | $33,000 | $184 | $13,000 | $40,000 | $203,000 | $77,000 |
| Land & Structures & Special Projects (boc 32) | $761,700 | $675,000 | $0 | $250,000 | $50,000 | $50,000 | $50,000 |
| Deferred Maintenance | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other (boc 22, 24 & 42) | $2,200 | $2,000 | $0 | $2,000 | $2,000 | $2,000 | $2,000 |
| TOTAL OBLIGATIONS | $3,536,850 | $3,412,000 | $270,759 | $3,177,000 | $2,919,000 | $3,297,000 | $3,076,000 |
| SINKING FUNDS AND RESERVE (SF&R) CASH | | | | | | | |
| Heavy Equipment | $522,000 | $39,000 | $0 | $89,000 | $133,000 | $34,000 | $51,000 |
| Well Replacement | $330,000 | $0 | $0 | $0 | $0 | $0 | $0 |
| China Wash Flume Rehab/Replacement | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| SCR Arch Survey of Drawdown Zone | $0 | $75,000 | $0 | $0 | $75,000 | $0 | $75,000 |
| Emergency Reserve | $884,213 | $800,000 | $0 | $600,000 | $800,000 | $800,000 | $800,000 |
| SUBTOTAL SF&R CASH | $1,736,213 | $914,000 | $0 | $689,000 | $1,008,000 | $834,000 | $926,000 |
| TOTAL OBLIGATIONS AND SF&R CASH | $5,273,063 | $4,326,000 | $0 | $3,866,000 | $3,927,000 | $4,131,000 | $4,002,000 |
| END OF YEAR CASH | | | | | | | |
| Cash Less Total Obligations (TO) | $2,987,237 | $3,946,758 | $5,150,098 | $3,124,758 | $2,780,758 | $2,618,758 | $702,242 |
| Cash Less TO and Next Year Assessment | $2,997,237 | $3,946,758 | $4,150,098 | $3,124,758 | $2,780,758 | $2,618,758 | $702,242 |
| Cash Less TO, Next Year Assess. and SF&R Cash | $1,261,024 | $3,032,758 | $4,150,098 | $2,435,758 | $1,752,758 | $1,784,758 | -$1,128,242 |

Exhibit 6
Page 1 of 1

Cash Flow Summary
In Thousands

| | Rollforward | Per 12/12/06 Spreadsheet |
|---|---|---|
| By Year: | | |
| FY 1999 | | |
| Beginning balance, 10/1/98 | $ 5,018 | $ 5,018 |
| Deobligated cash | 165 | |
| Assessment collections | 2,829 | |
| Other income | 649 | |
| Obligations | (3,355) | |
| Ending balance, 9/30/99 | 5,306 | 5,306 |
| FY 2000: | | |
| Beginning balance, 10/1/99 | 5,306 | 5,304 |
| Deobligated cash | 277 | |
| Assessment collections | 2,000 | |
| Other income | 671 | |
| Obligations | (3,508) | |
| Ending balance, 9/30/00 | 4,746 | 4,745 |
| FY 2001: | | |
| Beginning balance, 10/1/00 | 4,746 | 4,678 |
| Deobligated cash | 366 | |
| Assessment collections | 2,000 | |
| Other income | 574 | |
| Obligations | (3,165) | |
| Ending balance, 9/30/01 | 4,521 | 4,453 |
| FY 2002 | | |
| Beginning balance, 10/1/01 | 4,521 | 4,501 |
| Deobligated cash | 69 | |
| Assessment collections | 2,000 | |
| Other income | 340 | |
| Obligations | (3,098) | |
| Ending balance, 9/30/02 | 3,832 | 3,812 |
| FY 2003: | | |
| Beginning balance, 10/1/02 | 3,832 | 3,828 |
| Deobligated cash | 9 | |
| Assessment collections | 1,000 | |
| Other income | 351 | |
| Obligations | (2,595) | |
| Ending balance, 9/30/03 | 2,597 | 2,700 |
| FY 2004: | | |
| Beginning balance, 10/1/03 | 2,597 | 2,597 |
| Deobligated cash | - | |
| Assessment collections (1) | 2,000 | |
| Other income | 579 | |
| Obligations | (2,565) | |
| Ending balance, 9/30/04 | 2,611 | 3,612 |
| FY 2005 | | |
| Beginning balance, 10/1/04 | 2,611 | 2,587 |
| Deobligated cash | - | |
| Assessment collections | 3,000 | |
| Other income | 524 | |
| Obligations | (2,021) | |
| Ending balance, 9/30/05 | 4,114 | 4,090 |
| FY 2006: | | |
| Beginning balance, 10/1/05 | 4,114 | 4,559 |
| Deobligated cash | - | |
| Assessment collections | 3,000 | |
| Other income | 327 | |
| Obligations, excl. special projects | (2,439) | |
| Special projects (China Wash) | (492) | |
| Ending balance 9/30/06 | $ 4,510 | $ 4,954 |
| Difference from rollforward | | $ 444 |

(1) Assessments were noted as $3,000,000 on the 12/12/06 spreadsheet.

# FY 2006 IRRIGATION BUDGET

Prepared by: Carl Christensen
Date: 10/02/06
Months Elapsed This Fiscal Year: 100%

| | Budget | September | Summation 10/01/05-09/30/06 | Income & Obligations As Percent of Budget |
|---|---|---|---|---|
| Unobligated Cash: Beginning | 4,053,255<br>10/01/05 | | 5,255,122<br>08/31/06 | |
| Unobligated Cash: Ending | 3,481,087<br>09/30/06 | | 5,050,887<br>08/31/06 | |
| ***Summation Income:*** | | | | |
| Indian Works (Overpumping) | | | | |
| Interest | 19,000 | | 233,249 | |
| Miscellaneous | 20,000 | 6,000 | 93,300 | |
| O&M Assessment * | 3,000,000 | | 3,000,000 | 100 |
| Total Income | 3,039,000 | | 3,326,549 | 109 |
| ***Balance Undelivered Orders:*** | | | | |
| FY 2005 Services | | | | |
| ***Summation Obligations:*** | | | | |
| Personnel | 970,000 | 64,780 | 819,648 | 84 |
| Travel | 8,000 | | 2,707 | 34 |
| Utilities | 70,000 | 3,661 | 26,377 | 38 |
| Power for Pumping | 520,000 | 74,769 | 437,902 | 84 |
| Services | 495,000 | 55,642 | 588,418 | 119 |
| Water Commissioner | 385,000 | | 362,015 | 94 |
| Supplies | 215,000 | 7,520 | 158,159 | 74 |
| Equipment | 80,000 | | 43,450 | 54 |
| China Wash** | 260,000 | | | |
| Other | 2,000 | | 452 | 23 |
| Subtotal Obligations | 3,005,000 | 206,372 | 2,439,218 | 81 |

* 2006 Assessment:
IW Paid $500,000 – 01/13/06
SCIDD Paid $1,500,000 – 03/01/06
2007 Assessment:
IW Paid $1,000,000 – 01/13/06
IW Owes $500,000 – Due 10/01/06
SCIDD Owes $1,500,000 – Due 05/15/06

CASH

| | | |
|---|---|---|
| 8/31/06 | | $5,255,122 |
| Obligation | + | 26,435 |
| Income | + | 6,000 |
| Disbursement | - | 236,670 |
| 9/30/06 | | $5,050,887 |

# FY 2007 IRRIGATION BUDGET

Prepared by: Carl Christensen
Date: 10/1/07
Months Elapsed This FY: 100%

| | Budget | September | FY Summation | Income & Obligations As Percent of Budget |
|---|---|---|---|---|
| Unobligated Cash: Beginning | 4,558.612<br>10/1/06 | | 4,478,190<br>8/31/07 | |
| Unobligated Cash: Ending | 4,500,000<br>9/30/07 | | 2,134,904<br>9/30/2007 | |
| **Summation Income:** | | | | |
| Indian Works (Overpumping) | | | | |
| Interest | 150,000 | | 245,174 | 163% |
| Miscellaneous | 155,000 | 5 | 55,680 | 36% |
| O&M Assessment* | 3,050,000 | | 2,000,000 | 66% |
| Total Income | 3,355,000 | 5 | 2,300,854 | 69% |
| **Balance Undelivered Orders:** | | | | |
| FY 2006 Services | | | | |
| **Summation Obligations:** | | | | |
| Personnel** | 1,091,000 | 12 | 947,254 | 87% |
| Travel | 5,000 | | 816 | 16% |
| Utilities + Rent + Equipment | 76,000 | 1,921 | 35,601 | 47% |
| Power for Pumping | 619,000 | 479,158 | 509,577 | 82% |
| Services | 422,000 | 110,727 | 617,204 | 146% |
| Water Commissioner | 376,000 | | 389,441 | 104% |
| Supplies | 113,000 | 145,611 | 301,723 | 267% |
| Equipment | 33,000 | | 3,176 | 10% |
| Well Replacement & Abandonment*** | 675,000 | 2,000,000 | 2,345,297 | 347% |
| Subtotal Obligations | 3,410,000 | 2,737,429 | 5,150,089 | 151% |

| | Cash |
|---|---|
| 8/31/2007 | 4,478,190 |
| Obligation | (1,764,836) |
| Income | 5 |
| Disbursement | (578,455) |
| 9/30/2007 | 2,134,904 |

* 2007 Assessment:
IW Paid $500.000 on 6/29/07
SCIDD Paid $1,500,000 on 02/27/07

* 2008 Assesment:
IW Owes $1,050,000 - Due 10/01/07
SCIDD Owes $1,050,000 - Due 05/15/07

** Includes accrual to 9/30/07

*** Includes Coolidge Dam, San Carlos Reservoir & New Office Building

Exhibit 9
Page 1 of 3

# FY 2006 IRRI ION DIVISION

| End of the Month | Collections excluding interest | Interest | Total Collection | Disbursement | Undelivered Order | Cash Balance |
|---|---|---|---|---|---|---|
| September | 18,457 | 2,204 | 20,661 | 168,093 | 224,781 | 4,053,255 |
| October | 2,329 | 65,851 | 68,180 | 135,844 | 182,364 | 4,028,008 |
| November | 19.70 | -0.43 | 19.00 | 100,678.37 | 271,075 | 3,838,638 |
| December | 453 | 0 | 453 | 85,600 | 500,566 | 3,523,999 |
| January | 1,508,251 | 39,407 | 1,547,658 | 172,630 | 469,229 | 4,922,108 |
| February | 15 | 0 | 15 | 80,983 | 521,032 | 4,789,338 |
| March | 1,506,231 | 0 | 1,506,231 | 271,746 | 359,043 | 6,185,813 |
| April | 616 | 54,554 | 55,170 | 273,406 | 293,686 | 6,032,932 |
| May | 23,191 | 0 | 23,191 | 77,594 | 274,151 | 5,998,065 |
| June | 46,195 | 0 | 46,195 | 194,866 | 331,353 | 5,792,200 |
| July | 0 | 71,233 | 71,233 | 293,164 | 369,646 | 5,531,968 |
| August | 0 | 0 | 0 | 457,445 | 189,047 | 5,255,122 |
| September | 6,000 | 0 | 6,000 | 236,670 | 654,887 | 4,558,612 |

# FY 2005 IRRI ION DIVISION

| End of the Month | Collections excluding interest | Interest | Total Collection | Disbursement | Undelivered Order | Cash Balance |
|---|---|---|---|---|---|---|
| September | 6,060 | 0 | 6,060 | 315,149 | 279,565 | 2,586,687 |
| October | 17,495 | 19,034 | 36,529 | 161,434 | 277,340 | 2,464,007 |
| November | 2,180 | 0 | 2,180 | 88,528 | 297,831 | 2,357,167 |
| December | 506 | 0 | 506 | 146,443 | 458,537 | 2,063,024 |
| January | 1,533 | 0 | 1,533 | 100,267 | 428,447 | 1,981,864 |
| February | 5 | 0 | 5 | 269,753 | 329,916 | 1,814,575 |
| March | 1,050,242 | 0 | 1,050,242 | 140,622 | 233,410 | 2,823,229 |
| April | 501,016 | 0 | 501,016 | 156,067 | 314,794 | 3,090,023 |
| May | 1,835,101 | 23,769 | 1,858,870 | 109,089 | 190,949 | 4,963,669 |
| June | 9,309 | 4,637 | 13,946 | 380,844 | 174,474 | 4,590,746 |
| July | 3,398 | 0 | 3,398 | 232,085 | 279,537 | 4,279,377 |
| August | 35,408 | 0 | 35,408 | 168,854 | 241,295 | 4,184,173 |
| September | 18,457 | 20,661 | 20,661 | 168,093 | 226,467 | 4,051,569 |

# FY 2004 IRRI ION DIVISION

| End of the Month | Collections excluding interest | Interest | Total Collection | Disbursement | Undelivered Order | Cash Balance |
|---|---|---|---|---|---|---|
| September | 19,872 | 0 | 19,872 | 441,869 | 354,502 | 2,597,348 |
| October | 9,338 | 24,069 | 33,407 | 206,318 | 314,539 | 2,464,801 |
| November | 1,003,022 | 0 | 1,003,022 | 123,912 | 334,256 | 3,324,194 |
| December | 782 | 0 | 782 | 108,997 | 358,603 | 3,191,633 |
| January | 3,329 | 0 | 3,329 | 255,761 | 354,548 | 2,943,254 |
| February | 5,181 | 0 | 5,181 | 155,540 | 299,578 | 2,847,866 |
| March | 474,452 | 0 | 474,452 | 183,852 | 340,717 | 3,097,327 |
| April | 24,211 | 0 | 24,211 | 82,697 | 353,585 | 3,025,972 |
| May | 3,819 | 15,145 | 18,964 | 104,310 | 350,895 | 3,943,316 |
| June | 1,139 | 0 | 1,139 | 537,652 | 385,701 | 3,371,997 |
| July | 6,330 | 0 | 6,330 | 200,873 | 314,902 | 3,248,253 |
| August | 2,448 | 0 | 2,448 | 390,262 | 182,421 | 2,992,919 |
| September | 6,060 | 0 | 6,060 | 315,149 | 279,565 | 2,586,687 |

# SFRC vs. Total Obligations




□ SFRC Reported at End of Fiscal Year

▨ Total Obligations for Betterments, Subsequent 3 Fiscal Years (for example, total showing for FY 1999 represents amounts spent or obligated for betterments in FY 2000, FY 2001, and FY 2002)

N/A = Not available

Sinking Funds and Reserve Cash (SFRC) Comparison
to Certain Obligations by Fiscal Year (FY)

| Fiscal Year | End of Year SFRC | Total FY Obligations (a) | Subsequent Three Years of Obligations |
|---|---|---|---|
| 1999 | $ 1,497,000 | $ 350,560 | $ 424,477 |
| 2000 | $ 1,887,318 | $ 240,054 | $ 191,720 |
| 2001 | $ 2,173,450 | $ 103,151 | $ 95,182 |
| 2002 | $ 2,348,000 | $ 81,272 | $ 16,700 |
| 2003 | $ 2,020,000 | $ 7,297 | $ 545,128 |
| 2004 | $ 729,475 | $ 6,613 | $ 886,988 |
| 2005 | $ 960,844 | $ 2,790 | N/A |
| 2006 | $ 1,600,275 | $ 535,725 | N/A |
| 2007 | Unknown | $ 348,473 (b) | N/A |
| | | $ 1,675,935 | |

(a) Sum of "Equipment," "Land & Structure & Special Projects," and "Deferred Maintenance."

(b) Excludes $2,000,000 Well Replacement & Abandonment added in September 2007.

Average Operations and Maintenance Expenditures (OME), 2003-2007

| Fiscal Year | End of Year Total Obligations | End of Year Betterments (a) | End of Year OME |
|---|---|---|---|
| 2003 | $ 2,594,929 | $ 7,297 | $ 2,587,632 |
| 2004 | $ 2,564,940 | $ 6,613 | $ 2,558,327 |
| 2005 | $ 2,021,177 | $ 2,790 | $ 2,018,387 |
| 2006 | $ 2,931,403 | $ 535,725 | $ 2,395,678 |
| 2007 | $ 5,150,089 | $ 2,345,297 | $ 2,804,792 |
| | $ 15,262,538 | $ 2,897,722 | $ 12,364,816 |
| Average OME | | | $ 2,472,963 |

(a) Sum of "Equipment," "Land & Structure & Special Projects," "Deferred Maintenance," and "Well Replacement & Abandonment" included in Total Obligations.

Exhibit 12
Page 1 of 2

nterest Collected by Month

| | Fiscal Year 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|
| October | $ 189,820 | $ - | $ - | $ - | $ - | $ 24,069 | $ 19,034 | $ 65,851 | $ 65,118 |
| November | - | - | - | - | - | - | - | - | - |
| December | - | - | - | - | 98,049 | - | - | - | - |
| January | - | - | - | - | 9,150 | - | - | 39,407 | 63,396 |
| February | - | - | - | - | - | - | - | - | - |
| March | 77,364 | - | - | - | - | - | - | - | - |
| April | 164,044 | 164,525 | 165,876 | - | 38,324 | - | - | 54,554 | 52,602 |
| May | - | - | - | 64,439 | - | 15,145 | 23,769 | - | - |
| June | - | - | - | - | - | - | 4,637 | - | - |
| July | - | - | - | 12,203 | - | - | - | 71,233 | 65,755 |
| August | - | - | - | - | - | - | - | - | - |
| September | - | 187,809 | 123,805 | - | - | - | 2,204 (b) | - | - |
| Total for FY | $ 431,228 | $ 352,334 | $ 289,681 | $ 76,642 | $ 145,523 | $ 39,214 | $ 49,644 | $ 231,045 | $ 246,871 |
| | (a) | (a) | (a) | (a) | (a) | (a) | (a) | 233,249 (c) | 245,174 (d) |
| Difference | | | | | | | | (2,204) | 1,697 |
| Unobligated cash 10/1 | $ 5,018,352 | $ 5,248,467 | $ 4,677,772 | $ 4,501,241 | $ 3,827,873 | $ 2,597,348 | $ 2,586,687 | $ 4,051,569 | $ 4,558,612 |
| Unobligated cash 9/30 | $ 5,248,467 | $ 4,677,772 | $ 4,501,241 | $ 3,827,873 | $ 2,597,348 | $ 2,586,687 | $ 4,051,569 | $ 4,558,612 | $ 4,134,904 (e) |
| Average unobligated cash | $ 5,133,410 | $ 4,963,120 | $ 4,589,507 | $ 4,164,557 | $ 3,212,611 | $ 2,592,018 | $ 3,319,128 | $ 4,305,091 | $ 4,346,758 |
| Average interest rate | 8.4% | 7.1% | 6.3% | 1.8% | 4.5% | 1.5% | 1.5% | 5.4% | 5.7% |
| 3 Month T-Bill Rate, March | 4.5% | 5.9% | 4.5% | 1.8% | 1.2% | 1.0% | 2.8% | 4.6% | 5.1% |

(a) Agrees to "Operation & Maintenance Budget" spreadsheet dated 12/12/06.
(b) Noted as $20,661 on "FY 2005 Irrigation Division" summary of collections, interest, and disbursements by month. Corrected on "FY 2006 Irrigation Division" summary of collections, interest, and disbursements by month.
(c) Total interest according to "Operation & Maintenance Budget" spreadsheet dated 12/12/06. It appears that the $2,204 collected in September 2005 was counted twice.
(d) Total interest for FY 2007 according to "FY 2007 Irrigation Budget" spreadsheet dated 10/1/07. Reason for difference is unknown.
(e) Adjusted for $2,000,000 encumbered for well replacement and abandonment in September 2007

## Actual Interest Rate Earned vs. Three Month T-Bill Rate



# Statement of Financial Accounting Concepts No. 2

CON2 Status Page

## Qualitative Characteristics of Accounting Information

May 1980

Financial Accounting Standards Board
of the Financial Accounting Foundation
401 MERRITT 7, P.O. BOX 5116, NORWALK, CONNECTICUT 06856-5116

CCH

FASB - Financial Accounting Standards Board
FASB Concepts Statements\Original Pronouncements
Statement of Financial Accounting Concepts No. 2: Qualitative Characteristics of Accounting Information

# STATEMENT OF FINANCIAL ACCOUNTING CONCEPTS NO. 2: QUALITATIVE CHARACTERISTICS OF ACCOUNTING INFORMATION

(c) 1980 Financial Accounting Standards Board

## STATUS

Issued: May 1980

Affects: No other pronouncements

Affected by: Paragraph 4 and footnote 2 replaced by CON 6

## SUMMARY OF PRINCIPAL CONCLUSIONS

The purpose of this Statement is to examine the characteristics that make accounting information useful. Those who prepare, audit, and use financial reports, as well as the Financial Accounting Standards Board, must often select or evaluate accounting alternatives. The characteristics or qualities of information discussed in this Statement are the ingredients that make information useful and are the qualities to be sought when accounting choices are made.

All financial reporting is concerned in varying degrees with decision making (though decision makers also use information obtained from other sources). The need for information on which to base investment, credit, and similar decisions underlies the objectives of financial reporting. The usefulness of information must be evaluated in relation to the purposes to be served, and the objectives of financial reporting are focused on the use of accounting information in decision making.

*****************************************************************************

# STATEMENTS OF FINANCIAL ACCOUNTING CONCEPTS

This Statement of Financial Accounting Concepts is one of a series of publications in the Board's conceptual framework for financial accounting and reporting. Statements in the series are intended to set forth objectives and fundamentals that will be the basis for development of financial accounting and reporting standards. The objectives identify the goals and purposes of financial reporting. The fundamentals are the underlying concepts of financial accounting -- concepts that guide the selection of transactions, events, and circumstances to be accounted for, their recognition and measurement, and the means of summarizing and communicating them to interested parties. Concepts of that type are fundamental in the sense that other concepts flow from them and repeated reference to them will be necessary in establishing, interpreting, and applying accounting and reporting standards.

The conceptual framework is a coherent system of interrelated objectives and fundamentals that is expected to lead to consistent standards and that prescribes the nature, function, and limits of financial accounting and reporting. It is expected to serve the public interest by providing structure and direction to financial accounting and reporting to facilitate the provision of evenhanded financial and related information that is useful in assisting capital and other markets to function efficiently in allocating scarce resources in the economy.

Establishment of objectives and identification of fundamental concepts will not directly solve financial accounting and reporting problems. Rather, objectives give direction, and concepts are tools for solving problems.

The Board itself is likely to be the most direct beneficiary of the guidance provided by the Statements in this series. They will guide the Board in developing accounting and reporting standards by providing the Board with a common foundation and basic reasoning on which to consider merits of alternatives.

However, knowledge of the objectives and concepts the Board will use in developing standards should also enable those who are affected by or interested in financial accounting standards to understand better the purposes, content, and characteristics of information provided by financial accounting and reporting. That knowledge is expected to enhance the usefulness of, and confidence in, financial accounting and reporting. Careful use of the concepts may also provide guidance in resolving new or emerging problems of financial accounting and reporting in the absence of applicable authoritative pronouncements.

Statements of Financial Accounting Concepts do not establish standards prescribing accounting procedures or disclosure practices for particular items or events, which are issued by the Board as Statements of Financial Accounting Standards. Rather, Statements in this series describe concepts and relations that will underlie future financial accounting standards and practices and in due course serve as a basis for evaluating existing standards and practices. [See *]

> [* Pronouncements such as APB Statement No. 4, "Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises", and the Accounting Terminology Bulletins will continue to serve their intended purpose -- they describe objectives and concepts underlying standards and practices existing at the time of their issuance.]

The Board recognizes that in certain respects current generally accepted accounting principles may be inconsistent with those that may derive from the objectives and concepts set forth in Statements in this series. However, a Statement of Financial Accounting Concepts does not (a) require a change in existing generally accepted accounting principles, (b) amend, modify, or interpret Statements of Financial Accounting Standards, Interpretations of the FASB, Opinions of the Accounting Principles Board, or Bulletins of the Committee on Accounting Procedure that are in effect, or (c) justify either changing existing generally accepted accounting and reporting practices or interpreting the pronouncements listed in item (b) based on personal interpretations of the objectives and concepts in the Statements of Financial Accounting Concepts.

Since a Statement of Financial Accounting Concepts does not establish generally accepted accounting principles or standards for the disclosure of financial information outside of financial statements in published financial reports, it is not intended to invoke application of Rule 203 or 204 of the Rules of Conduct of the Code of Professional Ethics of the American Institute of Certified Public Accountants (or successor rules or arrangements of similar scope and intent). [See +]

> [+ Rule 203 prohibits a member of the American Institute of Certified Public Accountants from expressing an opinion that financial statements conform with generally accepted accounting principles if those statements contain a material departure from an accounting principle promulgated by the Financial Accounting Standards Board, unless the member can demonstrate that because of unusual circumstances the financial statements otherwise would have been misleading. Rule 204 requires members of the Institute to justify departures from standards promulgated by the Financial Accounting Standards Board for the disclosure of information outside of financial statements in published financial reports.]

*****************************************************************

INTRODUCTION

1. The purpose of this Statement is to examine the characteristics of accounting information[1] that make that information useful. This Statement is one of a planned series of publications in the Board's conceptual framework project. It should be seen as a bridge between FASB Concepts Statement No. 1, "Objectives of Financial Reporting By Business Enterprises", and other Statements to be issued covering the elements of financial statements and their recognition, measurement, and display. The Statement on objectives was concerned with the PURPOSES of financial reporting. Later Statements will be concerned with questions about HOW those purposes are to be attained; and the standards that the Board has issued and will issue from time to time are also intended to attain those purposes. The Board believes that, in between the "why" of objectives and the "how" of other Statements and standards, it is helpful to share with its constituents its thinking about the characteristics that the information called for in its standards should have. It is those characteristics that distinguish more useful accounting information from less useful information.

[1] "Accounting information", "information provided by financial reporting", and variations on those descriptions are used interchangeably in this Statement.

*****************************************************************************

RELIABILITY

58. That information should be reliable as well as relevant is a notion that is central to accounting. It is, therefore, important to be clear about the nature of the claim that is being made for an accounting number that is described as reliable.

59. The reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user, which comes through verification, that it has that representational quality. Of course, degrees of reliability must be recognized. It is hardly ever a question of black or white, but rather of more reliability or less.

60. Two different meanings of reliability can be distinguished and illustrated by considering what might be meant by describing a drug as reliable. It could mean that the drug can be relied on to cure or alleviate the condition for which it was prescribed, or it could mean that a dose of the drug can be relied on to conform to the formula shown on the label. The first meaning implies that the drug is effective at doing what it is expected to do. The second meaning implies nothing about effectiveness but does imply a correspondence between what is represented on the label and what is contained in the bottle.[8]

[8] Perhaps, more accurately, there is also a third meaning -- that the drug does not have hidden undesirable side effects. The alleged undesirable economic impact of certain FASB standards is perhaps an accounting analogue to side effects of drugs, which are, in essence, costs to be considered in a cost-benefit analysis.

61. Effectiveness is indeed a quality that is necessary in information, but in an accounting context it goes by another name -- relevance. It is not always easy to maintain a clear distinction between relevance and reliability, as in the drug illustration, yet it is important to try to keep the two concepts apart. Given at least a minimum acceptable level of reliability, the choice of a drug will depend on its effectiveness in treating the condition for which it is prescribed.

62. Use of the term reliability in this Statement implies nothing about effectiveness. Accounting information is reliable to the extent that users can depend on it to represent the economic conditions or events that it purports to represent. As indicated in paragraph 59, reliability of accounting information stems from two characteristics that it is desirable to keep separate, representational faithfulness and verifiability. Neutrality of information also interacts with those two characteristics to affect its usefulness.

REPRESENTATIONAL FAITHFULNESS

63. Representational faithfulness is correspondence or agreement between a measure or description and the phenomenon it purports to represent. In accounting, the phenomena to be represented are economic resources and obligations and the transactions and events that change those resources and obligations.9

[9] Representational faithfulness is closely related to what behavioral scientists call "validity", as in the statement that intelligence quotients are (or are not) a valid measure of intelligence. Validity is a more convenient term than representational faithfulness, but out of its scientific context it has too broad a connotation for it to be an appropriate substitute.

*******************************************************************