**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 06-576C<br>(Judge Block)<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff San Carlos Irrigation and Drainage District ("District") moves this Court for an order granting summary judgment against the United States for the reasons discussed in the attached Memorandum and damages in the amount of $1,697,500. The District's Motion is supported by the Proposed Findings of Uncontroverted Fact filed on this date and the affidavits, depositions and exhibits attached thereto. The District requests that the court schedule oral argument on this motion.

Respectfully Submitted this 9th day of April 2008.

Salmon, Lewis & Weldon, P.L.C.

By: /s/ RINEY B. SALMON
Riney B. Salmon, II
Salmon, Lewis & Weldon, PLC
2850 E. Camelback Road
Suite 200
Phoenix, Arizona 85016

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 06-576C
(Judge Block)

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff San Carlos Irrigation and Drainage District ("District") moves this Court for an order granting summary judgment against the United States for the reasons discussed in the attached Memorandum and damages in the amount of $1,697,500. The District's Motion is supported by the Proposed Findings of Uncontroverted Fact filed on this date and the affidavits, depositions and exhibits attached thereto. The District requests that the court schedule oral argument on this motion.

Respectfully Submitted this 9th day of April 2008.

Salmon, Lewis & Weldon, P.L.C.

By: ______________________

Riney B. Salmon, II
Salmon, Lewis & Weldon, PLC
2850 E. Camelback Road
Suite 200
Phoenix, Arizona 85016

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**

**MOTION FOR SUMMARY JUDGMENT**

The District represents landowners in Pinal County, Arizona, who collectively own 50,000 acres that are entitled to receive irrigation water from the federal San Carlos Irrigation Project ("the Project"). Each year, the District collects money from these landowners to pay the Project's annual operation and maintenance ("O&M") charge, as required under contracts between the District and United States. The United States has failed to perform two of its reciprocal contractual obligations related to these O&M charges.

First, the United States has a contractual and good-faith duty to fix the O&M charge for a given fiscal year ("FY") within a specific timeframe. The District must receive notice of the charge in time to assess and collect the charge from its landowners under the annual tax assessment process defined under Arizona law and meet the District's contractual payment deadline. The United States failed to timely fix the charges for FY 2005-2007.

Second, the United States has a duty to fix the O&M charge for each year based on a reasonable estimate of the Project's future financial needs. The final O&M charge must be based upon a good faith honest belief, after "careful computations" of historical expenses and future needs, that the charge "will cover the expenses and outlays directly and fairly connected with" Project O&M costs.[1] For the fiscal years at issue, however, the United States fixed O&M charges at excessive, unreasonable, and unauthorized levels without concern for the Project's actual O&M needs. As a result, the Project accumulated an excessive and unauthorized cash surplus at the expense of the District and its landowners.

The District was damaged by the United States' material breaches in regard to O&M charges collected for FY 2005-2007. The facts supporting the District's claims are clear and indisputable. Therefore, the District seeks summary judgment against the United States and damages in the amount of $1,697,500.

---

[1] *Yuma County Water Users' Ass'n v. Schlecht*, 275 F. 885, 888 (1921).

## I. Summary of Facts

The District is an irrigation and drainage district organized and existing under the laws of the State of Arizona and a political subdivision of the State. Located in Pinal County, Arizona, the District embraces 50,000 acres of irrigable public and private lands within the boundaries of the Project.[2]

The Project is a federal irrigation project operated by the United States Department of the Interior's Bureau of Indian Affairs ("BIA"), with direct oversight by the Natural Resources Division of the BIA's Western Regional Office. Congress authorized the Project under the San Carlos Project Act of June 7, 1924 ("1924 Act") for the purpose of delivering irrigation water to 50,000 acres of District lands and 50,000 acres of Indian lands on the Gila River Indian Reservation.[3]

After the Project was authorized by Congress, each landowner within the District entered into the *Landowners' Agreement with the Secretary of the Interior, San Carlos Project: Act of June 7, 1924* ("Landowners' Agreement") with the United States wherein they surrendered to the United States their surface water rights and their right to pump groundwater for irrigation purposes. The landowners further consented to a permanent first lien on their irrigable lands and agreed to pay the United States (on a per-acre share basis) one-half the original construction cost of the Project and one-half of the Project's annual operation and maintenance charges. In return, the United States contracted to fulfill certain duties to the landowners, including the obligation to deliver water for irrigation and to operate and maintain the Project's storage, diversion, and delivery works.[4]

The 1924 Act directed the United States to enter into "an appropriate repayment contract" with an irrigation district representing the owners of irrigable non-Indian lands in the Project.

---

[2] Proposed Findings of Uncontroverted Fact, ¶¶ 1-2 (April 9, 2008) ("FOF").
[3] *Id.* ¶¶ 3, 4, and 7.
[4] *Id.* ¶¶ 10-13.

On July 16, 1928, the District was formed under Arizona law to represent these landowners and enter into a repayment contract.[5]

The *Repayment Contract Between the United States and the San Carlos Irrigation and Drainage District, Arizona* (June 8, 1931) ("Repayment Contract"), sets forth express mutual obligations between the District and the United States. The Repayment Contract further defines the commitments made in the Landowners' Agreement, including the obligations to repay a pro rata share of the Project's construction costs and annual O&M charges and to accept liens on land within the District in favor of the United States.[6] In exchange and "in consideration of the promises...mutual covenants, and other valuable considerations" given by the District, the United States obligated itself to "maintain all of the project works," store and deliver irrigation water to Indian and private lands equally, and annually fix a reasonable O&M charge for payment by the District under a process dictated by the Repayment Contract and Arizona law.[7] The Repayment Contract was later supplemented to provide more time for the District to pay the annual O&M charges to the United States without penalty.[8]

On June 15, 1938, the Secretary executed a "Joint Works Order" with the District that was based on the Repayment Contract and Landowners' Agreement incorporated therein. The Joint Works Order defined responsibilities among the District, Indians and United States for District Works, Indian Works, and Joint Works, respectively.[9]

Based upon these agreements, statutes, and administrative orders, the United States operates and maintains the Project's Joint Works. The United States is entitled to recoup the "total annual cost of operation and maintenance"[10] from landowners in the Project by assessing a reasonable operation and maintenance charge on an uniform per-acre basis. Under its contracts

---

[5] FOF, ¶¶ 15-17.
[6] *Id.* ¶¶ 18-19.
[7] *Id.* ¶¶ 18, 20 and 21.
[8] *Id.* ¶¶ 25-26.
[9] *Id.* ¶¶ 27-29.
[10] *Id.* ¶¶ 13 and 21.

with the District, the United States (acting through the Secretary of the Interior) must "fix" the O&M charge on an annual basis and notify the District of the charge.[11] The District then collects the charge from its landowners on the annual per-acre basis through the property tax assessment and collection process dictated by Arizona law. To permit time for the assessment and collection process, the United States must notify the District of the annual O&M charge by July 1 of the year preceding the start of the Project's fiscal year (which starts October 1).[12]

## II. Legal Argument

### A. The District is Entitled to Damages for Breach of Contract by the United States as a Matter of Law.

The Landowners' Agreement and the Repayment Contract, as supplemented, represent valid and binding contracts between the United States, the District, and the non-Indian landowners whom the District represents. The District and its landowners gave substantial consideration to the United States as part of these bargained-for agreements, including valuable water rights, a lien on lands within the District, and a commitment to pay the original construction cost of the Project and an annual operation and maintenance charge imposed by the United States.[13] By turning over their water rights, the landowners conveyed access to the only water available to develop their lands and the United States essentially assumed absolute control over the agricultural and economic development of the District. The landowners' consent to a permanent lien on their lands assured the Government's control over their lands by giving the United States potential ownership of 50,000 acres in the event of default. The District's agreement to reimburse the United States for one-half of Project construction costs and annual O&M charges provided an assurance that Project operations would not be supported by public tax dollars.

---

[11] FOF, ¶ 18.
[12] *Id.* ¶¶ 18 and 40-43.
[13] *Id.* ¶¶ 11-13 and 18-19.

For its part, the United States assumed crucial obligations to the District and its landowners. It agreed to: (1) operate and maintain the Joint Works of the Project for the benefit of all landowners within the Project; (2) fix the O&M charges on an annual basis; (3) provide timely advance notice of those charges so the District and its landowners could budget and plan accordingly; and (4) make the O&M rate-setting process transparent and cooperate with the District and its landowners in planning and budgeting for Project needs.[14] Furthermore, the United States agreed to conduct the process of fixing and collecting O&M charges in good faith and in a reasonable manner.[15]

The District has met, and continues to meet, its obligations under these contracts. For FY 2005-2007, however, the United States breached these contracts and the District suffered material damage as a result. The United States' breach of its contractual obligations entitles the District to damages as a matter of law.[16]

**B. The United States Breached its Obligation to Timely Fix O&M Charges.**

The contracts between the United States and the District establish a process and deadlines for the United States to fix annual O&M charges and for the District to collect the charges from its landowners and pay the charges to the United States for the coming fiscal year. The United States, in breach of its contractual obligations, failed to timely fix the Project's O&M charges as required by the Repayment Contract, precluding the District from properly and timely collecting the charges from its landowners. Ignoring its own breach, however, the United States held the District to the contractual payment deadline and coerced the District into paying the O&M charges and penalty interest under threat that irrigation water deliveries would be terminated.

---

[14] FOF, ¶¶ 12 and 18-22.

[15] *Commerce International Co., Inc. v. United States*, 338 F.2d 81, 84, 167 Ct. Cl. 529, 536 (1964) (the government has an ever present obligation to perform its duties under a contract reasonably and in good faith and to cooperate with the other contracting party).

[16] *San Carlos Irr. & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997) ("The appropriate remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed.").

The District requests damages in the amount of $47,500 (the amount of unauthorized penalty interest paid to the United States) as a result of the United States' breach.

### 1. The Landowners' Agreement, Repayment Contract and Arizona Law Define the Process and Schedule for Fixing, Collecting, and Paying O&M Charges.

Under the 1924 Act and the Repayment Contract, the District must pay O&M charges annually, in advance, no later than March 1st. If the O&M charges are not paid when due, a penalty of one-half percent is added, and another one-half percent is added on the first day of each month thereafter until paid.[17] The United States later agreed that the District could pay the O&M charges by May 15, the deadline for District landowners to pay all of their tax assessments under Arizona law, without penalty.[18] The United States may refuse to deliver water to the District if charges remain unpaid for twelve months after the due date.[19]

The Landowners Agreement expressly states that annual O&M charges are to be "*fixed* from time to time in advance by the Secretary of the Interior, based upon the annual cost of the operation and maintenance of the San Carlos Project."[20] The Repayment Contract further defines this obligation, requiring that O&M charges "be fixed *annually* by the Secretary of the Interior." The Secretary must "give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts."[21]

Arizona law requires the District to collect the Project O&M charges through the county tax assessment process. The District must submit the charges to the Pinal County Board of Supervisors by July 1 of each year as part of the District's annual assessment, which also includes assessments for the District's annual O&M costs. The Board of Supervisors then

---

[17] FOF, ¶¶ 18 and 24.
[18] *Id.* ¶¶ 25-26.
[19] *Id.* ¶ 23.
[20] *Id.* ¶ 13.
[21] *Id.* ¶ 18.

includes the O&M charges as part of the overall tax assessment against District landowners. District landowners must pay the first half of their taxes in November and the remainder in May of the following year. Thus, to collect the O&M charges from its landowners for payment to the United States in March, the District must be notified of the charges by the preceding July 1.[22]

It follows from these facts and the provisions of the Landowners' Agreement and Repayment Contract, that the United States must notify the District of the final O&M charges for a given fiscal year by July 1 of the preceding year in order to enable the District to meet its payment obligations under those agreements.

### 2. The United States Failed to Fix Project O&M Charges by the Contractual Deadline.

The Repayment Contract requires the Secretary of the Interior to fix the O&M charges. The Secretary has only delegated authority to fix O&M charges to the Assistant Secretary for Indian Affairs; no one lower in command, such as the Project manager or staff in the BIA's Western Regional Office, may do so.[23] For years 2005-2007, neither the Secretary nor the authorized delegate fixed the O&M charges by the Repayment Contract's July 1 deadline. The following table shows the contractual deadline for the United States to fix the charges and the actual date on which the United States did so:

| Fiscal Year | Fiscal Year Began | Notice of Final O&M Charges Due Under Repayment Contract & Arizona Law | Notice of Final O&M Charges Published by BIA in Federal Register | Date Payment Due Under 1924 Act | Months Late |
|---|---|---|---|---|---|
| 2005 | 10/1/04 | 7/1/03 | 4/30/04 | 3/1/04 | 10 |
| 2006 | 10/1/05 | 7/1/04 | 8/8/05 | 3/1/05 | 13 |
| 2007 | 10/1/06 | 7/1/05 | 4/5/06 | 3/1/06 | 9 |

---

[22] FOF, ¶¶ 40-43.
[23] *Id.* ¶ 30.

For each of the years at issue, the United States not only missed its contractual deadline by at least nine months, but it also did not fix the charges until at least one month *after* the charges were due to the United States under the 1924 Act.[24]

The United States' breach of its contractual duties made it impossible for the District to properly assess its landowners and collect the O&M charges by the payment deadline under the process mandated by the Repayment Contract and Arizona law. As a practical matter, the District could not include the charges in its July 1 assessment notice to the Pinal County Board of Supervisors because it did not know at that point what the final decision regarding the O&M charges would be. As a legal matter, the District was not contractually required to take any action until the United States first met its obligation to fix the O&M charges and notify the District of its final decision.

The United States' failure to timely fix the charges played havoc with the District's assessment and collection of the charges from its landowners. The District had to guess what the final charge would be and when it guessed too low, as for instance in regard to FY 2005, the District had to make up the difference out of its own reserves.[25] Once it gets behind in the collection of O&M charges, it is difficult for the District to catch up again without unreasonably burdening the landowners with what is essentially a double bill in future years.

Nevertheless, each year the United States held the District to the March 1 payment deadline under the 1924 Act, forcing the District to pay the charges before it had collected them from its landowners with threats that water deliveries would be terminated.[26] The United States arrogantly refused to acknowledge its own breach or extend the payment deadline to allow the District adequate time to comply with the Repayment Contract and Arizona law in collecting the charges. Although the United States has discretion to assess penalties or terminate water deliveries for non-payment under the Repayment Contract, the implied covenant of good faith

[24] FOF, ¶ 44.
[25] *Id.* ¶¶ 61-62 and 82.
[26] *Id.* ¶¶ 82, 123, and 134.

and fair dealing requires that it exercise that discretion reasonably and with consideration for the original purpose and intent of the contract.[27] Here, the United States' actions were a breach of the implied covenant of good faith and fair dealing because: (1) the United States acted unreasonably in light of the circumstances created by its own breach; (2) the District was not at fault for its inability to pay the charges by the March 1 deadline; and (3) the United States would not have incurred any damages or deficits by extending the payment deadline because the Project's account contained millions of dollars in unobligated cash with which to pay ongoing O&M costs.[28]

### 3. Fiscal Year 2005

For FY 2005, the United States assessed penalty interest against the District beginning March 1, 2004, the original due date for payment of the O&M charges, even though the United States did not fix the charges until two months later on April 30, 2004. In February 2005, the Acting Project Manager sent a letter to the District threatening to terminate the District's irrigation water deliveries unless the charges were paid immediately. The United States asserted that the charges were one year past due, such that termination was proper under the Repayment Contract.[29]

In its letter, the United States stated that the District had the right to appeal under a process that provided thirty days for the District to file a statement of reasons in support of the Appeal. The District timely appealed. Before the District could file a statement of reasons in support of the appeal and without the benefit of a hearing, however, the Acting Regional Director affirmed the Acting Project Manager's February 2005 decision.[30]

In his March 2005 letter affirming the decision, the Acting Regional Director alleged that the District's failure to pay threatened the continued operation of the Project due to lack of

---

[27] *Orange Cove Irrigation District v. United States*, 28 Fed. Cl. 790, 800-801 (1993).
[28] FOF, ¶¶ 81, 113, and 133.
[29] *Id.* ¶ 76.
[30] *Id.* ¶¶ 77-79.

funds.[31] Staff of the Western Regional Office later confirmed that a purported lack of funds was the sole reason for the decision to terminate water deliveries.[32] At the time of this decision, however, the Project had unobligated cash in its accounts totaling approximately $1.8 million, more than enough funds on hand to operate for the remainder of the fiscal year even without any payments by the District. Faced with potential termination of water deliveries, the District paid under protest the $1.5 million in O&M charges and $47,500 in penalty interest to the United States out of assessments collected the previous year and the District's reserve funds.[33]

**4. Fiscal Year 2006**

For FY 2006, the United States did not fix the O&M charges until over one year after payment of the charges was originally due from the District under the 1924 Act.[34] Nevertheless, the United States held the District to the original payment deadline. In February 2006, the United States again threatened termination of the District's irrigation water deliveries if the O&M charges were not paid immediately, once again alleging that the Project could run out of money if the charges were not paid. The United States conveniently ignored the fact that around the time this demand was made (nearly half way through FY 2006), the Project's account held $4,922,108 in unobligated cash, twice as much money as the Project needed to operate for the entire fiscal year.[35]

The District requested a meeting with the Acting Regional Director to discuss the FY 2006 O&M budget process and the threat to terminate water deliveries. As a result of that meeting, the Director permitted the District to submit a written proposal for addressing these issues.[36] But the Director promptly rejected the proposal, asserting that the funds were needed to address "outstanding O&M activities," including: (1) a well replacement program that was later

---

[31] FOF, ¶ 79.
[32] *Id.* ¶ 80.
[33] *Id.* ¶¶ 81-82.
[34] *Id.* ¶ 103.
[35] *Id.* ¶¶ 111-113.
[36] *Id.* ¶¶ 114-115.

abandoned without one dollar spent; (2) a well abandonment program that has never been conducted; and (3) a facilities condition assessment study that has never been conducted.[37] The Director also asserted that the Project would have to engage in deficit spending if it lowered the O&M charges. At the time the Director affirmed the decision to terminate water deliveries due to a lack of Project funds, the Project's account contained approximately $4.8 million in unobligated cash.[38]

Under duress and under protest, the District paid the FY 2006 O&M charges out of previously collected assessments and District reserve funds. The United States tacitly acknowledged its failure to meet its contractual obligations, because the Director did not charge penalty interest for the alleged late payment based, in part, on the fact that notice of the O&M charges was provided to the District months after the payment was originally due.[39]

**5. Fiscal Year 2007**

The pattern was repeated for FY 2007. The United States did not fix the O&M charges until one month after the payment of FY 2007 O&M charges were originally due, but threatened to terminate water deliveries in February 2008 if payment was not made immediately. The District under protest paid $1.5 million in O&M charges in March 2008 to prevent termination of water deliveries. At the time of the United States' demand, the Project held over $4.1 million in unobligated cash.[40]

Based on the foregoing facts, it cannot be disputed that under the express terms of the Repayment Contract:

- The United States must fix the annual Project O&M charges in time for the District to assess its landowners under Arizona property tax laws, collect the funds, and pay the United States.

---

[37] FOF, ¶¶ 118-120.
[38] *Id.* ¶¶ 121-122.
[39] *Id.* ¶¶ 123-124.
[40] *Id.* ¶ 128 and 133-134.

- The United States breached its obligation to do so for each fiscal year at issue and that no mitigating circumstances exist to excuse the United States' breach.
- The District was under no obligation to begin the assessment process for each of these fiscal years until the United States first met its obligation to fix the O&M charges.
- The United States' coercion of payment from the District, in a conscious refusal to acknowledge the United States' own breach, and the United States' demand for payment under the false pretense that the Project lacked funding, was a breach of the United States' duty of good faith and fair dealing.

Despite the District's repeated complaints, the United States has refused to honor its contractual obligation to fix the O&M charges in a timely manner, instead setting the charges at its own convenience. The United States has refused to recognize the serious consequences of this breach on the District's ability to meet its payment obligations, holding the District's irrigation water hostage in order to coerce payments and penalties in violation of the Repayment Contract and the United States' duties of good faith, fair dealing, and cooperation. As a result of the United States' actions, the District was damaged by being forced to pay $47,500 in unauthorized penalty interest for FY 2005.

### C. The United States Breached its Obligation to Base O&M Charges on Reasonable Annual O&M Costs.

Project O&M charges must be "based upon the total annual cost of the operation and maintenance of the said San Carlos project."[41] The United States has admitted that it "is obligated to fix the annual O&M rate based upon a reasonable estimate of the Project's O&M expenses."[42] Thus, in setting O&M charges, the Secretary must make "careful computations"

---

[41] FOF, ¶ 13.

[42] *Id.* ¶ 21; *United States v. Cantrall*, 176 Fed. 949 (Or. 1910) (the secretary cannot fix charges that are unreasonable under the Reclamation Act).

that are based upon a study of available information and historical experience.[43] Although the Secretary's estimates need not be exact, they must be made in good faith.[44]

Project O&M charges for 2005-2007 were not based upon reasonable estimates of actual Project costs. The BIA's substandard accounting practices obscured the Project's actual income and costs. Unneeded and unauthorized projects were initiated on paper to inflate proposed budgets, but were never actually implemented. Expenses were purposefully overestimated and income purposefully underestimated to justify higher O&M charges. Excessive cash surpluses, at times sufficient to operate the Project for two years or more, were accumulated without authorization or justification.[45]

Although the District's claims in this case cover only three fiscal years, the United States' disregard for its contractual obligations, basic accounting practices, and principles of fairness and reasonableness started long before. The former Acting Regional Director of the Bureau of Indian Affair's Western Regional Office, which oversees Project operations, summed up these problems in an administrative decision on similar complaints brought by the District a decade ago:

> The administrative record in this Appeal contains six different budget spreadsheets generated by the Project, at different points in time, showing projected and actual O&M budget expenditures for fiscal years 1993 through 1998. . . . An examination and comparison of all the budget spreadsheets reveal that from FY 1993-1996: (1) the Project consistently projected larger O&M budget expenditures than it actually expended; (2) the Project consistently underestimated its projected cash balance; and (3) the Project's cash balance increased significantly each year from FY 1993-1996 to its present balance of $2,873,099.
>
> Although the Project and [the District] appear to agree that the Project's cash balance should be around $600,000 the Project continues to prepare O&M budget projections for FY 1997 and 1998 which include annual cash balances significantly in excess of $600,000. In addition, the Project has included in each of its FY 1997 and 1998 O&M

---

[43] *Yuma County Water Users' Ass'n v. Schlecht*, 275 F. 885, 888 (9th Cir. 1921) ("By estimated cost is not meant the actual exact final sums paid for construction, but rather such sums as it is believed after careful computations will cover the expenses and outlay directly and fairly connected with the construction of the project."); *Delinquent Operation and Maintenance Charges on Flathead Indian Irrigation Project*, 58 Int. Dec. 41 (1942).

[44] *Indiana Gas v. Williams*, 175 N.E.2d 31 (Ind. App. 1961); *Commerce International*, 338 F.2d at 84, 167 Ct. Cl. at 536.

[45] FOF, ¶¶ 131 and 135.

> budget a line item in the amount of $750,000 for special projects activities on which there is no agreement among the Project, [the District], and the Indian Works.
>
> Based on the foregoing, it does not appear that the Project's FY 1998 O&M charges have been fixed based on an estimate of the total annual cost of the O&M of the Project. Rather, it appears that the Project first estimated what its annual income will be in FY 1998 based on the $30/acre assessment and other projected revenues and then projected budget expenditures, in both its normal budget categories and in its newly created budget category for special projects, to spend down the projected revenues."[46]

Despite the Acting Regional Director's decision, the United States has continued to assess unreasonable and unauthorized O&M charges against the District and its landowners in violation of the United States' contractual duties under the Project Agreements and the covenant of good faith and fair dealing.

**1. The United States' Excessive O&M Charges Were Not Based Upon Careful and Reasoned Estimates of Annual Income and Costs.**

For FY 2005 through FY 2007, the Secretary's decision to fix O&M charges at $30 per acre was not supported by a careful analysis of the Project's historical income and obligations, its future needs, or even the recommendations of Project staff. The Project never needed $30 per acre to reasonably operate and maintain its facilities; the charges fixed by the United States served only to further increase already bloated cash reserves.

**i. O&M charges for FY 2005 were premised upon non-existent shortfalls and accounting errors.**

The United States assessed $30 per acre in O&M charges for FY 2005, an increase of fifty percent over previous years, despite repeated protests from the District. The United States attempted to justify the increase with unfounded allegations that the Project had exhausted available cash reserves due to an alleged $2 million accounting error. But the Project's actual year-end budget figures show that the United States began FY 2005 with unobligated cash reserves of over $2.5 million dollars. By the end of FY 2005, unobligated cash totaled $4.0

---

[46] FOF, ¶ 46.

million.[47] These facts belie the Regional Director's contention that the cash reserves were exhausted or that any accounting error had occurred.

Including collected O&M charges and miscellaneous other income, the Project's total income for FY 2005 was approximately $3.5 million, but the Project only spent about $2.0 million to pay O&M costs for the year.[48] A few examples highlight just how far the United States strayed from reasonable estimations of Project income and costs in an effort to justify a $30 per acre O&M charge:

- The proposed budget estimated Project income, excluding O&M charges collected during the year, at just $70,500. Actual income was $511,339, over five times that amount.[49]
- The proposed budget estimated Project O&M obligations, excluding sinking funds and reserves, at $3,151,000. Actual O&M obligations for the year totaled only $2,031,177, over one-third less than projected.[50]
- Unobligated cash available at the end of FY 2005 was estimated at $629,119 in the proposed budget. Actual year-end unobligated cash totaled $4,051,569, over six times the United States' projection.[51]

The United States has decades of income and cost data upon which it can rely in fixing O&M charges. No reasonable government agency, upon careful review of that information and reasoned consideration of future Project needs, could have missed the mark this widely. No reasonable government agency could have believed that it had incurred a $2.0 million accounting error when current data indicated just the opposite. In fixing O&M charges for FY 2005, the United States was either grossly negligent or purposefully attempted to distort the numbers in order to maintain enormous reserves of unobligated cash. Either way, the District was damaged by the United States' breach of the Repayment Contract and the covenant of good faith and fair dealing. Based upon collected O&M charges of $3.0 million and actual Project expenditures of

---

[47] FOF, ¶¶ 51-60, 68, and 75.
[48] *Id.* ¶¶ 71 and 73.
[49] *Id.* ¶¶ 69 and 71.
[50] *Id.* ¶¶ 72-73.
[51] *Id.* ¶¶ 74-75.

only about $2.0 million, the District overpaid the United States by $10 per acre, or $500,000 total, for FY 2005.[52]

**ii. The United States arbitrarily doubled O&M charges for FY 2006 from the $15 per acre charge that the Project and District agreed was reasonable.**

In discussions regarding the FY 2006 budget, Project personnel proposed a $15 per acre O&M charge, which the District accepted as reasonable. The Western Regional Director, however, unilaterally and arbitrarily decided to maintain FY 2006 O&M charges at $30 per acre and, without notice to the District, directed Interior Department staff to "go ahead and publish" the $30 per acre charge in the Federal Register. This decision was made in spite of the recommendation of Project staff and despite the fact that the Director had not yet requested (and the Project had not provided) any information that would support a higher $30 per acre rate. The Western Regional Director then directed the Project Manager to revise the FY 2006 budget as necessary to justify a thirty dollar per acre O&M charge. The United States eventually fixed the FY 2006 O&M charges at thirty dollars per acre, in accordance with a revised budget that was illegally manipulated to the point that it had no connection to the Project's actual financial condition or budgetary needs. [53]

The Western Regional Director based the proposed assessment rate increase on the purported need to set aside funds for the China Wash Flume project, the Heavy Equipment Replacement Fund, and deferred maintenance. The United States' revised budget reflected a $30 per acre O&M charge but failed to allocate significant funds for any of these purported needs. The revised $30 per acre budget contained no allocation for work on China Wash Flume and no work on the China Wash Flume project was conducted in FY 2006. The revised budget did contain $262,000 for heavy equipment replacement, but that figure was later revised downward to $8,000 in subsequent budget adjustments. The revised budget contained $640,000 for well

---

[52] The Project collected $1.0 million more than it spent for FY 2005, but the District only paid half of that amount; the BIA paid the remainder on behalf of Indian landowners on the Gila River Indian Reservation.

[53] FOF, ¶¶ 83-93 and 103.

replacement (under the line item for "Land and Structures"), but no money was spent on this item in FY 2005.[54] As far as the District knows, no other deferred maintenance was budgeted for or conducted during FY 2006. Thus, the items listed by the Western Regional Director as justifying a $30 per acre O&M charge ultimately amounted to, at most, $8,000 in O&M expenditures during the year.

In manipulating the FY 2006 budget, the United States also revised numerous income and cost categories that were never mentioned by the Western Regional Director. For instance, the United States lowered its estimate of Project income (excluding O&M charges) by over eighty percent, from $420,000 to just $53,000. This included dramatic decreases in estimates of interest and miscellaneous income. The original estimate was much closer to the Project's actual FY 2006 income, which totaled over $325,000.[55] The United States also increased estimates of various obligations, including an increase in utility expenses of forty percent and an increase in supply costs of thirty percent. The estimate of total obligations increased by over twenty percent, to $3,385,100, but actual obligations incurred during FY 2006 were only about $2.4 million.[56]

Thus, the Project began FY 2006 with over $4 million in cash reserves. After collecting $3 million in O&M charges from the District and Indian landowners, the Project only spent about $2.4 million during the year. At year's end, the Project's cash reserves had increased to over $4.5 million.[57] The United States had no basis for charging District landowners $30 per acre when the Secretary approved the FY 2006 budget, and it cannot justify the charge as reasonable now. In collecting charges from the District that were not based upon a reasonable estimate of Project obligations and that ultimately were not needed to operate or maintain the Project, the United States breached the Project Agreements and the covenant of good faith and fair dealing, with resultant damages to the District.

---

[54] FOF, ¶¶ 88-91, 105, and 107-108 .
[55] *Id.* ¶¶ 94-95 and 104.
[56] *Id.* ¶¶ 96-97 and 105.
[57] *Id.* ¶¶ 75, 97, 103, and 110.

**iii. FY 2007 O&M charges were unexplained, unreasonable and unnecessary.**

The United States did not even meet with the District to discuss the FY 2007 O&M charges, as it had in the past, nor did it bother to provide a summary of its budget proposal. The only information provided for FY 2007 was a "tentative" budget estimate provided to the District in December 2004 as part of discussions on the FY 2006 budget. Ten months later, the United States published notice of the proposed $30 per acre charge without further discussion or information regarding how that rate was determined. The $30 per acre O&M charge was finally fixed by the Assistant Secretary in April 2006, over District protests.[58]

Once again, the ending figures for FY 2007 demonstrate that the $30 per acre charge was unjustified and unreasonable. The Project began the year with over $4.5 million in cash reserves.[59] At year's end, the Project had an adjusted cash balance of over $3.3 million,[60] indicating that the Project could easily have operated for the entire fiscal year without collecting *any* O&M charges. The collection of unreasonable and unnecessary O&M charges from the District represents a breach of the Repayment Contract and the covenant of good faith and fair dealing, with resultant damages to the District.

**iv. Deferred maintenance, sinking funds, or other special projects do not justify the excessive O&M charges.**

The United States has consistently asserted that excessive O&M charges were justified by the need to conduct deferred maintenance or to set aside money for various special projects or special needs in future years. But the United States' own budget figures and the history of O&M activities at the Project demonstrate this is not the case. In most cases, the United States never undertook the projects, conducted the activities, or purchased the equipment or supplies. Instead,

---

[58] FOF, ¶¶ 125-128.
[59] *Id.* ¶ 110.
[60] *Id.* ¶ 131.

the money collected for these items was rolled over each year into larger and larger cash surpluses, at the expense of the District and its landowners.

**a. Undefined deferred maintenance activities were never conducted.**

For FY 2006, the Western Regional Office of the BIA rejected the Project's proposal, agreed to by the District, for a $15 per acre O&M charge. The Project was told to revise the budget to reflect a $30 per acre charge, based in part on the alleged need for undefined "deferred maintenance."[61] At the time this order was given, the Project had unobligated cash on hand of over $2.5 million.[62] Months later, the Project Manager would estimate that the Project's total deferred maintenance needs were only about $750,000.[63]

To the District's knowledge, no deferred maintenance of any substance has occurred since the time that the FY 2006 O&M charges were doubled, aside from the China Wash Flume project. In fact, the United States has spent only $1.68 million on deferred maintenance projects over nine years, including the China Wash Flume project.[64] The District paid excessive O&M charges, in part, for deferred maintenance that was never conducted.

**b. Well replacement and well abandonment projects were never implemented.**

In various budgets for 2005-2007, the United States included funding for a well replacement project. The intent was to replace older Project wells with new wells, regardless of the existing well's condition or production. The District strenuously objected that this program was unnecessary, but for years, the United States ignored the District's complaints and continued to include charges in the budget for a sinking fund to pay for the well replacement program. The United States has never replaced a single well.[65] The sinking fund was eliminated from the budget, but no money was ever returned to the District.

---

[61] FOF, ¶¶ 87-92.
[62] *Id.* ¶ 68.
[63] *Id.* ¶ 118.
[64] *Id.* ¶ 131.
[65] *Id.* ¶¶ 88, 105, and 118.

The United States also alleged, as early as February 2006, that O&M charges were needed to fund a well abandonment program. That program has never been implemented either.[66]

**c. The United States fully funded the China Wash Flume project years before the work was actually conducted.**

In October 2004, the Western Regional Director ordered the Project to keep $351,000 in the sinking fund for the China Wash Flume project. Although the Project did ultimately complete that project, the work was not conducted until over two years later.[67] Thus, inclusion of over $350,000 in the proposed FY 2006 budget served no purpose other than to justify an excessive and unnecessary O&M charge to the District. The United States further manipulated figures associated with this project when revised year-end figures for FY 2006 to include the project's costs although the project was not actually started or completed until FY 2007.[68]

**d. The Heavy Equipment sinking fund allocation was unnecessary.**

The Western Regional Director also directed in October 2004 that the Project re-establish a sinking fund for Heavy Equipment. Money allocated to this fund had been redistributed to other budget items in past years. The District had complained for years that the fund was unnecessary because the Project had no Heavy Equipment needs and was happy to see the fund emptied and money used for legitimate expenses. At the Director's urging, however, over $260,000 was allocated to this sinking fund for FY 2006.[69] That money has not been spent to date and the Project has never made clear what it plans to use the money for. The Project still has no need for additional or replacement heavy equipment and the sinking fund exists merely to justify excessive and unauthorized O&M budgets and charges.

---

[66] FOF, ¶ 119.
[67] *Id.* ¶¶ 89 and 107.
[68] *Id.* ¶¶ 107-109.
[69] *Id.* ¶ 105.

**v. The United States has consistently and purposefully overestimated Project obligations and underestimated Project income to help justify excessive O&M charges and cash surpluses.**

The United States consistently overstated Project obligations in order to justify excessive O&M charges and the carrying of large cash balances from year to year. Comparing year-end figures to original budget projections, the United States has overstated Project obligations anywhere from thirteen to forty percent in an effort to justify increased O&M charges. The table below compares the total obligations depicted in Project budgets used to justify O&M charges to the District and the money spent on Project obligations during each fiscal year, based on year-end summaries from the Project:[70]

| | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Budget Obligations | $3,326,500 | $3,385,100 | $3,410,000 |
| Actual Obligations | $2,031,177 | $2,931,403[71] | $ 2,804,792 |

On the other hand, the United States consistently underestimated Project income during these years. In numerous budgets, the United States purposefully but improperly excluded unpaid O&M charges from Project income, in a deliberate attempt to reduce projected income in the Project budgets. In every budget for the years at issue, the United States consistently underestimated income from excess pumping, sales of excess water, and other sources. The wide disparity between budgeted and actual Project income (exclusive of O&M charges) is depicted in the following table:[72]

| | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Budgeted Income | $53,000 | $53,000 | $53,000 |
| Actual Income | $511,399 | $326,549 | $ 300,854 |

Estimates of interest income in the Project budget are especially puzzling. Interest income on the Project's cash balances has risen and fallen over the years, even though the

---

[70] FOF, ¶¶ 72-73, 96-97, and 129-130.

[71] This includes the cost of work on the China Wash Flume project, which was not actually conducted until FY 2007. *Id.* ¶¶ 107-109.

[72] *Id.* ¶¶ 70-71, 94-95, and 129.

Project's cash balances have generally been increasing during that time. The reported annual average interest rate has ranged from 1.5% to 8.4% with no explanation for the significant variation.[73]

**vi. Unauthorized costs were included in Project O&M charges.**

The United States also has consistently included the cost of unauthorized projects in its annual budgets. For instance, the United States has charged the District for archaeological studies at San Carlos Reservoir. The United States originally alleged that these studies were a response to litigation brought by the San Carlos Apache Tribe, although it did not explain how litigation-related costs constituted O&M. The United States, however, won that suit several years ago.[74] Nevertheless, it continues to conduct the archaeological survey work and charged the District for those costs during the fiscal years at issue. These costs are not authorized O&M costs under the Project Agreements.

For FY 2007, the United States included a $2.0 million charge in an adjusted budget, attempting to charge the District for a new Project office building.[75] Such expenses clearly constitute a Project "betterment" that cannot be charged without prior District approval.[76] Although the United States appears to have abandoned plans for a new building at this time, this illustrates the United States' willingness to ignore its contractual obligations in order to justify huge cash reserves and exorbitant O&M charges.

**D. The United States' Accounting Practices Are Inadequate, Inaccurate, Misleading, and Fail to Meet Basic Accounting Standards.**

The Repayment Contract requires that "full and accurate accounts shall be kept at all times by both the United States and the District of all receipts and expenditures and other fiscal operations in connection with the Project."[77] The United States is obligated to make these

[73] FOF, ¶ 132.
[74] *Id.* ¶ 106.
[75] *Id.* ¶ 131.
[76] *Id.* ¶ 14.
[77] *Id.* ¶ 22

records available to the District and to consult with the District on "contemplated future steps of importance."[78] These basic obligations are intended to create transparency in Project operations and financial records so that the District and its landowners will know how their money is being spent.

The United States has ignored these obligations for years. The United States' accounting system for Project income and obligations is inadequate, poorly maintained, ignores basic principles of accounting, makes it impossible to determine when or where money is being spent, and has been subject to significant accounting errors that were never reconciled. Budget and financial information provided by the United States fails to meet even the most basic standards of financial accounting and reporting and is consistently incomplete, inaccurate, and misrepresentative. Budget numbers constantly change without explanation, even after a budget has been approved by the Secretary, and are riddled with internal errors and discrepancies. Thus, the financial information provided by the United States is not "full and accurate," as required by the Project Agreements. Nor is it sufficient to provide the Secretary with an understanding of Project obligations and income upon which a reasonable decision can be made regarding O&M charges.[79]

In his 1997 decision, the Acting Western Regional Director addressed the multiple problems presented by the United States' accounting procedures:

> There is no clear response from the Project or any other explanation in the record about the huge unexplained variations in total expenses for the Project from spreadsheet to spreadsheet. This is particularly troubling due to the fact that the Project's O&M expenditures are funded by private funds collected by the Project from [District] landowners, and by Federal funds appropriated for the benefit of the Indian beneficiaries of the Project. It is essential from a procedural standpoint that the Project provide sufficient information to [the District] and the Indian Works to explain the expenditures on the budget spreadsheets as well as the basis for deviations from budget spreadsheets presented or approved in prior years. The Project fails to demonstrate in the record that it has met this threshold.[80]

---

[78] FOF, ¶ 22.
[79] *Id.* ¶ 135.
[80] *Id.* ¶ 48.

His characterization of the problem is as true today as it was then. After a thorough review of the Project's records, Lawrence Field—a certified public accountant with years of experience in investigative accounting—concluded that the Project's financial records "are not presented in accordance with any specific set of rules or principles and fails to meet the foundational basis for accounting information which requires that it be reliable, relevant and representationally faithful."[81]

The United States' failure to provide the District with "full and accurate" records of Project income and costs is a breach of the Repayment Contract and the United States' duty of good faith and fair dealing. This breach has contributed to damages incurred by the District by shrouding the true facts regarding the Project's finances in a fog of misleading and inaccurate information.

**E. The District Incurred Damages as a Result of the United States' Actions.**

The end result of the United States' mishandling of Project budgets and O&M charges is that the District has been overcharged at least $1,697,500 for FY 2005 through FY 2007. Each of these years, the District was charged $30 per acre for O&M, but the Project's annual O&M costs were as low as $20 per acre. Meanwhile, the United States leveraged these overcharges to accumulate unnecessary and unauthorized cash balances exceeding $4.0 million.

The District's damages were calculated as follows. The reported cash balance in the Project's account at the end of FY 2007 was $2,134,904. The United States, however, reported a back-charge of $2.0 million for FY 2007 for "Coolidge Dam, San Carlos Reservoir & New Office Building" that the District did not approve and should not have been counted as a Project cost obligation. This total does not, however, include $2,100,000 in unpaid assessments for FY 2008, which should be counted in the year's total income. Adjusting for these two errors, the Project's reported cash balance at year's end was actually $6,234,904.[82]

---

[81] FOF, ¶ 135.
[82] *Id.* ¶ 131.

The Project's average O&M costs over the last five years have been $2,472,963. Its average miscellaneous income has been $241,964. Subtracting the Project's average O&M costs from the cash on hand to start FY 2008, and adding the Project's average income, provides a reasonable estimate of the Project's unobligated cash at the end of FY 2008--$4,003,905. Setting aside $650,000 for emergency reserves for unforeseen events, the Project has available excess cash totaling $3,353,905. The District's one-half share of that total is $1.65 million.[83] The District also is entitled to damages in the amount of $47,500 due to unauthorized penalty interest illegally assessed against the District for FY 2005.

## IV. Summary And Requested Action

The United States, through the BIA, created this payment fiasco itself. The Repayment Contract, by expressly incorporating Arizona law governing irrigation district assessments, establishes July 1 as the ultimate deadline to fix final annual Project O&M charges. The government failed to meet this deadline for 2005, 2006, and 2007 by at least 10, 13 and 9 months, respectively. As a result, the District fell behind in payments by one year and the District's landowners now face the risk of double payments in future years. To compound the problem, the government refused to listen to reason or acknowledge its own culpability by accepting the District's eminently reasonable suggestion to make up assessment shortfalls by taking the necessary funds from the Project's abundant cash surpluses. Although this would have caused little or no disruption to Project operations, the United States insisted on adhering to an outdated and unreasonable payment schedule. Apparently, no consideration was given to the fact that it was the government's failure to timely fix the assessment in the first place that caused the problem. It would have taken little effort to adjust the schedule and reasonably accommodate everyone. Instead, the United States threatened to terminate water supplies, forced the District to pay O&M charges it had not yet had time to fully collect, and tacked on unauthorized

[83] FOF, ¶ 131.

penalties of $47,500 for 2005. This was all avoidable, unnecessary, unduly harsh, a breach of express contract, and a violation of the covenant of good faith and fair dealing.

The United States also breached its contractual and good faith duties to fix O&M charges based upon reasonable estimates of the Project's needs. Historical data regarding Project operations was plentiful and available to the United States. That information must be carefully analyzed in good faith to make sure proposed budget figures are directly and fairly connected with the actual operation and maintenance costs of the Project. This was clearly not done. As the District's expert witness CPA Lawrence Field concluded, the BIA's 2005-2007 budget data and information were "unreliable, irrelevant and lacked representational faithfulness" and, as such, "failed the most basic foundational requirements for accounting information."[84] One can only conclude that the government did not let the actual costs and needs of the Project drive the O&M charges but first decided what the O&M charges would be and then manipulated the budget process to justify the charges.

The United States manipulated and mishandled the O&M budget process so as to charge the District a total of $4.5 million dollars for Project O&M during Fiscal Years 2005 through 2007. At the end of FY 2007, the Project possessed an excess adjusted cash balance of over $3.3 million, even after operating expenses for FY 2008 and a $650,000 emergency reserve fund are set aside. By overcharging the District for O&M during this period, the United States violated its contractual obligations and the covenant of good faith and fair dealing, resulting in significant and material damage to the District.

[84] FOF, ¶ 135.

The relevant facts of this case are not subject to dispute and the Court may interpret the relevant contracts, statutes, and administrative materials and apply the terms of those documents to the facts as a matter of law. The District requests that the Court enter summary judgment for the District, find that the United States breached its contractual obligations, and award damages in the amount of $1,697,500.

DATED this 9th day of April, 2008.

Salmon, Lewis & Weldon, P.L.C.

By: /S/ RINEY B. SALMON
Riney B. Salmon II
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016
(602) 801-9060 (office)
(602) 801-9070 (facsimile)
*Attorneys for Plaintiff*