IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 06-576C<br>(Judge Block)<br><br>Proposed Findings of Uncontroverted Fact |

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, the San Carlos Irrigation and Drainage District ("District") submits its Proposed Findings of Uncontroverted Fact in support of its Motion for Summary Judgment filed concurrently herewith.

PARTIES

1. The District is an irrigation and drainage district organized and existing under the laws of the State of Arizona[1] and a political subdivision of the State of Arizona.[2]

2. The District is located in Pinal County, Arizona and embraces 50,000 acres of irrigable public and private lands within the boundaries of the San Carlos Irrigation Project (the "Project").[3]

3. The Project is operated by the Bureau of Indian Affairs ("BIA"), an agency of the United States Department of the Interior.[4] Staff in the Natural Resources Division of the Western Regional Office of the BIA, located in Phoenix, Arizona, act as a liaison between the Project and

[1] Ariz. Rev. Stat. §§ 48-2901 to -3256.
[2] Ariz. Const. art. 13, § 7; Ariz. Rev. Stat. § 48-2901.
[3] *Repayment Contract Between the United States and the San Carlos Irrigation and Drainage District, Arizona*, at 2-3 (June 8, 1931) ("Repayment Contract") (Exhibit 1).
[4] *See generally* Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Facilities*, 69 Fed. Reg. 23805 (April 30, 2004) (Exhibit 2).

BIA's Central Office in Washington, D.C. The Natural Resources Division supervises and assists the Project as well.[5]

4. The Project is located in Pinal County, Arizona, in the vicinity of the Town of Florence and the Cities of Coolidge and Casa Grande, Arizona. The Project delivers irrigation water to 50,000 acres of District lands and 50,000 acres in the Gila River Indian Reservation.[6]

5. The District is empowered to act as representative of the non-Indian owners of lands within the District in all dealings with the Secretary of the Interior regarding the Project.[7]

6. The provisions of the 1924 Act and Repayment Contract are codified and incorporated by the Code of Federal Regulations into federal law governing the Project:

> "The payment of . . . costs of future operation and maintenance for said project as provided for in said section 3 of the act of June 7, 1924 (43 Stat. 476), as supplemented or amended and such contingent project liabilities which may be incurred in accordance with the provisions of said repayment contract shall be made in accordance with the provisions of said act of June 7, 1924, as supplemented or amended and the repayment contract by and between the San Carlos irrigation and drainage district and the Secretary of the Interior bearing date of June 8, 1931 . . . ."[8]

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

THE ORIGINS OF THE PROJECT IN THE 1924 ACT

7. Congress authorized development of the water storage and distribution facilities of the Project under the 1924 Act. The 1924 Act authorized construction of Coolidge Dam for the purpose of assuring an adequate supply of water for the irrigation of lands allotted to Pima Indians on the Gila River Indian Reservation, Arizona, and for non-Indian lands that are included within the District.[9]

---

[5] Deposition of Catherine Wilson, at 5 and 10-11 (October 2, 2007) ("Wilson Deposition") (Exhibit 3).

[6] Repayment Contract, at 2-3 (Exhibit 1).

[7] San Carlos Project Act of June 7, 1924, 43 Stat. 475-76 ("1924 Act") (Exhibit 4); *Landowners' Agreement with the Secretary of the Interior, San Carlos Project: Act of June 7, 1924* ("Landowners' Agreement") (a form of which is attached as Exhibit 5); Ariz. Rev. Stat. §§ 49-3091 to -3098.

[8] 25 C.F.R. § 137.4.

[9] 1924 Act, § 1 (Exhibit 4).

8. The 1924 Act states that "the total cost of the project shall be distributed equally per acre among the lands in Indian ownership and the lands in private or public ownership that can be served from the waters impounded by [Coolidge] dam."[10]

9. Under the 1924 Act, the District and its landowners were required to pay their share of the Project's operation and maintenance ("O&M") charges "annually in advance not later than March 1st . . . ."[11]

THE DISTRICT LANDOWNERS' AGREEMENT WITH THE SECRETARY

10. The United States, acting through the Secretary and pursuant to the 1924 Act, executed separate Landowners' Agreements with each owner of land among the 50,000 acres of irrigable public and private land within the District.[12]

11. Under the Landowners' Agreement, each non-Indian landowner conveyed all of the surface water rights appurtenant to his or her land to the United States, to be administered pursuant to the terms and conditions of the 1924 Act for the benefit of Project lands.[13] Each non-Indian landowner also agreed not to drill and operate wells on his or her lands to withdraw groundwater for irrigation purposes.[14]

12. The Landowners further consented to a permanent first lien on their irrigable lands and to pay the United States one-half the original construction cost of the Project and one-half of the Project's annual operation and maintenance charge.[15] In return, the United States contracted to fulfill certain duties to the District, including the obligation to deliver water for irrigation and to operate and maintain the Project works.[16]

13. The Landowners' Agreement requires each landowner to pay Project O&M charges in accordance with the 1924 Act. The contract states that these charges are "to be fixed from time to

---

[10] *Id.*
[11] *Id.* § 3.
[12] Landowners' Agreement (Exhibit 5).
[13] *Id.* at 5.
[14] *Id.* at 8.
[15] *Id.* at 5.
[16] *Id.* at 14-15.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

time by the Secretary of the Interior, based upon the total annual cost of the operation and maintenance of the said San Carlos project, and such charge shall be uniform throughout said project and made upon a per acre of acre-foot basis unless otherwise provided by agreement with said district and with the approval of the Secretary of the Interior."[17]

14. Charges for improvements or "betterments" to Project facilities may not be added to the O&M charge without the District's approval.[18]

<u>THE REPAYMENT CONTRACT WITH THE SECRETARY</u>

15. The 1924 Act directed the United States to enter into "an appropriate repayment contract" with an irrigation district representing the owners of irrigable non-Indian lands in the Project.[19]

16. As a condition to the expenditure of funds for the benefit of non-Indian Project lands, the 1924 Act required the creation of an irrigation district under Arizona law that embraced the irrigable public and private lands of the Project.[20] Pursuant to this requirement, the District was organized on July 16, 1928, under the laws of the State of Arizona governing the creation of irrigation districts.[21]

17. On June 8, 1931, the District and the United States, acting through the Secretary, entered into the Repayment Contract, which refers to and incorporates the provisions of the Landowners' Agreement.[22]

18. The Repayment Contract requires the District to pay an annual assessment to the United States for the operation and maintenance of Project works annually, in advance, not later than March 1st":[23]

---

[17] *Id.* at 13; 15.
[18] *Id.* at 15.
[19] 1924 Act, § 4 (Exhibit 4)
[20] *Id.*
[21] Ariz. Rev. Stat. §§ 48-2901 to -3256; Affidavit of Douglas D. Mason, District General Manager, (April 8, 2008) ("2008 Mason Affidavit") (Exhibit 6).
[22] Repayment Contract, at 2 (Exhibit 1).
[23] Repayment Contract, at 16.



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

> Except when certain works of the Project within the District shall be operated and/or maintained by the District and at its expense and (*sic*) works of the Project used exclusively for distribution of water to the lands on the Indian Reservation shall be operated and/or maintained by the United States and at the expense of said lands or the United States, the whole cost of operating and maintaining the works of the Project, after sums collected for excess water and other sums which may go to the operation and maintenance fund as provided herein have been deducted, shall be divided equally on a per acre basis among all of the lands of the project and regardless of whether they are irrigated or not.
>
> When one year after the public notice aforesaid shall have been issued, if the operation and/or maintenance of the works of the district is turned over to the district, the remaining works of the project not used exclusively for the distribution of water to the lands on the Indian Reservation shall be considered reserved or joint works and payment for the cost of the operation and maintenance of such reserved or joint works shall be divided equally on a per acre basis among all of the lands of the project and also a surcharge may be placed against all of the lands of the project for paying the cost of operating and maintaining the pumps and equipment used for pumping drainage or irrigation water, without reference to where such pumps are located; and if the United States permits certain works of the Project within the District to be operated by the District and at its expense while the United States retains the maintenance thereof the Secretary of the Interior may charge to the District the cost of such maintenance as determined by him, thereby requiring the District to pay the cost of maintaining the project's works within its borders thus turned over to it, and leaving the United States or the Indians to pay the cost of maintaining the Project works within the Indian Reservation.[24]

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

The Repayment Contract further provides that the Secretary must notify the District of O&M charges each year in time for the District to collect the charges from its landowners under Arizona law:

> Operation and maintenance for the reserved works and maintenance charges for works operated, but not maintained, by the District shall be fixed annually by the Secretary of the Interior and paid to the United States by the District. The Secretary of the Interior will give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts.[25]

The Repayment Contract also obligates the District to "pay an operation and maintenance charge . . . to be fixed from time to time in advance by the Secretary of the Interior, based upon the annual cost of the operation and maintenance of the San Carlos Project."[26]

---

[24] *Id.* at 7.
[25] *Id.* at 8.
[26] *Id.* at 16.

19. The Repayment Contract requires that the "costs of the Project incurred under appropriations already made, pursuant to the Act of June 7, 1924, and subsequent Acts and under the Land Owners' Agreement, shall be repaid to the United States."[27] The Repayment Contract includes a detailed statement of the Project's construction costs and provisions explaining how the District is to repay its share of those costs.[28] To secure this obligation, the Repayment Contract reiterates the lien requirements found in the Landowners' Agreement, stating that lands within the District "are subject to the liens and other obligations created by the execution of said Land Owners' Agreement, which agreement remains in full force and effect."[29]

20. In the Repayment Contract, the United States agreed, "in consideration of the promises…mutual covenants, and other valuable considerations" given by the District, to "maintain all of the Project works."[30] The United States also agreed to that "The stored and pumped water of the San Carlos Project shall be deemed a common Project water supply in which all lands in the project and under the San Carlos Reservoir shall be entitled to share equally, and all such water shall be distributed to the lands of the project as equitable as the physical conditions permit."[31]

21. The United States has admitted that it is obligated to fix the annual O&M rate based upon a reasonable estimate of the Project's O&M expenses.[32]

22. The United States is obligated under the Repayment Contract to keep "full and accurate" accounts of the books of accounts and fiscal operations of the Project:

> However the Project may be operated, whether entirely or partly by the United States, or entirely or partly by the District, full and accurate accounts shall be kept at all times by both the United States and the District of all receipts and expenditures and other fiscal operations in connection with the Project, and such accounts and the books showing them, and also all records, maps, plans, estimates, budgets and engineering data of the United States and the District concerning said Project, at all reasonable times, shall be open to the inspection of the United States and its agents, and of the District and its representatives and of all persons properly interested, and the United

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

[27] Repayment Contract, at 10-11 (Exhibit 1).
[28] *Id.* at 11-15.
[29] *Id.* at 23.
[30] *Id.* at 6.
[31] *Id.* at 4.
[32] United States' Answer, p. 9, ¶ 35.

> States and the District shall inform and consult with each other as to contemplated future steps of importance.[33]

23. The United States reserved the right "to refuse to deliver water to the District in the event of default by the District for more than twelve months in any of the payments due the United States hereunder."[34]

24. If the District is delinquent in its payments to the United States, the Repayment Contract limits the District's penalty to one half of one percent of the amount owed for each month that the payment remains delinquent.[35]

25. In 1935, the United States and the District executed a First Supplement to the Repayment Contract, in part, to address difficulties the District had experienced in collecting from its landowners and paying the Project's annual O&M charges by March 1:

> WHEREAS, under Arizona law the second half of tax payments do not become delinquent until the first Monday in May and as a consequence the District has encountered considerable difficulty and been placed at additional expense in complying with the provision of said Repayment Contract requiring payment in advance and not later than March first of each year, . . . .[36]

26. The First Supplement modifies the original Repayment Contract by allowing the District to make its O&M assessment payment to the Project on or before May 15 (rather than March 1) of each year without penalty:

> Since by the terms of the San Carlos Act, operation and maintenance charges must be paid in advance and not later than on March 1 of each year, and since under Arizona law the second half of tax payments are not delinquent until the first Monday in May, and since at the time the irrigation season is not far advance and the District is only able to collect such charges generally as when the farmers request water, and so is placed in default with the United States on March 1 for any delinquent amount, and must pay a penalty under the June 8, 1931 Repayment Contract, it is agreed that the penalty provision of that Repayment Contract, in so far as operation and maintenance charges or assessments are involved, is hereby modified to provide that hereafter a penalty of one-half of one per cent per month shall attach for each and every month or fraction thereof during which any installment or part thereof of the operation and

---

[33] *Id.* at 19.
[34] *Id.* at 20.
[35] *Id.* at 20-21.
[36] First Supplement to the Repayment Contract, ¶ 4 (November 12, 1935) ("First Supplement") (Exhibit 7).

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

maintenance charges or assessments remain due and unpaid on and after May 15 of each year.[37]

THE SECRETARY'S JOINT WORKS ORDER

27. On June 15, 1938, the Secretary executed a "Joint Works Order" with the District that was based on the Repayment Contract and Landowners' Agreement incorporated therein.[38]

28. The 1938 Joint Works Order divides the Project works into three categories: Joint Works, District Works, and Indian Works. The "Joint Works" include, among other Project works, Coolidge Dam, including the electrical generation and distribution facilities.[39] "District Works" are all works, other than Joint Works, that "are used for the serving of District lands."[40] "Indian Works" are "[a]ll Project works serving Indian lands not reserved herein as Joint Works."[41]

29. The Joint Works Order states that the "cost of maintaining and operating the Joint Works shall be paid equally on account of the Indian lands and the public and private lands at a per acre rate to be established by order of the Secretary annually hereafter, which said rate shall produce such a sum of money as shall be determined by the Secretary to be the amount necessary to meet, on the aforesaid basis, the proportionate share of the expense required by the Project to maintain and operate the Joint Works."[42] The Joint Works Order also states that the O&M costs of the Joint Works shall be paid in accordance with the Landowners' Agreement and the Repayment Contract.[43]

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

---

[37] *Id.* ¶ 7(c).

[38] *June 15, 1938 Secretarial Order Defining Joint District and Indian Works of the San Carlos Federal Irrigation Project: Turning over Operation and Maintenance of District Works to the San Carlos Irrigation and Drainage District* ("Joint Works Order") (Exhibit 8).

[39] *Id.* at 2-5.

[40] *Id.* at 5.

[41] *Id.* at 6.

[42] *Id.* at 7.

[43] *Id.*

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

THE UNITED STATES' O&M BUDGET PROCESS

30. The Secretary has delegated the authority to set O&M charges under the 1924 Act to the Assistant Secretary for Indian Affairs.[44]

31. A proposed Project budget and recommendation regarding the O&M charge for a given fiscal year is prepared by Project staff.[45] Frequently, the proposed budget projects income and obligations for the Project several years into the future beyond the fiscal year at issue.[46]

32. The Project staff's budget proposal and recommendation are forwarded to the Western Regional Office of the BIA in a memorandum from the Project manager to the Regional Director, along with documentation or other information in support of the recommendation.[47]

33. The Western Regional Office forwards this information to the Office of the Assistant Secretary for Indian Affairs in Washington, D.C.[48]

34. The Office of the Assistant Secretary publishes the proposed O&M charge in the Federal Register and permits comments on the proposed charge.[49]

35. After the comment period, the Assistant Secretary of Indian Affairs makes the final decision that fixes the O&M charge for the fiscal year at issue.[50]

36. The Project purports to follow the BIA's Irrigation Handbook in developing proposed budgets and O&M charges.[51]

---

[44] Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects*, 73 Fed. Reg. 7583, 7584 (February 8, 2008) (Exhibit 9); Department of the Interior, *Departmental Manual*, Part 209, Chapter 8.1A (Exhibit 10).
[45] Wilson Deposition, at 12 (Exhibit 3).
[46] *See, e.g.*, R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).
[47] Wilson Deposition, at 12 and 14 (Exhibit 3).
[48] *Id.*
[49] *Id.* at 12, 14, and 37.
[50] *Id.*
[51] Deposition of Carl Alan Christensen, at 10-12 (October 1, 2007) (Exhibit 12) ("Christensen Deposition").

37. The BIA Irrigation Handbook states that "Public Law 89-554 (80 Stat. 383; 5 U.S.C. 551 [Supplement II, 1965-1966]) requires publication in the Federal Register of notice of intention to amend orders, such as orders fixing O&M charges."[52]

38. Until 1999 and through the Project's 2001 fiscal year, the proposed and final O&M rates for the Project were published as an individual notice in the Federal Register.[53]

39. Beginning in 2002 for the 2002 fiscal year, the proposed and final rates for the Project were published in a combined notice for all irrigation projects managed by the BIA.[54] All payments due from the District or to become due to the United States under the Repayment Contract must be derived from annual assessments upon the landowners' real property under the law of Arizona[55].

<u>THE DISTRICT'S OBLIGATION TO ASSESS AND COLLECT</u>

<u>THE UNITED STATES' O&M CHARGES</u>

40. The District, not later than July 1 each year, must estimate the amount of money necessary to meet the obligations of the District for the next fiscal year and certify to the Pinal County Board of Supervisors the amount needed and the number of acres to be taxed or assessed.[56]

41. The deadline for the District to comply with Arizona law in passing the Project O&M charges on to its water users through the tax assessment and collection process is July 1 of the year preceding the start of the fiscal year.[57]

42. The Pinal County Board of Supervisors includes the Project O&M charges, as part of the County's property tax rate-setting and assessment process. The County's tax assessor notifies

---

[52] BIA, *Irrigation Handbook*, at 39 (May 2002) (Exhibit 13).

[53] *See, e.g.*, Bureau of Indian Affairs, *San Carlos Indian Irrigation Project (Joint Works) O&M Assessment Rates, Arizona, Notice of Rate Change*, 60 Fed. Reg. 4499 (January 23, 1995) (Exhibit 14); Bureau of Indian Affairs, *Irrigation Operation and Maintenance Rate Adjustment for San Carlos Irrigation Project, Arizona*, 64 Fed. Reg. 24674 (May 7, 1999) (Exhibit 15). The May 7, 1999 O&M rate notice set the O&M charge at twenty dollars per acre "until further notice." *Id.* at 24,675.

[54] *See, e.g.*, Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects*, 67 Fed. Reg. 10748 (March 8, 2002) (Exhibit 16).

[55] A.R.S. § 48-3096.

[56] A.R.S. § 48-3112.

[57] Wilson Deposition, at 33 (Exhibit 3); 2008 Mason Affidavit, at 7 (Exhibit 6).



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

landowners of the charges through the County's annual property tax bill. District landowners must pay the first half of their taxes by November and the remainder by the following May.[58]

43. The County holds the assessments collected and the District uses these funds to pay the Project O&M charges to the United States by the contractual deadline.[59]

44. For the years at issue, the United States has been 10 months, 13 months and 9 months late in providing a final, published assessment rate.[60]

| Fiscal Year | Fiscal Year Begins | Final Notice of Assessment Due Under Repayment Contract & Arizona Law | Payment Originally Due Under Repayment Contract & First Supplement | Final Notice Published by BIA | Months Late | First Opportunity for District to Include Assessment Rate in Annual Property Tax Notice | Assessments Collected From Landowners and Due to District for Payment to Project |
|---|---|---|---|---|---|---|---|
| 2005 | 10/1/04 | 7/1/03 | 5/15/04 | 4/30/04 | 10 | 7/1/04 | 5/15/05 |
| 2006 | 10/1/05 | 7/1/04 | 5/15/05 | 8/8/05 | 13 | 7/1/05 | 5/15/06 |
| 2007 | 10/1/06 | 7/1/05 | 5/15/06 | 4/5/06 | 9 | 7/1/06 | 5/15/07 |

THE ACTING REGIONAL DIRECTOR'S 1997 DECISION

45. In 1997, the Acting Regional Director, deciding an appeal of O&M charges brought by the District, remanded the proposed 1998 O&M budget and assessment rate back to the Project.[61]

46. In regard to the amount of the O&M charge, the Acting Regional Director concluded that:

[58] 2008 Mason Affidavit, ¶ 9 (Exhibit 6); A.R.S. §§ 48-3112, *et seq.*
[59] 2008 Mason Affidavit, ¶ 10 (Exhibit 6).
[60] Operation and Maintenance Charge Notice and Payment Chart FY 1998-2007 (Exhibit 17); *see also* Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects,* 70 Fed. Reg. 45,740 (Exhibit 53); Bureau of Indian Affairs *Rate Adjustments for Indian Irrigation Projects,* 72 Fed. Reg. 19950 (Exhibit 62); Bureau of Indian Affairs *Rate Adjustments for Indian Irrigation Projects,* 71 Fed Reg. 17,131 (Exhibit 70).
[61] *Decision of the Acting Area Director Regarding Notice of Appeal of the FY 1998 San Carlos Irrigation Project O&M Assessment Submitted by the San Carlos Irrigation and Drainage District* (January 10, 1997) (Exhibit 18).

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

> The Landowners' Agreement requires the Secretary to fix the O&M charges based on the total annual cost of the O&M of the Project. Based on the following, it does not appear that the Project's FY 1998 O&M assessment charges have been fixed based on an estimate of the total annual cost of the O&M of the Project.
>
> The administrative record in this Appeal contains six different budget spreadsheets generated by the Project, at different points in time, showing projected and actual O&M budget expenditures for fiscal years 1993 through 1998. Three of these budget spreadsheets were generated in calendar year 1996 for the purpose of identifying O&M budget needs for FY 1998. An examination and comparison of all the budget spreadsheets reveal that from FY 1993-1996: (1) the Project consistently projected larger O&M budget expenditures that it actually expended; (2) the Project consistently underestimated its projected cash balance; and (3) the Project's cash balance increased significantly each year from FY 1993-1996 to its present balance of $2,873,099.
>
> Although the Project and SCIDD appear to agree that the Project's cash balance should be around $600,000 the Project continues to prepare O&M budget projections for FY 1997 and 1998 which include annual cash balances significantly in excess of $600,000. In addition, the Project has included in each of its FY 1997 and 1998 O&M budget a line item in the amount of $750,000 for special projects activities on which there is no agreement among the Project, SCIDD, and the Indian Works.
>
> Based on the foregoing, it does not appear that the Project's FY 1998 O&M charges have been fixed based on an estimate of the total annual cost of the O&M of the Project. Rather, it appears that the Project first estimated what its annual income will be in FY 1998 based on the $30/acre assessment and other projected revenues and then projected budget expenditures, in both its normal budget categories and in its newly created budget category for special projects, to spend down the projected revenues.[62]

47. The Acting Regional Director concluded that "[t]he BIA has a responsibility to explain the rationale and factual basis for decisions affecting persons dealing with the BIA, and failure to provide such information is a violation of due process."[63]

48. In response to the District's complaints regarding a proposed expenditure to replace a dragline, the Acting Regional Director determined that:

> At the Fact Finding meeting to discuss the FY 1998 O&M budget the Project provided SCIDD with a budget spreadsheet explanation of budget expenditures for FY 1996-98 which showed for FY 1996 a $500,000 dragline replacement which was not identified in the Project's FY 1996 O&M budget submitted to SCIDD two years earlier. . . .

---

[62] *Id.* at 9-10.
[63] *Id.* at 3.

The Project's June 28, 1996, Memorandum shows that the Project responded to SCIDD's objections regarding the dragline replacement by agreeing not to spend the $500,000 as proposed, although the question left unanswered by the Project was the ultimate disposition of the $500,000. There is no clear response from the Project of any other explanation in the record about the huge unexplained variations in total expenses for the Project from spreadsheet to spreadsheet. This is particularly troubling due to the fact that the Project's O&M expenditures are funded by private funds collected by the Project from SCIDD landowners, and by Federal funds appropriated for the benefit of the Indian beneficiaries of the Project. It is essential from a procedural standpoint that the Project provide sufficient information to SCIDD and the Indian Works to explain the expenditures on the budget spreadsheets as well as the basis for deviations from budget spreadsheets presented or approved in prior years. The Project fails to demonstrate in the record that it has met this threshold.[64]

49. In response to the District's allegations that the Project's budget recommendations for equipment and supplies were arbitrary and capricious, the Acting Regional Director noted the Project's own admission that it could not adequately track its own inventory and remanded the matter to the Project for further review. *Id.* at 24.

50. The Acting Regional Director found numerous other deficiencies in the substance and procedure related to the Project's proposed 1998 O&M assessment rate.[65]

THE 2005 O&M BUDGET AND CHARGES

51. From FY 1998 to FY 2004, the Project O&M charge was fixed at $20 per acre.[66]

52. On April 1, 2003, the Project prepared a proposed budget for FY 2005 based upon a $20 per acre assessment.[67]

---

[64] *Id.* at 20-21.

[65] *See generally id.* at 8-26.

[66] BIA, *Operation and Maintenance Rate Adjustment: San Carlos Irrigation Project, Arizona*, 63 Fed. Reg. 12818 (March 16, 1998) (Exhibit 19); BIA, *Irrigation Operation and Maintenance Rate Adjustment for San Carlos Irrigation Project, Arizona*, 64 Fed. Reg. 24674 (May 7, 1999) (Exhibit 15); BIA, *Rate Adjustments for Indian Irrigation Facilities*, 67 Fed. Reg. 63674 (October 15, 2002) (Exhibit 20); BIA, *Rate Adjustments for Indian Irrigation Facilities*, 68 Fed. Reg. 68103 (December 5, 2003) (Exhibit 21); BIA, *Rate Adjustments for Indian Irrigation Facilities*, 69 Fed. Reg. 23805 (April 30, 2004) (Exhibit 22).

[67] R. Shaw, *Irrigation Division Budget, San Carlos Irrigation Project* (April 1, 2003) (Exhibit 23).



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

53. On April 18, 2003, the Project advised the District in writing of its proposed O&M charges and budget for FY 2005. In the letter, the Project Manager informed the District that the FY 2005 O&M charge would be $30 per acre.[68]

54. The following was cited as the purported basis for the increase:

> The draft 1 budget contained an accounting error that existed for a number of years but was never discovered until about April 3, 2003 of this year.
>
> It was a double-accounting error in which the operation and maintenance (O&M) assessment was included in the unobligated cash balance on October 1st of each year and was included again in the income section of the budget as assessment collections. The second draft of the budgets provided the majority of clean-up associated with this error. Finally, the third draft provided more clean-up ensuring the sinking funds were fully funded for each fiscal year.
>
> The net affect from draft 1 to draft 3 of the FY 2005 budget is an increase in the O&M assessment from $20 per acre of decreed land to $30 per acre of decreed land.[69]

55. The District responded to the BIA's proposal with comments and proposed revisions on May 16, 2003, suggesting numerous ways for the Project to reduce its O&M budget.[70]

56. One week after receiving the District's comments, the Project informed the District at a FY 2005 budget fact-finding meeting that the proposed budget for FY 2005 would be based upon an assessment rate of thirty dollars per acre. The Project further informed the District that the budget and rate assessment for FY 2006 likely would be thirty-five dollars per acre.[71]

57. The BIA's Western Regional Office submitted the proposed FY 2005 budget and assessment rate to the Assistant Secretary on June 6, 2003.[72]

58. On that same day, the Western Regional Director responded to the District's comments on the FY 2005 budget. The Western Regional Director indicated that he had requested that the proposed $30 per acre charge be published in the Federal Register. The Director indicated that "[The District] will be given a formal opportunity to submit comments in accordance with the instructions in

---

[68] Letter from Robert E. Carolin to Douglas Mason (April 18, 2003) (Exhibit 24).
[69] *Id.*
[70] Letter from Riney B. Salmon II to Robert E. Carolin (Exhibit 25).
[71] Affidavit of Douglas D. Mason, District General Manager, ¶ 14 (November 25, 2003) (Exhibit 26).
[72] Letter from Wayne Nordwall to Riney B. Salmon II (June 6, 2003) (Exhibit 27).



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

the Federal Register notice. Final action on whether to increase the rate will be made by the Assistant Secretary for Indian Affairs after the Federal Register notice is published and the comment period is completed."[73]

59. The Western Regional Director further asserted that, as a result of the alleged accounting error cited in the Project Manager's April 18, 2003 letter, "[t]he rate increase is necessary as the Project no longer has the extra cash reserves."[74]

60. The Director stated that "The accounting error resulted in artificially low assessment rates for several years. The water users benefited greatly during the years the rate was set at $20.00. Because the water users received a benefit from this accounting error, it is difficult to justify the complaint that the increase in the assessment rates for FY 2005 is unfair.[75]

61. In the absence of a final decision on the FY 2005 assessment rate, the District, out of an abundance of caution, assessed its landowners the same twenty dollars per acre as the rate from the previous fiscal year.[76]

62. The District had a good faith belief that the Project would set the final assessment to the more reasonable level of twenty dollars per acre, because several times in past years the Project had proposed a higher assessment rate but used a lower rate when the final decision was made.[77]

63. In September 2003, the United States published notice in the Federal Register that it was proposing to fix Project O&M charges for FY 2005 at $30 per acre. The notice stated that it was being issued "in accordance with the BIA's regulations governing its operation and maintenance of irrigation projects." The notice further stated that these regulations "provide for the fixing and announcing of rates for annual assessments and related information for our irrigation projects." The

---

[73] *Id.*
[74] *Id.* at 2.
[75] *Id.* at 3.
[76] 2008 Mason Affidavit, ¶ 14 (Exhibit 6).
[77] *Id.*

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

notice provided a December 1, 2003 deadline for submitting comments on the proposed O&M charges.[78]

64. The District timely filed its objections to the proposed FY 2005 assessment in November 2003.[79]

65. On April 30, 2004, the Assistant Secretary of Indian Affairs published notice that Project O&M charges for FY 2005 had been fixed at $30 per acre.[80]

66. At least six different budgets were presented to the District by the United States as representing the Project's income and obligations for FY 2005.[81]

67. In these budgets, "Total Unobligated Cash" to begin FY 2005 was estimated in various amounts as follows:[82]

| Total Unobligated Cash: Beginning of FY 2005 | | | | | |
|---|---|---|---|---|---|
| Draft 1 Budget | Draft 2 Budget | Draft 3 Budget | Draft 4 Budget | Proposed Budget | Approved Budget |
| $2,736,119 | $3,724,119 | $3,722,119 | $3,760,619 | $3,709,619 | $2,586,687 |

68. Based on the budget summary prepared by the Project for review by the District, the actual unobligated cash reported for the end of FY 2004 was $2,586,687.[83]

69. In these budgets, total Project income for FY 2005 was estimated as follows:[84]

---

[78] Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects*, 68 Fed. Reg. 56,302 (September 30, 2003) (Exhibit 29).
[79] Letter from Riney B. Salmon II to Jeff Lowman, Acting Director, BIA Office of Trust Responsibilities (November 26, 2003) (Exhibit 30).
[80] Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Facilities: Notice of Rate Adjustments*, 69 Fed. Reg. 23805 (April 30, 2004) (Exhibit 22).
[81] *See* FY 2005 Budget Draft 1 (Randy Shaw, April 1, 2003) (Exhibit 23); FY 2005 Budget Draft 2 (Randy Shaw, April 1, 2003) (Exhibit 31); FY 2005 Budget Draft 3 (Randy Shaw, April 10, 2003) (Exhibit 32); FY 2005 Budget Draft 4 (Randy Shaw, *et al.*, May 22, 2003) (Exhibit 33); Proposed Irrigation Division Budget (R. Shaw, C. Christensen, R. Kaskalla, June 6, 2003) (Exhibit 34); Proposed FY 2006 Budget (R. Kaskalla & C. Christensen, October 28, 2004)(Exhibit 35) (collectively, "FY 2005 Budgets").
[82] *Id.*
[83] Carl Christensen, *FY 2004 Irrigation Budget* (October 4, 2004) (Exhibit 36).
[84] FY 2005 Budgets.

| FY 2005 Income | | | | | |
|---|---|---|---|---|---|
| Draft 1 Budget | Draft 2 Budget | Draft 3 Budget | Draft 4 Budget | Proposed Budget | Approved Budget |
| $2,070,500 | $3,070,500 | $3,070,500 | $3,070,500 | $3,070,500 | $4,553,000 |

70. The Project income reported in the Approved Budget included O&M charges for FY 2006. Excluding those charges of $1.5 million, income for FY 2005 only would have been reported as $3,053,000, including $3.0 million in O&M charges.[85]

71. Based on the budget summary prepared by the Project for review by the District, actual Project income for FY 2005 was $3,511,339, including $3,000,000 in O&M charges collected.[86]

72. In these budgets, operation and maintenance cost obligations were estimated as follows:[87]

| FY 2005 Obligations | | | | | |
|---|---|---|---|---|---|
| Draft 1 Budget | Draft 2 Budget | Draft 3 Budget | Draft 4 Budget | Proposed Budget | Approved Budget |
| $3,165,000 | $3,160,000 | $3,151,000 | $3,151,000 | $3,151,000 | $3,326,500 |

73. Based on the budget summary prepared by the Project for review by the District, the Project actually spent $2,031,177 on operation and maintenance costs for FY 2005.[88]

74. In the FY 2005 budgets, unobligated cash at the end of the fiscal year was estimated as follows:[89]

| FY 2005 End of Year Unobligated Cash (With Sinking Funds and Reserve Unobligated) | | | | | |
|---|---|---|---|---|---|
| Draft 1 Budget | Draft 2 Budget | Draft 3 Budget | Draft 4 Budget | Proposed Budget | Approved Budget |
| $1,614,619 | $3,934,619 | $641,619 | $680,119 | $629,119 | $3,813,187 |

75. Actual unobligated cash at the end of FY 2005 was reported to be $4,051,569 in a budget summary provided to the District in October 2005.[90]

---

[85] *Id.*
[86] Carl Christensen, *FY 2005 Irrigation Budget* (October 5, 2005) (Exhibit 37)
[87] FY 2005 Budgets.
[88] Carl Christensen, *FY 2005 Irrigation Budget* (October 5, 2005) (Exhibit 37).
[89] FY 2005 Budgets.



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

THE DECISION TO TERMINATE WATER DELIVERIES TO THE DISTRICT

76. On February 8, 2005, the Project transmitted a letter to the District threatening to terminate water deliveries to the District on March 2, 2005, less than thirty days later, if the FY 2005 assessment was not paid in full by that date:

> This is in response to the non-payment by the San Carlos Irrigation and Drainage District Fiscal Year 2005, operation and agreement bill (*stet*) in the amount of One million five hundred thousand dollars ($1,500,000), which was due on March 1, 2004. The payment is currently Eleven (11) months past due.
>
> The 1924 Act of Congress states that the payment is to be paid in advance not later than March 1, and the June 8, 1031 Repayment Contract states "The United States reserves the right to refuse to deliver water to the District in the event of default by the District for more than twelve months in any of the payments due the United States hereunder.
>
> Therefore, the San Carlos Irrigation Project will abide by the terms of the 1931 Contracts and terminate delivery of irrigation water to the San Carlos Irrigation and Drainage District on March 2, 2005, if payment in the amount of $1,500,000.00 plus accumulated interest and penalties since May 15, 2004 is not received by closed of business March 1, 2005.[91]

77. The letter indicated that District had the right to appeal the decision to the Acting Regional Director within thirty days.[92]

78. As provided in the Project's letter and applicable regulations, on February 23, 2005 the District filed a notice of appeal of the decision to terminate the District's water deliveries. In its notice of appeal, the District requested that the BIA stay its decision to terminate water deliveries on March 2, 2005 pending the outcome of the appeal.[93]

79. On March 1, 2005, the Acting Regional Director affirmed the February 10, 2005 decision of the Acting Project Manager without allowing the District the requested thirty days to file a statement of reasons in support of its appeal and without providing any opportunity for a hearing. The Acting Regional Director's decision gave the District two days to pay $1 million of the FY 2005 assessment and another thirty days to pay the remaining $500,000. The only basis given for the

[90] Carl Christensen, *FY 2005 Irrigation Budget* (October 5, 2005) (Exhibit 37).
[91] Letter from Charles R. Tate to Michael Urton (February 8, 2005) (Exhibit 38).
[92] *Id.*
[93] Letter from Riney B. Salmon II to Western Regional Director (February 23, 2005) (Exhibit 39).

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

decision to terminate water deliveries without giving the District an opportunity to be heard was an alleged "potential" violation of the Anti-Deficiency Act and alleged, unexplained impacts on "public safety, protection of trust resources, or other public exigency."[94]

80. In regard to the March 1, 2005 decision, Catherine Wilson, a Supervisory Water Rights Specialist for the Bureau of Indian Affairs in the Western Regional Office, testified under oath as follows:

> Q. And what was the basis for that decision? What were the reasons discussed?
> A. The statutes and regulations that govern the project are pretty clear, from a program manager's standpoint, in that if a water user doesn't pay O & M, you're not supposed to deliver water. We were already, at this point, delivering water to SCIDD four months into the fiscal year when nonpayment had occurred. So we -- and so we needed to take action, and we did. That was the genesis of this.
> Q. Okay. All right. Now, were any public safety issues discussed at any of these meetings?
> A. I do not recall that they were.
> . . .
> Q. You've already said there wasn't any discussion about public safety, but how about protection of trust resources? Do you recall any discussions about that?
> A. I believe, yes, with regard to that issue, we were concerned about protecting the facilities, the water delivery, the water resources that we deliver through the project, especially to the reservation, which would be the trust resources at issue.
> Q. And how would this payment or this nonpayment affect the protection of trust resources?
> A. If water users don't pay their O & M assessment as required by law, then the project is at risk for not being able to operate the project and deliver the water.
> Q. You mean not having enough money to pay the expenses of the project? Is that what you're saying?
> A. Yes.
> Q. And anything else?
> A. No.
> Q. Just lack of money?
> A. No. No.
> Q. Nothing else?
> A. Not that I can think of right this moment.[95]

81. A summary report of the FY 2005 Project budget prepared by the BIA on March 8, 2005 indicates that the total budget for FY 2005 was just over 2.8 million dollars.[96] At the point, the Project had paid approximately $750,000 of its obligations for FY 2005, leaving approximately 2.1

---

[94] Letter from Bryan Bowker to Riney B. Salmon II (March 1, 2005) (Exhibit 40).
[95] Wilson Deposition, at 26-27 (Exhibit 3).
[96] Carl Christensen, *FY 2005 Irrigation Budget* (March 8, 2005) (Exhibit 41).

million dollars in obligations remaining. According to the summary report, the Project had over 1.8 million dollars in unobligated cash as of February 28, 2005 and an expected income for the remainder of the budget year of $395,000, not counting any payments of O&M charges by the District.[97]

82. Because it was threatened with the termination of its water deliveries, the District paid $1.5 million, plus $47,500 in penalty interest, to the Project by the deadline indicated in the Regional Director's decision. The funds were supplied in part by a $20 per acre O&M charge assessed by the District in July 2004, with the difference taken from the District's own reserve funds. The District made the payment under protest and with an express reservation of its rights to challenge the FY 2005 assessment.[98]

THE FY 2006 O&M BUDGET AND CHARGES

83. On June 29, 2004, the Project held a FY 2006 budget fact-finding meeting, which was attended by the District.[99] At that meeting, the Project discussed a budget summary prepared on or about June 22, 2004 that summarized the Project's proposed budget for FY 2001-2008.[100] The summary showed a $15 per acre O&M charge for FY 2006. At that meeting, the Project and the District agreed that a charge of $15 per acre for FY 2006 was appropriate.[101]

84. In July 2004, the District submitted an assessment of $51 per acre to the Pinal County Treasurer for lands within the District. This amount included $15 per acre to pay Project O&M charges for FY 2006 as proposed and agreed to during the June 29, 2004 meeting. It also included an additional $5 per acre to recoup part of the $30 per acre Project O&M charges for FY 2005 that the District did not assess the previous year because it did not receive timely notice of the final O&M rate.[102]

---

[97] *Id.*

[98] Letter from Douglas Mason (March 2, 2005) (Exhibit 42); 2008 Mason Affidavit, ¶ 15 (Exhibit 6).

[99] Memorandum from Robert Carolin to Office of the Regional Director (September 15, 2004) (Exhibit 43).

[100] Irrigation Division Budget, San Carlos Irrigation Project (June 22, 2004) ("June 2004 Budget Proposal) (Exhibit 44); 2008 Mason Affidavit, at 16 (Exhibit 6).

[101] 2008 Mason Affidavit, at ¶ 16 (Exhibit 6); Christensen Deposition, at 55 & 58 (Exhibit 12)

[102] Deposition of Douglas D. Mason, at 50-51 (October 4, 2007) (Exhibit 45).



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

85. On September 15, 2004, the Project Engineer submitted the Project's recommended FY 2006 budget to the BIA Western Regional Director.[103] That submittal stated that "[t]he operation and maintenance rate for FY 2006 is $15.00 per acre for a total assessment of $1,500,000." The Project Manager referred to the June 29 fact-finding meeting and correctly informed the Regional Director that "[t]he participants at the Fact Finding Committee seem satisfied with the proposed FY 2006 budget and the recommended assessment rate of $15.00 per acre."[104]

86. The Project Engineer also stated: "In addition, attached is a summary of the FY 2004 budget through August 31, 2004, which shows total obligations of $2,340,751 to date. It is currently anticipated the total obligations for FY 2004 will not exceed $2,700,000. If it is $2,700,000 the carryover to FY 2005 will increase from $2,350,000 to about $2,600,000."[105]

87. In an October 1, 2004 memorandum to the Project Manager, the Western Regional Director of the BIA stated that "[w]e do not concur with your recommendation to decrease the assessment for FY 2006 to $15.00 per acre."[106]

88. The Western Regional Director cited the need for "work on deferred maintenance items," including the well replacement program, as a basis for disagreeing with the recommendation by Project staff.[107] The well replacement program was a program proposed by the BIA and objected to by the District that involved the replacement of Project wells based on their age rather than their condition or capacity.[108]

89. The Western Regional Director also stated that "In your proposed budget, funding for the China Wash flume repair is reduced from $351,000 to $260,000. Until the project is completed, the amount of funds set aside should remain at $351,000.[109]

---

[103] Memorandum from Robert Carolin to Office of the Regional Director (September 15, 2004) (Exhibit 43).
[104] *Id.*
[105] *Id.*
[106] Memorandum from the Western Regional Director to the Project Manager (October 1, 2004) (Exhibit 46).
[107] *Id.*
[108] 2008 Mason Deposition, at 92-93.
[109] Memorandum from the Western Regional Director (October 1, 2004) (Exhibit 46).

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

90. The Western Regional Director further stated: "When the 2005 budget was formulated, the Heavy Equipment Replacement Fund was reduced to help mitigate an error in the 2004 budget which over estimated the amount of carryover funds available by $2,000,000. This fund will have to be reestablished. Please provide a plan for reestablishing this fund."[110]

91. The Western Regional Director ordered the Project Manager to "[p]rovide a plan for addressing deferred maintenance."[111]

92. On September 29, 2004 (two days before the Western Regional Director sent his October 1 memorandum to the Project Engineer), the Western Regional Office told Interior Department staff that "[w]e will be keeping the 2006 rate for the Joint Works at $30.00 per acre. Please go ahead and publish this proposed rate."[112]

93. Project staff prepared a revised budget based upon a thirty dollar per acre O&M charge through FY 2010.[113] The Project Manager stated in a later memorandum that "Russell Kaskalla and Carl Christensen recalculated the proposed 2006 budget as well as tentative budgets for FY 2007 through FY 2010 based upon keeping the Assessment Rate at $30.00 per year."[114]

94. Total Project income for FY 2006, excluding O&M charges collected, was estimated in the original June 2004 Budget Proposal and the revised October 2004 Budget Proposal as follows:[115]

| FY 2006 Income (excluding O&M charge collections) | |
|---|---|
| June 2004 Budget Proposal | October 2004 Budget Proposal |
| $420,000 (including income from overpumping) | $53,000 |

[110] *Id.*
[111] *Id.*
[112] E-mail correspondence from Russell Kaskalla, Civil Engineer, Western Regional Office, to Ross Mooney, Chief, Branch of Irrigation, Power, Safety of Dams, Operation of Non-federal Dams (October 29, 2004) (Exhibit 47).
[113] Proposed FY 2006 Budget (R. Kaskalla & C. Christensen, October 28, 2004)(Exhibit 35) ("October 2004 Budget Proposal").
[114] Memorandum from Robert E Carolin to Acting Western Regional Director (January 18, 2006) (Exhibit 48).
[115] *See* June 2004 Budget Proposal; October 2004 Budget Proposal.



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

95. Based on the budget summary prepared by the Project for review by the District, actual income, excluding O&M charges collected, for FY 2006 was $326,549. This total did not include income from overpumping.[116]

96. Total Project obligations for FY 2006 operations and maintenance were estimated in the original June 2004 Budget Proposal and the revised October 2004 Budget Proposal as follows:[117]

| FY 2006 Obligations | |
|---|---|
| June 2004 Budget Proposal | October 2004 Budget Proposal |
| $2,650,000 | $3,385,100 |

97. Based on the budget summary prepared by the Project for review by the District, actual FY 2006 operation and maintenance obligations were $2,931, 403, which includes a charge of $492,275 for work on the China Wash Flume project that was not conducted until FY 2007.[118]

98. The Project held another fact-finding meeting on December 16, 2004. The notice for that meeting stated: "Based upon current Bureau of Indian Affairs, Irrigation Handbook financial management and deferred maintenance guidelines (enclosed), the recommended assessment is being increased from $15.00 per acre to $30.00 per acre."[119] This was the first notice that the District received that the proposed $15 per acre O&M charge had been rejected and that the proposed charge for FY 2006 would be $30 per acre.[120]

99. At that meeting, the Project distributed to the water users a copy of the revised budget prepared on October 28, 2004 with the higher $30 per acre rate. Representatives of the District attended that meeting and voiced their objections to the $30 per acre rate.[121]

---

[116] Carl Christensen, *FY 2006 Irrigation Budget* (October 11, 2006) (Exhibit 49).
[117] *See* June 2004 Budget Proposal; October 2004 Budget Proposal.
[118] *Id.*.
[119] Letter from Robert E. Carolin, Project Manager, to Douglas Mason, District General Manager (December 9, 2004) (Exhibit 50).
[120] Mason Deposition, at 51-52 (Exhibit 45).
[121] *Id.* at 52.

100. During the December 2004 fact-finding meeting, the Project indicated that "the Assessment would not be less than $30.00 per acre for the period FY 2006 through FY 2010, but due to unforeseen circumstances, the assessment may have to be raised to a rate higher than $30.00 per acre."[122]

101. The United States published notice of its intent to fix FY 2006 O&M charges at the $30 per acre rate in the February 1, 2005 *Federal Register*. The notice stated that "[i]nterested parties may submit comments on the proposed rate adjustments on or before April 4, 2005." The notice further stated that the United States was:

> . . . publishing this notice to notify [the District] that we proposed to adjust one or more of our irrigation assessment rates. This notice is published in accordance with the BIA's regulations governing its operation and maintenance of irrigation projects, specifically, 25 C.F.R. 171.1. These sections provide for the fixing and announcing of the rates for annual assessments and related information for our irrigation projects.[123]

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

102. The District timely objected to the notice of proposed charges with comments and proposed revisions on or about April 1, 2005.[124]

103. The United States published notice of its final decision fixing the O&M charges at $30 per acre for FY 2006 on August 8, 2005.[125]

104. A comparison of the Project's proposed $15 per acre budget, the revised $30 per acre budget mandated by the Western Regional Office of the BIA, and actual year-end figures reveal the following regarding Project income for FY 2006:[126]

a. In its revised $30 per acre budget, the estimate of Project interest income was lowered from $45,000 to $19,000. Based on the budget summary prepared by the Project for review by the District, year-end figures for FY 2006 indicate that actual interest income was $233,249, or twelve times the amount estimated by the United States in the revised FY 2006 budget.

---

[122] Memorandum from Robert E. Carolin to Acting Western Regional Director (January 18, 2006) (Exhibit 48).

[123] Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects*, 70 Fed. Reg. 5,210 (Exhibit 51).

[124] Letter from Riney B. Salmon II to Arch Wells (April 1, 2005) (Exhibit 52).

[125] Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects*, 70 Fed. Reg. 45,740 (Exhibit 53).

[126] *See* June 2004 Budget Proposal (Exhibit 44); October 2004 Budget Proposal (Exhibit 35); and Carl Christensen, *FY 2006 Irrigation Budget* (October 11, 2006) (Exhibit 49).

b. The United States lowered its estimate of miscellaneous income by $25,000 in the revised $30 per acre budget, from $45,000 to $20,000. Year-end figures for FY 2006 indicate that actual miscellaneous income was $93,300.

105. A comparison of these same budgets and year-end figures reveal the following regarding Project obligations for FY 2006:[127]

a. The United States raised its estimate of utility expenses by forty percent, to $70,000 in the revised $30 per acre budget. Year-end figures for FY 2006 indicate that actual utility expenses were $26,377, less than half of the United States' revised projection.

b. The United States allocated $970,000 in the revised $30 per acre budget to personnel salaries and benefits. Year-end figures for FY 2006 indicate that actual personnel expenses totaled $819,648.

c. The proposed $15 per acre budget contained no charge for Land and Structures. The revised $30 per acre budget contained a charge of $640,000 for Land and Structures, all of which was allocated for well replacement costs. From 2005 to 2007, no money was spent for replacement of Project wells.

d. The United States increased its estimate of supply costs by approximately 30 percent, from $150,000 to $215,000. Actual supply costs for FY 2006 were $158,159.

e. The revised $30 per acre budget allocated $262,000 for heavy equipment replacement.[128] The United States reduced the allocation to $8,000 in subsequent budget adjustments.[129]

106. The revised FY 2006 budget mandated by the Western Regional Office also allocated $55,000 for an archaeological survey at San Carlos Reservoir.[130] The United States had asserted that this work was required due to historic preservation claims made against the United States in litigation with the San Carlos Apache Tribe,[131] but the United States won that litigation.[132] In addition,

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

---

[127] *Id.*

[128] R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).

[129] R. Shaw, Irrigation Div. Budget, Draft 2 (April 20, 2006) (Exhibit 76).

[130] R. Shaw, *Irrigation Division Operation and Maintenance Budget* (February 27, 2006) (providing "Proposed Adjusted Budget #1") (Exhibit 55).

[131] *See Notes from Fact Finding Committee Meeting on 5/30/02*, at 2 (May 31, 2002) (Exhibit 77); Letter from Robert Carolin to Douglas Mason, at 3 (May 30, 2002) (Exhibit 28); Letter from Wayne Nordwall to Riney B. Salmon II, at 6 (June 6, 2003) (Exhibit 27).

[132] *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860 (D. Ariz. 2003)

$262,000 was allocated for the Heavy Equipment Sinking Fund. The amount allocated for heavy equipment was reduced to $6,000 in later revisions to the FY 2006 budget.[133]

107. The revised $30 per acre budget contained no charge for work on the China Wash Flume project. No work was conducted during FY 2006 on this project, as bids for the project were not taken until sometime after September 15, 2006, two weeks before the end of the fiscal year.[134]

108. A year-end budget summary prepared by the Project for the District shows no expenditures for China Wash Flume in 2006.[135]

109. In a revised budget summary prepared approximately one week later, however, the Project is shown to have charged $492,275 for work on China Wash Flume in September 2006.[136]

110. The revised FY 2006 budget estimated that unobligated cash at the year's end would total $3,481,087.[137] The Project's final year-end figures for FY 2006 show unobligated funds totaling $4,558,612.[138]

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

THE THREAT TO TERMINATE WATER DELIVERIES TO THE DISTRICT

111. On February 2, 2006, the Acting Western Regional Director of the BIA, relying once again on the one-year default provision of the Repayment Contract, notified the District that water deliveries would be terminated on March 1, 2006 if the District had not paid the FY 2006 charges in full by that date.[139]

112. In the notice letter, the Acting Regional Director stated:

> If [the District] does not pay the 2006 O&M assessment by the alternate due date of March 1, 2006, I have directed the Project to terminate irrigation water deliveries to [the District] at 8 a.m. on March 2, 2006. For the following reasons, I have determined that public safety, protection of trust resources, or

---

[133] R. Shaw, *Irrigation Division Operation and Maintenance Budget* (February 27, 2006) (providing "Proposed Adjusted Budget #1") (Exhibit 55).
[134] Memorandum from Carl Christensen (September 13, 2006) (Exhibit 56); 2008 Mason Affidavit, ¶ 27 (Exhibit 6).
[135] Carl Christensen, *FY 2006 Irrigation Budget* (October 2, 2006) (Exhibit 57).
[136] Carl Christensen, *FY 2006 Irrigation Budget* (October 11, 2006) (Exhibit 49).
[137] R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).
[138] Carl Christensen, *FY 2006 Irrigation Budget* (October 11, 2006) (Exhibit 49).
[139] Letter from Allen Anspach to Douglas Mason (February 2, 2006) (Exhibit 58).

> other public exigency require that this decision be made effective immediately. See 25 CFR Part 2.6(a). First, [the District's] failure to pay the 2006 O&M assessment would place the Project at risk. The Project's irrigation operations are funded one-half by assessments collected from [the District] and one-half from the Project Indian Works. Second, failure by SCIDD to make its assessment payment for 2006 would place the Project in a position to violate the Anti-Deficiency Act. Finally, if the Project does not have sufficient funds to operate in 2006, Project water deliveries to the Indian Works and the associated Indian trust lands on the Gila River Indian Reservation may be impaired.[140]

113. On or about February 2, 2006 (the same date as the Acting Regional Director's notice), the Project prepared a budget summary for presentation to the District indicating that the Project's account contained $4,922,108 in unobligated cash and that total budgeted obligations remaining for FY 2006 were approximately $2.9 million.[141]

114. At the District's request, the Acting Western Regional Director met with representatives of the District on February 13, 2006 to discuss the O&M budget process and the Director's decision to terminate water deliveries. In that meeting, the Director asked the District to submit a proposal to the BIA to address the District's concerns in general and the payment of the FY 2006 O&M charges in particular.[142]

115. The District submitted its proposal on February 17, 2006, proposing that the United States use the Project's large cash surpluses and credit the District for overpayments in previous years and reduce the proposed O&M charges in future years.[143]

116. The Acting Regional Director of the BIA rejected the District's proposal and demanded immediate payment to avoid termination of water deliveries.[144]

117. In the notice letter rejecting the District's proposal, the Acting Regional Director stated that the BIA's billing and collection system was not capable of crediting funds from a previous year to the current year.[145]

---

[140] *Id.*
[141] Carl Christensen, *FY 2006 Irrigation Budget* (February 2, 2006) (Exhibit 59).
[142] 2008 Mason Affidavit, ¶ 20 (Exhibit 6).
[143] Letter from Riney B. Salmon to Allen Anspach (February 17, 2006) (Exhibit 60).
[144] Letter from Allen Anspach to Riney B. Salmon (February 28, 2006) (Exhibit 61).
[145] *Id.*



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

118. The notice letter also stated that the charges previously collected were necessary to fund "outstanding O&M activities" including a well replacement program.[146] From 2005 to 2007, the United States did not spend any money on well replacement.[147] At or around the time of the Acting Regional Director's notice letter, the Project Manager estimated the cost of all outstanding deferred maintenance to be approximately $750,000.[148]

119. Another "outstanding O&M activit[y]" cited by the Acting Regional Director was a "well abandonment program."[149] That work has never been conducted.[150]

120. A third "outstanding O&M activit[y]" cited by the Acting Regional Director was a "condition assessment study directed by the Assistant Secretary for Indian Affairs."[151] That work has never been conducted.[152]

121. The Acting Regional Director also stated: "If the Project were to reduce the O&M rate to $20/acre or $25/acre in 2006 or 2007, the Project would have to engage in deficit spending and then increase the rate to $33/acre or $34/ acre for FY 2008-2010 in order to meet Project O&M obligations."[153] The Assistant Secretary subsequently fixed the O&M charges for FY 2008 and FY 2009 at twenty-one dollars per acre.[154]

122. A few days after the Assistant Regional Director sent his letter rejecting the District's proposal, the Project prepared a budget summary for submittal to the District indicating that the

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

---

[146] *Id.*
[147] Wilson Deposition, at 52 (Exhibit 3); 2008 Mason Affidavit, ¶ 24 (Exhibit 6); R. Shaw, *Irrigation Division Budget, Draft 2* (April 20, 2006) (Exhibit 76).
[148] Memorandum from Robert E. Carolin to Acting Western Regional Director, at 5 (January 18, 2006) (Exhibit 48).
[149] Letter from Allen Anspach to Riney B. Salmon (February 28, 2006) (Exhibit 61).
[150] Wilson Deposition, at 53-54 (Exhibit 3).
[151] Letter from Allen Anspach to Riney B. Salmon (February 28, 2006) (Exhibit 61).
[152] Wilson Deposition, at 54-55 (Exhibit 3).
[153] Letter from Allen Anspach to Riney B. Salmon (February 28, 2006) (Exhibit 61).
[154] Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects*, 72 Fed. Reg. 19950 (April 20, 2007) (Exhibit 62).

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Project had $4,789,338 in unobligated cash as of February 28, 2006, with obligations for the remainder of FY 2006 totaling approximately $2.8 million.[155]

123. Because it was once again faced with termination of water deliveries from the Project, the District paid $1,500,000 to the Project under protest and with an express reservation of its rights to challenge the FY 2006 O&M charges.[156] The charge was paid in part from previously collected assessments and in part from the District's reserve funds.[157]

124. The United States, however, did not attempt to charge the District penalties or interest for the late payment. The Acting Regional Director stated in a memorandum that:

> The 2006 O&M rate for the SCIP-Joint Works was published as final in the Federal Register on August 8, 2005. The invoice for the 2006 O&M assessment was recently mailed to SCIDD and reflects a due date of March 1, 2005, and an alternate due date of March 1, 2006. Penalties will begin to accrue on any unpaid portion of this invoice after March 1, 2006, rather than the May 15, 2005 date contained in the Repayment Contract between [the District] and the United States. The basis of this consideration on the penalties is the late Federal Register Notice establishing the 2006 O&M rate, and the lawsuit referenced above which was pending in U.S. District Court until recently.[158]

THE FY 2007 O&M BUDGET AND CHARGES

125. On October 4, 2005, the United States published notice in the Federal Register that it was proposing to fix Project O&M charges for FY 2007 at $30 per acre.[159]

126. The United States provided no background documentation in support of the proposed or final budgets for FY 2007, other than a budget summary prepared on or about June 22, 2004 that contained a "tentative" budget for 2007 based upon an O&M charge of $24.40 per acre.[160] The

---

[155] Carl Christensen, *FY 2006 Irrigation Budget* (March 9, 2006) (Exhibit 63).
[156] Letter from Douglas D. Mason to Robert Carolin (March 1, 2006) (Exhibit 64).
[157] 2008 Mason Affidavit, ¶ 25 (Exhibit 6).
[158] Memorandum from Allen Anspach to the Project Manager (February 2, 2006) (Exhibit 65).
[159] Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects*, 70 Fed. Reg. 57,889 (Exhibit 66).
[160] Carl Christensen, *Irrigation Division Budget, San Carlos Irrigation Project* (June 22, 2004) (Exhibit 54).

Project did not hold a fact-finding meeting with the District in regard to the FY 2007 O&M charges.[161]

127. The District filed comments on the proposed budget and O&M charges on December 1, 2005.[162]

128. The United States published notice of its final decision fixing the O&M charges for FY 2007 at $30 per acre on April 5, 2006.[163]

129. At least six different budgets were presented to the District by the United States as representing the Project's income and obligations for FY 2007. Unobligated cash at the beginning of the fiscal year was reported in these various budgets in amounts ranging from $1.05 million to $6.115 million. O&M charge collections were reported from a low $2.1 million up to $3.05 million. Operation and maintenance costs were reported from a low of $2.55 million up to $3.412 million. Unobligated cash at the end of the fiscal year ranged from $1.14 million to $5.557 million.[164] Total Project income for FY 2007, exclusive of O&M charges, was estimated at $53,000.[165] Actual income, based upon a budget summary provided by the Project, was $300,854."[166]

130. Actual year-end figures provided in a summary prepared by the Project manager reveal the following regarding Project income and obligations for FY 2007:

a. The Project's final year-end figures for FY 2007 show unobligated funds totaling $2,134,904.[167]

b. Year-end Project obligations of $5,150,089 included $2.345 million for "Well Replacements & Abandonment." A footnote to this entry states that this line item "Includes Coolidge Dam, San Carlos Reservoir & New Office Building."[168] This obligation did not appear in previous versions of the budget. The United States never

---

[161] Memorandum from Robert E. Carolin to Acting Western Regional Director (January 18, 2006) (Exhibit 48); 2008 Mason Affidavit, ¶ 29 (Exhibit 6).
[162] Letter from Riney B. Salmon II to Arch Wells (December 1, 2005) (Exhibit 69).
[163] Bureau of Indian Affairs, *Rate Adjustments for Indian Irrigation Projects*, 71 Fed. Reg. 17,131 (Exhibit 70).
[164] *Expert Report of Lawrence Field, C.P.A.*, at 7, ¶ 3 (November 29, 2007) (Exhibit 71).
[165] R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).
[166] Carl Christensen, *FY 2007 Irrigation Budget* (October 1, 2007) (Exhibit 72).
[167] *Id.*
[168] *Id.*



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

sought District approval for a new office building and, to date, the United States has not undertaken this project. Thus, actual year-end obligations totaled no more than $2,804,792.[169]

c. The year-end cash balance of $2,134,904 does not include $2.1 million in O&M charges that were due for FY 2007 but unpaid as of September 30, 2007.[170]

d. The year-end cash balance does not include amounts that were obligated, but not spent, during FY 2007.[171]

131. In his expert report, Lawrence Field, C.P.A., states the following regarding the year-end budget figures for FY 2007:[172]

> On October 1, 2007 BIA prepared a schedule showing the financial activity for the month of September 2007 and an annual summation of financial activity for the Project for the fiscal year ended September 30, 2007 (see Exhibit 8). This schedule shows the total income, obligations and ending cash balance for the Project as of September 30, 2007. This schedule also shows that $2.0 million was spent or obligated in September 2007 for "Well Replacement & abandonment" which line item was footnoted as "Includes Coolidge Dam, San Carlos Reservoir & New Office Building." Per my interview of Mr. Mason, these betterments were never presented to SCIDD for approval. For BIA to show these funds as spent or obligated without the required approval of SCIDD results in this presentation being inaccurate and misleading.
>
> The October 1, 2007 BIA prepared schedule is the most recently prepared financial presentation that I was able to locate. This schedule shows a cash balance at September 30, 2007 of $2,134,904. This stated cash balance is misleading for at least the following reasons:
>
> 1) BIA uses a concept referred to as "obligating funds" to reserve cash for planned expenditures. Once cash is obligated it is shown on the financial summaries as if it has been spent. Documents reviewed indicate that once cash is obligated it is then accounted for by BIA as an "undelivered order" until such funds are spent (see Exhibit 9). Per review of the documents reviewed, undelivered orders averaged approximately $326,000 at any one time during the fiscal years ended September 30, 2004 through 2006.
>
> 2) The cash balance does not include $2,100,000 in assessment collections that should have been paid during the fiscal year but were unpaid at September 30, 2007. While these amounts are noted as unpaid on the fiscal

---

[169] 2008 Mason Affidavit, ¶ 26(Exhibit 6); Letter from Riney B. Salmon, II to Allen Anspach (November 1, 2007) (Exhibit 67); Letter from Acting Regional Director to Riney B. Salmon II (November 29, 2007) (Exhibit 68).
[170] *Expert Report of Lawrence Field, C.P.A.*, at 10, No. 2 (November 29, 2007) (Exhibit 71).
[171] *Id.*
[172] *Id.* at 9-13.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

year summation schedule, not including them in the cash balance while deducting for amounts obligated but unspent, i.e. undelivered orders, provides a misleading view of the Project's financial stability.

Deducting for amounts to be spent in the future fiscal years (obligated funds) while not counting assessment collection income that is due but unpaid as of September 30, 2007, is incomplete, inaccurate and misrepresentative.

The true cash balance (or available to spend balance) at September 20, 2007 should have been reported as follows:

| | |
|---|---|
| Cash balance reported by BIA | $2,134,904 |
| Removal of Well, Replacement & Abandonment added in September 2007, not approved by SCIDD | 2,000,000 |
| Addition of assessment collections due in the fiscal year ended September 30, 2007 but unpaid | 2,100,000 |
| Available to spend balance at September 30, 2007 | $6,234,904 |

The annual budget and financial presentation provided by BIA for the Project includes estimated amounts to be spent on future betterment projects, SFRC. As noted in Exhibit 10 attached hereto, the amounts listed by BIA as SFRC were significantly and materially overstated on a recurring basis. While these SFRC amounts were not directly deducted from the Project's cash balance, as obligated funds, it is my opinion that the purpose of showing these materially overestimated amounts was to inaccurately present that the Project needed to carry significant cash balances. If these listed SFRC amounts were not required then BIA would have no legitimate reason to carry significant cash balances. As noted on Exhibit 10, for most years SFRC was shown on the multi-year financial presentation in excess of $1.5 million and in no year was more than $1.0 million spent on SFRC type projects within the next three fiscal years. In fact the most significant SFRC expenditure during the nine year period from fiscal years ending September 30, 1999 to 2007 was the $492,275 obligated in the fiscal year ended September 30, 2006 for the China Wash project and it is readily apparent from the documents reviewed in this Case that BIA was aware of this project more than four years before the funds were obligated. Even with the China Wash project, BIA spent only $1,675,935 on SFRC projects during this nine year period. BIA's own "Irrigation Handbook" dated May 2002 states that for a project with a five year average annual OME of $3,000,000, an appropriate emergency reserve would be between $400,000 and $900,000 (Irrigation Handbook, pages 96-97). It should be noted that the project's five year annual OME for the fiscal years ended September 30, 2002 to 2007 was approximately $2.5 million, excluding betterments (see Exhibit 11). Giving consideration to a reasonable reserve, as defined by BIA, and the funds required for the China Wash project, BIA's claiming the need for SFRC cash of $729,475 and $960,844 for the fiscal years ended September 30, 2004 and 2005 was reasonable. Conversely, BIA's claiming the need for SFRC cash

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

between $1,497,000 and $2,348,000 for the fiscal years ended September 30, 1999 through 2003 and of $1,600,275 for the fiscal year ended September 30, 2006 is inaccurate, incomplete and misrepresentative.

As previously discussed in this section of this report, BIA follows the practice of obligating funds once they believe that the funds will be spent and the obligated funds are shown as deductions from the Project's cash balance despite the fact that the funds are not spent, i.e. undelivered orders. The latest multi-year financial presentation was dated December 12, 2006 (see Exhibit 5). This presentation noted that during the fiscal years ended between September 30, 1999 and 2003, $886,453 of cash was added to the Project's beginning cash balance as "Deoblig. [deobligated] Cash from Prior Year UDO's [undelivered orders]". Starting with the fiscal year ended September 30, 2004, BIA inexplicably showed $0 (zero) in deobligated undelivered orders for each future fiscal year. From a reasonable financial presentation preparer's view, it is not credible to assume that from October 1, 2004 through September 30, 2007 there were no amounts deobligated from undelivered orders. From the documents reviewed, it was not possible to ascertain the amount of deobligated undelivered orders during this four year period but it is reasonable to believe that such amount could be material to the Project's financial condition. BIA's failure to properly inform SCIDD of the disposition of deobligated undelivered orders results in an inaccurate and incomplete reporting.

During my interview of Mr. Mason, he informed me that BIA representatives have stated that the interest income listed in BIA's budget and financial presentations represents the interest earned on the Project's cash balances. As noted in Exhibit 12 attached hereto, the interest recorded in BIA's financial presentations varied from a low point of $39,214 for the fiscal year ending September 30, 2004 to a high point of $431,228 for the fiscal year ending September 30, 1999. Additionally, the low point annual average interest rate earned on the Project's funds was 1.5% and the high point annual average interest rate was 8.4%. Based upon the documents reviewed in this Case, I was unable to ascertain the average interest rate that should be paid on the Project's cash balance. Despite not knowing the actual interest rate that should be paid on the Project's cash balances, a reasonable preparer of a financial presentation would logically conclude that the interest income should be consistently recorded at some predetermined rate of interest. As noted from the chart included with Exhibit 12, the average interest rate earned on the Project's funds inexplicably range from 3.9% over the three month T -Bill rate to 1.3% below the three month T-Bill rate. Based on these facts, one can conclude that such financial presentations were not prepared by BIA in good faith as such presentations were inaccurate, incomplete and misrepresentative.

<u>BIA's Financial Presentations for the Project Shows a Cash Balance, Arizona Adjusted, in Excess of the Project's Required Cash Balance</u>

The financial presentations prepared by BIA for the Project as a September 30, 2007 shows a cash balance, as adjusted, that is $3.3 million in excess of the Project's required cash balance (normalized OME, less normalized other income and a reasonable emergency reserve). As discussed in the preceding portion of this "Findings" section of this report, the Project's cash balance at September 30, 2007 as adjusted for unapproved betterments and for assessment collections due prior to September 30, 2007 was $6,234,904. This adjusted cash balance is in excess of the funds required by BIA to operate the project in an amount equal to no less than $3,353,905 which is calculated as follows:

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

| | |
|---|---|
| Adjusted cash balance at September 30, 2007 | $ 6,234,904 |
| Plus: Normalized interest and miscellaneous income For September 30, 2007 | 241,964 |
| Less: | |
| Normalized OME for the five fiscal years ended September 30, 2007 (see Exhibit 11) | (2,472,963) |
| Jointly approved betterments not yet obligated at September 30, 2007 | -0- |
| Average emergency reserve per BIA | (650,000) |
| Project excess adjusted cash balance as of September 30, 2007 | $ 3,353,905 |

In calculating the excess adjusted cash balance as of September 30, 2007, I have added what a reasonable financial presentation preparer would assume as an estimate of other income for the fiscal year ending September 30, 2008. It should be noted that I excluded consideration of excess pumping income from the normalized other income amount of $241,964 as the income from this source ceased being reported by BIA in the fiscal year ending September 30, 2005. From the documents reviewed in this case, it is unclear if there was an acceptable reason why excess pumping income was no longer being recorded in the Project's financial presentation. Additionally, I have deducted what a reasonable financial presentation preparer would assume as a logical estimate of OME for the fiscal year ending September 30, 2008. This amount must be deducted as the assessment collections for 2008 ($2,100,000) were to have been paid during the fiscal year ended 2007 and have been included in the adjusted cash balance at September 30, 2007 of $6,234,904.

Per my interview of Doug Mason, there have been no BIA recommended betterments that have been approved by SCIDD. As a result, a reasonable financial presentation preparer would assume that no funds will be spent on any betterment, except for emergency charges, in the fiscal year ended September 30, 2008. The stated emergency reserve of $650,000 is exactly the median of BIA's recommended range for an emergency reserve of an irrigation project similar in size to that of the Project. A reasonable financial presentation preparer would conclude that a $650,000 emergency reserve is more than adequate to provide for unforeseen expenses as (has been previously noted in this "Findings" section of this report) the Project has consistently been spending between $2.0 million and $2.8 million per year on OME and has only spent $1.184 million, excluding the China Wash project, on betterments in a nine year period. It is my opinion that excess funds have been held by BIA for the Project for a number of years. SCIDD's portion of the excess funds at September 30, 2007 is $1.65 million.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

132. Budget numbers presented in the last multi-year budget and financial presentation received by the District from the United States[173] indicate the following:

a. Unobligated cash at the end of FY 2004 is listed as $3.612 million, but unobligated cash at the start of FY 2005 is listed as $2.587 million.

b. Unobligated cash at the end of FY 2005 is listed as $4.090 million, but Unobligated cash at the start of FY 2006 is listed as $4.559 million.

c. For FY 2006, an obligation of $492,275 is listed in the line item for "Obligations-Land Structures & Special Projects." The same dollar amount is listed in the line item for "China Wash Flume Rehab/Replacement." The China Wash Flume Project was not implemented until FY 2007.[174]

d. The interest rate earned on the Project's funds ranged from 1.5% to 8.4%, with total interest income ranging from $39,213 per year to $431,228 dollars per year.[175]

133. As of March 3, 2008, the Project reported unobligated cash in its account totaling $4,133,127.[176]

134. On February 29, 2008, out of concern that its water deliveries would be terminated, the District paid $1,500,000 to the Project under protest.[177]

135. In his expert report, Lawrence Field, C.P.A., states that the "financial presentations prepared by the BIA fail to meet the foundational basis for accounting information, which requires that it be reliable, relevant and representationally faithful."[178] Mr. Field further opined that the financial presentations prepared by the BIA are not presented in accordance with any specific set of

---

[173] R. Shaw, A. Riggs, *San Carlos Irrigation Division Operation and Maintenance Budget (*December 12, 2006*)* (Exhibit 74).
[174] 2008 Mason Affidavit, ¶ 27 (Exhibit 6).
[175] *Expert Report of Lawrence Field, C.P.A.*, at 11 (November 29, 2007) (Exhibit 71).
[176] Carl Christensen, *FY 2008 Irrigation Budget* (March 3, 2008) (Exhibit 73).
[177] Check Dated February 27, 2007 from SCIDD to the Project (Exhibit 75).
[178] *Expert Report of Lawrence Field, C.P.A.*, at 15-16 (November 29, 2007) (Exhibit 71).

rules and principals, were unreliable, irrelevant and lacked representational faithfulness.[179] Mr. Field concluded that the BIA financial presentations failed the most basic foundational requirements for accounting information.[180]

DATED this 9th day of April, 2008.

By: /s/ RINEY B. SALMON
Riney B. Salmon II
SALMON, LEWIS & WELDON, P.L.C.
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016
(602) 801-9060 (office)
(602) 801-9070 (facsimile)
*Attorneys for Plaintiff*

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

[179] *Id.*
[180] *Id.*