IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, )
Plaintiff, )
vs. ) No. 06-576C
THE UNITED STATES, )
Defendant. )

DEPOSITION OF CATHERINE WILSON

Phoenix, Arizona

October 2, 2007

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
(Copy) Certification No. 50503

# I N D E X



| WITNESS | | PAGE |
|---|---|---|
| CATHERINE WILSON | | |
| | Examination by Mr. Salmon | 4 |



## EXHIBITS MARKED



| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 8 | Letter from Brian Bowker to Riney B. Salmon, II, dated 3-1-05 | 22 |
| 9 | Letter from Allen Anspach to Riney B. Salmon, II, dated 2-28-06; Irrigation Division Operation and Maintenance Budget, dated 8-27-05 | 43 |
| 10 | Letter from Riney B. Salmon, II to Allen Anspach, dated 2-17-06 | 43 |

DEPOSITION OF CATHERINE WILSON

was taken on October 2, 2007, commencing at 9:35 a.m., at the law offices of Salmon, Lewis & Weldon, P.L.C., 2850 East Camelback Road, Suite 200, Phoenix, Arizona, before Gerard T. Coash, a Certified Reporter in the State of Arizona.

* * *

APPEARANCES:

For the Plaintiff:
SALMON, LEWIS & WELDON, P.L.C.
By: Riney B. Salmon, II, Esq.
2850 East Camelback Road
Suite 200
Phoenix, Arizona 85016
602-801-9061

For the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
By: Kirk T. Manhardt, Esq.
Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, District of Columbia 20005
202-353-0541

Also present: Douglas D. Mason

CATHERINE WILSON,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

EXAMINATION

BY MR. SALMON:

Q. Good morning, Cathy.
A. Good morning.
Q. Do you mind if I call you Cathy?
A. No.
Q. You can call me Riney, if you wish.
First of all, what is your residence address?
A. 6833 North 12th Avenue, Phoenix, Arizona 85013.
Q. Okay. And are you married?
A. Yes.
Q. To whom?
A. Daniel Jackson.
Q. And is that Mr. Jackson the attorney here today?
A. That's correct.
Q. Okay. What is your present position with the Bureau of Indian Affairs here in Phoenix?
A. I'm employed as a supervisory water rights specialist for the BIA Western Region here in Phoenix.
Q. And what are your duties and responsibilities?

A. In my office, which is the Division of Natural Resources for the Western Region, we have four different program disciplines which I supervise: One is water rights; two is agricultural and range; three is safety of dams; and the fourth is irritation and power.

Q. Can you give me a brief description -- a little more detailed description of what each of those areas entail? What work you do for each of those areas?

A. Yes. In the water rights program area, our responsibility or our program mission is to protect and defend Indian water rights. We have a three-state area in our region: Utah, Nevada, and Arizona. In that region, for water rights we have, I believe, approximately six federal water decrees that we are responsible for enforcement and administration. We have approximately 10 water -- Indian water right settlements that have been legislated by Congress, which we have in various stages of implementation. And we have two active water rights negotiations that we are participating in.

Q. In that position, do you have subordinates and superiors?

A. I have -- Yes, I do.

Q. And what are your subordinates?

A. Subordinates for the water rights program are a hydrologist, and a fish and wildlife biologist who

Q. Yes.
A. Which has in it the safety of dams program function.
Q. And who is your first lieutenant, so to speak?
A. Actually, I have only one staff in that program -- our safety of dams officer -- and his name is Dean Hagstrom.
Q. I see.
And how long has he been with you folks?
A. Approximately seven or eight years.
Q. And then the last category?
A. Irrigation and power, we have seven revenue-generating irrigation projects -- Indian irrigation projects in our region. And we have a number of non-revenue generating irrigation systems at other reservations. We have two of the three Indian power divisions in the BIA in our region; one, of course, is at SCIP, and the other is at Colorado River Agency.
Q. Okay.
A. And our program at the regional level serves as a liaison between our Central Office headquarters staff and the field staff at the projects and performs other technical assistance, regional activities relating to irrigation and power.
Q. What involvement, if any, do you have to do with

the budget-setting process for the San Carlos Irrigation Project?

A. As the program staff to the regional director's office and, I guess, as the liaison between the regional office and the project. We work occasionally with the SCIP staff on irrigation, O & M budget issues.

Q. And you say as what? You said as program director?

A. No, as liaison, I believe I said.

Q. Oh, liaison. Okay.

A. Between the regional office and the project.

Q. Okay. So that's a job duty or capacity that you fill, the liaison between the area director -- regional director -- excuse me -- and the project?

A. Yes.

Q. Now, would that be you interacting with the project manager or engineer and Carl Christensen?

A. Yes.

Q. And what generally would that type of a liaison duties and responsibilities involve?

A. One example might be when the project sets the water apportionment for the year for the project. The project sends a memo in to the regional director recommending that an apportionment be made at a certain level, and the regional director relies on our office to

review that and make a recommendation or set up the formal paperwork for him to either concur or not concur with the recommendation of the project manager.

Q. I see.

Okay. How about the fixing of the O & M charges for the project for particular fiscal years? What's your involvement with that?

A. The annual O & M rate for the project -- for all of our revenue-generating projects are developed originally at the project level, by staff, whether it's SCIP or other revenue-generating projects. And a recommendation is made by the project staff on what the annual rate should be. It is sent through our regional office and then on to the assistant secretary for Indian affairs office for publication in the Federal Register as a proposed rate --

Q. Uh-huh.

A. -- for public comment. And eventually, then the assistant secretary for Indian affairs will set the final rate for all of the revenue-generating projects nationwide.

Q. You used the term "revenue-generating projects." What does that mean?

A. It means that the irrigation project sets O & M rates and collects the revenues to run the project, from

the water users.

Q. I see.

Well, then, in that case, are all irrigation projects revenue-generating projects?

A. Not in our region. We have a category that we call "irrigation systems" where they are not -- we don't collect O & M rates for.

Q. You don't collect O & M rates for them?

A. Correct.

Q. You don't collect O & M rates from the water users?

A. Yes.

Q. Then how is it funded?

A. They're not.

Q. How do they get money to operate?

A. Just on -- For instance, at the Yomba Shoshone Reservation in Nevada --

Q. Yes.

A. -- we have an irrigation system there.

Q. Yes.

A. The reservation is made up of four different -- four or five different ranches that were acquired and established as a reservation. The tribe simply -- and its members -- simply manage the project and arrange for the water deliveries on their own.

Q. I see.

So it is not a matter of O & M receipts from the water users and/or congressional appropriation; it's the Indian tribes fund the expenses themselves?

A. Yes.

Q. Basically?

A. Yes.

Q. Okay. Going back to your duties with the O & M rates, is the recommendation from the project level submitted to you or submitted to somebody else, and then you just do a review?

A. The project manager at the project submits a memo to the regional director recommending a rate and, usually, attaching the documentation or basis for why the recommendation is being made.

Q. Okay.

A. And then the regional director packages that up and sends it forward to the assistant secretary for Indian affairs.

Q. And who is that?

A. His -- Currently, his name is Carl Artman.

Q. And how long has he been assistant secretary?

A. Approximately a year.

Q. And who was he before that?

A. I believe he was the associate solicitor for

a discussion in a meeting?

A. Correct.

Q. Okay. Very good.

Well, was there a consensus that the notice of appeal by the district would be denied and that the water deliveries would be terminated if payment wasn't made?

A. Yes.

Q. And what was the basis for that decision? What were the reasons discussed?

A. The statutes and regulations that govern the project are pretty clear, from a program manager's standpoint, in that if a water user doesn't pay O & M, you're not supposed to deliver water.

We were already, at this point, delivering water to SCIDD four months into the fiscal year when nonpayment had occurred. So we -- and so we needed to take action, and we did. That was the genesis of this.

Q. Okay. All right. Now, were any public safety issues discussed at any of these meetings?

A. I do not recall that they were.

Q. How about -- I don't want to be cute with you, Cathy. Not at all. The first paragraph, the last sentence says, "Additionally, I have determined that public safety, protection of trust resources, or other

public exigency requires that my decision be made effective immediately."

You've already said there wasn't any discussion about public safety, but how about protection of trust resources? Do you recall any discussions about that?

A. I believe, yes, with regard to that issue, we were concerned about protecting the facilities, the water delivery, the water resources that we deliver through the project, especially to the reservation, which would be the trust resources at issue.

Q. And how would this payment or this nonpayment affect the protection of trust resources?

A. If water users don't pay their O & M assessment as required by law, then the project is at risk for not being able to operate the project and deliver the water.

Q. You mean not having enough money to pay the expenses of the project? Is that what you're saying?

A. Yes.

Q. And anything else?

A. No.

Q. Just lack of money?

A. No. No.

Q. Nothing else?

A. Not that I can think of right this moment.

Q. Okay. Now, you're aware, are you not, that in the fixing of the assessment charges, that the irrigation district has to comply with Arizona law in passing the assessment on to its water users?

A. That's my understanding.

Q. And that the deadline date for that process is July 1st of each year?

A. Yes.

Q. Have you discussed that particular deadline date with anybody at the water district, such as Mr. Mason, ever?

A. "Ever"? I don't recall -- I don't recall an actual precise meeting where that was the subject, that doesn't mean it didn't happen. I just don't recall.

Q. Okay. Have you ever discussed that with individuals such like Carl Christensen?

A. I do not recall.

Q. How about with anybody in the area office, such as the area director or Mr. Bowker?

A. The only -- I don't know -- I don't know who I might have talked to about this issue. I just have -- I do have a recollection that whenever we're doing the fact-finding meetings and the setting of the rate, that the project is concerned about trying to be sensitive about the July 1st date for the district.

ever requested that a rate be changed either up or down?

A. I don't recall ever -- You mean after it's already been established?

Q. Yes.

A. I don't recall that we've ever done it after it's already been established, either up or down.

Q. By your answer, perhaps it has been done with respect to a proposed rate?

A. Perhaps. I don't know of a specific situation, but perhaps.

Q. What is your understanding as to the purpose of a proposed rate being published in the Federal Register?

A. It's my understanding that the purpose of a proposed rate being published in the Federal Register is to provide the public or the affected water users the chance to review and comment to the assistant secretary on the proposed rate.

Q. Okay. Now, what is your understanding -- Well, strike that.

Drop down to the next paragraph, and you can read it if you wish. It refers to a "Failure by SCIDD to make its assessment payment for 2005 subjects the Project to a potential violation of the Anti-Deficiency Act."

Do you see that?

A. Yes.

A. The project has 98 irrigation wells that provide a significant portion of the water supply to the project when surface supply is short. And we have a well replacement program to make sure that we are able to respond when -- if and when one of our wells goes down.

Q. Now, was there such a well replacement program in effect at this time?

A. Yes.

Q. Has, to your knowledge, to the present date, any money been spent on that well placement program?

A. The well replacement program has been modified in response to SCIDD's and possibly other water user comments to us, I think a year ago June. And the well replacement program is as it was approximately June 2006, as discussed with the water users in June 2006.

Q. But has any money been spent on that well replacement program yet?

A. Not that I'm aware of.

Q. And so what is the arrangement, if I may use that word, with respect to the implementation in the future, I guess, of the well replacement program?

A. My last recollection of what that is, is in the June 2006 spreadsheet O & M budget, where there are several worksheets that describe the status of the wells, cost to replace, possible locations, and how the project

would propose reserving enough funds for that. And I would just defer to that spreadsheet because I don't recall all the specifics of it.

Q. Okay. Was that a spreadsheet that was perhaps prepared by Randy Shaw?

A. Yes.

Q. And was, perhaps, Randy Shaw's conclusion that the well replacement program was not necessary at the time or could be delayed? Something of that nature?

A. In his assessment as of June 2006 or thereabouts, is that what you're referring to?

Q. Yes.

A. After we had those extensive fact-finding meetings with the water users and discussion of Randy's extensive research on well replacement issues, I believe the project accepted his recommendations about what that well replacement program should look like. And, again, I refer you back to that spreadsheet and all the work tabs for the details.

Q. Okay. What is the current intention, if you can tell me, of the project with respect to the well replacement program?

A. I don't know the answer to that question.

Q. And who would know the answer to that question?

A. I assume the project engineer -- the irrigation

engineer would be the first place to start.

Q. Okay. Mr. Anspach also refers to a well abandonment project in here, Cathy. Can you tell me what is your understanding of this well abandonment program?

A. My understanding of the well abandonment program is that we have a number of wells -- project wells that used to provide irrigation water but have been abandoned over the years, which are just still out in the fields. And we -- the project has, on its list of things to do, go out and GPS-identify these sites and take care of them so they're not a safety problem or so that they're properly abandoned.

Q. Has that been done yet?

A. No.

Q. What is the schedule for that to be done?

A. The latest schedule that I've heard is, hopefully, in fiscal year 2008. The project is relying on regional staff to help with that effort due to staff shortages at the project. So we have regional staff in my office who are planning to try to take care of that project this year.

Q. I see.

Okay. Mr. Anspach also refers to ". . . a condition assessment study discussed" -- excuse me -- "directed by the Assistant Secretary" -- initial caps --

"for Indian Affairs . . ." -- initial caps, close quotes. Do you see that?

A. Yes.

Q. What is your understanding of this condition assessment study?

A. My understanding of the condition assessment study is that the assistant secretary for Indian affairs has asked the Central Office irrigation staff to calendar in condition assessment studies for every revenue-generating irrigation project in BIA.

Q. Is this a SOD program?

A. No.

Q. And why isn't it a SOD program?

A. It's a condition assessment study for the irrigation project, which in SCIP's case would include Coolidge Dam and reservoir but isn't a safety program; it's a condition assessment for the irrigation facilities.

Q. Has that ever been done -- a study?

A. Not at SCIP, no.

Q. And do you know why?

A. I don't know why.

Q. What is the current intention, if you know?

A. I believe it's still on the plans to accomplish at some point.

Q. I see.