*Bureau of Indian Affairs*

# IRRIGATION HANDBOOK

May 2002

U.S. Department of the Interior
Bureau of Indian Affairs

# TRANSMITTAL MEMORANDA

## 1 Scope

The National Irrigation Handbook (Handbook) is not a static document but is dynamic and will change with corresponding changes in law, regulations, and philosophy. As changes occur within the program, updates and modifications to the Handbook will be made, and transmittal memoranda summarizing the material will be sent from the Bureau of Indian Affairs (BIA), Director of the Office of Trust Responsibilities to the Regional Directors for subsequent transmission down through the levels of management to the appropriate program and project personnel. A sample transmittal memorandum is shown below.

To comply with the Government Paper Elimination Act and to make this Handbook readily available to interested parties, the Branch of Irrigation, Power, and Safety of Dams is currently developing web pages for the Irrigation, Power, and Safety of Dams programs. Each program's web page will contain a link to its Handbook. The latest updated version of the Handbook will be available on the Internet when the Irrigation Program web page is fully operational.

Comments and corrections to this document for review and approval should be forwarded to: Bureau of Indian Affairs; Office of Trust Responsibilities; Division of Natural Resources; Branch of Irrigation,

Power, and Safety of Dams; 1849 C Street NW, MS-3061 MIB; Washington DC 20240; telephone (202) 208-5480; or email to: rossmooney@bia.gov.

# Sample

United States Department of the Interior

BUREAU OF INDIAN AFFAIRS

Washington DC 20240

Memorandum

To: All Holders of the Bureau of Indian Affairs (BIA) National Irrigation Handbook

From: Director, Office of Trust Responsibilities

Subject: Transmittal of BIA National Irrigation Handbook Section __________

This National Irrigation Handbook release includes ____________________________________.

The release provides information and guidance in the following areas:

(1) ________________________________________________

(2) ________________________________________________

(3) ________________________________________________

Director, Office of Trust Responsibilities

Filing Instructions:

Remove: _______________

Insert: _______________

# TABLE OF CONTENTS


Page

**Chapter 1—General** . . . . . . . . 1
1.1 Introduction . . . . . . . . 1

**Chapter 2—Background** . . . . . . . . 3
2.1 A Brief History of Irrigation on Indian Lands of the United States . . . . . . . . 3
2.2 Overview of BIA Irrigation Projects . . . . . . . . 7
2.3 Original Designs . . . . . . . . 7
2.4 Construction Techniques . . . . . . . . 8
2.4.1 Earthwork . . . . . . . . 8
2.4.2 Wood and Steel . . . . . . . . 9
2.4.3 Concrete . . . . . . . . 10
2.5 Level of Completion . . . . . . . . 11
2.6 Maintenance . . . . . . . . 12

**Chapter 3—Typical Project Facilities** . . . . . . . . 15
3.1 General . . . . . . . . 15
3.2 Storage Facilities . . . . . . . . 16
3.3 Canals . . . . . . . . 17
3.4 Laterals . . . . . . . . 18
3.5 On-Farm Irrigation Systems . . . . . . . . 19
3.6 Surface Drainage Systems . . . . . . . . 19
3.7 Irrigation Structures . . . . . . . . 20
3.8 Heavy Equipment and Project Vehicles . . . . . . . . 20
3.9 Miscellaneous Rights-of-Way Obstructions . . . . . . . . 21

**Chapter 4—Investigations and Planning** . . . . . . . . . . 25
4.1 Irrigation, Drainage, and Related Resources . . . . . . . . . . 25
4.1.1 Investigations . . . . . . . . . . 25
4.1.2 Report of Investigations . . . . . . . . . . 25
4.1.3 Approval of Project . . . . . . . . . . 26
4.1.4 Preauthorization Investigations . . . . . . . . . . 27
4.1.5 Reconnaissance Investigations . . . . . . . . . . 28
4.1.6 Feasibility Investigations . . . . . . . . . . 29
4.1.6.1 Hydrological Studies . . . . . . . . . . 29
4.1.6.2 Power Aspects . . . . . . . . . . 30
4.1.6.3 Economic Studies . . . . . . . . . . 30
4.1.6.4 Community Involvement . . . . . . . . . . 31
4.1.6.5 Legal Review . . . . . . . . . . 31
4.1.6.6 Interests/Other Agencies . . . . . . . . . . 31
4.1.6.7 Final Report . . . . . . . . . . 32
4.1.7 Special Planning Reports . . . . . . . . . . 32
4.1.8 Postauthorization Investigations . . . . . . . . . . 32
4.1.9 Drainage . . . . . . . . . . 33

**Chapter 5—Construction** . . . . . . . . . . 35
5.1 Methods . . . . . . . . . . 35
5.2 Construction Surveys . . . . . . . . . . 35
5.3 Designs and Specifications . . . . . . . . . . 37

**Chapter 6—Federal Laws, Regulations, and Guidance Governing BIA Irrigation Projects** . . . . . . . . . . 39
6.1 Background . . . . . . . . . . 39
6.2 Indian Affairs Manual, Release No. 98-07, Part 50, Chapter 1, Irrigation . . . . . . 40
6.3 CFR 25, Indians, Part 171, Operation and Maintenance . . . . . . . . . . 40
6.4 CFR 31, Chapter IX, Federal Claims Collections Standards . . . . . . . . . . 41
6.5 CFR 29, OSHA Regulations, Part 1926, Safety and Health Regulations For Construction . . . . . . . . . . 41
6.6 Department of the Interior Manual, Part 485, Safety and Occupational Health Program . . . . . . . . . . 41

6.7 Bureau of Indian Affairs Manual, Part 25, Safety Management . . . . . . . . . . . . . 42
6.8 Indian Affairs Manual, Release No. 98-06, Part 59, Environmental Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
6.9 Endangered Species Act of 1971, 16 U.S.C. Sections 1531-1544 . . . . . . . . . . 43
6.10 Resource Conservation and Recovery Act, 42 U.S.C. Sections 6901 et seq. (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
6.11 Clean Water Act of 1977, as Amended, 33 U.S.C. Section 1251 . . . . . . . . . . . 44
6.12 National Environmental Policy Act of 1969, as Amended, 42 U.S.C. Sections 4221-4347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
6.13 National Historic Preservation Act of 1966, as Amended (P.L. 89-665; 16 U.S.C. 470a, et seq.) (P.L. 89-665; 80 Stat. 915, amended 1980, 1992) (P.L. 96-515; 94 Stat. 2997) . . . . . . . . . . . . . . . . . . . . . . . . 45
6.14 Indian Self-Determination and Education Assistance Act, P.L. 93-638 as Amended (25 U.S.C. 450 et seq.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
6.15. Control Legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
6.16 Claims Relating to Irrigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
6.16.1 Nature of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
6.16.2 Processing of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
6.16.3 Authority to Settle Irrigation Claims . . . . . . . . . . . . . . . . . . . . . . . 52
6.16.4 Liquidated Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Chapter 7—Related Natural Resource Considerations** . . . . . . . . . . . . . . . . . . . . . . . **55**
7.1 Fish and Wildlife . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
7.2 River Basin Management/Conservation Districts . . . . . . . . . . . . . . . . . . . . . . . 55
7.3 Noxious Weeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
7.4 Water Quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**Chapter 8—Irrigation Organization and Management** . . . . . . . . . . . . . . . . . . . . . . . **59**
8.1 Management Levels and Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . 59
8.1.1 Central Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
8.1.2 Regional Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
8.1.3 Agency Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**Chapter 9—Other BIA Programs Involved in Irrigation** . . . . . . . . . . . . . . . . . . . . . . . . 63

9.1 Division of Natural Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

9.2 Realty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

9.3 Trust Asset Accounting Management System (TAAMS) . . . . . . . . . . . . . . . . . 65

9.4 Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

9.5 Environmental and Cultural Resources Management . . . . . . . . . . . . . . . . . . . . 66

9.6 Geographic Data Service Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**Chapter 10—Land Classification Systems** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

10.1 Land Ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

10.1.1 Tribal Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

10.1.2 Allotted Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

10.1.3 Assigned Tribal Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

10.1.4 Fee Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

10.1.4.1 Project Employee Ownership of Project Lands . . . . . . . . . 71

10.2 Land Classification for Irrigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

10.2.1 Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

10.2.2 Presently Assessable Lands . . . . . . . . . . . . . . . . . . . . . . . . . . 73

10.2.3 Temporarily Non-Assessable Lands . . . . . . . . . . . . . . . . . . . . . 74

10.2.4 Presently Non-Assessable Lands . . . . . . . . . . . . . . . . . . . . . . . 74

10.2.5 Reclassification for Irrigation . . . . . . . . . . . . . . . . . . . . . . . . . 75

10.2.6 Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

10.2.7 Purpose of Land Classification Surveys . . . . . . . . . . . . . . . . . . . 76

10.2.8 Practicably Irrigable Land . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

10.2.9 Irrigation Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

10.2.10 Capital Expenditures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

10.2.11 Project Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

10.2.12 Purpose of Reclassification Surveys . . . . . . . . . . . . . . . . . . . . . 78

10.2.13 Purpose of Interim Classification . . . . . . . . . . . . . . . . . . . . . . . 78

10.2.14 Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

10.2.14.1 Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

10.2.14.2 Composition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

10.2.14.3 Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

10.2.14.4 Course of Action . . . . . . . . . . . . . . . . . . . . . . . . . . 81

10.2.14.5 Financing . . . . . 81
10.2.14.6 Final Report . . . . . 82

**Chapter 11—Water User Participation . . . . . 83**
11.1 Background . . . . . 83
11.2 Frequently Asked Questions . . . . . 84

**Chapter 12—Financial Management . . . . . 89**
12.1 O&M Budget . . . . . 89
12.1.1 Introduction . . . . . 89
12.1.2 O&M Budget Template . . . . . 90
12.1.3 Planning . . . . . 90
12.1.4 Program of Work Justification . . . . . 90
12.1.5 Required Reviews and Approvals . . . . . 91
12.1.6 O&M Budget Preparation . . . . . 92
12.1.7 Calculation of O&M Rate . . . . . 96
12.1.8 Public Notification . . . . . 97
12.2 Irrigation Billing and Collection . . . . . 97
12.2.1 Review of Land Ownership Records . . . . . 97
12.2.2 Review Procedures . . . . . 98
12.2.2.1 Fee Patent Land . . . . . 99
12.2.2.2 Tribal (Trust) Lands . . . . . 100
12.2.3 Billing Procedures . . . . . 101
12.2.3.1 Leases of Project Lands . . . . . 101
12.2.4 National Irrigation Management Information System . . . . . 102
12.2.4.1 Billing . . . . . 102
12.2.5 NIIMS Contingency Plans . . . . . 103
12.2.6 O&M Payment Responsibility . . . . . 104
12.2.7 Past Due Debt . . . . . 104
12.2.8 Collections . . . . . 105
12.2.9 Regular O&M Payment . . . . . 106
12.2.10 Administrative, Interest and Penalty Fees . . . . . 106
12.2.11 Payment Plans . . . . . 106

12.3 Debt Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
12.3.1 Due Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
12.3.2 Past Due Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
12.3.3 Referral to U.S. Treasury for Collection . . . . . . . . . . . . . . . . . . . . 109
12.3.4 Treasury Recalls . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
12.3.5 Treasury Collections on Referred Debts . . . . . . . . . . . . . . . . . . . . 110
12.3.6 Termination of Collection Activities . . . . . . . . . . . . . . . . . . . . . 111
12.3.7 Estates/Probates . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
12.3.8 1099-C Close-Out . . . . . . . . . . . . . . . . . . . . . . . . . . 112
12.3.9 Suspension, Termination of Collection Action, or Compromising A Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

**Chapter 13—Program Administration . . . . . . . . . . . . . . . . . . . . . . . . . . 113**
13.1 Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
13.1.1 Annual Project Budgets, Public Notice Proposals of Ratesetting, and Deferred Maintenance . . . . . . . . . . . . . . . . . . . 113
13.1.2 Irrigation Debt Cancellation . . . . . . . . . . . . . . . . . . . . . . 114
13.1.3 Administrative Writeoff of Irrigation Debt . . . . . . . . . . . . . . . . . . 115
13.2 Recordkeeping Requirements/Archives/Records Retention . . . . . . . . . . . . . . . . 115
13.3 Property, Plant, and Equipment . . . . . . . . . . . . . . . . . . . . . . . . 116
13.4 Deferred Maintenance Reporting . . . . . . . . . . . . . . . . . . . . . . . . 117
13.4.1 Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
13.4.2 Obtaining Forms and Assistance . . . . . . . . . . . . . . . . . . . . . . 118
13.4.3 Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
13.4.4 References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
13.4.5 Procedure on Reporting Deferred Maintenance . . . . . . . . . . . . . . . . 119
13.4.5.1 Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . 119
13.4.6 Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
13.4.7 Measurement . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
13.4.8 Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
13.4.9 Condition Assessment Survey . . . . . . . . . . . . . . . . . . . . . . . 122
13.4.10 Frequently Asked Questions About Deferred Maintenance . . . . . . . . . 123
13.4.11 Deferred Maintenance Program Filing Deadlines . . . . . . . . . . . . . . . 128
13.4.12 Ineligible Deferred Maintenance Items . . . . . . . . . . . . . . . . . . . 129

13.5 Project Management Tools . . . . . . . . . . 129
13.5.1 Maintenance Management System . . . . . . . . . . 129
13.5.2 Geographic Information System Desktop Management and Reporting . . . . . . . . . . 130
13.6 Program Reviews—Program, Regions, and Projects . . . . . . . . . . 131
13.6.1 Irrigation Program Reviews . . . . . . . . . . 131
13.7 Construction-in-Progress (CIP) . . . . . . . . . . 132

**Chapter 14—Glossary . . . . . . . . . . 135**

**Appendices**

**A Sample Right-of-Way Encroachment Permit**
**B Typical Irrigation Program Planning Activities**
**C Sample Journal Voucher**
**D Sample Payment Plan**
**E Abbreviations and Acronyms**

CHAPTER 1

# GENERAL

## 1.1 Introduction

This National Irrigation Handbook (Handbook) has been written for those projects for which assessments are levied and monies collected from water users (both Indian and non-Indian), for reimbursement to the Bureau of Indian Affairs (BIA) for operation and maintenance (O&M) costs, and to repay construction costs. This Handbook, however, can be used as a reference for BIA projects and systems that do not fall under the above criteria. Supplements to this Handbook are planned for such other projects.

Proper maintenance of project facilities demands close and continuous examination of the facilities and timely repair and replacement programs. Project managers should keep current lists of all irrigation facilities needing repairs, so that such facilities can be brought up to efficient operating condition. Comprehensive maintenance programs should then be instituted to maintain the irrigation facilities properly. Included in the maintenance program, and financed with O&M funds, will be an orderly program for repairing or replacing irrigation structures and facilities that become structurally or functionally unsound.

The objective of this document is to provide BIA irrigation personnel with information and guidelines that will facilitate improved management, O&M, and fiscal management of BIA irrigation projects. Federal regulations have been established for the irrigation projects,

as well as policy guidelines from BIA. It is not our intention to re-create or simply restate the Federal regulations in this document, but to supplement existing policy and regulations with information and helpful guidelines that will assist irrigation project personnel to better fulfill their job duties. The ultimate objective is to improve the BIA's service to the water users by being more accountable for our actions while conducting our daily job duties.

The Indian Affairs Manual No. 98-07, Part 50, Chapter 1, Irrigation, states the policy goals for BIA irrigation projects. A link to the manual is provided later in this document, in the chapter entitled "Federal Laws, Regulations, and Guidance Governing BIA Irrigation Projects."

CHAPTER 2

# BACKGROUND

## 2.1 A Brief History of Irrigation on Indian Lands of the United States

Irrigation by Indian Tribes on agricultural lands in what is now Arizona took place as early as A.D. 800. By the years A.D. 1200 to 1400, large-scale irrigation structures were delivering water several miles through large canals measuring 10 to 11 feet wide and 6 to 7 feet deep. Corn, wheat, and cotton were common crops, along with a variety of fruits and vegetables. In the 1600s and 1700s, documentation shows successful irrigated agricultural developments in regions other than the Southwest, including the northern plains along the Missouri River shore lines by the Mandan, Arikara, and Hidatsa Tribes.

During the decline of the fur trade, the Federal Government took a great interest in the importance of waterways for transporting agricultural goods and as sources for irrigating agricultural croplands. Most early legislation dealt with purchase and trade regulations under the authority of the United States, with no specific attention given to irrigated agriculture until the 1800s. From the end of the Civil War in 1865 until 1925, the Federal Government's involvement in irrigating Indian trust lands gained significant momentum. Congress first appropriated funds for constructing an irrigation canal on the Colorado River Indian Reservation by the Act of March 2, 1867. Around this same time, the movement to fractionate approximately 139 million acres of Indian landholdings began.

General appropriations from Congress for irrigation projects on Indian reservations began in 1893. Between 1900 and 1912, Congress drafted 15 laws, which made reimbursement of irrigation construction costs, partially or totally, a mandatory process.

In 1911, Congress set limitations on appropriations for irrigation construction and attached restrictive language that no new irrigation project could be undertaken on Indian land until engineering costs were determined from plans, surveys, and reports provided to the Indian Service chief irrigation engineer and approved by the Secretary of the Interior (Secretary). After 1911, no irrigation project valued at over $11,000 could be legally undertaken and paid from Federal funds without specific congressional approval. After passage of the Act of August 1, 1914, Congress ceased authorizing payment of irrigation project costs requiring reimbursement of costs on the basis of individual benefits.

**[The following paragraph will be revised.]** Computing irrigation construction costs proved virtually impossible, due to the uncompleted state of numerous projects. During this time, Congress also learned that the magnitude of Indian irrigation construction and O&M would require employing a large number of specialists on a permanent basis. Thus, a trend began of relying on temporary employees, most of them untrained in the irrigation field.

Prior to 1930, Indian lands were subjected to the increased burden of unpaid charges for construction and maintenance of irrigation facilities. Non-Indian landowners or land users within the irrigation projects paid the majority of assessed charges on

Indian irrigation projects during this period. This resulted in huge liens imposed upon the lands within the reservations, liens often exceeding the appraised value of the trust lands.

Acknowledging this, Congress passed legislation known as the Snyder Act of November 2, 1921, authorizing the BIA to expend appropriated funds for extensions, improvements, and O&M of existing Indian irrigation systems. Congress adopted the Leavitt Act of July 1, 1932, which authorized the Secretary of the Interior to:

> *. . . adjust or eliminate reimbursable charges of the Government of the United States existing as debts against individual Indians or Tribes of Indians in such a way as shall be equitable and just in consideration of all circumstances under which such charges were made: Provided, that the collection of all construction costs against any Indian-owned lands within any Government irrigation project is hereby deferred, . . . and any construction assessments heretofore levied against such lands in accordance with the provisions of Section 386 of Title 25 of the United States Code, and uncollected, are hereby canceled.*

The White-Leavitt Act of June 22, 1936, provided for adjustment, deferment, and cancellation of construction, maintenance, and operations charges for non-Indians owning land within Indian irrigation projects and for projects in which the United States purchased water rights for Indians who are unable to pay irrigation charges because of inability to operate such lands profitably by reason of lack of fertility of the soil, inadequacy of water supply, defects in irrigation works, or for any other cause.

From the end of World War II in 1945 to 1983, the Federal Government, led by the Bureau of Reclamation (Reclamation), developed and expanded irrigation, built electrical power networks, and constructed dams for flood control throughout the United States. Much of this development took place on Indian trust lands. During this time, a substantial amount of legislation was developed which influenced irrigation on Indian trust lands. Most significant may have been Public Law (P.L.) 93-638, the Indian Self-Determination Act, passed in 1975. This law provided Indian Tribes the opportunity to contract BIA programs.

A method to distribute O&M funding to the various projects and systems was initiated in a July 11, 1960, memorandum from the Assistant Commissioner - Administration to the regions (area offices). This memorandum issued instructions for preparing the 1962 budget request for non-reimbursable irrigation O&M funds. The regions/area offices were instructed to distribute their O&M funding based on a category system whereby projects and systems were placed into six different categories. The category system since that time has been thought of as the policy on the use of appropriated funding for irrigation O&M financing. There currently are conflicting views on whether or not the category system is the official policy of the BIA. To eliminate the confusion regarding the category system, the Central Office will be developing guidelines for prioritizing appropriated funds for irrigation O&M.

Many efforts to improve irrigation operations on reservations have been made over the years, many of them unsuccessful. However, numerous irrigation rehabilitation and betterment (R&B) contracts have been completed, resulting in updated infrastructure throughout

certain projects. Ongoing efforts to improve irrigation on Indian trust lands are taking place through cooperative work by the BIA, Tribal P.L. 93-638 contract programs, Reclamation, and the Intertribal Agriculture Council.

## 2.2 Overview of BIA Irrigation Projects

There are currently 17 BIA irrigation projects for which assessments are levied and monies collected from both Indian and non-Indian water users for reimbursement to the Federal Government for O&M costs. These projects range in size from approximately 2,400 acres at the Walker River Irrigation Project to 149,820 acres at the Wapato Irrigation Project. Irrigation seasons vary from project to project. Projects located in the northern States may deliver water from May to October, while those located in the southern States may operate year round with only a few weeks of dryup for major repairs. Over the years, many studies and reports have been developed that address the conditions of the BIA irrigation project facilities. These reports are on file at the regional and Agency Offices and should be utilized when seeking information about the projects.

## 2.3 Original Designs

The original designs of many BIA irrigation facilities were completed early in the 20th century, prior to the majority of large-scale irrigation facility design and construction in the Western United States. Consequently, design methods used to develop plans for irrigation

projects were in their infancy, compared to the design standards accepted for irrigation facilities today. Much of the infrastructure was designed without the long-term experience and knowledge of how the structures would perform over time. Consequently, numerous designs ended up being "trial and error" projects, many of which failed and were reconstructed based on the deficiencies found in the original designs. As described in the following subsection, construction materials and techniques used around the turn of the last century may have been the most limiting factor by which any design could be built.

## 2.4 Construction Techniques

### 2.4.1 EARTHWORK

The construction methods for earthwork used around the turn of the 20th century during construction of many BIA irrigation projects consisted mainly of horse-drawn teams. Historical documents by the Indian Irrigation Service show photos of horse-drawn teams using "fresnos" to excavate canals and laterals. A fresno is an implement that was pulled behind a team of horses to excavate earthen material from the bottom of the canal being constructed and deposit the excavated material onto the adjacent canal bank. Obviously, this technique was not a precise way of obtaining a consistent slope on an excavated canal. However, considering the techniques used in this construction, it is somewhat surprising that many main canals have functioned relatively well over the years.

Good compaction of canal banks is achieved today with modern machinery. By comparison, methods used in the early 1900s often did not achieve adequate bank compaction. As a result, many banks have settled significantly or have high seepage rates or both. High seepage rates compromise bank stability, and bank settlement decreases canal capacity, both of which make it difficult to safely operate the canals at design flows. Significant work is needed on many projects to reduce bank seepage and to restore banks to an elevation that provides sufficient freeboard at design flows.

### 2.4.2 Wood and Steel

Most of the original canal turnout gates and farm headgates were constructed of wood, rather than the steel products commonly used today. Many wooden headgates are still in use today, although they have likely been rebuilt numerous times since their original construction. Many of the old, wooden structures in operation today are not functioning as the original design intended and should be replaced to current standards using state-of-the-art materials. Similarly, much of the steel that was used in the original construction of the irrigation facilities has deteriorated to the point that structures are failing. Many of the old, original steel structures need replacement (along with the concrete structures they were constructed in) to fulfill their intended function. Many of these structures are beyond repair and need replacement.

### 2.4.3 CONCRETE

Many of the concrete structures on the BIA irrigation projects, often very large and significant structures, were constructed early in the 20th century, using early concrete technology. The first Reclamation concrete manual was not even released until 1938, many years after most BIA irrigation facilities were constructed. Consequently, many of the concrete structures within BIA's projects were built before formal Reclamation technical standards were developed. Since publication of Reclamation's first concrete manual, research and experience have modernized concrete design and construction techniques.

Many BIA irrigation projects are subjected to extreme conditions. In some regions of the country, daily temperatures may vary by 60 degrees Fahrenheit and annual temperatures by 150 degrees Fahrenheit. Hundreds of freeze and thaw cycles have taken their toll on these structures. The use of an air entrainment admixture, a relatively new technology in concrete design, provides for a concrete mix with improved durability during freeze and thaw cycles. Air entrainment is the process by which millions of air bubble chambers are added to the concrete mixture to provide space for water to freeze and thaw without damaging the concrete. This technology was not available when older concrete structures were built.

Other factors also influence the extent of concrete damage in old structures. For instance, using excessive water in the concrete mix lowers the concrete strength. Chemical reactions, including sulfate deterioration and alkali-aggregate reaction also damage concrete. Especially in water projects, damage from abrasion erosion and

cavitation are common. Also common at many irrigation projects is damage from corrosion of the reinforcing steel within the concrete structures. Often, cracking of aging concrete allows the steel corrosion to occur.

Modern concrete is a very durable construction material and, if properly proportioned and placed, will give very long service under normal conditions. New concrete technology available today should be included in any rehabilitation or replacement jobs on BIA irrigation projects.

## 2.5 Level of Completion

No BIA irrigation project has ever been completed to the full extent of the originally authorized acreage. Today, problems arising from below-design-capacity and incomplete construction are often viewed as poor design or lack of maintenance. In reality, incomplete construction has created many of the administrative and operational problems that the irrigation projects deal with daily. Table 1 shows the level of completion for many of the major projects.

Land classification studies are periodically conducted to determine the designation of project irrigation lands. The reclassification of lands will more clearly define actual project acres for billing purposes. Upon completion of project land redesignation work, the project managers will be able to determine whether to supply water to those lands or to remove the lands from assessable status.

[Project to provide most current data to complete this table]

Table 1.—Project level of completion

| Project | State | Region | Tribe | Authorized Acres | Constructed Acres | Assessed Acres[1] |
|---|---|---|---|---|---|---|
| Blackfeet | MT | RMR | Blackfeet | | | |
| Crow | MT | RMR | Crow | | | |
| Fort Belknap | MT | RMR | Assiniboine and Gros Ventre | | | |
| Fort Peck | MT | RMR | Sioux and Assiniboine | | | |
| Wind River | WY | RMR | Arapaho and Shoshone | | | |
| Colorado River | AZ | WR | Navajo, Hopi, Mojave, and Chemehuevi | | | |
| Duck Valley | NV | WR | Shoshone Paiute | | | |
| San Carlos | AZ | WR | Gila River | | | |
| Uintah | UT | WR | Uintah Ouray Ute | | | |
| Pine River | CO | SWR | Southern Ute | | | |
| Flathead | MT | NWR | Salish/Kootenai | | | |
| Fort Hall | ID | NWR | Shoshone/Bannock | | | |
| Wapato | WA | NWR | Yakama Nation | | | |

[1] Currently assessed acres as of 2002.

## 2.6 Maintenance

Due to low O&M assessment rates and nonpayment of assessed fees, many of the projects have not been maintained to levels required to sustain efficient and functional irrigation systems. Maintenance is deferred each year so that the irrigation projects can meet other financial requirements (mainly administrative costs of personnel and operational expenses). Such deferred maintenance results in irrigation projects that are in critical condition. If drastic

changes, mainly in acquiring and utilizing funding for rehabilitation, are not made soon, the future of many BIA irrigation projects is in jeopardy.

In many cases, agricultural prices and economic conditions make an assessment increase prohibitive. In fact, a number of Indian and non-Indian water users are currently unable to make payments and are in financial default status with the BIA. Irrigation project managers and administrators must seek innovative ways to better utilize funds collected for O&M so that more maintenance can be accomplished in the field. Without significant changes to the status quo in BIA irrigation projects, the systems will soon become inoperable.

CHAPTER 3

# TYPICAL PROJECT FACILITIES

## 3.1 General

Every reasonable precaution should be taken to provide for the safety of employees and the public with regard to project facilities. Supervisors shall familiarize themselves with the safety regulations of BIA and promote safe practices among their employees. Regular safety meetings shall be held and reported on, as prescribed in the 25 BIAM, Safety Management. Every employee directly engaged in project O&M should attend these meetings and be encouraged to offer suggestions and actively participate in the discussion and formulation of safety measures.

It is the duty of O&M personnel to foresee circumstances that may interrupt delivery of project water. The project engineer, or other Official-in-Charge, shall be responsible for developing project plans to cope with such circumstances as canal breaks or structure failures. He should be certain that all employees are fully informed of emergency plans and understand their respective assignments. The gatetenders and ditchriders, particularly, shall be familiar with emergency plans for structure or canal bank failures, debris jams, or other emergencies demanding immediate action.

## 3.2 Storage Facilities

During the original construction of the irrigation projects, numerous dams were constructed to store, divert, or deliver irrigation water. Since their construction, multiple uses have developed for these reservoirs, including electrical power generation, endangered species recovery, creation of wetlands, fishing, hunting, boating, and other miscellaneous activities. Therefore, many other interested parties now share the use of the reservoir. However, the operation of the irrigation reservoirs is primarily the responsibility of the Bureau of Indian Affairs irrigation projects.

Safety issues relating to the O&M, rehabilitation, and enlargement of BIA irrigation dams are coordinated through the Regional Safety of Dams Officers. BIA irrigation project managers should work closely with tribal water resources and dam safety officials to assure safe dam operations. Operation manuals for reservoirs within each reservation are available at the serving agency. If assistance is required for Safety of Dams issues, the Regional Safety of Dams Officers should be contacted.

The safety of BIA dams varies widely. Safety of Dams modifications are ongoing at BIA water storage facilities nationwide. These modifications will continue in order to ensure safe operation and, thus, a safe and adequate water supply for irrigation projects. The schedule for completion of these modifications will be based on available funding and prioritized safety concerns.

# 3.3 Canals

Generally speaking, most BIA irrigation projects consist of main canals and laterals that deliver water from a specific source to the project lands. In certain areas, main canals deliver water from one watershed to another, without direct service to irrigated lands. These canals are often referred to as "cross-over canals." These canals were completed to maximize water use within a reservation by capturing runoff from drainage areas and centralizing the irrigation water for use in a specific area, or irrigation unit. Developments in irrigation technology have made it economical for some projects to use pumps to lift water from one elevation to another, providing for the irrigation of additional lands.

The BIA is responsible for the safe O&M of main canals that serve the BIA's projects. Considering the age and existing condition of the infrastructure throughout BIA irrigation projects, this is a daunting task. Generally speaking, the canals are functioning, but sometimes inadequately. The flow capacities and condition of associated structures along the canal systems have deteriorated over time and often are inadequate for the project acreage served. The deterioration is caused by numerous factors including, but not limited to, lack of adequate maintenance, vegetation overgrowth, erosion/ sedimentation caused by poor hydraulic conditions, and livestock breaking down the canal banks.

The Official-in-Charge, usually the irrigation project manager, is responsible for operating and maintaining the water delivery system in a safe and economical manner and to such a degree that water

can be delivered throughout the system. The Official-in-Charge uses a staff of water masters, ditchriders, equipment operators and laborers to accomplish O&M tasks.

Reliable measurement of irrigation water is of critical importance in the control of water waste and the attainment of maximum beneficial use. The negligent wasting of water shall not be permitted. Measurements will be made as accurately as is practicable, and action will be taken to restrain overdelivery. Operational waste shall be held to a minimum, and all practical protective and corrective measures shall be taken to overcome seepage and leakage from irrigation systems. In cases of misuse of project water by an irrigator, the Officer-in-Charge can terminate water delivery (See Title 25 Code of Federal Regulations [CFR], Section 171.240).

## 3.4 Laterals

Laterals are ditches that, like their name describes, deliver water laterally from the main canal to lands located some distance away from the main canal. Laterals are generally smaller in capacity than the main canals that serve them. Many of the farm headgates that serve individual tracts of land within BIA's irrigation projects are located on laterals, although some are on main canals. The capacities of many of the laterals have diminished over time, mainly due to inadequate maintenance and growth of vegetation in the laterals. Control of vegetation, which limits the capacities of canals and laterals, is sometimes very difficult, due to limited physical

access to clean the laterals, inadequate equipment, and environmental concerns about using herbicides (some of BIA's project lands are organic farms and do not allow herbicides, pesticides, etc.).

## 3.5 On-Farm Irrigation Systems

Gravity irrigation methods are the most common methods used in BIA irrigation projects. Sprinkler systems (center pivots, wheel lines, etc.), gated pipe, and drip irrigation methods are also used by some farming operations. As specified in 25 CFR 171, "project operators will deliver irrigation water to one point on the boundary of each farm unit within the irrigation project." Although there can be exceptions to the previous statement, in general, the responsibility to operate and maintain systems ends at the water delivery point to each tract. If a landowner(s) does not maintain the farm delivery ditch or other farm irrigation system, the BIA can refuse to deliver water to that tract of land.

## 3.6 Surface Drainage Systems

The water users are responsible for all waste or surplus water resulting from their irrigation practices and for its conveyance to project canals, drains, wasteways, or natural drainage channels. Wastewater is not permitted to flow upon or collect in road or project rights-of-way. BIA is responsible for maintenance of the drains constructed as part of the irrigation project.

## 3.7 Irrigation Structures

Irrigation structures vary by function and type throughout the irrigation projects, from concrete diversion dams on rivers to wooden turnout gates to individual tracts of land. Each structure was originally designed to function in coordination with other project features. BIA is responsible for the safe O&M of the irrigation structures located within irrigation projects. This does not include structures that are considered "on-farm irrigation systems." Further discussion of the rules and regulations regarding structures is included in 25 CFR 171. The condition of irrigation structures varies, due to the wide range of structure types and age, climate, and soil conditions. Reclamation's expertise is available and should be used, as needed, when examining major structures. Arrangements for such services can be made by the Regional Director, with the Regional Director of Reclamation having jurisdiction of the area in which the structure is located, or arrangements can be made through the Central Office through a Memorandum of Interagency Agreement. A report on examinations shall be prepared with copies furnished to the Central Office, Regional Office, and water user organizations.

## 3.8 Heavy Equipment and Project Vehicles

Each irrigation project has heavy equipment, including such items as dozers, backhoes, dump trucks, ditchers, and patrols. This heavy equipment is used to maintain canals, laterals, and project access roads along canals and other project facilities. Irrigation project vehicles vary from small pickups (used by ditchriders) to specialty

vehicles (such as flatbed fuel trucks). Many of the heavy equipment and specialty vehicles have been acquired through the Federal Government's General Services Administration (GSA) surplus and are owned by the irrigation projects.

Pickups, used for daily transportation by the project managers, equipment operators, and ditchriders have historically been leased through GSA. However, since the irrigation projects operate with nonappropriated funds, which are paid by water users, many irrigation projects are purchasing vehicles to reduce costs. This is being accomplished through standard Government procurement. Central Office policy requires all irrigation projects to investigate and compare the costs and benefits of leasing through GSA versus purchasing vehicles outright for the projects. It is important to note that purchasing vehicles may not be the most economical or appropriate alternative for all projects; leasing through GSA may be the best option in some cases. However, with the current financial conditions of the BIA irrigation projects, innovative ideas must be used to trim project costs to keep the infrastructure operational.

## 3.9 Miscellaneous Rights-of-Way Obstructions

Right-of-way obstructions exist throughout BIA irrigation projects. Many original project structures are used by landowners and the general public for accessing lands on or near irrigation facilities. An example of such a structure might be a canal bridge, originally constructed for irrigation maintenance access, which is currently being used as a driveway approach into a residence.

These types of structures create unique problems for BIA projects, both from an operational and liability standpoint. Other problems exist, such as locked gates on fences that have been constructed by others for controlling livestock or limiting access to private property, which restricts BIA access to irrigation infrastructure. If unauthorized, all obstructions shall be removed, replaced, or otherwise mitigated to allow full access by BIA personnel. If significant costs result from mitigation of obstructions, the full cost of mitigation shall be charged to the landowner in accordance with 25 CFR 171.405(g), 171.410(b(ii)), 171.415(d), and 171.420(d).

In many locations, fences are not constructed where they are critically needed for the welfare of the irrigation infrastructure. When livestock are allowed to graze uncontrollably on the canal banks, they destabilize banks and destroy the canal geometry by breaking down the earthen banks. These practices limit the hydraulic capacity of the canal by changing the geometry and making the canal less efficient. This also causes an increase in the sediment load into the canal system which, in turn, increases maintenance costs due to canal cleaning requirements. In these cases, the Officer-in-Charge may choose to construct fences to limit access by livestock on irrigation rights-of-way at the landowner's expense. Also, stock water may only be provided to landowners or lessees according to the guidelines listed in 25 CFR 135.

For existing obstructions, or where construction of one is proposed, a Right-of-Way Encroachment Permit must be approved by the BIA Officer-in-Charge. The encroachment permit provides a formal process that allows necessary and reasonable obstructions to exist on BIA irrigation project rights-of-way. A prudent review and

approval of Encroachment Permits should be made to ensure that obstructions have a minimum impact on O&M activities. A sample Encroachment Permit, including general guidelines for the review and approval process, is shown in appendix A.

CHAPTER 4

# INVESTIGATIONS AND PLANNING

## 4.1 Irrigation, Drainage, and Related Resources

### 4.1.1 INVESTIGATIONS

The investigation and planning relative to these facilities shall be conducted in a systematic manner, giving consideration to all factors required for the successful development of an irrigation project. Factors such as quantities of water available, type of land and its use and management, subdivision of farm units, economic feasibility, construction, O&M, and drainage facilities shall all be investigated and thoroughly integrated in a planning report for each potential unit or combination of units. The finished report shall be forwarded to the Central Office for review and acceptance. The planning report should follow the format approved by the Central Office.

### 4.1.2 REPORT OF INVESTIGATIONS

Once the Central Office has received and approved the planning report, it will then issue instructions regarding the release and circulation of the report to interested Government or State organizations and will present copies of the report to the Department, Office of Management and Budget, and to the Congress for consideration and for the purpose of securing authorization for the construction of the project and appropriations.

The above brief outline regarding the procurement of investigation data and compilation of a planning report applies primarily to extensive areas upon which prescribed investigation reports are not available. Small areas or extensions of units or projects upon which surveys have been made, or areas that are adjacent and comparable to lands that are being irrigated, do not require extensive investigation or the development of a planning report. Rather, a complete description of the work proposed, including justification and cost estimates, should be prepared and forwarded to the Central Office for approval.

The succession of responsibilities in connection with the conduct of the investigations and the subsequent related planning of irrigation projects and their potential power developments, if any, shall be carried out as outlined in the following paragraphs of this section.

### 4.1.3 APPROVAL OF PROJECT

The approval of a proposed irrigation project embracing tribal lands on a reservation shall be obtained by the Agency Superintendent from the affected Tribe or Tribes prior to the planning of the project or any part thereof. (See Section 16 of the Act of 1934, 48 Stat. 987, as amended; 25 United States Code [U.S.C.] 476, Respecting Organized Tribes.) This approval shall be manifested by a signed resolution duly made and adopted by a majority of the tribal council or other proper representative body. A copy of the resolution shall form a part of the justification for the project. Under existing law, construction charges represent a deferred lien against irrigable lands under a project. The individual Indians or Tribes are expected to assume and pay as they

accrue the obligations covering the O&M charges assessed against their lands (38 Stat. 583; 45 Stat. 210, Section 8, 60 Stat. 867; 25 U.S.C. 387 and 385), in accordance with rules and regulations promulgated in 25 CFR 221.

### 4.1.4 PREAUTHORIZATION INVESTIGATIONS

It is the basic policy of BIA to complete the field and office studies necessary to adequately support the prescribed objectives of an investigation with a minimum of expenditure of time and funds.

After receiving a resolution requesting construction of a project, or part thereof, the Regional Director shall request authority and funds to conduct a reconnaissance survey and other preauthorization investigations as necessary to determine the engineering and economic feasibility. When feasibility becomes apparent and authorizations are anticipated, investigations should be directed toward the requirements for a project planning report. In a similar manner, when infeasibility becomes apparent, preauthorization investigations should be continued only to the point necessary to show infeasibility under existing or foreseeable conditions.

On investigations for large projects, where a small percentage of estimated construction costs represent very large preauthorization investigation costs, sound judgment will have to be used in conjunction with readily available data as the basis for certain estimates. Engineering, geologic, and economic boards and consultants may be used under such circumstances.

The Regional Director shall assemble all available data pertaining to the project from other Federal, State, and local agencies and, subsequent to a study of this material, will determine the extent of the surveys and studies necessary for the completion of a feasibility report.

Tribes or councils shall be kept informed of the progress of the survey and shall receive copies of the report when completed. The purpose and scope of the proposed development shall be explained to them visually by the use of maps at appropriate times during the course of the surveys. The opinions of the councils shall be given serious consideration before further detailed information is accumulated for the formation of a project plan. Approval of the feasibility report, and authority for the initiation of a program for the compilation of data upon which the planning report is based shall also be secured from the Central Office.

### 4.1.5 Reconnaissance Investigations

Reconnaissance-phase investigation in the planning process emphasizes the use of existing studies and data to perform the analyses. If funds and time allow, limited additional data may be obtained or developed. The study determines whether or not a project is likely to be feasible, given the economic and environmental constraints (required benefit/cost ratios, funding limitations, endangered species requirements, wildlife and fisheries requirements, wetland protection requirements, Clean Water Act of 1977

requirements, etc.). Based on this determination, the report recommends either a feasibility-level investigation or termination of the study.

## 4.1.6 Feasibility Investigations

A feasibility-phase investigation proceeds upon a positive recommendation in the reconnaissance report. The feasibility investigation provides the basis for authorization and construction appropriation and should be sufficiently detailed to show conclusively that a project is feasible and to allow the work effort to proceed directly to the design phase. The feasibility investigation usually requires additional studies and the procurement of additional field data. If any additional studies are needed, they should be coordinated with other governmental agencies to determine the potential impact of the project on wildlife and fisheries, endangered species, the Clean Water Act of 1977, or wetland protection.

### *4.1.6.1 Hydrological Studies*

Hydrological studies previously made shall be refined. This probably will not require any substantial change in conclusions if the original study was prepared properly, but the conclusions must be adequately supported and substantiated by detailed studies that demonstrate how the project will operate under both normal and critical conditions. This phase is one of the most important in the project studies. The success or failure of the project depends on the land and on the quality and quantity of the water supply.

### 4.1.6.2 *Power Aspects*

A complete analysis of the power aspects of the project must be made, including their relationship to other plants and systems with which they may be coordinated. This analysis will help to determine the prospects of this feature and to coordinate power with the other functions of a project. Upon completion of the required land classification and engineering activities, sufficient information is available to outline a plan for developing the area and preparing a cost estimate. Design and cost estimates should be accurate and consistent with the information at hand.

### 4.1.6.3 *Economic Studies*

While the plan and cost estimate are being developed, economic studies should have progressed sufficiently to enable formulation of a definite proposal. The economic studies will include an estimate of project costs and benefits, first without regard to the Leavitt Act (which would include recommended cost allocations and repayment requirements and capabilities), and second, with regard to the Leavitt Act (cost-benefit ratio computed only as to annual O&M charges and replacement costs). The proposal shall include procedures under which the project can be constructed and provision for proper financial return when required by law. These items should be determined as definitely as possible so that the BIA can support them, subject to minor alteration or change following preconstruction surveys, in the approach to Indian tribal councils, irrigation districts or other interested parties, the Secretary, and the Congress. The Act of April 4, 1910 (36 Stat. 270), requires Congress to authorize any new

projects with costs exceeding $35,000. However, any information released prior to the planning report should be positively identified as tentative only and subject to major changes or identified as a complete discard so that no commitments should be made with it as the basis therefore.

### *4.1.6.4 Community Involvement*

A general census of the Indian community in the affected area is a requisite in this stage of planning. If an unfavorable attitude toward the development exists, the planning report may recommend that no further action be taken.

### *4.1.6.5 Legal Review*

The importance of legal review during the investigation cannot be overemphasized. Adequate review of the legal aspects of planning requires careful consideration. Like other portions of the planning investigation, it is time consuming; therefore, it should not be deferred until the completion of the plan. Legal review is an integral part of any development plan.

### *4.1.6.6 Interests/Other Agencies*

Activities of other Federal, State, and local agencies, particularly other bureaus of the Department of the Interior (Interior), must be consulted in the planning and development of an area. In many instances, features recommended by another agency cannot be

incorporated into the general plan because of the reimbursable nature of the Indian project funds. However, there are also many cases where a slight variation in plan will enable such recommendations to be incorporated at no additional cost.

#### 4.1.6.7 *Final Report*

When necessary field and office work are completed, all project information, including recommendations and basic data, is consolidated into a project planning report. This report must be complete in every essential respect and contain data on the irrigation unit as it exists under present conditions and as proposed for development.

### 4.1.7 SPECIAL PLANNING REPORTS

Special planning reports present the findings and conclusions of special investigations and studies that are required to satisfy special situations or specific requests, or for prospective legislation requirements. They are made also to cover specific problems that exist or that may arise from time to time on irrigation projects and their various related activities.

### 4.1.8 POSTAUTHORIZATION INVESTIGATIONS

Upon authorization of the project, additional investigations shall proceed as rapidly as funds are made available. These investigations

may consist of additional detailed soil classification studies, irrigation area topographic surveys where adequate surveys have not been made by the U.S. Geological Survey, additional detailed surveys on major structures, and underground water and drainage studies.

### 4.1.9 DRAINAGE

The BIA recognizes that if lands under its jurisdiction are allowed to become unproductive due to seepage, the investment in irrigation works is endangered. Also of critical concern is the reduction or total loss of income to the people in that area. It is, therefore, the BIA's policy to provide for adequate drainage on new projects and, where feasible, to provide (or to assist in providing) such facilities where required on existing projects.

On all irrigation projects, it is the responsibility of the Official-in-Charge to observe the use of project lands, to reduce damaging seepage and surface waste, and provide drainage where the fault is directly attributable to the operation of the irrigation system. Where lands become waterlogged and drainage needs arise due to improper irrigation by the water user, it is not the policy of the BIA to provide drainage unless special provision is made and funds are provided. Where drainage problems develop to the extent that remedial measures require a major project, a report shall be made containing all facts relative to conditions and recommended solutions. This report shall be submitted to the Regional Director, who will add his recommendations and submit it to the Central Office, together with plans for financing the work.

On Indian projects operated by the water users, it is the Regional Director's responsibility to work out solutions to the project's seepage problems and make recommendations for the alleviation of such problems to the Central Office. Such recommendations shall be made only after consultation with the water users and only when the necessary work is beyond the ability of the water users to finance.

CHAPTER 5

# CONSTRUCTION

## 5.1 Methods

The construction of facilities for irrigation may be carried out by either of two methods or a combination thereof. They are "force account" (defined here as the use of BIA forces) and "contract."

Many factors affect the choice of method. The quantity and type of work involved, its location, availability of contractors, availability of "force account" crews and equipment, and the local labor situation are a few of the factors that must be considered. Of primary importance, however, is that the desired results should be obtained at the most reasonable cost possible. It must be remembered that where reimbursable costs are involved, such costs become a direct debt attached to the land.

In choosing a construction method, effort must be made to ensure that no items of expense are hidden or overlooked in preparing and comparing cost estimates. Regardless of the method employed, the same standards of quality, workmanship, materials, etc., shall be specified for basis for choice and quality of the product.

## 5.2 Construction Surveys

The term "construction surveys" refers to all surveying activities that are performed in connection with necessary construction

requirements immediately before or during construction. This includes surveys for excavation, embankments, structure erection, and machinery installation. Construction surveys are intended to direct construction operations (either contract or Government), to ensure that the work is in compliance with the designs. The necessity for, and complexity of, construction surveys will vary with the magnitude and type of construction operation involved.

Specifications generally require the contractor to furnish all necessary surveys, lines, grades, and related data during construction work. The contracts may provide that the contractor furnish certain supplies and assistance. Contractual requirements should be ascertained and complied with to the fullest extent possible.

The construction survey party chief and his crew carry the direct responsibility of fulfilling the Government's obligations to supply certain surveys and data as construction proceeds. It is essential that the survey parties maintain courteous, business-like, and cooperative relations with the contractor and his forces at all times. It is only through such cooperative relations that the work can be carried on efficiently and result in a quality final product. The construction survey crew is also responsible for the information upon which both partial payments and final payments to the contractor are based. Accuracy is, therefore, of extreme importance in making proper payment for work performed. The records of work performed (as well as the manner in which it was carried out) are also very important. The value of such records cannot be overemphasized. Accurate records are critical in th event that claims for overpayment or underpayment develop, if claims are made or suits are filed on account of substandard work, structural failure, etc.

## 5.3 Designs and Specifications

The Regional Irrigation Engineer is responsible for all design work. He may, in the case of large intricate structures such as dams or power houses, obtain the aid of specialized technicians in the various fields by agreement with other Government design organizations such as the Bureau of Reclamation, Army Corp of Engineers, or by contracting with private engineering firms to acquire a complete design job for the facility to be constructed. The procurement of the field data required for the preparation of final designs may have a critical bearing on both the cost of the project and its adequacy. The Regional Irrigation Engineer should provide a list of the data normally required for the field jurisdiction engineer or the engineer delegated to do the proposed fieldwork. It is the responsibility of the field forces, however, to fully anticipate the needs of the designers by obtaining reliable information on all the factors that may affect the designs. In obtaining the field data, it is required that surveying and mapping practices be based on the best experience of the BIA and data available from textbooks, handbooks, and other published documents. Engineering judgment should be used to ensure the construction of adequate project features in accordance with sound engineering economics. Design criteria and construction standards and procedures are available through Reclamation for most types of structures including dams, drainage structures, power facilities, and canals and laterals. The U.S. Army Corps of Engineers also has various engineering manuals (available at no charge) that can be accessed online at: <http://www.usace.army.mil/search.html>.

CHAPTER 6

# FEDERAL LAWS, REGULATIONS, AND GUIDANCE GOVERNING BIA IRRIGATION PROJECTS

## 6.1 Background

The following is an abbreviated discussion of the policies that are in place for the administration of BIA irrigation projects. Copies of selected regulations are included in the appendices of this report.

The several acts applying to Indian irrigation projects are published in the *United States Statutes at Large*. Statutory citations, together with a comprehensive discussion relating to the more important projects, appear in Section B7 of Chapter III of the *Handbook of Federal Indian Law*, 1958 edition, and U.S.C. Annotated, Title 25.

The Federal Register Act of July 26, 1935 (49 Stat. 501; 44 U.S.C. 305), prescribes the classes of orders and regulations to be published in the *Federal Register*. Public Law 89-554 (80 Stat. 383; 5 U.S.C. 551 [Supplement II, 1965-1966]) requires publication in the *Federal Register* of notice of intention to amend orders, such as orders fixing O&M charges.

Regulations relative to time of payment, delivery of water, penalties for nonpayment, apportionment of water, and distinctions as to classes of water users and the effect of contracts in force with

irrigation districts, water users' associations, municipalities, or other groups and which are currently in force are published in 25 CFR, Indians.

## 6.2 Indian Affairs Manual, Release No. 98-07, Part 50, Chapter 1, Irrigation

The Indian Affairs Manual (IAM), Release No. 98-07, Part 50, Chapter 1 discusses the purpose, policy, authority, and guidance associated with BIA irrigation projects. For a complete list of the statutes, judicial decrees, and regulations related to BIA irrigation projects, please refer to this IAM. It also outlines the responsibilities of BIA irrigation personnel, from the Assistant Secretary - Indian Affairs in Washington DC to the Officials-in-Charge at each agency. The IAM also discusses collection of construction debt, collection of O&M assessments, and the cancellation of irrigation debt. IAM, Release No. 98-07 can be accessed on the Internet at the following address: <http://www.doi.gov/bia/iams/50iam.pdf>.

## 6.3 CFR 25, Indians, Part 171, Operation and Maintenance

Part 171 of CFR Regulation 25, Operation and Maintenance of Indian Irrigation Projects, can be accessed on the Internet at the following address: <http://www.access.gpo.gov/nara/cfr/>.

## 6.4 CFR 31, Chapter IX, Federal Claims Collections Standards

The Code of Federal Regulations for the Federal Claims Collection Standards, Chapter IX, can also be accessed on the Internet at the following address: <http://www.access.gpo.gov/nara/cfr/>.

## 6.5 CFR 29, OSHA Regulations, Part 1926, Safety and Health Regulations for Construction

All U.S. Department of Labor Occupational Safety and Health Administration (OSHA) construction safety standards apply for the O&M of BIA irrigation projects. The safety standards for construction are not shown in the appendices of this report but can be accessed on the Internet at the following address: <http://www.osha-slc.gov/OshStd toc/OSHA Std toc 1926.html>.

## 6.6 Department of the Interior Manual, Part 485, Safety and Occupational Health Program

This manual outlines the legal authorities for safety programs in the Department of the Interior and sets forth the policy for the implementation and administration of the Safety and Occupational Health Program for the Department. Part 485 DM also encompasses motor vehicle safety, which was previously covered in Part 488 DM. Part 485 DM can be accessed on the Internet at <http://elips.doi.gov/ELIPS/toc/ACT_MAN.HTM>. The

most recent safety and health information for Interior can be found on the Internet at: <http://safetynet.smis.doi.gov>.

## 6.7 Bureau of Indian Affairs Manual, Part 25, Safety Management

The BIAM Part 25 covers the policy, requirements, and responsibilities for the BIA safety programs. Mandatory reporting requirements and recordkeeping responsibilities are defined for the various safety programs. Numerous handbooks are also available from the BIA Division of Safety and Risk Management, 505 Marquette Avenue, Suite 1425, Albuquerque, New Mexico 87102; telephone: (505) 248-5060; telefax: (505) 248-5064. Information on the BIA safety management program can be found on the Internet at: <http://www.doi.gov/bia/safety_riskmgt/index.htm>.

## 6.8 Indian Affairs Manual, Release No. 98-06, Part 59, Environmental Management

The Indian Affairs Manual defines the environmental policy of the BIA, the statutory authority for the environmental program, and outlines the responsibilities of BIA personnel for compliance with environmental statutes and regulations. 59 IAM also establishes the basic requirements, guidance, and responsibilities for complying with the National Environmental Policy Act of 1969 (NEPA) and other environmental analysis and review requirements. The BIA Environmental Manual is available on the Internet at <http://www.doi.gov/bia/iams/59iam.pdf>.

## 6.9 Endangered Species Act of 1971, 16 U.S.C. Sections 1531-1544

The purpose of the Endangered Species Act (ESA) is to conserve the ecosystems upon which endangered and threatened species depend and to conserve and recover listed species. The U.S. Fish and Wildlife Service and the National Marine Fisheries Service administer the law. All Federal agencies must utilize their authorities to conserve listed species and ensure that their actions do not jeopardize the continued existence of listed species. The ESA can be accessed on the Internet at the following address: <http://www4.law.cornell.edu/uscode/16/1531.html>.

## 6.10 Resource Conservation and Recovery Act, 42 U.S.C. Sections 6901 et seq. (1976)

The Resource Conservation and Recovery Act (RCRA) gave the Environmental Protection Agency (EPA) the authority to control hazardous waste from the "cradle-to-grave." This includes generating, transporting, treating, storing, and disposing of hazardous waste. RCRA also set forth a framework for the management of nonhazardous wastes. The 1986 amendments to RCRA enabled EPA to address environmental problems that could result from underground tanks storing petroleum and other hazardous substances. RCRA focuses only on active and future facilities and does not address abandoned or historical sites (see CERCLA). The Federal Hazardous and Solid Waste Amendments are the 1984 amendments to RCRA that required phasing out land disposal of hazardous waste. Some of the other mandates of this strict law

include increased enforcement authority for EPA, more stringent hazardous waste management standards, and a comprehensive underground storage tank program. The text of RCRA can be obtained on the Internet at the following address: <http://www4.law.cornell.edu/uscode/unframed/42/ch82.html>.

## 6.11 Clean Water Act of 1977, as Amended, 33 U.S.C. Section 1251

The Clean Water Act (CWA) is a 1977 amendment to the Federal Water Pollution Control Act of 1972, which set the basic structure for regulating discharges of pollutants to waters of the United States. The law gives EPA the authority to set effluent standards on an industry-wide basis (technology based) and continued the requirements to set water quality standards for all contaminants in surface waters. The CWA makes it unlawful for any person to discharge any pollutant from a point source into navigable waters unless a National Pollutant Discharge Elimination System (NPDES) permit is obtained under the CWA. The 1977 amendments focused on toxic pollutants. The CWA provides for the delegation by EPA of many permitting, administrative, and enforcement aspects of the law to State and tribal governments. In States with the authority to implement CWA programs, EPA still retains oversight responsibilities. The full text of the CWA can be obtained on the Internet at: <http://www4.law.cornell.edu/uscode/unframed/33/ch26.html>.

## 6.12 National Environmental Policy Act of 1969, as Amended, 42 U.S.C. Sections 4221-4347

The National Environmental Policy Act requires that the environmental effects of any major federal action be evaluated before initiating the action. Other statutes may impose similar requirements. Environmental analysis and review activities are also required before land can be taken into trust and before property is transferred from BIA to Tribes or other parties. NEPA can be accessed on the Internet at: <http://www4.law.cornell.edu/uscode/42/ch55.html#PC55>.

## 6.13 National Historic Preservation Act of 1966, as Amended (P.L. 89-665; 16 U.S.C. 470a, et seq.) (P.L. 89-665; 80 Stat. 915, amended 1980, 1992) (P.L. 96-515; 94 Stat. 2997)

The National Historic Preservation Act (NHPA) declares Federal policy to protect historic sites and values in cooperation with other nations, States, Tribes, and local governments. It establishes a program of grants-in-aid to States and Tribes for historic preservation activities. Subsequent amendments designated the State Historic Preservation Officer as the individual responsible for administering programs in the States. Additionally, some Tribes have established their own State Historic Preservation Officer. The act also creates the President's Advisory Council on Historic Preservation (Advisory Council). Federal agencies are required to consider the effects of their undertakings on historic resources and to give the Advisory Council a reasonable opportunity to comment on those undertakings. The

NHPA can be accessed on the Internet at the following address: <http://www4.law.cornell.edu/uscode/16/470.html>.

## 6.14 Indian Self-Determination and Education Assistance Act, P.L. 93-638 as Amended (25 U.S.C. 450 et seq.)

The purpose of P.L. 93-638 is to provide maximum Indian participation in the government and education of Indian people; to provide for the full participation of Indian Tribes in programs and services conducted by the Federal Government for Indians and to encourage the development of human resources of Indian people; to establish a program of assistance to upgrade Indian education; to support the right of Indian citizens to control their own educational activities; and for other purposes. Title I of this act provides for Self-Determination contracts for Tribes or tribal organizations to plan, conduct, and administer programs, functions, services, or activities of the Department of the Interior and the Department of Health and Human Services that support the delivery of services to Indians. P.L. 93-638 can be accessed on the Internet at: <http://www.doi.gov/bia/self-determ/Forms/638rev02.pdf>.

## 6.15 Control Legislation

Excerpts from some of the laws that will further clarify and supplement the statements above are included below.

**Act of March 1, 1867 (14 Stat. 514-515)**

This is the first congressional legislation authorizing irrigation on any Indian reservation. This act provided for the construction of a canal for the irrigation of the lands of the Colorado River Reservation.

**Act of April 4, 1910 (36 Stat. 270)**

This provided,

> *. . . hereafter no new irrigation project on any Indian reservation, allotments, or lands shall be undertaken until it shall have been estimated for and a maximum limit of cost ascertained from the surveys, plans, and reports submitted by the Chief Irrigation Engineer of the Indian Service, and approved by the Secretary of the Interior, and such limit of cost shall in no case be exceeded without express authorization of Congress, and hereafter no new project to cost in the aggregate to exceed $35,000 shall be undertaken on any Indian reservation without specific authority of Congress.*

**Reimbursement of Construction Costs, Act of August 1, 1914 (38 Stat. 583)**

Up to and including fiscal year 1914, the cost of all irrigation work undertaken on Indian reservations under the general appropriations "Irrigation, Indian Reservations," made since 1884, had been borne by the United States. Most of the work performed under special or specific appropriations had been charged against Indian tribal funds or made reimbursable out of tribal funds. However, a few of the special appropriations had been made from the United States Treasury. In the appropriation act quoted above, Congress announced a distinct and sweeping change in legislation for Indian irrigation projects, by

appending two provisos to the general irrigation appropriation act. They read as follows:

> *Provided further, that all moneys expended heretofore or hereafter under this provision shall be reimbursable where the Indians have adequate funds to repay the Government, such reimbursements to be made under such rules and regulations as the Secretary of the Interior may prescribe: Provided further, that the Secretary of the Interior is hereby authorized and directed to apportion the cost of any irrigation project constructed for Indians and made reimbursable out of tribal funds of said Indians in accordance with the benefits received by each individual Indian so far as practicable from said irrigation project, said cost to be apportioned against such individual Indian under such rules, regulations, and conditions as the Secretary of the Interior may prescribe.*

**Act of February 14, 1920 (41 Stat. 409) - Begin Partial Reimbursement**

For several years following the Act of 1914, no steps were taken and no regulations were formulated by Interior looking to an apportionment of irrigation costs as therein directed. The reason given was that the costs would not be known until the irrigation systems were completed, and practically none was then completed. In this situation, Congress in the Indian Appropriation Act of February 14, 1920, supra, enacted the following:

> *The Secretary is hereby authorized and directed to require the owners of irrigable land under any irrigation system heretofore or hereafter constructed for the benefit of Indians and to which water for irrigation purposes can be delivered to begin partial reimbursement of the construction charges where reimbursement is required by law, at such times and in such amounts as he may deem best; all*

> *payments hereunder to be credited on a per acre basis in favor of the land in behalf of which such payments shall have been made and to be deducted from the total per acre charge assessable against said land.*

Under the 1920 act, the assessment rate to be made was left to the discretion of the Secretary, except on the Fort Hall and Wapato Projects, where the law had already fixed the rates. On three of the projects—Flathead, Blackfeet, and Fort Peck—the assessment rates were fixed at 50 cents per acre annually. On the remaining projects, assessments were fixed at the rate of five percent of the per-acre construction cost as of June 30, 1920, and made due November 15, 1920, and each year thereafter until 1927, when the rates on these projects were reduced by Title 25 CFR 134, Partial Payment Construction Charges on Indian Irrigation Projects.

**Lien Act—March 7, 1928 (45 Stat. 210)**

For many years, Interior had considerable difficulty making irrigation collections on certain projects because no general law existed to specifically make irrigation charges a lien against the lands of such projects. The situation was relieved by this act, which specified the projects for which legislation liens had been created and extended the lien to all Indian irrigation projects where the construction and O&M costs of such projects remain unpaid and are reimbursable.

**Act of July 1, 1932 (47 Stat. 564)**

This act, providing for adjustment of reimbursable debts of Indians, reads as follows:

> *. . . That the Secretary of the Interior is hereby authorized and directed to adjust or eliminate reimbursable charges of the Government of the United States existing as debts against individual Indians or Tribes of Indians in such a way as shall be equitable and just in consideration of all the circumstances under which such charges were made: Provided, That the collection of all construction costs against any Indian-owned lands within any Government irrigation project is hereby deferred, and no assessments shall be made on behalf of such charges against such lands until the Indian title thereto shall have been extinguished and any construction assessments heretofore levied against such lands in accordance with the provisions of the Act of February 14, 1920 (41 Stat. 409), and uncollected, are hereby canceled: Provided further, That a report shall be made to Congress annually, on the first Monday in December, showing adjustments so made during the preceding fiscal year: Provided further, That any proceedings hereunder shall not be effective until approved by Congress unless Congress shall have failed to act favorably or unfavorably thereon by concurrent resolution within sixty legislative days after the filing of said report, in which case they shall become effective at the termination of the said sixty legislative days.*

(The Solicitor for Interior has held by Opinion No. M-36708, dated July 18, 1967, that Indian-owned fee lands are subject to construction assessments and the collection thereof.)

**The Act of June 22, 1936**

The Act of June 22, 1936 (49 Stat. 1803; 25 U.S.C. 389 and 389a), directed an investigation to determine whether the owners of non-Indian lands under Indian irrigation projects, and in projects where the United States had purchased water rights for Indians, were

unable to pay irrigation charges because of inability to operate profitably due to lack of soil fertility, inadequate water supply, or defective irrigation works. It authorized the Secretary to adjust, defer, or cancel charges as conditions warranted. It also authorized due charges over periods not exceeding 10 years and, with the consent of landowners, determined to eliminate permanently nonirrigable lands from projects and, in certain cases, to cancel outstanding charges.

Numerous other related regulations are involved with BIA irrigation projects, either directly or indirectly. Close coordination between the irrigation projects and the various other programs that BIA administers is critical to maintain accurate billing records and to maintain administrative integrity among the BIA programs (i.e., Real Estate Services, Titles and Records, Contracting, Accounting, etc.). A list of irrigation-related Federal regulations is listed in the Irrigation Indian Affairs Manual.

# 6.16 Claims Relating to Irrigation

## 6.16.1 NATURE OF CLAIMS

Damage (tort) claims arise out of the construction and O&M of Indian irrigation projects and result from mishaps such as collision of Government-owned and operated vehicles, drowning of livestock in irrigation canals, and the spreading of fires from the burning of weeds or other debris in ditch cleaning work.

## 6.16.2 Processing of Claims

For the procedures to be followed in processing tort claims against the United States, see Part 451 of the Interior Department Manual (451 DM 2.6). Note that only the Solicitor and the Regional and Field Solicitors have been delegated the Secretary's authority to settle tort claims. The function of the BIA is limited to preventing and reducing situations that may cause tort claims, as well as properly investigating, documenting, and processing tort claims.

## 6.16.3 Authority to Settle Irrigation Claims

In addition to the authority conferred upon the Solicitor and the Regional and Field Solicitor to settle general tort claims of $2,500 or less, pursuant to the Federal Tort Claims Act (28 U.S.C. 2671-2680), as amended by the Act of July 18, 1966 (80 Stat. 306) (see Release 961 of July 7, 1967, Part 451 of the Interior Department Manual 451.I.18), these officials are authorized to determine claims arising on Indian irrigation projects in amounts not exceeding $15,000, pursuant to 25 U.S.C. 388. (See Solicitor's Regulation 5, dated September 24, 1954, as amended October 5, 1965.) Authorities and dollar levels sometimes change - check with the Solicitor.

## 6.16.4 Liquidated Damages

The Congress has given the Comptroller General authority to remit liquidated damages to the extent that he/she considers just and

equitable, upon recommendation of the head of the Government agency concerned (Federal Property Act of 1949, as amended 64 Stat. 591). Section 27 of Order No. 2509, as amended, December 18, 1950 (15 FR 9529), provides that where the Solicitor of Interior determines that as a matter of justice and equity, liquidated damages assessed on or after July 1, 1949, because of delays by a party under a contract made by Interior or one of its agencies on behalf of the Government, should be remitted, he/she is authorized to recommend to the Comptroller General that such remission be made. Such cases of assessed liquidated damage, should be referred by the Regional Director direct to the Solicitor for consideration.

CHAPTER 7

# RELATED NATURAL RESOURCE CONSIDERATIONS

## 7.1 Fish and Wildlife

The Official-in-Charge will give consideration to fish and wildlife conservation as an integral part of plans for conservation of soil, water, and plant resources. Projects will work closely with tribal game and fish departments to protect and enhance wildlife. The Indian people will be encouraged to protect, conserve, and develop their fish and wildlife resources.

## 7.2 River Basin Management/Conservation Districts

Close cooperation shall be maintained with the agency or agencies charged with responsibility for the overall river basin planning, and any others involved.

## 7.3 Noxious Weeds

Noxious weeds affect millions of acres on BIA irrigation projects and surrounding lands. Noxious weeds are particularly problematic on the irrigation infrastructure and surrounding areas of the irrigation projects. Typically, these areas have been continuously disturbed,

either by construction and maintenance practices or farming. Noxious weeds, and the resources affected by them, are becoming more and more publicized. States in the Rocky Mountain region are enacting laws that require landowners to control noxious weeds on their property. The BIA irrigation projects are responsible for the control of noxious weeds on its facilities and rights-of-way surrounding its infrastructure.

It is imperative that the BIA work together with Tribes; adjacent landowners; and local, county, State, and other Federal entities to control noxious weeds on BIA irrigation projects.

Shown below are selected web sites that may be of interest:

<http://www.mtweed.org> - Montana Weed Control Association

<http://www.montana.edu/places/mtweeds/> - Montana Noxious Weed Survey and Mapping System

<http://www.wyoweed.org> - Wyoming Weed and Pest Council

<http://www.fremontcounty.org/county.htm> - Fremont County Weed and Pest Control

<http://plants.usda.gov/plants/cgi bin/topics.cgi?earl=noxious.cgi> - U.S. Department of Agriculture, Natural Resource Conservation Service, Invasive Plant Site

# 7.4 Water Quality

The BIA acknowledges that if lands under its jurisdiction are allowed to become unproductive due to seepage, the investment in irrigation works is endangered. Additionally, and more serious is the reduction or total loss of income to the people in that area. It is, therefore, the BIA's policy to provide for adequate drainage on new projects and, where feasible, to provide or to assist in providing such facilities where required on existing project.

It is the responsibility of the Official-in-Charge of the project to monitor the use of project lands, to reduce damaging seepage and surface waste, and to provide drainage where the fault is directly attributable to the operation of the irrigation system. Where lands become waterlogged and the water user needs drainage as a result of improper irrigation, it is not the BIA's policy to provide drainage unless special provisions are made and funds are provided. Where drainage problems develop, and remedial measures will necessitate a major project, a report shall be compiled which includes all facts relative to conditions and recommended solutions. This report shall be submitted to the Regional Director, who will submit recommendations to the Central Office, along with plans for financing the work.

On Indian projects operated by the water users, it is the Regional Director's responsibility to work out solutions to the project's seepage problems and make recommendations for the alleviation of such problems to the Central Office. Such recommendations shall be made only after consultation with the water users and only when the necessary work is beyond the ability of the water users to finance.

CHAPTER 8

# IRRIGATION ORGANIZATION AND MANAGEMENT

## 8.1 Management Levels and Responsibilities

There are three management levels concerning BIA irrigation projects: (1) the Central Office, (2) the Regional Office, and (3) the Agency. In some cases, there is also a project management level. Each level fulfills a specifically defined role in meeting the overall administrative and technical requirements for the BIA irrigation program. These relationships are defined in IAM Release No. 98-07 as follows:

### 8.1.1 Central Office

Under the Secretary of the Interior, the Assistant Secretary of Indian Affairs establishes policy regarding Indian Affairs. The Deputy Commissioner of Indian Affairs oversees the operations of the BIA and carries out the policies established by Interior. The BIA Irrigation Program is part of the Branch of Irrigation, Power, Safety of Dams and Operation of non-Federal Dams under the Division of Natural Resources, which, in turn, falls under the Office of Trust Responsibilities. The duties of the Central Office pertain to congressional and administrative directives for the construction, investigation, planning, O&M, and conservation of Indian lands and water resources. The congressional and administrative functions rely on the tribal, agency, and regional levels for providing information.

### 8.1.2 REGIONAL OFFICES

Regional Offices are the responsibility of Regional Directors who have been delegated authority to supervise the implementation of Bureau policies, standards, and procedures. Of particular concern are the operation and maintenance aspects of irrigation projects, to which Regional staff provide planning and technical assistance support. Under the present structure, Regional staffs provide administrative, engineering, planning, investigative and technical services in support of Bureau irrigation systems and projects. The Regional Directors are responsible for the satisfactory condition and functioning of irrigation structures and facilities on projects under their jurisdiction and should assess the condition of irrigation facilities as frequently as necessary to carry out this responsibility. A condition assessment of project works should be programmed by Regional personnel on a periodic basis.

### 8.1.3 AGENCY OFFICES

Agency Offices are administrative units under the Regional Office supervision and are located at the reservation level. Agency staff serve under the administrative direction of the agency superintendent and the technical guidance and assistance of the Regional Office. Agency Offices and, in some cases, the Project Offices have direct responsibility for the delivery of water and related services to Indian landowners and water users. Generally, irrigation projects are one element in the overall service delivery system of the agency. However, the planning, implementation, and administrative

requirements for irrigation systems are exceedingly important functions for the use, protection, and conservation of Indian water resources.

CHAPTER 9

# OTHER BIA PROGRAMS INVOLVED IN IRRIGATION

## 9.1 Division of Natural Resources

The Division of Natural Resources assists the Director, Office of Trust Responsibilities, in formulating policies that relate to the execution of renewable Natural Resources Programs, including Water Resources, Fish, Wildlife and Recreation, Irrigation, Power and Safety of Dams, Range and Agriculture, and pesticide applications. The division is responsible for feasibility studies relative to the use and development of these resources. The Division of Natural Resources also serves as the Director's liaison to the Regional Offices on issues involving renewable natural resources and conducts evaluations concerning program activities at the Regional Offices.

The Branch of Agriculture and Range is responsible for providing program assistance to protect and enhance the value of the Indian agronomic resources; to maximize income, while maintaining and/or improving the Indian resources on Indian lands; and to manage the Indian natural resources through technical assistance to Tribes, Indian landowners, and /or operators of trust property. It provides staff advice for all activities related to the planning, management, conservation, development, and utilization of the Indians' soil, water, pesticide applications, and rangeland resources; and directs BIA's flood plains management program.

The Branch of Fish, Wildlife, and Recreation is responsible for fulfilling and executing the Federal Government's trust and rights protection responsibilities relating to fish, wildlife, and recreational resources that are important to the sustenance, cultural enrichment, and economic support of Indians; for promoting the conservation, development, and utilization of these resources for the maximum benefit of Indians; and for supporting the fulfillment of tribal co-management responsibilities associated with the existence of hunting, fishing and gathering rights.

The Branch of Water Resources is responsible for providing program assistance concerning: (1) conduct of technical studies on Indian reservations for the purpose of obtaining favorable water rights settlements, either through litigation or negotiations; and (2) providing comprehensive guides to Tribes in conserving, developing, and using their water resources with particular reference to water resource problems and uses of a special nature.

Although providing irrigation water and related services is the primary responsibility of the Branch of Irrigation, Power and Safety of Dams, other BIA branches are also involved in various aspects of irrigation management. This is the point where the financial accountability process begins, since irrigation projects and systems management involves an extensive recordkeeping process. The Branch of Irrigation, Power and Safety also interacts with the Realty and Finance Branches, at both the agency and regional levels. The following discussions define this interactive process.

## 9.2 Realty

The Division of Realty is responsible for the maintenance of all land ownership data in the Integrated Record Maintenance System (IRMS). During the preparatory stage for the irrigation season, Agency Irrigation must interact with Realty staff to confirm the status of leases, notices of land sales, exchanges, or probates, and to ascertain the land units in the irrigation system. This provides the basis for control for the steps that follow in the irrigation accounting process (i.e., billings, collections, and dispositions).

Similarly, the billing and collection of payments of O&M charges requires coordination among the BIA irrigation projects and Finance. This ensures that landowners and/or water users are properly billed on the basis of their assessed rates.

## 9.3 Trust Asset Accounting Management System (TAAMS)

The Trust Asset Accounting Management System is currently under review and development.

## 9.4 Safety

The Division of Safety and Risk Management provides professional leadership in the management of BIA's Safety and Health Program. The division performs the following activities:

- Ensures compliance with the requirements of the Occupational Safety and Health Act of 1970, Executive Order 12196, and 29 CFR Part 1960
- Administers the Injury Compensation Program and the provisions of the Federal Tort Claims Act
- Ensures that construction of Indian education facilities are in compliance with applicable Federal, State, or tribal safety and health standards in accordance with 25 U.S.C. Sec. 2005
- Ensures all bureau facilities and workplaces are inspected annually in accordance with 29 CFR Part 1960.25
- Reviews all new construction plans, including renovation
- Administers the Indian Highway Safety Program for Indian Tribes
- Provides safety and health guidance to the BIA Central Office, regional, agency, and tribal programs.

Information on the BIA program can be found on the Internet at <http://www.doi.gov/bia/safety_riskmgt/index.htm>.

## 9.5 Environmental and Cultural Resources Management

The Division of Environmental and Cultural Resources Management for the BIA includes environmental compliance, and environmental analysis and review activities, including those required by NEPA. The

goals of the Environmental and Cultural Resources Management Program are:

- To improve compliance with Federal environmental laws at BIA facilities and operations
- To clean up areas or buildings previously contaminated with hazardous substances, such as asbestos, lead-based paints, PCBs, waste solvents, and waste pesticides
- To conduct audits of 28 BIA agencies for environmental compliance
- To assist Tribal economic development by allowing the BIA to complete pre-acquisition site assessments and environmental and archeological assessments required by NEPA
- To continue to educate tribal members and BIA employees regarding environmental responsibilities and compliance techniques; how to reduce pollution, thus reducing risk and operational costs; and how to conduct the environmental reviews required by NEPA
- To assist Tribes to close open dumps that affect drinking water supplies or otherwise have an adverse health impact, and to develop self-sustaining, economically feasible, solid waste disposal programs

Information on the BIA program can be found on the Internet at <http://www.doi.gov/bia/iam/59iam.pdf>.

# 9.6 Geographic Data Service Center

The Geographic Data Service Center (GDSC), located in Lakewood, Colorado, is part of the Office of Trust Responsibilities. The GDSC mission is to develop and implement policies, procedures, standards, goals, and objectives for all spatial data technologies and applications throughout BIA. The GDSC supports BIA offices and federally recognized Indian Tribes. The GDSC provides the principal support functions for the irrigation program in the areas of Geographic Information System (GIS) mapping of irrigation projects, irrigation web site hosting, on-line deferred maintenance and budget reporting, and automated maintenance management.

CHAPTER 10

# LAND CLASSIFICATION SYSTEMS

## 10.1 Land Ownership

This section concentrates on the distinction between four land types: tribal lands, allotted lands, land assignments, and fee patent lands.

### 10.1.1 TRIBAL LANDS

Tribal lands are the first land type under the administration of the Bureau of Indian Affairs. Tribal lands are held in common by a Tribe and were generally reserved for a Tribe by the United States through treaty, Executive Order, or congressional act. Tribal lands are held in trust by the United States for the benefit of individual Indian Tribes and tribal members. The terms of the trust may vary but:

> *These variations occur in every aspect of property law in the duration of the possessors right, whether perpetual or limited, in the extent of that right, with respect, e.g., to timber, minerals, water, and improvements on tribal land, in the measure of supervision which the Federal Government reserves over tribal property, and in the types of use and disposition which may be made of the property by the tribal "owner." In view of these diversities, generalizations about "tribal property" should be scrutinized as critically as assertions about "property" in general* (Cohen 1958, in Price 1970: 562).

## 10.1.2 ALLOTTED LANDS

The General Allotment Act (Dawes Act) of 1887 authorized the President to partition tribal lands in tracts of 40, 80, or 160 acres and to make allotments to individual tribal members. The size of the allotment was based on its productivity potential for dry land or irrigated farming, or for livestock production. The statutes pertaining to allotments are found in 25 U.S.C. 231, et seq. Allotments are generally divisible by heir ship and alienable to Indians or non-Indians subject to the approval of the Secretary. The Indian Reorganization Act of 1934 (48 Stat. 984) was an attempt to reverse the allotment process in an effort to maintain remaining tribal lands. In 1966, approximately 11,121,300 acres remained as allotted Indian lands (Price 1970: 563).

## 10.1.3 ASSIGNED TRIBAL LANDS

The third type of reservation land tenure is the assignment of trust lands to individual tribal members. However, assignment of land is a tribal action that requires the approval of the Secretary. Assignments are made for the benefit of the individual, usually for life. While heir ship rights generally are not associated with assignments, these can pass down to an individual's heirs.

## 10.1.4 FEE PATENT

Fee patent lands may include acreage and tracts that have passed out from Indian ownership. These lands were part of the reservation under the original acts establishing the reservation. Since then, fee

patent landowners have acquired title to these lands. The manner in which land ownership has transferred to non-Indians has a complex background. It is safe to assume that most of the transfers are associated with the Indian allotment acts under which Indians received land allotments for agricultural or grazing purposes. Excess lands following Indian allotment were often opened for homesteading. This is one way that non-Indians acquired fee patent lands within an Indian reservation boundary.

Fee patent lands may be present within the boundaries of certain Indian reservations. These may include lands that are held as part of the public domain by various Federal agencies for specific purposes, such as national parks, water projects, and/or administrative purposes. Both the BIA and the Indian Health Service hold lands; however, these are generally held by these agencies for the well-being of affected Indian Tribes.

#### *10.1.4.1 Project Employee Ownership of Project Lands*

The ownership or operation of project lands by permanent employees of a project is not generally encouraged. It is necessarily a responsibility of the Official-in-Charge of the project to make sure that such activities do not interfere with an employee's proper handling of his job and, especially, that in distribution or division of water, that the employee does not favor himself. Where possible and desirable, project officials should make specific rules for control purposes in accordance with their local conditions. Where ditchriders are furnished Government quarters or employment is for the full 12 months greater control may be warranted.

# 10.2 Land Classification for Irrigation

## 10.2.1 BACKGROUND

The purpose of an irrigation system is to deliver water to irrigable lands to increase productivity and profitability. The land classification system for the irrigation sets forth the criteria for assessing, apportioning, and collecting O&M-related costs. This system can serve as a manual in classifying lands for irrigation. The designation of lands for irrigation under one of the following categories is a function of the Secretary, by virtue of the laws enacted by the United States. All project Indian lands are classified as presently assessable unless they have been taken out of that status for some specific reason.

The classification of assessable lands for irrigation is generally the responsibility of the BIA, with approvals for changes residing at the various levels of authority. Agency superintendents and/or irrigation project managers may appoint a Designation Committee to review proposed classifications in an irrigation project.

The designation system of Presently Assessable (PA), Temporarily Non-Assessable (TNA), and Presently Non-Assessable (PNA) land emanates from the various laws passed by the Congress regarding BIA irrigation projects. The Secretary is primarily responsible for filing O&M charges for BIA irrigation projects. In turn, the designation of irrigable lands provides the basis for distributing water, setting a fair and equitable O&M rate, and apportioning

charges among Indian and non-Indian water users and/or landowners. This concept is one of the major features in the irrigation program and provides the basis for O&M.

Thus, the designation of irrigable lands is an important process. Under the various laws, landowners may request that certain lands be redesignated, subject to the approval of the Secretary. These are summarized below, with pertinent portions of the "Manuals for the Redesignation of Irrigable Lands."

### 10.2.2 PRESENTLY ASSESSABLE LANDS

PA lands are categorized as those to which water can be delivered in their present state and by virtue of their physiographic and topographic conditions, and to which water from an existing project can generally be delivered, upon request, within a reasonable amount of time. A reasonable amount of time may vary by project and depending on current conditions, particularly water supply and irrigation demand. PA lands are capable of economically producing crops under sustained irrigation. The failure of the landowner to provide internal ditches, perform minor leveling, or remove vegetation are not factors that prevent the designation of lands in this classification. Moreover, these reasons are not sufficient to remove lands from this classification.

### 10.2.3 Temporarily Non-Assessable Lands

TNA lands are lands that are not presently suitable for the production of crops by the application of water, through no fault of the landowner or water user. The basis for designating lands under the TNA classification are: (1) the inability of the project to deliver water within a reasonable amount of time, due to irrigation system structural deficiencies; (2) the need for major land development before irrigation can be economically applied; and (3) the conditions of soil and drainage which, in the opinion of the Designation Committee, appear to be temporary in nature, and by proper treatment and/or construction, these lands can be made economically capable of producing crops under sustained irrigation.

### 10.2.4 Presently Non-Assessable Lands

The PNA land category pertains to lands that have been determined as unlikely of ever being irrigated. (It is mentioned that this designation is also referenced as Permanently Non-Irrigable in other BIA materials and documents.) A Designation Committee at the project level can be established to review and make recommendations on the classification of certain units within the project. Again, the conditions of the land or the characteristics of the soil that make a unit unsuitable for agriculture may provide the rationale for this designation.

## 10.2.5 Reclassification for Irrigation

Assessable land classifications may be changed as circumstances dictate. Land can be upgraded from a previously lower designation (TNA, PNA) to a higher use classification, or downgraded to a lower use classification. Changes are accomplished through the combined interaction of Designation Committees, survey reports, or events (both man-caused and natural) that may affect the productivity of the land. Depending on the nature of a change, various BIA officials have the authority to recommend a change. The final authority for approval, however, rests with the U.S. Congress. Changes can be made only as follows: (1) From a higher to lower classification—changes are made through the recommendation of the Designation Committee and the approval of the Regional Director, (2) TNA to PA—changes can be affected by the Superintendent when the conditions that placed lands into the TNA designation have been removed, (3) PNA to PA or TNA—changes are made by the action of the Designation Committee and with the approval of the Secretary. This change constitutes an alteration in the ultimate irrigable acreage of the project and affects the water supply of all irrigable lands. Secretarial action to delete land must be submitted for congressional approval. The Regional Director can affect PA to TNA changes.

## 10.2.6 Authority

The authority to classify lands for inclusion in an Indian irrigation project lies with the Secretary and the Congress. The Secretary is also responsible for proper classification of project land's assessibility

status. Additionally, through delegation, the Secretary has authorized the Deputy Commissioner to initiate and direct surveys as required by necessity, directive, legislation, or agreement. Action may be initiated by landowners, water user organizations, or authorized BIA representatives.

### 10.2.7 PURPOSE OF LAND CLASSIFICATION SURVEYS

The purpose of a land classification survey is to determine which lands are practicably irrigable and, thereby, suitable to be included in an irrigation system. Reclassification surveys should be initiated on an as-needed basis, depending on the local water supply, soils, and drainage conditions of the project.

### 10.2.8 PRACTICABLY IRRIGABLE LAND

Practicably irrigable land is: (1) arable soil; (2) land to which water is, or can be, delivered; and (3) land which is, or can be made, capable of producing crops by constructing necessary facilities and other improvements for sustained irrigation production under sound engineering principles. Such sustained irrigation production should be capable of meeting annual land preparation costs, irrigation project O&M costs, equipment replacement costs, and employee wages or a suitable family income in accordance with local standards.

### 10.2.9 IRRIGATION DEVELOPMENT

In conducting soil surveys and land classification designations, regard as to whether irrigation development of the designated practicably irrigable land will in fact occur shall not be taken into account.

### 10.2.10 CAPITAL EXPENDITURES

Capital expenditure items include, but are not limited to, the following four items:

- Constructing delivery systems to deliver irrigation water
- Clearing and preparing land for crop production
- Constructing adequate drainage facilities
- Constructing water storage and delivery facilities to service a project, shall be discounted pursuant to the deferral of the repayment of construction charges as authorized by the Leavitt Act (25 U.S.C. 386a).

### 10.2.11 PROJECT BENEFITS

Project benefits, as stated above, should reflect the surrounding circumstances to ensure the implementation of the policy of the Federal Government to obtain economic benefits for the Tribes and their members through the development of their human and natural

resources and, thereby, improve the quality of life on the reservation. (Availability of water will be determined in accordance with the Winters Doctrine, *Winters* v. *United States*, 207 U.S. 564 [1908]).

## 10.2.12 Purpose of Reclassification Surveys

The purpose of reclassification surveys are to make adjustments in previous classifications. Adjustments may be necessitated due to: (1) inability of the project to deliver water (no water or no facilities); (2) inability of land to beneficially use water (has become waterlogged, saline, or alkaline); or (3) land lost due to erosion or use change to nonagricultural purposes. Land may be reclassified from any one classification to another.

## 10.2.13 Purpose of Interim Classification

Interim classifications are made between formal classifications and will be verified and formalized at the time of the next reclassification. Their purpose is to: (1) make adjustments as the need arises; (2) avoid or alleviate hardship cases; (3) simplify bookkeeping where changed assessments are involved; and (4) help improve public relations and maintain just and equitable assessments. Interim reclassifications would be justified before a full-scale reclassification when such incidents or circumstances occur, as follows:

A sudden channel change that cuts a portion of irrigable land off from delivery works in a manner such as to make water available to it only

by excessively costly works, or development of other conditions causing land to become economically nonirrigable.

## 10.2.14 Committee

A Classification or Reclassification Committee should be established for each irrigation project.

### *10.2.14.1 Purpose*

The purpose of the Classification or Reclassification Committee is to use the necessary surveys to: (1) maintain contacts with the water users; (2) compile data and develop a final report; and (3) establish the assessable status of all lands within economical reach of the delivery system of an approved irrigation project, for which an adequate water supply is available.

### *10.2.14.2 Composition*

The committee shall be comprised of three members nominated by the Superintendent ,or in case of Wapato, San Carlos, and Navajo Projects, by the Project Engineer or Manager and approved by the Regional Director. The first committee member, representing the BIA, will serve as chairman and be fully responsible for action, progress, and completion of assignments, including technical and clerical work. The second committee member will represent the Tribe (including individual Indians) that owns irrigated lands. The

third member should be selected to suit the particular project involved. If it is entirely an Indian project, such as Salt River, Colorado River, or Duck Valley, the third committee member may represent the Tribal Government. If the project contains a relatively small acreage of assessable non-Indian land, the third member may be a representative of the Tribe. If the project includes an appreciable acreage of non-Indian assessable land, the third member should be a representative of the non-Indian landowners.

Committees may be appointed on a unit basis or an entire project basis, as deemed appropriate for the particular project concerned. The BIA member should represent an entire project. The landowner representatives, however, may be changed, if advisable, to suit dissimilar or widely separated units.

The committee members who are not BIA representatives shall be designated Field Assistants. The series and grade of these positions will be dependent upon the duties and responsibilities involved and the qualifications required to perform the work. The Field Assistants shall be hired on an as-needed basis so they can perform job duties intermittently as the work demands.

### *10.2.14.3 Qualifications*

The BIA representative must be well informed of the responsibilities and requirements involved in efficient and acceptable project operation and understand the fundamentals of irrigation farming. They must also be capable of furnishing the technical advice and interpretations necessary to properly guide committee decisions.

Finally, they must be able to provide stable and objective chairmanship, leading to just recommendations, with consideration for both individual and group interests. All members of the committee must be individuals of integrity, with good reputations, who are highly regarded in their circles of acquaintance. They must be capable of forming and expressing sound opinions and able to work as team members with a single purpose. The second and third committee members, particularly, should be well informed about agricultural habits and the problems of irrigation farming, including beneficial use of water in the area involved.

### 10.2.14.4 *Course of Action*

The methods or course of action followed by a committee shall be in accordance with technical assistance recommendations from each Regional Office and as supplemented by the Superintendent or Project Engineer. Such instructions should vary in accordance with the particular conditions existing at each project, and the committee should be provided with those instructions in writing before starting work on any assignment.

### 10.2.14.5 *Financing*

The cost of reclassification surveys and reports shall be financed in accordance with the funding situation on each project being considered. The means of financing shall be recommended by the Agency or Project Office and approved by the Regional Office.

### 10.2.14.6 Final Report

The work of the Classification Committee should be summarized to show: (1) for irrigation projects not heretofore designated, by each farm unit contract the recommended classifications in acres; (2) for projects previously classified, the tabulation should indicate the previous classifications, the proposed classification, decrease or increase in acres between the previous and new classification.

Along with the tabulation, the Classification Committee should submit a narrative report, indicating the general makeup of the committee, the methods used in classification determinations, and the length of time the committee has functioned.

The report should have the approval and recommendations of the Superintendent and be forwarded to the Regional Office for review and approval before submission to the Central Office of the Bureau of Indian Affairs. If the Central Office of the Bureau of Indian Affairs endorses the report, it will be forwarded to the Assistant Secretary of Indian Affairs for consideration and approval.

Any actions taken pursuant to the Act of June 22, 1936 (49 Stat. 1802) cannot become effective until approved by Congress.

CHAPTER 11

# WATER USER PARTICIPATION

## 11.1 Background

O&M activities at BIA Indian irrigation projects are primarily funded by assessments charged to water users. O&M funding on some projects is federally subsidized. However funded, all irrigation project employees need to keep in mind that they are a service-oriented organization, with a primary responsibility to water users. Therefore, it is good business practice, and required by regulation and the IAM, to meet with the water users to discuss the O&M of the irrigation project.

Part 25 CFR 171.1 (c) states:

> *The Official-in-Charge is responsible for . . . the proper operation, maintenance, and administration of the irrigation project or unit. In making such judgments, the Official-in-Charge consults with water users and their representatives, and with tribal representatives, and seeks advice on matters of program priorities and operational policies. . . .*

Part 50, IAM Chapter 1, 1.2.B, states:

> *Provide opportunities for participation by water users and Tribes in matters impacting irrigation project operations;*

Part 50, IAM Chapter 1, H.17, states:

*Meet regularly with water users to discuss proposed O&M assessment rates, water apportionments, and general operation and maintenance of the project;*

## 11.2 Frequently Asked Questions

**Why meet with the water users?**

As stated above, water user fees pay for the O&M of the project (i.e., salaries, equipment costs, etc.). The water users usually will know their area of the irrigation project better than employees of the project. They may be able to provide good suggestions on fixing problems and maintenance needs, and may be able to assist in performing the work. The water users want the irrigation project to operate efficiently; many depend on irrigation for their livelihood.

Water users are interested in what is planned for the project during the year. They may be wondering why no work is planned in their area. Having these meetings will prevent the staff from answering general questions over and over. It could provide information for all water users on the plan for the entire project.

**What should be discussed at these meetings?**

At a minimum, the following items should be covered during water users meetings:

(1) **Annual Budget and Work Plan**—This is what most water users are interested in. An important factor is to explain the budget breakdown as follows:

a. **Administration**—Project manager and irrigation accounting technicians salaries and office costs.

b. **Operations**—Majority of ditchriders salaries and their equipment - pickups, etc.

c. **Maintenance**—Majority of equipment operator salaries, maintenance equipment (including the cost of operating and maintaining the equipment), cost of transporting and purchasing equipment, ditchrider salaries and their equipment when involved in maintenance, and maintenance contracts.

The above items represent the basic breakdowns. Keeping track of these costs will assist the project manager in explaining project costs to the water users.

If possible, it is recommended that two water user meetings take place: one in the fall and one in the spring. The fall meeting should cover the work performed during the year and allow the water users to comment on the way work progressed and how the system was operated. The water users could give suggestions for work to be performed the following year.

The annual work plan should be discussed with the water users. The plan should be based on the fall meeting with the water users, items

noted from the ditchrider's diaries, and other sources. If a long-range plan is available, it should be an item for discussion. This would show the water users which areas will be worked on this year and which areas are scheduled for future years.

(2) **Proposed O&M Assessment Rates**—Any proposed changes in the O&M rates should be discussed. The project manager should explain the justification for the rate increase. Presentation of the budget and work plans would be helpful.

(3) **Operational Policies**—If operational policies change, they should be discussed. If it is a drought year, or there are changes in water rights or tribal water codes, water apportionments should be discussed.

**Who should the project managers meet with?**

The project manager should meet and consult with the water users, their representatives, and tribal representatives. Other forums for providing information in a timely manner would be newspapers and radio.

Water user associations may be formed by the water users and could act as representatives for their unit. Some user associations have provided a contract source for the BIA to provide maintenance work. At least one water user association has contracted the O&M for their unit. It is recommended that a copy of water users association by-laws be kept at the Project Office.

**What authority do these groups have?**

There is no authority with respect to the management of the project. The Official-in-Charge has the authority and responsibility for the proper operation of the irrigation project.

CHAPTER 12

# FINANCIAL MANAGEMENT

## 12.1 O&M Budget

### 12.1.1 INTRODUCTION

This section introduces the primary element of irrigation program financial management. It discusses the essential steps for developing the O&M Budget and the Program of Work, which are essential for making proper O&M assessments.

All lands suitable for irrigation, to which water can be delivered through constructed works of the Indian irrigation projects, are subject to O&M assessments (whether water is used or not) unless exempted by legislation or specific regulations. The O&M Budget (Financial Program Plan [FPP] forms) and the Program of Work (formerly Form 5-5503) summarize the budgeting information for submission to BIA management.

The steps recommended below should provide the manager the necessary information to complete the BIA forms. Completing the forms is a matter of transferring the information from the budget, schedules, and planning documents to the standard BIA forms. It is recommended that the procedures detailed in these sections be followed in order to develop overall uniformity in the BIA's irrigation budgeting process.

## 12.1.2 O&M BUDGET TEMPLATE

The O&M Budget shall be prepared using an on-line budget template form. The O&M Budget template is currently under development and will be available for fiscal year 2003. Project staff will receive training and detailed instructions as the online O&M Budget template becomes available.

## 12.1.3 PLANNING

Although schedules may differ from project to project, all projects use some form of scheduling to plan and administer O&M activities. See Appendix B for a schedule of typical irrigation program planning activities.

## 12.1.4 PROGRAM OF WORK JUSTIFICATION

A project manager and/or engineer is responsible for writing a Program of Work Justification for the planned project year. The justification provides a rationale for the budget and is part of the Irrigation Program of Work. It should be brief and contain the following elements as a minimum:

- Introduction (what is contained in the O&M Budget and Program of Work)
- Statement of needs (all essential O&M tasks/activities and the associated costs, as addressed in the O&M Budget)

- Objectives (a summary of the objectives from each activity)

- Summary (how the project personnel will meet the objectives during the irrigation season)

The Program of Work Justification process can then proceed, providing a brief explanation of what the O&M Budget contains. The completed package (i.e., O&M Budget, Program of Work, and Program of Work Justification) should be provided to BIA management.

### 12.1.5 REQUIRED REVIEWS AND APPROVALS

Review and approval of the annual O&M Budget, including the Program of Work and Program of Work Justification, is required by BIA management. The standard review and approval process is described as follows:

- **Agency Superintendent/Officer-in-Charge:** Develops the annual O&M Budget package and submits it to the Regional Office for recommendation and concurrence.

- **Regional Irrigation Engineer:** Reviews the budget package for validity, recommends changes (if necessary) to the agency, and recommends budget package to Regional Director.

- **Regional Director:** Concurs with the budget package and submits it to the Office of Trust Responsibilities for final approval

- **Director, Office of Trust Responsibilities:** Reviews and approves O&M Budgets, which provides for the expenditure of

irrigation O&M funds. Because the Director, Office of Trust Responsibilities (OTR) is the official allottee for all irrigation funds, final approval rests with the Director.

## 12.1.6 O&M BUDGET PREPARATION

O&M costs are project expenses for administration, O&M, and rehabilitation. Depending on the activity, they include at least:

- Personnel salary and benefits for the facility engineer/manager and employees under their management control
- Materials and supplies
- Vehicle and equipment repairs
- Equipment, including transportation, fuel, oil, grease, lease, and replacement
- Capitalization and depreciation costs
- Acquisition costs
- Maintenance of a reserve fund available for contingencies or emergency costs for (and insuring) reliable operation of the irrigation facility infrastructure
- Other costs the BIA determines necessary to properly perform the activities and functions characteristic of an irrigation activity

The irrigation projects are required to prepare their O&M Budget using the online O&M Budget template, which includes the required FPP forms. A list and brief description of each form follows:

- FPP-1: Authorized Position/Personnel Services Plan
- FPP-2: Travel Plan
- FPP-3: Equipment Acquisition and Procurement Plan
- FPP-6: Summary of all costs (FPP-1 through FPP-3)
- Other costs (list of proposed maintenance activities for the current year, including cost estimates for each activity)

**Authorized Position/Personnel Services Plan (FPP-1)**—Include salary and fringe benefits costs associated with the management, O&M, and rehabilitation of the project. These are the full-time and part-time employees, as well as seasonal workers employed during the irrigation season. Employees necessary for administrative support are generally covered under personnel costs for a project. Since personnel needs are essential, it is recommended that the proposed O&M Program of Work be reviewed to determine these requirements for the irrigation season. All personnel, their salary rates, and benefits should be detailed in the project plan which, in turn, can be utilized for estimating personnel costs.

Fringe benefit costs are also part of personnel costs. They include all legally mandated payments (i.e., Federal and State employment taxes, annual and sick leave, and any other benefits, such as holidays. Since individual rates may vary, it is recommended that a percentage of the total personnel costs be utilized in estimating employee fringe benefits (see Payroll Detail Report for fringe benefit).

**Travel Plan (FPP-1)**—Travel plan includes such costs as per diem, lodging, airfare, and personally owned vehicle costs to attend training, meetings, etc. Record travel costs on FPP-2, then summarize costs on FPP-1 via the online O&M Budget template.

**Equipment Acquisition and Procurement Plan (FPP-3)**—The O&M Budget should include an accurate estimate of proposed procurement, including equipment acquisition. Further investigation by contacting equipment vendors will also provide valid unit rental rates to use when preparing the annual O&M Budget. In summary, sources should be consulted to derive an accurate projection of equipment requirements for the project year.

**Materials and Supplies (FPP-6)**—Material and supplies costs include office supplies, gasoline, diesel and oil, herbicide, parts (vehicle and other), grease, antifreeze, tires, lumber, cement, construction hardware (nails, bolts, nuts, etc.). Projects should consider preparing supplementary schedules to support the summary costs recorded on FPP-6. Construction costs should not be included on this form.

**Other Costs**—Other costs associated with the O&M and rehabilitation of the project include purchased power, pumping costs, capitalization and acquisition expenses, operation of satellite offices and other facilities, communications, the cost of training workshops and seminars, and the maintenance of storage rooms and storage yards. Costs in this category may vary by project, depending on the unique requirements at each project.

**O&M Reserve Requirement**—The irrigation IAM requires the BIA to "prepare contingency plans for events or emergencies which might interrupt the delivery of irrigation water." As such, the irrigation projects should maintain cash reserves sufficient to support anticipated events and/or emergencies that may arise. Guidelines for establishing and maintaining such reserves are presented in this section.

The amount of cash that should be maintained in reserve will vary by project. Reclamation has developed guidelines for estimating an adequate reserve of O&M funds. The amount is based on a percentage of the annual O&M collected by the project each year. Typically, the smaller the acreage of the project, the larger the percentage of cash reserve. Conversely, larger projects, that collect larger total sums of monies each year, typically keep less percentage in cash reserve.

It is recommended that all projects use table 2 to estimate the amount of funds that should be maintained in the project reserve account at all times. The guidelines in table 2 provide a range of values. At their discretion, the Regional Director and/or the Official-in-Charge of any project may determine that, due to unusual circumstances, project reserves should be maintained at a higher amount. If this is determined, the proposed amount and supporting documentation should be provided in writing and kept on file at the irrigation project. The O&M reserve requirement should be supported by a supplementary schedule and be factored into the rate calculations that are entered into FPP-6.

Table 2.—Determination of emergency reserve funds for BIA irrigation projects

Emergency reserve fund determination guidelines[1]

| 5-year average annual O&M costs ($) | Minimum reserve ($) | Maximum reserve ($) | Minimum reserve (% of annual O&M) | Maximum reserve (% of annual O&M) |
|---|---|---|---|---|
| 20,000 | 20,000 | 30,000 | 100 | 150 |
| 30,000 | 25,000 | 40,000 | 83 | 133 |
| 50,000 | 35,000 | 50,000 | 70 | 100 |
| 75,000 | 45,000 | 70,000 | 60 | 93 |
| 100,000 | 55,000 | 85,000 | 55 | 85 |
| 150,000 | 70,000 | 110,000 | 47 | 73 |
| 200,000 | 75,000 | 120,000 | 38 | 60 |
| 300,000 | 80,000 | 155,000 | 27 | 52 |
| 400,000 | 100,000 | 200,000 | 25 | 50 |
| 500,000 | 112,500 | 225,000 | 23 | 45 |
| 1,000,000 | 200,000 | 400,000 | 20 | 40 |
| 2,000,000 | 300,000 | 700,000 | 15 | 35 |
| 3,000,000 | 400,000 | 900,000 | 13 | 30 |
| 4,000,000 | 500,000 | 1,000,000 | 13 | 25 |

[1] From Bureau of Reclamation's "Review of Operation and Maintenance Program Field Examination Guidelines," 1991.

## 12.1.7 Calculation of O&M Rate

Total assessable acres are defined as the total acres that the project is authorized to deliver water to. Total O&M costs are all the administrative, O&M, and rehabilitation costs the project incurs to deliver water. These costs do not generally include costs above the project engineer/manager level. O&M costs do not include charges to recover the cost of construction.

O&M Rate = Total costs per acre = total O&M costs divided by total assessable acres

### 12.1.8 PUBLIC NOTIFICATION

All projects must publish O&M rate changes in the ***Federal Register*** **in accordance with the requirements of the Federal Register Act, P.L. 89-554, Part 303 of the *Departmental Manual*.** Projects should submit proposed O&M rate changes to the Office of Trust Responsibilities by July 1st to allow sufficient time for proposed publication, public comment, and publication of the final rates.

## 12.2 Irrigation Billing and Collection

### 12.2.1 REVIEW OF LAND OWNERSHIP RECORDS

The land ownership records of the Realty Branch are an important source of information for planning the irrigation program year. By using these records, irrigation personnel can correctly identify responsible landowners for the payment of irrigation charges. Land ownership is not static, however, and transactions such as sales, transfers, exchanges, and probates may change the complexion of an irrigation unit at any time during the season. Moreover, lease transactions, renewals, and expirations will also have a bearing on the responsibility for payment of irrigation charges. Thus, determining land ownership is a prerequisite to ensuring that the correct responsible parties are identified for the payment irrigation charges. A review process should be established to ensure that:

- The total acreage of assessable lands has been included in the upcoming season's records
- The correct responsible parties to the land have been identified
- The controls for the acreage are accurate and current prior to the irrigation season
- Current records are made available to the irrigation office in a timely manner (within 3 business days of any changes/updates) so updates can be made in the National Irrigation Information Management System (NIIMS) to correctly reflect irrigation charges

The review process should also be planned before the irrigation season begins, since this work has a direct impact on the accuracy of irrigation assessments and billings. Since the Realty Branch maintains the land ownership records, it is essential for irrigation personnel to rely on the Realty Branch to ascertain the ownership status of the land. Status changes emanating from sales, exchanges, transfers, and probates that have been processed prior to the review are extremely important transactions.

### 12.2.2 Review Procedures

The Official-in-Charge (or his/her designee) are responsible for ascertaining land ownership and the total acreage of irrigable land. Certain actions are required on the part of both the Realty Branch and the Irrigation Office, so that amounts for total and assessable acreage

correlate. The following steps provide a general framework for the land ownership review.

### *12.2.2.1 Fee Patent Land*

1. The agency form, Notice of Transfer of Land Ownership, is routed from the Branch of Realty to the irrigation project within 3 business days of each realty record update. All sales, gifts, exchanges, and partitions are indicated as transactions. Probates involving land ownership changes among Indian landowners are recorded as separate documents. Probate data is handled in the same way as trust land.

2. Check the realty number for the allotment or land tract against the master list.

   (a) If the tract is not in the project, make a copy for the record and file.

   (b) For tracts that are in the project, check the NIIMS Master Land Base to see if the tract has Presently Assessable (PA) and/or Presently Non-Assessable (PNA) acres. It is essential that the totals for each of the land designations add up to the total for all lands. If there are no PA acres, state this in the records.

   (c) Make appropriate changes as described below and copy for the file for those tracts in the irrigation project.

3. Record transfers of ownership for fee patented lands with PA acres.

### 12.2.2.2 *Tribal (Trust) Lands*

1. If the trust land of a reservation is changed through a change in ownership transaction, the Irrigation Office must show PA, TNA, and PNA lands. The Realty Branch will not have this data available and it must come from the Irrigation Office.

2. The assignment of a new tract number, by the Irrigation Office, requires that a journal voucher (SF-1081) be prepared, which modifies the acreage of the parent tract and indicates the acreage of the new tract. Parent tract acreage (gross, PA, TNA, and PNA) must equal the total acreage of the subdivided, smaller tracts. A sample journal voucher (SF-1081) is provided in Appendix C.

When a land ownership change involves an exchange from Trust (individuals) to tribal (or vice versa) or from trust (the BIA cannot buy land from Tribes—this must be through an exchange of Trust land only) to Fee Status, a journal voucher must be prepared. Each journal voucher must be signed by the person preparing the voucher and be approved by the project engineer/manager. The journal voucher must be dated and assigned a number.

## 12.2.3 BILLING PROCEDURES

Billing data changes that accompany land ownership changes are listed below.

### *12.2.3.1 Leases of Project Lands*

The leasing of Indian land for irrigation is commonly practiced to provide revenues to the Indian landowner. The responsibility of the landowner for O&M assessments and payment is not diminished by the act of leasing. However, the BIA has established mechanisms to ensure that the lessee is the responsible party for the payment of O&M charges before water is provided. Thus, it is essential to properly record all leases and accurately maintain the control totals. This section provides recommendations and guidance for controlling the leasing process within BIA irrigation project or system.

Controlling the leasing process also requires close interaction and coordination between the Irrigation Office and the Branch of Realty prior to the irrigation season. Realty is responsible for all transactions relating to a lease, including relating information to the Irrigation Office within 3 business days of any changes/updates. Lease information received from the Realty Office must be properly recorded and maintained by the irrigation project staff.

## 12.2.4 NATIONAL IRRIGATION MANAGEMENT INFORMATION SYSTEM

### *12.2.4.1 Billing*

Billing must proceed in a timely manner and must take place prior to the irrigation season. This is essential, since water users must pay the O&M assessment prior to the deliver of water. The planning calendar illustrates the deadline for the procedure to be completed. All payments should then be recorded and posted to the appropriate ledgers and journals.

The Irrigation Office requires the following information:

- Tract information
- Ownership information
- Name/address information
- Taxpayer Identification Number (TIN)
- Lease information

Generally, the agency has the ownership, name/address, TIN, and lease information for trust lands. Effective with the passage of the Debt Collection Improvement Act of 1996, projects are required to obtain TINs from water users. NIIMS has a mandatory TIN field to facilitate this requirement. The agency is responsible for providing this information to the Irrigation Office on a timely basis (within 3 business days of any changes/updates). Information for fee land is recorded with the county.

The irrigation project staff input the ownership, name/address, and lease information into NIIMS.

O&M bills and construction bills are issued annually. Prior to issuing the annual bills, the parameter file in NIIMS needs to be updated. This file includes the project name/address, contact person, starting bill numbers, O&M rates, construction rates, and rates for any miscellaneous charges (such as storage fees and minimum bill fees).

Review the pre-bill list. This report is option 23 from the NIIMS batch report menu. There are 3 options:

- O&M bills only
- Construction bills only
- All bills

Choose the appropriate option. Review this report for accuracy. When the pre-bill is correct, print the bill's (annual – final) report. This report is option 22 from the NIIMS batch report menu.

Bills are printed and mailed from BIA's contracting office, the National Business Center (NBC) in Denver. Contact NBC to make arrangements for printing and mailing the bills.

### 12.2.5 NIIMS CONTINGENCY PLANS

In the event that automated computer systems, including NIIMS, are disabled or unavailable, a contingency plan should be developed by the Regional Offices in consultation with Central Office, Power and Irrigation Reconciliation Team and NBC.

## 12.2.6 O&M Payment Responsibility

The responsibility of paying the O&M assessment resides with the landowner. In cases where the land is leased, the lessee shall be billed for the O&M assessment, unless specified otherwise in the lease agreement. Any unpaid O&M assessments are a lien against the land. It is essential that project managers perform reviews of landowner leasing records early in the accounting cycle, to derive an updated and accurate list of responsible parties for irrigation charges for lands within the irrigation project.

## 12.2.7 Past Due Debt

The U.S. Department of the Treasury (Treasury) requires past due debt to be reported in accordance with the Debt Collection Improvement Act of 1996 (P.L. 104-134, 110 Stat. 1321). It is necessary to report past due debt so that all unpaid O&M charges can be identified and timely collection can occur. Both leased and idle lands are included in the procedure. Reporting of past due debt depends upon the generation of O&M bills and accurate and timely posting of payments to accounts.

It is recommended that all past due O&M debt be reported to the agency Realty Office. This will enable the Realty Office to withhold these charges from lease bonds when notified of the delinquency.

## 12.2.8 COLLECTIONS

References:

- 31 CFR Parts 900, et al.—The Federal Claims Collection Standards
- 31 CFR Part 206—Management of Federal Agency Receipts, Disbursements, and Operation of the Cash Management Improvements Fund
- Debt Collection Improvement Act of 1996 (P.L. 104-134, 110 Stat. 1321)

Receipts are posted in NIIMS from the File Maintenance and Inquiry Menu, option 13. Receipts for payment may be issued from this option.

Review the collection data, using the Report Selection Menu, option 9, Unproofed Schedule of Collections, to ensure that the amounts equal the actual deposit. Any corrections can be made at this point. When the collections equal the deposit, a final proof of collections must be done. This is accomplished using the File Maintenance and Inquiry Menu, option 14. After the final proof, run the Schedule of Collections from the Report Selection Menu, option 1.

The collection procedures below apply to the prepayment and regular payment of O&M charges. They also provide general guidance in terms of interest payments; and in making determinations for deferring payments in the case of Indian responsible parties. In

certain instances, the procedures parallel BIA policies, where these exist and are necessary. In other instances, recommendations are provided for expediting the collection process.

## 12.2.9 REGULAR O&M PAYMENT

The agency finance office generally receives O&M payments. The management of unpaid O&M accounts, likewise, relies on these procedures for accurate and timely posting to accounts.

## 12.2.10 ADMINISTRATIVE, INTEREST AND PENALTY FEES

Pursuant to 31 CFR, 901.9, interest, penalty, and administrative fees are to be assessed on all delinquent irrigation charges. Interest, penalty, and administrative fees are based upon the bill payment process reflecting the status of irrigation charges. Effective with the passage of the revised Federal Claims Collection Standards, interest and penalty fees are assessed all State, local, and tribal governments.

## 12.2.11 PAYMENT PLANS

When a landowner is financially unable to pay the O&M assessment on time, the Superintendent or Officer-in-Charge may approve a payment plan. The Superintendent must certify that the individual is not able to pay the current assessment, based on financial records submitted by the landowner. The burden of proof of hardship lies with the landowner.

Inability to pay does not relieve the individual landowner of the responsibility of payment. Payment will still be required as specified in the payment plan. In all cases, nonpayment of the assessed rate will result in a lien on the land, which is carried forward until: (1) the O&M assessment has been paid; or (2) the land has been disposed of through a sale by the landowner, in which case all unpaid assessments encumbered by liens will be taken from the proceeds of the sale.

The BIA does not have an established procedure for determining inability to pay. Under current practices, discretion is used on a case-by-case basis. The use of discretion, however, suggests that each case should be analyzed fairly to determine an individual's ability to pay the assessed rate. The irrigation project shall maintain copies of all certification and payment plans. A sample payment plan template is provided for your use in Appendix D.

## 12.3 Debt Management

Debt collection is prescribed by Federal statute and regulations. The debt management policy derives from and complies with the following authorities:

- Federal Claims and Collection Act of 1966
- Privacy Act of 1974
- Debt Collection Act of 1982 (as amended)
- Deficit Reduction Act of 1984

- Administrative Dispute Resolution Act of 1990
- Federal Debt Collection Procedures Act of 1990
- Federal Credit Reform Act of 1990
- Cash Management Improvement Act Amendments of 1992
- Office of Management and Budget Circular A-129, revised January 1993
- Omnibus Budget Reconciliation Act of 1993
- Department of Justice 1994 Appropriation Act
- Debt Collection Improvement Act of 1996 (P.L. 104-134)
- Federal Claims Collection Standards, December 22, 2000

### 12.3.1 Due Date

Bills are due and payable within 30 days of the due date, which is printed on the bill, unless otherwise provided for by statute, regulation, contract, or agreement.

### 12.3.2 Past Due Debt

A bill is delinquent (or past due) if it is not paid within 30 days of the due date. On the 31st day after the due date, a bill is considered past due. Past due bills are subject to all collection mandates of Federal law and to the techniques and strategies management deems appropriate.

## 12.3.3 Referral to U.S. Treasury for Collection

Under the Letter of Agreement dated September 11, 1997, between the Department of the Interior and the Department of the Treasury, the Treasury will provide debt collection services for the BIA as permitted in accordance with 31 U.S.C. 3701 et seq., as amended by the 1996 Debt Collection Improvement Act. Referral of **all** debt 180 days delinquent to Treasury for collection is mandatory.

Exemptions from this requirement are:

- Debt in litigation or foreclosure, in which case the debt has been referred to the Department of Justice
- Debts whose debtors are in bankruptcy
- Debts whose debtors are deceased (in probate)
- Debts owed by Federal agencies
- Debts owed by foreign entities
- Debts which are in an administrative appeals process
- Debts less than $25.00 (per debtor)
- Debts which have been administratively offset

If a debt is referred to Treasury, it may incur additional fees of up to 30 percent. Treasury has the authority to report debt to a credit bureau, offset any Federal tax refunds or other Federal payments owed by the debtor, report the debt to a private collection agency, or refer the debt to the Department of Justice for litigation.

Once an account is referred to Treasury, the debtor will be notified by Treasury regarding future inquiries and payment on the debt. Treasury will be solely responsible for collection and any further correspondence. **Note:** BIA will not send any additional correspondence to the debtor and will not accept any further payments from the debtor for the delinquent debt.

Prior to referral to Treasury, the BIA must ensure that all records of payment received by BIA, prior to the date of referral, have been properly posted. The Superintendent or Official-in-Charge must sign a statement certifying that all debts submitted are valid. Project/ agency certifications should be sent to the OTR for centralized processing. OTR will forward all irrigation debts to Treasury.

### 12.3.4 TREASURY RECALLS

On rare occasions, it is sometimes necessary to recall a debt previously referred to Treasury. In these instances, the project is required to provide written documentation justifying the recall. The project must also provide the debtor's name, TIN, address, tract number, amount, and other pertinent data to OTR. OTR will contact Treasury and initiate the recall. Such recalls should be limited to billing errors created by inaccurate information at the time of billing.

### 12.3.5 TREASURY COLLECTIONS ON REFERRED DEBTS

Payments made by Treasury to the BIA for collection received on referred debt will be made electronically, using the Online Payment

and Collection process. These collections are processed into NIIMS centrally by NBC in Denver. Each project is notified by e-mail when collections have been posted. The project can then run a schedule of collections to obtain the detail of the collection(s).

## 12.3.6 TERMINATION OF COLLECTION ACTIVITIES

After Treasury has maintained a claim for a reasonable amount of time (e.g., 1 year) and has exhausted all attempts to collect on the claim, the claim may be returned to BIA with Treasury's recommendations. For debts returned to BIA from Treasury, it is the BIA's policy to terminate debt collection activity and discharge the debt. Once a debt has been terminated and the account closed, further collection action is prohibited. Additionally, BIA must request the release of any liens securing the debt. (See 31 CFR Parts 903.5(a) and 903.5(d)).

## 12.3.7 ESTATES/PROBATES

When a water user dies, claims for unpaid bills and bills that accrue after death, but before settlement of the estate, should be filed against the estate. Claims are settled during probate when the estate is closed. BIA will submit for writeoff any claims remaining unpaid from the closed estate. Projects shall not rebill the estate's delinquent debt to heirs. However, heirs are responsible, and should be billed, for debts accrued after they are determined to be a legal owner.

## 12.3.8 1099-C Close-Out

Discharge of debt that is $600 or more must be reported to the Internal Revenue Service (IRS) on Form 1099-C. The IRS has published guidance to assist agencies in meeting their reporting requirements. Treasury will file the 1099-C forms with IRS on BIA's behalf.

## 12.3.9 Suspension, Termination of Collection Action, or Compromising a Claim

The Assistant Secretary of Indian Affairs has the authority to suspend or terminate collection actions on a debt or to compromise a claim, exclusive of interest, penalties, and administrative charges, up to and including an amount of $100,000. Debts exceeding $100,000 require Department of Justice concurrence (Financial Administration Memorandum No. 94-022). At the discretion of the Assistant Secretary of Indian Affairs, this authority may be redelegated. Refer to Chapter 7, Part 205, of the Departmental Manual, for compromise limits and Solicitor concurrence requirements. In addition, the authority to suspend or terminate collection action is limited to $5,000 when an Assistant Secretary has an uncorrected material weakness related to debt management in the annual Federal Managers' Financial Integrity Act Report. Suspension of termination of amounts in excess of $5,000 will be referred to the Solicitor for concurrence.

CHAPTER 13

# PROGRAM ADMINISTRATION

The mission of the BIA is to enhance the quality of life, promote economic opportunity, and carry out the Federal Government's responsibility to protect and improve the trust assets of Indian Tribes and Alaska natives. In carrying out its mission, the BIA must build credibility and trust through the development of strong and competent administrative and management processes, priorities, and structures. To strengthen those processes, the Branch of Irrigation, Power, and Safety of Dams is committed to the development of up-to-date handbooks that describe the policies, procedures that irrigation personnel must follow to carry out the mission of the BIA.

## 13.1 Reporting

### 13.1.1 ANNUAL PROJECT BUDGETS, PUBLIC NOTICE PROPOSALS OF RATESETTING, AND DEFERRED MAINTENANCE

Each year, the Regional Offices shall ensure that project O&M Budgets and associated O&M assessment rate information are prepared and submitted by the regions to the Central Office by July 15 of each year. Receipt of the information by that date will allow the Central Office to assemble Federal Register Notices of Proposed Rate Adjustments by September 1 of the year. Following a 60-day comment period and 30 days for developing comment responses, the final notices of irrigation O&M rates can be published, with responses to comments by December 1 each year. The timing

of the information collection will allow rates to be in place at the outset of each calendar year. Each year, also, the Central Office is responsible for reporting to the Department an Annual Status Report on Deferred Maintenance for each irrigation project within the BIA program. The report is due to the Department by August 31 each year. To provide the Central Office with the information needed each year to complete this report, the Regional Directors shall submit the deferred maintenance report for each irrigation project within their region by August 1st.

To comply with the Government Paper Elimination Act and to facilitate data entry at the field level and data collection at the Central Office level, the Irrigation Program is currently developing a web page that will contain a link to data entry forms that will enable the above information to be collected.

### 13.1.2 IRRIGATION DEBT CANCELLATION

Information required for irrigation debt cancellation shall be submitted to the Branch of Irrigation, Power, and Safety of Dams at the Central Office by the regions on October 15 of each fiscal year, to allow the information to be processed and routed through the Department and on to the Congress by December 1 each fiscal year. Projects should submit cancellation requests to their respective Regional Offices for their review and approval. Upon approval by the Regional Director, regions shall submit cancellation request(s) to the Branch of Irrigation, Power, and Safety of Dams at the Central Office by October 15 of each fiscal year. All cancellation requests should contain sufficient