United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
PHOENIX AREA OFFICE
P.O. BOX 10
PHOENIX, ARIZONA 85001

TAKE PRIDE IN AMERICA

IN REPLY REFER TO:

BRANCH OF WATER RESOURCES
602-379-6789

JAN 10 1997

January 10, 1997

Mr. Riney B. Salmon II
Salmon, Lewis & Weldon, P.L.C.
4444 North 32nd Street, Suite 200
Phoenix, Arizona 85018

RE: Appeal on Fiscal Year 1998 Operation and Maintenance Budget and Assessment Rate - San Carlos Irrigation Project

Dear Mr. Salmon:

Enclosed please find my decision regarding the Notice of Appeal and Statement of Reasons you submitted on behalf of the San Carlos Irrigation and Drainage District concerning the FY 1998 operation and maintenance budget and assessment rate for the San Carlos Irrigation Project.

Sincerely,

Larry W. Welch

Acting Area Director

Enclosures

Decision of the Acting Area Director
Bureau of Indian Affairs (BIA), Phoenix Area Office
Regarding Notice of Appeal of the
FY 1998 San Carlos Irrigation Project O&M Assessment
Submitted by the San Carlos Irrigation and Drainage District

Decision Date: January 10, 1997

## I. Introduction

On July 25, 1996, the San Carlos Irrigation and Drainage District (SCIDD)[1] submitted to the Acting Area Director for the Bureau of Indian Affairs, Phoenix Area Office, a "Notice of Appeal of FY 1998 San Carlos Irrigation Project Assessment and Statement of Reasons" (Appeal), pertaining to the recommendation of the Project Engineer of the San Carlos Irrigation Project (Project) contained in a Memorandum to this office dated June 28, 1996, that the Project's FY 1998 operation and maintenance (O&M) assessment rate remain at $30 for each assessable acre of land as set forth in the January 23, 1995, Federal Register Notice, Vol. 80, No. 14, of the Assistant Secretary for Indian Affairs.[2]

On August 28, 1996, the Project submitted to this office a memorandum titled "Rebuttal to Salmon, Lewis & Weldon, Notice of Appeal of FY 1998 SCIP Assessment." Based on my review of the July 25 and August 28 submissions, it became clear that the BIA Pima Agency, in its capacity as operator of the Project's Indian Works on the Gila River Indian Reservation, is an interested party to the Appeal and there is no indication in either submission that SCIDD or the Project served their initial documents on the Pima Agency. On September 12, 1996, this office invited the written views of the Pima Agency (Indian Works) concerning the issues raised in the Appeal.[3] By cover memorandum dated October 24, 1996,

---

[1]There are a number of documents in the administrative record of this Appeal to which I refer generally as SCIDD documents, regardless of whether the document is signed by SCIDD's General Manager, Douglas D. Mason, or SCIDD's attorney, Riney B. Salmon II.

[2]The Federal Register Notice states that the O&M rate for the Project will be $30.00 per assessable acre for the 1995 irrigation season and subsequent seasons.

[3]SCIDD was notified by this office in a letter dated September 13, 1996, that the views of the Indian Works had been requested. By letter to this office dated October 8, 1996, SCIDD objected to the delay caused by the decision of this office to seek a response from the Indian Works. While I agree with SCIDD that the Appeal needs to be decided in a timely manner, it is my view that: (1) the input from the Indian Works was and is necessary to inform my

the Agency Superintendent submitted the views of the Indian Works to this office in the form of an October 3, 1996, Memorandum prepared by the Supervisory Agricultural Engineer in the Branch of Land Operations.

On November 7, 1996, the Project submitted two additional Memoranda responding to the Appeal. On November 26, 1996, SCIDD responded to the three Project submissions and the single Indian Works submission and requested that this office render its decision on the Appeal as soon as possible.

By Memorandum dated December 6, 1996, the Project addressed to this office a further response to the Appeal, and by correspondence dated December 9, 1996, served this response both on SCIDD and the Indian Works. Due to the lateness of this submission and the fact that the Project already had ample opportunity to submit a response to the Appeal, I considered whether to strike the Project's December 6, 1996, Memorandum from the administrative record or to include it in the administrative record and use it to inform my decision. Since neither SCIDD nor the Indian Works objected to the late submission, it has been included in the administrative record of the Appeal.

SCIDD responded to the Project's December 6, 1996, submission by letter to this office dated December 27, 1996. Included in this letter was notice by SCIDD pursuant to 25 CFR 2.8 that SCIDD would file an administrative appeal to the next highest level based on "inaction of an official" if SCIDD did not receive notice of this office's decision in this Appeal by January 6, 1997. On January 3, 1997, and in accordance with 25 CFR 2.8(b), this office notified SCIDD that a decision in the Appeal would be made, and a copied provided to SCIDD, no later than January 10, 1997.

It appears from the administrative record in this Appeal that all interested parties have received copies of all of the submissions made in the Appeal and have had full opportunity to respond to the issues raised in the Appeal. My decision is based on a painstaking review of the administrative record described

---

decision; (2) I was within my authority to delay decision on the Appeal until the Indian Works was afforded an opportunity to submit its views on the Appeal; and (3) my action has not resulted in any adverse consequences for SCIDD. SCIDD's October 8 letter also alerted this office to the fact that the Project had failed to serve SCIDD with its August 28, 1996, rebuttal memorandum. The Project remedied this oversight by transmitting its Memorandum to SCIDD by letter dated October 21, 1996.

above and the laws applicable to the subject matter of the Appeal.[4]

II. Standard of Review

At the outset, I would like to address the standards applicable to my review of the Appeal.

A BIA Area Director is vested with jurisdiction to decide an appeal arising under 25 CFR Part 2 if the subject of the appeal is a decision by a person under the authority of that Area Director.[5] A decision signed by an acting Area Director of the BIA has the same status as a decision signed by an Area Director.[6] The BIA has a responsibility to explain the rationale and factual basis for decisions affecting persons dealing with the BIA, and failure to provide such information is a violation of due process.[7] In appeals arising under 25 CFR Part 2, the person appealing the decision bears the burden of proving that the action complained of is erroneous or not supported by substantial evidence.[8] It is also a requirement that the administrative record in an appeal from a BIA decision be adequate to support the decision or the decision will be vacated and the matter remanded for the development of an adequate record and the issuance of a new decision.[9] Under 25 CFR 2.7, it is the responsibility of the BIA's decision official to give notice of the decision to all interested parties known to the official,[10] and a written statement of the appeal rights should be

---

[4]The submissions by SCIDD and the Project included a number of exhibits. All of the documents contained in the administrative record of this Appeal are identified in the Attachment to this decision.

[5]*Choctaw Nation of Oklahoma v. Muskogee Area Director, Bureau of Indian Affairs*, 191 IBIA 243 (February 26, 1991).

[6]*Pat Hayes v. Anadarko Acting Area Director, Bureau of Indian Affairs*, 22 IBIA 65 (June 3, 1992).

[7]*Quileute Tribe v. Portland Area Director, Bureau of Indian Affairs*, 23 IBIA 20 (October 29, 1992).

[8]*Joint Board of Control for the Flathead, Mission and Jocko Irrigation Districts v. Portland Area Director, Bureau of Indian Affairs*, 19 IBIA 31 (October 23, 1990).

[9]*White Earth Band of Chippewa Indians v. Minneapolis Area Director*, Bureau of Indian Affairs, 23 IBIA 216 (March 3, 1993).

[10]*Edward Parisian v. Acting Billings Area Director, Bureau of Indian Affairs*, 19 IBIA 109 (December 3, 1990).

included in the decision.[11]

III. Legal Authorities Specific to Project O&M

SCIDD asserts that the Project Engineer's conclusions and recommendations regarding the Project budget and O&M assessment rate for FY 1998, as reflected in the Project Engineer's June 28, 1996, Memorandum to this office, are arbitrary and capricious and a breach of the Landowner's Agreement, the 1931 Repayment Contract, the 1938 Joint Works Order, and pertinent federal regulations.[12] The Landowners' Agreement, Repayment Contract, and Joint Works Order derive from the Act of June 7, 1924, 43 Stat. 475, an act for the continuance of construction work on the San Carlos Irrigation Project, and each of these documents makes reference to Project O&M. The following sets forth the pertinent O&M provisions in these laws which I used as the foundation for my decision.

A. The Act of 1924 - This Act provides that the operation and maintenance charges associated with the land in private ownership or with land in Indian ownership but operated under lease shall be paid annually in advance not later than March 1.[13] This Act also mandated the execution of "an appropriate repayment contract in accordance with the terms of this Act and, in form approved by the Secretary of the Interior" prior to the expenditure of any construction funds authorized to be appropriated under the Act. The contract was required to be properly executed by a district organized under State law,[14] embracing the lands in public or private ownership irrigable under the Project and confirmed by a decree of a court of competent jurisdiction.[15] Finally, the Act authorizes the Secretary of the Interior to perform any and all acts and to make such rules and regulations as may be necessary and

---

[11]*Nevaco Inc. v. Pyramid Lake Tribe v. Acting Area Director, Bureau of Indian Affairs*, 24 IBIA 157 (August 31, 1993).

[12]To the extent the Project's conclusions and recommendations regarding the Project budget and O&M assessment rate for FY 1998 may be inconsistent with any of these laws, such conclusions and recommendations would not constitute a breach until they were actually implemented. It is clear from the record that the Project intends to implement its conclusions and recommendations regarding the FY 1998 O&M assessment rate in the absence of any administrative ruling to the contrary.

[13]See section 3 of the Act, 43 Stat. 476.

[14]As noted in SCIDD's Notice of Appeal at page 2, SCIDD is the irrigation district organized under state law for this purpose.

[15]See section 4 of the Act, 43 Stat. 476.

proper for the purpose of carrying out the terms of the Act.[16]

B. Landowners' Agreement[17] - The arrangement reflected in the Agreement provides that: (1) the landowners shall pay the operation and maintenance charges for the Project in accordance with the Act of 1924;[18] (2) the Secretary shall operate and maintain the Project works in accordance with the Agreement and all present and future acts of Congress;[19] (3) all of the lands included in the Project together with the interest of the landowners in the water rights of the Project are burdened with and subject to a first lien to secure to the United States the full payment of a pro rata share of the entire cost of the Project and all of the betterment, operation, maintenance charges, and any penalties therewith;[20] (4) each landowner shall pay the operation and maintenance charges fixed from time to time by the Secretary of the Interior (emphasis added) whether or not the landowner uses the water or has facilities for using the water on his land;[21] (5) the Secretary shall fix the operation and maintenance charges from time to time based on the total annual cost of the operation and maintenance of the Project[22] and such charges shall be uniform throughout the Project and made on a per acre or acre-foot basis unless otherwise provided by agreement (emphasis added) with SCIDD

---

[16] *Id.*, section 5.

[17] The form of this document was approved by the Secretary on March 24, 1926 and executed by individual non-Indian landowners who desired to have their lands included in and receiving the benefits of the Project. See Memorandum of the Solicitor, Department of the Interior (M-36208) dated April 28, 1954. The document is titled "Landowners' Agreement With The Secretary of the Interior, San Carlos Project: Act of June 7, 1924". The document incorporates a complete restatement of the Act of 1924.

[18] Landowner's Agreement, page 6.

[19] *Id.*

[20] *Id.*, page 3.

[21] *Id.*, page 7. As noted below in the sections describing the Repayment Contract and Joint Works Order, the United States and SCIDD have agreed that the O&M charges will be fixed annually, and by order of the Secretary.

[22] As noted below in the section describing the Joint Works Order, it was agreed that the O&M assessment rate would produce such amount of money as is determined by the Secretary to be necessary to meet SCIDD's proportionate share of the Joint Works O&M costs.

and the approval of the Secretary;[23] and (6) betterment charges may be added to operation and maintenance charges by agreement between the Secretary and SCIDD.[24]

C. <u>1931 SCIDD Repayment Contract</u>[25] - The Contract provides that the whole cost of operating and maintaining the works of the Project, after certain Project revenues are deducted, shall be divided equally on a <u>per acre basis</u> (emphasis added) among all of the lands of the Project, regardless of whether the lands are irrigated.[26] The Contract also anticipated the arrangement reflected in the 1938 Joint Works Order whereby the works of the Project that serve SCIDD lands exclusively would be operated and maintained by SCIDD at its expense and that works of the Project that serve Indian lands exclusively would be operated and maintained at the expense of the United States (the Indian Works). Under such circumstances, the Contract provides that the cost of operating and maintaining the remaining Project works (i.e. the Joint Works[27]) shall be divided equally on a per acre basis among all the lands of the Project and that a surcharge may be placed against all the lands of the Project for paying the O&M costs for pumps and equipment used for pumping irrigation water without regard for where such pumps are located.[28]

The Contract provides further that O&M charges for the Joint Works shall be <u>fixed annually by the Secretary</u> (emphasis added) and paid to the United States by SCIDD, and that the Secretary will give notice to SCIDD of the amount of charges to be paid annually

---

[23]Landowners' Agreement, p. 7. As noted below in the section describing the Repayment Contract, the United States and SCIDD have agreed the O&M charges will be made on a per-acre basis.

[24]*Id.*

[25]The Contract reiterates the provision in the Act of 1924 that O&M charges shall be paid annually in advance no later than March 1, as well as the provision in the Landowners' Agreement that the Secretary shall fix the O&M cost in advance from time to time based upon the annual cost of the operation and maintenance of the Project. See p. 10 of the Contract.

There are two supplements to the Contract executed in 1935 and 1947, but neither supplement contains provisions relevant to this Appeal.

[26]1931 Repayment Contract, page 7.

[27]It is the Joint Works O&M assessment which is the subject of this Appeal.

[28]1931 Repayment Contract, page 7.

in sufficient time to permit SCIDD to make the annual tax levies and to comply with the laws of the State of Arizona relating to the levy and collection of taxes by irrigation districts.[29] The Secretary also agreed in the Contract to use such means as are open to him and as he deems effective and expedient to make available to the Project on account of the Indian lands their share of the total cost of operating and maintaining the Project.[30]

The Contract includes a provision requiring full and accurate accounts to be kept at all times by both the United States and SCIDD of all receipts and expenditures and other fiscal operations in connection with the Project (with rights to inspect each other's books and accounts), and a provision that the United States and SCIDD shall inform and consult with each other as to contemplated future steps of importance.[31]

D. <u>1938 Joint Works Order</u> - The purpose of the Joint Works Order (Order) was to define the "Joint Works" of the Project (those facilities necessary to serve both Indian lands and SCIDD lands) as distinguished from the "District Works" (those facilities serving SCIDD lands exclusively), and to set forth the conditions under which SCIDD was authorized to operate and maintain the District Works. Operation and maintenance of the Joint Works would remain the Project's responsibility. The Order defines "Indian Works" as all Project works serving Indian lands and not otherwise defined as Joint Works or District Works, and provides that Indian Works shall be operated and maintained by the United States.

With regard to operation and maintenance of the Joint Works, the Order provides that:[32]

(1) the O&M costs of the Joint Works, including the administration of the Gila Decree, but exclusive of certain operation and maintenance costs associated with power generation, shall be paid by the Project landowners as provided for in the Landowners' Agreement and the Repayment Contract;

(2) the O&M costs of the Joint Works shall be paid equally on

---

[29]*Id.*, page 8. See also, SCIDD's June 26, 1996, letter to the Project, wherein SCIDD states that Arizona law requires SCIDD to make its landowner assessments by July 1 of each year to allow sufficient time for the county assessor to process and collect the landowners' payments necessary to cover the O&M assessment payment due the following March 1.

[30]*Id.*, page 9.

[31]*Id.*, page 19.

[32]See the Order at pages 7-9, page 11, 18, and 19.

account of the Indian lands and the public and private lands at a per acre rate to be established by order of the Secretary annually;

(3) the assessment rate for O&M of the Joint Works shall produce such amount of money as shall be determined by the Secretary to be the amount necessary to meet the proportionate share of the expense required by the Project to maintain and operate the Joint Works;

(4) SCIDD's share of the Joint Works' O&M assessment shall be paid by SCIDD annually in advance, not later than March 1;

(5) the United States or the Indians shall make available the Indian Works' share of the O&M costs each fiscal year in the manner provided from time to time by the Secretary in accordance with the law and the Repayment Contract;

(6) to the extent that the provisions of this Order require funds to be made available by the United States, the availability of such funds are dependent on appropriations to be made by Congress for such purposes, and the United States, through the Secretary of the Interior, will use every legal effort to secure such funds in order that the Joint Works and Indian Works may be operated and maintained in the best possible manner;

(7) the Order shall not be construed as amending or modifying the Landowners' Agreement or the Repayment Contract, but as an administrative operating order made pursuant to the provisions of the Repayment Contract; and

(8) the Secretary reserves the right to exercise any and all rights, powers and privileges given him by law with regard to the Project, as well as the right to revoke, amend, or modify the Order.

IV. Discussion of the Issues on Appeal

**A. Are the Project Engineer's conclusions and recommendations regarding the Project's O&M budget and assessment rate for FY 1998 a breach of the Landowners' Agreement?**

There are two provisions of the Landowners' Agreement implicated by the Project's recommended O&M budget and assessment rate for FY 1998. Based on the following, I have determined that the FY 1998 O&M assessment rate and budget recommendation of the Project should be remanded to the Project and the Project is directed, in consultation with SCIDD and the Indian Works and consistent with the findings and conclusions in this Decision, to: (1) review and evaluate the feasibility of an O&M assessment rate for FY 1998 that is less than $30 per acre, including the $20/acre

O&M assessment rate and budget as proposed by SCIDD (see SCIDD Exhibit 2); and (2) recommend to this office by February 1, 1997, a revised O&M assessment rate for FY 1998.

1. The Landowners' Agreement requires the Secretary to fix the O&M charges based on the total annual cost of the O&M of the Project. Based on the following, it does not appear that the Project's FY 1998 O&M assessment charges have been fixed based on an estimate of the total annual cost of the O&M of the Project.

The administrative record in this Appeal contains six different budget spreadsheets generated by the Project, at different points in time, showing projected and actual O&M budget expenditures for fiscal years 1993 through 1998.[33] Three of these budget spreadsheets were generated in calendar year 1996 for the purpose of identifying O&M budget needs for FY 1998.[34] An examination and comparison of all the budget spreadsheets reveal that from FY 1993-1996: (1) the Project consistently projected larger O&M budget expenditures than it actually expended; (2) the Project consistently underestimated its projected cash balance; and (3) the Project's cash balance increased significantly each year from FY 1993-1996 to its present balance of $2,873,099.[35]

Although the Project and SCIDD appear to agree that the

---

[33]See SCIDD Exhibits 5, 6, 7, 8, and 11; and the budget spreadsheet provided with the Project's November 7, 1996, Memoranda.

[34]See SCIDD Exhibits 5, 6, and 7.

[35]Each of the three budget spreadsheets prepared in 1996 show that the actual cash balance at the end of FY 1995 was $2,873,099. However, there is great variation among the three spreadsheets prepared in calendar year 1996 with regard to the projected cash balances for FY 1996-98. In the March 1996 spreadsheet, the projected cash balances for FY 1996, 1997, and 1998 are $2,344,099, $2,109,099, and $1,639,099, respectively. In the May 7, 1996, spreadsheet, the projected cash balances for FY 1996-98 are $2,344,000, $1,403,000, and $600,000, respectively. In the June 28, 1996, spreadsheet, the projected cash balances for FY 1996-98 are $3,039,000, $2,219,000, and $1,356,000, respectively. In addition, the Project added a new budget category, "special projects", to the May 7 and June 28 spreadsheets. The May 7 spreadsheet projects $937,000 to be used for special projects in FY 1997-98 and the June 28 spreadsheet projects $1.5 million to be used for special projects.

Project's cash balance should be around $600,000[36] the Project continues to prepare O&M budget projections for FY 1997 and 1998 which include annual cash balances significantly in excess of $600,000. In addition, the Project has included in each of its FY 1997 and 1998 O&M budget a line item in the amount of $750,000 for special projects activities on which there is no agreement among the Project, SCIDD, and the Indian Works.[37]

Based on the foregoing, it does not appear that the Project's FY 1998 O&M charges have been fixed based on an estimate of the total annual cost of the O&M of the Project.[38] Rather, it appears that the Project first estimated what its annual income will be in FY 1998 based on the $30/acre assessment and other projected revenues and then projected budget expenditures, in both its normal budget categories and in its newly created budget category for special projects, to spend down the projected revenues.

2. The Landowners' Agreement requires agreement between SCIDD and the Secretary of the Interior before betterment charges may be added to O&M charges. There are three components of the Project's FY 1998 O&M budget which are alleged to be "betterment". These are the spillway gates, new well construction, and the new office building.[39] I will address each in turn.

a. Spillway gates - The Project has a general and continuing duty to operate and maintain the spillway gates at Coolidge Dam. See *San Carlos Irrigation and Drainage District v. United States*, 877 F.2d 957, 960 (Fed.Cir. 1989) and *San Carlos Irrigation and Drainage District v. United States*, 23 Cl.Ct. 276, 281 (1991). Hence, the Project's recommendation to repair the spillway gates as part of its general and continuing duty to operate and maintain the gates is not betterment within the meaning

---

[36]See Project's August 28, 1996, Memorandum (at p. 4), SCIDD's April 9, 1996, letter (at p. 1), and also the Project's December 6, 1996, Memorandum (at p. 6) wherein it is conceded that the unobligated cash balance funds that have accumulated should be shown either as a credit to the water users in future years or used to address other critical needs of the Project.

[37]See SCIDD's Statement of Reasons at p. 10, and the October 3, 1996, Memorandum from the Indian Works at p. 2.

[38]My decision on this point is bolstered by the provision in the 1938 Joint Works Order which provides that the assessment rate shall produce such amount of money as shall be determined by the Secretary to be the amount necessary to meet the proportionate share of the expense required by the Project to maintain and operate the Joint Works. See Joint Works Order at p. 7.

[39]See Project's June 28, 1996, Memorandum at pages 2 and 4.

of the Landowners' Agreement. I note that the Project, as part of its FY 1998 O&M budget presentation, has not provided any specific cost estimates or plans regarding operation and maintenance of the spillway gates, and I remand this issue to the Project to develop such information for presentation to SCIDD and the Indian Works as soon as possible.

b. Well construction - Well construction is betterment to the extent that the new wells are not meant to replace existing Project wells. The administrative record fails to specify the precise nature of the Project's well construction proposal. The Project has not refuted SCIDD's assertion that well construction is betterment and has characterized this activity as to "drill and equip new wells". The Project also has not provided a factual basis to justify the well construction as a "replacement" activity. To the extent the well construction is "betterment" and not "replacement", the Landowners' Agreement requires SCIDD's concurrence. I remand this issue to the Project for further deliberation and consultation with SCIDD and the Indian Works.

c. New office building - Construction of a new office building is betterment except to the extent the office is necessary to replace existing facilities. The Project has not specifically refuted SCIDD's assertion that the new office building is betterment, nor has the Project provided an adequate factual basis to show that it is necessary to replace its offices.

In the Project's May 7, 1996, letter to SCIDD (at p. 3), the new office is justified based on the Project's assertion that the temporary office that houses Power Division staff does not meet applicable codes and is not suitable for an office environment, and that a new office is needed to have all managers and support staff in one office building. The Project states further that its long term need is to provide a consolidated main office, warehouse, storage, and parking facility. These assertions alone are not sufficient to justify charging the Irrigation Division with a pro rata share of a "replacement" office.

In the Project's December 6, 1996, submission (at p. 8), the new office is justified based on the Project's assertion that its staff is located in four separate structures including three 1930-1940 era buildings and a temporary trailer. The Project does not provide any factual information to show there is anything structurally wrong with these buildings, or to show the new building would result in any long-term cost savings for the Irrigation Division or the Project. The Project states further that with a new office it could consolidate its current 8,000 square feet of space into a more efficient 7,000 square feet, but that the Project really needs 10,000 square feet to meet its future

staffing needs.[40] These assertions alone are not sufficient to justify charging the Irrigation Division with a pro rata share of "replacement offices".

To the extent the new office can be justified as "replacement", the Landowners' Agreement does not require SCIDD's concurrence. I remand this issue to the Project for further deliberation and consultation with SCIDD and the Indian Works to define better the justification for this activity.

At the present time, to the extent that well construction or the new office building qualifies as "betterment", the record reflects there is not agreement between the Project and SCIDD for inclusion of these betterment charges in the O&M budget.[41]

**B. Are the Project Engineer's conclusions and recommendations regarding the Project's O&M budget and assessment rate for FY 1998 a breach of the 1931 Repayment Contract?**

There are five provisions in the 1931 Repayment Contract relating to Project O&M which must be analyzed in light of the administrative record to determine whether implementation of the Project's O&M budget recommendations would be consistent with the Repayment Contract. Based on the following, the FY 1998 O&M assessment rate and budget recommendation by the Project is remanded to the Project and the Project is directed, in consultation with SCIDD and the Indian Works and consistent with the findings and conclusions in this Decision, to:

* Recommend to this office by February 1, 1997, a revised O&M assessment rate for FY 1998 so that I may recommend to the Assistant Secretary for Indian Affairs an appropriate Federal Register Notice to fix the O&M assessment rate for FY 1998;

* Undertake a study to determine if a rate adjustment is appropriate with regard to the FY 1999 O&M assessment rate, and establish a schedule for conducting and completing such study in time to set the FY 1999 O&M assessment rate;

* Prepare a schedule, with deadlines, for review and completion of the annual O&M budget and assessment rate, including a reasonable period prior to Fact Finding meetings for water

---

[40] It is not clear whether the future increase in staffing is attributable to the Power Division or the Irrigation Division, but as is discussed below in section IV.E.10., the Project has stated its intentions to reduce its Irrigation Division staff.

[41] See SCIDD's Statement of Reasons at page 10 and pages 12-13, and the October 3, 1996, Memorandum from the Indian Works at page 2.

users to review the Project's written materials and budget proposals, which provides SCIDD with notice of the rate in sufficient time to permit SCIDD to make the annual tax levies and to comply with the laws of the State of Arizona regarding the levy and collection of taxes by irrigation districts;

* Review the opportunities described in section IV.B.3. below, explore any other feasible options, and take or recommend to my office, immediate steps not dependent upon Congressional action, to make the annual Indian prepayment in a more timely manner;

* Develop a clearer process by which the Project will inform and consult with SCIDD on all matters of importance relevant to the Contract.

1. The Contract provides that O&M charges for the Joint Works shall be fixed annually by the Secretary.[42] Based on the following, I do not believe that reliance on the 1995 Federal Register Notice issued by the Assistant Secretary for Indian Affairs setting the O&M assessment rate for the 1995 irrigation season and subsequent seasons is consistent with this Contract provision.

This contract provision is an outgrowth of the Secretary's authority in the 1924 Act "to perform any and all acts . . . as may be necessary and proper for the purpose of carrying out the terms of the Act," and further defines the duty of the Secretary set forth in the Landowners' Agreement to fix the operation and maintenance charges from time to time.

Attached to Exhibit 5 of SCIDD's Statement of Reasons is a copy of the January 23, 1995, Federal Register Notice of the Assistant Secretary for Indian Affairs regarding the Project's O&M assessment rate. The introductory paragraph of the Notice states that the BIA is decreasing the Project's Joint Works O&M assessment rate from $35 to $30 per assessable acre <u>for the 1995 irrigation season and subsequent seasons</u> (emphasis added). In a subsequent paragraph the Notice states that the basic assessment rate for the operation and maintenance of the Joint Works only <u>for FY 1995</u> (emphasis added) is hereby fixed at $30 per assessable acre of land, and reference is made to the 1924 Act, the 1931 Repayment

[42]See Contract at p. 8. This provision is reiterated in the 1938 Joint Works Order wherein it is provided that the O&M costs of the Joint Works will be paid equally on account of the Indian lands and the public and private lands at a per acre rate <u>to be established by order of the Secretary annually.</u> (emphasis added). See Order at p. 7.

Contract, and the 1938 Joint Works Order.[43]

Regardless of the disparity within the Notice on this point, the record reflects that the Project interprets the Notice to establish an O&M rate of $30 per acre for an indefinite period of years, contrary to the requirement in the Contract. In the Memorandum to the Project Engineer from the Project's Supervisory Civil Engineer dated November 7, 1996, and submitted to this office in response to the Appeal, the Project's Supervisory Civil Engineer states that the Project:

> "meets with the water users formally at Fact Finding meetings during the year to discuss mutual concerns . . . . Assessment rates are rarely discussed since they remain constant and do not vary year to year. Assessment rates are not set or adjusted by the SCIP Project Engineer nor by the Phoenix Area Director."

On page 7 of the same Memorandum, the Project's Supervisory Civil Engineer reiterates:

> "The Project does not set the per acre assessment each year . . . . Based upon recommendations from the Project, the Secretary of the Interior from time to time sets the assessment per acre for operation and maintenance of the Joint Works, as per applicable laws, agreements, and regulations applicable to the Project."

The Project's Supervisory Civil Engineer goes on to point out that the authority to set or adjust Project O&M rates has been delegated by the Secretary of the Interior down only to the Assistant Secretary for Indian Affairs.[44]

The Project has accurately stated the authority within the Department to fix the Project's O&M rates. However, I do not believe that the issuance of a Federal Register Notice purporting to fix the O&M charges for the 1995 irrigation season "and subsequent seasons" complies with our obligation under the Contract to fix the O&M charges annually. It is my view that immediate steps should be taken to prepare a Federal Register Notice for approval by the Assistant Secretary for Indian Affairs that would

---

[43]There is a discrepancy in the Notice which is not an issue in the Appeal, but which the Project should address in the near future. The Notice states the assessment is due and payable on or before the 15th of May prior to the fiscal year the assessment is for, as provided in the Act of June 7, 1924, contrary to the terms of the Act of 1924 which requires the assessment to be paid not later than March 1 of each year.

[44]See November 7 Memorandum at page 1.

supersede the January 23, 1995, Notice and would propose to fix the O&M assessment rate for FY 1998 only. It is further my view that the O&M assessment rate be fixed by annual notice rather than by a notice which continues indefinitely into future years.

With regard to the Project's role in the establishment of the annual O&M assessment rate, I concur with the statement of the Acting Project Engineer that the Project's "role in fixing the Project's assessment is limited to the conduct of studies to determine if rate adjustments should be undertaken, and the reporting of findings, conclusions and recommendations."[45]

2. The Contract requires the Secretary to give notice to SCIDD of the amount of charges to be paid annually in sufficient time to permit SCIDD to make the annual tax levies and to comply with the laws of the State of Arizona relating to the levy and collection of taxes by irrigation districts. Based on the following, it is my view that the Project's final recommendation to this office regarding the FY 1998 O&M assessment rate and budget is not consistent with this Contract provision.

Exhibit 3 of SCIDD's Statement of Reasons is a June 26, 1996, letter from SCIDD informing the Project that on June 25, 1996, SCIDD's Board approved a $20 per acre assessment for FY 1998. SCIDD's action was based on:

* SCIDD's dissatisfaction with the Project's May 7, 1996, response (Project Exhibit 3) to SCIDD's April 9, 1996, comments (SCIDD's Exhibit 1) on the March 6, 1996, Fact Finding meeting about the proposed O&M budget for FY 1998;

* the Project's failure to address SCIDD's June 12, 1996, comments (SCIDD's Exhibit 2) on the May 22, 1996, Fact Finding meeting about the FY 1998 proposed O&M budget; and

* the Project's failure to respond to SCIDD's proposal for an O&M budget for FY 1998 based on a $20 per acre assessment as set forth in SCIDD's June 12, 1996, letter to the Project.

SCIDD's June 26 letter also reminded the Project of SCIDD's duty to make landowners' assessments by July 1 in order to allow sufficient time for the county assessor to process and collect the landowner payments.

Exhibit 4 of SCIDD's Statement of Reasons is a one page letter from the Project Engineer to SCIDD dated June 27, 1996, (stamped "hand delivered") informing SCIDD that the Project concluded the FY 1998 Joint Works O&M assessment should remain at $30 per acre.

[45]See November 7, 1996, Memorandum from the Acting Project Engineer to the Phoenix Area Director at page 1.

Exhibit 5 of SCIDD's Statement of Reasons contains a one page letter dated June 28, 1996, from the Project to SCIDD in response to SCIDD's June 12 and June 26, 1996, letters regarding the FY 1998 O&M assessment, as well as a copy of the January 23, 1995, Federal Register Notice, a revised O&M budget for FY 1998 prepared by the Project, and a Memorandum from the Project to my office setting forth the basis for the Project's recommendation that the O&M assessment remain at $30 per acre for FY 1998. The Project's June 28, 1996, letter states that draft minutes of the two Fact Finding meetings would be available within one week but the administrative record does not include these draft minutes or any final minutes.

Consistent with my decision above that the O&M charges should be fixed annually, it is my view that notice to SCIDD regarding the Project's final recommendation to this office on the FY 1998 O&M assessment rate and budget, which is dated less than a week prior to July 1 and was provided to SCIDD after the date of its June Board meeting, is not consistent with our obligation in the Contract to give SCIDD notice of the amount of charges to be paid annually in sufficient time to permit SCIDD to make the annual tax levies and to comply with the laws of the State of Arizona relating to the levy and collection of taxes by irrigation districts.

I note that SCIDD requests that the Fact Finding meeting to discuss the succeeding year's O&M budget be held no later than February 1 and that written notice of the meeting and copies of information to be discussed at the meeting should be provided with sufficient review time for SCIDD.[46] I note also that SCIDD requests that the Project adopt specific deadlines by which the annual Fact Finding meetings will occur and specific time period during which the affected water users will be allowed to review written materials prior to such meetings.[47] As a general matter, these appear to be reasonable requests. In light of the work remanded to the Project and the water users with regard to the FY 1998 O&M assessment rate and budget, March 1 may be a more reasonable deadline for completion of the budget review process for the FY 1999 O&M assessment rate. However, I remand to the Project, in consultation with SCIDD and the Indian Works, the task of adopting an appropriate and specific schedule and deadline for this activity.

3. The Contract provides that the Secretary shall use such means as are open to him as he deems effective and expedient to make available to the Project the Indian lands' share of the total cost of operating and maintaining the Project. Based on the following, it is my view that there may be a number of measures available to the Project and the Area Office which would enable the

---

[46]See SCIDD's Statement of Reasons at page 7.

[47]See SCIDD's December 27, 1996, submission, at p. 2.

BIA to comply better with this Contract provision.

SCIDD asserts in its Statement of Reasons,[48] and the Indian Works confirms in its October 3, 1996, Memorandum, that the pre-payment of O&M charges associated with the Indian lands in the Project is not currently being paid on time even though the Indian Works has at least for the last two fiscal years requested, albeit unsuccessfully, a double appropriation to resolve this issue.[49] While this effort on the part of the Indian Works is commendable, its success depends on too many factors beyond the control of the Indian Works, the Project, or the Area Office, such as global budget policy considerations in the Department, the Administration as a whole, and Congress.[50]

Based on information provided in the administrative record, it is my view that a number of other means may be available to and within the control of the Area and the Project to comply with this Contract provision:

- The Project's FY 1998 revised O&M budget (dated June 28, 1996) shows a "special projects" line item of $750,000 in FY 1997 and again in FY 1998. The record shows there is no consensus on either the creation of this budgetary line item or the designation of these amounts into this line item.[51] 50% of the amounts so designated for special projects is attributable to the O&M assessment charges collected by the Project from the Indian Works and could be credited as an advance on the O&M assessment owed by the Indian Works.

- The Project's FY 1998 revised O&M budget, dated June 28, 1996, shows an unobligated cash balance in FY 1996 of $3,039,000, in FY 1997 of $2,219,000, and in FY 1998 of $1,356,000. Both the Project and SCIDD agree that a cash balance somewhere in the amount

---

[48]at pages 8-9.

[49]See October 3, 1996, Memorandum at page 2.

[50]As described above, the 1938 Joint Works Order reaffirms the obligation of the United States under the 1924 Act, the Landowners' Agreement and the Repayment Contract, including the obligation to make available the Indian Works' share of the O&M costs each fiscal year. The Order goes on to clarify that:

> "to the extent that the provisions of this Order require funds to be made available by the United States, the availability of such funds are dependent on appropriations to be made by Congress for such purposes. . . ."

[51]See footnote 37, *supra*.

of $600,000 is more appropriate.[52] 50% of the unobligated cash balance is attributable to the O&M assessment charges collected by the Project from the Indian Works and could be credited as an advance on the O&M assessment owed by the Indian Works.

- SCIDD asserts in its Statement of Reasons that the Project's Power Division overcharged the Project's Irrigation Division for pumping power payments (O&M charges) from FY 1984-1995. This assertion is confirmed in a letter signed by the Department of Justice dated February 28, 1996, and included as Exhibit 10 of SCIDD's Notice of Appeal. In addition, the Project admits the truth of this assertion and confirms that $242,613.65 plus interest will be credited to the Project's Irrigation Division.[53] 50% of this amount is attributable to the O&M assessment charges collected by the Project from the Indian Works and could be credited as an advance on the O&M assessment owed by the Indian Works.

- Included in the administrative record is a request by the Project for the Area Office to change the manner in which the Indian Works' O&M assessment is transferred to the Project each fiscal year, and thereby result in a more timely receipt of the Indian Works' O&M assessment.[54]

4. The Contract requires that full and accurate accounts be kept at all times by the United States (and SCIDD) for all receipts and expenditures and other fiscal operations in connection with the Project. The Project states, in its May 7, 1996, letter to SCIDD, that the current accounting system used by the Project, the Federal Finance System (FFS), is a credible accounting system for showing income, obligations, disbursements, fund balances, categories of expenses, etc., and that the Project staff reviews and analyzes FFS records on a daily and monthly basis. It is my view that financial record keeping by the Project under the FFS satisfies this Contract provision. There is nothing in the record to indicate that the Project manages its financial records under FFS in an inappropriate manner.[55] Both SCIDD and the

---

[52]See footnote 36, *supra*.

[53]See Project's December 6, 1996, Memorandum to this office in response to the Appeal, pages 9-10.

[54]*Id.*, attachment 3.

[55]SCIDD identifies and documents a number of problems regarding the manner in which the Project prepares and administers its O&M budget, and the manner in which the Project presents financial data derived from the FFS. The Indian Works concurs generally with SCIDD on this point without providing any additional documentation of the problem. This particular grievance will be dealt with more

Project refer to and make characterizations about a number of annual audits of Project accounts.[56] However, neither SCIDD nor the Project included any documentation regarding such audits in the administrative record to enable any further discussion on this point.

5. The Contract requires the United States and SCIDD to inform and consult with each other as to contemplated future steps of importance. Based on the following, it is my view that the Project could develop and implement a clearer process by which it informs and consults with SCIDD on all matters of importance relevant to the Contract.

The preparation of the annual O&M budget is a step of importance envisioned by the Contract. The record on Appeal is replete with recitations of meetings and exchanges of written and verbal information about the FY 1998 O&M budget. SCIDD's primary complaint is that it had only a few days notice of the March 6, 1996, Fact Finding meeting and received no written data or information to review in advance of the meeting. This circumstance was confirmed in the Indian Works Memorandum dated October 3, 1996, and conceded by the Project in its December 6, 1996, Memorandum in response to the Appeal.

**C. Are the Project Engineer's conclusions and recommendations regarding the Project's O&M budget and assessment rate for FY 1998 a breach of the 1938 Joint Works Order?**

By and large the Joint Works Order reiterates and reaffirms the provisions in the 1924 Act, the Landowners' Agreement and the Repayment Contract. The Order states further that the Order shall not be construed as amending or modifying the Landowners' Agreement or the Repayment Contract, but shall serve as an administrative operating order made pursuant to the provisions of the Repayment Contract. To the extent that the Project Engineer's conclusions and recommendations regarding the Project's O&M budget and assessment rate for FY 1998 implicate the 1938 Order, such implications have already been discussed above.

**D. Are the Project Engineer's conclusions and recommendations regarding the Project's O&M budget and assessment rate for FY 1998 a breach of pertinent federal regulations?**

SCIDD's Appeal does not state precisely to which pertinent federal regulations it refers. I note that the BIA's Irrigation

---

precisely below in Section IV.E.

[56]See SCIDD's Statement of Reasons, pages 11-12; SCIDD's April 9 and June 12, 1996, letters; and the Project's December 6, 1996, Memorandum, page 7.

O&M regulations at 25 CFR 171.1(g) provide:

> The administration, rights obligations and responsibilities for the operation and maintenance of this project are set forth in the Repayment Contract dated June 8, 1931 as supplemented or amended, between the San Carlos Irrigation and Drainage District and the United States as authorized by the Act of June 7, 1924 (43 Stat. 475-476) and the Secretarial Order of June 15, 1938, title "Order Defining Joint, District and Indian Works of the San Carlos Federal Irrigation Project: Turning over Operation and Maintenance of District Works to the San Carlos Irrigation and Drainage District." The regulations appearing in this subchapter apply only to the Indian lands works and in the San Carlos Irrigation Project unless specified otherwise, and should not be interpreted or construed as amending or modifying the District Contract or the Secretarial Order.

**E. Are the Project Engineer's conclusions and recommendations regarding the Project's O&M budget and assessment rate for FY 1998 arbitrary and capricious?**

The preceding aspects of my decision involve the extent to which the Project's recommended action would be within the scope of the Project's statutory authority and the associated legal documents implementing such statutory authority. There are a number of grievances in the Appeal which are not addressed directly by the 1924 Act, the Landowners' Agreement, the Repayment Contract, or the Joint Works Order, but which can be addressed under the "arbitrary and capricious" rubric. As such, the issue before me is whether any of the grievances made by SCIDD concerning specific aspects of the Project's recommended course of action for the FY 1998 O&M budget and assessment rate, which have not been addressed above, are arbitrary and capricious.

**1. Deviations from Prior Years' Budgets - Is it arbitrary and capricious for the Project to make unilateral deviations (primarily increases) in Project O&M budgets without providing sufficient information to or obtaining the consent of SCIDD and the Indian Works? Based on the following, it is my view that this issue should be remanded to the Project to provide sufficient information to SCIDD and the Indian Works to explain the expenditures on the budget spreadsheets, as well as the basis for deviations from budget spreadsheets presented or approved in prior years.**

SCIDD provides two examples to illustrate its grievance on this issue. At the Fact Finding meeting to discuss the FY 1998 O&M budget the Project provided SCIDD with a budget spreadsheet explanation of budget expenditures for FY 1996-98 which showed for FY 1996 a $500,000 dragline replacement which was not identified in the Project's FY 1996 O&M budget submitted to SCIDD two years

earlier (SCIDD Exhibit 11). In addition, SCIDD provides copies of budget spreadsheets prepared by the Project at different times which show an unexplained variation of several hundred thousand dollars in total O&M expenses for FY 1996 and FY 1997 from spreadsheet to spreadsheet. (See SCIDD Exhibits 5, 6, 8, and 11). The May 7, 1996, revised budget spreadsheet (SCIDD Exhibit 7) shows an additional variation in the total expenses. The October 3, 1996, Memorandum of the Indian Works adds further that when a Fact Finding meeting is called to analyze a proposed budget for a future year, the Project does not present a discussion on how the currently proposed budget compares with the budget projections for that year made in past years.

The Project's June 28, 1996, Memorandum shows that the Project responded to SCIDD's objections regarding the dragline replacement by agreeing not to spend the $500,000 as proposed, although the question left unanswered by the Project was the ultimate disposition of the $500,000. There is no clear response from the Project or any other explanation in the record about the huge unexplained variations in total expenses for the Project from spreadsheet to spreadsheet. This is particularly troubling due to the fact that the Project's O&M expenditures are funded by private funds collected by the Project from SCIDD landowners, and by Federal funds appropriated for the benefit of the Indian beneficiaries of the Project. It is essential from a procedural standpoint that the Project provide sufficient information to SCIDD and the Indian Works to explain the expenditures on the budget spreadsheets as well as the basis for deviations from budget spreadsheets presented or approved in prior years. The Project fails to demonstrate in the record that it has met this threshold.

**2. Timing and Conduct of Budget Review Process**

The substance of this grievance has been addressed in Section IV.B.

**3. Unnecessarily Large Cash Reserves**

The substance of this grievance has been addressed in Sections IV.A. and B.[57]

**4. Indian Prepayment**

The substance of this grievance has been addressed primarily

---

[57]The Project states in its December 6, 1996, Memorandum that the large cash reserve is addressed in the FY 1998 budget by shifting $750,000 to a "special projects" line item. In light of my decision in section IV.E.6. below relating to the special projects, this is not currently a feasible resolution of the cash reserve problem.

in Section IV.B.3. SCIDD also requests that the interest income earned on SCIDD's prepayment be credited to SCIDD until such time as the Indian prepayment is made on time by the United States. This issue is remanded to the Project and the Project is hereby directed, in the context of the findings and conclusions regarding Indian prepayment set forth in Section IV.B.3. and in consultation with the Solicitor's Office, to evaluate the extent to which interest income earned on SCIDD's prepayment and credited both to SCIDD and the United States can or should be adjusted, and to make such adjustments as appropriate.

**5. New Equipment - Is it arbitrary and capricious for the Project to establish a budget for new equipment which is not based on a formal plan or strategy for acquiring and retiring equipment? Based on the following, it is my view that the issue should be remanded to the Project for preparation, in consultation with SCIDD and the Indian Works, of a written plan or strategy upon which the acquisition and retirement of equipment and provision therefore in future O&M budgets will be based.**

The point most evident from the record about the dispute over new equipment is that no written plan or strategy exists to explain the basis for acquisition or retirement of equipment by the Project. In the May 7, 1996, letter from the Project to SCIDD, the Project Engineer states:

> "Because of the increased cost of equipment, it is my position that we should fund the equipment account at a level of $300,000 annually." (at page 3)

In the Project's June 28, 1996, Memorandum to this office, the Project Engineer states:

> ". . . .we had initially proposed to spend $150,000 for new equipment in FY 1997;[58] now we are proposing to spend $110,000. We had initially proposed to spend $300,000 in FY 1998; now we are proposing to spend $240,000[59] . . . .A portion of the funds saved by not purchasing new equipment will be used for the purpose of constructing the new office for SCIP." (at page 3)

It is essential from a procedural standpoint for the Project to provide a rationale for its new equipment budget proposals, the record fails to demonstrate this threshold.

---

[58]The Project's budget spreadsheet for its FY 1997 O&M budget Fact Finding meeting proposes a new equipment budget of $200,000. (See SCIDD Exhibit 11)

[59]The Project's budget spreadsheet dated December 1993 proposes an FY 1998 new equipment budget of $200,000. (See SCIDD Exhibit 8)

6. Special Projects - Is it arbitrary and capricious for the Project to establish a budget for special project activities as indicated in the Project's June 28, 1996, Memorandum? Based on the following, it is my view that this issue should be remanded to the Project for adjustment or elimination of its special projects budget activity consistent with the findings and conclusions below and in section IV.A.2 above.

The Project's special projects budget for FY 1997 and 1998 consists of four activities: (1) rehabilitating generators at Coolidge Dam; (2) installing spillway gates at Coolidge Dam; (3) drilling and equipping new wells on Project lands; and (4) purchasing CAP water during off peak demand periods.[60] The spillway gates and new well construction have been discussed previously in Section IV.A.2.

The Project proposes in its June 28 Memorandum to spend $2,512,011 to rehabilitate one generator unit and $3,500,000 to rehabilitate two generator units. SCIDD provided as Exhibit 9 to its Statement of Reasons a copy of a memorandum and cost estimate from the Bureau of Reclamation showing that one generator unit could be rehabilitated for $840,562. None of the Project's submissions in response to the Appeal addresses or refutes the information contained in Exhibit 9. As such, the Project's recommendation regarding this budget activity is not persuasive.

The Project proposes in its June 28 Memorandum to use the special projects budget to purchase CAP water at $41/acre-foot during off peak demand periods, but no explanation is provided as to the quantity of water to be purchased or the total expenditure that is contemplated for this activity. The June 28 Memorandum also states:

> "The response to the special projects/activities from the SCIDD representatives at the May 22, 1996 meeting was perceived as neutral. However, at our January 29, 1996 Fact Finding Committee meeting, the SCIDD representatives . . . . requested SCIP to consider purchasing CAP water during dry years." (at page 5)

Unfortunately, the Project does not provide documentation, by Fact Finding meeting minutes or otherwise, to show that SCIDD requested the Project to use O&M funds to purchase CAP water, and in its Statement of Reasons (at page 10), SCIDD expressly indicates its objection to such a budget expenditure.[61] In addition, the Project

[60]See June 28 Memorandum at pages 4-5.

[61]In its October 3, 1996, Memorandum the Indian Works stated that it was "not aware until this year that the Joint Works had $1.5 million budgeted for special projects. The special projects

acknowledged SCIDD's objection to this activity in its June 28 Memorandum, wherein the Project refers to SCIDD's proposal of June 12, 1996, for an O&M budget for FY 1998 which shows zero expenditures for special projects or CAP water. The Project's recommendation for this budget activity is not persuasive.

**7. Parts and Supplies - Are the Project's budget recommendation and its handling of its parts and supplies inventory arbitrary and capricious? Based on the following, it is my view that this issue should be remanded to the Project for further action in consultation with SCIDD and the Indian Works.**

I note that SCIDD's Statement of Reasons (at p. 11) contains a number of allegations and assertions which are not otherwise documented in the record. SCIDD refers to an audit report but does not include the report in the record. However, I note also that in its May 7, 1996, letter to SCIDD, the Project concedes that the Project currently does not have a good method of tracking the existing inventory of supplies within either the Power or Irrigation Divisions, and that control of the inventory of supplies is now an organizational goal of the Project. This matter is hereby remanded to the Project for further action in consultation with SCIDD and the Indian Works.

**8. Calculation Errors and Haphazard Accounting Practices - Are the mathematical errors and accounting practices reflected in the Project's budget spreadsheets arbitrary and capricious? Based on the following, it is my view that there is insufficient information in the record upon which to base a decision.**

I find there is insufficient information in the administrative record upon which to base a decision on this issue. While the Project's December 6, 1996, Memorandum (at p. 7) appears to admit SCIDD's allegation of "simple mathematical errors", it is not clear from the record whether this is a chronic problem or simply a one-time instance. With regard to SCIDD's allegations of "haphazard accounting practices", SCIDD refers in its Statement of Reasons (at p. 12) and the Project refers in its December 6 Memorandum (at p. 7) to certain audits. However, neither party provides documentation of its assertions in the record.

**9. New Office Building**

The substance of this grievance has been addressed in Section IV.A.2.

---

being considered with this money are all important projects that have been mentioned in the past. To my knowledge, the money for these special projects did not come about as a result of planning and adhering to a budget process." (at page 2)

10. **Personnel - Is the Project's recommended budget for personnel expenses in FY 1998 arbitrary and capricious? Based on the following, it is my view that this issue should be remanded to the Project to refine its personnel budget activity for FY 1998 to reflect more precisely the findings below.**

The Project's responses to the Appeal show a clear intent by the Project to reduce personnel costs in FY 1998. The Project anticipates "an additional 4 positions vacated within the next year, based upon an organizational chart approved by the Phoenix Area Director on March 19, 1996."[62] The Project also decided "to eliminate the Well and Pump Section by FY 1998. This action is reflected in the FY 1998 budget."[63] What is not so clear is how these reductions in personnel costs are accounted for in the FY 1998 O&M budget proposed by the Project. The June 28, 1996 budget proposes personnel expenditures for FY 1998 which are only $22,000 less than the Project's actual personnel expenditures for FY 1995 and FY 1996 and this budget amount is not a persuasive reflection of the Project's stated or intended personnel reductions.[64]

11. **Failure to Credit SCIDD for Acknowledged Overcharge**

As noted in the Project's December 6, 1996, Memorandum, the Project concedes that it failed previously to credit the Irrigation Division for the overcharge for pumping power from FY 1984-95, plus interest. The Project states that it is correcting this situation by crediting the Project's Irrigation Division with $242,613.65 as of October 8, 1996, and is proceeding to calculate the interest owed on this amount for credit to the Irrigation Division. This issue is remanded to the Project and the Project is directed to complete this task in time to reflect it in the budget spreadsheet presented at the first Fact Finding meeting in calendar year 1997.

12. **Power for Pumping**

This issue is currently in litigation. However, the United States Court of Federal Claims has held that the Project currently has the power to charge for pumping. *San Carlos Irrigation and Drainage District v. United States*, 32 Fed. Cl. 100, 201 (1994). The Court has further determined what is a reasonable pumping power charge and determined that the Project may charge the actual cost of producing the pumping power plus the costs associated with delivering the power to SCIDD. *San Carlos Irrigation and Drainage District v. United States*, No. 460-86L (Fed. Cl. Feb. 24, 1995).

---

[62]See May 7, 1996, Memorandum at page 2.

[63]See the Project's June 28, 1996, Memorandum at page 3.

[64]See the budget spreadsheets attached to the Project's August 28, 1996, and November 7, 1996, Memoranda.

While these issues are on appeal before the Federal Circuit Court of Appeals, the lower court's ruling remains the law of the case. I find, therefore, that the Project may charge for power for pumping in accordance with these rulings and remand this issue to the Project for action consistent with these rulings.

**13. Fish Barrier - Is the Project's budget recommendation for this activity arbitrary and capricious? Based on the following, it is my view that this issue should be remanded to the Project for adjustment or refinement of the fish barrier budget activity consistent with the findings below.**

The budget spreadsheets contained in the record[65] reflect that: (1) the fish barrier costs increased from $2688 to $5050 from FY 1993-95; (2) the Project estimated the fish barrier would cost $10,000 in FY 1995 and either $10,000 or $11,000 in FY 1996, but that the actual cost in each of these fiscal years was $5050; (3) the Project continues to project fish barrier costs in FY 1997 and FY 1998 to be $10,000; and (4) the Project has significantly overestimated the fish barrier costs each fiscal year. The record does not explain adequately why the Project believes its cost estimates for the fish barrier are more accurate for FY 1997 and FY 1998 than has been the case in FY 1993-96.

**14. Services**

The specific factual situation underlying SCIDD's grievance on this point has been addressed previously in section IV.E.10.

V. Summary

In the event that any party to this Appeal requires clarification of this decision, such clarification should be requested in writing and served on all parties to the Appeal.

This decision may be appealed directly to the Interior Board of Indian Appeals (IBIA) in accordance with the regulations in 43 CFR 4.310-4.340. The IBIA is located at the following address:

U.S. Department of the Interior
Interior Board of Indian Appeals
Office of Hearings and Appeals
4015 Wilson Boulevard
Arlington, VA 22203

Your notice of appeal to the IBIA must be signed by you or your attorney and must be mailed within 30 days of the date you receive this decision. It should clearly identify the decision

---

[65] See SCIDD Exhibits 5, 6, 7, and 8; and the budget spreadsheet included with the Project's November 7, 1996, Memoranda.

being appealed. You must send copies of your notice of appeal to (1) the Assistant Secretary - Indian Affairs, U.S. Department of the Interior, 4140 MIB, 1849 C Street, N.W., Washington, D.C., 20240; (2) each interested party known to you; and (3) this office. Your notice of appeal sent to the IBIA must certify that you have sent copies to all necessary parties. If you file a notice of appeal, the IBIA will notify you of further appeal procedures. If no appeal is timely filed, this decision will become final for the Department of the Interior at the expiration of the appeal period. No extension of time may be granted for filing a notice of appeal. We have enclosed a copy of 43 CFR 4.310-4.340. If you have any questions regarding this matter, please contact our Branch of Land and Water Resources at (602) 379-6789.

This decision was mailed to the following parties, first class and postage prepaid, on January 10, 1997:

Douglas D. Mason, General Manager
San Carlos Irrigation and Drainage District
P.O. Box 218
Coolidge, AZ 85228

Ralph Esquerra, Project Engineer
San Carlos Irrigation Project
P.O. Box 250
Coolidge, AZ 85228

Warren LeBeau, Superintendent
Attention: Land Operations
BIA, Pima Agency
P.O. Box 8
Sacaton, AZ 85247

This decision was hand delivered to the following person on January 10, 1997:

Riney B. Salmon II, Esq.
Salmon, Lewis & Weldon, P.L.C.
4444 North 32nd Street, Suite 200
Phoenix, AZ 85018

Barry W Welch

Attachment

Attachment

San Carlos Irrigation and Drainage District (SCIDD) v. BIA

RE: San Carlos Irrigation Project (Project) FY 1998 O&M Assessment

| | Submitted By | Description of Document |
|---|---|---|
| 1. | SCIDD | Notice of Appeal and Statement of Reasons dated 7/25/96 |
| 2. | SCIDD | SCIDD letter to Project dated 4/9/96 (SCIDD Exhibit 1) |
| 3. | SCIDD | SCIDD letter to Project dated 6/12/96, including proposed O&M budget at $20/acre (SCIDD Exhibit 2) |
| 4. | SCIDD | SCIDD letter to Project dated 6/26/96 (SCIDD Exhibit 3) |
| 5. | SCIDD | Project letter to SCIDD dated 6/27/96 (SCIDD Exhibit 4) |
| 6. | SCIDD | Project letter to SCIDD dated 6/28/96, including January 23, 1995 Federal Register Notice, revised O&M budget, and Memorandum to Acting Phoenix Area Director recommending $30/acre assessment (SCIDD Exhibit 5) |
| 7. | SCIDD | FY 1998 O&M budget spreadsheet presented by Project at March 6, 1996, Fact Finding meeting (SCIDD Exhibit 6) |
| 8. | SCIDD | FY 1998 O&M budget spreadsheet and "special projects" narrative dated May 7, 1996 (SCIDD Exhibit 7) |
| 9. | SCIDD | FY 1996 O&M budget spreadsheet dated 12/13/96 (SCIDD Exhibit 8) |
| 10. | SCIDD | Memorandum and cost estimate from Bureau of Reclamation to Project re: Coolidge Dam generator rehabilitation dated 2/2/96 (SCIDD Exhibit 9) |
| 11. | SCIDD | Department of Justice letter and documentation to SCIDD re: pumping power overcharges dated 2/28/96 (SCIDD Exhibit 10) |
| 12. | SCIDD | FY 1997 O&M budget spreadsheet prepared by Project for Fact Finding, meeting in 1995. |
| 13. | Project | Project Memorandum to Acting Area Director in response to Appeal dated 8/28/96 |
| 14. | Project | FY 1998 O&M budget spreadsheet presented by Project at March 6, 1996, Fact Finding meeting (Project Exhibit 1) |
| 15. | Project | SCIDD letter to Project dated 4/9/96 (Project Exhibit 2) |
| 16. | Project | Project letter to SCIDD dated 5/7/96, (Project Exhibit 3) |
| 17. | Project | Revised FY 1998 O&M budget spreadsheet and special projects narrative (Project Exhibit 4) |
| 18. | Project | SCIDD letter to Project dated 6/12/96 (Project Exhibit 5) |
| 19. | Project | SCIDD letter to Project dated 6/26/96 (Project Exhibit 6) |
| 20. | Project | Project letter to SCIDD dated 6/28/96 (Project Exhibit 7) |
| 21. | Project | Project Memorandum to Acting Area Director dated 6/28/96 (Project Exhibit 8) |
| 22. | Project | FY 1998 O&M budget spreadsheet revised dated 6/28/96 (Project Exhibit 9) |
| 23. | Area Director | Memorandum from Acting Area Director to Pima Agency dated 9/12/96 |
| 24. | Area Director | Letter from Acting Area Director to SCIDD's attorney dated 9/13/96 |

| | Submitted By | Description of Document |
|---|---|---|
| 25. | SCIDD | Letter from SCIDD's attorney to Acting Area Director dated 10/8/96 |
| 26. | Project | Project letter to SCIDD dated 10/21/96 |
| 27. | Pima Agency | Cover Memorandum from Pima Agency dated 10/24/96, providing 10/3/96 comments of Indian Works re: Appeal |
| 28. | Project | Project Memorandum to Phoenix Area Director dated 11/7/96 |
| 29. | Project | Memorandum from Project Supervisory Civil Engineer to Project Engineer dated 11/7/96, including comparative O&M budget spreadsheet |
| 30. | SCIDD | SCIDD letter dated 11/26/96 including copy of 1991 federal court opinion in SCIDD v. United States, 23 Cl.Ct. 276 |
| 31. | Project | Project Memorandum to Acting Area Director dated 12/6/96, including the Project's 5/7/96 letter to SCIDD, the Project's 6/28/96 Memorandum to Acting Area Director, Project's 9/19/96 and 11/20/96 Memoranda and attachments to Acting Area Director re: Indian prepayment |
| 32. | Project | SCIDD letter to Commissioner of Indian Affairs dated 1/13/81 re: power to pump Project water |
| 33. | Project | Federal court order dated 2/24/95 in SCIDD v. United States |
| 34. | Project | Project letter to SCIDD dated 12/9/96 re: Project's 12/6/96 response |
| 35. | Project | Project memorandum to Pima Agency dated 12/9/96 re: Project's 12/6/96 response |
| 36. | SCIDD | SCIDD letter dated December 27, 1996, in response to Project's December 6, 1996, submission. |
| 37. | Area Director | Letter from Acting Area Director to SCIDD's attorney dated January 3, 1997 |
| 38. | Area Director | 1924 Act authorizing construction of Project |
| 39. | Area Director | 1926 Landowners' Agreement |
| 40. | Area Director | SCIDD 1931 Repayment Contract and 1935 and 1947 Supplements |
| 41. | Area Director | 1938 Joint Works Order |
| 42. | Area Director | SCIDD v. United States, 887 F.2d 957 (Fed.Cir. 1989) |