Friends of Maine Seabird Islands. All of these relationships would be integral to successfully accomplishing our goals and objectives.

We would pursue Service acquisition similar to Alternative A, except we would increase our proposed Petit Manan NWR expansion to include 87 nationally significant seabird and bald eagle nesting islands (2,314 acres) not permanently protected. According to our Gulf of Maine Program staff and MDIFW, these 87 islands are the highest priority seabird and bald eagle nesting islands in Maine in need of permanent protection. This proposal would make significant gains in the regional recovery of several species of seabirds and bald eagles. On our mainland divisions, we would await the recommendations of the inter-agency Maine Wetlands Protection Coalition Team before determining if an expansion proposal is warranted.

We would pursue wilderness designation of eight wilderness study areas (WSAs), comprised of 13 islands. Appendix D of the Draft CCP/EIS describes in detail the wilderness review process we conducted on all current refuge lands. Until a final decision on wilderness designation, or we choose to modify the recommendation, we would manage the WSAs to maintain their wilderness character to the extent it would not preclude fulfilling the respective refuge establishment purposes and the Refuge System mission. Existing, compatible priority public uses, including hunting and fishing, would not be affected by management to preserve wilderness character and values. If formally designated as wilderness, the purposes of the Wilderness Act would become additional purposes of the affected NWRs. We would manage to achieve the establishing purposes of these NWRs, the mission of the National Wildlife Refuge System and the purposes in the Wilderness Act.

*Alternative C:* This alternative builds on Alternative B with substantial expansions of our biological, public use, and land protection programs. Funding and staffing levels would increase commensurately. We would initiate 12 new seabird habitat restoration sites over the 15-year planning time-frame, substantially increasing our responsibilities for and leadership in seabird recovery in Maine. Our biological inventory and monitoring programs would notably increase in complexity and duration, but would remain focused on seabirds, migratory landbirds, waterfowl, and shorebirds identified as a conservation priority in national and regional plans.

Under this alternative, we would implement the expanded priority public use programs identified in Alternative B, and would further supplement the educational and interpretive programs. On some seabird habitat restoration sites, we would install a live-feed video camera, to be broadcast on our website for use with a curriculum we would develop. We would also pursue a partnership with State and Federal highway administrations to construct interpretive panels at rest stops and visitor facilities along major travel ways. With regards to non-priority public uses, we would open Petit Manan, Gouldsboro Bay, and Sawyers Marsh divisions and Cross and Bois Bubert islands to furbearer trapping according to State and refuge regulations. On the mainland divisions, trapping would not begin before December to protect the thousands of fall migrating waterfowl congregating on refuge wetlands.

Alternative C proposes the largest refuge expansion. We would pursue Service acquisition from willing sellers of all, or parts of, 151 nationally significant seabird and bald eagle nesting islands (approximately 6,310 acres) not permanently protected. This proposal includes all unprotected coastal Maine islands determined nationally significant and would substantially advance the regional recovery of seabirds and bald eagles. In addition to the mainland parcels identified in Alternative B, we would pursue Service acquisition of mainland tracts from willing sellers on a case-by-case basis within Atlantic Coast Joint Venture Focus Areas. Our priority would be to acquire those tracts with high quality migratory waterfowl habitat in proximity to existing refuge lands.

Similar to Alternative B, we would pursue formal wilderness designation of the eight WSAs.

*Alternative D:* This alternative is best described as a custodial, or low-intervention, approach to administering the complex and managing its resources. We would minimize human intrusion or intervention into ongoing ecological processes, except where necessary to protect threatened and endangered species, avoid catastrophic loss to seabird populations on refuge lands, control invasive and exotic species, or enforce regulations. Funding and staffing levels would remain at current levels, with the exception of added law enforcement capabilities.

We would reduce our effort at individual seabird restoration sites, limiting our activities to non-lethal gull control, and hand-treatment of vegetation. We would no longer use sheep, prescribed burning, or mowing to manage vegetation. Our monitoring of seabird nesting success would be curtailed to an annual census of nesting pairs.

We would maintain the priority public use infrastructure currently in place on the Petit Manan Point Division, but would keep the other mainland divisions undeveloped to minimize public use. Instead, our priority public use efforts would be focused on off-site environmental education and interpretation, such as at the proposed Coastal Education Center and in schools. Hunting would not be allowed on refuge lands. Further, all islands would be closed to public use and access year round, except when a tour is organized by our staff or led by a partner operating under a special use permit.

Under Alternative D, we would continue to pursue Service acquisition from willing sellers of the 467 acres within our currently approved boundary. No expansion would occur; however, we would continue to work with our land conservation partners to support their efforts in protecting important coastal habitats in Maine. We would not pursue formal wilderness designation under this alternative.

Dated: February 26, 2004.

**Richard O. Bennett,**

*Acting Regional Director, U.S. Fish and Wildlife Service, Hadley, Massachusetts.*

[FR Doc. 04–9783 Filed 4–29–04; 8:45 am]

BILLING CODE 4310–55–P

---

## DEPARTMENT OF THE INTERIOR

## Bureau of Indian Affairs

## Rate Adjustments for Indian Irrigation Facilities

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of rate adjustments.

**SUMMARY:** The Bureau of Indian Affairs (BIA) owns or has an interest in irrigation facilities located on various Indian reservations throughout the United States. The BIA establishes irrigation assessment rates to recover its costs to administer, operate, maintain, and rehabilitate certain of those facilities. We are notifying you that we have adjusted the irrigation assessment rates at several of our irrigation facilities where we are required to recover our full costs of operation and maintenance.

**EFFECTIVE DATE:** The irrigation assessment rates shown in the tables were effective on January 1, 2004.

**FOR FURTHER INFORMATION CONTACT:** For details about a particular BIA irrigation

facility, please use the tables in the SUPPLEMENTARY INFORMATION section to contact the regional or agency office where the facility is located.

SUPPLEMENTARY INFORMATION: A notice of proposed rate adjustment was published in the **Federal Register** on September 30, 2003 (68 FR 56302), to adjust the irrigation rates at several BIA irrigation facilities. The public and interested parties were provided an opportunity to submit written comments during the 60-day period subsequent to September 30, 2003.

## Did the BIA Receive Any Comments on the Proposed Irrigation Assessment Rate Adjustments?

Written comments were received for the proposed rate adjustments for the Wind River Irrigation Project, Montana, and the San Carlos Irrigation Project, Arizona.

## What Issues Were of Concern by the Commentators?

The commenters were concerned with one or more of the following three issues: (1) Consultation with stakeholders; (2) how funds collected from stakeholders are expended on operation and maintenance; and (3) the impact of an assessment rate increase on the local agricultural economy.

## How Does BIA Respond to the Concern of Consultation With Stakeholders?

Consultations between stakeholders and any of the BIA irrigation facilities are ongoing through local meetings held periodically at different locations convenient to the stakeholders of the individual irrigation facilities. At these consultation meetings, any issue of concern by a stakeholder can be brought up and discussed such as water operations, facility maintenance, and financial management. Stakeholders also can contact BIA representatives at the specific facility serving them using the tables in the SUPPLEMENTARY INFORMATION section to discuss issues of concern.

## How Does BIA Respond to the Concern of How Funds Are Expended for Operation and Maintenance?

The BIA's records for expenditures on all of its irrigation facilities are public records and available for review by stakeholders or interested parties. These records can be reviewed during normal business hours at the individual agency offices. To review these records, stakeholders and interested parties are directed to contact the BIA representative at the specific facility serving them using the tables in the SUPPLEMENTARY INFORMATION section.

## How does BIA Respond to the Concern of an Irrigation Assessment Rate Increase and Its Impact on the Local Agricultural Economy?

All of the BIA's irrigation projects are important economic contributors to the local communities they serve contributing millions in crop value annually. Historically, BIA tempered irrigation rate increases to demonstrate sensitivity to the economic impact on water users. This has resulted in a rate deficiency at most of the irrigation projects.

Over the past several years the BIA's irrigation program has been the subject of several Office of Inspector General (OIG) audits. In the most recent audit, No. 96–I–641, March 1996, the OIG concluded, ''Operation and maintenance revenues were insufficient to maintain the projects, and some projects had deteriorated to the extent that their continued capability to deliver water was in doubt. This occurred because operation and maintenance rates were not based on the full cost of delivering water, including the costs of systematically rehabilitating and replacing project facilities and equipment, and because project personnel did not seek regular rate increases to cover the full cost of operation.'' This audit recommendation is still outstanding.

A previous OIG audit, No. 88–42, February 1988, reached the same conclusion. A separate audit performed on one of BIA's largest irrigation projects, No. 95–I–1402, September 1995, reinforced the general findings of the OIG on the BIA's irrigation program. This pointed out a lack of response by the BIA to the original findings of the OIG in addressing this critical issue over an extended period of time. The BIA must systematically review and evaluate irrigation assessment rates and adjust them when necessary to reflect the full costs to properly operate, and perform all appropriate maintenance on, the irrigation facility infrastructure for safe and reliable operation. If this review and evaluation is not accomplished, a rate deficiency can eventually accumulate. Overcoming rate deficiencies can result in the BIA having to raise irrigation assessment rates in larger increments and over shorter time frames than would have been otherwise necessary.

## Did the BIA Receive Comments on Any Proposed Changes Other Than Rate Adjustments?

We received comments on the proposed change in billing procedures for the Colorado River Irrigation Project starting with the 2004 irrigation season. Due to the possible significant impact of the proposed change on stakeholders, the BIA has deferred implementation pending further review.

## Where Can I Get Information on the Regulatory and Legal Citations in this Notice?

You can contact the individuals listed in the contact tables below or you can use the Internet site for the Government Printing Office at *http://www.gpo.gov*.

## What Authorizes Us to Issue This Notice?

Our authority to issue this document is vested in the Secretary of the Interior by 5 U.S.C. 301 and the Act of August 14, 1914 (38 Stat. 583; 25 U.S.C. 385). The Secretary has in turn delegated this authority to the Assistant Secretary—Indian Affairs under Part 209, Chapter 8.1A, of the Department of the Interior's Departmental Manual.

## Does This Notice Affect Me?

This notice affects you if you own or lease land within the assessable acreage of one of our irrigation facilities, or you have a carriage agreement with one of our irrigation facilities.

## Who Can I Contact for Further Information?

The following tables list the regional and agency contacts for the irrigation facilities where the BIA recovers its costs for local administration, operation, maintenance, and rehabilitation.

| Name | Contacts |
|---|---|
| **Northwest Region Contacts** | |
| Stanley Speaks, Regional Director, Bureau of Indian Affairs, Northwest Regional Office, 911 N.E. 11th Avenue, Portland, Oregon 97232–4169, Telephone (503) 231–6702. | |
| Flathead Irrigation Project ............... | Ernest T. Moran, Superintendent, Flathead Agency Irrigation Division, P.O. Box 40, Pablo, Montana 59855–5555, Telephone: (406) 675–2700. |

| Name | Contacts |
|---|---|
| Fort Hall Irrigation Project | Eric J. LaPointe, Superintendent, Fort Hall Agency, P.O. Box 220, Fort Hall, Idaho 83203–0220, Telephone: (208) 238–2301. |
| Wapato Irrigation Project | Pierce Harrison, Project Administrator, Wapato Irrigation Project, P.O. Box 220, Wapato, WA 98951–0220, Telephone: (509) 877–3155. |
| **Rocky Mountain Region Contacts** | |
| Keith Beartusk, Regional Director, Bureau of Indian Affairs, Rock Mountain Regional Office, 316 North 26th Street, Billings, Montana 59101, Telephone: (406) 247–7943. | |
| Blackfeet Irrigation Project | Ross Denny, Superintendent, Cliff Hall, Irrigation Manager, Box 880, Browning, MT 59417, Telephones: (406) 338–7544, Superintendent; (406) 338–7519, Irrigation. |
| Crow Irrigation Project | Gordon Jackson, Superintendent, Dan Lowe, Irrigation Manager, P.O. Box 69, Crow Agency, MT 59022, Telephones: (406) 638–2672, Superintendent; (406) 638–2863, Irrigation. |
| Fort Belknap Irrigation Project | Cleo Hamilton, Superintendent, Dan Spencer, Irrigation Manager, R.R.1, Box 980, Harlem, MT 59526, Telephones: (406) 353–2901, Superintendent; (406) 353–2905, Irrigation. |
| Fort Peck Irrigation Project | Spike Bighorn, Superintendent, P.O. Box 637, Poplar, MT 59255, Rhonda Knutsen, Irrigation Manager, 602 6th Avenue North, Wolf Point, MT 59201, Telephones: (406) 768–5312, Superintendent; (406) 653–1752, Irrigation. |
| Wind River Irrigation Project | Steven Pollock, (Acting) Superintendent, Hilare Peck, Irrigation Manager, P.O. Box 158, Fort Washakie, WY 82514, Telephones: (307) 332–7810, Superintendent; (307) 332–2596, Irrigation. |
| **Southwest Region Contacts** | |
| Larry Morrin, Regional Director, Bureau of Indian Affairs, Southwest Regional Office, 615 First Street, NW., Albuquerque, New Mexico 87102, Telephone (505) 346–7587. | |
| Pine River Irrigation Project | Michael Stancampiano, Superintendent, Kenneth Caveney, Irrigation Engineer, P.O. Box 315, Ignacio, CO 81137–0315, Telephones: (970) 563–4511, Superintendent; (970) 563–1017, Irrigation. |
| **Western Region Contacts** | |
| Wayne Nordwall, Regional Director, Bureau of Indian Affairs, Western Regional Office, P.O. Box 10, Phoenix, Arizona 85001, Telephone (602) 379–6600. | |
| Colorado River Irrigation Project | Allen Anspach, Superintendent, R.R. 1 Box 9–C, Parker, AZ 85344, Telephone: (928) 669–7111. |
| Duck Valley Irrigation Project | Paul Young, Superintendent, 1555 Shoshone Circle, Elko, Nevada 89801, Telephone: (775) 738–0569. |
| Fort Yuma Irrigation Project | William Pyott, Land Operations Officer, P.O. Box 11000, Yuma, Arizona, Telephone: (520) 782–1202. |
| San Carlos Irrigation Project Joint Works. | Carl Christensen, Irrigation Manager, 13805 N. Arizona Boulevard, Coolidge, AZ 85228, Telephone: (520) 723–6216. |
| San Carlos Irrigation Project Indian Works. | Joe Revak, Pima Agency, Land Operations, Box 8, Sacaton, AZ 85247, Telephone: (520) 562–3372. |
| Uintah Irrigation Project | Lynn Hansen, Irrigation Manager, P.O. Box 130, Fort Duchesne, UT 84026, Telephone: (435) 722–4341. |
| Walker River Irrigation Project | Robert Hunter, Superintendent, 1677 Hot Springs Road, Carson City, Nevada 89706, Telephone: (775) 887–3500. |

### What Will BIA Charge for the 2004 and Later Irrigation Seasons?

The rate tables below show the rates we will bill at each of our irrigation facilities for the 2004 and later irrigation seasons. An asterisk immediately following the name of the facilities notes the irrigation facilities where rates were adjusted.

| Name | Rate category | 2004 season rate |
|---|---|---|
| **Northwest Region Rate Table** | | |
| Flathead Irrigation Project* | Basic per acre | $21.45 |
| Fort Hall Irrigation Project | Basic per acre | 22.00 |
| Fort Hall Irrigation Project—Minor Units | Basic per acre | 14.00 |
| Fort Hall Irrigation Project—Michaud | Basic per acre | 30.00 |
| | Pressure per acre | 43.50 |
| Wapato Irrigation Project—Ahtanum Unit | Billing Charge Per Tract | 5.00 |
| | Farm unit/land tracts up to one acre (minimum charge) | 13.00 |
| | Farm unit/land tracts over one acre—per acre | 13.00 |
| Wapato Irrigation Project—Toppenish/Simcoe Units | Billing Charge Per Tract | 5.00 |
| | Farm unit/land tracts up to one acre (minimum charge) | 13.00 |
| | Farm unit/land tract over one acre—per acre | 13.00 |
| Wapato Irrigation Project—Wapato/Satus Unit | Billing Charge Per Tract | 5.00 |
| | Farm unit/land tracts up to one acre (minimum charge) | 51.00 |
| | ''A'' farm unit/land tracts over one acre—per acre | 51.00 |
| | Additional Works farm unit/land tracts over one acre—per acre | 56.00 |
| | ''B'' farm unit/land tracts over one acre—per acre 61.00. | |

| Name | Rate category | 2004 season rate |
|---|---|---|
| | Water Rental Agreement Lands—per acre | 62.00 |
| **Rocky Mountain Region Rate Table** | | |
| Blackfeet Irrigation Project | Basic per acre | 13.00 |
| Crow Irrigation Project | Basic per acre | 16.00 |
| Fort Belknap Irrigation Project* | Indian per acre | 7.75 |
| | Non-Indian per acre | 15.50 |
| Fort Peck Irrigation Project | Basic per acre | 14.00 |
| Wind River Irrigation Project* | Basic per acre | 14.00 |
| **Southwest Region Rate Table** | | |
| Pine River Irrigation Project | Minimum Charge per tract | 25.00 |
| | Basic per acre | 8.50 |

| Project name | Rate category | 2004 season rate | 2005 season rate |
|---|---|---|---|
| **Western Region Rate Table** | | | |
| Colorado River Irrigation Project | Basic per acre up to 5.75 acre-feet | $47.00 | |
| | Excess Water per acre foot over 5.75 acre-feet. | 17.00 | |
| Duck Valley Irrigation Project | Basic per acre | 5.30 | |
| Fort Yuma Irrigation Project (See Note below) | Basic per acre 0up to 5.0 acre-feet | 60.00 | |
| | Excess Water per acre-foot over 5.0 acre-feet. | 10.50 | |
| San Carlos Irrigation Project* (Joint Works) | Basic per acre | 20.00 | $30.00 |
| San Carlos Irrigation Project (Indian Works) | Basic per acre | 56.00 | |
| Uintah Irrigation Project* | Basic per acre | 11.00 | |
| Walker River Irrigation Project | Indian per acre | 7.32 | |
| | Non-Indian per acre | 15.29 | |

**Note:** The Fort Yuma Irrigation Project is owned and operated by the Bureau of Reclamation (Reclamation). The irrigation rates assessed for operation and maintenance are established by Reclamation and are provided for informational purposes only. The BIA only collects the irrigation assessments on behalf of Reclamation.

## Consultation and Coordination With Tribal Governments (Executive Order 13175)

The BIA irrigation facilities are vital components of the local agriculture economy of the reservations on which they are located. To fulfill its responsibilities to the tribes, tribal organizations, water user organizations, and the individual water users, the BIA communicates, coordinates, and consults on a continuing basis with these entities on issues of water delivery, water availability, costs of administration, operation, maintenance, and rehabilitation. This is accomplished at the individual irrigation facilities by agency and regional representatives, as appropriate, in accordance with local protocol and procedures. This notice is one component of the BIA's overall coordination and consultation process to provide notice and request comments from these entities on adjusting irrigation assessment rates.

## Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use (Executive Order 13211)

The rate adjustments will have no adverse effects on energy supply, distribution, or use (including a shortfall in supply, price increases, and increase use of foreign supplies) should the proposed rate adjustments be implemented. This is a notice for rate adjustments at BIA owned and operated irrigation facilities, except for the Fort Yuma Irrigation Project. The Fort Yuma Irrigation Project is owned and operated by the Bureau of Reclamation with a portion serving the Fort Yuma Reservation.

## Regulatory Planning and Review (Executive Order 12866)

These rate adjustments are not a significant regulatory action and do not need to be reviewed by the Office of Management and Budget under Executive Order 12866.

## Regulatory Flexibility Act

This rate making is not a rule for the purposes of the Regulatory Flexibility Act because it is "a rule of particular applicability relating to rates." 5 U.S.C. 601(2).

## Unfunded Mandates Act of 1995

These rate adjustments impose no unfunded mandates on any governmental or private entity and are in compliance with the provisions of the Unfunded Mandates Act of 1995.

## Takings Implications (Executive Order 12630)

The Department has determined that these rate adjustments do not have significant "takings" implications. The rate adjustments do not deprive the public, State, or local governments of rights or property.

## Federalism (Executive Order 13132)

The Department has determined that these rate adjustments do not have significant federalism effects because they pertain solely to Federal-tribal

relations and will not interfere with the roles, rights, and responsibilities of States.

### Civil Justice Reform (Executive Order 12988)

In accordance with Executive Order 12988, the Office of the Solicitor has determined that this rule does not unduly burden the judicial system and meets the requirements of sections 3(a) and 3(b)(2) of the Order.

### Paperwork Reduction Act of 1995

These rate adjustments do not affect the collections of information which have been approved by the Office of Information and Regulatory Affairs, Office of Management and Budget, under the Paperwork Reduction Act of 1995. The OMB Control Number is 1076–0141 and expires April 30, 2006.

### National Environmental Policy Act

The Department has determined that these rate adjustments do not constitute a major Federal action significantly affecting the quality of the human environment and that no detailed statement is required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321–4370(d)).

Dated: April 20, 2004.

**David W. Anderson,**

*Assistant Secretary—Indian Affairs.*

[FR Doc. 04–9832 Filed 4–29–04; 8:45 am]

BILLING CODE 4310–W7–P

---

## DEPARTMENT OF THE INTERIOR

## Bureau of Indian Affairs

## Indian Gaming

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of approved Class III Gaming Compact.

**SUMMARY:** This notice publishes the extension to an approved Class III Gaming Compact between the Crow Tribe and the State of Montana. Under the Indian Gaming Regulatory Act of 1988, the Secretary of the Interior is required to publish notice in the **Federal Register** approved Tribal-State compacts for the purpose of engaging in Class III gaming activities on Indian lands.

**EFFECTIVE DATE:** April 30, 2004.

**FOR FURTHER INFORMATION CONTACT:** George T. Skibine, Director, Office of Indian Gaming Management, Office of the Deputy Assistant Secretary—Policy and Economic Development, Washington, DC 20240, (202) 219–4066.

**SUPPLEMENTARY INFORMATION:** Under section 11 of the Indian Gaming Regulatory Act of 1988 (IGRA) Public Law 100–497, 25 U.S.C. 2710, the Secretary of the Interior shall publish in the **Federal Register** notice of approved Tribal-State compacts for the purpose of engaging in Class III gaming activities on Indian lands.

The Crow Tribe and the State of Montana have agreed to an extension of the existing agreement and will extend the compact until June 1, 2004. The Principal Deputy Assistant Secretary—Indian Affairs, Department of the Interior, through his delegated authority, is publishing notice that the Fourth Amendment to and Extension of the Agreement for Class III gaming between the Crow Tribe and the State of Montana is in effect.

Dated: March 18, 2004.

**Aurene M. Martin,**

*Principal Deputy Assistant Secretary—Indian Affairs.*

[FR Doc. 04–9886 Filed 4–29–04; 8:45 am]

BILLING CODE 4310–4N–P

---

## DEPARTMENT OF THE INTERIOR

## Bureau of Indian Affairs

## Indian Gaming

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of approved Class III Gaming Compact.

**SUMMARY:** This notice publishes the extension to an approved Class III Gaming Compact between the State of Nevada and the Pyramid Lake Paiute Tribe. Under the Indian Gaming Regulatory Act of 1988, the Secretary of the Interior is required to publish notice in the **Federal Register** approved Tribal-State compacts for the purpose of engaging in Class III gaming activities on Indian lands.

**EFFECTIVE DATE:** April 30, 2004.

**FOR FURTHER INFORMATION CONTACT:** George T. Skibine, Director, Office of Indian Gaming Management, Office of the Deputy Assistant Secretary—Policy and Economic Development, Washington, DC 20240, (202) 219–4066.

**SUPPLEMENTARY INFORMATION:** Under Section 11 of the Indian Gaming Regulatory Act of 1988 (IGRA) Public Law 100–497, 25 U.S.C. 2710, the Secretary of the Interior shall publish in the **Federal Register** notice of approved Tribal-State compacts for the purpose of engaging in Class III gaming activities on Indian lands. On January 6, 1988, the Assistant Secretary—Indian Affairs, Department of the Interior, through his delegated authority, approved the Compact between the Pyramid Lake Paiute Tribe and the State of Nevada, which was executed on August 4, 1997. Article X of that compact allows for automatic extensions of up to 20 years upon the mutual written consent of the parties.

On August 15, 2003, the Pyramid Lake Paiute Tribe and the State of Nevada agreed to a 1-year extension of the existing compact. This 1-year period will extend the compact until January 1, 2005. The Assistant Secretary—Indian Affairs, Department of the Interior, through his delegated authority, is publishing notice that the Extension to the Tribal-State Compact for Class III gaming between the State of Nevada and the Pyramid Lake Paiute Tribe is in effect.

Dated: April 14, 2004.

**Aurene M. Martin,**

*Principal Deputy Assistant Secretary—Indian Affairs.*

[FR Doc. 04–9887 Filed 4–29–04; 8:45 am]

BILLING CODE 4310–4N–P

---

## DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

## National Park Service

**[ID 079 1610 DP 051D]**

## Notice of Availability of the Draft Management Plan and Draft Environmental Impact Statement (EIS) for the Craters of the Moon National Monument and Preserve

**AGENCIES:** Bureau of Land Management and National Park Service.

**ACTION:** Issuance of a Notice of Availability of a Draft EIS for a Draft Resource Management Plan/General Management Plan (hereinafter, Draft Plan/EIS), for the Craters of the Moon National Monument and Preserve. The Monument is located in Blaine, Butte, Lincoln, Minidoka, and Power Counties, in Idaho.

**SUMMARY:** The Bureau of Land Management and the National Park Service have jointly prepared a Draft Plan/EIS for the Craters of the Moon National Monument and Preserve. The Draft Plan/EIS describes and analyzes four alternative management strategies, each presenting a different approach to resolving issues identified through public scoping. The Draft Plan/EIS is now available for public review and comment.

**DATES:** Written comments on the Draft Plan/EIS will be accepted for 90 days