United States Department of the Interior
BUREAU OF INDIAN AFFAIRS
WESTERN REGIONAL OFFICE
P.O. BOX 10
PHOENIX, ARIZONA 85001

TAKE PRIDE IN AMERICA

RECEIVED
JUN 10

IN REPLY
REFER TO:
Branch of Land and Water Resources
(602) 379-6789

JUN 06 2003

Mr. Riney Salmon II
Salmon, Lewis, & Weldon, P.L.C.
Attorneys at Law
2850 E. Camelback Road, Suite 200
Phoenix, AZ 85016

Dear Mr. Salmon:

We acknowledge receipt of your May 16, 2003, comments and proposed budget revisions to the San Carlos Irrigation Project's (Project) proposed FY 2005 Irrigation Operation and Maintenance (O&M) budget and budget adjustments for FY 2003 and 2004. As you recall, at the May 23, 2003, fact-finding meeting, you were informed that the rate increase will be published as a proposed rate in the Federal Register.

Please be advised that the request to publish the proposed rate in the Federal Register was transmitted to the Assistant Secretary for Indian Affairs on June 6, 2003. The decision to move forward with the publication is necessary in order to allow the San Carlos Irrigation and Drainage District (SCIDD) time to plan and set its FY 2005 tax assessments. SCIDD will be given a formal opportunity to submit comments in accordance with the instructions in the Federal Register notice. Final action on whether to increase the rate will be made by the Assistant Secretary for Indian Affairs after the Federal Register notice is published and the comment period is completed.

In the interim, in accordance with our commitment at the fact-finding meeting, the following is our response to your May 16, 2003, comments.

1. **FY 2005 Assessment**

On April 18, 2003, we provided you with the Project's proposed FY 2005 budget (draft 3). This proposed budget includes a chart and graph which show that the assessment rate was reduced from a $30.00 per acre average during 1985 to 1997 to $20.00 per acre in 1998; and, also shows the rate was held at $20.00 per acre through FY 2004. For the past five years, the rate reduction was possible as the Project operated with a budget supplemented by a cash reserve which had accumulated over a period of time. The past reductions in the assessment rate were done with SCIDD's full knowledge and support.

The proposed budget includes the following detailed breakdown of the cost to operate and maintain the Project's Irrigation Division.

(a) Personnel salary and benefits for the Project engineer/manager and Project employees under their management control;
(b) Materials and supplies;
(c) Major and minor vehicle and equipment repairs;
(d) Equipment, including transportation, fuel, oil, grease, lease and replacement;
(e) Capitalization expenses;
(f) Acquisition expenses;
(g) Maintenance of a reserve fund available for contingencies or emergency expenses for, and insuring, reliable operation of the irrigation system; and
(h) Other expenses we determine necessary to properly perform the activities and functions characteristic of an irrigation project.

The rate increase is necessary as the Project no longer has the extra cash reserves. Therefore, we must now charge a rate that accurately reflects the true annual O&M costs listed above. We have determined that for FY 2005, this cost is $30.00 per acre. The Project is primarily supported by the O&M assessments from non-Indian water users and the Federal Government, on behalf of the Indian water users. The proposed budget also lists other sources of miscellaneous income. The Federal Government provides no subsidies to the Project. The Project must assess for the full O&M cost of the Project minus the miscellaneous sources of income listed in the proposed budget.

Draft 4 of the proposed budget was provided to SCIDD at the May 23, 2003, fact-finding meeting. The only difference between draft 3 and draft 4 is the amount of interest collected in FY 2003, showing an increase from $107,000 to $145,000. The Project has further refined the proposed budget based on updated information. Enclosed for your information is a copy of the Proposed Budget dated June 6, 2003, which differs from draft 4 in two ways. First, the amount of income from excess pumping is revised downward from $457,000 to $331,000, based on more current natural flow data. Second, the estimated amount of pumping by SCIDD was reduced from 36,000 acre-feet to 34,000 acre-feet. The combination of these two changes reduced the cost for power for pumping from $645,000 to $570,000.

**2. <u>Prior Accounting Error</u>**

The current budget format was developed in response to complaints from SCIDD that budget formats were not consistent from year to year. The current budget format has been in use for several years, without complaints or comments. The Project has provided proposed draft budgets and has met and consulted with SCIDD and the Gila River Indian Community (GRIC) several times each year to review the proposed budgets. Until the Project discovered the accounting error, neither SCIDD or GRIC noticed the error.

The FY 2004 budget approved last year and reviewed in depth by SCIDD and GRIC, indicated unobligated cash at the end of the fiscal year of $40,756. It was clear that even with the accounting error, FY 2005 would be the first year in which extra cash reserves would not be available. And, a significant rate increase would likely be required.

The accounting error resulted in artificially low assessment rates for several years. The water users benefitted greatly during the years the rate was set at $20.00. Because the water users received a benefit from this accounting error, it is difficult to justify the complaint that the increase in the assessment rates for FY 2005 is unfair.

3. **GRIC Excess Pumping**

The San Carlos Irrigation Project - Indian Works ("Indian Works," under the direction of the Pima Agency Superintendent) pumped excess water in 1999, 2000 and 2002 in accordance with the guidance provided by the Regional Director in his letter dated July 2, 1999 (copy enclosed). The Project intends to continue this practice and will reflect the income it generates in the annual budget. The Regional Director's July 2, 1999, letter offered excess pumping to SCIDD under the same conditions which were approved for the Indian Works.

The majority of well repairs occur on SCIDD wells, and this cost is shared between SCIDD and the Indian Works. A breakout of SCIDD well repair expenses versus Indian Works well repair expenses is enclosed.

4. **Power for Pumping**

Because the generators are inoperable, there are no additional revenues in the Power Division to subsidize power costs for the Irrigation Division. Additionally, there are no other Government (or appropriated ) funds to cover power for pumping. SCIDD made the claim in *San Carlos Irrigation and Drainage District v. United States*, 32 Fed. Cl. 200 (1994), that the Project could not charge SCIDD for power for pumping which "replaced" power formerly generated at Coolidge Dam. SCIDD lost this argument. The United States Court of Appeals for the Federal Circuit affirmed the holding of the U.S. Claims Court and concluded: "We agree with the government's contention that providing power for pumps is properly considered part of the 'operation' of the pumps. There is no statement that free power to run the pumps is assured in the Contract or the Act." *San Carlos Irrigation and Drainage District v. United States*, 111 F.3d 1557, 1556 (Fed. Cir. 1997).

5. **Use of Construction Repayment Funds**

SCIDD's position on this issue repeats claims of prior years and is contrary to statute. The amount of $479,000 per year from the Project's Power Division which appears in SCIDD's proposed budget as income to the Irrigation Division is derived from sale of "excess" power. There are three statutory enactments relevant to the issue of how these power revenues may be used: (1) Act of March 7, 1928, 45 Stat. 200, 211, which authorizes the Project's power system; (2) Act of June 22, 1936, Stat.

1822; and, (3) Act of August 7, 1946, 60 Stat. 895. The 1928 and 1936 Acts specifically address the Project; and, the 1946 Act applies generally to all Indian irrigation projects.

The 1936 Act states that "the net revenues from the sale of surplus power developed at the Coolidge Dam and other generating plants of the San Carlos project and transmitted over existing transmission lines" must be devoted to the same purposes, in the same priority order, as provided in the 1928 Act. The 1946 Act, which applies broadly to all Indian irrigation projects, provides that power revenues may be devoted to any of four purposes, without specifying any particular priority: (1) payment of O&M expenses for the power system; (2) creation and maintenance of a reserve fund for the power system; (3) repayment of construction costs; and (4) "payment of other expenses and obligations chargeable to power revenues to the extent required or permitted by law."

The 1928 and 1936 Acts make very clear that payment of irrigation O&M charges is the third priority, after repayment of the costs of developing the power system and the cost of the San Carlos Irrigation Project, which includes the Coolidge Dam and other Project construction costs. The 1946 Act does not provide any express authority at all for using power revenues to pay irrigation O&M costs. Even if purpose 4 of the 1946 Act allowing for "payment of other expenses and obligations chargeable to power revenues" is arguably broad enough to include irrigation O&M charges, that authority is limited "to the extent required or permitted by law." The relevant law is in the 1928 and 1936 Acts. Consequently, the BIA may not use power system revenues, from any source, to pay irrigation system O, M and R costs, until <u>all</u> construction costs have been repaid. When the costs of developing the power system are paid off, therefore, the income from excess power sales must, by statute, next be devoted to reimbursement of Project construction costs, and not to reducing SCIDD's O&M charges.

**6. <u>Well Replacement</u>**

A total of $750,000 during FY 2003 and FY 2004 has been liquidated for the well replacement fund in order to keep the FY 2004 O&M rate at $20.00 per acre. This retains $450,000 in the well replacement budget for FY 2003 for drilling two new wells. One of these wells will be located on the SCIDD side of the Project and the other will be located on the Indian Works. The annual budget of $300,000 per year is being eliminated for FY 2005, in order to keep the O&M rate low. The annual budget of $300,000 will resume in FY 2006.

The well replacement program is necessary because of the age of the existing wells (26 wells are over 60 years old). A number of project wells were retired in past decades and never replaced. The well replacement program was outlined to SCIDD in the Project's letter dated May 30, 2002 (copy enclosed). Since SCIDD did not respond to this letter, it was assumed that SCIDD did not object to the well replacement program.

It is particularly important to replace wells in the SCIDD to assure that the Project can apportion surface water and groundwater fairly between GRIC and SCIDD.

7. **China Wash Flume Rehabilitation/Replacement**

A failure of China Wash Flume would cut off surface water to the entire Project. Therefore, SCIP does not intend to delay its scheduled rehabilitation and maintenance on the China Wash Flume.

8. **Heavy Equipment Sinking Fund**

SCIDD contends that a Heavy Equipment Sinking Fund does not exist, and that SCIDD was not provided with sufficient data to justify inclusion of additional money into the fund. The budget provided to SCIDD in the April 18, 2003, letter includes a yearly tabulation of the Vehicles and Heavy Equipment Sinking Fund and Reserve income, expenses, and balances through FY 2014. The expenses on this table are based on a detailed equipment and vehicle replacement schedule which is also included in the budget provided to SCIDD. The replacement schedule is based on a detailed spreadsheet which tracks usage of each government vehicle on a monthly basis. The Heavy Equipment replacement schedule was developed in conjunction with meetings with the Project foremen.

As was explained to SCIDD in the same letter, approximately $400,000 in the Heavy Equipment Sinking Fund has already been liquidated to accommodate the proposed FY 2005 rate of $30.00 per acre. This will leave less than $10,000 in the Heavy Equipment Sinking Fund in FY 2005. This is an adequate balance to meet the equipment replacement needs in accordance with the schedule estimated through FY 2014 and shown in the table entitled "Sinking Fund and Reserve Projects, 1. Equipment Sinking Fund," which is attached to the Proposed Budget dated June 6, 2003.

9. **Staffing and Wages**

The remand letter of January 10, 1997, ordered the Project to "refine its personnel budget" to more accurately reflect actual personnel costs. SCIDD's comments appears to address a reduction in staffing and personnel costs. The budget provided to SCIDD includes a detailed breakdown, by position, of all personnel costs. The details provided in this budget satisfactorily addresses the remand letter.

SCIDD contends that "the Project has many more employees than are necessary." Since 1994, the Project's Irrigation Division has reduced the number of personnel from 47 to 26. Specifically, SCIDD complains that there is a duplication of effort by outside contractors and pump shop employees, and that the pump shop should be eliminated entirely. The Project is in the process of eliminating all but two positions in the pump shop. These positions are planned for elimination by the end of FY 2003. Currently, outside contractors are being hired only when the current pump shop staff is not capable of doing the work. Thus, there is no duplication in effort. The practice of hiring outside contractors will continue in the future when the pump shop is reduced in size.

SCIDD contends that the Project's labor wages are one and a half to two times more than SCIDD's and that the Project's labor wages should more closely resemble the average wages paid by other

entities in the geographic area. The reason for the disparity is that the Project's labor are organized and represented by a union, whereas, SCIDD's labor is not represented by a union. As a Federal entity, the Project is required to negotiate with the bargaining union to set wages. Alternatively, it is the union's option to request the utilization of the Federal Wage System (FWS) wage grade salaries. The FWS is close to the salaries presently earned by the Project's labor force. If the union makes this request, the Project is required to allow the conversion to the FWS.

The Indian Works took exception to SCIDD's suggestion to eliminate two zanjeros positions. (See copy of enclosed Indian Works' comments dated May 22, 2003). The Indian Works contends that the hiring of the additional zanjeros was not intended to be on a trial basis, and that since the zanjeros were hired, fluctuations in water deliveries to the Indian Works have been substantially stabilized. Previous to the hiring of the zanjeros, SCIDD operated some of the Project turnouts on the Pima Lateral, which resulted in large fluctuations in deliveries to the Indian Works. These zanjeros are, and should be, employees of the Project, as opposed to SCIDD employees. This is because the zanjeros are operating Project-Joint Works (not SCIDD) facilities and they would ensure fair treatment to both SCIDD and GRIC.

**10. <u>Litigation Defense Costs</u>**

As the Project has indicated to SCIDD in the past, legal costs associated with challenges to the Project operations are a valid O&M cost. Your letter offers no basis for asserting that legal expenses incurred by the Project are not legitimate O&M costs.

**11. <u>Archaeology Study</u>**

This study was conducted in defense of litigation in *San Carlos Apache Tribe v. United States*, Civ.No. 99-255 (D.Ariz). See also response to No. 10.

**12. <u>Expense and Service Accounting</u>**

We appreciate your comments and suggestion concerning the expense and service accounting. The budget item for garbage pickup and fire protection from the City of Coolidge has been corrected.

We hope that this correspondence has addressed all of your concerns. Again, you will be given the opportunity to comment formally once the proposed rate is published in the Federal Register. Upon publication of the Federal Register notice, we will forward a copy to you.

If you have any questions regarding this letter, please contact Mr. Russell Kaskalla, Civil Engineer, at (602) 379-6789.

Sincerely,

Wayne Nordwall

Regional Director