**SALMON, LEWIS & WELDON, P.L.C.**
Attorneys at Law

Riney B. Salmon II, P.C.
John B. Weldon, Jr.
Lisa M. McKnight
James R. Huntwork
Kristin D. Magin
Alexandra M. Arboleda

2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016
Telephone 602-801-9060
Facsimile 602-801-9070

M. Byron Lewis
Stephen E. Crofton
Mark A. McGinnis
Karen S. Gaylord
Ronnie P. Hawks
Rebecca C. Goldberg

Of Counsel
Richard N. Morrison

*Writer's Direct Line*
602-801-9061

*Writer's Internet Address*
rbs@slwplc.com

November 26, 2003

Mr. Jeff Lowman
Acting Director
Office of Trust Responsibilities
ATTN: Irrigation and Power
MS-3061-MIB, Code 210
1849 C Street, NW.
Washington, D.C. 20240

Re: San Carlos Irrigation and Drainage District's Comments on the Bureau of Indian Affairs' Proposed 2005 Budget and Operation and Maintenance Assessment for the San Carlos Irrigation Project

Dear Mr. Lowman:

This firm represents the San Carlos Irrigation and Drainage District (the District), which consists of non-Indian water users of the San Carlos Irrigation Project (the Project). In response to the Department of the Interior's notice of proposed rate adjustments, 68 Fed. Reg. 56302 (September 30, 2003), the District hereby submits its comments on the Bureau of Indian Affair's (BIA or Agency) proposed budget and assessment rates for Fiscal Years (FY) 2004 and 2005. The District requests that the Assistant Secretary reduce the FY 2005 Budget and assessment to $15 per acre. As set forth in the following comments, the budget and assessment rate proposed by the Western Regional Director for FY 2005 are arbitrary and capricious and a breach of the applicable Landowners' Agreement, 1931 Repayment Contract, 1938 Joint Works Order, and pertinent federal statutes and regulations. Although the District is willing to accept the assessment rate of $20 per acre for FY 2004, it has several objections to the FY 2004 budget that are described more fully below.

The District has made every effort to cooperate with Agency officials in determining an appropriate budget and assessment rate for FY 2005. However, the BIA's proposed FY 2005 budget and assessment rate of $30 per acre, a 50% increase over previous years, represents a

persistent, if not contemptuous, refusal to deal realistically with fundamental problems that have been facing the Project for years. Despite the continuation of one of the worst droughts in the State's history, depressed commodities prices, difficult economic conditions, and numerous recommendations by objective third-party auditors and others to improve BIA management and efficiency, the BIA refuses to act in a fiscally responsible manner for the best interests of the Project's beneficiaries.

The contracts and regulations that govern the operation of the Project do not provide the BIA with a "blank check" to spend money without restriction or accountability and pass the costs onto the water users in the form of higher assessments. The BIA is obligated by law and contract to prepare and implement a well-grounded budget and to comply with generally accepted accounting principles so that the Project is operated and maintained at the lowest possible cost. If BIA management cannot do so, it should be replaced and competent management obtained.

The District and its landowners can no longer endure the BIA's fiscal practices and can no longer finance the BIA's bloated and inefficient bureaucracy. The BIA's unreasonable proposal to raise assessment rates by 50% threatens the property interests of District farmers, the local economy, and the Project itself, prompting the District to seek direct assistance from the Secretary of the Interior pursuant to 25 U.S.C. § 389. *See* Letter from J. Michael Urton, District President, to Hon. Gale Norton (November 14, 2003) (Exhibit 1). To ensure the continuing viability of the Project and its water users, the Assistant Secretary must reject the BIA's proposed budget and assessment rate for FY 2005, set the rate at no more than $15 per acre, and remand to the Regional Director for corrective action as requested in this letter.

## I. HISTORY AND BACKGROUND

The Project contains 100,000 acres of Indian and non-Indian lands. It is administered by the Secretary of the Interior (Secretary) through the BIA. Congress authorized construction of the Project on June 27, 1924. *See* Act for the Continuance of Construction Work on the San Carlos Federal Irrigation Project in Arizona, and for Other Purposes, Pub. L. No. 68-210, 43 Stat. 475 (1924 Act) (Exhibit 2). The purpose of the 1924 Act was to provide irrigation water for Project lands. *Id.* In the 1924 Act, Congress authorized the construction of Coolidge Dam (Dam), which impounds the waters of the Gila River to form San Carlos Reservoir (Reservoir) for the benefit of Project landowners. The total cost of the Project—including construction,

operation, and maintenance—was distributed one-half to the District's landowners equally per acre. The 1924 act authorized the Secretary to enter into a construction repayment contract with an irrigation district representing the landowners, i.e., the District. *Id.*

In furtherance of the Act, the district's landowners transferred their water rights to the United States for use as a common Project water source with the Pima-Maricopa Indians (i.e., the Gila River Indian Community) and also pledged their lands as collateral for the repayment of the original Project construction cost and the ongoing operation and maintenance (O&M) cost. *See* Landowners' Agreement with the Secretary of the Interior, San Carlos Project: Act of June 7, 1924 (various dates), at 4-6 (Landowners' Agreement) (Exhibit 3). The landowners also agreed to pay an O&M charge to be fixed from time to time by the secretary, "based upon the total annual *cost* of the operation and maintenance of the said San Carlos project." *Id.* at 15 (emphasis added).

In 1928, Congress authorized the "development of electrical power at the Coolidge Dam as an incident to the uses of the Coolidge Reservoir for irrigation." *See* An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1929, and for other purposes, Pub. L. 70-100, ch. 138, 45 Stat. 200, 211 (March 7, 1928) (Exhibit 4) (1928 Act). This act authorized the Secretary to enter into a contract with the District "for repayment of the costs of construction of said power plant." The act also authorized the Secretary "to sell surplus power" and apply the "net revenues" after the cost of generation was deducted to reimburse the United States for "the cost of developing such electrical power," the cost of constructing the irrigation project, and the cost of operating and maintaining the project. *Id.*

In 1931, the District entered into a Repayment Contract with the Secretary. *See* Repayment Contract Between the United States and the San Carlos Irrigation and Drainage District, Arizona (June 8, 1931) (Repayment Contract) (Exhibit 5). The Contract requires the District's landowners to repay their share of the construction cost of the original Dam. Under the Repayment Contract, the landowners agreed to pay an equal share of "the whole cost of operating and maintaining the works of the Project, after sums collected for excess water and other sums which may go to the operation and maintenance fund as provided herein have been deducted. . . ." *Id.* at 7. The Repayment Contract also expressly provides that the Project must

maintain accurate and professional accounting practices with respect to the funds paid by the Project water users:

> . . . [F]ull and accurate accounts shall be kept at all times at both the United States and the District of all receipts and expenditures and other fiscal operations in connection with the Project, and such accounts and the books showing them, and also all records, maps, plans, estimates, budgets and engineering data of the United States and the District concerning said Project, at all reasonable times, shall be open to the inspection of the United States and its agents, and of the District and its representatives and of all persons properly interested; and the United States and the District shall inform and consult with each other as to contemplated future steps of importance.

*Id.* at 19; *see also* 25 C.F.R. § 171.1(g) (terms of Repayment Contract control over any conflicting BIA regulations).

On June 15, 1938, the Assistant Secretary issued an Order providing, among other things, that the District's landowners would pay an equal share of the cost of operating and maintaining the Project's Joint works exclusive of the cost of operating and maintaining the power generating plant at the Dam. *See* Order Defining Joint, District and Indian Works of the San Carlos Federal Irrigation Project: Turning Over Operation and Maintenance of District Works to the San Carlos Irrigation and Drainage District, at 7 (Exhibit 6).

Throughout the 1960s, 1970s, and early 1980s, the BIA, through its negligence, allowed the facilities at the Dam to fall into a state of gross disrepair. Much of the current difficulty with the Project facilities has its roots in this period of the BIA's neglect. On October 1, 1983, a storm caused inflows of water into the Reservoir. Three days later, the Reservoir began to spill over the spillway crests and down the spillway gates. The spills were minor, in as much as the two spillway gates were sized for a 120,000 cubic feet per second (cfs) discharge, and the maximum discharged during the storm was only 4,000 cfs. The Dam had gates located in the spillways to stop or control the spills, but they were inoperable due to the BIA's failure to properly operate and maintain them or to provide a permanent replacement. No other means existed to stop or control spills. If the gates had operated properly, twelve feet would have been added to the spillway crests, preserving the designed storage capacity of the Dam. *See generally San Carlos Irr. & Drainage Dist. v. United States*, 15 Cl. Ct. 197 (1988), *rev'd*, *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957 (Fed. Cir. 1989).

Although the 1983 spills were minor, they did serious damage to the Project that has never been repaired. At the time, holes existed in the downstream powerhouse wall that were never repaired by the BIA. This allowed the uncontrolled spills to back up into the switchyard behind the powerhouse wall and supersaturate the ground beneath the Dam's hydroelectric facilities, causing the switchyard to settle and rendering the Dam's electric generating system completely inoperable. As a result, no more power could be generated for the Project's groundwater pumps and no surplus power could be sold to produce much needed revenue for the Project. To date, both the spillway gates and generating facilities remain inoperable. *See generally id.*

Each year, the BIA proposes, two years in advance, the per-acre assessment to be paid by the Project water users, which assessment is paid one year in advance. On April 18, 2003, the BIA advised the District of its proposed Irrigation O&M Budget for FY 2005. *See* Letter from Robert Carolin, Project General Manager, to Douglas Mason, District General Manager (Exhibit 7). The District responded to the BIA's proposal with comments and proposed revisions, suggesting numerous ways for the Project to reduce its O&M budget. *See* Letter from Riney B. Salmon, counsel for the District, to Robert Carolin (May 16, 2003) (Exhibit 8). On May 23, 2003, just one week after receiving the District's comments, the District was informed at a FY 2005 budget fact-finding meeting that the proposed budget and rate assessment of $30 per acre would be published as a proposed rate in the Federal Register. The District was also informed that the budget and rate assessment for FY 2006 would likely be $35 per acre. Affidavit of Douglas D. Mason, District General Manager, ¶ 14 (November 26, 2003) (Exhibit 9). The BIA's Western Regional Office submitted the proposed FY 2005 budget and assessment rate to the Assistant Secretary on June 6, 2003. On that same day, the Western Regional Director responded to the District's comments. *See* Letter from Wayne Nordwall to Riney B. Salmon (Exhibit 10). The proposed rate assessment of $30 per acre was published in the Federal Register on September 30, 2003. 68 Fed. Reg. 56302.

. . .

## II. COMMENTS ON PROPOSED FY 2005 BUDGET AND RATE ASSESSMENT

Over the past several years, the District has provided the BIA with information and comments on each year's budget. Despite expressing a willingness to engage in a meaningful dialogue with the District, the BIA has largely ignored many of the District's substantive comments and concerns. The BIA has occasionally reduced the assessment from what the Project initially proposed. Those reductions, however, have come as a result of the BIA shuffling money between budget categories and "pre-spending" assessments received for future years' budgets, rather than as a result of the BIA pursuing the increased efficiencies and cost reductions that the District has urged.

Based upon a "double accounting" error disclosed by the BIA in its April 18, 2003 letter, in which the BIA admitted that cash available to the Project had been overstated by approximately $2,000,000, it is now clear that the BIA has no cash reserves to use. *See* Carolin Letter to Mason (Exhibit 7). The BIA must immediately, therefore, undertake real reform of its budget and operating practices. A combination of the Project's inadequate water supply, the BIA's incompetent budget practices, and its insistence on imposing excessive assessments upon the farmers in an effort to compensate for the "lost" $2 million (proposed now to continue through FY 2005 with more increases in FY 2006), will result in many District landowners leaving farming and making no assessment payments. The BIA has to realize that it must become more efficient in order for the Project, the District, and farmers within the Project to survive. It is with that expectation that the District submits the following comments to the Project's proposed O&M budget and assessment rates for FY 2005.

### 1. <u>Fiscal Year 2005 Assessment</u>.

The proposed FY 2005 budget results in an unacceptable assessment of $30 per acre, a 50% percent increase over previous years. *See* Irrigation Division Budget, Draft 4, at 1, column 8 (May 22, 2003) (Budget Draft 4) (Exhibit 11). The BIA does not need $3,000,000 in fiscal year 2005 to accomplish its assigned tasks. As discussed below, the BIA can reduce its operating costs to a level of $15 per acre and still maintain appropriate cash reserves at year end. *See id.*, at 1, column 7 (providing the District's proposed budget figures). This can be done by, among other things, reducing personnel; using Project Power Division reserves to reduce the cost of power for irrigation pumping; contributing Power Division surpluses previously applied to

repayment of the Power construction debt to irrigation O&M costs; and postponing and restudying the need for construction of new wells and rehabilitation work on the China Wash Flume. Although all this will require staff reduction and belt-tightening, such measures are absolutely necessary for all entities to survive in the current economic climate and sustained drought.

District farmers cannot afford to pay an assessment of $30 per acre for FY 2005 nor $35 per acre for FY 2006. The Gila River watershed is in the depths of an extended drought, and the Project water deliveries are near all-time lows. *See* Mason Affidavit, ¶ 3 (Exhibit 9). If there is no water, the farmers cannot farm. If they cannot farm, there is no money. The impacts of the drought are exacerbated by depressed commodity prices that reduce the farmers' income and profits at a time when the cost of operating expenses and supplies are on the rise. *Id.* ¶ 4.

In the face of these conditions, the District and its farmers have had to significantly reduce their own overhead and operating costs in this time of crisis. The District, for example, has recently reduced its own staff by almost twenty percent. *See* District Staffing Charts (illustrating reduction in personnel) (Exhibit 12). Individual farmers have cut staff and costs by even greater amounts in order to survive these tough times. *See* Mason Affidavit, ¶ 5 (Exhibit 9). These cuts are not only a matter of good business sense, they are, for many, a matter of survival.

The BIA, however, has its head in the sand, ignoring current economic and drought conditions and the need to address its continuing fiscal irresponsibility and inefficiency. Instead of attempting to hold the line or reduce its budget to help its beneficiaries, the BIA proposes instead to increase its budget by half.

Part of the problem lies in the fact that the BIA has little incentive to reduce costs and keep charges at the lowest reasonable level. The total cost of the Project originally was to be divided equally per acre between Indian and non-Indian lands in the Project. *See* 1924 Act (Exhibit 2). But Congress subsequently passed a law relieving the Community of its share of the construction debt as long as the Indian lands in the Project remained in the possession of the Community and its members. *See* Act of July 1, 1932, ch. 369, 47 Stat. 564, *codified as amended at* 25 U.S.C. § 386a. Later, the United States Court of Claims decided that the Project's Indian beneficiaries were not required to pay for their one-half share of BIA O&M costs. *United States v. Gila River Pima-Maricopa Indian Community*, 586 F.2d 209, 214-216

(1978). Those costs are now paid by the United States on the Community's behalf and, therefore, only non-Indian landowners must personally bear the disproportionate burden of BIA excessive bureaucratic assessments. Because the BIA believes its first duty is to the tribes, and because the BIA receives its funding for the Indian portion of the Project directly from the United States treasury, the BIA has little interest in concerning itself with the problems facing non-Indian farmers. The BIA must be made to realize that the non-Indian farmers are also Project beneficiaries, and their interests, by law and contract, must be fairly and equally considered in making operation and maintenance decisions and setting Project budgets and assessments. The BIA's indifference to the circumstances and needs of its non-Indian beneficiaries is a breach of the agreements, statutes, and regulations governing Project operations and a breach of the Government's duties to those landowners.

**2. <u>BIA Accounting Errors</u>.**

On April 18, 2003, the BIA informed the District that, for a number of years, the Project had overlooked a "double accounting" error that caused it to overestimate available funds by approximately $2,000,000. *See* Carolin Letter to Mason (indicating that error was discovered on April 3, 2003) (Exhibit 7). This error was apparently caused when revenues from O&M assessments were included in the unobligated cash balance on October 1st of each year and then included again in the income section of the same budget as assessment collections. *Id.* The double accounting of assessment payments resulted in a cash surplus figure that did not exist. That error has had significant consequences for the BIA's budget and Project farmers.

Incredibly, the Regional Director argues that the District and its landowners have actually benefited from this accounting error. *See* Nordwall Letter to Salmon, at 3 (Exhibit 10). Nothing could be farther from the truth. The Regional Director argues that the non-existent surpluses resulted in artificially low O&M assessments for several years. The false surpluses, however, were not credited to the District to reduce any O&M costs. Rather, those surpluses were used by the BIA to finance projects, expenses, and personnel salaries and benefits that likely would not have been included in the O&M budget or, more importantly, the District would not have approved if the true cash balances and financial condition of the Project had been known. At various times over the past several years, the District has agreed to expenditures by the Project, based on the misrepresentation that the BIA was carrying a substantial cash reserve. The District

never would have agreed to those expenditures had it realized the actual financial position the Project was in. Thus, the District and its landowners have been severely wronged because the BIA has spent money it did not have, primarily on personnel, and now hopes to recoup that money through increased assessments upon the District's landowners in following years.

The Regional Director also attempts to blame the District for not earlier noticing the BIA's own error. The responsibility for the books and accounting is the BIA's and not the District's. Moreover, the BIA has never provided the District with the details of its accounts and budget line items that would have been required to discover this error. *See* Repayment Contract, at 19 (Exhibit 5). Furthermore, no annual audit of the BIA's books or budget proposals is ever performed, so the BIA's accounting methods and practices remain hidden from scrutiny and view of the public. It is disingenuous of the BIA to withhold relevant information from the District, then attempt to blame the District for not finding errors the BIA never should have made in the first place and should have found itself much earlier than it did.

The BIA's gross accounting error is not an unique or first-time event. In 1990, the first-ever independent review of Project accounting and management cited pervasive material weaknesses and deficiencies in the BIA's accounting systems and numerous errors and omissions in its books, records, and supporting documents. The 1990 review concluded that the BIA's accounting system and internal control procedures "suffer from a variety of procedural weaknesses and other problems, such as inadequate training and supervision of personnel, and personnel shortages. Certain of the weaknesses are so pervasive and fundamental as to render the accounting systems unreliable." *See* Arthur Anderson & Co., Report of Independent Public Accountants on San Carlos Irrigation Project—Irrigation Division, at 10 (September 30, 1989) (Exhibit 13); Arthur Anderson & Co., Report of Independent Public Accountants on San Carlos Irrigation Project—Power Division, at 12 (September 30, 1989) (citing same problems in the Project Power Division) (Exhibit 14). Based on its review, Arthur Anderson made numerous recommendations to improve management and accounting. Seven years later, however, another review by the same company revealed that "no significant progress" had been made on many of those recommendations, including the following:

- The need to review the allocation of costs between the Power and Irrigation Divisions;
- The need to monitor accountable Project property;

- The need to monitor and reconcile accounting ledgers;
- The need to define accounting responsibilities and reporting relationships at the Project.

*See* Arthur Anderson Letter Report (March 7, 1997) (Exhibit 15).

The BIA's most recent multi-million dollar error indicates that the Agency still has done little to correct its management and accounting practices. It would be patently unfair to now expect the Project farmers to pay a substantially elevated assessment for FY 2005 and FY 2006 to make up for the BIA's own gross negligence in managing its affairs. If a sacrifice must be made as a result of that negligence, that sacrifice must be made by the BIA, as the agency responsible, not the Project farmers.

The District requests that the Assistant Secretary order an immediate independent audit of the BIA's records and accounts to determine the cause of the accounting error and the methods by which the BIA has attempted to compensate for that error. If the BIA pulled money from cash reserves or sinking funds to pay for shortfalls resulting from this mistake, the BIA should be required to make up those funds from its own budget. Similarly, if the BIA "borrowed" from assessments paid by the District for use in future years in order to fund shortfalls in previous years due to the BIA's own internal budget and accounting errors, the Agency should be required to make up those funds as well. The District should not be required to pay higher assessments in 2005 or future years to cover the BIA's mistakes. Given the persistent and pervasive nature of management and accounting problems at BIA that should have been rectified long ago, the BIA's mismanagement cannot be used as an excuse for extracting even more money from District farmers for the BIA to waste.

**3. <u>Deviations in Past Year Budgets.</u>**

For years now, the District has complained that, even after a budget has been approved by the District and the Assistant Secretary, the BIA unilaterally moves funds from one line item O&M category to another and increases and decreases costs for various category items without explanation. In his 1997 decision, the then-Acting Area Director addressed the District's concerns, finding that these actions are "particularly troubling due to the fact that the Project's O&M expenditures are funded by private funds collected by the Project from [District] landowners, and by Federal funds appropriated for the benefit of the Indian beneficiaries of the Project. The Acting Director concluded that "It is essential from a procedural standpoint that the

Project provide sufficient information to SCIDD and the Indian Works to explain the expenditures on the budget spreadsheets as well as the basis for deviations from budget spreadsheets presented or approved in prior years. The Project fails to demonstrate in the record that it has met this threshold." *See* Decision of the Acting Area Director Regarding Notice of Appeal of the FY 1998 San Carlos Irrigation Project O&M Assessment, at 21 (January 10, 1997) (Exhibit 16). The Area Director remanded the issue to the BIA and ordered it to explain past budget deviations.

Six years later, however, nothing has changed. As evidenced by the BIA's budget summary and supporting documentation, the BIA makes it a practice to move money from one line item O&M category to another, eliminate funding in one place but increase funding in others, etc., even after the budget for a given fiscal year has been approved by the Assistant Secretary. *See* Budget Draft 4, at 1 (showing numerous figures within the same budget year for line items for unobligated cash, end of year unobligated cash, miscellaneous expenses, sinking funds and reserves, etc.) (Exhibit 11). The budget that is presented to the District as the basis for O&M assessments in a given year and that is submitted to the Assistant Secretary for final approval and publication in the Federal Register is the budget that the BIA should be bound by for that fiscal year. The BIA should not be allowed to unilaterally reallocate funds collected from District landowners during the fiscal year, without first consulting with the District and obtaining its consent. Otherwise, the entire budget process is pointless and meaningful input into the process by the District is a shameful illusion.

The BIA clearly appears to be using assessments paid by the District for the next fiscal year to cover expenses incurred in the current fiscal year. The proposed budget for FY 2005 indicates, in the line item entitled "Assessment Collected," that assessments collected for FY 2004 and FY 2005 are being used to fund expenses in the previous fiscal year. *See id.* at 1, (showing assessment for next fiscal year as income in current fiscal year). This practice is wrong and must be stopped. Payments made by the District in May for use in the next fiscal year should be deposited and left untouched to draw interest for the benefit of the District until the start of the new fiscal year on October 1. The BIA should not be allowed to draw from these funds to pay for current expenses and should not count those funds as income for the current

fiscal year. The Assistant Secretary should order the BIA immediately stop this practice and provide an explanation of how it intends to reform its accounting practices to address this issue.

Basic accounting principles and good business practices require that the BIA adhere to its proposed budget as approved by the Assistant Secretary. The District's landowners entered into contractual agreements to pay O&M costs based upon the BIA's promise that it would provide an open and fair process for setting Project budgets. The unilateral alteration of already-approved budgets and the use of funds from future fiscal years for current expenses undermines the integrity of the budget process and deprives the District and its landowners of their contractual and procedural rights to participate in that process. Such practices cannot be allowed to continue.

**4. <u>Excess Pumping by the Gila River Indian Community</u>.**

The budget for FY 2003, as well as past budgets, have included charges relating to the pumping of groundwater by the Gila River Indian Community in excess of their annual apportionment of stored and pumped Project water. Although the proposed budgets for FY 2004 and 2005 apparently contain no such entries, the BIA may attempt to add such items to the FY 2004 or 2005 budgets at a later date if the Community requests the right to pump excess groundwater.

For numerous reasons, the District has long objected to excess pumping by the Community. *See*, *e.g.*, Letter from Riney Salmon to Robert Carolin (February 4, 2002) (explaining the District's objections to this practice) (Exhibit 17).[1] The District's primary objection is that it cannot take advantage of excess pumping like the Community because the Project facilities cannot physically transport excess pumped water to District lands where it is needed. As a result, the Community is provided a larger amount of Project water than the District, in violation of the agreements and rules governing the Project. *See*, *e.g.*, Landowners' Agreement, at 11 (Exhibit 3); Repayment Contract, at 4, ¶ 7 (Exhibit 5). The District has proposed certain conditions under which it would agree to the Community's pumping, but the BIA continues to ignore the District's reasonable solution to this problem. *See* Letter from Riney Salmon to Rodney Lewis (March 15, 2002) (Exhibit 18).

[1] The arguments found in this letter are incorporated by reference herein.

Each of the BIA's beneficiaries should be allowed to pump or divert their joint share of the common Project water supply and no more. To allow the Community to take an "excess" share of the common Project water supply over and above the apportionment by pumping violates the most basic tenet upon which the Project was founded—a shared common water supply. The District objects to the Community's pumping of additional Project water, over and above its annual apportionment, in FY 2003 or in future years, unless the District is provided an equivalent amount of stored and pumped water on an equal footing with the Community. Until this occurs, the District insists that the BIA delete any allowance for such pumping in current or future budgets.

5. **Power for Pumping.**

The proposed FY 2005 budget includes approximately $435,000 for electric power for irrigation pumping. *See* Budget Draft 4, at 1, column 11, "Power for Pumping" (Exhibit 11). The District objects to this expense category. The purpose of creating the Project power system was to generate electricity and money to help reduce the cost of delivering irrigation water to the Project farmers. The Project's Coolidge Dam power infrastructure has been inoperable for almost twenty years due to the BIA's own negligence, not due to any action or lack of action by the Project beneficiaries. It is inherently unfair and contrary to the purposes of the Project for the beneficiaries to be penalized for the Government's negligence by continuing to pay for power that otherwise could have been generated at the Dam. The Assistant Secretary should order the BIA to delete appropriate charges for pumping power from the FY 2005 budget.

The District also does not believe that the charges are reasonable and justifiable. The charges appear to include administrative and overhead costs of the Power Division and its retail operations that are not properly chargeable to the Project pumps. It also appears that the BIA is using Project federal preference power in order to help subsidize the cost of power to the Project's retail customers. To address these concerns, the Assistant Secretary should order: (1) the BIA to provide power to the Project's pumps at the Project's preference power rate plus the cost of distribution from the Coolidge substation to the pumps; (2) an accounting of the benefits that the Project's retail customers receive from the Project's allocation of federal preference power; and (3) an audit of the BIA's accounting and charges for pumping power to ensure that the Agency is charging the Project pumps the lowest cost possible for power.

6. **Use of Construction Repayment Funds.**

The 1928 Act authorizes the Secretary to sell surplus power developed at Coolidge Dam and to use the resulting revenues to reimburse the United States for the costs of developing the electrical power; reimburse the United States for the costs of constructing the Project; and payment of O&M charges and costs associated with Project repairs and improvements. *See* Exhibit 4. In 1936, Congress passed another statute requiring that "the net revenues from the sale of surplus power developed at the Coolidge Dam and other generating plants of the San Carlos project and transmitted over existing transmission lines" be devoted to the purposes described in the 1928 Act. *See* Act of June 22, 1936, 49 Stat. 1822. In 1946, Congress passed legislation that applied generally to all BIA irrigation projects, authorizing the Secretary to devote power revenues to O&M and other costs related to the power system and to "payment of other expenses and obligations chargeable to power revenues to the extent required or permitted by law." *See* Act of August 7, 1946, ch. 802, § 3, 60 Stat. 895.

For the past several decades, the BIA has been paying off the cost of constructing the Project power system with surplus power revenues. The remaining balance on that power construction debt is now $42,956.38. *See* Summary of District payments (February 19, 2003) (Exhibit 19). Thus, the FY 2003 payment from surplus power revenues should retire that balance. The rest of the funds that would have gone to the power construction payment for FY 2003, as well as the entire amount for FY 2004 and the future, should, according to the relevant repayment contracts and regulations, be credited to the Project's operation and maintenance costs in order to help reduce the cost of delivering water. The proposed FY 2005 budget makes no accounting for this increase in available funds.

The Regional Director argues that the statutes described above present a priority ranking of uses for surplus power revenues, such that O&M costs cannot be paid with such revenues until other Project costs are first paid off. These acts, however, do not prioritize the order in which surplus power revenues must be used, but rather provide a list of permissible uses for these funds. *See San Carlos Irr. and Drainage Dist. v. United States*, 111 F.3d 1557, 1560 (Fed. Cir. 1997). The Secretary thus has the authority to use these funds for any of these purposes as reasonably necessary. Under current conditions of drought and depressed farm prices, it is both reasonable and necessary to the continued viability of the Project and its farmers to use surplus

power revenues to offset costs in the FY 2005 budget. The Assistant Secretary should require that the BIA account for these surplus power revenues in its proposed budget and that it use those projected revenues to offset O&M costs. *See San Carlos Irr. & Drainage Dist. v. United States*, 26 Cl. Ct. 229, 232 (1992) (Repayment Contract confirms the United States' obligation to use net revenues from the sale of surplus power to defray O&M costs).

7. **Well Replacement.**

For the last several years, the District has objected to the BIA setting aside funds for well replacement, especially given the difficult economic climate and the fact that the BIA intended to place the wells at locations different from those recommended by its independent consultant. *See* Mason Affidavit, ¶¶ 15-16 (Exhibit 9). The proposed FY 2005 budget provides no money for well replacement. The District requests that no funds be spent for well replacement in FY 2003 and 2004 as well, and that these funds be used to help reduce future assessments.

8. **China Wash Flume Rehabilitation/Replacement.**

The proposed FY 2004 budget contains $351,000 for the rehabilitation of the China Wash Flume. *See* Budget Draft 4, column 8, "China Wash Flume Rehab/Replacement (Exhibit 11). This expense should be removed from the FY 2004 budget. It has been several years since the initial reconnaissance work was done on the China Wash work. Rather than budget $351,000 to perform the actual work in FY 2004, a much smaller budget amount should be included for FY 2004 so that a qualified consultant can be retained to revisit the need for such work and the timing of that need.

The China Wash project was one of the expenses to which the District previously agreed because the District was led to believe that the Project was in sound financial condition and had surplus reserves. The $351,000 for this work in the FY 2004 budget corresponds to part of the cash reserves, that the BIA has now disclosed were artificially inflated and do not exist. If the China Wash flume work can be safely put off beyond FY 2005, it should be deferred. Although the District does not disagree that the flume will ultimately need to be repaired or replaced, it would be reasonable and prudent to postpone the work until a time when more water is available in the reservoir and funds can be made available for this work without unnecessary burden to District landowners.

In 1996, the Project Engineer agreed with the District that major capital expenditures, such as the China Wash flume project, should be delayed during water-short years. The Project Engineer defined a water-short year as one in which "less than 1.5 acre feet is apportioned for the project lands." *See* Memorandum from Project Engineer to Phoenix Area Director, at 5 (June 28, 1996) (Exhibit 20). Under this definition, each of the last 5 years have been water-short years for the Project. *See* Table 1, Annual Apportionments of Project Water (Exhibit 21). It is unlikely that the current drought will end anytime in the near future. Therefore, under the BIA's own treatment of major capital expenditures, the China Wash flume work should be delayed and the costs for that work should be eliminated from the FY 2005 budget.

**9. Heavy Equipment Sinking Fund.**

The proposed FY 2005 budget continues to set aside money in a heavy equipment sinking fund. *See* Budget Draft 4, at 1, column 4, "Heavy Equipment" (Exhibit 11). Like the China Wash Flume work, the money set aside in the heavy equipment sinking fund does not exist, given that the BIA has disclosed that its cash surpluses were not as represented. No money should be set aside for a heavy equipment sinking fund in the FY 2005 budget.

**10. Staffing and Wages.**

For years now, the BIA has refused to address overstaffing and overcharges to the District for personnel costs. The District has raised this issue repeatedly in the past. *See, e.g.*, District Notice of Appeal of FY 1998 Project Assessment, at 10, ¶ 13 (July 25, 1996) (Exhibit 22). In his decision on the District's appeal of the FY 1998 O&M assessment, the Acting Area Director remanded to the BIA the issue of reducing the Project's labor costs, ordering the BIA to "refine its personnel budget" to more accurately reflect its stated or intended personnel reductions, including pump shop personnel. *See* Acting Area Director's Decision, at 25 (Exhibit 16). The BIA has never adequately addressed the District's concerns as required in the Director's 1997 decision, despite the Regional Director's conclusion to the contrary. *See* Nordwall Letter to Salmon, at 5, ¶ 9 (Exhibit 10). With the proposed FY 2005 budget, the BIA still has not adequately reduced Project personnel costs and eliminated unnecessary staff.

Two primary problems exist with respect to Project staffing and wages. First, the Project has many more employees than are necessary to accomplish its assigned tasks. Second, the

Project pays its employees well above the going wage rates for the local area. Budget savings through reductions in personnel and salaries can be made in the following areas:

**A. Reduction in Force.**

The BIA must take a hard look at how many employees it really needs. As stated above, the District has recently reviewed its own staffing requirements and has reduced its work force by almost twenty percent. *See* District Staffing Charts (Exhibit 12). The BIA can and should do much more. Simply put, if there is no water, there is substantially less work for irrigation employees. A reasoned review of the Project's budget and staffing needs indicates that numerous staff positions can be eliminated, saving money with no detriment to the BIA's ability to manage the Project's facilities and operations.

*i.* ***Well and Pump Section Employees.*** The BIA has been assuring the District since 1996 that Well and Pump Section employees were going to be eliminated. In a memorandum to the Phoenix Area Director addressing the District's concerns with the FY 1998 O&M assessment rate, the Project Engineer affirmatively stated that, based upon an evaluation made by his staff, he had "opted to eliminate the Well and Pump Section by FY 1998." *See* Memorandum from Project Engineer to Acting Phoenix Area Director, at 3 (Exhibit 20). The Well and Pump Section was not eliminated by FY 1998, however, and has been included in each O&M budget since 1998. Two employees remain in the proposed budget for FY 2005, at a cost of $121,458 to the Irrigation Division. *See* Budget Draft 4, at 5, Project Irrigation Division Obligations, Personnel and Benefits Obligations Table (proposing that the Irrigation Division pay 95% of the cost of a Pump Shop Mechanic Foreman and Helper) (Exhibit 11).

The District originally proposed elimination of the Well and Pump Section because the work could be performed more cheaply and efficiently by outside contractors. Since 2000, the BIA has out-sourced most of the pump-related work to contractors and has included the costs associated with that work in the O&M budget each year. *See, e.g., id.* at 11 (listing costs associated with well repair by outside contractors). Incredibly, however, the BIA has retained the same Agency employees who did that work in the first place, making assessments for their salaries and benefits *on top of* the expense of the outside contractors. Once again, at the FY 2005 fact-finding meeting, the BIA indicated that remaining Well and Pump Section employees would be eliminated by the end of FY 2003, which ended September 20, 2003. *See* Mason Affidavit, ¶

6 (Exhibit 9). It is now nearly December 2003 and the BIA is still paying for these employees *and* the outside contractors to do the same work.

The BIA appears to agree with the District that the work of the Well and Pump Section can be handled more cheaply and efficiently by outside contractors, yet it refuses to eliminate personnel rendered unnecessary by this fact. This redundant staffing has cost the Project at least $250,000 per year every year since 2000, for a total of $1.0 million over the last 4 years. *See* Doug Mason Affidavit, ¶ 9 (Exhibit 9). The pump shop should immediately be eliminated in its entirety.

***ii. Zanjeros.*** Some time ago, the BIA hired extra irrigation system operators (zanjeros) to cover the Project canal operations twenty-four hours a day, seven days a week. That action was initially taken on a trial basis. These extra zanjeros have cost the Project approximately $70,000 per year since the trial project was initiated. *Id.* ¶ 10.

In arguing that the two zanjeros should be retained to ensure fair treatment of the District and Community, the Regional Director ignores the indisputable fact that the Community was never treated unfairly in the first place. *See* Nordwall Letter to Salmon, at 6 (Exhibit 10). He also ignores the fact that the Project has installed measurement structures on the Project canals at a cost of $150,000. These measurement structures ensure that all flows are accurately measured, eliminating the need for extra zanjeros. *See id.* Even if this were not the case, it is not necessary to have as many operations personnel in times of drought as it is when more water is flowing. With little or no water behind the Dam, the BIA needs no more than two zanjeros, plus a supervisor. The BIA should eliminate two zanjeros positions for an immediate savings of $67,089.62. *See* Budget Draft 4, at 5, Project Irrigation Division Obligations, Personnel and Benefits Obligations Table (Exhibit 11).

***iii. Other Areas.*** The BIA also needs to make substantial cuts in other staffing areas. At least one equipment operator should be eliminated. If additional help is needed, the Project can hire a temporary employee to cover for brief periods. Eliminating this position would save the BIA $53,852.03 in salary and benefits. *Id.* The BIA also needs to reduce the personnel at the Dam. With no water in storage, little work is left to do at the dam.

**B. Salary Adjustments.**

The BIA pays its employees well above the going wage rates for the local area. In 2002, the District supplied the BIA with a study of local wage rates, and this comparison revealed that BIA employees routinely make one and a half to two times more than employees in the same trade working for other entities within Pinal County. *See* Letter from Douglas Mason to Robert Carolin (May 21, 2002) (Exhibit 23). A revised study prepared for FY 2003 demonstrates that the BIA continues to pay its employees far above market rates. *See* Table 3, Labor Rate Comparison (Exhibit 24).

The following comparison is revealing. The District operates and maintains 204 miles of canal system with nineteen employees on a budget of $4,369 per mile. The BIA, on the other hand, proposes to operate and maintain just forty miles of canal system with twenty-six employees—a budget of $22,234 per mile, or over 5 times that of the District to handle a canal system that is 80% smaller than the District's. *See* Table 3, 2005 Labor Budget Comparison (Exhibit 25). It is impossible to comprehend why it is necessary to employ six heavy equipment mechanics, seven operators, three laborers, two welders, and three engineers on the Project payroll for only 40 miles of canals. In terms of operators alone, this works out to one operator for every 5.5 miles of canal per year. The District employs one operator for every 40 miles of canal.

The BIA must sharply reduce salaries to all personnel and the wages it pays to operators, mechanics, zanjeros, welders, dam operators, and pump shop riggers, so that those wages more closely resemble the average wage paid by other entities in the area. If, as the Regional Director alleges, the BIA is bound by union contracts to pay its employees at these rates, *see* Exhibit 10, at 5-6, it should only charge the District that proportion of those wages that is equivalent to prevailing wage rates in the area. To continue on the same level of personnel and wages in spite of the existing circumstances is arbitrary, capricious, and a breach of the Landowners' Agreement and the Repayment Contract.

The revisions in BIA staffing and wages discussed above would reduce the personnel costs in the FY 2005 proposed budget from $921,000 to $682,000. *See* Budget Draft 4, at 1, columns 10 and 11, "Personnel" (compare District's proposed personnel budget to that of

Project) (Exhibit 11). The District insists that the BIA institute those revisions and reduce the FY 2005 budget accordingly.

**11. <u>Archaeology Study.</u>**

The FY 2003, FY 2004 and FY 2005 budgets include $50,000, $51,500, and $53,045, respectively, for an archaeological study of areas within the Reservoir exposed by dropping Reservoir water levels during the continuing drought. *See* Budget Draft 4, at 11 (charges to "Perform 1,000 ac arch. Survey of SCR drawdown zone") (Exhibit 11). These funds were included in the Project budget at the insistence of the San Carlos Apache Tribe. As it has in the past, the District strongly opposes any use of Project funds for this study. Neither the Project nor the District has any duty to the Tribe to conduct such studies, as the Tribe has no rights or interests in the Project or the land under San Carlos Reservoir. *See San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 868 (2003) (Coolidge Dam sits on federal property). Money spent on this study adds no value to the Project and does nothing to further the efficient delivery of water to Project beneficiaries. The cost of this study should be paid for by either the San Carlos Apache Tribe or the United States as its trustee. Therefore, the District requests that the Assistant Secretary order these costs to be eliminated from the FY 2004 and FY 2005 budgets.

**12. <u>Expense and Service Accounting.</u>**

The BIA still has not done an adequate job of accounting for all of its expenses, services, and equipment. The District has requested that the BIA provide it with supporting information for all services and utility expenses included in the FY 2005 budget, so that the District can determine if the Irrigation Division of the Project is being charged the appropriate percentage of joint Project expenses. *See* Salmon Letter to Carolin, at 6-7 ¶ 12 (Exhibit 8). To date, the BIA and Regional Director have ignored that request, raising a question regarding the Project's ability to justify its budget allocations for these line items.

The District also is concerned about the BIA's failure to properly track its equipment inventory. When Irrigation Division equipment is lent to the Power Division or other entities, credits and charges should be made to account for that fact, and those entries should properly include equipment time and fuel. The District also suggested this change in Project accounting over six months ago, *id.*, but has received no response from the BIA.

To the extent that such practices have occurred in the past, the Irrigation Division should be fully compensated for the use or sale of its equipment by other agencies or third parties. Because the BIA has ignored the District's requests for detailed information on the Project's service, utility and equipment expenses, it is impossible for the District to provide more detailed comments on this budget item. Nevertheless, it is apparent from the lack of documentation in the budget that substantial problems likely exist with the BIA's accounting and expenses for these items. The District, therefore, requests that the Assistant Secretary remand these line items in the proposed budgets for FY 2004 and FY 2005 to the BIA and order that: (1) the BIA provide the District with any and all relevant documentation in support of its service and utility expenses; (2) provide a full accounting of its Irrigation Division equipment for the last five years, including inter-divisional loans of the equipment or loans or sales of the equipment to or by third parties or other Federal agencies; (3) provide appropriate credits to the District for any use or sale of Irrigation Division equipment by the Power Division, other Federal agencies, or third parties; and (4) revise its proposed budgets, with input from the District, as required to ensure that the Irrigation Division is charged appropriately for these budget items. *See, e.g.*, 41 C.F.R. Part 101-45.

**13. <u>BIA's Failure to Charge Concession Royalties.</u>**

The BIA has failed to charge concession royalties and apply any revenues generated from concession operations at the Reservoir to defray Project O&M costs. This is a violation of the BIA's duties and responsibilities under the Repayment Contract and 25 U.S.C. § 390 (Section 390). The District requests that the BIA, in consultation with the District, determine the value of revenues generated by concession operations at the Reservoir, collect and use those revenues to pay for Project O&M costs, and offset the proposed FY 2004 and 2005 O&M rate assessments by the amount of those revenues.

The Repayment Contract provides that the "whole cost of operating and maintaining the works of the Project" shall be divided equally among project lands "*after sums collected...which may go to the operation and maintenance fund as provided herein have been deducted.*" *See* Repayment Contract, at 7 (emphasis added) (Exhibit 5). The Repayment Contract further provides that "[t]he sums collected by or for the benefit of the Project . . . shall go to pay a proper share of the cost of operating and maintaining the Project, however it may be operated or

maintained." *Id.* at 10. These provisions clearly demonstrate that, before setting per acre O&M charges, the BIA must: (1) investigate all potential sources of revenue to the Project, such as concession royalties; and (2) apply all such sources of revenue to defray O&M costs.

In 1938, Congress enacted Section 390, which authorizes the Secretary, in her discretion, to grant concessions on reservoir sites in connection with the Project. Section 390 specifically provides that, "the funds derived from such concessions...shall be available for expenditure in accordance with the existing laws in the operation and maintenance of the irrigation projects with which they are connected." Thus, by providing the Project with an additional source of potential revenue, this statute supports, and is fully consistent with, the provisions of the Repayment Contract, which contemplates that revenues generated by or for the benefit of the Project will be used to pay O&M costs.

The BIA has consistently failed to meet its obligation, under the Repayment Contract and Section 390, to collect the revenues generated by Reservoir concessions and make these revenues available to pay for Project O&M costs. A 1988 grant of concession to the San Carlos Apache Tribe expired in 1998, and since that time, the Apache Tribe has continued to operate concessions at the reservoir, without authorization of the Secretary *and without payment to the Project of any portion of the revenues generated from these concessions*. Ignoring its obligations under the Repayment Contract and Section 390, the BIA has taken no action to require the payment of funds generated from the Apache Tribe's concession operations for the benefit of the Project. The BIA's failure to do so constitutes a flagrant and continuing violation of the 1938 statute and a breach of the Repayment Contract.

The funds derived by the Apache Tribe's unauthorized concessions operations at the Reservoir are quite significant, in fact, "in excess of two million dollars a year." *See* Apache Tribe's Response to Motions for Summary Judgment, *San Carlos Apache Tribe v. United States of America et al.*, CIV 99-255, at 4 (September 27, 2002) (Exhibit 26). In light of these earnings, the BIA has been depriving the Project of a huge source of revenue for decades, to the significant detriment of Project landowners. When one considers that the entire proposed O&M budget for FY 2005 totals $3,000,000, it is undeniable that the BIA's continued failure over many years to recover the funds generated by the Apache Tribe's concessions operations has severely and adversely affected the Project and its landowners.

The District requests that the Assistant Secretary order the BIA, in consultation with the District, to determine the value of revenues generated by concession operations at the Reservoir and enter into a new grant of concession agreement providing for the payment of this amount to the Project. *See* Repayment Contract, at 19 ("the United States and the District shall inform and consult with each other as to contemplated future steps of importance.") (Exhibit 5). Further, the District requests that the BIA be ordered to collect and offset these revenues from Project O&M expenses, and reduce the FY 2005 O&M charges accordingly.

## III. TIMING OF THE BUDGET REVIEW PROCESS

The District must know what the final O&M assessment rate will be so that it can issue timely assessments to its landowners. The Repayment Contract states that O&M rates "shall be fixed annually by the Secretary of the Interior." The Secretary must "give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts." Repayment Contract, at 8 (Exhibit 5). The BIA has consistently failed to meet this contractual duty.

Using FY 2005 as an example, the BIA apparently expects the District to pay the assessment for FY 2005 by May 15, 2004. In order for the District to do so in compliance with the Repayment Contract and Arizona law, the following schedule would have to be followed:

- July 1, 2003: The deadline for the District to inform the Pinal County tax assessor of the FY 2005 assessment rate to be included in the next property tax bill.
- September 2003: Tax assessor mails the property tax bill to District landowners.
- November 2003 and March 2004: First and second halves of property tax assessment, including the District's assessment, are due under Arizona law.
- May 15, 2004: District submits FY 2005 assessment to BIA.

*See* Mason Affidavit, ¶ 12 (Exhibit 9). Given this schedule, July 1 of each year is the deadline for the BIA's final decision on the assessment rate for the fiscal year two years in the future. The BIA has consistently failed to meet this deadline in the past and continues to do so for FY 2005, as evidenced by the fact that the *proposed* rate for FY 2005 was not even published until September 2003.

This problem has clearly arisen in the past. In 1997, the Acting Area Director agreed with the District that it should not have to pay any assessment until after a final decision is

published. Acting Area Director's Decision, at 16 (Exhibit 16). The Director acknowledged the fact that the District has to know the final assessment rate by July 1 in order for it to be able to collect the landowner's payments by May 15 of the following year and that the BIA's failure to provide a final decision on the O&M rate before this date violated the Repayment Contract. Despite his decision, the BIA continues to ignore the July 1 deadline for finalizing the budget and assessment rate.

In the past, when the BIA failed to issue a final decision on O&M rates in time for the District to assess its landowners, the District made an informed guess at what the rate would be and assessed its landowners based upon that guess. Because no decision was made by July 1 for the FY 2005 assessment rate, the District was forced again this year to make a good faith guess at the Assistant Secretary's final decision on the assessment rate and assess its landowners $20 per acre for FY 2005. *See* Mason Affidavit, ¶ 13 (Exhibit 9). The District will no longer guess, however, at what the rate assessments for future years will be. If the BIA fails to issue a final decision in time for the District to submit its assessment to Pinal County by the deadline required under Arizona law, the District will not submit the assessment to the Project until a final decision has been published and the District has had the requisite time to submit and collect the proper assessment from its landowners.

## IV. CONCLUSION

The Project's proposed increase of 50% in the budget and O&M rate assessment for FY 2005 is totally unacceptable. The Assistant Secretary should require that the Project revise its FY 2004 and 2005 budgets and reduce the assessment. Under the current conditions of depressed commodity prices, ever-increasing variable costs of production, and the unprecedented drought facing this region, District landowners cannot afford to pay these rates into the Project so that a bloated and inefficient Project bureaucracy can continue with business as usual. Although the Project has numerous problems and issues that need to be addressed, the answer lies in more efficient operations and tighter controls, not in extracting even more money from Project landowners already on the brink of financial disaster. The District stands ready to work with the Project in any way it can to help reduce costs and improve efficiencies. For the reasons described above, the District requests that the Assistant Secretary reject the Project's proposed

budget and O&M rate assessment, remand to the Project for reconsideration, and set the rate at a more reasonable level of $15 per acre.

Very truly yours,

Salmon, Lewis and Weldon

By [signature]
Riney B. Salmon

cc: Arizona Congressional Delegation
Wayne Nordwall, BIA Regional Director
San Carlos Irrigation and Drainage District