**SALMON, LEWIS & WELDON, P.L.C.**
Attorneys at Law

Riney B. Salmon II, P.C.
John B. Weldon, Jr.
Lisa M. McKnight
James R. Huntwork
Ronnie P. Hawks
Alexandra M. Arboleda
Jason P. Alberts

2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016
Telephone 602-801-9060
Facsimile 602-801-9070

M. Byron Lewis
Stephen E. Crofton
Mark A. McGinnis
Karen S. Gaylord
Kristin D. Magin
Rebecca C. Goldberg

*Of Counsel*
Richard N. Morrison

*Writer's Direct Line*
(602) 801-9060
*Writer's Internet Address*
*rbs@slwplc.com*

April 1, 2005

**Via overnight delivery,**
**for delivery on April 4, 2005**

Arch Wells, Director
Office of Trust Services
Attn: Irrigation and Power
MS-4655-MIB, Code 210
1849 C Street NW
Washington, D.C. 20240

Re: San Carlos Irrigation and Drainage District's Comments on Bureau of Indian Affairs' Proposed FY 2006 Budget and Operation and Maintenance Assessment Rate for San Carlos Irrigation Project, Arizona

Dear Mr. Wells:

This firm represents the San Carlos Irrigation and Drainage District ("District"), which consists of 50,000 acres of non-Indian lands in the San Carlos Irrigation Project ("Project") in Pinal County, Arizona. This letter constitutes the District's comments on, and objections to, the proposed operation and maintenance ("O&M") charge for the Project for fiscal year 2006 ("FY 2006"), which was published in the *Federal Register* on February 1, 2005. *See* 70 Fed. Reg. 5210. The District strongly opposes the proposed rate of $30/acre and requests that the final rate be set at no more than $15/acre, as originally proposed by the Project itself.

Over the past several years, the District has provided the Project and the Bureau of Indian Affairs ("BIA") with information and comments on each year's Project budget and the associated O&M rates charged to Project water users. Those submittals have gone largely ignored. Based upon this lack of response to its concerns, the District has pursued its appeals of the proposed and final rates. The District recently filed a lawsuit against the United States, the BIA, Project, and others in the United States District Court for the District of Arizona relating to the FY 2005 Project O&M rate. *See San Carlos Irr. & Drainage Dist. v. United States*, No. CV05-0937 PHX DGC (D. Ariz., complaint filed March 29, 2005) ("FY 2005 Lawsuit").

The $30/acre rate proposed for FY 2006 is a continuation of years of inept management by Project officials and inadequate financial and operational oversight by the BIA. The $30/acre

rate is entirely unjustified in view of the large cash reserves presently maintained by the Project, the projected costs of operating the Project for FY 2006, and the information provided by all Project water users. Complaints about the FY 2006 budget and assessment rates have come from both sides of the Project, Indian and non-Indian. The Gila River Indian Irrigation and Drainage District ("GRIIDD"), which represents the 50,000 Indian acres in Project, has joined the District in opposing the $30/acre rate and supporting an assessment of no more than $15/acre. *See* Letter from Harlan Bohnee, Chairman, GRIIDD, to Robert E. Carolin, Project Manager, and Wayne Nordwall, BIA Western Regional Director (January 18, 2005) (copy attached hereto as Exhibit 1). For FY 2006, even Project management agreed that $30/acre was too high and proposed an assessment of $15/acre. *See* Memorandum from Robert E. Carolin, Project Manager, to Wayne Nordwall, BIA Western Regional Director (September 15, 2004) (Exhibit 2).

The BIA Western Regional Director ("Regional Director"), however, rejected the Project's own proposal of $15/acre and directed that the proposed assessment rate be doubled. *See* Memorandum from Wayne Nordwall, Regional Director, to Project Manager (October 1, 2004) (Exhibit 3). The $30/acre rate proposed in the February 1, 2005 *Federal Register* is not supported by the information in the record and is contrary to the well-reasoned positions of the Indian and non-Indian Project beneficiaries and Project management itself. The District requests that the BIA reject the proposed $30/acre rate and adopt a rate of no more than $15/acre for FY 2006.

## I. HISTORY AND BACKGROUND

### A. Congressional Enactments, Agreements, and BIA Regulations Governing the Project

The Project contains 100,000 acres of Indian and non-Indian lands. It is administered by the Secretary of the Interior ("Secretary") through the BIA. Congress authorized construction of the Project on June 27, 1924. *See* Act for the Continuance of Construction Work on the San Carlos Federal Irrigation Project in Arizona, and for Other Purposes, Pub. L. No. 68-210, 43 Stat. 475 ("1924 Act") (Exhibit 4). The purpose of the 1924 Act was to provide irrigation water for Project lands. *Id.* In the 1924 Act, Congress authorized the construction of Coolidge Dam, which impounds the waters of the Gila River to form the San Carlos Reservoir for the benefit of Project landowners. The total cost of the project—including construction, operation, and maintenance—was distributed one-half to the District landowners and one-half to Reservation water users equally per acre. The 1924 Act authorized the Secretary to enter into a construction repayment contract with an irrigation district representing the landowners, i.e., the District. *Id.*

In furtherance of the act, the District's landowners transferred their water rights to the United States for use as a common Project water source with the Pima-Maricopa Indians, i.e., the Gila River Indian Community, and also pledged their lands as collateral for the repayment of the initial Project construction cost and the ongoing O&M cost. *See* Landowners' Agreement with the Secretary of the Interior, San Carlos Project: Act of June 7, 1927, at 4-6 (various dates) ("Landowners' Agreement") (Exhibit 5). The landowners also agreed to pay an O&M charge to

be fixed by the Secretary from time to time, "based upon the total annual cost of the operation and maintenance of the said San Carlos Project." *Id.* at 15.

In 1928, Congress authorized the "development of electrical power at the Coolidge Dam as an incident to the uses of the Coolidge Reservoir for irrigation." *See* An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1929, and for other purposes, Pub. L. No. 70-100, ch. 138, 45 Stat. 200, 211 (March 7, 1928) ("1928 Act") (Exhibit 6). This act authorized the Secretary to enter into a contract with the District "for repayment of the costs of construction of said power plant." The act also authorized the Secretary "to sell surplus power" and apply the "net revenues" after the cost of generation was deducted to reimburse the United States for "the cost of developing such electrical power," the cost of constructing the irrigation project, and the O&M cost of the Project. *Id.*

In 1931, the District entered into a repayment contract with the Secretary. *See* Repayment Contract Between the United States and the San Carlos Irrigation and Drainage District, Arizona (June 8, 1931) ("Repayment Contract") (Exhibit 7). That contract requires the District's landowners to repay their share of the construction cost of the original dam and water delivery system. Under that contract, the landowners agreed to pay an equal share of "the whole cost of operating and maintaining the works of the Project, after sums collected for excess water and other sums which may go to the operation and maintenance fund as provided herein have been deducted." *Id.* at 7. The Repayment Contract also expressly provides that the Project must maintain complete and accurate accounts and records with respect to the funds paid by District water users. *Id.* at 19; *see also* 25 C.F.R. § 171.1(g) (terms of Repayment Contract control over any conflicting BIA regulations) (Exhibit 8).

In 1938, the Assistant Secretary issued an Order providing, among other things, that the District landowners would pay an equal share of the O&M cost of the Project's Joint Works, exclusive of the cost of operating and maintaining the power generating plant at Coolidge Dam. *See* Order Defining Joint, District and Indian Works of the San Carlos Federal Irrigation Project: Turning Over Operation and Maintenance of District Works to the San Carlos Irrigation and Drainage District, at 7 (June 15, 1938) (Exhibit 9).

Throughout the 1960s, 1970s, and early 1980s, the BIA, through its negligence, allowed the facilities at Coolidge Dam to fall into a state of gross disrepair. Much of the current difficulty with the Project facilities has its roots in this period of the BIA's neglect. On October 1, 1983, a storm caused inflows of water into the San Carlos Reservoir. Three days later, the reservoir began to spill over the spillway crests and down the spillway gates. The spills were minor, in as much as the two spillway gates were sized for a 120,000 cubic feet per second discharge, and the maximum discharged during the storm was only 4,000 cubic feet per second. The dam had gates located in the spillways to stop or control spills, but they were inoperable due to the BIA's failure to properly operate and maintain them or to provide a permanent replacement. No other means existed to stop or control spills. If the gates had operated properly, twelve feet would have been added to the spillway crests, preserving the designed storage

capacity of the dam. *See generally San Carlos Irr. & Drainage Dist. v. United States*, 15 Cl. Ct. 197 (1988), *rev'd*, 877 F.3d 957 (Fed. Cir. 1989).

Although the 1983 spills were minor, they did serious damage to the Project. At the time, holes existed in the downstream powerhouse wall that the BIA never repaired. This allowed the uncontrolled spills to back up into the switchyard behind the powerhouse wall and supersaturate the ground beneath the dam's hydroelectric facilities, causing the switchyard to settle and rendering the dam's electric generating system completely inoperable. As a result, no more power could be generated for the Project's groundwater pumps and no surplus power could be sold to produce much needed revenue for the Project. To date, both the spillway gates and generating facilities remain inoperable. *See generally id.*

**B. Establishing the Proposed FY 2006 O&M Assessment Rate**

Each year, the Secretary is required to publish notice of the annual O&M assessment charge to be paid by District water users.[1] The decision must be made "in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts." Exhibit 7, at 8. Under Arizona law, the District must provide the assessment rate to the Pinal County Board of Supervisors by July 1 of each year in order for the rate to be included in the County's tax bills to the District's landowners. *See* Ariz. Rev. Stat. § 48-3112(A). The assessment is collected from the landowners as part of their property tax bill, which is not delinquent until the following May 1. *See* Ariz. Rev. Stat. § 42-18052. Therefore, if the Project hopes to collect the assessment from the District by May 15 of a given year for the upcoming fiscal year, the BIA must provide the final assessment rate to the District by the previous July 1.

The Project submitted spreadsheets to the water users prepared on or about June 22, 2004, showing the Project's proposed budget for FY 2001-2006. *See* Irrigation Division Budget, San Carlos Irrigation Project (June 22, 2004) (Exhibit 10). Those spreadsheets showed a $30/acre assessment for FY 2005 and a $15/acre assessment for FY 2006. *Id.* With a $15/acre rate for FY 2006, that spreadsheet showed an ending cash balance for FY 2006 of more than $3,000,000. *See id.*

On June 29, 2004, the Project held a fact-finding meeting, which was attended by the District and GRIIDD representatives. At that meeting, Project management agreed that a rate of $15/acre for FY 2006 was appropriate.

On September 15, 2004, the Project Engineer submitted the Project's recommended FY 2006 budget to the BIA Western Regional Director. *See* Exhibit 2. That submittal stated that "[t]he operation and maintenance rate for FY 2006 is $15.00 per acre for a total assessment of

[1] SCIP and the BIA have made a habit of being substantially late in notifying the water users of the proposed and final assessment rates. *See* FY 2005 Lawsuit, *supra*.

$1,500,000." *Id.* The Project Manager referred to the June 29 fact-finding meeting and correctly informed the Regional Director that "[t]he participants at the Fact Finding Committee seem satisfied with the proposed FY 2006 budget and the recommended assessment rate of $15.00 per acre." Importantly, the Project Engineer continued and stated: "In addition, attached is a summary of the FY 2004 budget through August 31, 2004, which shows total obligations of $2,340,751 to date. It is currently anticipated the total obligations for FY 2004 will not exceed $2,700,000. If it is $2,700,000 the carryover to FY 2005 will increase from $2,350,000 to about $2,600,000." *Id.* The Project Engineer's prediction held true, as the Project's proposed budget indicates that $2,586,687 in surplus cash was carried over from FY 2004. *See* San Carlos Irrigation Project, Proposed FY 2006 Budget (October 28, 2004) (Exhibit 11).

The Regional Director, however, rejected the Project's recommendations for its own FY 2006 budget. In an October 1, 2004 memorandum to the Project Manager, the Regional Director stated that "[w]e do not concur with your recommendation to decrease the assessment for FY 2006 to $15.00 per acre." *See* Exhibit 3. The Regional Director based his rejection of the Project's recommendations almost entirely on the need for "work on deferred maintenance items." *Id.* Although not specifically addressing what "deferred maintenance" he believed was necessary for the Project, the Regional Director ordered the Project Manager to "[p]rovide a plan for addressing deferred maintenance." *Id.*

The BIA Western Regional Office made the decision to set the FY 2006 Project assessment at $30/acre rather than $15/acre *even before* it requested or received any supporting information from the Project to justify that higher rate. On September 29, 2004 (before the Regional Director sent his October 1 memorandum to the Project Engineer), the Western Regional Office told Interior Department staff that "[w]e will be keeping the 2006 rate for the Joint Works at $30.00 per acre. Please go ahead and publish this proposed rate." *See* E-mail correspondence from Russell Kaskalla, Civil Engineer, Western Regional Office, to Ross Mooney, Chief, Branch of Irrigation, Power, Safety of Dams, operation of Non-federal Dams (October 29, 2004) (Exhibit 12). This decision was made despite the fact that the Project itself had recommended a $15/acre rate and the Regional Director had not yet requested (and the Project had not provided) any information that would support a higher $30/acre rate.

Directed by their superiors to justify a $30/acre rate for FY 2006, Project staff prepared a revised budget that included the higher rate. *See* Exhibit 11. That revised budget included substantial upward adjustments for certain cost categories and showed a beginning cash surplus for FY 2007 of almost $3,500,000. *Id.*

The Project held another fact-finding meeting on December 16, 2004, intending to justify the higher $30/acre FY 2006 assessment. The notice for that meeting stated: "Based upon current Bureau of Indian Affairs, Irrigation Handbook financial management and deferred maintenance guidelines (enclosed), the recommended assessment is being increased from $15.00 per acre to $30.00 per acre." *See* Letter from Robert E. Carolin, Project Manager, to Douglas Mason, District General Manager (December 9, 2004) (Exhibit 13). At that meeting, the Project distributed to the water users a copy of the revised budget prepared on October 28, 2004,

attempting to justify the higher $30/acre rate. *See* Exhibit 11. The District and GRIIDD both attended that meeting and voiced their objections to the $30/acre rate.

On January 18, 2005, GRIIDD sent a letter to the Regional Director, outlining in detail some of the same concerns about the proposed $30/acre rate set forth by the District in these comments. *See* Exhibit 1. Those objections were apparently ignored, because the BIA published notice of the $30/acre rate less than two weeks later in the February 1, 2005 *Federal Register*. *See* 70 Fed. Reg. 5210. The narrative portion of the February 1 *Federal Register* notice contains no discussion of the valid concerns raised repeatedly by the Project water users and sets forth no rational basis for rejecting the Project's recommended $15/acre rate and proposing a higher rate of $30/acre.

The District has numerous substantive objections and comments regarding the proposed FY 2006 assessment rate and budget for the Project. In light of these substantive issues, described below, no reasonable argument can be made to justify the proposed budget and assessment rate. Furthermore, the process employed by the BIA to set the proposed FY 2006 assessment rate is riddled with procedural irregularities and violations of the laws, regulations, and agreements governing the Project. These procedural errors alone undermine any decision that relies on the proposed budget or assessment. For the reasons set forth herein, the District strongly opposes the $30/acre rate proposed for FY 2006 and joins with the original recommendation by the Project and GRIIDD's request that the rate be set at no more than $15/acre.

## II. <u>THE DISTRICT'S COMMENTS ON THE PROPOSED $30/ACRE RATE FOR FY 2006.</u>

The District shares GRIIDD's belief that the revised budget prepared by the Project on October 28, 2004 underestimates Project income and includes unnecessary expenses for various work items, purchases, and reserve funds, in an improper and unjustified attempt to "maintain an assessment of thirty dollars ($30) per acre rather than the proposed fifteen-dollar ($15) per acre." *See* Exhibit 1, at 1. The Western Regional Office had decided to propose a $30/acre rate even before the Regional Director requested information from Project to support such a rate. *See* Exhibits 3 and 12. The October 28, 2004 revised budget is nothing more than a *post hoc* attempt to rationalize the higher assessment directed by the Western Regional Office. That revised budget does not support the proposed $30/acre rate.

Furthermore, the District farmers cannot afford to pay a $30/acre assessment for FY 2006. Despite recent rains in other parts of Arizona, the Gila River watershed continues in the depths of an extended drought. Although the Reservoir is at its highest level in years, one season of increased water deliveries will not make up for years of dry conditions and low crop yields. The impacts of the continued drought are exacerbated by depressed commodity prices that reduce the farmers' income and profits at a time when operating expenses and the cost of supplies are on the rise.

In the face of these conditions, the District and its farmers have had to significantly reduce their own overhead and operating costs. The District, for example, has reduced its own staff by almost twenty percent in recent years. Individual farmers have cut staff and costs by even greater amounts in order to survive in these tough times. The Project, however, continues to increase its operating costs, funding its recklessness by demanding more money from the Project farmers. Because O&M costs for Reservation lands within the Project are paid by the United States on the Indians' behalf, the BIA has little incentive to reduce costs and keep charges at the lowest reasonable level. The BIA must realize that the District farmers, like the Reservation Indians, are Project beneficiaries and partners in the irrigation project. The BIA's continued indifference to the difficulties of the non-Indian Project beneficiaries is contrary to the stated purpose of the Project, as clearly expressed in the relevant statutes, agreements, and regulations governing operation of the Project.

The District's numerous objections to, and concerns with the FY 2006 budget and assessment fall into three categories: (1) incompetent accounting practices; (2) incorrect or unreasonable assumptions regarding Project income and obligations; and (3) procedural deficiencies.

**A. <u>The Project's Records and Accounting Practices are Woefully Inadequate.</u>**

Before delving into the substantive issues regarding the proposed FY 2006 budget, an initial point must be made concerning the Project's records and accounting practices. The Repayment Contract requires Defendants to keep full and accurate records and accounts of the Project's fiscal operations, receipts, and expenditures and to make the books and accounts of the Project available to the District. *See* Exhibit 7, at 19 ("Books of Accounts"). Contractual good faith and fair dealing, the United States' fiduciary duty to the District as operator of the Project, and the basic accounting standards applicable to federal agencies all require that the Project's records be kept in a commercially-acceptable manner and that the Project's accounting practices and budget decisions be transparent and reasonably understandable.

Unfortunately, it is nearly impossible to decipher the Project's budgets and accounting records. Total income and expenses never match and year-end totals are adjusted for the beginning of the next year without explanation. Annual expenses are constantly moved from one cost category to another without rhyme or reason. The cost categories themselves are not broken down so as to illustrate what types of expenses are included. To make matters worse this year, the BIA has provided absolutely no supporting documentation to the District to explain the raw budget numbers upon which the FY 2006 assessment is based.

The numbers upon which the Project relies also are constantly changing without explanation. For instance, the October 28, 2004 budget, upon which the proposed FY 2006 assessment rate is based, indicates that the total obligations for FY 2005 are approximately $3.3 million, not counting sinking fund and reserve balances, while income is only $53,000, not counting O&M assessments. Yet in a budget prepared on March 8, 2005, the Project showed total obligations for FY 2005 of only about $2.8 million, and income of $420,000. *See* FY 2005

Irrigation Budget, prepared by Carl Christensen (March 8, 2005) (Exhibit 14). The enormous disparity in these two budget presentations, prepared within months of each other for the same fiscal year, defies reasonable explanation.

Nor does the BIA appear to concern itself with actual numbers when setting its budgets. As GRIDD has pointed out, the proposed FY 2006 budget does not include income received from the District in FY 2004. Exhibit 1, ¶ 1. As a result, the ending unobligated cash number for FY 2004 does not match the beginning unobligated cash number for FY 2005, yet no effort is made to explain the disparity. *Id.* Based upon past experience, the District also believes that the BIA routinely bases other income and obligation figures for past budget years on the "paper" numbers in the original budget, not the actual and correct figures derived from year-end accounting totals. Without actual numbers from past years, it is impossible to evaluate income and expense histories and trends or to accurately predict future budget needs. The BIA and Project must begin providing and using actual and correct expense and income figures when such numbers are known in order to provide a true and accurate picture of the Project's fiscal status. *Id.*

Furthermore, it appears that the BIA continues to make it a practice to move money from one line item O&M category to another, eliminate funding in one place but increase funding in others, etc., even after the budget for a given fiscal year has been approved by the Assistant Secretary. The budget that is presented to the District as the basis for O&M assessments in a given year and that is submitted to the Secretary for final approval and publication in the *Federal Register* is the budget that the BIA should be bound by for that fiscal year. The BIA should not be allowed to unilaterally reallocate funds collected from District landowners during the fiscal year, without first consulting with the District and obtaining its consent. Otherwise, the entire budget process is pointless and meaningful input into the process by the District is a sham.

This is not a new problem. In his 1997 decision, the then-Acting Area Director addressed this same issue, finding that the BIA's unilateral decisions to shift funds among expense categories are "particularly troubling due to the fact that the Project's O&M expenditures are funded by private funds collected by the Project from [District] landowners, and by Federal funds appropriated for the benefit of the Indian beneficiaries of the Project." The Acting Director concluded that "It is essential from a procedural standpoint that the Project provide sufficient information to SCIDD and the Indian Works to explain the expenditures on the budget spreadsheets as well as the basis for deviations from budget spreadsheets presented or approved in prior years. The Project fails to demonstrate in the record that it has met this threshold." *See* Decision of the Acting Area Director Regarding Notice of Appeal of the FY 1998 San Carlos Irrigation Project O&M Assessment, at 21 (January 10, 1997) (Exhibit 15).

Despite this decision and continuing complaints by the District, however, the BIA continues to employ lax accounting methods and play fast and loose with budget figures. The BIA has a legal and contractual obligation to use the same basic accounting principles and good business practices employed by any other federal agency or responsible business. The Secretary should require, beginning immediately, that the Project's record-keeping and account

management be updated and revised to make the Project's fiscal records transparent and readily understandable. In the meantime, the District's comments on the BIA's budget numbers will continue to be based upon the limited records made available by the BIA and the District's best understanding of what those records and numbers appear to mean.

**B. <u>The Project Has Underestimated Income for FY 2006 from Sources Other than O&M Assessments.</u>**

The Project's proposed FY 2006 budget relies too heavily on higher O&M assessments from District landowners partly because the BIA has underestimated Project income from sources other than the O&M assessments. More reasonable income projections, consistent with the the BIA's duties and obligations under applicable laws and agreements, would help lower the assessment rate charged against District landowners.

**1. <u>The revised budget does not reflect income from excess pumping on the Reservation.</u>**

Against the District's objections, the Project has for several years allowed water users on the Gila River Indian Reservation to pump additional amounts of Project groundwater with the payment of an "excess apportionment" pumping charge. For numerous reasons, the District has long objected to excess pumping by the Reservation water users. *See*, *e.g.*, Letter from Riney B. Salmon II to Robert Carolin (February 4, 2004) (explaining the District's objections to this practice) (Exhibit 16). The District's primary objection is that it cannot take advantage of excess pumping, unlike the Reservation water users, because the Project facilities cannot physically transport excess pumped water to District lands where it is needed. As a result, the Reservation water users are provided a larger amount of Project water than the District water users, in violation of the agreements and rules governing the Project. *See* Exhibits 5, 7. The District has proposed certain conditions under which it would agree to such excess pumping on the Reservation, but the BIA has consistently ignored the District's reasonable solutions to this problem. *See* Letter from Riney B. Salmon II to Rodney Lewis (March 15, 2002) (Exhibit 17).

Each of the Project's beneficiaries should be allowed to pump or divert their joint share of the common Project water supply, and no more. To allow the Reservation water users to take an "excess" share of the common Project water supply by pumping, over and above the apportionment, violates the most basic tenet upon which the Project was founded—a shared common water supply. The District continues to object to the pumping of excess Project water on the Reservation, unless the District is provided an equivalent amount of stored and pumped water on an equal footing with the Reservation water users.

The October 28, 2004 revised budget further exacerbates this problem by not accounting for funds received for such over-pumping, thereby depriving the District landowners of the use of an equivalent amount of this "excess" water and still forcing them to pay elevated assessments by not recognizing the revenue received as result of over-pumping on the Reservation. The amount due to the Project for over-pumping for FY 2005, for example, is estimated at $350,000.

The October 28, 2004 budget, intended to justify the $30/acre assessment rate, does not account for the Project's receipt of this excess pumping charge for FY 2005, FY 2006 or future years. *See* Exhibit 11; Exhibit 1, ¶ 3. The failure to recognize this expected income artificially increases the Project's need for assessment payments by District water users.

**2. The revised budget continues to fail to charge concession royalties.**

The Repayment Contract provides that the "whole cost of operating and maintaining the works of the Project shall be divided equally among Project lands "after sums collected . . . which may go to the operation and maintenance fund as provided herein have been deducted." See Exhibit 7, at 7. The Repayment Contract further provides that "[t]he sums collected by or for the benefit of the Project . . . shall go to pay a proper share of the cost of operating and maintaining the Project, however it may be operated or maintained." These provisions clearly demonstrate that, before setting the per-acre O&M charges, the BIA must investigate all potential sources of revenue to the Project and apply such sources of revenue to defray O&M costs.

The BIA has repeatedly failed to charge concession royalties and apply any revenues generated from concession operations at San Carlos Reservoir to defray Project O&M expenses. A 1988 grant of concession to the San Carlos Apache Tribe expired in 1998 and the Apache Tribe has since continued to operate concessions at the reservoir, without authorization of the Secretary *and without payment to the Project of any portion of the revenues generated from these concessions.* Ignoring its obligations under the Repayment Contract and 25 U.S.C. § 390, the BIA has taken no action to require the payment of funds generated from the Apache Tribe's concession operations for the benefit of the Project. As a result, the revised FY 2006 budget recognizes no revenues from concession payments. This is a flagrant violation of the Secretary's duties and responsibilities under the Repayment Contract and 25 U.S.C. § 390.

As the District has pointed out previously, the funds derived by the Apache Tribe's unauthorized concessions operations at the Reservoir exceed two million dollars per year. *See* Letter from Riney B. Salmon II to Jeff Lohman, at 22 (November 26, 2003) (Exhibit 18) ("FY 2005 Comments"). The Project's share of those earnings undeniably would offset a substantial portion of the Project's O&M costs. The District reiterates its demand that the BIA, in consultation with the Project water users, determine the value of revenues generated by concession operations at the reservoir, collect and use those revenues to pay for Project O&M costs, and offset the proposed FY 2006 O&M assessment rate by the amount of those revenues.

**3. Project power revenues should be included as income.**

The 1928 Act authorizes the Secretary to sell surplus power developed at Coolidge Dam and to use the resulting revenues to reimburse the United States for the costs of developing the electrical power; reimburse the United States for the costs of constructing the Project; and payment of O&M charges and costs associated with Project repairs and improvements. *See* Exhibit 6; *see also* Act of June 22, 1936, 49 Stat. 1822; Act of August 7, 1946, ch. 802, § 3, 60

Stat. 895. For the past several decades, the BIA has been paying off the cost of constructing the Project power system with surplus power revenues. Those costs have now been paid in full, such that surplus power revenues are available for other purposes.

The Secretary has the authority to use these funds for any of these purposes as reasonably necessary, yet the proposed FY 2006 budget makes no accounting for this increase in available funds. Under current conditions of drought and depressed farm prices, it is both reasonable and necessary to the continued viability of the Project and its farmers to use surplus power revenues to offset costs in the FY 2006 budget. The Secretary should require that the BIA account for these surplus power revenues in its proposed budget and that it use those projected revenues to offset O&M costs. *See San Carlos Irr. & Drainage Dist. v. United States*, 26 Cl. Ct. 229, 232 (1992) (Repayment Contract confirms the United States' obligation to use net revenues from the sale of surplus power to defray O&M costs).

**4. The FY 2006 budget underestimates accrued interest and inexplicably eliminates other sources of income.**

The Project's original budget projected interest income for FY 2006 at $45,000. *See* Exhibit 10. The revised budget lowered interest income to only $19,000, without explanation. *See* Exhibit 11. As evidenced by the Project's own records, the Project had already earned over $19,000 in interest less than half way through FY 2005. *See* Exhibit 14. Thus, the revised interest income projection is obviously too low and should be revised.

The Project also eliminated $10,000 in income from surplus sales and $25,000 in income from miscellaneous sources in its revised FY 2006 budget. *Compare* Exhibits 10 and 11. No explanation has been provided for the lowered income numbers, leaving one to conclude that this is part of the BIA's improper attempt to justify a $30/acre assessment rate. The BIA should explain the changes in these figures and include reasonable estimates of these income sources in its budget.

**C. The Project Has Overestimated O&M Costs in a *Post Hoc* Attempt to Justify an Arbitrary $30/Acre Assessment Rate.**

Prior documentation provided by the Project demonstrates that the Project has carried over approximately $2.5 million in unobligated cash at the beginning of each fiscal year for the last several years. Previously, the Project had operated for several years with a budgeted year-end surplus of approximately $600,000. The Project began FY 2005 with approximately $2.5 million in unobligated cash and the BIA clearly expects the Project to start FY 2005 with nearly $4 million in unobligated cash. No reason exists for the Project to have this amount of cash remaining on hand at the end of any budget year.

The only explanation for these enormous annual surpluses is that the Project consistently overestimates its obligations for the year. Whether this is due to poor analysis of Project needs, a desire to maintain unnecessarily large reserves, or a desire to maintain high salary and benefit

levels and promote job security is irrelevant. No reasonable justification exists for such large reserves. Reducing the anticipated FY 2006 beginning surplus from $3.8 million to a more reasonable $600,000 alone would eliminate the need for any O&M assessment for FY 2006. The Project must begin to accurately state its annual obligations in terms of the actual cost of Project O&M for the fiscal year. *See* Exhibit 7, at 16.

1. **<u>Project personnel costs have not been reduced as promised</u>.**

In its comments on the FY 2005 budget, submitted nearly two years ago, the District objected to Project overstaffing and salaries that were far above prevailing rates in the area. In his response to the District's comments, the Regional Director indicated that numerous "positions are planned for elimination by the end of FY 2003." *See* Letter from Wayne Nordwall to Riney B. Salmon II, at 5 (June 6, 2003) (Exhibit 19). The Project has provided no information to confirm whether that commitment was met. What is clear, however, is that Project payroll is basically the same and much too high, likely for the same reasons pointed out by the District in its comments on the FY 2005 budget.

The Project has provided no documentation in support of its payroll projections, in violation of its obligations under applicable laws and agreements, so it is impossible for the District to comment specifically on where payroll should be eliminated. The District maintains, however, that Project payroll costs are too high and should be substantially reduced. The District also believes that the Project may be improperly charging the Project Irrigation Division for the costs of administrative or Project Power Division personnel. Without a full accounting of the Project's payroll and staffing, however, it is impossible to comment in more detail on this issue at this time.

2. **<u>The Project has not explained the forty percent increase in projected utility costs for FY 2006</u>.**

The original budget proposed by the Project estimated utility costs of $50,000 for FY 2006. Exhibit 10. This estimate appears reasonable because the Project, as of February 28, 2005, was on track to spend $50,000 for utilities in FY 2005. *See* Exhibit 14. The revised FY 2006 budget, however, has increased utility costs by forty percent, to $70,000, without explanation. *See* Exhibit 11. This deviation should be explained and justified with supporting documentation and analysis, or the extra $20,000 should be eliminated from the budget. Furthermore, the BIA has not provided an explanation or documentation to show that charges to the Project Irrigation Division for utilities are legitimate and justifiable.

3. **<u>The BIA has never justified costs attributed to "services</u>."**

Despite repeated objections by the District, including a lengthy discussion of the issue in its comments on the FY 2005 assessment, the BIA still has not justified costs in the budget attributable to "services." *See* Exhibit 18. The District's requests for supporting information for all services expenses, needed to determine if the Project Irrigation Division is being charged the

appropriate percentage of joint Project expenses, have been ignored. The BIA should provide explanation and documentation to support its allocation of $495,000 for services in FY 2006. *See* Exhibit 11.

4. **<u>The budget item for archaeological surveys is not a proper O&M cost to be charged to the Project water users.</u>**

The October 28, 2004 revised budget includes $104,600 for "arch survey of SCR Drawdown Zone" for FY 2005 and $111,700 for FY 2007. *See* Exhibit 11. These funds were included in the budget for the sole benefit of the San Carlos Apache Tribe ("Tribe"). As it has in the past, the District strongly opposes any use of Project funds for this study. Neither the Project nor the District or GRIIDD has any duty to the Tribe to conduct such studies, because the Tribe has no rights or interests in the Project or the land under the San Carlos Reservoir. *See San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 868 (2003) (Coolidge Dam sits on Federal property). Money spent on this study adds no value to the Project and does nothing to further the efficient delivery of water to Project beneficiaries. The cost of this study should be paid for either by the Tribe or by the United States as its trustee. Therefore, the District demands that these costs be eliminated from the FY 2005 and FY 2007 budgets.

5. **<u>The BIA has not explained $65,000 in extra supply costs.</u>**

Although the original budget proposed by the Project for FY 2006 included $150,000 for "supplies," the revised budget increases this expense category by $65,000 without explanation. *Compare* Exhibits 10 and 11. Based on the numbers to date, it appears that the Project will spend much less than $150,000 for supplies this year. *See* Exhibit 14. Therefore, it is difficult for the District to understand how the BIA can justify increasing this expense category by nearly half, unless the increase was made only to support a higher assessment charge against the District's landowners. The BIA should justify the original $150,000 for supply costs in FY 2006 and immediately eliminate the additional $65,000 from the budget.

6. **<u>Equipment charges have not be explained or justified.</u>**

The FY 2006 budget includes a substantial increase in "equipment" costs over previous years. While the increase may be justified, the BIA has provided no documentation to support this number.

Of substantial concern to the District, the revised budget also includes an expenditure of $715,000 to replace an "excavator" in FY 2008. *See* Exhibit 11, at 3. That "excavator" is a dragline at Ashurst-Hayden Diversion Dam that the Project has not needed or used for over eight years. During that period, the Project has rented caterpillar-type equipment to remove the silt behind the diversion dam. No need or reason exists for the Project to budget $715,000 to buy unnecessary equipment—equipment that can be leased when needed, and neither the Project nor the Regional Office has provided any information or justification for this expenditure.

The District also remains concerned about the BIA's failure to properly track its equipment inventory. When Irrigation Division equipment is lent to the Power Division or other entities, credits and charges should be made to account for that fact, and those entries should properly include equipment time and fuel. The District has been suggesting this change in Project accounting for years, but has received no response from the BIA. *See*, *e.g.*, Exhibit 18. To the extent that such practices have occurred in the past, the Irrigation Division should be fully compensated for the use or sale of its equipment by other agencies or third parties. Because the BIA has ignored the District's requests for detailed information on the Project's service, utility and equipment expenses, it is impossible for the District to provide more detailed comments on this budget item. Nevertheless, it is apparent from the lack of documentation in the budget that substantial problems likely exist with the BIA's accounting and expenses for these items.

**7. Charges attributable to "Land and Structures" should be reduced or eliminated.**

The BIA has included substantial charges in the budgets for FY 2006 and beyond for "Land and Structures" that lack explanation and likely cannot be justified. The inclusion of hundreds of thousands of dollars in the budget under this line item imposes an enormous burden on District landowners that requires more from the BIA than the wall of silence that has met the District's objections in the past.

The October 28, 2004 revised budget includes a cost of $640,000 for well replacement that was not included in the Project's original budget. *Compare* Exhibits 10 and 11. Prior budgets also have included funds for this purpose, but the money has not been spent and has been carried over from year to year. Despite not having spent those funds in past budgets, the Project has included them in its FY 2006 budget solely in an attempt to justify the higher $30/acre assessment. *See* Exhibit 1, ¶ 5.

Numerous unanswered questions surround this budget item. The District objected to well replacement charges for FY 2005 and previous years, in part, because the Project was proposing to ignore the conclusions of its own consultant regarding the proper location for the wells. *See* Exhibit 18, at 15. In a response to previous objections by the District, the Regional Director indicated that well replacement costs would be eliminated from the FY 2005 budget, but that $300,000 would be included in the FY 2006 budget. *See* Exhibit 18, at 4. Although the District objects to any amount being included for well replacement in FY 2006, the BIA should, at a minimum, explain why well replacement costs were more than doubled from what the BIA told the District would be included for FY 2006.

Furthermore, no information has been provided to the District regarding how many wells can be installed for $640,000 or where the wells will be located. It is also not clear to the District whether these wells are actually equivalent replacements for existing wells. To the extent that these proposed wells represent new wells or major improvements over existing wells, they may actually constitute a Project "betterment" that must be approved by the District before this money can be spent. *See* Exhibit 5, at 15.

The Project's intent regarding future well replacement also has not been adequately explained. The proposed FY 2006 budget contains $640,000 for well replacement and the proposed FY 2009 budget contains $350,000. The BIA has not explained why no funds are set aside for well replacement in any other fiscal year or why the costs are not spread more evenly over the proposed budgets for the next six years. The BIA also has not indicated whether its allocation of funds for well replacement takes into consideration the impacts of the Arizona Water Settlements Act of 2004 and its authorization of funding for Project improvements in coming years. *See* Pub. L. No. 108-451, 118 Stat. 3478 (2004).

The revised budget also includes an expenditure of $650,000 in FY 2007 to "replace ditch w/pipe upstream of siphon." Exhibit 11, at 3. Although GRIIDD requested information on the nature of this expected work in its January 18, 2005 letter, neither the Project nor the Western Regional Office has provided any information or justification regarding this expenditure. *See* Exhibit 1, ¶ 6. It would appear that this expense is intended only to justify an on-going assessment rate of $30/acre in future years, as the $650,000 for this unexplained expense in 2007 is nearly identical in amount to the $640,000 expense for replacement wells in the FY 2006 budget.

**8. <u>The revised budget improperly includes an expense item for "power for pumping."</u>**

The revised budget includes $520,000 for "power for pumping" for FY 2006. *See* Exhibit 11. The District objects to this expense category. The purpose for creating the Project power system was to generate electricity and money to help reduce the cost of delivering irrigation water to the Project water users. Coolidge Dam's power infrastructure has been inoperable for more than twenty years due to the BIA's own negligence, not due to any action or lack of action by Project beneficiaries. It is inherently unfair and contrary to the purposes of the Project for the beneficiaries to be penalized for the Government's negligence by continuing to pay for power for pumping that otherwise could have been generated at the dam.

The District also does not believe that the charges are reasonable and justifiable. The charges appear to include administrative and overhead costs of the Project Power Division and its retail operations that are not properly chargeable to the Project pumps. It also appears that the BIA is using Project federal preference power to help subsidize the cost of power to the Project's retail customers. The "power for pumping" item should be deleted from the FY 2006 budget.

**9. <u>The revised budget double-counts certain items in the "sinking funds" and other budget items.</u>**

The October 28, 2004 revised budget includes certain items, such as well replacement, as part of a "sinking fund" category. Several of these items, however, are also included in the "reserve obligation" category. *See* Exhibit 1, ¶ 8; Exhibit 11. Although the Project water users have requested additional information regarding these budget entries, neither the Project nor the

Western Regional Office has provided such information. Double-counting of these items in the revised FY 2006 budget should be eliminated in the final budget upon which the District's O&M assessment is based.

The revised FY 2006 budget also indicates that Project reserves will be increased from $600,000, the reserve fund level for many years, to 25 percent of total obligations for FY 2006 and beyond. Exhibit 11, at 2. No explanation has been given for this increase of nearly $250,000 for FY 2006 and the District can find no good reason for the increase. This money should be eliminated from the reserve fund immediately.

**10. <u>The BIA has not followed its own requirements for including charges for deferred maintenance in the FY 2006 budget.</u>**

The revised FY 2006 budget and the budgets for future years appear to include numerous items of deferred maintenance. These were included at the desire of the Regional Director, who expressly objected to the original $15/acre assessment because it allegedly did not include sufficient funding for deferred maintenance. *See* Exhibit 3.

The charges for deferred maintenance lack support in the record, however. For the December 2004 fact-finding meeting, the BIA distributed its Irrigation Handbook, which contains a thorough discussion of the process for determining the Project's need for deferred maintenance charges. *See* Irrigation Handbook, chapter 13 (May 2002). The BIA has provided no documentation or explanation to indicate that it followed that process in setting deferred maintenance charges for FY 2006 and beyond. For example, the BIA has not provided evidence that it has conducted a "Condition Assessment Survey" to measure the amounts necessary for deferred maintenance. *Id.* § 13.4.7.

The BIA also has failed to provide evidence that it considered other factors in setting deferred maintenance charges. For example, the BIA should have taken into account the last eight years of drought and below-average water deliveries to the District and the accompanying impacts on the District landowners' ability to pay for deferred maintenance. The BIA also should have considered the Arizona Water Settlements Act, which authorizes funding in future years for Project remediation and improvements. This federal funding likely eliminates the need to include certain deferred maintenance charges in the Project assessments against the District's landowners, but there is no indication that the BIA has taken this into account.

Until the Project and BIA can demonstrate that they have followed the BIA's own guidelines for deferred maintenance and that the charges are justifiable, any charges for deferred maintenance should be eliminated from the FY 2006 budget.

**11. <u>The BIA must credit assessment income in the proper fiscal year.</u>**

It appears from the revised FY 2006 budget that the BIA continues to be using assessments paid by the District for the next fiscal year to cover expenses incurred in the current

fiscal year. As the District has complained in the past, this practice is wrong and must be stopped. *See* Exhibit 18. Payments made by the District in May for use in the next fiscal year should be deposited and left untouched to draw interest for the benefit of the District until the start of the new fiscal year on October 1. The BIA should not be allowed to draw from these funds to pay for current expenses and should not count those funds as income for the current fiscal year. The Assistant Secretary should order the BIA immediately stop this practice and provide an explanation of how it intends to reform its accounting practices to address this issue.

The District has also argued for years that the United States should pay assessments for Indian lands in advance of the fiscal year, on the same schedule as District assessments. Although the District believed that this problem had been corrected, the revised budget indicates that assessments for Indian lands will be collected a year after the District's assessments are due. This disparate treatment is unfair to the District, violates the United States' payment obligations, and cannot continue.

**12. The BIA has not explained how the Project maintained unobligated cash reserves of over two million dollars, despite an alleged accounting error for FY 2004.**

On April 18, 2003, the BIA informed the District that, for a number of years, the Project had overlooked a "double accounting" error that caused it to overestimate available funds by approximately $2,000,000. *See* Letter from Robert Carolin, Project Manager, to Douglas Mason, District General Manager (Exhibit 20). This error was apparently caused when revenues from O&M assessments were included in the unobligated cash balance on October 1st of each year and then included again in the income section of the same budget as assessment collections. The double accounting of assessment payments allegedly resulted in a cash surplus figure that did not exist. The BIA maintained it would be facing an operating deficit in FY 2005 if it did not increase the assessment rate to make up for the error. The BIA used that alleged error as a major argument in support of a $30/acre assessment rate for FY 2005.

Now, however, it is clear that the Project has continued to carry a multi-million dollar surplus over the last two years, despite the fact that the District has not paid the full thirty dollar assessment for FY 2005. The BIA has not explained why the alleged accounting error has not resulted in decreases in the cash left over at year-end. Furthermore, it would appear that a significant basis for raising the District's assessment by half in FY 2005 actually had little or no impact on Project accounting or operations, such that the Project overcharged the District and its landowners for FY 2005.

**D. Approval of the Revised Budget Will Deny the District Important Procedural Rights.**

The Project, the District, and GRIIDD were all in agreement that the FY 2006 assessment rate should be set at $15/acre. In Section II(B), *supra*, the District explained how the BIA arbitrarily decided to set the FY 2006 assessment at $30/acre, then required the Project to revise

its budget to support the higher assessment figure. That *post hoc* attempt to justify an arbitrary assessment rate that lacks support in the record is alone a sufficient procedural violation to warrant remand of the FY 2006 assessment and budget to the Project. But other procedural irregularities and violations of the BIA's obligations to the District add further support to the District's position that the FY 2006 budget decision should be revisited by the Project and BIA.

1. **The Secretary is already almost a year late in setting the FY 2006 assessment rate.**

In order to timely collect and pay its portion of the O&M assessments, the District must timely receive notice from the Secretary of the final rate for each year. The Repayment Contract states that the O&M rates "shall be fixed annually by the Secretary of the Interior." The Secretary must "give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts." Exhibit 7, at 8. The Secretary has again failed to timely set the assessment rate for FY 2006.

The BIA apparently expects the District to pay the FY 2006 assessment by May 15, 2005. Because the Secretary has not yet issued a final decision on the FY 2006 rate, it will be impossible for the District to properly levy and collect irrigation district taxes in time to pay such assessment. In order to collect and pay the assessment by May 15, 2005, the District would have needed to notify the Pinal County Board of Supervisors before July 1, 2004 of the proper amount of assessment to levy against the District landowners. The first half of those landowner assessments would have been due by October 1, 2004 and delinquent if not paid by November 1, 2004. The second half of those assessments would have been due by March 1, 2005 and delinquent if not paid by May 1, 2005.

The Secretary is now nine months late in setting the FY 2006 assessment. There is no way that the District can possibly levy and collect the landowner assessments in time for the District to pay the assessment to Project by May 15, 2005. Furthermore, if the final rate is not set in time for the landowners to be assessed on July 1, 2005, the District will not be able to collect and pay the assessments until sometime in May 2007—two years after Project demands payment. The District urges the Secretary to carefully consider the comments submitted by the District and GRIIDD and to issue a final decision setting the FY 2006 assessment rate at no more than $15/acre at least two weeks prior to July 1, 2005. If the Secretary fails to meet the July 1 deadline, she should be aware that the District will not collect the assessment from its landowners for payment to the Project until May 2007.

2. **The BIA has refused to open its records to the District.**

The District must have reasonable access to Project records in order to determine the basis for the Project's operation and management decisions and assessments so that the District can participate in an informed manner as a participant in the operation of the Project. *See*

Exhibit 7, at 19 ("the United States and the District shall inform and consult with each other as to contemplated future steps of importance."). The Project is required to provide the District with reasonable access to Project records and accounts. *Id.*

Despite repeated requests by the District for access to Project records and for additional information in support of the budget for FY 2006 and previous years, the BIA has refused to provide the District with reasonable access to Project records or to provide documentation that adequately explains the budget line items. No reasonable basis exists for limiting the District's access to the Project's records because the District has a fundamental due process right to the information necessary to understand the BIA's budget decisions. *See* Exhibit 15, at 21. The BIA's continued refusal to provide such access is a violation of due process that, alone, invalidates any decision in support of the revised budget for FY 2006.

## III. CONCLUSION AND REQUESTED ACTION

The Indian and non-Indian Project beneficiaries do not always agree on every issue as it relates to the operation of the Project. They do agree on one thing, however: The proposed assessment rate for FY 2006 is artificially high. The proposed $30/acre rate is twice as high as the Project itself recommended, twice as high as the figure supported by the District and GRIIDD, and twice as high the Project needs to operate for FY 2006. The District demands that the proposed $30/acre rate be rejected and that the final rate be set at no more than $15/acre for FY 2006.

Very truly yours,

Salmon, Lewis & Weldon, P.L.C.

By [signature]
Riney B. Salmon II

cc: Arizona Congressional delegation
Bryan Bowker, Acting Western Regional Director, BIA
San Carlos Irrigation and Drainage District
Harlan Bohnee, Chairman, GRIIDD
Rodney Lewis, General Counsel, GRIC

**LIST OF EXHIBITS**

1. Letter from Harlan Bohnee, Chairman, GRIIDD, to Robert E. Carolin, Project Manager, and Wayne Nordwall, Western Regional Director (January 18, 2005).

2. Memorandum from Robert E. Carolin, Project Manager, to Wayne Nordwall, BIA Western Regional Director (September 15, 2004).

3. Memorandum from Wayne Nordwall, BIA Western Regional Director, to Project Manager (October 1, 2004).

4. Act for the Continuance of Construction Work on the San Carlos Federal Irrigation Project in Arizona, and for Other Purposes, Pub. L. No. 68-210, 43 Stat. 475 ("1924 Act").

5. Landowners' Agreement with the Secretary of the Interior, San Carlos Project: Act of June 7, 1927 (various dates) ("Landowners' Agreement").

6. An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1929, and for other purposes, Pub. L. No. 70-100, ch. 138, 45 Stat. 200, 211 (March 7, 1928) ("1928 Act").

7. Repayment Contract Between the United States and the San Carlos Irrigation and Drainage District, Arizona (June 8, 1931) ("Repayment Contract").

8. 25 C.F.R. § 171.1(g).

9. Order Defining Joint, District and Indian Works of the San Carlos Federal Irrigation Project: Turning Over Operation and Maintenance of District Works to the San Carlos Irrigation and Drainage District (June 15, 1938).

10. Irrigation Division Budget, San Carlos Irrigation Project (June 22, 2004).

11. San Carlos Irrigation Project, Proposed FY 2006 Budget (October 28, 2004).

12. E-mail correspondence from Russell Kaskalla, Civil Engineer, Western Regional Office, to Ross Mooney, Chief, Branch of Irrigation, Power, Safety of Dams, operation of Non-federal Dams (September 29, 2004).

13. Letter from Robert E. Carolin, Project Manager, to Douglas Mason, District General Manager (December 9, 2004).

14. FY 2005 Irrigation Budget, prepared by Carl Christensen (March 8, 2005).

15. Decision of the Acting Area Director Regarding Notice of Appeal of the FY 1998 San Carlos Irrigation Project O&M Assessment, at 21 (January 10, 1997).

16. Letter from Riney B. Salmon II to Robert Carolin (February 4, 2004).

17. Letter from Riney B. Salmon II to Rodney Lewis (March 15, 2002).

18. Letter from Riney B. Salmon II to Jeff Lohman (November 26, 2003).

19. Letter from Wayne Nordwall to Riney B. Salmon II, at 5 (June 6, 2003).

20. Letter from Robert Carolin, Project Manager, to Douglas Mason, District General Manager (April 18, 2003).