No. 06-576C
(Judge Block)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SAN CARLOS IRRIGATION AND,
DRAINAGE DISTRICT,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

KIRK T. MANHARDT
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-0541
Facsimile: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:

WILLIAM W. QUINN
Field Solicitor
Phoenix Field Office
Office of the Solicitor
U.S. Department of the Interior

June 23, 2008

# TABLE OF CONTENTS

DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT . . . . . 1

STATEMENT OF THE ISSUES . . . . . 1

STATEMENT OF FACTS . . . . . 2

SUMMARY OF ARGUMENT . . . . . 2

ARGUMENT . . . . . 4

I. The Standard For Summary Judgment . . . . . 4

II. The Government Did Not Breach The Repayment Contract By Requiring Payment Of O&M Charges By March 1 . . . . . 5

A. The Requirement To Pay O&M Charges By March 1 Is Mandated By Statute . . . . . 5

B. The Repayment Contract Does Not Require The BIA To Publish O&M Charges In The Federal Register By July 1 . . . . . 7

1. The Landowners' Agreement . . . . . 9

2. The Repayment Contract . . . . . 10

C. The United States Satisfied Its Contractual Commitment . . . . . 15

III. The District Cannot Claim Injury Based Upon The Amount Of The FY 2005-2007 O&M Charges . . . . . 17

A. Introduction . . . . . 17

B. Federal Circuit Precedent Precludes The District's Claim of Injury . . . . . 18

IV. The Government Did Not Breach The Repayment Contract In Setting The Amount Of O&M Charges For Fiscal Years 2005-2007 . . . . . 21

A. The District Is Required To Pay Its Proportionate Share Of The Annual Total Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. The FY 2005-07 O&M Charges Were Based Upon Estimates Of The Annual Total Costs And Income Of The Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2. FY2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3. FY2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

4. FY2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

V. The United States Is Entitled To Summary Judgment Upon the District's Claim Of A Breach Of The Implied Duty Of Good Faith And Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VI. The District's Arguments Regarding Accounting Practices And Its Calculation Of Damages Must Be Rejected . . . . . . . . . . . . . . 43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## TABLE OF AUTHORITIES

**CASES:** **PAGES:**

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) . . . . . . . . . . passim

American Airlines, Inc. v. Austin,
75 F.3d 1535 (Fed. Cir. 1996) . . . . . . . . . . 6, 7

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 4

Asco Falcon II Shipping Co., et al., v. United States,
32 Fed. Cl. 595 (1994) . . . . . . . . . . 42

Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,
853 F.2d 1557 (Fed. Cir. 1988) . . . . . . . . . . 4

Balboa Insurance Co. v. United States,
775 F.2d 1158 (Fed. Cir. 1985) . . . . . . . . . . 22

Burnside-Ott Aviation Training Center v. United States.,
107 F.3d 854 (Fed. Cir. 1997) . . . . . . . . . . 6, 22

Butler v. Principi,
244 F.3d 1337 (Fed. Cir. 2001) . . . . . . . . . . 25

Carolina Tobacco Co. V. Bureau of Customs & Border Protection,
402 F.3d 1345 (Fed. Cir. 2005) . . . . . . . . . . 25

Casitas Municipal Water District v. United States,
72 Fed. Cl. 746 (2006),
appeal pending, No. 2007-5133 (Fed. Cir.) . . . . . . . . . . passim

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 4

Centex Corp. v. United States,
395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . 41

Chapman Law Firm Co. v. United States,
490 F.3d at 934, 940 (Fed. Cir. 2007) . . . . . . . . . . passim

Davis v. Department of Homeland Security,
239 Fed. Appx. 586 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Essex Electro Eng'rs, Inc. v. Danzig,
224 F.3d 1283 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Estate of Coward v. Nicklos Drilling Co.,
505 U.S. 469 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

First Nationwide Bank v. United States,
431 F.3d 1342 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Galen Medical Associates, Inc. v. United States,
369 F.3d 1324 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Gonzales v. Def. Logistics Agency,
772 F.2d 887 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Hughes Aircraft Co. v. Jacobson,
525 U.S. 432 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Jennings v. Mansfield,
509 F.3d 1362 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Nampa & Meridian Irr. Dist. v. Bond,
268 U.S. 50 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

San Carlos Apache Tribe v. United States,
272 F. Supp. 2d 860 (D. Ariz. 2003),
aff'd, 417 F.3d 1091 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

San Carlos Irrigation and Drainage District v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

San Carlos Irrigation and Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

South Corp. v. United States,
690 F.2d 1368 (Fed. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 4

T&M Distrib., Inc. v. United States,
185 F.3d 1279 (Fed. Cir. 1999) . . . . . . . . . . 41, 42

United States v. Armstrong,
517 U.S. 456 (1996) . . . . . . . . . . 25

United States v. Gila River Pima-Maricopa Indian Community,
586 F.2d 209 (Ct. Cl. 1978) . . . . . . . . . . 21

Weyerhauser v. United States,
92 F.3d 1148, 1151 (Fed. Cir. 1996) . . . . . . . . . . 19

**STATUTES:**

16 U.S.C. § 470 . . . . . . . . . . 33

16 U.S.C. § 470h-2(a)(1)-(2) . . . . . . . . . . 33

24 U.S.C. § 3001 . . . . . . . . . . 33, 34

**REGULATIONS:**

25 C.F.R. 171.1(e) . . . . . . . . . . 16

25 C.F.R. § 171.1(g) . . . . . . . . . . 12

**MISCELLANEOUS:**

56 Fed. Reg. 43984 (Sept. 5, 1991) . . . . . . . . . . 27

58 Fed. Reg. 43990 (Aug. 18, 1993) . . . . . . . . . . 27

60 Fed. Reg. 4499 (Jan. 23, 1995) . . . . . . . . . . 27

63 Fed. Reg. 12818 (March 16, 1998) . . . . . . . . . . 27

71 Fed. Reg. 17132 (April 5, 2006) . . . . . . . . . . 39

71 Fed. Reg. 71143 (Dec. 14, 2007) . . . . . . . . . . 20

76 Fed. Reg. 19950 (April 20, 2007) . . . . . . . . . . 19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND, DRAINAGE DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-576C (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Rules of this Court ("RCFC"), defendant, the United States, respectfully requests that the Court deny the motion for summary judgment of plaintiff, San Carlos Irrigation and Drainage District ("SCIDD" or the "District") and grant the Government's cross-motion for summary judgment. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief, our appendix, the accompanying proposed findings of uncontroverted fact, and the exhibits filed by the District in this case.

STATEMENT OF THE ISSUES

1. Whether the United States is entitled to summary judgment upon the District's claim that Department of the Interior Bureau of Indian Affairs ("BIA") breached its contract with the District and caused damages of $47,500 when it required the District to pay a delinquent penalty for late payment of operation and maintenance charges.

2. Whether the United States is entitled to summary judgment upon the District's

claim that the BIA breached its contract with the District and caused damages of $1,650,000 when it required the District to pay annual operation and maintenance charges for fiscal years 2005-2007 that were based upon the annual cost of the operation and maintenance for the San Carlos Project estimated two years in advance, as required by the parties' contract and approved in San Carlos Irrigation and Drainage District v. United States, 111 F.3d 1557 (Fed. Cir. 1997) ("San Carlos").

3. Whether the United States is entitled to summary judgment upon the District's claim that the United States breached an implied duty of good faith and fair dealing.

## STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to our proposed findings of uncontroverted fact, which accompany this motion.

## SUMMARY OF ARGUMENT

The United States is entitled to summary judgment upon each of the District's claims. Those claims seek damages for alleged breach of contract in the setting and collection of operation and maintenance charges ("O&M charges" or rates) for the San Carlos Irrigation Project for the fiscal years 2005 through 2007.

The District seeks an award of $47,500 based upon the BIA's penalty assessment for late payment of O&M charges in the year FY2005. The District makes no claim for damages for FY2006 and FY2007 based upon notice. Pl. Mot. 26-28.[1] We are entitled to summary judgment

[1] "Pl. Mot. __" refers to plaintiff's motion for summary judgment; "Pl. Ex. __" refers to plaintiff's exhibits filed in support of its motion for summary judgment on April 9, 2008; "DA __" refers to defendant's appendix to our cross motion for summary judgment; "PPFUF ___" refers to plaintiff's proposed findings of uncontroverted fact; and, "DPFUF __" refers to our proposed findings of uncontroverted fact.

upon this claim because the District's FY2005 O&M payment, made in installments in March and April 2005, was delinquent under the San Carlos Irrigation Project Act of 1924 and the parties' contract which required payment by March 1, 2004.

We are further entitled to summary judgment because the United States did not cause the District to make a delinquent payment. In accord with the parties' agreement and practice, it is undisputed that the BIA notified the District of the annual O&M charge for FY2005 to be published in the Federal Register within sufficient time to allow the District to collect assessments from landowners and that the District did timely collect assessments from landowners for FY2005. The District simply withheld timely payment from the BIA and, consequently, was assessed a penalty required by the parties' contract.

The United States is also entitled to summary judgment upon the District's claim that contests the amount of the O&M charges for the years FY2005 through FY2007. This claim is governed by San Carlos Irrigation and Drainage District v. United States, 111 F.3d 1557 (Fed. Cir. 1997). In that earlier case, as here, the District sought contractual damages based upon the contention that the BIA's annual estimate of O&M expenses, set two years in advance as required by statute and the parties' contract, unreasonably exceeded actual O&M expenses. The Court of Appeals for the Federal Circuit has foreclosed any such damages claim based upon alleged overpayment, where, as here, payments are held for the District's credit for use in future years. San Carlos, 111 F.3d at 1568.

We are also entitled to summary judgment because the $30 per acre O&M charge assessed for FY2005-2007 was a reasonable estimate of the funds necessary to operate and maintain the project, properly developed two years in advance, based upon the project's needs

and the record of actual expenses in the years immediately preceding when those rates were determined.[2]

Finally, the United States is entitled to summary judgment upon the District's claim of breach of an implied duty of good faith and fair dealing because there is no evidence of breach, let alone the degree of proof required for a claim of bad faith.

## ARGUMENT

### I. The Standard For Summary Judgment

Summary judgment is the favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c). In this case, there is no dispute over any facts that could preclude the Government's entitlement to summary judgment upon the issue presented here.

---

[2] Because the United States pays one-half of all the O&M charges assessed to support the San Carlos Irrigation Project under the same assessment that is applied to the District, Shaw Aff. ¶ 6 (DA139), to accept the District's overpayment claim would require the Court to find that the United States imposed and collected an unreasonable rate against itself.

## II. The Government Did Not Breach The Repayment Contract By Requiring Payment Of O&M Charges By March 1

### A. The Requirement To Pay O&M Charges By March 1 Is Mandated By Statute

As we demonstrate below, the District was properly assessed a delinquent penalty of $47,500 for FY2005 because, pursuant to the express terms of the governing statute and the parties' agreement, the District failed to pay its FY2005 O&M charges when they were due.

The San Carlos Irrigation Project (the "Project')[3] was established by Congress in 1924 through enactment of the San Carlos Irrigation Project Act of 1924. 43 Stat. 475-76 (1924) (The "1924 Act"). Pl. Ex. 4. The 1924 Act authorized the Secretary of the Interior to construct the Coolidge Dam across the Gila River within the San Carlos Apache Indian Reservation in eastern Arizona as part of a project to provide irrigation both within the Gila River Indian Reservation and to public and private lands. Id. The Project consists of a total of 100,000 acres, divided evenly between Indian and non-Indian lands. PPFUF ¶ 4. Pursuant to the 1924 Act, the interests of owners of the non-Indian lands are represented by a district organized under state law, the San Carlos Irrigation and Drainage District, to manage water distribution within the district lands and to contract with the United States. Pl. Ex. 1, 4.

The 1924 Act mandates that operation and maintenance charges shall be paid by landowners, through the District, by March 1 in advance of the year for which the charges are due. Pl. Ex. 4 (43 Stat. at 476). PPFUF ¶ 9. As we demonstrate below, pursuant to this congressional mandate, the United States is entitled to summary judgment upon any complaint by

[3] The parties use the term "Project" to refer to the water project as a whole and to the organization within the Bureau of Indian Affairs that administers the San Carlos Irrigation Project.

the District that it was injured by its having to comply with the 1924 Act and pay O&M charges annually by March 1.

In authorizing construction of the Coolidge Dam, the 1924 Act provides that:

> the total cost of the project shall be distributed equally per acre among the lands in Indian ownership and the lands in public and private ownership that can be served from the waters impounded by said dam.

Pl. Ex. 4 (Sec. 1). In addition, the 1924 Act provides, without qualification, that

> The operation and maintenance charges on account of land in private ownership or of land in Indian ownership operated under lease shall be paid annually in advance not later than March 1st . . .

Pl. Ex. 4 (Sec. 3).

The District alleges a breach of contract based upon an alleged failure by the Secretary to fix O&M charges by July 1 each preceding year, which the District argues is necessary for it to meet its March 1 payment obligation. In so arguing, the District claims, in essence, that it possesses a contract right that qualifies or conditions the payment requirement imposed by the 1924 Act. "As in any case of statutory construction, [the Court's] analysis begins with the 'language of the statute'." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) quoting, Estate of Coward v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992). "And, where the statutory language provides a clear answer, it ends there as well." Id. Congress established the District's duty to pay O&M charges by March 1 each year and Congress did not qualify or condition that obligation in any manner. Although parties may voluntarily waive certain rights, parties may not contract away requirements established by statute. Burnside-Ott Aviation Training Center v. United States. 107 F.3d 854, 858 (Fed. Cir. 1997); American Airlines, Inc. v. Austin, 75 F.3d

1535, 1538 (Fed. Cir. 1996).

Here, the District's complaint is with the statutory requirement that it was required to pay O&M charges by March 1 of each year and assessed a delinquent penalty when it did not. The 1924 Act required that the Repayment Contract incorporate the March 1 payment date, Pl. Ex. 4 (Sec. 4), and the District's failure to make payment on time established its delinquency. In these circumstances, the Repayment Contract clearly required the imposition of a penalty:

> To every instalment of money required to be paid under this agreement which shall remain unpaid after the same shall have become due, there shall be added at once a penalty of one-half of one per centum thereof, and thereafter a like penalty of one-half of one per centum on the first day of each month so long as such default shall continue, and the District hereby agrees to pay said penalty.

Pl. Ex. 1 at 20-21. Because the District's O&M charge for FY2005 remained unpaid when due under the Act and the contract, the BIA properly assessed the District a penalty of $47,500 for FY2005.[4]

B. The Repayment Contract Does Not Require <u>The BIA To Publish O&M Charges In The Federal Register By July 1</u>

As we demonstrated above, pursuant to the 1924 Act, the District was delinquent in its payment of O&M charges for FY2005, and, consequently, the District was properly assessed a late fee penalty. In addition, and in the alternative, the Government did not breach any contractual agreement by failing to publish a final O&M rate in the Federal Register by July 1 in

---

[4] In is motion for summary judgment, the District complains that it ultimately paid O&M charges in the years 2005-2007 under a threat that the BIA would terminate water deliveries to landowners absent payment. Pl. Mot. 10-13. In so doing, the District fails to acknowledge that the parties expressly agreed in the Repayment Contract that the benefit of water delivery was conditioned upon payment of O&M charges even if those assessments were held void. Pl. Ex. 1 at 20.

the year preceding the District's March 1 payment due date. As we explain below, the BIA satisfied the parties' agreement when the Project office "gave notice" of the FY2005 O&M charge through the fact finding process agreed upon by the parties.

To state a claim for breach of contract, a party must allege that the parties had a contract, that one party breached the contract, and that the breach caused the non-breaching party to incur damages. As the United States Court of Appeals for the Federal Circuit held in an earlier case involving SCIDD:

> To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.

San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Interpreting this repayment contract, the Court of Appeals for the Federal Circuit has explained that although the Government has a duty to maintain the San Carlos Irrigation Project, "a breach of that duty can entitle plaintiff [SCIDD] to damages only where there was a contractual expectation interest flowing to SCIDD." San Carlos Irrigation and Drainage District v. United States, 111 F.3d 1557, 1569 (Fed. Cir. 1997). As we demonstrate below, the District's contract does not provide it "a contractual expectation interest" in the receipt of a Federal Register notice of O&M charges by July 1.

The express terms of the parties' contract require that the Secretary give notice of O&M charges within sufficient time to allow the District to collect the necessary assessments to pay the O&M charges by March 1. PPFUF ¶ 18; Pl. Ex 1 at 8. The contract does not grant the District a right to have its annual O&M charges fixed by notice in the Federal Register by July 1 of the year

preceding the year in which payment is due (July 1, 2003 for the FY2005 payment due on March 1, 2004). We review below both the Landowners' Agreement that preceded the District's existence and the Repayment Contract subsequently executed by the District.

1. The Landowners' Agreement

Following the passage of the 1924 Act, landowners within the Project entered into a Landowners' Agreement with the Secretary. Pl. Ex. 5. The Landowners Agreement transferred landowners' water rights to the United States in exchange for inclusion in the irrigation project. Id. Through the Agreement, landowners agreed to organize themselves into the entity that became the District, as called for by the 1924 Act:

> Said owners furthermore agree and promise that they will, as soon as possible, and under the general direction of the Secretary of the Interior, organize themselves into such a district as the Secretary of the Interior shall direct, so as to handle and control the privately-owned distributing systems leading from said project canals and be able to act as a unit in all dealings with the said Secretary. . . .

Pl. Ex. 5 at 12.

Landowners also made an express commitment to pay the project's O&M charges:

> The undersigned and all owners of private lands under the said San Carlos project hereby agree that the construction and operation and maintenance charges for said San Carlos project shall be payable, and they agree to pay the same, in accordance with the last-mentioned act of Congress. [the 1924 Act]

PPFUF ¶ 13; Pl. Ex. 5 at 13. As clearly stated, the landowners agreed to pay O&M charges in accordance with the 1924 Act, specifically, by March 1 in advance of the year in which they were due.

In addition, the Landowners' Agreement provides that

> every owner of private lands under said San Carlos project shall also pay for the irrigation of his lands . . . an operation and maintenance charge to be fixed from time to time by the Secretary of the Interior, based upon the total annual cost of the operation and maintenance of the said San Carlos project . . . The said operation and maintenance charges as far as the works of the said San Carlos project are concerned . . . shall be payable as is provided by the said last-mentioned act of Congress and the rules and regulations of the Secretary of the Interior which shall be made thereunder and under this agreement . . . .

Pl. Ex. 5 at 15. Thus, the Landowners' Agreement provides that landowners "shall" pay the O&M charges "to be fixed from time to time by the Secretary" and explicitly defines the landowners duty to pay as that payment duty is established in the 1924 Act and the rules made by the Secretary. The Landowners' Agreement does not define the term "fixed" and does not confine the manner in which the Secretary is permitted to act to "fix" the annual O&M charge. Consequently, the Landowners' Agreement does not support SCIDD's assertion of a right to Federal Register notice of an annual O&M charge by July 1 of a given year.

2. <u>The Repayment Contract</u>

Under the express terms of the 1924 Act, and as required by the Landowners' Agreement, landowners organized the District in 1928. Pl. Ex. 1, 6. In 1931, the United States executed the Repayment Contract with the District. PPFUF ¶ 17. The Repayment Contract expressly provides that the requirements of the 1924 have been "assented to . . . all owners or claimants of private lands whose property might come within the San Carlos Project." Pl. Ex. 1 at 1-2 (Explanatory Recitals).

In addition to confirming the controlling effect of the 1924 Act, the Repayment Contract provides,

> Operation and maintenance for the reserved works and maintenance charges for works operated, but not maintained, by the District shall be fixed annually by the Secretary of the Interior and paid to the United States by the District. The Secretary of the Interior will give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts.

Pl. Ex. 1 at 8. Consistent with the 1924 Act and the Landowners Agreement, the Repayment Contract, under the heading "Date of Beginning Payment, Operation and Maintenance, provides that:

> In addition to its proportion of the charge for the whole cost of said Project, the District shall also pay an operation and maintenance charge to begin one year after the issuance of the public notice and to be fixed from time to time in advance by the Secretary of the Interior, based upon the annual cost of the operation and maintenance of the San Carlos Project.
>
> Operation and maintenance charges shall be paid annually, in advance, not later than March 1st . . . ."

Pl. Ex. 1 at 16. The Repayment Contract also made explicit, the District's obligation to use the full breadth of its authority to collect operation and maintenance charges.

The contract provides:

> <u>District To Use Taxing Power</u>
>
> Pursuant to the provisions of the laws of the State of Arizona, and of the United States, and regulations established thereunder, the District will cause to be levied and collected all necessary assessments against the tracts of land now or hereafter included in the District designated by the Secretary of the Interior, to meet the terms of this agreement, and will use all the powers and resources of the District, including the taxing power and the power to withhold the delivery of water, to collect and pay to the United States all charges authorized under this agreement in full on or

before the day that the same become due.

Pl. Ex. 1 at 18.

In the Repayment Contract, the District also agreed that the Secretary retained the right to promulgate regulations to implement the 1924 Act, the Landowners' Agreement and the Repayment Contract. Pl. Ex. 1 at 22.

Finally, as explained above, the Repayment Contract contains a penalty provision for late payment by the District. Originally, penalties accrued on March 1, the due date for payment of operation and maintenance charges. Pl. Ex. 1 at 20. In 1935, the parties executed the First Supplement to the Repayment Contract and provided that, although payment remained due on March 1, penalties would not accrue until May 15 of each year. Pl. Ex. 7 at 4-6 (Sec. 7(c)).

Department of Interior regulations provide that the BIA Area Director or his designee may administer the Secretary's "rights, obligations and responsibilities for the operation and maintenance" of the Project. 25 C.F.R. § 171.1(g). Moreover, the Area Director is authorized "to fix as well as to announce, by notice published in the Federal Register, the annual operation and maintenance assessment rates for the irrigation projects or units within his area of responsibility." In the case of the San Carlos Irrigation Project the area director is the Western Regional Director located in Phoenix, Arizona. DA110-11. Notwithstanding the authority delegated by regulation, for the years FY2005-2007, the Western Regional Director forwarded the assessment rate to the Assistant Secretary for Indian Affairs for final approval. DA110-11; Pl. Ex. 3 at 8.

There is no dispute that the District has relied upon an annual property tax levy to collect O&M charges from landowners. Pl. Ex. 6 at 2. However, the District's assertion that the

Secretary has a contractual duty to fix O&M charges by July 1 only through publication of a final notice in the Federal Register is not supported by the parties' contract or the regulations applicable to the Project.

The July 1 date invoked by the District does not appear in the Repayment Contract. DPFUF ¶ 19; Pl. Ex. 1. Instead, the Government agreed in the Repayment Contract only to "fix" O&M charges annually. The sole reference to timing of O&M charges contained in the Repayment Contract provides that the Secretary is to "give notice" of O&M charges within sufficient time to permit the District to comply with Arizona law. Pl. Ex. 1 at 8. The Government made no binding commitment to fix O&M charges within a discreet time frame. As we explain below, Arizona law provides alternatives by which the District may levy and collect taxes which include means for which the July 1 date has no relevance. Moreover, even with regard to the District's chosen method for collection of taxes, the annual property tax assessment, the Secretary gave sufficient notice to allow the District to comply with Arizona law, and the District did so comply in the years FY2005-2007.

The July 1 date has its source in Arizona law, which mandates that the "board of directors [of the District], not later of July 1 each year, shall estimate the amount of money required to meet the obligations of the district for the next fiscal year" and transmit that estimate "to the board of supervisors of each county in which any lands of the district are located . . . ." Arizona Revised Code § 48-3112(A) and (C). PPFUF ¶ 40. On its face, Arizona law does not require the District to have received the Secretary's final O&M rate by July 1. Rather, Arizona law requires the district to provide an *estimate* of the amount of money it requires for the next fiscal year to the Pinal County Board of Supervisors by July 1. PPFUF ¶ 40. No action or inaction of

the United States prevented the District from providing the required estimate in FY2005 and the District, in fact, provided the required estimate to the board of supervisors in June 2003. DA5-9; DPFUF ¶ 33.

Moreover, under the Repayment Contract, the District is obliged to use all taxing authority within its power to collect O&M charges:

> the District will cause to be levied and collected all necessary assessments against the tracts of land now or hereafter included in the District designated by the Secretary of the Interior, to meet the terms of this agreement, and will use all the powers and resources of the District, including the taxing power and the power to withhold the delivery of water, to collect and pay to the United States all charges authorized under this agreement in full on or before the day that the same become due.

Pl. Ex 1 at 18. In addition to availing itself of the taxing authority through Pinal County, reflected in A.R.S. Sec. 48-3112, the District has authority, pursuant to Section 48-3151 of the Arizona Revised Statutes, to levy an assessment directly to collect O&M charges. Specifically, Section 48-3151(A) provides,

> In addition to authorized taxes, the board of directors may, at a regular or special meeting, notice of which shall be given for at least ten days previous by posting in three public places within the district . . . levy an assessment for the purpose of paying or refunding district indebtedness, repairing, improving, extending, maintaining and operation existing irrigation work, installing new works or systems or meeting emergencies.

Under this authority, an assessment in excess of $2.50 per acre per year must be approved by a "majority vote of the qualified electors of the district." A.R.S. § 48-3153(A). Rather, than avail itself of this distinct alternative under Arizona law for levying an assessment, the District has utilized the authority available to it under the annual property tax assessment. Pl. Ex. 6. The

United States did not bind itself to the District's choice of compliance with Arizona law. The District's claim regarding notice is a complaint regarding the District's preferred method for collecting O&M charges from its landowners, not a proper claim of breach of a contractual duty by the United States.

C. <u>The United States Satisfied Its Contractual Commitment</u>

As we explain below, the Secretary's contractual agreement to give notice of annual O&M charges to the District requires that the Secretary give notice of the charges applicable to the fiscal year that commences on October 1, in sufficient time that the District might comply with Arizona law to collect assessments from landowners and pay the United States by the preceding March 1. Pl. Ex 1 at 8. Years before the fiscal years at issue in this case, the District and the United States agreed upon a process that satisfied the Secretary's duty and it is undisputed that the time frame, as agreed upon, was fulfilled in FY2005, the year for which the District claims injury.

In 1997, then Acting Area Director of the Phoenix Area Office of the Bureau of Indian Affairs decided that a practice of fixing O&M rates to apply for an indefinite term of years did not satisfy the Secretary's duty to fix O&M charges annually. Pl. Ex. 18. In response, the San Carlos Irrigation Project proposed an annual Budget Formulation and Assessment Rate Setting Process for the District's consideration. DA1-3. The District accepted the time frames established in that process. DA4. As adopted by the parties, the annual rate setting process followed a series of steps, from December through the spring of the ensuing year, for the development of the annual project O&M rate. DA2-3. Under the budget rate setting process the Project prepares a draft budget, shares that budget with the District, conducts a fact finding

meeting with the District, receives written comments, and, ultimately gives notice of the O&M charge that the Project intends to recommend to the Regional Director. PPFUF ¶¶ 52-57; DA2-3. The District accepted the Project's proposal and has participated in this rate setting process for nearly a decade. Shaw Aff. ¶ 13 (DA146). As demonstrated below, for FY2005 this notice process allowed the District to satisfy its obligations under Arizona law.

For fiscal year 2005, the San Carlos Irrigation Project Engineer prepared a draft budget by April 1, 2003. Shaw Aff. ¶¶ 15, 34 (DA147, 154); Pl. Ex. 23. The Project shared its draft budget with the District at a meeting with the District's board of directors on April 10, 2003. Shaw Aff. ¶ 35 (DA155). Through the spring of 2003, the Project then revised the budget based upon the District's oral and written comments and conducted another fact finding meeting on May 23, 2003. Shaw Aff. ¶¶35-36 (DA155). Based upon theses exchanges and meetings, for FY2005, the District admits that it was on notice from at least May 23, 2003 that the Project would recommend that the FY2005 annual O&M charge be fixed at $30 per acre. Pl. Ex. 26. The Project's final proposed budget for FY2005 was submitted to the BIA Western Regional Office, and, on June 6, 2003, the Western Regional Director again notified the District of the $30 O&M charge and forwarded notice of the $30 O&M rate to the Assistant Secretary for Indian Affairs for publication in the Federal Register.[5] 25 C.F.R. 171.1(e). Pl. Ex 27; PPFUF ¶ 58.

The District cannot dispute the significance of the June 6 notice, as it relied upon that notice to complete its responsibilities under Arizona law. Specifically, on June 12, 2003, the

---

[5] The rate is published in the Federal Register pursuant to 25 C.F.R. § 171.1(e). The FY2005 rate was published as proposed on September 30, 2003, and as final, on April 30, 2004. Pl. Ex. 22. The District paid the FY 2005 assessment late, in two installments (March 2, 2005 and April 5, 2005). Pl. Ex. 6 at ¶ 15.

District transmitted its estimate of funds needed to the Pinal County Board of Supervisors. DA5. The District assessed its landowners $51 per acre, the same amount the District had assessed its landowners in earlier years. DA5; PPFUF ¶ 61. As the District admits, it made a conscious decision to collect fees from its landowners based upon a projected project O&M charge of $20 pre acre knowing that the Regional Director had forwarded a $30 per acre O&M charge for publication in the Federal Register. Id.

Having collected at least $20 per acre from its landowners in 2003 and 2004, the District failed to make any O&M payment whatsoever to the Project in 2004. DPFUF ¶ 34; DA46, 107-08. It is undisputed that the District paid its FY2005 O&M charges in arrears, rather than in advance, in 2005. PPFUF ¶¶ 79, 82. That FY2005 payment was delinquent under the express terms of the statute and the repayment contract. Consequently, the District was properly assessed a delinquent payment penalty of $47,500 for FY2005.

## III. The District Cannot Claim Injury Based Upon The Amount Of The FY 2005-2007 O&M Charges

### A. Introduction

The Court of Appeals for the Federal Circuit has already determined that the District has no basis to claim injury under the Repayment Contract where O&M overpayments in one year are retained by the Project and credited to the District's use in future years.[6] San Carlos, 111, F.3d at 1568. Consequently, even if the District were able to prove that the Project's O&M budget estimates were not reasonable in any particular year, a claim we dispute, the District's claim could still not be sustained.

---

[6] Unspent funds held by the Project earn interest as determined by the Department of the Treasury. Shaw Aff. ¶ 24 (DA150).

We do not dispute that the Project accumulated cash reserves in calendar years 2003-2005. However, those funds were credited to the District in future years. Specifically, in 2006, the Project set annual O&M charges for future years (FY2008 and FY2009) below the level of projected expenses for those years in order to spend down accumulated funds. Shaw Aff ¶ 48 (DA158-59). Thus, the District is receiving the express credit anticipated by the Federal Circuit when it decided San Carlos, 111 F.3d at 1568.

The District's claim of damages is further precluded by the Arizona Water Settlements Act. 118 Stat. 3478 (2004)("Settlements Act"). Pursuant to the Settlements Act, the District and the United States have entered into an agreement to transfer certain operation and maintenance functions from the United States to the District (and the Gila River Indian Community) together with Project reserve funds. Given this disposition of funds, the District cannot sustain a claim of injury.

B. Federal Circuit Precedent Precludes The District's Claim of Injury

The issue of the Government's collection of O&M charges in excess of expenses was expressly at issue in the prior San Carlos litigation. Specifically, in 1997, after 10 years of litigation, the Federal Circuit rejected the claim by the District that it is entitled to contract damages where the Project's estimate of O&M charges can be proven to have overestimated actual expenses. In San Carlos, 111 F.3d at 1567, the District maintained that one category of the Project's O&M budget, that for "power for pumping" irrigation wells, should have been based upon the cost of actual electrical usage, rather than the Government's advance estimates of usage, which proved to have been higher than the actual usage. The Court of Appeals determined that "[o]n the issue of the charge for estimated rather than actual power usage, the terms of the

Contract again cover resolution" of the claim and bar recovery because the contract "provides for charges in advance of use, necessarily implicating the use of estimates." Id. at 1568.

In rejecting the District's claim for damages, the Court of Appeals held,

> The Contract clearly contemplates advance assessment of charges based upon estimates; such a provision makes sense since the project needs funds to cover its current operating expenses. Moreover, so long as power is only charged for as used, the proper balance of such funds remains credited to SCIDD for its future use. Nor is a two year advance assessment period unreasonable in light of the circumstances presented by operation of the power plant.

Id. Thus, the District's claim that it is damaged by collection of an O&M rate that proves to have overestimated actual expenses, in circumstances where, as here, the funds are retained for use by the Project for the benefit of the District, has already been considered and rejected by the Federal Circuit. That holding is binding upon this Court. Weyerhauser v. United States, 92 F.3d 1148, 1151 (Fed. Cir. 1996) citing South Corp. v. United States, 690 F.2d 1368 (Fed. Cir. 1982) (en banc).

It cannot be disputed that the very funds that the District seeks to recover as damages in this case are currently being credited for the District's benefit. In 2006, in specific reliance upon those funds, the Project set the O&M rate for FY2008 and FY2009 at $21 per acre. Shaw Aff. ¶ 48 (DA158-59); DA84-86. The FY2008 and FY2009 O&M rates of $21 per acre were published in the Federal Register. 76 Fed. Reg. 19950 (April 20, 2007). Pl. Ex. 62. For both FY2008 and FY2009, the Project estimated that it would incur obligations of approximately $3 million, yet it set a $21 per acre O&M charge through which the project would collect only $2.1 million. DA42. The FY2008 and FY2009 budgets anticipate that the difference will be covered by the funds accumulated in prior years. Consequently, this case is controlled by the Federal

Circuit's decision in San Carlos, 111 F.3d at 1568.

The Arizona Water Settlements Act, 118 Stat. 3478 (2004) and the parties' agreement under that statute, further preclude any claim of injury by the District. In 2004, Congress enacted the Settlements Act to authorize the settlement of certain water rights claims and to provide for rehabilitation and operation and maintenance of the San Carlos Irrigation Project. 118 Stat. 3478, 3499-3500. Specifically, the Settlements Act authorized the Secretary of the Interior to execute an agreement called the Gila River agreement and directed the Secretary to execute exhibit 20.1 to the Gila River agreement, which contains Attachment 2.14, known as the Joint Control Board agreement DA10. As a result of these agreements, responsibility for certain maintenance of the Project will transfer from the BIA to the District and the Gila River Indian Community to be administered through a Joint Control Board ("JCB") appointed by the District and the Community. Along with the transfer of responsibilities for maintenance, the United States has agreed in paragraph 3.2.1 that it shall:

> Transfer to the JCB any and all financial reserves, materials and equipment that it holds for the operation and maintenance of the Project Joint Works, less any funds, materials and equipment necessary to accomplish the continuing responsibilities of the United States . . . .

DA14.

The transfer called for in the Joint Control Board agreement is expected to occur on or about July 13, 2009.[7] Plainly, the mechanism provided in the Joint Control Board agreement, as

---

[7] The JCB was to be established 30 days after the Enforceability Date determined pursuant to Section 207 of the Settlements Act. Section 207 requires the publication in the Federal Register of a statement of findings by the Secretary of the Interior. This Federal Register notice establishing the Enforceability Date was published on December 14, 2007. 71 Fed. Reg. 71143. Presuming timely establishment of the JCB, the transfer of responsibilities for

authorized by the Settlements Act, provides for a disposition of the same funds that the District illogically seeks to recover as contract damages through this litigation. Because the agreement authorized by the Settlements Act demonstrates once again that the funds that the District claims were overpayments in FY2005-2007 are held for the credit of the District, the District's damages claim is barred by the holding of the Court of Appeals in San Carlos, 111 F.3d at 1568.

IV. The Government Did Not Breach The Repayment Contract In Setting The Amount Of O&M Charges For Fiscal Years 2005-2007

In the event that the Court were to reach the District's claim for damages based upon the alleged overpayment of O&M charges for FY2005-2007, the United States is entitled to summary judgment because undisputed facts demonstrate that the O&M charges assessed in those years were reasonable.[8]

A. The District Is Required To Pay Its Proportionate Share Of The Annual Total Cost

The 1924 Act requires "that the total cost of the project shall be distributed equally per acre among the lands in Indian ownership and the lands in public or private ownership that can be served from the waters impounded by" the Coolidge Dam. Pl. Ex. 4. To implement that statutory mandate through the repayment contract, the United States agreed to operate and maintain the project and the District agreed to pay annual operation and maintenance charges.

The repayment contract places the duty to "maintain all of the project works" upon the

---

maintenance and the transfer of pertinent financial reserves would occur within 18 months of the Enforceability Date, or, on or about July 13, 2009. DA20.

[8] Pursuant to United States v. Gila River Pima-Maricopa Indian Community, 586 F.2d 209 (Ct. Cl. 1978) the United States pays one-half of all O&M charges assessed by the Project (the charges assessed against Indian lands). As a practical matter, the District cannot sustain the burden of persuading the Court that the United States has abused its discretion to overcharge itself.

United States, subject to the Government's right to designate certain works to be operated by the District. Pl. Ex. 1 at ¶ 9. As the Court of Appeals for the Federal Circuit has determined, "[t]he plain language of the Repayment Contract convinces us that the government contracted to keep the entire Joint Works . . . in a state of repair and to safeguard against their failure." San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 960 (Fed. Cir. 1989). The Government can be liable for breach of contract if it fails to maintain the works of the Project through performance of operation and maintenance responsibilities. Id.

Because the Government has the duty to operate and safeguard the works of the Project, it is the Government that must determine the work that needs to be done, and, consequently, the amount of funds necessary to perform operation and maintenance. Those decisions regarding operation and maintenance are subject to judicial review only for an abuse of discretion. Burnside-Ott Aviation Training Center v. Dalton, 107 F.3d 854, 859-60 (Fed. Cir. 1997); see San Carlos Irrigation and Drainage District v. United States, 111 F.3d at 1558. As the Court of Appeals has explained, "[w]here the Government is entitled to exercise its discretion, the 'plaintiff has an unusually heavy burden of proof in showing that the determination made . . . was arbitrary and capricious,' [citation omitted] and "[t]he standard of proof to be applied . . . must be, and is, high.'" Balboa Insurance Co. v. United States, 775 F.2d 1158, 1164 (Fed. Cir. 1985).[9]

As explained above, in the exercise of its discretion, the BIA must determine the annual O&M rate based upon estimates projected two years in advance. It is settled in this Circuit that

[9] The District does not allege a failure by the Project to perform two of the most important duties derived from the 1924 Act: 1) proper maintenance of project works to assure water delivery; and 2) operation of the project works to deliver water in compliance with the 1935 Federal Gila Decree. See www.gilawater.org, 1935 Decree, Articles V, VI and VII at. pp. 12-105.

the repayment contract "provides for [O&M] charges in advance of use, necessarily implicating the use of estimates." San Carlos Irrigation and Drainage District v. United States, 111 F.3d at 1568-69 ("The Contract clearly contemplates advance assessment of charges based upon estimates; such a provision makes sense since the project needs funds to cover its current operating expenses.") Consequently, under the parties' agreement, the Government cannot be found liable for breach of contract for simply setting an O&M rate that, in hindsight, collected more funds than were expended in a given year. Rather, the Government acts reasonably when it fixes O&M charges annually based upon a reasonable consideration of the cost experience and maintenance needs known to the Government at the time the rate is set. As we demonstrate below, the O&M charges assessed for FY 2005-2007 were reasonably determined based upon budgets prepared upon due consideration of 1) the actual expenses then incurred by the Project, and 2) an assessment of the project's maintenance needs, projected two years in advance. Because the decisions regarding the FY 2005-2007 O&M charges were neither arbitrary, nor capricious, but rather, reflect the BIA's reasonable exercise of discretion, the United States is entitled to summary judgment upon the District's claim.

## B. The FY 2005-07 O&M Charges Were Based Upon Estimates Of The Annual Total Costs And Income Of The Project

### 1. Introduction

The O&M charges for fiscal years 2005-2007 were determined through a review of an annual budget prepared by the Project for each of those years. Shaw Aff. ¶ 34-39 (DA154-56); Pl. Ex. 34, 35. As we demonstrate below, those annual budgets included categories of expenses that are well-settled and appropriate and the Project possessed a reasonable basis for the amounts

specified.

As the Supreme Court has explained, when an irrigation system is completed,

> Expenditures made to maintain it as an efficient going concern, and to operate it effectively to the end for which it was designed are, at least generally, maintenance and operating expenses.

Nampa & Meridian Irr. Dist. v. Bond, 268 U.S. 50, 53 (1925). Moreover, "it is not necessary that each expenditure for maintenance or operation considered by itself shall directly benefit every water user, in order that he be called upon to pay his proportionate part of the cost." Id. at 54. Instead,

> The irrigation system is a unit, to be, and intended to be, operated and maintained by the use of a common fund, to which all lands under the system are required to contribute ratably, without regard to benefits specifically and directly received from each detail to which the fund is from time to time devoted.

Id. Finally, expenditures "for the purpose of overcoming injurious consequences arising from the normal and ordinary operation" of the system are reasonable O&M expenses. Id.

This Court recently considered the scope of operation and maintenance expenses as applicable to an irrigation system. In Casitas Municipal Water District v. United States, 72 Fed. Cl. 746 (2006), appeal pending, No. 2007-5133 (Fed. Cir.), plaintiff water district complained that the construction of a fish passage facility constituted a breach of contract. In rejecting that contention, relying upon the Supreme Court's opinion in Nampa, this Court determined that "costs undertaken to correct the injurious effects of system operation are chargeable as operation and maintenance expenditures." Id. at 751. The Court thus held that the construction of a fish passage facility was a reasonable O&M expense as the work reasonably corrected the injurious

impact that the water project had inflicted upon the environment.[10]

In reviewing the composition of the San Carlos Irrigation Project's O&M budget, as explained above, this Court is required to apply a deferential standard of review and decide only whether the Government acted reasonably, that is, had a rational basis for the rate adopted. In so doing, the Court must presume that Project officials acted properly when they prepared those budgets. "A presumption of regularity applies to 'official acts of public officers,' and allows [the Court] [i]n the absence of clear evidence to the contrary' to 'presume[] that public officers have properly discharged their official duties." Jennings v. Mansfield, 509 F.3d 1362, 1367 (Fed. Cir. 2007), citing Butler v. Principi, 244 F.3d 1337, 1340 (Fed. Cir. 2001) and cases cited therein; Carolina Tobacco Co. V. Bureau of Customs & Border Protection, 402 F.3d 1345, 1350 (Fed. Cir. 2005)(citing United States v. Armstrong, 517 U.S. 456, 464 (1996) ("Government officials are presumed to do their duty, and one who contends they have not done so must establish that defect by 'clear evidence.'"). As the Court of Appeals recently reiterated, "[t]here is a presumption that administrative actions are correct and the 'government officials act in good faith' in discharging their duties." Davis v. Department of Homeland Security, 239 Fed. Appx. 586, 590-91 (Fed. Cir. 2007) citing, Gonzales v. Def. Logistics Agency, 772 F.2d 887, 892 (Fed. Cir. 1985).

---

[10] The Court also properly held that the claim that the imposition of costs to build the fish passage facility were a breach of the parties' repayment contract were barred by the sovereign acts doctrine because those costs were incurred to comply with a Federal mandate, the Endangered Species Act.

2. FY2005

Project engineer Randy Shaw developed the first draft of fiscal year 2005 project budget in April 2003. Shaw Aff. ¶ 34 (DA154). That budget went through several revisions based upon its review within the Project and upon comments upon it made by the District. Shaw Aff. ¶¶ 35-37 (DA155).

Following a consistent format, the budget Mr. Shaw prepared was presented to the District in an Excel workbook. Shaw Aff. ¶ 10 (DA145); Pl. Ex 34. In addition to a single page budget summary, the work book contained detailed work pages that explained the basis for the items reflected in the budget summary. Pl. Ex. 23, 34; DA42-73. As reflected in the budget summary, Mr. Shaw organized the budget under the major categories of income, obligations (current expenses), sinking funds and reserves. Shaw Aff. ¶ 16 (DA147); Pl. Ex. 34.

The Project's income is primarily a function of the O&M assessment to be determined. Shaw Aff. ¶ 22 (DA149). It also includes amounts for interest received on funds held for the Project by the Department of the Treasury, miscellaneous income derived from the sale of permits, and income obtained from the sale of water in years when the Gila River Indian Community pumps excess water from irrigation wells. DA34; Shaw Aff. ¶ 22-24 (DA149-50).

To determine the Project's obligations or current operating expenses, Mr. Shaw documented costs incurred by the project in prior years. Shaw Aff. ¶ 9, 11 (DA145-46). This effort allowed Mr. Shaw to develop a factual baseline for the expenses regularly incurred by the Project and a reasonable basis for estimating what those costs would be in FY2005. Id. Budget obligations include costs such as those for personnel, supplies and service contracts. In addition, in any given year, the Project may obligate funds for non-routine maintenance work. As project

engineer, looking forward to FY2005, Mr. Shaw surveyed the maintenance needs of the project to anticipate what maintenance projects that would be undertaken in FY 2005. Shaw Aff. ¶ 29 (DA151-52).

In total, the FY2005 budget, prepared in the spring of 2003, estimated that the Project would obligate $3,151,000 in FY2005. Pl. Ex. 34. That estimate compared favorably to the actual experience of the Project then known which demonstrated that obligations had exceeded $3 million in each of the previous four years. The chart below lists the actual obligations incurred from FY1999-2002:

| | |
|---|---|
| FY1999 | $3,335,416 |
| FY2000 | $3,507,679 |
| FY2001 | $3,164,958 |
| FY2002 | $3,098,319 |

Pl. Ex. 76; DA42. Based upon the FY2005 O&M expense projections, the Project projected the FY2005 O&M assessment rate at $30 per acre to generate $3 million. Shaw Aff. ¶¶ 35-37 (DA155). The District was assessed one-half of that amount or $1.5 million. Pl. Ex. 40.

The FY2005 assessment of $30 per acre reflected an increase of the annual assessment from a rate of $20 per acre that had prevailed from FY1998-2004.[11] PPFUF ¶ 51. Because obligations had exceeded $3 million from FY1999-2002, the Project had operated at an annual deficit in those years which had been covered with reserve funds that were exhausted by FY2002. Shaw Aff. ¶ 14 (DA147); DA42.

---

[11] In the years preceding FY1998, the O&M rate had been approximately $30 or more. Specifically, the FY1993 assessment was $29.95 per acre. 56 Fed. Reg. 43984 (Sept. 5, 1991). The FY1994 assessment was $35 per acre and the assessment from FY1995 through FY1997 was $30 per acre. 58 Fed. Reg. 43990 (Aug. 18, 1993); 60 Fed. Reg. 4499 (Jan. 23, 1995); 63 Fed. Reg. 12818 (March 16, 1998).

In addition to current obligations, the FY2005 budget developed by project engineer Shaw identified unobligated funds in the possession of the Project. Shaw Aff. ¶¶ 17-21 (DA147-49). Some of those funds were held as sinking funds (for planned long term maintenance projects), some funds were held as an emergency reserve, and any remaining funds were held as excess. None of the funds held as sinking funds, reserves or as excess were included in the more than $3 million planned for obligation in FY2005, just as those anticipated or emergency needs were not reflected in the actual obligations incurred by the Project from FY1999-2002. DA42.

For fiscal year 2005, the budget included sinking funds dedicated to heavy equipment, irrigation well replacement, and a project identified as the China Wash Flume Rehab/Replacement. Shaw Aff. ¶ 30 (DA152-53); Pl. Ex 34. For fiscal year 2005, the budget did not set aside any new funds for the China Wash Flume.[12] In addition, the Project acceded to comments from the District and did not set aside any funds for well replacement. Consequently, the total sinking fund allocation in FY 2005 was less than $10,000 for heavy equipment. Pl. Ex. 34. To address, unanticipated emergencies, the Project budgeted an emergency reserve of $600,000. Id. This reserve was consistent with BIA guidelines and the District concurred with its purpose. DA93; Pl. Ex. 13 at 96.

In its motion for summary judgment, the District seeks to prove that the FY2005 O&M charge of $30 per acre was unreasonable by using hindsight to compare actual expenses incurred

[12] Funds for work on the China Wash Flume were identified in a sinking fund in the FY2004 budget. Pl. Ex. 34. In the FY2005 budget, because the Project anticipated that it would undertake the work that year, the China Wash Flume sinking fund was projected to be zero and the funds allocated to that work were listed as an obligation. Id. In fact, the funds were obligated to a contract for the work at the end of FY2006, the work was performed in FY2007 and ensuing budgets were adjusted accordingly. Shaw Aff. ¶ 30 (DA153).

in FY2005 to the estimates prepared in 2003. Even more unfairly, the District fosters confusion by relying upon documents that are not used in the rate setting process.[13] As we demonstrate below, the District a) fails to recognize that the FY2005 Project budget was properly developed in 2003 using reasonable estimates as approved in San Carlos, 111 F.3d at 1568, and, b) misconstrues the budget line items it attempts to cite as examples of error.

As explained above, the FY2005 O&M rate setting process took place in the spring of 2003. By letter dated June 6, 2003, the BIA Western Regional Director shared with the District the Project budget that was relied upon to set the FY2005 O&M charge of $30. Pl. Ex. 27, 34; PPFUF ¶ 58. That budget estimated that the Project would have unobligated cash on hand on October 1, 2004 of $3,674,619 and after adding income anticipated during FY2005, estimated that the project would have total funds available to it in the amount of $3,780,119 during fiscal year 2005. The same budget estimated that the Project would incur obligations of $3,151,000 during FY2005, leaving a balance of $629,119. Pl. Ex. 34. Subtracting a planned emergency reserve of $600,000 and a sinking fund of $9,844 for heavy equipment purchases, meant that as estimated in 2003, the total funds available to the project and not earmarked for a purpose (what the District would call excess) amounted to $19,276.

Because the FY2005 budget was prepared in the spring of 2003, the budget necessarily did not include certain information that the District now seeks to rely upon in hindsight. First,

---

[13] As sources for actual expenses and, for budget data, the District frequently relies upon monthly reports that the Project provides to the District. Pl. Ex. 36, 37, 41, 49, 57, 59, 63, 72, 73. Those monthly reports track Project obligations during the current year in which they were prepared. Those monthly reports are not used to determine the annual O&M assessment. Shaw Aff. ¶ 12 (DA146). Instead, as the District was informed in 2003, the FY2005 O&M charge was based upon the budget Excel workbook provided to the District in draft in April 2003 and as the proposed budget on June 6, 2003. Pl. Ex 27, 34.

the budget could not, and did not, anticipate that the District would violate the 1924 Act and the Repayment Contract and fail make an FY2005 O&M payment in the spring of 2004. Pl. Ex. 6 at ¶ 15. The District's own failure to pay O&M charges in 2004 caused the FY2005 estimate of unobligated cash on hand at the beginning of FY2005 to differ from the amount estimated in 2003. Pl. Mot. 15. Second, in the spring of 2003, the O&M charge for FY2006 (payable during FY2005) had not yet been determined. Shaw Aff. ¶ 38 (DA156). Consequently, no FY2006 O&M charges were reflected in the budget prepared in the spring of 2003. The reasonableness of the Project's estimates must be determined based upon the information available to the Government in 2003 when those estimates were made.

The examples relied upon by the District do not support the District's contention that the FY2005 O&M charge of $30 per acre was unreasonable. Below, we refute each cited example in turn.

Although the District faults the budget for estimating that Project income for FY2005 (exclusive of O&M charges) would amount to $70,500 when actual year end income was $511,339 (final tallies were $524,294), the District neglects to consider the actual data available to the Project in the spring of 2003. Pl. Ex. 76; DA42. It is undisputed that for the years FY1999-FY2002, the Project generated the following income:

| | Interest | Excess Pumping | Miscellaneous |
|---|---|---|---|
| FY1999 | $431,228 | $0 | $217,631 |
| FY2000 | $352,334 | $248,723 | $ 70,437 |
| FY2001 | $289,681 | $281,520 | $ 2,312 |
| FY2002 | $ 76,642 | $0 | $263,618 |

Pl. Ex. 76; DA42. As the prior years' data demonstrate, most project income, exclusive of O&M charges, was obtained through the interest obtained on held funds and through the payment of

fees for pumping excess water on Indian lands. Because in 2003 the Project estimated that by FY2005 all excess funds would have been depleted, the Project properly estimated that it would receive only a small amount of interest income in FY2005. Similarly, because excess pumping had yielded no income in two of the prior four years, the Project had a reasonable basis in 2003 to estimate that it would receive no income from that source in FY2005.[14] Thus, based upon the data available to it in 2003, the Project's estimate that it would receive income in FY2005, of $70,500, exclusive of O&M charges, was plainly reasonable.

The other examples relied upon by the District are equally flawed. Although the Project estimated that it would obligate more than $3 million in FY2005 and actually obligated just over $2 million, Pl. Mot. 16, the Project had a sound basis, based upon its actual expenses from FY1999-2002 for the estimate rendered in 2003. In fact, obligations had exceeded $3 million for each of the preceding four years. Pl. Ex. 76; DA42.

Looking more closely at the budget figures, the single greatest cause of the difference in estimated and actual obligations in FY2005 is reflected in the budget category "Land & Structures & Special Projects." For FY2005, the bulk of the cost under that item related to work intended on the China Wash Flume, a concrete structure that carries water over a dry river bed. Shaw Aff. ¶ 30 (DA152-53). In 2003, the project engineer estimated that the $351,000 sinking fund set aside for maintenance of the China Wash Flume would be obligated for expense in 2005. In fact, the award of a contract for that work was delayed and the funds were ultimately

[14] Excess pumping income is generated when the Gila River Indian Community is permitted to run well pumps to obtain excess water. The circumstance is highly dependent upon the weather and available water in storage, and, consequently, as an income source, it is highly uncertain. Shaw Aff. ¶ 23 (DA149-50).

obligated to a contract in FY2006 and the work was undertaken in FY2007. DA87-89. The delay in the work is simply a real world delay that does not support a contention that the budget estimate prepared in 2003 lacked a rational basis.

The District's criticism of the FY2005 estimate that the Project would have $629,119 in unobligated funds at the end of FY2005 when it proved to have $4 million is equally flawed. As explained above, in June 2003, the Project had no estimate for FY2006 O&M charges (that would be payable in FY2005 under the 1924 Act).[15] By the end of FY2005 (September 30, 2005), the FY2006 O&M charge not only had been determined, it should have been paid. Thus, the actual year end funds for FY2005 should have been higher than the 2003 budget estimate by at least the amount of the FY2006 assessment.[16] The difference between the estimate of $629,000 in year end funds rendered in 2003 and the $4 million in actual funds held as of September 30, 2005, properly reflects the additional information available to the Project from June 2003 to September 2005.

Finally, the District's contention that charges related to the funding of an archeological study at the San Carlos Reservoir are unauthorized is wholly unsupported and wrong.[17] As explained above, the Supreme Court held almost a century ago that costs undertaken "for the

---

[15] In accord with parties' agreed upon rate setting process, that FY2006 O&M charge would not be known until 2004. Shaw Aff. ¶ 38 (DA156).

[16] The District was required to pay $1.5 million in the spring of 2004 (for FY2005 O&M charges) and an additional $1.5 million in the spring of 2005 (for FY2006 O&M charges) for a total of $3 million by the end of FY2005. The District actually paid only $1.5 million over that two year period. DA46.

[17] This expense amounted to $53,045 in proposed obligations in FY2005. Pl. Ex. 34 at 11.

purpose of overcoming injurious consequences arising from normal and ordinary operation" of the irrigation system are properly chargeable as operation and maintenance expenditures. Nampa, 268 U.S. at 54; Casitas, 72 Fed. Cl. at 751.

The archeological study undertaken by the San Carlos Irrigation Project is a reasonable O&M expenses because as the United States District Court for the District of Arizona has found:

> Prior to inundation of the Lake [San Carlos Reservoir] in 1928, the lake-bed was the site of the town of "old" San Carlos where the Apache Tribe resided. Additionally, the waters impounded behind Coolidge Dam cover tribal cemeteries, graves, and archeology sites that contain and protect human remains, private homes, a grain mill, and many other historical sites, many of which have significant spiritual and cultural meaning to the Apache Tribe.

San Carlos Apache Tribe v. United States, 272 F. Supp. 2d 860 (D. Ariz. 2003), aff'd, 417 F.3d 1091 (9th Cir. 2005). As a consequence, the Project reasonably incurs costs to comply with a variety of statutes that mandate the identification and preservation of those sites and artifacts. Compliance with those Sovereign Acts cannot constitute a breach of contract. Casitas, 72 Fed. Cl. at 753-55.

As the Court of Appeal for the Ninth Circuit has explained, the National Historic Preservation Act, 16 U.S.C. § 470 et seq. ("NHPA") encourages the preservation of sites and structures of historic, architectural or cultural significance. San Carlos Apache Tribe v. United States, 417 F.3d at 1093-94. Pursuant to NHPA, the Project has a duty to "take into account the effect of [its] undertakings on 'any district, site, building, structure or object that is included in or eligible for inclusion in the National Register" Id. at 1094, and the Project has a statutory duty to establish a preservation program for the protection of historic properties. 16 U.S.C. § 470h-2(a)(1)-(2). The Project is responsible for the protection of Native American human remains

and objects pursuant to the Native American Graves Protection and Repatriation Act, 24 U.S.C. § 3001 et seq. San Carlos Apache Tribe v. United States, 272 F. Supp. 2d at 886-94.

The archeological study of which the District complains is a reasonable O&M expense because those funds are used to comply with Federal law "for the purpose of overcoming injurious consequences arising from the normal and ordinary operation" of the irrigation system. Nampa, 268 U.S. at 53. Casitas, 72 Fed. Cl. At 751.

To conclude, the Project's budget estimates for FY2005 were reasonably based upon the Project's actual budget history known in 2003 and its needs as estimated for FY2005. The estimates did not constitute a breach of contract when they proved to differ from actual expenses incurred two years later.

3. FY2006

The District's criticism of the FY2006 O&M charge must also be rejected upon consideration of the actual cost history of the Project. There is no dispute that the Project budget upon which the FY2006 $30 per acre rate was based was well in accord with the Project's actual budget experience. PPFUF ¶¶ 93-99. Specifically, in the fall of 2004, when the FY2006 budget was prepared, the latest data available to the Project encompassed the years 1999-2004. In those years, the Project had actually incurred the following obligations:

| | |
|---|---|
| FY1999 | $3,355,416 |
| FY2000 | $3,507,679 |
| FY2001 | $3,164,958 |
| FY2002 | $3,098,319 |
| FY2003 | $2,594,929 |
| FY2004 | $2,564,940 |

Pl. Ex. 76; DA42. Critically, in the years FY2003 and FY2004, the Project had performed no significant maintenance work as the obligated amounts for "Land & Structures and & Special

Projects" were $0 in those years. Given the Project's contractual duty to maintain the project facilities, it was not unreasonable for the Government to anticipate that by FY2006, the Project would resume incurring maintenance expenses and thus the FY2006 estimate that the Project would incur obligations of over $3 million was patently reasonable.

The reasonableness of the Government's estimate was borne out by actual events At the close of FY2006, the Project reported FY2006 actual O&M obligations of $2,931,403, nearly the exact amount collected for FY2006. PPFUF ¶ 97; Pl. Mot. 22. Faced with these facts, the District resorts to an unsubstantiated attack upon the Project's inclusion of funds for the China Wash Flume, discussed above, in the obligated amount. As we explain below, the District's criticism of FY2006's inclusion of funds for work on the China Wash Flume as obligated funds is based either upon a factual error on the District's part or a willful failure to comprehend Government fiscal law as it defines obligations.

There is no dispute that work on the China Wash Flume was authorized and necessary maintenance. DA98. There is also no dispute that the work was performed in FY2007. Shaw Aff. ¶ 30 (DA153). The District's attack upon this maintenance item is limited to whether the China Wash Flume funds were actually obligated in FY2006. The Government's records demonstrate that the contractual commitment to expend funds for the China Wash Flume was made by a warranted contracting officer on September 28, 2006, within FY2006. DA87-89. With the proper inclusion of the China Wash Flume funds, the Project obligated approximately $3 million in O&M expenses in FY2006. Given that the Project incurred obligations of $3 million in FY2006, the District's contention that FY2006 O&M charge of $30 per acre (to yield collections of $3 million) lacked a rational basis, must be rejected.

The timing of the China Wash Flume work typifies the issue of deferred maintenance that lies at the heart of the District's complaints regarding the FY2006 budget. The matter of deferred maintenance also explains why the BIA Western Regional Director rejected the Project staff recommendation for a FY2006 $15 per acre rate which the District would have preferred. PPFUF ¶ 83. As the District admits, when the BIA Western Regional Director reviewed a proposed budget that would have allowed imposition of a $15 per acre O&M rate, the regional director identified specific maintenance items that would have been unfunded or underfunded in such a budget. PPFUF ¶¶ 87-91. It cannot be disputed that the inclusion of funds for maintenance is a proper exercise of the Government's discretion to provide for the operation and maintenance of the irrigation system, warranted by the Government's contractual duty to maintain the Project joint works, San Carlos Irrigation and Drainage District v. United States, 877 F.2d at 960.

The District's specific complaints regarding maintenance planned for FY2006 must be rejected. In the case of the China Wash Flume, as explained above, the District concurred in the need for this work. DA98. Had the Project not repaired the deteriorated concrete in the flume and had the flume failed, the Project would have been prevented from delivering surface water to the District and the District would likely have asserted a claim for breach of contract. San Carlos, 877 F.2d at 960. In any event, the District's complaints regarding the China Wash Flume do not have any impact upon the overall Project budget since the District concedes that the work was necessary and was actually performed.

In the case of the well replacement plan, it is undisputed that reasonable minds can differ on how to maintain and replace aging wells which are indisputably an essential part of the

Project's water supply. Shaw Aff. ¶¶ 42-44 (DA157); PPFUF ¶ 88. It also cannot be disputed that in May 2002, the Project Engineer conducted a study and found that: (1) wells had been drilled in every decade of the Project, from the 1930's through the 1980's, (2) by 2004, 26 of the Project wells were more than 60 years old, and (3) no new wells had been drilled in 20 years. Shaw Aff. ¶ 30 (DA152-53). Based upon this information , the Project reasonably determined that it should anticipate the need for replacement of wells used to supplement the delivery of water from the San Carlos Reservoir. No funds were set aside for the well replacement sinking fund in FY2003 through FY2005. In addition, in 2004, the Project redirected $500,000 in funds that had been previously set aside for well replacement to cover expenses not met by the then FY2004 assessment rate of $20 per acre. Taking these matters into account, by FY2006, in the reasonable exercise of its discretion, the Project planned to reestablish a well replacement fund because the need remained to replace failing Project wells. Because there is a well-documented rational basis for the Project's decision, rendered in 2004, to include expenses for well replacement in the FY2006 budget, the District's disagreement with the Project's choice fails to prove that the inclusion of this budget item constituted a breach of contract.

Finally, the District's criticism of the Project's need for funds for heavy equipment is similarly mistaken. As the District's brief makes clear, the District's complaint is not with any particular item of equipment or with the determination of the appropriate amount of funds. Instead, the District makes a non-specific, factually unsupported, criticism of the discretionary decision of the Government regarding what is necessary to operate and maintain facilities the Government is bound to maintain. In contrast, as a regular part of its budget preparation, the Project reviews the various heavy equipment, vehicles and trucks used by the Project and

determines the Project's needs through the development of a replacement schedule based upon a survey of that equipment. Shaw Aff. ¶ 30 (DA152); DA119-21. This data is entered in the Excel workbook spreadsheets that support the overall budget. Pl. Ex. 34; DA42, 57.

The District's criticism of the income estimate utilized in the FY2006 budget is as misdirected as its criticism of anticipated expenses. Although the District uses hindsight to fault the budget estimate, the District's arguments ignore that virtually the entire difference between the funds projected and the funds actually received was derived from interest income in FY2006 that the Project could not have known about when the budget was prepared in 2004 because the principal funds that generated that interest were to have been spent on required maintenance in the intervening years. Pl. Ex. 34, 35. As with the bulk of its criticisms, the District seeks to exploit changes that occurred over the two year budget estimating process when the Government's budget estimates had a rational basis at the time they were made.

Finally, the District's intimation that the FY2006 O&M charge was determined without regard to the Project's actual needs has no factual support. Pl. Mot. 17. The engineers who prepared the budget and determined the need for the $30 per acre assessment have testified that they determined the Project's needs by reviewing the actual maintenance needs of the project. DPFUF ¶ 67; DA112, 119-21. These engineers testified unequivocally that the FY2006 rate was determined through an evaluation of the Project's needs and that they were never requested to support a particular rate assessment. Id. In these circumstances, this Court is required to apply the presumption that Government officials act in good faith in the discharge of their duties and reject the District's unsupported allegations. Davis v. Department of Homeland Security, 239 Fed. Appx. 586, 590 (Fed. Cir. 2007); Chapman Law Firm Co. v. United States, 490 F.3d 934,

940 (Fed. Cir. 2007); Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002).

4. FY2007

Because the FY2006 budget cycle was prolonged until December 2004, the Project determined the FY2007 budget at the same time as it finalized the FY2006 budget. DPFUF ¶ 68; DA113-14. Specifically, the FY2007 budget was included in a fact finding meeting with the District on December 16, 2004. DA113-14; PPFUF ¶¶ 98-100. The BIA reviewed the FY2007 budget cycle in a notice published in the Federal Register well before the commencement of this litigation. In that notice, the BIA determined that,

> [a]s early as December 16, 2004, at a Fact Finding Meeting, BIA provided the District with a budget and rate projection for the period 2006-2010, indicating that the annual O&M rate was projected to remain at $30/acre for this time period. BIA staff met with the District Board ten times during CY 2005 at which time BIA provided Project budget, expenditure, cash balance, income, and rate information, and reiterated BIA's projection that the $30/acre O&M rate was likely to remain constant from 2006-2010 in order for BIA to operate the Project adequately, maintain a sufficient reserve account for emergencies, and to build up a sinking fund for major capital projects that need to be funded in the future, such as well replacements.

71 Fed. Reg. 17132 (April 5, 2006) (Pl. Ex. 70).

As it had in prior years, the Project estimated its annual operating expenses and maintenance needs for FY2007 in the budget dated October 28, 2004 and shared this budget with the District in December 2004. PPFUF ¶¶ 99-100; DA113-16; Pl. Ex. 35. That budget estimated the Project's obligations would exceed $3.5 million in FY2007 as it had in FY1999 and FY2000. Pl. Ex. 35; DA42. The most significant cause of the projected increase over recent years ($650,000) related to the anticipated well replacement, which was projected to be undertaken in

FY2007. Pl. Ex. 35. In addition, the Project anticipated continuing to fund reserves for heavy equipment and for future well replacement. Pl. Ex. 35. These estimates and projections were rationally based upon the Project's expense history and planned maintenance activities.

Once again, the District seeks to fault the Project's budget based upon hindsight. Pl. Mot. 19. However, the District fails to acknowledge that the very figures upon which it seeks to rely demonstrate that the Project incurred actual obligations of more than $3 million in FY2007, vindicating the Project's decision to collect $3 million for O&M expenses in FY2007. Pl. Ex. 72.[18]

The District's sole criticism specific to the FY2007 budget concerns the consideration of $2 million related to construction of a Project building. Pl. Mot. 23. In raising this issue, the District neglects to mention that the $2 million building expense was not used in determining the FY2007 O&M charge so it has no relevance to a determination of whether the actual information relied upon to set the FY2007 reasonably supported the decision to set the FY2007 O&M charge at $30 per acre. In any event, it is undisputed that the BIA withdrew the proposal to expend O&M funds on building construction. Pl. Ex. 68. In sum, the issue had no impact upon the 2004 estimates for the FY2007 budget, no impact upon the actual obligations in FY2007, and resulted in the expenditure of no funds. PPFUF ¶ 130. As such, the building construction issue is

---

[18] The FY2007 actual O&M expenses did not include any funds for well replacement in FY2007, as had been anticipated in 2004, due to ongoing disagreement between the parties as to the need for well replacement and the proper location for future wells. Pl. Ex. 72; DA104-05. Had that work been undertaken, the FY2007 obligations would have been even higher. In 2006, after the budgets for FY2005-2007 had been determined, the issue of well replacement was resolved between the parties when the Project acceded to the District's desire that well replacement be handled as an emergency expense in the event of well failure, rather than as planned maintenance. DA42; Shaw Aff. ¶¶ 42-44 (DA157). This resolution is reasonably reflected in the Project budgets for FY2008 and FY2009. DA42.

irrelevant to this litigation.

V. The United States Is Entitled To Summary Judgment Upon the District's Claim Of A Breach Of The Implied Duty Of Good Faith And Fair Dealing

The United States is entitled to summary judgment upon the District's claim that the Government breached the implied duty of good faith and fair dealing because there is no evidence to rebut the required presumption that Government officials act in good faith in the discharge of their duties. Davis v. Department of Homeland Security, 239 Fed. Appx. at 590; Chapman Law Firm Co. v. United States, 490 F.3d at 940. Moreover, that presumption may only be rebutted by "clear and convincing evidence," Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1234, or "well-nigh irrefragable proof." Chapman, 490 F.3d at 940; T&M Distrib., Inc. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999). Here, in accord with the terms of the repayment contract, employees of the BIA provided the District with advance notice of annual O&M rates for the years FY2005-2007 that were reasonably based upon the project's prior expenses and there is no ground upon which to impugn the motives, intent, or good faith of those Federal employees.

"The covenant of good faith and fair dealing requires a party to respect and implement the contract in accordance with its terms." First Nationwide Bank v. United States, 431 F.3d 1342, 1350 (Fed. Cir. 2005); see Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000). As demonstrated throughout this brief, Government officials fully satisfied the terms of the parties' contractual agreement. Moreover, the District's claim that the Government breached the implied duty of good faith and fair dealing may not simply complain about the Government's performance, but must overcome the strong presumption that Federal employees act in good faith. Chapman, 490

F.3d at 940; Galen Medical Associates, Inc. v. United States, 369 F.3d 1324, 1335 (Fed. Cir. 2004); Am-Pro Protective Agency, Inc. v. United States, 281 F3d at 1240. To establish that the Government did not act in good faith, the District must allege and prove by "clear and convincing evidence," specific acts of bad faith on the part of the Government, Id. at 1239-40; Chapman, 490 F.3d at 940, citing T&M Distribs., Inc. v. United States, 185 F.3d at 1285 ("Government officials are presumed to act in good faith and 'it requires 'well-nigh irrefragable proof' to induce a court to abandon the presumption of good faith.").

"[I]n order to state a claim premised on a violation of the obligation of good faith and fair dealing, plaintiffs must allege facts which if proved would constitute malice or an intent to injure." Asco Falcon II Shipping Co., et al., v. United States, 32 Fed. Cl. 595, 604 (1994); see Am-Pro, 281 F.3d at 1240-41. Specifically, a plaintiff must show that the Government's actions were "motivated alone by malice," "part of a proven 'conspiracy . . . to get rid of [plaintiff],'" or "part of a course of governmental conduct which was 'designedly oppressive' or . . . 'activated by animus toward'" plaintiff. Am-Pro, 281 F.3d 1241 (citations omitted). The presumption cannot be "defeat[ed] . . . with just bald assertions and speculations of wrongful conduct." T & M Distrib., Inc., 185 F.3d at 1285.

The record in this case is clear that years before the current dispute, Government officials proposed a procedure for the development of the annual O&M rate assessment that provided for a sharing of information regarding the Project's anticipated budget two years in advance of that budget year. That procedure comported with the repayment contract and the District concurred with the procedure. In accordance with the agreed-upon procedure, Government officials provided information to the District that contained estimates of the Project's anticipated costs

for the years FY2005-2007 well in advance of those budget years, received comments from the District regarding those projections and made adjustments in response to those comments. The Government estimates were reasonably based upon the prior costs actually incurred by the project and the maintenance needs of the project as determined by the Government's supervisory civil engineer. In these circumstances, the Government is fully entitled to the presumption that its officials discharged their duties in good faith and there is no merit to the District's claim of a breach of the duty of good faith and fair dealing.

## VI. The District's Arguments Regarding Accounting Practices And Its Calculation Of Damages Must Be Rejected

Finally, contrary to the District's unsupported contentions, the BIA fully satisfied the terms of the repayment contract in determining O&M charges for FY2005-2007, in keeping "full and accurate" accounts of "receipts and expenditures and other fiscal operations in connection with the Project," and in consulting with the District "as to contemplated future steps of importance." Pl. Ex. 1 at 19. The District has admitted that in addition to receiving a fully documented budget for upcoming fiscal years, it also receives monthly reports detailing the Project's receipts and expenses, and that it has not, and does, not dispute the accuracy of the Project's reporting. DA100-03. The District's record keeping complaints seek to exploit the abundance of information that the Project provides to it and mistakenly relies upon the opinions of a proposed expert accountant who admits that he possesses no understanding of the documents he reviewed or the process that governs the work of the Project.

There is no question that the Project routinely reports its financial status to the District through monthly reports provided to the District's board of directors. Pl. Ex. 36, 37, 41, 49, 57, 59, 63, 72, 73. These monthly financial statements reflect the Project's actual receipts and

expenditures. It is also undisputed that these monthly reports are not part of the annual budget setting process. Shaw Aff. ¶ 12 (DA146). As the District has admitted, these reports present "the expenses and what they're [the Project] doing now, not what is projected." DA100.

In contrast to the monthly report of expenses, the O&M rates are set based upon a budget that is developed two years in advance. The District has agreed that projections or estimates rendered in these budgets can reasonably vary from actual results. DA97-98. Moreover, as even the District's general manager has explained, the timing of the budget process "means you have to guess" at future expenses. DA97. In contrast to the District's effort to obfuscate the issues, the O&M rates for FY20005-2007 are properly supported by distinct budget documents. Pl. Ex. 34, 35. This Court should reject the District's attempt to portray the Project's information sharing efforts as confused and inconsistent and find instead that the Project reasonably provides "full and accurate" information to the District through its monthly financial statements and its annual budget setting process.

The District's complaints regarding consultation also do not withstand scrutiny. The two most significant maintenance items at issue during the years involved in this case concern the China Wash Flume rehabilitation and the well replacement plan. In both cases, the District has admitted that the matters were discussed for years. DA99, 104-05. In the case of the China Wash Flume, the District agreed the work was required and admits the work was performed. DA90, 106. As for the well replacement plan, the District has admitted that it was consulted, that it disagreed with the Project's plan, and proposed its own alternative. DA104-06. The Project adopted the District's alternative well replacement plan, which involves replacing wells as they fail, rather than on a replacement schedule. Shaw Aff. ¶¶ 43-44 (DA157-58).

The District's complaint that the Project's reporting does not follow a set of rules and fails to meet standards for accounting information also has no factual support. The Project budget's are prepared in accordance with the laws and contracts that govern the Project and rely upon financial data generated from the Federal Finance System. Shaw Aff. ¶¶ 5, 8, 11 (DA143-45). Among the reports relied upon, the BIA 700 report provides data on all funds held by the Department of the Treasury for the benefit of the Project. Other reports track the disposition of funds. The District's accounting expert, Lawrence Field, lacked any basis for his criticisms given his admissions that he has never audited a Government program, or an irrigation project, has never worked with the Federal Finance System, has never worked with reports generated from the Federal Finance System and has no experience or training in Federal appropriations law. DA124-28.

Even more telling, Mr. Field admitted that he did not know anything about the documents that he reviewed. Specifically, Mr. Field admitted that in commenting upon documents prepared by the Project, he had no knowledge of the purpose for which those documents were prepared and he did not know what documents were actually used by the Project to determine the annual O&M assessment. DA129-35. Because neither the District, nor its proposed expert Mr. Field, disputed any of the historical data that was actually relied upon by the Project to determine the O&M charges for FY2005-07, DA101-03, 129-35, there is no support for the District's contention that the Project breached the Repayment Contract or caused the District injury based upon the record keeping duties contained in the Repayment contract.

In explaining how he would expect an O&M rate to be determined, the District's expert actually endorsed the budgeting approach followed by the Project. Specifically, as the project

engineer has explained, the Project O&M budget is determined based upon a review of past expenditures and income known at the time, as adjusted with current data. Shaw Aff. ¶¶ 7-11, 20-31, 40-49 (DA144-53, 156-59). Mr. Field endorsed this approach:

> Q. But is it your opinion that they [the budget preparer] should be relying upon – that the budget preparer should be relying upon historical information?
>
> A. [Mr. Field] Plus known changes, yes.
>
> Q. Plus known changes.
>
> A. That's correct.
>
> Q. If the preparer possessed, for the 2005 budget, that data from fiscal year 1999 through year 2002 and that was the only data it possessed, because that budget was prepared in spring 2003, is it the 1999 through 2002 data that the preparer should rely upon?
>
> A. Is that a hypothetical?
>
> Q. Yes.
>
> A. In a hypothetical sense, they should rely on that data and then roll that data forward for known changes, yes.

DA137-38. The method endorsed by the District's expert is the method followed by the Project.

In the final analysis, because the District's expert did not review the actual budget work of the Project, the expert acknowledged that he did not render any opinion upon whether the Project's O&M rates for FY2005-2007 were too high. DA139-41.[19] Given that the District's expert did not review the data upon which the FY2005-2007 O&M charges were based and

---

[19] Based upon data available in November 2007, Mr. Field rendered an opinion that the Project's O&M rate should not be higher than $22.30. Pl. Ex. 71 at 15. Although Mr. Field qualified his opinion and there are flaws in his analysis, that opinion is hardly an indictment of the FY2008 rate of $21 set by the Project working in June 2006.

expressed no opinion regarding the propriety of the actual rates set, the expert's opinion cannot support the entry of judgment for the District. Instead, as demonstrated throughout this brief, the United States is entitled to summary judgment upon the District's claim that it breached the repayment contract because it reasonably set the O&M charges for FY2005-2007 at $30 per acre.

Finally, although we have demonstrated that the District's claims must be rejected in their entirety, in the event the Court were to consider the issue of damages, it would be required to reject the District's demand for $1,650,000. Pl. Mot. 25-26. First, the District's expert has admitted that he rendered no opinion upon whether the Project's O&M rates for FY2005-2007 were too high and did not even consider the information available to the Project during the time that it made its estimates for FY2005-2007. DA139-41. Second, Mr. Field's calculation of a "normalized OME rate" for the Project, a) arbitrarily failed to include actually incurred expenses, such as those for the China Wash Flume, which the District conceded were necessarily incurred, and b) was not based upon the information that was available to the Project in 2003 and 2004. Pl. Ex. 71 at 14, 34. Third, Mr. Field failed to account for funds that have been credited for the District's benefit. Id. Having failed even to consider relevant information, Mr. Field's work cannot support any damages claim.

CONCLUSION

For the reasons explained above, we respectfully request that the Court deny plaintiff's

motion for summary judgment, grant our cross motion for summary judgment and dismiss the complaint.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-0541
Facsimile: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:

WILLIAM W. QUINN
Field Solicitor
Phoenix Field Office
Office of the Solicitor
U.S. Department of the Interior

June 23, 2008

CERTIFICATE OF FILING

I hereby certify that on June 23, 2008, a copy of foregoing "DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kirk Manhardt
Kirk Manhardt