IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-576C |
| | ) | (Judge Block) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

APPENDIX TO
DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# PART III - PAGES 74 - 89

United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
WESTERN REGION
P.O. Box 10
Phoenix, Arizona 85001

TAKE PRIDE IN AMERICA

IN REPLY REFER TO:

Division of Natural Resources, MS 460
(602) 379-6789

JUN 13 2006

RECEIVED
USDI-BIA-SCIP
JUN 16 2006
OFFICE OF THE PROJECT MANAGER

Mr. Riney Salmon
Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

RE: San Carlos Irrigation Project (Project) – FY 2008 Operation and Maintenance (O&M) Rate and Budget

Dear Mr. Salmon:

Thank you for your letters dated April 14, 2006, and May 12, 2006, on behalf of the San Carlos Irrigation and Drainage District (District) with comments and questions regarding the Draft 1 and Draft 2 FY 2008 O&M budgets for the Project. Your comments were helpful and my staff was able to incorporate several changes into the FY 2008 O&M budget based on your comments. The FY 2008 O&M budget was discussed in detail with the Project water users at Fact Finding meetings on March 27, 2006 (First Fact Finding Meeting), and on April 20, 2006 (Second Fact Finding Meeting). The following is our response to your comments and questions. No written comments were received from the Gila River Indian Irrigation District. A copy of the Draft 3 FY 2008 O&M budget is enclosed, and will be the basis for my recommendation to the Assistant Secretary for Indian Affairs for the FY 2008 O&M budget for the Project Joint Works. Additionally, I will recommend to the Assistant Secretary for Indian Affairs that the FY 2009 O&M rate also be set at $21 per acre.

Please be advised that the request to publish the proposed O&M rate for FY 2008 and FY 2009 in the Federal Register will be transmitted by this office to the Assistant Secretary for Indian Affairs shortly, and a copy will be provided to you. The decision to move forward with this recommendation is necessary in order to allow the District time to plan and set its annual tax assessment. The District will be given a formal opportunity to submit comments in accordance with the instructions in the Federal Register notice. Final action on the FY 2008 and/or the FY 2009 O&M rate for the Project Joint Works will be made by the Assistant Secretary for Indian Affairs after the Federal Register notice is published and the comment period is completed.

1. Gila River Indian Reservation Assessments

<u>Comment</u>: The District requests documentation regarding the last five years of O&M payment history for the Reservation lands, including dates paid and amounts, together with the BIA's

DX 16

determination on whether assessments paid in calendar year 2006 by the Pima Agency (Agency) were for FY 2006 or FY 2007.

Response: We included the summary information of the requested documentation covering the past 10 years in the Draft 2 budget that was presented at the Second Fact Finding Meeting. This information indicates that the Agency has fully paid the Joint Works O&M assessment through FY 2006, and has made an advance payment of $1,000,000 for FY 2007. An additional $500,000 is owed by the Agency for FY 2007. We note that District has not yet paid its FY 2007 O&M assessment which was due on March 1, 2006; penalties for late payment of the FY 2007 O&M assessment began on May 16, 2006, in accordance with the Repayment Contract between the United States and the District.

2. Interest

Comment: Although future interest rates are difficult to predict, the District believes that $250,000 per year for FY 2006 through FY 2011 is a more accurate projection for interest income based on historic performance.

Response: We agree that future interest rates are difficult to predict. Our Draft 1 budget included a graph of interest income from FY 1999 through the present in an effort to determine what would be a reasonable amount to budget. FY 2004 and FY 2005 both had interest income under $100,000. Interest rates are trending upward but recent indications are that interest rates may be reaching the "top". The Draft 2 budget was modified to include $200,000 of interest income for FY 2006 and $150,000 for FY 2007. The remaining years through FY 2011 were left unchanged with interest income budgeted at $100,000 annually. We chose this approach because of the uncertainty of future interest rates.

3. Excess Pumping

Comment: Due to continuing drought conditions, it appears likely that pumping on the Reservation will be significant this season. The FY 2007 budget should be revised to show approximately $350,000 in excess pumping income, which represents a fair estimate based on historic usage.

Response: The Project's position on this subject is documented in a Regional Director's decision letter dated July 20, 1999. The difficulty with budgeting for this line item is similar to the difficulty of budgeting for interest income. Both involve the uncertainties of the future. Droughts in the Southwest are cyclical. Last year was a "wet year" that no one expected. We believe it would be more prudent at this time to leave the budgeted amount for this line item unchanged.

4. Miscellaneous Income

Comment: You requested further documentation on the components of miscellaneous income to have a better understanding of the various income streams and to ensure that the Project does not under budget this item.

Response: Receipts for miscellaneous income were gathered from the Project accounting department from FY 2003 through the present. The information from these receipts was entered in a new spreadsheet added to the Draft 2 budget called "Miscellaneous Income". A bar graph of miscellaneous income was also added to the Draft 2 budget in which each bar represents miscellaneous income for the year and each bar is comprised of colored bands of varying widths corresponding to the amounts from individual revenue streams. There was no detectable pattern in the individual revenue streams that was deemed adequate for budgeting miscellaneous income.

We considered the best approach was to average miscellaneous income from FY 2000 through FY 2005, omitting FY 2002 from the average because of its large variance from the other years. Since the Project no longer has a sand contractor at Ashurst Hayden Dam, the average sand income for FY 2000 through FY 2005 was subtracted from the average miscellaneous income. Using this approach, we calculated $55,000 of miscellaneous income and included this amount for FY 2006 through FY 2011.

Additionally, you stated that the Project should execute a concession contract with the San Carlos Apache Tribe (Tribe) immediately and begin collecting royalties on the Tribe's activities at San Carlos Reservoir (Reservoir). Currently, no formal concession agreement is in place at the Reservoir. In 1992, Congress authorized the Tribe to participate in decisions concerning recreation and fish and wildlife concessions at the Reservoir. See Public Law 102-575, Title XXXVII, Section 3710(e), 106 Stat. 4600, 4750, amending 25 U.S.C. 390. In addition, while the District's Repayment Contract generally provides that "any sums collected by or for the benefit of the Project" are to be used to pay operation and maintenance costs, it makes no reference to concession revenues and there is no provision, express or implied, that requires the Secretary of the Interior or the Project to develop such other sources of funding.

5. Personnel

Comment: The GS-12 Civil Engineer position should be eliminated.

Response: My staff recommended that the Project delay filling this position due to the uncertainties associated with the Arizona Water Settlements Act (Settlement Act). For the following reason, I am not accepting this staff recommendation and I have modified the O&M budget accordingly. Presently, there is only one Civil Engineer performing irrigation duties at the Project. It is my view that the immediate and future work load responsibilities at the Project require an additional Civil Engineer to be hired. There are many aspects of the Settlement Act and implementing agreements which fall to Project to implement over several years. Also, the current Civil Engineer at Project is eligible to retire, and it is prudent to assure adequate back-up at the Project to prepare for this eventuality. As such, I have authorized the recruitment of a second Civil Engineer for the Project at a GS-13 level, and this cost will be expended from the Project O&M budget at the time this position is filled.

Comment: The Project should begin planning for a Reduction in Force now because the Irrigation Division's responsibilities will be substantially reduced in a few years with the creation of the Joint Works Board.

Response: There are still many uncertainties surrounding Arizona Water Settlement Act (Act), which authorizes the establishment of the Joint Works Board. Until the Secretary of the Interior publishes findings in the Federal Register as specified in Section 207(c) of the Act, the potential exists that Title 2 of the Act could be rescinded if the findings are not published by December 31, 2007. If Title 2 is rescinded, the Project will maintain its existing responsibilities. We believe it would be prudent to plan as if the Act will not affect the Project until the Enforceability Date is established by the Secretary of the Interior's in the Federal Register.

You pose three additional questions regarding the Project personnel. The questions and our responses are presented below.

1) Comment: Several changes have been made to the percentage of a position's salary and benefits that are charged to the Irrigation Division. Upon what assumptions or data are these changes based?

   Response: The Project tracks payroll charges to the Irrigation Division and establishes these percentages based on its observations of the payroll data. Some years will result in more costs to the Irrigation Division than others depending on the activities the various support personnel are working on for the Irrigation Division. Some years will have funds other than O&M funds that will in part offset a portion of an employee's salary such as the case with Safety of Dams funding. In these years, the percentage of the employee's salary charged to the Irrigation Division will be reduced from prior years when less Safety of Dam funding was available.

2) Comment: What safety concerns compel the hiring of an additional laborer to assist the dam tender?

   Response: Our concern is that we have an employee who is located over 100 miles from our headquarters who works in isolated conditions on a daily basis. Two-way radios and cell phones do not work in the areas at the base of the dam where this employee frequently works. The dam and generating station create a potentially hazardous working environment. A buddy system would vastly decrease the time to respond to an accident and the "buddy" could provide immediate first aid treatment or CPR as needed. However, based on comments received from the District, the Project is investigating the automation of Dam tender activities. The Project provided preliminary research on this matter at the Second Fact Finding Meeting. The Project will keep you advised as the research proceeds.

3) Comment: Who are the "Power Employees" for which the Irrigation Division is being charged $5,150? Why does this small sum represent 100% of these employees' salary?

   Response: These are the Power crews that repair the well electrical starter panels when they are not working properly. When a group of Power employees work on the electrical starter panels, they charge their time to the Irrigation Division. Rather than

list the numerous Power employees by name and salary, the annual charges are presented as if it were the salary of a single Power employee working 100% of the time on Irrigation Division activities.

6. Power for Pumping

Comment: The BIA should segregate Project pumps from the Project's other power customers and charge Project landowners only the actual cost of delivering power to those pumps.

Response: The Project believes that the electric rate set for power used to operate Project pumps is in accordance with applicable law. See *San Carlos Irrigation and Drainage District v. United States*, 32 Fed. Cl. 200 (1994); and *San Carlos Irrigation and Drainage District v. United States*, 111 F.3d 1557, 1566 (Fed. Cir. 1997). The electric rate assigned to Project pumps was the subject of a public rate setting process earlier this year. The current rate approved by this office for pumps owned and operated by the Project is 35.0 mills/kWh, which consists of the blended cost of power, energy and transmission of the Parker-Davis preference Power Allocation received by the Project and the current proportional average Project Operation, Maintenance and Administrative costs.

7. Well Maintenance

Comment: The BIA needs to explain what work it expects the outside contractors to perform and what work its Pump Shop employees will be doing. The BIA also needs to explain how it arrived at an annual well maintenance figure of nearly one half million dollars.

Response: The outside contractors perform work such as video surveying well casing; patching holes in casing, installing casing liner, deepening a well, brush and bailing the well, replacing bowls, replacing tube and shafting and column pipe, machining of well parts etc. The Project well foreman identifies wells with problems and coordinates repairs with the contractors. He coordinates well testing with the Project well consultant. He performs minor repairs and adjustments as needed such as adjusting the lateral displacement of the well shafting. The Pump Shop Mechanic Helper ensures that the drip oil is properly supplied and set on 98 Project wells and that the motor bearings are properly supplied with oil.

The well maintenance budget for FY 2008 was set based on past costs for well maintenance escalated at 3% per year into the future. The table below presents well maintenance costs for FY 2003 through FY 2005. Maintenance costs include personnel, services (contracts), and supplies. Some minor maintenance costs such as cell phone service and power to the Pump Shop are not included.

| Fiscal Year | Maintenance Costs |
|---|---|
| 2003 | $950,102 |
| 2004 | $827,478 |
| 2005 | $515,960 |
| Average: | $764,513 |

The well maintenance budgeted in FY 2008 is presented below.

| Item | Amount |
|---|---|
| Personnel | $110,000 |
| Supplies | $22,000 |
| Services (Contracts) | $372,000 |
| Total Budgeted: | $504,000 |

As seen in the above 2 tables, our budgeted amount is less than each of the three years from 2003 through 2005.

---

Well replacement costs were greatly reduced in the Draft 2 budget. A more detailed discussion of this item is presented below under item 10 titled "Well Replacement."

Comment: No reasonable water provider would propose spending millions of its customer's dollars on system maintenance and improvements without a sound plan that anticipates future needs and projected revenues and prioritizes the work in the most efficient and cost-effective manner. If the Project has such a plan or study, it should provide a copy to the District for review. If no such study has been done, it should be prepared before millions of dollars are allocated to well maintenance and construction on an ad hoc basis.

Response: First of all, Project only performs well maintenance and repair and does not perform betterment ("improvements") work. The Project has a well consultant who has collected large amounts of data on Project wells. A portion of this data was provided to the District in electronic form after the First Fact Finding Meeting. Additional well data was presented at the Second Fact Finding Meeting. This data is often the basis of making major repairs. A formal study of the well maintenance and replacement program has not been performed. No cost is presently included in the budget for such a study. The Project does not believe such a study is needed.

8. Archaeological Services

Comment: The FY 2008 budget also includes an allocation for GRIC Archaeological Services that is based on a $22,000 charge for FY 2006 that is adjusted for inflation.

Response: This was an erroneous budget line and it has been deleted.

Comment: The District continues to object to the archaeological survey work the Project is performing at the Reservoir.

Response: The Project's archaeological survey work is being completed to comply with certain Federal cultural resources protection laws, and is in defense of federal court litigation in *San Carlos Apache Tribe v. United States*, Civ. No. 99-255 (D. Ariz.). The Project believes this survey work is a valid Project O&M cost. This matter has been discussed at length with you in the First and Second Fact Finding Meetings on the FY 2008 O&M budget and rate. The Project understands that you disagree with its position on this matter.

9. Equipment

Comment: The District requests that the Project provide a current and detailed equipment inventory for the Irrigation Division.

Response: As discussed at the Second Fact Finding Meetings, the Project will prepare an updated equipment inventory and replacement schedule to replace the inventory and schedule which is currently in effect.

10. Well Replacement

The well replacement budget item was changed considerably from the Draft 1 budget to the Draft 2 budget. A short list was created of wells that were possible candidates for replacement. This information was presented at the First Fact Finding meeting. The Project has not received any comments from the District or other Project water users on the extensive well use and efficiency data provided at the First and Second Fact Finding Meetings. Nor has the Project received any alternative suggestions from the District or other Project water users for the proposed criteria developed by the Project for well replacement consideration identified in the First Fact Finding Meeting.

After the First Fact Finding Meeting, the Project researched the matter further with its well consultant, Mr. Gary Weesner, and determined that only two wells are ready for abandonment and replacement. These were wells 24B and 90. The proposed replacement locations for these two wells are in the vicinity of well 24B as a replacement site for well 24B and in the vicinity of Ashurst Hayden Dam (600 to 800 feet west of well 6C) as a replacement site for well 90. The two existing wells in the vicinity of Ashurst Hayden Dam discharge 4.6 cfs and 4.8 cfs. It is assumed that a new well in this vicinity will discharge at least this much water. The well 24B replacement site will involve drilling a deep well that will probably cost the same as the well cost estimate contained in the Draft 1 budget. The well in the vicinity of Ashurst Hayden Dam would probably cost no more than $200,000 due to shallow bedrock. As such, the projected budget for the well replacement program has changed significantly from the Draft 1 to the Draft 2 budget. The Project will continue to work with the water users on the refinement of these well replacement plans and costs.

11. Well Abandonment

Comment: The BIA has proposed an undertaking that will incur significant cost and resources without any idea of the scope of the project.

Response: The Project performed a preliminary survey of abandoned Project wells using old files and maps to determine that approximately 40 Project wells were abandoned. These wells were not abandoned to present day standards and create potential liability for Project. The Project estimates that the cost to abandon a well properly can range between $8,000 to $20,000 per well.

If the cost of abandonment is at the lower range, and if there are only 25 wells that need to be abandoned, the cost of the work would be $200,000. Our Draft 2 budget presents $50,000 per year for four years. We believe that our estimate for this work is conservative and reasonable, and it will be further refined as data is collected and studied. BIA staff will be conducting field work this year to locate and map the wells which need to be abandoned.

12. Condition Assessment Study and Area Capacity Table for San Carlos Reservoir

Comment: The District requests more information regarding the purpose and need for both of these projects. The District also requests the cost estimates or proposals from contractors or BIA staff to support the cost figures associated with these projects.

Response: The Joint Works Condition Assessment Study is a requirement for all Bureau of Indian Affairs irrigation projects pursuant to Executive Order 13327 and the Interim FY 2005 Guidance for Real Property Inventory Reporting. The Executive Order was created to promote efficient and economical use of the Federal Government's real property assets. The Interim FY 2005 Guidance for Real Property Inventory Reporting was written in response to the Executive Order. It identifies 23 mandatory inventory data elements to be captured and reported by all executive agencies. One of the mandatory data elements is a Condition Index. The Condition Index is a general measure of the constructed asset's condition at a specific point in time.

The Project lacks the personnel to conduct the condition assessment study and will be contracting it out. The budgeted amount of $100,000 is an estimated cost for conducting the study. This amount will be refined as proposals are received to perform the work.

Throughout the history of the Project, area capacity tables of the San Carlos Reservoir have been periodically updated. These tables are important for ensuring that apportionments of stored water are accurate. In recent times, the tables have been important for ensuring the minimum pool is properly measured. Below is a table of when area capacity table updates were performed and the declining reservoir capacity at elevation 2430.

| No. | Year of Update | Capacity at Elevation 2430 (acre-feet) |
|---|---|---|
| 1 | 1937 | 132,800 |
| 2 | 1946 | 124,115 |
| 3 | 1966 | 102,202 |
| 4 | 1982 | 83,060 |
| 5 | 1990 | 82,618 |
| 6 | 1996 | 77,770 |

In the First Fact Finding Meeting, a comment was received from the Project Indian Works, suggesting that the Gila Water Commissioner (Commissioner) should assess the cost of this work from all decreed water rights holders since he utilizes the tables in the administration of the Gila Decree. A letter was sent to the Commissioner dated April 6, 2006, requesting his opinions on the need for the updated tables and on who should fund the study. A copy of the letter was provided to the District previously. The Commissioner responded in an undated letter which was

received in this office on April 26, 2006, and which indicated that copies were provided to the attorneys for all major parties. The cost for this work was moved back to FY 2008 in the Draft 2 budget until the issues presented in the correspondence with the Commissioner are resolved. The budgeted amount of $100,000 is an estimated amount based on the cost estimate provided by the Bureau of Reclamation. The amount will be revised as appropriate, if the Commissioner seeks to include the work in his annual assessment.

13. Heavy Equipment Sinking Fund

Comment: Concern is expressed whether the purchase of six ½ ton and ¾ ton trucks over the next five years is necessary.

Response: As stated earlier in this letter, the Project will prepare an updated equipment inventory and replacement schedule. This will verify whether the purchases on the schedule in the Draft 1 budget are necessary.

Comment: The supply costs for fuel in the budget detail suggests that annual mileage is rather low.

Response: The cost of fuel includes bulk purchases of unleaded, $18,548; bulk purchase of diesel $15,914; and purchase of diesel and unleaded at service stations, $10,609, for a total of $45,071. Based upon the replacement of unleaded fuel pickups with diesel pickups, it is expected that the percentage of purchases of unleaded versus diesel will change; however, the total expenditures for fuel should remain the same. The majority of Irrigation Division employees work four-ten hour days which we believe saves on fuel costs. The highest mileage accumulated on vehicles is by three ditch riders who average 24,000 miles per year per vehicle.

Comment: The District requests that the BIA provide justification for the Gradall purchase and questions whether such equipment could be rented at a lower cost.

Response: As the Project prepares the updated replacement schedule for equipment, the Project will evaluate whether renting a Gradall is a practical and economical option.

Comment: The District also requests an explanation for why an autocar will be necessary in 2011.

Response: The Project will address this question in its updated replacement schedule.

Comment: Another concern in your letter is that Irrigation Division vehicles that are used for non-Irrigation Division work be prorated so that the purchase price of new vehicles, maintenance, and fuel costs are shared in the same proportion as personnel costs.

Response: The following describes generally how these costs are presently proportioned. Vehicles on loan to other agencies are maintained and operated by that agency. It is a fairly rare situation in which Project equipment is lent to other agencies. Your letter comments on a Project scraper which was on loan to Fort Apache Agency. As Project staff advised you in the Second

Fact Finding Meeting, this equipment was returned to the Project in a timely manner even though the Project did not note as such on the schedule. The Equipment spreadsheet of the Draft 1 and Draft 2 budgets indicated that a 631B Cat Scraper was at Whiteriver (Fort Apache Agency). This is not the case and the Draft 3 budget was corrected. The Project on occasion has used an excavator and operator from the Colorado River Agency. We receive the benefit of using their equipment at a cheaper rate than a rental, while paying for the maintenance and operation costs during the period it is at the Project. This is very advantageous to the Project and to require other agencies to pay differently than we pay when we borrow their equipment would only be to the detriment of the Project.

14. Emergency Cash Reserve

Comment: Because the FY 2008 budget contains over $1,200,000 in sinking fund and reserve allocations, the allocation of $600,000 to emergency reserves is excessive and unnecessary.

Response: The emergency reserve was set consistent with the guidelines in Table 2 of the BIA National Irrigation Handbook. In addition, the Draft 2 budget did away with the well sinking fund and increased the emergency cash reserves to $800,000. If a well fails and can not be repaired, the Project proposes to use funds in from the emergency cash reserve for such well replacement.

If you have any questions or require further information, please contact Mr. Robert Carolin at (520) 723-6200, or Mr. Carl Christensen at (520) 723-6203.

Sincerely,

Allen J. Anspach

Regional Director

Enclosure

cc: ✓Project Manger, San Carlos Irrigation Project
Superintendent, Pima Agency
Attn: Project Indian Works
Manager, Gila River Indian Irrigation District
Manager, San Carlos Irrigation and Drainage District

United States Department of the Interior
BUREAU OF INDIAN AFFAIRS
WESTERN REGION
P.O. Box 10
Phoenix, Arizona 85001

U.S. DEPARTMENT OF THE INTERIOR MARCH 3, 1849

TAKE PRIDE® IN AMERICA

IN REPLY REFER TO:

JUN 13 2006

Division of Natural Resources, MS 460
(602) 379-6789

MEMORANDUM

To: Director, Bureau of Indian Affairs
Attention: Director, Office of Trust Responsibilities, MS 4600-MIB

From: Western Regional Director

Subject: San Carlos Irrigation Project – FY 2008 and FY 2009 O&M Rates

I have determined that the irrigation operation and maintenance (O&M) rate for FY 2008 and FY 2009 for the San Carlos Irrigation Project - Joint Works (Project) should be $21.00 per acre. This is a decrease in the FY 2007 rate which is $30.00 per acre. Please publish this proposed rate for both years in the Federal Register as soon as possible to allow the District time to plan and set its tax assessment for the FY 2008 and FY 2009 O&M assessments. I have advised the San Carlos Irrigation and Drainage District (District) and other affected water users of my recommendation for FY 2008 and FY 2009. The water users have also been advised that the Assistant Secretary for Indian Affairs will formally propose any such O&M rate and provide them with the opportunity for comment on the proposed rate before it is finally established.

The $21.00 per acre rate that I am recommending for FY 2008 and FY 2009 would permit the Project to pay for the full cost of Project O&M expenses that the government expects to incur in each fiscal year. The attached budget spreadsheet documents the detailed Project budget and the justification for this recommended rate for FY 2008 and FY 2009.

The proposed O&M budgets for FY 2008 and FY 2009 were presented to the District, the Project Indian Works, and the Gila River Indian Irrigation District at meetings on March 27, 2006, and April 20, 2006. Based on comments received from the District and the Project Indian Works, the proposed O&M budgets for FY 2008 and FY 2009 were revised twice, and are now reflected in the attached document which is titled "Draft 3" Budget. The affected water users have received a copy of the recommended Draft 3 Budget.

If you or your staff has any questions concerning this recommendation or the documentation supporting it, please contact the Regional Irrigation Engineer, Mr. James May, at (602) 379-6789.

Allen J. Anspach

Attachment

cc: Project Manager, SCIP Joint Works
Superintendent, Pima Agency
Attn: SCIP Indian Works
Manager, San Carlos Irrigation and Drainage District
Manager, Gila River Indian Irrigation District

CWILSON/bt 06/08/06 FY2008O&M.WROtoCO.doc

# Irrigation Division Operation and Maintenance Budget
## San Carlos Irrigation Project - Joint Works

Prepared by: R. Shaw, BIA 5/19/2006
Modified by J. May 6/9/2006

| | FY2007 Budget | FY 2008 Proposed Budget | FY 2009 Proposed Budget |
|---|---|---|---|
| **O&M RATE:** | $30 | $21 | $21 |
| **UNOBLIGATED CASH:** | | | |
| Unoblig. Cash on 10/1: | $6,115,255 | $5,108,255 | $4,284,255 |
| Deoblig. Cash from Prior Year UDOs | $0 | $0 | $0 |
| TOTAL UNOBLIGATED CASH | $6,115,255 | $5,108,255 | $4,284,255 |
| **INCOME:** | | | |
| Assessment Collections for Next FY ($/Acre) | $21.00 | $21.00 | $23.00 |
| Assessment Collections for Next FY | $2,100,000 | $2,100,000 | $2,300,000 |
| Assessment Collections for This FY | | $0 | $0 |
| Interest | $150,000 | $100,000 | $100,000 |
| Excess Pumping | $100,000 | $100,000 | $100,000 |
| Miscellaneous | $55,000 | $55,000 | $55,000 |
| TOTAL INCOME | $2,405,000 | $2,355,000 | $2,555,000 |
| **TOTAL CASH AND INCOME** | $8,520,255 | $7,463,255 | $6,839,255 |
| **OBLIGATIONS:** | | | |
| Personnel (boc 11) & Benefits (boc 12) | $1,091,000 | $1,123,000 | $1,157,000 |
| Travel (boc 21) | $5,000 | $5,000 | $5,000 |
| Utilities (boc 23 less power for pumping) | $76,000 | $79,000 | $81,000 |
| Power for Pumping (boc 23 for 51030) | $619,000 | $619,000 | $619,000 |
| Services (boc 25 less Gila Water Commissioner) | $422,000 | $585,000 | $448,000 |
| Gila Water Commissioner (boc 25) | $376,000 | $387,000 | $399,000 |
| Supplies (boc 26) | $113,000 | $116,000 | $120,000 |
| Equipment (boc 31) | $33,000 | $13,000 | $40,000 |
| Land & Structures & Special Projects (boc 32) | $675,000 | $250,000 | $50,000 |
| Deferred Maintenance | $0 | $0 | $0 |
| Other (boc 22, 24 & 42) | $2,000 | $2,000 | $2,000 |
| TOTAL OBLIGATIONS | $3,412,000 | $3,179,000 | $2,921,000 |
| **SINKING FUNDS AND RESERVE (SF&R) CASH:** | | | |
| Heavy Equipment | $39,000 | $89,000 | $133,000 |
| Well Replacement | $0 | $0 | $0 |
| China Wash Flume Rehab/Replacement | $0 | $0 | $0 |
| SCR Arch Survey of Drawdown Zone | $75,000 | $0 | $75,000 |
| Emergency Reserve | $800,000 | $600,000 | $800,000 |
| SUBTOTAL SF&R CASH: | $914,000 | $689,000 | $1,008,000 |
| **TOTAL OBLIGATIONS AND SF&R CASH:** | $4,326,000 | $3,868,000 | $3,929,000 |
| **END OF YEAR CASH:** | | | |
| Cash Less Total Obligations (TO) | $5,108,255 | $4,284,255 | $3,918,255 |
| Cash Less TO and Next Year Assessment | $3,008,255 | $2,184,255 | $1,618,255 |
| Cash Less TO, Next Year Assess. and SF&R Cash | $2,094,255 | $1,495,255 | $610,255 |

**SOLICITATION, OFFER, AND AWARD**
*(Construction, Alteration, or Repair)*

1. SOLICITATION NUMBER: RMH00060033
2. TYPE OF SOLICITATION: ☐ Sealed Bid ☑ Negotiated
3. DATE ISSUED: 08/29/2006
PAGE OF PAGES: Page 1 of 2

IMPORTANT - The "offer" section on the reverse must be fully completed by offeror.

4. CONTRACT NO. CMH00060036
5. REQUISITION/PURCHASE REQUEST NO. H59450-6-01
6. PROJECT NO.

7. ISSUED BY CODE 00011
BIA - Western Regional Office
OCFO, Div. of Acquisition, MS-210,Two Arizona Center, 12th Floor,400 North 5th Street
Phoenix,AZ 85004

8. ADDRESS OFFER TO CODE 00011
BIA - Western Regional Office
OCFO, Div. of Acquisition, MS-210,Two Arizona Center, 12th Floor,400 North 5th Street
Phoenix,AZ 85004

9. FOR INFORMATION CALL: A. NAME Renee D. Holly; B. TELEPHONE NO. *(Include area code) (NO COLLECT CALLS)* (602) 379-3822 ext.

## SOLICITATION

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS *(Title, identifying no., date):*

| | | |
|---|---|---|
| PART I | SECTION A | SF-1442, SOLICITATION, OFFER AND AWARD (REV. 4) |
| | SECTION C | UNIT PRICE SCHEDULE AND STATEMENT OF WORK<br>TECHNICAL CONTRACT SPECIFICATIONS |
| | SECTION G | CONTRACT ADMINISTRATION |
| PART II | SECTION I | CONTRACT CLAUSES (FAR 1997) |
| PART III | SECTION J | LIST OF ATTACHMENTS<br>GENERAL WAGE DECISION<br>BONDS (SF-25, SF-25A, SF-28)<br>STATEMENT OF CONTIGENT OR OTHER FEES<br>STATEMENT OF ACKNOWLEDGEMENT<br>TECHNICAL REFERENCE MATERIAL<br>STANDARD SPECIFICATIONS FOR THE REPAIR OF CONCRETE M47, 08-96 |
| PART IV | SECTION K | REPRESENTATIONS , CERTIFICATION AND STATEMENTS OF BIDDERS |
| | SECTION L | INSTRUCTIONS, CONDITIONS AND NOTICES TO BIDDERS<br>SPECIAL CONDITIONS |
| | SECTION M | EVALUATION FACTORS |

BIDS DUE SEPTEMBER 22, 2006, AT 4:00 P.M. LOCAL TIME.

This is not a sealed bid solicitation

11. The Contractor shall begin performance within 10 calendar days and complete it within 120 calendar days after receiving ☐ award ☑ notice to proceed. This performance period is ☑ mandatory ☐ negotiable. (See FAR CLAUSE NO. 52.211-10 )

12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? *( If "YES", indicate within how many calendar days after award in Item 12B.)* ☑ YES ☐ NO

12B. CALENDAR DAYS: 10

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 0 copies to perform the work required are due at the place specified in Item 8 by *(hour)* local time *(date)*. If this is a sealed bid solicitation, offers will be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due. N/A

B. An offer guarantee ☐ is, ☑ is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than 60 calendar days for government acceptance after the date offers are due will not be considered and will be rejected.

**OFFER (Must be fully completed by offeror)**

14. NAME AND ADDRESS OF OFFEROR *(include zip code)* DUNS 799374228
TOPCOR SERVICES, INC
12025 INDUSTRIPLEX BLVD
BATON ROUGE, LA 70809

CODE FACILITY CODE

15. TELEPHONE NO. *(include area code)* (337) 499-4067

16. REMITTANCE ADDRESS *(include only if different than item 14)*

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government in writing within 60 calendar days after the date offers are due. *(Insert any number equal to or greater than the minimum requirement stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.)*

AMOUNT: $492,275.00

18. The offeror agrees to furnish any required performance and payment bonds.

**19. ACKNOWLEDGEMENT OF AMENDMENTS**

*(The offeror acknowledges receipt of amendments to the solicitation - give number and date of each)*

| AMENDMENT NO. | 1 | 2 | 3 | 4 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DATE | 9/15/06 | 9/8/06 | 9/15/06 | 9/20/06 | | | | | |

20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)* JAMES M. BAKER PRESIDENT

20B. SIGNATURE [signature]

20C. OFFER DATE 22 SEPT 06

**AWARD (To be completed by Government)**

21. ITEMS ACCEPTED:

*ITEMS 1, 2 & 3 ACCEPTED*

22. AMOUNT *$492,275.00*

23. ACCOUNTING AND APPROPRIATION DATA *H59450 2006 51000 120ER001 252Z*

24. SUBMIT INVOICES TO ADDRESS SHOWN IN: *(4 copies unless otherwise specified)* ITEM

25. OTHER THAN FULL AND OPEN COMPETITION PURSUANT TO ☐ 41 U.S.C. 253 (c) ☐ 10 U.S.C. 2304(c) ( )

26. ADMINISTERED BY CODE 00011
BIA - Western Regional Office
OCFO, Div. of Acquisition, MS-210, Two Arizona Center, 12th Floor, 400 North 5th Street
Phoenix, AZ 85004

27. PAYMENT WILL BE MADE BY CODE fiscal
BIA - Division of Fiscal Services
2051 Mercator Drive
Reston, VA 20191

**CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE**

☑ 28. NEGOTIATED AGREEMENT *(Contractor is required to sign this document and return 1 copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform all work requirements identified on this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications incorporated by reference in or attached to this contract.

☐ 29. AWARD *(Contractor is not required to sign this document.)* Your offer on this solicitation is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary.

30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN *(Type or print)*

31A. NAME OF CONTRACTING OFFICER *(Type or print)*

30B. SIGNATURE [signature]

30C. DATE

31B. UNITED STATES OF AMERICA BY [signature: Byron J. Greene]

31C. AWARD DATE 28 Sep 2006

GPO: 1985 0 - 469-758 STANDARD FORM 1442 BACK (REV. 4-85)



Approved Safety [initials]

## SECTION C – DESCRIPTION/SPECICATIONS/STATEMENT OF WORK

### UNIT PRICE SCHEDULE (ADDITION TO SF-1442)

### SOLICITATION NO. RMH00060033

### STATEMENT OF WORK

The Contractor shall furnish all necessary equipment, materials, transportation and labor required to remove old fractured, delaminated concrete from the China Wash Flume barrels, abutments and lateral support beams. Corroded exposed rebar will be replaced. Epoxy bonded concrete will be used to replace concrete removed from the barrels. Replacement concrete and other types of concrete as required will be used to replace concrete removed from the abatements and lateral support beams. The lateral support beams may be replaced with steel beams. Leaks of water through the structure will be repaired with polyurethane resin injections. All work will be done in accordance with attached specifications. Bid Schedule must be included with the bid.

The contractor is encouraged to visit the site before submitting a bid. Details visible at the sites not shown explicitly on the solicitation documents shall be included as they affect price in the unit price schedule. The one and only site visit will be conducted on September 8, 2006.

Contractor will be required to follow Bureau of Reclamation (BOR) standards and specifications for Items No. 1 and 2.

Bidders may offer "alternate" methods for Item No. 3.

Do not offer alternate methods for Items No. 1 and 2.

| Item | Description | Quantity | Unit | Amount |
|---|---|---|---|---|
| 1. | Provide services to remove concrete in accordance with attached specifications & drawings. (MANDATORY METHOD) | 1 | L.S. | $ 175,000.00 |
| 2. | Provide services to replace rebar in accordance with attached specifications & drawings. (MANDATORY METHOD) | 1 | L.S. | $ 92,275.00 |
| 3. | Provide services for patching in accordance with attached specifications & drawings. (ALTERNATE METHOD) | 1 | L.S. | $ 225,000.00 |
| | Total Bid Amount | | | $ 492,275.00 |