IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-576C |
| | ) | (Judge Block) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

APPENDIX TO
DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# PART IV - PAGES 90 -160

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 06-576C |

30(b)(6) DEPOSITION OF

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT

Phoenix, Arizona

October 4, 2007

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)



Coash & Coash
PHOENIX DEPOSITION REPORTERS & VIDEOCONFERENCING

DOUGLAS DEAN MASON,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

EXAMINATION

09:32:58

BY MR. MANHARDT:

Q. Mr. Mason, as you know, my name is Kirk Manhardt. I'm with the Department of Justice, and I represent the United States in this case.

09:33:08 Could you just state your full name for the record?

A. My full name is Douglas Dean Mason.

Q. Have you ever been deposed before?

A. One other time, for a lawsuit with the upper

09:33:17 valleys.

Q. In your current capacity?

A. Yes.

(Deposition Exhibit 1 was marked for identification.)

09:34:13 BY MR. MANHARDT:

Q. Mr. Mason, this is a copy of a document -- the court document entitled "Defendant's Notice of Deposition Pursuant to RCFC 30(b)(6)." And under a 30(b)(6) deposition, the entity that receives it, which in this

':34:35 case was the San Carlos Irrigation and Drainage District,

designates a person to testify about the matters identified. Have you been designated by SCIDD to testify?

A. Yes.

Q. And can you turn to what is the third page of
09:34:50 this?

A. Okay.

Q. That's Attachment A, and that's the topics the United States identified for discussion. Are you designated to testify concerning all those topics?

09:35:01 A. Yes.

Q. And you are aware that -- for purposes of a 30 (b)(6) deposition, that your testimony is based upon your personal knowledge as well as all matters known to, in this case, SCIDD -- reasonably known to SCIDD?

09:35:15 A. Yes, that's my understanding.

Q. Okay. Can you describe your current position and job title?

A. My current position is general manager for the San Carlos irrigation district.

09:35:34 Q. And what are your duties in that capacity?

A. A little bit of everything. In charge of operation and maintenance of the San Carlos irrigation district, which maintains the non-Indian portion of the SCIP system -- San Carlos Irrigation Project. Also
):35:47 coordinates and makes meetings and everything else that

A. Just to be able to use some of those reserves to get us through the period that we were in.

Q. As a budgeting matter in running an irrigation district, do you agree that there needs to be some form of
10:25:11 cash reserve?

A. I never denied that.

Q. So you do agree there's appropriate reserves?

A. There is appropriate reserves.

Q. But the disagreement between SCIP and SCIDD
10:25:17 refers -- is about what's -- what that number ought to be, not the concept of retaining some reserve?

A. I think that's correct.

Q. I'm sorry. There's one more thing I should have asked, so I understand. If we turn back to that page
10:25:51 again, 878. There's -- looking at the "Income" section, there is an income -- a difference in your proposal on the income, and that is -- I think that one -- the one entitled "Payment by the Project Power"?

A. I believe we were suggesting that the project
10:26:13 power contribute some money to offset the irrigation at that point in time.

Q. And can you explain what the issue of that is?

A. Project has a lot of cash reserves in the power. We felt they should be able to offset some of the payments
):26:29 for the irrigation side.

10:33:43 10:34:34 10:35:10 ):35:36

was being suspended?

A. I would have to look at the schedule of payments. They all run together, and I can't -- I'm not sure which one they were suspending here, whether it was one for May of 2003 or -- there was -- I don't know. I would just be guessing.

MR. MANHARDT: Let me just do one more document, and we'll take a break.

MR. SALMON: Sure. Absolutely.

(Deposition Exhibit 9 was marked for identification.)

THE WITNESS: Okay.

BY MR. MANHARDT:

Q. Exhibit 9 has multiple pages. The first page appears to be a letter on the letterhead of San Carlos Irrigation and Drainage District. Is that right?

A. Yes.

Q. Have you seen this before?

A. Yes.

Q. Can you explain what it is?

A. It's a letter to the assessor, Paul Larkin, from Theresa Lara, who is my business manager, indicating the resolutions that the levy for the next year will be $51 an acre.

Q. And turning to the second page of the document.

A. Yeah.
Q. What is that?
A. That's a resolution that we set the assessment and sort of the justification.
10:35:52 Q. What is the -- what does SCIDD -- This is an estimate of the expenses needed for SCIDD provided to the county board. Is that right?
A. Yes.
Q. And for what year is this projecting?
10:36:08 A. This would be our 2004 budget year, year 2005 fiscal year.
Q. And so what year's payment to SCIP would this encompass?
A. This would be the 2005.
10:36:24 Q. And the assessment is $51?
A. Yes.
Q. And if we look at the -- There is a budget listing here, and there's cash outlays, and there's a section "capital spending/debt/Joint Works/CAP COGS," and
10:36:49 it's 1,115,000. How much is being -- is SCIDD identifying or including in there for payment toward SCIP?
A. Well, about $20 an acre.
Q. And why is that? Do you recall?
A. Because we were estimating. And I think at the
':37:09 time, we thought we would take money out of reserves to

pay that if we lost on a protest.

MR. MANHARDT: Okay. We'll take a break.

(A recess ensued.)

THE WITNESS: I would like to clarify some of my testimony on the -- on the regular monthly board meeting, why they suspended it. I was thinking back there, and I couldn't remember why, and it came to me why we did at this point in time.

10:51:49

Up to this point, we had had a problem with the tribe paying on time. We had actually worked out a deal where they were paying up front, same time we were paying. This was the first year after that, that they were all of a sudden delinquent or their payment. And the board had said they weren't going to pay until the tribe paid. And if I remember right, the tribe paid in August or September of that year. We were notified in October and paid in November.

10:52:05

10:52:22

The reason we suspended this year's payment, it was for 2004, your budget year 2004, which was due May 15th of 2003. And the reason that is an issue is because, right now, the government pays for the tribe. We have to pay six months ahead. The interest that accrues from the time we pay until the government pays for the tribe, you guys end up splitting half that benefit.

10:52:39

And we see no reason that we should be

:53:04

money in their pocket than the government to have it their pocket collecting interest so they can offset rates. It doesn't make sense to overcollect. And my job is to make sure that these budgets are a reasonable expectation, what the project can do and should do, so I can tell my farmers and everybody else on the board that this is something they can do, this is something they can live with; it's not pie in the sky that they have to build on.

And that's been the frustration I've had over the years because we've dealt -- I've dealt with so many project engineers and O & M chiefs. I've probably had 10 of the -- I counted up yesterday. Carl listed 10 of those project engineers, and everybody has got their own idea. And I've dealt with about that many in operation and maintenance, and they all put together the budgets, and they all seem to want to build cash, and that seems to be the goal.

Excuse me.

Q. That's fine.

What do you think the impact of doing budgets two years in advance means to the process?

A. Okay. The process is set up that way because of raising taxes and collections. It means you have to guess. But you still should be able to do a lot better and closer job of guesstimating work projects two years

out than what we do. And in some cases we create work projects that have no rhyme or reason.

The good example is the replacement of wells. They were going to replace two wells every other year, and then -- because our wells are 50 years old. If the wells are down, then you replace them. You don't do it -- you don't start a program and spend 600,000 every other year or a million, 2- every year to do it. I mean, that's the problem.

11:18:16

11:18:31

And if it's just to build -- And in most cases they set these budgets up, and then they just keeping moving them out. And it still builds cash reserves and will force you to have higher obligations. There are times I wish I didn't have to budget a year in advance.

11:18:55

Q. Right.

For example, on the well replacement, if you look at this -- the next page from what we were looking at, so if you could turn to page 1863 of Exhibit No. 10.

11:19:12

On that page there is a listing for "Well Replacement."

A. Yes.

Q. And there are -- in fiscal year '05, it's listed as zero. Is that your recollection, that there was no money funded in the SCIP budget for well replacement that

:19:32

well replacement?
A. That's correct.
Q. But the projected 2007 did?
A. Uh-huh.
11:21:15 Q. Okay. You mentioned earlier that -- you referred to the budget as a line item -- I'm sorry -- I'm not good on accounting language -- but you referred to "line item" and you need to be told why it's changing and when it's changing. Is that --
11:21:45 A. Right.
Q. Would you agree that discrete lines that are identified as projections in 2003 for expenses in 2005 can reasonably vary?
A. Reasonably, yes.
11:22:11 Q. And so if I understand it, the frustration you were expressing was that -- was with the level of information sharing about why those variances may occur?
A. No. The frustration is that when they give you an estimate in 2006, and we get to 2006 and the cow that I thought I was buying is now a horse, it gets a little 11:22:40 frustrating. I mean, if we're going to be working on China Wash, then that should be what we focus on and what we work on. It shouldn't then be, "We didn't have that money spent, so we better substitute something else in the sinking fund," or something else is different. .:22:58

Q. But China Wash, as an example, was that a case where it was reasonable for work to be, necessarily, done at China Wash?

A. The work has been required at China Wash for five years. They had it in the budget for five years. It drove the budget for five years. And we kept having it set up in the line item called "Land and Structures." So it shows a large obligation. It has money in the sinking fund, and it's still kept driving that stupid budget.

11:23:14

11:23:34 I mean, if you've got it already collected, then it shouldn't have to be -- it's not an obligation that's going to be an expense that you have to collect for. And that's how they get around it all the time.

Q. Okay. And was that work eventually done?

11:23:50 A. Yes. It was done in -- Let's see, it was charged in the end of 2006. In fact, it was charged out in September 2006.

Excuse me. It was charged out in -- It wasn't charged out in September, but we got an October

11:24:21 report showing it was charged out in September 2006 and a month late. So they back dated the charges.

Q. And would that have been -- is that a function of fund obligated versus --

A. I guess. I was told -- I'm guessing. I don't

:24:42 know why.

meeting to resolve the differences. Don't always.

Q. At the meeting, can -- is SCIDD at liberty to ask questions about different line items in the budget and special projection?

11:31:11 A. Yes. Can and normally do. This was more of a directive, a one-way discussion, if I remember right. We were adamantly opposed to the budget. We were being told, "This is what the budget is going to be, and this is what we're recommending."

11:31:23 Q. But did you understand you were free to ask questions?

A. Yes.

Q. Okay. At the SCIDD monthly board of directors meetings, did the -- again asking you to think back to 11:31:56 that spring of 2005 -- did the issue of the 2007 rate come up when Mr. Christensen was present?

A. No. Generally, Carl doesn't talk about budgets at the board meetings. He presents the expenses and what they're doing now, not what is projected. In fact, I 11:32:27 can't remember of any time that he's discussed budgets at the board meeting.

Q. Do you recall, did anyone at SCIDD ask the project about the fiscal year 2007 budget process as the months went by from January '05, February '05, and .:32:52 continuing on through spring?

presume is income, and "Oblg," which I assume is obligations, "End of Year."

What do you understand that column to reflect?

A. The "Income and Obligation, End of the Year" column?

Q. Yes.

A. My understanding is, that is the current -- or that is the expenses that were spent for 2005.

Q. Okay.

A. Income versus obligations.

Q. Okay. And running down to the -- in the "Obligations" block and across from the "Total Obligations" number for that same fiscal year '05 income and obligations end of year, the number shows that the project budget incurred $2,021,177. Is that right?

A. That's correct.

Q. Is there any dispute that those are the incurred amounts for that year? I mean, are you going to challenge those numbers, that they were actually spent?

A. I have no way of challenging those numbers. They come from the project. They are what the project tells us they are. I can go -- I don't have access to the -- or the resources to go into your federal -- the FFS forms to figure it out.

Q. But SCIDD does get copies of those kinds of reports, right?

A. Yes. We get a monthly basis from Carl.

Q. And do you get the 700 reports?

13:16:37 A. No. He gives a boiled-down version of the 700 reports, where it's just pretty well this nomenclature.

Q. Have you seen the 700 report sometimes?

A. We saw some in some of the stuff you gave us as supporting documents for this, yes.

13:16:56 Q. So sitting here on behalf of SCIDD, do you dispute that the incurred amount was this 2 million -- a little bit over $2 million?

A. I'm not going to dispute it, no. But I'm not sure it's correct either. I mean, I'm taking your word

13:17:08 that it's correct, it's coming off the system.

Q. In receiving this as part of a fact-finding or as sent by the regional director, SCIDD raised no disagreement with that number. Is that right?

A. We accepted it as the number.

13:17:23 Q. Okay. And would that be the case for the prior fiscal years as well?

A. We'll indicate that's what the project said they spent.

Q. Okay. And have you challenged those -- that

:17:37 these numbers are spent at other times?

A. No.
Q. If you can turn to five pages in -- I tried to mark them both for your copy and counsel's. This page is marked, at the top, as -- the same legend as the first page, but the block referred to -- at the top says "Theoretical Collections," "Actual Collections." Do you see that?
A. Yes.
Q. Down toward the bottom, there is another block that says "Assessment Collections Documentation (Prepared by: C. Christensen)"?
A. Yes.
Q. And within that block there is a column of "Fiscal Year" numbers; then a column of "Due March 1st in Advance"; "BIA 700 page No."; "Date"; "SCIDD Amount." Do you see that?
A. Yes.
Q. That structure?
Under that -- in this chart, do you see, all the way down following the -- on the left-hand side, the fiscal year number '04?
A. Yes.
Q. And running across, and it says "Date, 11-3-03," "SCIDD amount, $1 million"?
A. Uh-huh.

13:23:34 Q. Okay. Let me ask you to just turn to the last of the highlighted -- or the tabs, the markers. That is a sheet that runs lengthwise, and title is "Irrigation Division, Land, Structures and Special Projects." Is that right?

A. Uh-huh, that's correct.

13:23:49 Q. And this has -- the top box has a block or a chart of "Sinking Fund Accumulation for Vehicles and Heavy Equipment." Is that correct?

A. That's correct.

Q. And then the next item, there's number two, "Well Replacement Sinking Fund," and there are a list of notes. Do you see that?

A. Uh-huh, yes.

13:23:57 Q. Can you explain your recollection of the well replacement sinking fund process?

13:24:21 A. Okay. The well replacement sinking was a program that was thrown out there that our wells -- the project wells were 50 years old or more, and we needed to start a well replacement program. Somebody came up with the idea that they needed to replace a set amount of wells every other year and that we were going to accumulate a sinking fund for it.

13:24:34 After discussing it with my board and members and talking to your expert, Gary Weisner, he

indicated that you really don't replace wells on a time basis; you replace them as a need basis. So if a well goes down, you go in and you try to fix it. If it can't be fixed, then you replace it. You don't start saying, "I'm going to pull out this well because it's 80 years old," and put a new well in and just retire the well.

13:24:55

In some cases, the community was adamantly opposed to pulling the well down. They wanted new wells, but they didn't want to take a well out of production. So that, then, is an improvement, not a maintenance issue. So what we've done is we left a fund in there to replace wells as needed, but not as a scheduled -- almost 12 million, 2- every two years -- 675,000 every couple of years, like we're going to do.

13:25:28

Q. Does SCIDD have disagreement with policy that's now become adopted by SCIP in this approach to the well replacement?

MR. SALMON: Object to the form of the question.

13:25:40

Do you understand the question? The policy now adopted?

THE WITNESS: They have changed their policy. We are quite agreeable to replacing wells when they need to be replaced, not do a program approach to the replacement of the wells.

:25:53

BY MR. MANHARDT:

Q. And did SCIP come to that through the dialogue it had with SCIDD, in part?

A. I believe that was how they came to that, plus consultation with their own expert.

13:26:05

Q. Okay. If you go down to the very next block, it says, number 3, "China Wash Flume Rehab/Replacement."

MR. SALMON: I'm sorry, Counsel. What document are we referring to now?

13:26:25

MR. MANHARDT: We are at the --

MR. SALMON: "Land Structures & Special Projects," Draft 3?

MR. MANHARDT: Yes. The item number 3, "China Wash Flume Rehab/Replacement."

13:26:41

MR. SALMON: Okay. Thank you.

MR. MANHARDT: Sure.

BY MR. MANHARDT:

Q. And we talked a little -- somewhat about this China Wash Flume issue earlier today. And I understood you had testified that SCIDD recognized the need for the repair but had dissatisfaction about the manner that had been developed and implemented through the budget?

13:27:01

A. That's correct.

Q. The -- Do you see, under this block, there's a series of fiscal years again? There's a "Sinking Fund

:27:22

is recommended, which seems to be the past and present, how do we even out-guess you guys on what the assessment should be?

Q. But you have done assessments in each of the

13:39:20 years to the -- to the county and passed on to the water users, right?

A. That's correct.

Q. And you do that based on your best estimate, correct?

13:39:40 A. That's correct.

Q. So, again, what is the financial damage from that, from the receipt of information from SCIP but not information equal to the publication in the Federal Register?

13:39:59 A. I guess where the damage is occurred is, in current position I'm in, I'm having to assess my farmers more money than they would have historically had to collect for them because I've taken my reserves down so low that I can't afford to keep going.

13:40:16 Q. Well, we looked earlier about the payment history.

A. That's correct.

Q. And there was a payment in November '03 and the next payment was -- and we can pull this back out -- I

.:40:26 think it was March 2005.

A. That's correct.
Q. So does that mean that SCIDD made no payment to SCIP for calendar year 2004?
A. That's correct.
13:40:38 Q. So wasn't that money in the SCIDD reserves?
A. It was.
Q. And if SCIDD paid, as we looked at the amount in -- paid in March and April 2005, the amount for fiscal year 2005 --
13:41:06 A. Okay.
Q. -- wasn't -- was there a late -- was the notice late?
MR. SALMON: Object to the form of the question.
13:41:18 BY MR. MANHARDT:
Q. Wasn't SCIDD's payment, those dates, actually due the year before?
A. Correct.
Q. So the government was late in the notice, and
13:41:29 then SCIDD was late in the payment, in your view?
A. That's correct.
Q. Is that the case for fiscal years '05, '06, and '07?
A. Yes.
:41:48 Q. So, purely speaking about the notice question,

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 06-576C |

DEPOSITION OF CARL ALAN CHRISTENSEN

Phoenix, Arizona

October 1, 2007

DISK ENCLOSED

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)



Coash & Coash PHOENIX DEPOSITION REPORTERS & VIDEOCONFERENCING

1993.

Q. Okay. Now, you said earlier that the IIAM explained the -- what level has what responsibility with respect to the budget preparation, I believe?

09:35:23 A. I don't recall that I said that it had to do with budget preparation. It only has, as I recall, dealing with who has responsibility, such as who approves a budget at what level. It also shows a delegation of authority basically within Bureau of Indian Affairs.

09:36:02 Q. Describe for me your understanding of that delegation of authority with respect to approval of budgets, starting with yourself. Describe what your participation is and how it goes up the chain of command, I assume.

09:36:19 A. Starting at the local level at the San Carlos Irrigation Project --

Q. And that's the local area of the San Carlos Irrigation Project in Coolidge?

A. Yes.

09:36:30 Q. Okay.

A. At the local level of the irritation project, the irrigation project prepares a budget two years in advance, presents the budget to the water users at what we refer to as a fact-finding meeting. A budget is discussed by water

):37:15 users at the fact-finding meeting. And normally there

would not be an agreement at the first fact-finding meeting.

So what happens is, there will be dialogue, normally written correspondence, between the water users and the San Carlos Project, in order to come to a consensus of what assessment rate should be established in the upcoming years.

After considering all of the comments from the various water users, the San Carlos Irrigation Project would make a recommendation to the Western Regional Director, which was at one time titled "Phoenix area director."

09:37:48
09:38:36

Q. Okay.

A. The Western Regional Director would then make a recommendation that a certain assessment rate be considered or may not be considered, to the central office, who would make the final determination of what the rate should be in upcoming years.

09:39:08

Q. Well, the central office is where? Can you describe that a little bit more for me? Is that in Washington, D.C.?

09:39:48

A. Yes.

Q. Okay. And then how is the notice of this final rate determined? Is this the publication in the Federal Register?

?:40:22

together." And then later we thought, "Well, can we live with 30."

Q. So as I'm understanding, the target rate was $30, which had been the previous year's rate. Is that correct?

13:21:46 A. Well, not the "target rate." The target rate was what we needed to meet our needs. So our target was to let's first go through and put together a budget, and, once we put that budget together, that will give us a rate. I mean, we didn't start with -- we did not start 13:22:11 with 30 bucks and work backwards.

First we went through and determined how much money we needed to put in each sinking fund to accomplish the work that needed to be done in the future years and -- But then eventually, after quite a bit of 13:22:34 discussion, we said, "Well, maybe we can do it for 30. Let's just try to hold it at 30."

Q. When the $15 rate was rejected, weren't you told to support a $30 rate?

A. I don't believe anybody ever said, "Support a $30 13:22:58 rate."

Q. You're quite sure?

A. I'm quite sure.

Q. And when you say "anybody," you mean anybody with -- whom you were dealing with on this particular :23:12 budget, which would have been anybody, let's say, in the

A. Which is that we were coming up on presenting the 2007 budget. It was determined best to be presented at the December meeting rather than have another meeting the next month or two in 2005. So it seemed prudent to discuss both the 2006 and the 2007 in mid-December of 2004.

Q. Okay. Was there a budget for 2007 prepared and submitted at that time?

A. Yes.

14:30:54 Q. At that meeting?

A. Yes.

Q. I thought you just said, though, that you can't recall one being submitted at that meeting?

A. I stated I could not recall if there was an agenda put together prior to the meeting. You presented an Exhibit No. 2 -- or No. 1 -- I'm sorry --

Q. Uh-huh.

A. -- that showed an agenda that was presented at the June 29th, 2004, fact-finding committee meeting.

14:31:30 Q. Okay.

A. And as I recollect, there was also an agenda put together for the December 2004 meeting. And that was your question.

Q. Okay. Do you recall any special projects being discussed at that meeting with respect to the 2007 budget?

A. I don't recall any special projects at this time.
Q. Okay. Now, there were not any fact-finding meetings, though, with respect to 2007, in the year 2005?
A. I don't recall if there was one in 2005 or what time it might have been.
14:32:51
Q. Okay. And you've just told me that your best recollection is that the fact-finding meeting took place in December of 2004. Is that correct?
A. Yes.
14:33:02
Q. Now, what costs of operation and maintenance are you basically dealing with at the local-area level, the project level, when you include O & M costs in a budget?
A. The cost at the local level are expenses incurred by our payroll, would be shown as personnel costs on the budget. Our costs include any travel and training associated with the project. They include all utilities that are paid by the irrigation division. They include all services, which services -- primarily contracts for the professional service that may be required, or it can be for maintenance of wells, maintenance of buildings, maintenance of wheat growth in canals.
14:34:38
14:35:14
It could involve the cost of all the supplies needed to perform the maintenance. And part of the supplies would be fuel, batteries, the cost of material that's needed to perform the work.
:35:49

There's also a contract that's part of services, which we separate out. It's for the cost of the assessment that's due for the entire 100,000 acres of land plus an additional couple thousand acres of natural flow land associated with the cost of the Gila water commissioner. There's the cost for well repairs, which we -- for the past 10 years, we've had three different contractors on call to work on well repairs.

There's also costs that are associated with monies that are going to be expensed through the sinking funds. We try to show that as a separate line item with a little, brief description of what those costs are for on our budget.

Q. And that --

A. So it's basically costs that are associated with any -- any type of maintenance, whether it was an irrigation project or road maintenance or building maintenance. So they're all fairly general, routine costs that could be expected with a project such as an irrigation project.

Q. That are connected with the facilities the project has in Pinal County, which is the dam measures and the Joint Works, things of that nature?

A. Yes. Also including Coolidge Dam, which is not located in Pinal County.

Q. Okay. Now, after the fiscal year is over, are you able to determine the actual amount that you spent for that particular fiscal year on O & M for the irrigation works?

14:38:30 A. Yes.

Q. Okay. And if the amount is less than the estimated amount for O & M upon which the assessment is based, is a decrease made in the following year in the O & M costs?

14:38:59 A. There is not a decrease in the O & M assessment. The money is carried forward to -- the cash available is carried forward to the next fiscal year.

Q. So if you actually effect a savings and don't spend all the money that you've budgeted for operation and maintenance, you carry it forward into the next assessment

14:39:22 year? Is that what you're saying?

A. Yes.

Q. And it's reflected in the cash balances?

A. Yes.

14:39:32 Q. Okay. Why not give a credit to the water users of that particular savings that you achieved in the fiscal year that just ended?

A. The water users would receive a credit, at some point in the future, in that the assessment, if there's a

:40:00 large savings, it's not expended. There's a possibility

the water users -- They do benefit in future years in that the rate of assessment would not have to be raised.

Q. Can you think of any year for 2005, 2006, 2007 where that ever happened, where the rate was lowered rather than increased?

14:40:28

A. 2005, '6, and '7, the rate remained the same, but it was reduced for 2008 and 2009, with a significant reduction.

Q. But for 2005, 2006, and 2007, it was never reduced?

14:40:55

A. No.

Q. Even if the money that you set aside and budgeted for O & M expenses, actually spent, wasn't as high as you projected?

14:41:13

A. The majority of that money is not for O & M expense; it was for a sinking fund, for the monies accumulated in the sinking funds that are projected to the spent in a future year, not necessarily in the 2005, 2006, 2007 time frame.

14:41:33

Q. And the amount of money that the project has in its sinking funds is a large part, is it not, of the cash balance that is carried over from year to year?

A. It could be if payments were made into the -- into the fund in a timely manner.

:42:03

Q. If there is a savings in any one projected year

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br>Plaintiff,<br>vs.<br>THE UNITED STATES,<br>Defendant. | No. 06-576C |

DEPOSITION OF RUSSELL KASKALLA

Phoenix, Arizona

October 3, 2007

DISK ENCLOSED

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)



Coash & Coash PHOENIX DEPOSITION REPORTERS & VIDEOCONFERENCING

A. We had worked, you know, for quite some time on the budget, and so there had to be several -- several meetings.

Q. Why do you say there had to be several meetings?

10:06:21 A. Because of the amount of work that was involved, the amount of research that had to be done.

Q. What work did you do? What research did you do?

A. I looked into equipment costs, the amount of money that historically was being paid for power and

10:07:12 other -- you know, historical trends on other -- the other line items.

Q. And how did you do this? How did you, for example, look into equipment costs? What, physically, did you do?

10:07:53 A. I looked at the costs -- cost of the equipment that the project had, the age -- age of the equipment. I talked with people from one of the Caterpillar manufacturers here in town and got some information from them on maintenance costs.

10:08:23 Q. And what did you do with that information?

A. I used -- Carl and I used that to come up with a yearly -- yearly equipment cost for each piece of equipment.

Q. And did you put that together in some written

1:08:40 form?

A. Yes.
Q. Describe that document for me, please. What's the name of it? What's the label of it?
A. I don't recall. It was basically a piece of paperwork. Carl and I sat down and, you know, listed each piece of equipment and, you know, the associated costs -- yearly costs, you know.
Q. Do you still have --
A. No.
Q. -- that document?
A. No.
Q. Do you know if Carl has that document?
A. I don't know.
Q. Do you know what happened to that document?
A. No, I don't.
Q. Now, I believe you also mentioned the amount of money that was historically paid for power, correct? One of the line items you mentioned, I believe.
A. Right.
Q. What did you do in that regard?
A. I talked with project personnel about that, and I talked with the previous project -- irrigation project engineer.
Q. And did you do that with any other -- You said "line items." Line items of what?

A. Everything that is listed in the budget.
Q. And what budget are you talking about? Could you identify the budget for me?
A. The 2005 and previous years' budgets.
10:10:21 Q. Okay.
A. Everything that pertained there.
Q. Am I correct in understanding you went through each line item --
A. Right.
10:10:39 Q. -- to determine what would be appropriate for the 2006 budget?
A. Yes.
Q. How much time do you believe you spent on doing this work?
10:11:23 A. At least 40 hours.
Q. And why do you say 40 hours?
A. That's what I estimate that I spent. That's what I estimate.
Q. And what's the basis of this estimation?
10:11:51 A. Recollection of how much time I spent on it.
Q. That's five eight-hour days, correct?
A. That's the equivalent.
Q. The equivalent to five?
A. Right.
':12:01 Q. So did you basically expend five days in doing

working on the 2006 rate was Cathy Wilson, correct, other than Carl Christensen?

A. To the best of my recollection, yes.

Q. And you say that Cathy just told you to help Carl with determining the 2006 O & M assessment rate, correct?

10:40:57

A. To the best of my recollection.

Q. Now, did she tell you to come up with a $30 rate?

A. No.

Q. Did she tell you or did anyone tell you to come up with a $30 rate and justify it in some way?

10:41:16

A. No.

Q. There was no conversations of anything like that?

A. No.

Q. Did she or anyone else tell you that Carl had already recommended a $15 rate?

10:41:31

A. Not that I recall.

Q. So when you went down to Coolidge and met with Carl, he had not -- Well, he didn't say anything to you about the rate being $15 and that's what he wanted to use?

10:41:57

A. Not that I recall.

Q. Let me hand you Exhibit 1, which is Exhibit 1 to Carl Christensen's deposition, and ask you if you've ever seen that before?

A. Yes, I've seen this.

:44:25

Q. Okay. And when did you first see that?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 06-576C |

DEPOSITION OF LAWRENCE FIELD

Phoenix, Arizona

January 17, 2008

DISK ENCLOSED

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)

report, I had billed about $29,000, maybe 30.

And then subsequent to the report, I believe I billed San Carlos Irrigation Drainage District $450 in the month of December. And that has been -- actually, just got the check the other day. Hasn't been deposited yet. But I do have a check, so I'm fully paid at this point on this matter.

Q. Mr. Field, in your report you do describe, as you mentioned earlier, you include your resume, and you also describe professional qualifications. I'm not going to ask you to repeat that now, but I would like to ask you do you have any experience in the accounting or auditing of federal government programs?

A. I've had experience with it. I would not hold myself out to be an expert of auditing of governmental programs, no.

Q. What experience have you had?

A. Well, I've just been involved in projects over my career, HUD kind of audits. I've been involved in complaints that get filed with the Arizona State Board of Accountancy regarding governmental audits. So I've had exposure to them. But that's a totally different animal than what we're talking about here.

I mean, you're talking about auditing of a governmental entity was the question you asked me, which

is not the matter I'm giving an opinion on here.

Q. Have you had experience performing accounting on behalf of the federal government?

A. On behalf of the federal government, no, I have not.

Q. Have you had experience evaluating accounting conduct -- done by -- where the accounting was done by the federal government?

A. Up to this point, I would say no.

Q. And you mentioned the Arizona -- I'm sorry if I don't have the name right -- the Arizona Board of Accountancy?

A. Close enough.

Q. In that work, that's a state -- that's review of state governmental activity?

A. No, it is not. Not necessarily.

Q. What would it be?

A. It is -- the Arizona State Board of Accountancy is a governmental agency that is responsible for regulating the practice of accounting here in Arizona.

One of the functions, of the many functions of the Arizona State Board of Accountancy performs, is they regulate individual CPAs or CPA firms. And if a consumer has a complaint against a CPA, it is filed with the Arizona State Board of Accountancy.

The process that they typically follow is once a complaint is filed, someone at the office reviews it to determine if it has any merit. I would -- I would tell you that I think that's a pretty loose -- a very loose determination, because they clearly want to be overly inclusive of allowing a complaint to go forward as opposed to, you know, weeding them out.

At that point it will then get referred to one of two committees at the board. The committee is consistent of a group of volunteer CPAs. They will determine whether or not they think the case has any merit. If the complaint -- excuse me. At that point, if they believe the complaint has merit, not all the time, but typically, it will get referred out to a contract investigator. That's me.

The contract investigator will do whatever we're asked to do, but typically do a preliminary investigation and send a report back to the committee.

So it can go anywhere from a preliminary investigation up to -- if that produces some results that people believe need to be looked at more, you can do a detailed review, go out and interview the CPA, review their work papers, do whatever you need to do.

If the board thinks there's merit for discipline of some sort and the CPA does not, then their

resolve is to go to hearing on the matter.

So my job in that role is to be the contract investigator, which can end up ultimately being an expert in the case.

Q. And is the United States of any agency of the United States involved in any of those proceedings?

A. No.

Q. Other than your work in this matter, have you had any experience, either accounting -- in accounting or in auditing irrigation projects?

A. No.

Q. Have you ever had heard -- have you ever worked with the Federal Finance System?

A. Personally hands-on, no.

Q. Do you know what that -- what the Federal Finance System is?

A. I have a general understanding of it, yes.

Q. What would that be?

A. That's basically the accounting system that's used by the government.

Q. Have you ever accessed data from it?

A. No.

Q. Have you ever used it in your professional work other than to the extent you've had contact with it in this matter?

A. No. Other than in that context, no.
Q. So just so it's clear, so in your professional work, you do not utilize reports generated from the Federal Finance System?
A. In my work?
Q. Yes.
A. No, I do not.
Q. And have you ever had contact with any such reports, other than getting involved -- to the extent you've had any review of those kinds of reports in this case?
A. No, I have not.
Q. Have you had professional training in federal appropriations law?
A. No.
Q. Have you -- Do you use the GAO red book in your work?
A. I'm familiar with it. I do not use it on a regular basis, no.
Q. I want to ask you if you could turn to page 4 of your report, Exhibit 2.
A. Uh-huh.
Q. I guess three-quarters down the page there's a title "Procedures Performed." And actually -- and there are a number of items that are listed that carry on to

let me see. Hold on a second.

Yes, that's what it says.

Q. And turning, then, to Exhibit 4, the four different budgets are those identified in the first four columns of this report?

A. That is correct.

MR. MANHARDT: Let's take one break.

(An off-the-record discussion ensued.)

(Deposition Exhibits 5-1 through 5-9 were marked for identification.)

BY MR. MANHARDT:

Q. We've marked as Exhibit 5-1 through 5-9 an exhibit, the first page of which is Exhibit 4 of your report. Is that correct?

A. That's correct, yes.

Q. And the remaining pages are the budgets that you have drawn information from to compile Exhibit 4. Is that correct?

A. That's correct, yes.

Q. Can I ask you to look at Exhibit 5-2? Can you identify that document?

A. It's labeled "Irrigation Division Budget, San Carlos Irrigation Project, Draft 4, Prepared by R. Shaw, C. Christensen, R. Kaskalia," dated 5-22-03.

Q. Do you know for what purpose this document was

prepared?

A. Specifically, no. I do not know for what purposes it was prepared.

Q. Do you know what the heading "Draft 4" means?

A. Specifically, no, I do not. I can tell you there's a Draft 3 on there in another column with a SCIDD response. So I'm assuming that there was some iteration of drafts going back and forth.

Q. But do -- in your work -- is that an assumption on your part?

A. That's an assumption on my part from the wording on this document. Plus, I know I saw some other correspondence where they were, you know, going back and forth about budgets back in this time frame. But it is an assumption, yes. I did not tie all that together.

Q. And do you know whether this document was used as a basis for a recommendation made by the San Carlos Irrigation Project for any particular assessment?

A. I do not know that, no.

Q. If we can turn to the next document on the -- Exhibit 5-3.

Is this the document that you drew information from to -- for the second column of Exhibit 4 of your report, which is 5-1 of this -- marked for this deposition?

A. It's used in a couple places on 5-1, yes.
Q. Okay. Do you know the purpose for which this document was prepared?
A. Specifically, no.
Q. Okay. If you could look at the next document, 5-4.
A. Okay.
Q. Was this document also used by you to -- for information that you drew upon to compile into your Exhibit 4 of your report?
A. Yes.
Q. And do you know the purpose for which this document was prepared?
A. Specifically as I sit here, no.
Q. Okay. The next one I would ask you to look at, a document that's marked as, for this deposition, 5-8.
A. That would be the one that's prepared by R. Shaw 5-19-06 and modified by A. Riggs on 12-12-06?
Q. Yes.
A. Okay.
Q. And this is the last of the four documents you relied upon to develop your Exhibit 4 as it related to fiscal year 2005. Is that correct?
A. That's correct, yes.
Q. And do you know the purpose for which this one

was prepared?
A. Specifically as I sit here, no.
Q. Do you know whether this document was used in the formulation of any particular rate assessment?
A. Specifically, no, I do not know that.
Q. Do you know when the fiscal year 2005 rate assessment made by Bureau of Indian Affairs to SCIDD actually was first formulated by the San Carlos Irrigation Project?
A. First formulated by them?
Q. And made -- and presented to SCIDD.
A. I understand the process. I don't know the specific dates, no.
Q. Okay. Can you review the process for me?
A. The process, as I understand it from the documents that I've reviewed, is that the project suggests a rate. That rate then gets reviewed and discussed, and then it goes to -- I would call it upstairs. I don't know whether that's Phoenix or it's to -- ultimately I think it goes to the Secretary of the Interior, and it gets published ultimately in a register.
Q. And do you know when the project -- for project, I'm referring to the San Carlos Irrigation Project -- first presents that recommendation to SCIDD?
A. Specifically the date, no, I do not know.

referred to -- and I think those are the -- correct me -- as I understand that would be the column that has the date of 4-17-04, 6-22-04, and 12-12-06. Is that correct?

A. That's correct.

Q. Referring to those, do you -- did you know -- do you know the purpose for which those were prepared as applicable to this fiscal year 2006?

A. My answer would be the same as it was for fiscal year 2005.

Q. And just to jump ahead, as applicable for their reference in fiscal year 2007, would your answer be the same?

A. It would be, yes.

Q. So looking at the ones that were not identified and used for fiscal year 2005, the first of the ones that appears new here is -- I'm going to ask you to identify -- if I could ask you to identify an exhibit marked for deposition as 5-6.

A. I'm sorry? And that is what? What's the question? I apologize.

Q. Can you identify what Exhibit 5-6 is?

A. That's a spreadsheet titled "Irrigation Division Operation and Maintenance Budget, San Carlos Irrigation Project - Joint Works, Draft 3, Prepared by R. Shaw," dated -- R. Shaw, BIA, dated 5-19-06, modified by J. May,

BIA -- looks to be 6-14-06. And it says beneath that, "Original Budget: FY 2006, Adjusted Budgets: FY 2006 and FY 2007."

Q. And do you know the purpose for which this was prepared?

A. No, specifically, I do not.

Q. And jumping back -- I recognize I skipped one. Can you look at document 5-5?

A. Okay.

Q. Is that the document used to develop the third column in your -- applicable to fiscal year 2006 in Exhibit 4 of your report?

A. Yes, it is.

Q. And do you know the purpose for which this one was prepared?

A. Specifically, no.

Q. If we look at document 5-7 of the deposition exhibit.

A. Okay.

Q. Can you identify that document?

A. Can I identify it?

Q. Describe it.

A. Sure. It's labeled "San Carlos Irrigation Project - Joint Works, Irrigation Division Operation and Maintenance Budget, Prepared by: R. Shaw, BIA, 5-19-2006,

Exhibit 4 of your report represent any reporting of actual expenditures?

A. That's correct. That's my understanding.

Q. Okay. Just want to touch one more base. You have six columns applicable to fiscal year 2007 --

A. Uh-huh.

Q. -- in your report?

A. Uh-huh.

Q. I think we touched on five of the documents already. The one we had not, I think, is marked for this deposition as 5-9. Would you identify that one for the record?

A. Yes. That is labeled "FY 2007 Irrigation Budget, Prepared by: Carl Christensen, Date: October 1, 2007, Months Elapsed This Fiscal Year: 100 percent."

Q. And do you know why that one was prepared?

A. Specifically, I do not know why it was prepared.

Q. On page 7 of your report, the first full paragraph after the indentations, I think it's the second sentence states, "The variety of budgets submitted by BIA and the diverse nature of these budgets can lead to only one conclusion - that the presentations prepared by BIA related to the Project was so inaccurate, incomplete, and misrepresentative as to indicate a lack of good faith."

Can you explain the basis for that opinion?



Coash & Coash, Inc. 602-258-1440

Q. Okay. And what particular years are you relying upon when you do that analysis?
A. Well, as the report says, I looked at '03, '04, '05, and '06.
Q. Okay. Is it your opinion that the -- what's reflected on this Exhibit 5 of your report, that the obligation budget amounts are overestimated for fiscal year 1999?
A. I did not render that opinion, no.
Q. For fiscal year 2000?
A. I did not render that opinion.
Q. Fiscal year 2001?
A. I did not render that opinion.
Q. Fiscal year 2002?
A. I did not render that opinion.
Q. Did you review the information presented on this chart referring to those years as part of your analysis?
A. I'm sure I reviewed them, but I did not rely on that. I relied on the latest fiscal years because I believed those to be more indicative of what the current situation was.
Q. Do you know what years' information SCIP has within its possession when it develops the original budget for fiscal -- for a particular fiscal year? Let's take, for example, fiscal year '05. Do you know what

in hand when it develops the budget applicable to fiscal year 2004?

A. Specifically as we sit here, no.

Q. Do you -- if you don't know what information they possessed at that time, what --

Can you explain again what you rely upon to determine that if -- that they -- that the budgets have overestimated the obligation amounts?

A. Well, your specific question to me was information they had.

Q. Right.

A. I don't know what they had. I wasn't there.

Q. But is it your opinion that they should be relying upon -- that the budget preparer should be relying upon historical information?

A. Plus known changes, yes.

Q. Plus known changes.

A. That's correct.

Q. If the preparer possessed, for the 2005 budget, that data from fiscal year 1999 through fiscal year 2002 and that was the only data it possessed, because that budget was prepared in spring 2003, is it the 1999 through 2002 data that the preparer should rely upon?

A. Is that a hypothetical?

Q. Yes.

A. In a hypothetical sense, they should rely on that data and then roll that data forward for known changes, yes.
Q. Okay. The second full paragraph on page 9.
A. I'm sorry. The second full?
Q. The second full paragraph of page 9 of your report.
A. Okay.
Q. I'd like to ask you to focus your attention for a minute.
Begins --
A. Excuse me.
Q. -- making reference to "On October 1, 2007 BIA prepared a schedule." That's the paragraph I'm referring to there.
There's some discussion of an item called "Well Replacement and Abandonment" and then "Coolidge Dam, San Carlos Reservoir, a New Office Billing." That's the gist of the topic that's being discussed there. Is that right?
A. Correct. Yes.
Q. And the paragraph concludes with the sentence that says, "For BIA to show these funds as spent or obligated without the required approval of SCIDD results in this presentation being inaccurate and misleading."

available to it?

I honestly -- I don't recall. I don't want to answer that yes or no because I just don't recall what I specifically did with 2005 because I more focused this report on where we were today. Okay.

The normalized OME that I came up with, I came up for the purpose of determining -- when I say "today," today being September 30th, 2007, clearly not today, the latest date that I had available. So I did not go back through the same type of calculation for prior years.

Q. So your normalized OME is based -- is for current purposes?

A. That was for current purposes, yes.

Q. Did you intend to render an opinion as to what the normalized OME would have been for fiscal year 2005 at the time -- as projected two years in advance of that date?

A. I did not intend to render an opinion. I did intend to render an opinion that factually it ended up being significantly more than it needed to be. But I did not intend to render an opinion that back in 2005 because I didn't do the work to come to that conclusion.

Q. Okay. So your opinion concerning 2005 is that -- I'm restating this so I understand it -- your opinion

concerning the assessment rate for fiscal year 2005 is that it, in hindsight, proved to be too high?

A. My opinion is that factually it proved to be too high. And I'm not saying that I determined -- I'm not saying my opinion is it wasn't too high when it was assessed. I'm not saying, in my opinion, it was too high when it was assessed. What I am saying, I was not asked to come to a conclusion, an opinion on that matter. And I did not.

Q. So do you have an opinion as to whether the $30 rate assessed for 2005 -- fiscal year 2005 was too high?

A. And my answer to that is I only have the factual analysis. I don't have an opinion, taking myself and putting myself back into when that rate would have been set, in determining whether or not it's too high.

Q. Do you have an opinion as to whether the rate assessed for 2006 was too high?

A. Again, my answer would be the same. I was not asked to come to a conclusion about what the rate should have been for 2006. So, therefore, my answer is factually it proves it was too high, but my opinion is based on September 30th, 2007.

Q. Similar vein, do you have -- did you render an opinion as to the assessment of the rate for fiscal year 2007. Not what the rate should be as identified in

analysis conducted in 2007, but for the determination of the rate assessed applicable to the fiscal year 2007?

A. Once again, I would answer that that I was not asked to give that opinion, and I did not do enough work to give that opinion. So I can only assume what my opinion would be if I had done it. And I didn't do it. So --

Q. Okay.

A. But that's not to detract from my opinion that as of September 30th, 2007, the suggested rate -- a suggested rate of $30 going forward would be too high.

Q. Actually, that's -- toward that end, turning to page 14 of your opinion -- of your report rather.

The continuation paragraph at the top of the page has a sentence, "It is telling that once BIA corrected its admitted recording inadequacies, the assessment rate for 2008, which would have been set sometime in 2006, was reduced to $21 per acre."

That fair?

A. That's my understanding from what I've seen and read, yes.

Q. That -- so how much -- how much money would a rate assessment of $21 per acre amount to as an assessment collection?

A. In total between both entities?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND, DRAINAGE DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-576C |
| | ) | (Judge Block) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

AFFIDAVIT OF RANDY SHAW

I, Randy Shaw, declare as follows pursuant to 28 U.S.C. 1746:

**Background**

1. I have a bachelor's degree in Agriculture Engineering and I am licensed as a Professional Engineer in Civil Engineering in the State of New Mexico.

2. I have been associated with the San Carlos Irrigation Project (SCIP or Project) since 1989. SCIP is a 100,000 acre federal irrigation project, administered by the Bureau of Indian Affairs ("BIA") in which designated project lands are divided equally between the Gila River Indian Reservation and non-Indian lands in the vicinity of Florence, Coolidge, and Casa Grande, Arizona. The non-Indian side of SCIP is managed by the San Carlos Irrigation and Drainage District (SCIDD) and the Indian side of SCIP known as the San Carlos Indian Works is managed by the BIA, Pima Agency. Pima Agency worked closely with the Gila River Indian Community (GRIC) in performing its responsibilities. The BIA manages facilities and water deliveries to the boundaries of SCIDD and Pima Agency lands through an organization referred to as SCIP.

3. I was employed from March 1989 to August of 1999 with the BIA, Pima Agency, as a Supervisory Agriculture Engineer and the Land Operations Officer. In these roles, I was in charge of managing the San Carlos Indian Works. In this capacity I reviewed budgets prepared by SCIP, attended fact finding meetings and commented on SCIP prepared budgets. Fact finding meetings are meetings conducted by SCIP with SCIDD, GRIC and the Indian Works to discuss operation and maintenance (O&M) budgets and other project issues.

4. In August of 1999, I transferred from Pima Agency to SCIP and from 1999 to 2003, I managed the irrigation division of SCIP as the Supervisory Civil Engineer. In that capacity I personally developed the SCIP O&M budgets for fiscal years (FY) 2002 through FY 2005 and I reviewed and adjusted O&M budgets for FY 2000 through FY 2004. In late April of 2003, I transferred to the BIA's Mescalero Agency and in 2006 I transferred to the BIA Southwest Regional Office. From these positions, I remained involved in the preparation and review of SCIP budgets. Specifically, as part of my official duties, I reviewed and adjusted SCIP budgets for FY 2006 and FY 2007 and I prepared the SCIP budgets for FY 2008 and FY 2009.

5. I performed my responsibilities for SCIP under the following governing documents:

a. Act of June 7, 1924. Pl. Ex. 4[1].
b. The Landowner's Agreement with the Secretary of the Interior dated December 4, 1926. Pl. Ex. 5.
c. Repayment Contract, dated June 8, 1931. Pl. Ex. 1.
d. First Supplement to the Repayment Contract, dated November 12, 1935. Pl. Ex. 7.
e. Second Supplement to the Repayment Contract, dated May 29, 1946.

[1] "Pl. Ex. __" refers to exhibits filed in support of plaintiff's motion for summary judgment on April 9, 2008; "DA__" refers to the appendix filed in support defendant's cross motion for summary judgment.

f. June 15, 1938, Order of Assistant Secretary Chapman Defining Joint, District and Indian Works of the San Carlos Irrigation Project. Pl. Ex. 8.

**Overview**

6. SCIP is responsible for the operation and maintenance of the San Carlos Irrigation Project facilities that are known as the project's joint works. The cost for the operation and maintenance of the joint works is assessed per acre against each acre of the 100,000 acres of designated project land. The assessment applied to 50,000 acres of Indian project lands is paid by the Federal government. The assessment for the remaining 50,000 acres of non-Indian project land is paid by SCIDD on behalf of the private property owners.

7. On an annual basis, SCIP prepares a budget of projected expenses and income in order to determine the appropriate per acre assessment for the project. The SCIP budget is developed approximately two years before the operation and maintenance expenses are incurred. Payment by SCIDD is due by March 1 each year; however, payments were generally received in May because late payment penalties are not implemented until after May 15th.

8. When working on SCIP budgets, I rely upon financial reports generated by the BIA from the Federal Finance System (FFS) for developing project budgets. The FFS system is the official federal system that I was required to use as a BIA program manager to track all financial information relating to SCIP's operation and maintenance. Financial reports include the BIA 700 Report, the BIA 010 Report and the BIA 130S Report. In addition, I review the procurement files and records maintained by SCIP as part of my work on the annual budgets.

9. In FY 2001, to set a baseline for future budgets, I tracked all expenses incurred by SCIP from all sources, including credit card statements, purchase orders, and travel authorizations. I reconciled this expense data to the BIA 700 report to verify the expense actually occurred. This provided a baseline for establishing vendors and routine expenses in the utilities, services and supplies budget lines for subsequent years. I performed the same tracking effort to document income.

10. Prior to my assuming responsibility for preparing SCIP's budget, the budget was a hard copy document with a generally consistent format. The format listed budget categories of Income, Obligations, Sinking Funds and Reserves, as well as Unobligated Cash and End of Year Unobligated Cash. I converted the budget document into an electronic document using a Microsoft Excel workbook. Pl. Ex. 23, 34. A workbook in this case is a series of spreadsheets in a single computer file that are linked together so that data from one spreadsheet can be used in another spreadsheet. I generally distributed electronic copies of all draft budgets to SCIDD, GRIC and Pima Agency. This allowed the various parties to examine the formulas in the spreadsheet cells and to try different values in the spreadsheet to examine the effects of those changes on the final budget. SCIDD would occasionally insert a column in the budget summary containing data they proposed for SCIP to use. Pl. Ex. 34.

11. After a fiscal year's budget was approved, the Project tracked income and obligations on a monthly basis, in a column of the budget sheet titled "Inc. and Oblig. as of (date)" or "Inc. & Oblig. End of Year". Pl. Ex. 76. When the fiscal year was completed, end of year actual income and expenditures were placed in this column. Income data was obtained throughout the year from the BIA 700 reports. Obligation

data was obtained from the BIA 010 reports. The budget adjustments reflected in this "Inc. and Oblig." column were included in the budget worksheet to ensure that the most accurate income and expense information would be available for current and future budget projections. These adjustments were not used to set or change an approved annual assessment rate.

12. SCIP provided monthly budget updates to SCIDD for its review at its board of directors' meetings. The monthly updates reported income and expenses in the current year. They were not used in the process of setting O&M assessment rates. Examples of these monthly updates are included in plaintiff's exhibits in this case. Pl. Ex. 36, 37, 41, 49, 57, 59, 63, 72, 73.

13. During my tenure at SCIP, the annual budget was developed on a generally consistent schedule. I provided a draft budget to SCIDD, Pima Agency and GRIC early enough in the year (i.e. around March and April) to allow time for thorough review, response, and consultation. A minimum of one fact finding meeting was held in May or June after the parties had time to review and develop comments on the draft budget. This meeting was used to present a revised draft budget based on feedback from the parties. The budget and SCIP's recommended annual assessment rate, was established and shared with SCIDD, Pima Agency and GRIC by the end of June. At the same time it was forwarded by SCIP to the BIA Western Regional Director, who in turn forwarded the recommendation to the Assistant Secretary for publication in the Federal Register. I do not recall complaints from SCIDD about the schedule I used for presenting and developing the budget.

14. In the years, FY 1998 to FY 2004, SCIP's annual expenses exceeded the income obtained through the annual assessment of $20 per acre and generally expenses exceeded income for all sources. Excess cash from prior years was used to balance these deficits. That excess cash was depleted by FY 2002 but was not discovered until I prepared the FY 2003 budget adjustment along with the FY 2005 budget.

Development of the FY 2005 SCIP Budget

15. I began the development of the FY 2005 budget by preparing the draft 1 budget dated April 1, 2003. Pl. Ex. 23. Each substantive change in the draft budget was labeled draft 2, draft 3 and draft 4 to avoid confusion among versions of the budget being circulated among the parties. Pl. Ex. 31, Pl. Ex. 32, and Pl. Ex. 33. The final draft that was relied upon to submit an O&M assessment rate for publication in the Federal Register for FY 2005 was labeled "proposed budget". Pl. Ex. 34.

16. As in prior years, I organized the FY 2005 budget under the following sections:

Unobligated Cash
Income
Total Funds Available
Obligations
Sinking Funds and Reserve (SF&R) Balances
Total Obligations with SF&R
End of Year Unobligated Cash

**Unobligated Cash Section of the FY 2005 Budget**

17. The "Unobligated Cash" section of the Draft 1 FY 2005 budget is based upon data obtained from financial reports generated by the BIA from the FFS. The BIA 700 Report provides data on all funds held by the Department of the Treasury for the benefit of SCIP. The report details funds received and expended.

18. The BIA 700 Report identifies unobligated cash held for SCIP. Obligated cash is cash that is earmarked in the FFS for a particular purchase. It can not be spent in any way except for the purchase for which it is obligated. Unobligated cash is cash that is not earmarked or committed to any particular purchase.

19. If assessments have been paid as required prior to the outset of a fiscal year, the BIA 700 Report should indicate that SCIP possesses the upcoming year's assessments as unobligated cash. Funds held as emergency reserve are also unobligated cash as are funds being accumulated in sinking funds.

20. For the FY2005 budget, I projected the unobligated cash that SCIP might possess on October 1, 2004 (the first day of FY 2005). I based my estimate upon the data available in March 2003. I began by updating estimates for previously approved budgets for FY 2003 and FY 2004. The unobligated cash for the beginning of FY 2003 was obtained from the BIA 700 Report dated 10/25/02. Pl. Ex. 34 at 2. Unobligated cash, income and obligations were balanced from FY 2003 through FY 2004 to calculate the anticipated unobligated cash on October 1, 2004.

21. Another BIA FFS report provided the basis for determining the "Unobligated Cash from Prior Year Corrections". Specifically, the BIA 130S report describes for particular purchases the cash obligated, the expenditures made, and the balance of unexpended obligated cash. "Unexpended obligated cash" is reflected in the FFS as cash obligated to an "undelivered order." I reviewed the BIA 130S report periodically to determine when unexpended obligated cash could be deobligated. Once deobligated, the funds would be reflected in the BIA 700 report as unobligated cash. When adjusting budgets for the current fiscal year, I scrutinized the BIA 130S line by

line in order to come up with an estimate for cash that would be deobligated. Pl. Ex. 23 "Irrigation Division – Deobligations and Corrections" pages 2A and 2B. Starting with the FY 2005 budget process, I ceased making these estimates and I employed the budget assumption that obligations would be fully expended. Pl. Ex. 76. Independent of my former estimates, unexpended sums eventually appeared in the BIA 700 report as unobligated cash.

**Income Section of the FY 2005 Budget**

22. I developed the "Income" section of the Draft 1 FY 2005 budget by reviewing the FY 2003 budget and investigating income for past years, including FY 2002 and year-to-date income in FY 2003. The main component of the Project's income is the annual O&M assessment. To estimate the other sources of income, I made adjustments to both the FY 2003 and FY 2004 budgets based on updated interest rate projections, the likelihood of excess water pumped by Pima Agency (for which SCIP receives payment), and other sources of income, including the sale of equipment, issuance of permits and other minor sources of income. Pl. Ex. 23 "Irrigation Division – Income" page 3.

23. Excess pumping (also referred to as "overpumping") was allowed by SCIP when a party (i.e. SCIDD or Pima Agency) had fully depleted its annual apportionment of water and needed additional water for crops. The party utilizing excess pumping paid SCIP for the additional operation and maintenance cost of pumping this water. SCIDD never fully depleted its apportionment and only Pima Agency utilized excess pumping. Excess pumping was used by Pima Agency when the annual apportionment was inadequate to meet their crop demands. The apportionment was inadequate when the San

Carlos Reservoir had little water in storage at the beginning of the year. Therefore, excess pumping was indirectly related to climate conditions that resulted in smaller than needed river flows stored in San Carlos Reservoir. The relationship of excess pumping with climate conditions made it difficult to budget income from excess pumping 2 years into the future.

24. The Project earns interest on all funds held for its benefit. Those funds are held by the Department of the Treasury and earn interest as fixed by the Department of Treasury. The interest earned is reflected on the BIA 700 report.

25. One correction required of the draft 1 FY 2005 budget was its error in the reporting of assessments. As explained above, annual assessments are required to be collected in the year prior to their expenditure. Consequently, they are reported within the budget line item of unobligated cash on 10/1. In addition, however, the FY 2005 draft 1 budget reported the assessments projected to be collected in FY 2005 as income for FY 2005. Pl. Ex. 23. This reporting method mistakenly suggested that the project had more cash available for FY 2005 than was the case since assessments received in FY 2005 would ordinarily not be available to spend until FY 2006. This reporting error was corrected in future budget documents by labeling the assessment collections as pertaining to the next fiscal year. Pl. Ex. 31. However, the issue persisted in future years as a source of confusion, when SCIDD began to pay its assessment one year later than required by statute. As a consequence of SCIDD's late payment, beginning in FY 2004, SCIP began to receive assessment payments, not in advance as required, but in the actual year in which those assessments were to be expended.

**Total Funds Available Section of the FY 2005 Budget**

26. The "Total Funds Available" section of the Draft 1 FY 2005 budget is the total of "Total Unobligated Cash" and "Total Income". Pl. Ex. 23.

**Obligations Section of the FY 2005 Budget**

27. The "Obligations" section of the Draft 1 FY 2005 budget is based generally upon expense categories defined by the budget object classes ("boc") contained in the BIA 010 finance report. Pl. Ex. 23.

28. To estimate obligations for FY 2005, I reviewed the FY 2003 budget and made adjustments for actual expenditures to date. In certain categories, I applied a general escalation rate of 3 % for expenses. Pl. Ex. 23 "Irrigation Division – Obligations" pages 4A (Personnel and Benefits), 6A (Communications, Utilities, and Rental), 7A (Services), 8A (Supplies), and 8C (Equipment). SCIP's standard obligation categories include personnel, benefits, travel, utilities, services, supplies, land and structures, power for pumping, special projects and other. For each of these categories, the budget workbook detailed the items covered and supported the data presented on the one page budget summary. Pl. Ex. 23.

29. Within the "Obligations" portion of the budget are the line items "Power for Pumping" and 'Land & Structures." Power for Pumping refers to the energy costs incurred by SCIP to operate 98 irrigation wells that supplement the surface water delivered by the project to the 100,000 acres of designated project lands. Pl. Ex.23 "Power for Pumping" page 10. "Land & Structures" is a category that refers to required, non-routine maintenance to land and structures within the project. As the Supervisory Civil Engineer, I evaluated the maintenance needs of the irrigation project and estimated

the maintenance work that would be undertaken during that fiscal year. In FY 2005, SCIP anticipated undertaking significant maintenance referred to as the "China Wash Flume Rehabilitation/Replacement", which had initially been planned for FY 2004. Pl. Ex. 23 "Land and Structures Obligations" page 9.

**<u>Sinking Funds and Reserve Balances Section of the FY 2005 Budget</u>**

30. The "Sinking Funds & Reserve Balances" section of the budget identifies end of year cash balances for future expenses or emergencies. The intent of the sinking funds is to save for major purchases so that the assessment rate may remain somewhat stable and unaffected by these periodic purchases. The amounts budgeted in this section of the budget were end of fiscal year cash balances. Due to the nature of the FFS, this cash could not be obligated and would appear in the various FFS reports such as the BIA 700 report as unobligated cash. For the draft 1 FY 2005 budget, I identified the following Sinking Funds:

a. <u>Heavy Equipment</u> This sinking fund allowed the purchase of various heavy equipment, vehicles and trucks in a predetermined year. The amount budgeted for this sinking fund was determined through the development of a replacement schedule based upon a survey of SCIP's existing equipment and needs. Pl. Ex. 23 pages titled "I-plate Replacement Schedule for the SCIP Irrigation Division". Experience and the current condition of equipment was used as the basis of scheduling replacement of equipment that did not have an Interior license plate (I-plate). Relevant data relied upon was entered in the Excel workbook spreadsheets that supported the overall budget. Pl. Ex. 23 "Equipment Obligations" pages 8C and 8D.

b. <u>Well Replacement</u> This sinking fund was for the purchase of new wells to replace wells that were in need of abandonment. I performed a study in May of 2002 and found that: (1) wells were drilled every decade from the 1930's through the 1980's, (2) 26 of the project wells were more than 60 years old, and (3) no new wells had been drilled since the decade of the 1980's. My study confirmed that SCIP should anticipate the need for replacement of the wells used to supplement the delivery of water from the San Carlos Reservoir.

The detailed history of the well replacement sinking fund is contained in a spreadsheet within the Excel workbook budget. Pl. Ex. 23 "Well Replacement Sinking Fund" page 13B. That history shows that beginning in 1999, SCIP began to place $300,000 annually in a "Well Replacement" sinking fund. In FY 2001, SCIP did not add funds to the well replacement sinking fund of the FY 2003 budget due to continuing conflict between SCIDD, SCIP, Pima Agency and GRIC regarding the equitable division of Project water between the Indian Works and SCIDD. Due to the severity of an existing drought in FY 2002, no funds were added to the well replacement sinking fund in FY 2004 in an attempt to keep the assessment at $20 per acre. (The issue of well replacement was discussed at the fact finding meeting in 2002.) In addition, SCIP redirected $500,000 from the well replacement fund in 2004 to cover current expenses not met by the FY 2004 assessment rate of $20 per acre. The draft 1 FY 2005 budget proposed to resume adding $300,000 per year to the well replacement sinking fund in FY 2005. Pl. Ex. 23. This item was removed from later drafts of the FY 2005 budget at SCIDD's request and was not included in the FY 2005 proposed budget that was relied upon to set the FY 2005 O&M assessment rate. Pl. Ex. 34.

c. <u>China Wash Flume Rehab/Replacement</u> This sinking fund was established for the rehabilitation of the China Wash Flume. The China Wash Flume is an old, concrete structure designed to carry water in a major canal over a dry stream bed. Over the years, the flume deteriorated and required repair. In 2000, SCIP received an estimate of $300,000 for the cost of repair of the China Wash Flume. SCIP planned to award a contract for this work in FY 2004 and to have the work performed in FY 2005. To obtain the necessary funds, SCIP budgeted $117,000 in each year from FY 2002-2004. In the spring of 2003, I projected that the contract would be awarded in FY 2005. Consequently, this sinking fund was projected to have a balance of $0 by the end of FY 2005. Pl. Ex. 23 "China Wash Flume Rehab/Replacement" page 13B. As it turned out, the China Wash Flume funds were not obligated in FY 2005 due to a delay in contracting. The funds were obligated in FY 2006 and the work was done in FY 2007.

31. The fourth line in this section of the budget was "Cash Reserve". This was a fund set up with a constant cash balance of $600,000 to be used for unforeseen emergencies. The cash reserve was $600,000 for many years, including FY 2003 and FY 2005. The FY 2004 budget was adjusted so that the cash reserve was $300,000. The

reduction was made to cover expenses not met by the then FY 2004 assessment rate of $20 per acre. Pl. Ex. 34.

**Total Obligations with Sinking Funds**
**<u>and Reserve Section of the FY 2005 Budget</u>**

32. The "Total Obligations with SF&R" section of the Draft 1 FY 2005 adds "Total Obligations" to "Subtotal SF&R Balances". Pl. Ex. 23.

**<u>End of Year Unobligated Cash Section of the FY 2005 Budget</u>**

33. The "End of Year Unobligated Cash" section of the Draft 1 FY 2005 budget consists of two lines. The first line "with Sinking Funds and Reserve Unoblig." was obtained by subtracting "Total Obligations" from "Total Funds Available." The purpose of this line was to calculate the budgeted unobligated cash for October 1 of the next fiscal year budget. The second line "with Sinking Funds and Reserve Oblig." was obtained by subtracting "Total Obligations" and "Subtotal SF&R Balances" from the "Total Funds Available." The result reported in this second line reflected the cash available to SCIP that was not budgeted for a use or purpose in the FY 2005 budget. As a practical matter, this line reflects the total amount of any assessments to be collected for FY 2006 and excess cash available to SCIP. Because draft 1 of the FY 2005 budget was developed in 2003, at a time when the assessment for FY 2006 was not yet known, the draft 1 budget reflected only the excess cash available to SCIP. Once a basis for projecting a FY 2006 assessment became known, a subsequent budget adjustment would be made to include that amount in this line item. Pl. Ex. 34.

**<u>Chronology of the FY 2005 Budget</u>**

34. The draft 1 FY 2005 budget was created on April 1, 2003. Pl. Ex. 23. When the assessment income error described above was discovered, it became apparent

that SCIP would be operating at a deficit for FY 2005 if it set the FY 2005 assessment at $20 per acre as it had in prior years. In addition, because it had operated at a deficit for most of the years from 1998-2003, SCIP did not possess any funds to cover such a deficit.

35. To address the impending budget deficit, I developed a draft 2 budget that anticipated setting the FY 2005 assessment at $30 per acre. Pl. Ex. 31. The draft 2 FY 2005 budget was presented to the SCIDD board of directors on April 10, 2003. After these consultations, I prepared the draft 3 budget that was transmitted to SCIDD, Pima Agency and GRIC by letter on April 18, 2003. Pl. Ex. 32 and Pl. Ex. 24.

36. After the receipt of SCIDD's written comments dated May 16, 2003 concerning the Draft 3 FY 2005 budget, SCIP presented the draft 4 budget at a fact finding meeting on May 23, 2003. Pl. Ex. 25 and Pl. Ex. 33 and Pl. Ex. 6 at 13. Draft 4 made no changes in the projected income or expenses for FY 2005 projected in draft 3, but adjusted actual interest income received in FY 2003 which altered the projected FY 2005 cash. Pl. Ex. 33.

37. After the May 23, 2003 fact finding meeting, SCIP developed a final proposed budget for FY 2005. Pl. Ex. 34. This final proposed budget reflected the same projected income and expenses for FY 2005 as had been contained in the draft 3 and draft 4 budgets, but adjusted certain FY 2003 line items with more recent data. The BIA Western Regional Director enclosed the proposed FY 2005 budget in a letter to SCIDD dated June 6, 2003. Pl. Ex. 27 At the same time he forwarded the proposed budget and the request to publish the proposed $30 per acre assessment to the Assistant Secretary for Indian Affairs for publication in the Federal Register. This final proposed FY 2005

budget is the budget upon which the FY 2005 O&M assessment of $30 per acre is based. Pl. Ex. 34.

38. In June 2003, the Project had no approved estimate for FY 2006 O&M charges (that would be payable in FY 2005 under the 1924 Act). The FY 2006 assessment would not be known until 2004.

**Review of the FY 2006 and**
**FY 2007 Budgets and Development of the FY 2008 Budget**

39. The FY 2006 and FY 2007 budgets dated October 28, 2004, were prepared by engineers Carl Christensen and Russell Kaskalla. Pl. Ex. 35. Those budgets were relied upon to set the FY 2006 and FY 2007 O&M charges of $30 per acre.

40. Beginning in February 2006, I reviewed the budgets and documentation that were developed by the project from June 2003 through January 2006 so that I could prepare budget adjustments for FY 2006 and FY 2007 and create the FY 2008 budget. At that time, I prepared a new Excel Workbook to simplify the budget spreadsheets, links and formulas. In so doing, I retained the structure of the prior year budget presentations.

41. I organized the FY 2006 and FY 2007 budget adjustments and the FY 2008 proposed SCIP budget under the same categories that I have described at length in my discussion of the FY 2005 budget and that had been used for the approved FY 2006 and FY 2007 budgets. I also performed similar research of income, expenses and project needs that I had undertaken for the earlier budget years. Additionally, I relied on input and feedback from the SCIP supervisory civil engineer to ensure the reasonableness of budgeted income and expenses. I recorded the adjustments and the history of each budget category in spreadsheets that formed the Excel workbook, as I had for the FY

2005 budget. Pl. Ex. 76. Because I created the workbook in the spring of 2006, it contains the most complete actual data relevant to the SCIP budget available at that time.

42. There were several significant differences in the actual budget numbers for FY 2006 from the projections that had been made when the budget was created in 2004. A major unforeseen increase in income occurred in FY 2006 primarily due to an increase in interest earned. Pl. Ex. 76. In addition, in reviewing the components of the obligations budgeted for FY 2006, I evaluated the issue of well replacement contained in the "Land & Structures" budget line. As a result, the well replacement program was totally changed in FY 2006.

43. The modification of the well replacement program in 2006 significantly altered SCIP's expentitures in FY 2006 and its future budgets. In 2006, at SCIDD's urging and in consultation with SCIP's well consultant, SCIP investigated alternatives to its then scheduled replacement of project wells. Accepting SCIDD's arguments, SCIP decided not to pursue a scheduled well replacement program and instead decided to rely upon a plan to replace wells as they failed.

44. At the time we modified the approach to well replacement, there were already two wells that were considered to have irreversibly failed and were in need of replacement. Therefore, I planned the budget adjustments for FY 2006 and FY 2007 and the proposed budget for FY 2008 anticipating that the project would replace those 2 wells and then replace other wells as they failed. To implement this plan, I increased the well replacement sinking fund in the then current year FY 2006 budget by $300,000 so that the project would have $675,000 on hand in FY 2007 to replace the 2 already failed wells. In addition, I anticipated that the project's standard emergency reserve would be

kept at $800,000 to provide funds for well replacement. Pl. Ex. 76 "Irrigation Division – Land, Structures & Special Projects" and "2. Well Replacement Sinking Fund".

45. The FY 2006 budget dated October 28, 2004 contained a column for the FY 2005 budget labeled "approved" which actually included adjustments to the FY 2005 budget reflecting information gained since June 2003. Pl. Ex. 34 and Pl. Ex. 35. These adjustments included information regarding assessment collections, the inclusion of a line item for the San Carlos Reservoir archeological survey (which had previously been included in Services), an increase for "Land & Structures" to reflect the cost to reconstruct the Picacho Inlet/outlet channel and an adjustment of the costs for "power for pumping."

46. I created the draft 1 FY 2006 budget adjustment to revise SCIP's income, expense and projected maintenance plans to reflect more up-to-date income and obligation information. I also made budget adjustments for FY 2007 by projecting an escalation of some obligations from FY 2006 at 3% per year.

47. With the updated information included in the FY 2006 and FY 2007 budget adjustments in hand, I developed the FY 2008 budget. Before recommending an assessment rate for FY 2008, I prepared various scenarios for assessment rates extending into 2011. One scenario investigated what the assessment rate would need to be each year if all excess cash were fully depleted in the first year. Another scenario investigated the lowest assessment rate that could be maintained for 3 consecutive years without having a deficit in cash. Pl. Ex. 76 page 2.

48. Although I initially believed that an assessment of $30 per acre would be needed for FY 2008 in order to avoid a cash deficit, after consultation on the draft 1 FY 2008 budget with SCIDD, Pima Agency and GRIC, I was able to propose in the draft 2

FY 2008 budget that the assessment rate for FY 2008 and FY 2009 be set at $21 per acre. Pl. Ex. 76. Adoption of the $21 per acre rate would require the Project to make up a budget deficit for the year by spending down cash that had accumulated. Fact finding meetings on the FY 2008 budget were held with SCIDD on March 27, 2006, and April 20, 2006.

49. In May 2006, I prepared the draft 3 FY 2008 budget. DA42. The draft 3 FY 2008 budget differed from draft 2 only in the addition of another Supervisory Civil Engineer. Pl. Ex. 76; DA42. This new engineer was needed to work with the existing Supervisory Civil Engineer prior to his upcoming retirement.

50. On June 13, 2006, the Western Regional Director provided a written response to SCIDD's comments regarding the proposed FY 2008 budget and provided SCIDD with a copy of the draft 3 budget. DA74. The Western Regional Director also advised SCIDD that the draft 3 budget would serve as the basis for the Regional Director's recommendation that the FY 2008 assessment and the FY 2009 assessment both be set at $21 per acre. The draft 3 FY 2008 budget is the budget that was used as the basis for the actual O&M rate published in the Federal Register for FY 2008 and FY 2009. DA84-86; Pl. Ex. 62.

51. In my continuing work on project budgets, I have reviewed a summary budget worksheet dated December 12, 2006. Pl. Ex. 74. This December 12, 2006 budget presentation purports to update the draft 3 FY 2008 budget upon which the FY 2008 and FY 2009 assessments rates were based. This December 12, 2006 worksheet is not a complete budget workbook and it was not used to develop or support any proposed O&M assessment rate, as the FY 2008 and FY 2009 rates were published in the Federal Register in November 2006.

52. The December 12, 2006 budget contains a number of discrepancies, reflecting that it was not developed or refined through any fact finding or budget rate setting process. Among these discrepancies, the FY 2006 "Income & Obligation End of Year" column indicates that $492,275 is obligated for the China Wash Flume rehabilitation work in the budget line "Land & Structures & Special Projects" and the same $492,275 (rather than $0) is contained in the end of year balance in the sinking fund for the "China Wash Flume Rehabilitation/Replacement." Pl. Ex.74 and DA42. As verified by the project's contracting records, $492,275 was obligated in FY 2006 for the China Wash Flume rehabilitation work. DA87-89. Consequently, the December 12, 2006 budget sheet, and all subsequent project budgets, should reflect that the China Wash Flume rehab sinking fund was reduced to $0 in FY 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 6/10/2008 Randy Shaw

Randy Shaw

CERTIFICATE OF FILING

I hereby certify that on June 23, 2008, a copy of the foregoing "APPENDIX TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/KIRK T. MANHARDT