**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 06-576C<br>(Judge Block)<br><br>**PLAINTIFF'S REPLY AND RESPONSE TO DEFENDANT'S CROSS-MOTION** |

Plaintiff San Carlos Irrigation and Drainage District ("District") hereby files its Reply in support of its April 9, 2008 Motion for Summary Judgment and its Response to the Defendant's Cross-Motion for Summary Judgment. The District's responsive memorandum is supported by the Supplemental Proposed Findings of Uncontroverted Fact and the attached appendices, as well as the District's Response to the Defendant's Proposed Findings of Uncontroverted Fact, both of which are filed on this date.

Respectfully submitted this 24th day of July 2008.

Salmon, Lewis & Weldon, P.L.C.

By: /s/ RINEY B. SALMON

Riney B. Salmon, II
Salmon, Lewis & Weldon, PLC
2850 E. Camelback Road
Suite 200
Phoenix, Arizona 85016

TABLE OF CONTENTS


| | Page |
|---|---|
| ARGUMENT | 1 |
| I. The United States May Not Charge Late Payment Penalties When Payment Was Delayed Due to the United States' Own Breach of Contract. | 2 |
| A. Proposals and Recommendations Regarding Future O&M Charges Do Not Meet the United States' Contractual Obligation to Timely "Fix" Final O& M Charges. | 3 |
| B. Budget Proposals by Project Staff or the Western Regional Office Do Not Provide Constructive Notice of Final O&M Charges. | 5 |
| C. The BIA Had no Right to Assess Penalties Against the District Because the District's Payment of FY 2005 Charges Was Not Late. | 8 |
| D. Notice After July 1 Does not Provide the District Time to Assess and Collect O&M Charges for the Particular Fiscal Year Involved Under Arizona Statutes Governing the District. | 9 |
| E. Having Elected to Fix O&M Charges Through the Federal Register, the United States Is Bound by the Accompanying Obligations of that Decision. | 10 |
| F. The Repayment Contract Did Not Modify or Waive the Payment Deadline in the 1924 Act. | 11 |
| II. O&M Charges for FY 2005-2007 Were Excessive and Were Not Based Upon a Reasonable Estimate Derived from Facts Available at the Time. | 12 |
| A. The United States Violated Its Contractual Obligations, Including the Implied Duty of Good Faith and Fair Dealing, by Failing to Fix O&M Charges Using Reasonable Estimates of Project Income and Obligations. | 13 |
| B. The United States' Decisions Were Unreasonable and an Abuse of Discretion Based upon Facts Available at the Time the United States Provided Notice of the O&M Charge. | 14 |
| 1. The BIA Ignored Millions of Dollars in Surplus Cash in Preparing its Budgets and Fixing O&M Charges. | 15 |
| 2. The BIA Failed to Include FY 2006 O&M Charges as Project Income in its FY 2005 Budget. | 18 |
| 3. The BIA Excluded Reasonably Estimable Interest Income in its Projection. . | 19 |

4. O&M Charges Included Unauthorized and Unreasonable Costs. 19

C. The United States' Arguments Regarding Future Credits Are Contrived. 21

1. The BIA Has Refused to Provide a Credit in the Past. 22

2. The District Will Not Receive a Credit for FY 2008-2009. 23

3. The Transfer of Remaining Project Reserves to the Joint Control Board Will not Compensate the District for Past Overcharges. 25

III. The United States' Accounting Practices Are Inaccurate and Misleading. 26

CONCLUSION 28

# TABLE OF AUTHORITIES

Page

**CASES**

*Bunn v. Kingsbury County*
52 N.W. 673 (S.D. 1892) .......... 3

*Culberson v. Watkins*
119 S.E. 319 (Ga.1923) .......... 3

*Elliott v. United States*
877 F.Supp. 1569 (M.D. Ga. 1992) .......... 21

*Erinys Iraq Ltd. v. United States*
78 Fed. Cl. 518 (Fed. Cl. 2007) .......... 14

*Orange Grove Irr. Dist. v. United States*
28 Fed. Cl. 790 (1993) .......... 13

*Pitsker v. Office of Personnel Mgmt.,*
234 F.3d 1383 (Fed. Cir.2000) .......... 12

*San Carlos Apache Tribe v. United States*
272 F. Supp. 2d 860 (D. Ariz. 2003); *aff'd* 417 F.3d 1091 (9th Cir. 2005) .......... 19, 20

*San Carlos Irrigation and Drainage Dist. v. United States*
111 F.3d 1557 (Fed. Cir. 1997) .......... 13, 21

*Tecom, Inc. v. United States*
66 Fed. Cl. 736 (2005) .......... 14

*Warner-Lambert Co. v. Apotex Corp.*
316 F.3d 1348 (Fed. Cir. 2003) .......... 12

*Western Elec. Co., Inc. v. United States*
564 F.2d 53 (Ct.Cl. 1977) .......... 12

*Williams v. Nall*
420 P.2d 988 (Ariz. App. 1966) .......... 11

**STATUTES**

Ariz. Rev. Stat. § 48-3096(A) .......... 9

Ariz. Rev. Stat. § 48-3151 .......... 9

**REGULATIONS**

68 Fed Reg. 56302 (September 30, 2003) .......... 10

69 Fed Reg. 23805 (April 30. 2004) .......... 10

76 Fed Reg. 19950 (April 20. 2007) .......... 23

25 C.F.R. § 171.1(e) .......... 4

25 C.F.R. § 171.1(g) .......... 4

**OTHER AUTHORITIES**

*Proposed Contract-Savage Irr. Dist.*, 60 Int. Dec. 150 (1948) .......... 4

Oxford College Dictionary (2nd ed.) at 518 (Oxford University Press, Inc. 2007) .......... 3

## ARGUMENT

The United States admits that the Bureau of Indian Affairs ("BIA") built up millions of dollars in surplus cash reserves.[1] In fact, the latest figures available from the United States indicate that current surplus cash exceeds $4.2 million.[2] This is five times the amount of cash reserves recommended for the San Carlos Irrigation Project ("Project") in the BIA's own Irrigation Handbook and confirmed by a formal decision from the BIA's Western Regional Office.[3] The Government now argues that this surplus represents a prepayment of Project expenses for which the District will be credited in future years.

Despite the Government's litigation position, the BIA has never given the District a credit or refund to compensate for excessive collections and reduce the excessive cash surplus. In fact, the BIA assessed a late payment penalty against the District for FY 2005 even though the District had already according to the Government "prepaid" the FY 2005 charges. The Government can not credibly argue that the District will receive a credit in the future because: (1) the BIA has never given a credit in past years;[4] (2) the District is paying O&M charges for FY 2008 sufficient to cover the Project's expenses without even touching the million in surplus cash reserves; and (3) Congress has mandated that operation and maintenance of the majority of the Project works be transferred from the Government to a non-federal Joint Control Board in June 2009.[5]

In a good faith effort to amicably resolve this surplus cash issue before this case was filed, the District made a written proposal to the BIA that provided a reasonable, easy, and verifiable method for the BIA to show its good faith by crediting the District out of surplus cash

---

[1] U.S. Response, at 18.
[2] *District's Supplemental Proposed Findings of Uncontroverted Facts* ("SFOF"), ¶ 15 (July 24, 2008).
[3] The BIA's Irrigation Manual provides for only a $600,000 to $800,000 reserve. SFOF ¶ 17. The BIA's Acting Regional Director for the Western Regional Office confirmed these reserve limits in his 1997 decision. *District's Proposed Findings of Uncontroverted Facts* ("FOF"), ¶ 46 (April 9, 2008).
[4] SFOF ¶¶ 16 and 18.
[5] *Defendant's Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment*, at 20 (June 23, 2008) (hereinafter "U.S. Response").

reserves.[6] The BIA flatly rejected this proposal, giving excuses with no merit, and the District was forced to file suit.[7] If the BIA truly believed that the cash surpluses were the pre-payment of O&M charges, why didn't it agree to the District's proposal? Even after this case was filed, the BIA has refused, for no good reason, to provide a verifiable credit or refund for the amount of damages claimed.[8] Despite the United States' assertions, the BIA clearly never intended to credit the District for overpayments and has no intention of doing so in the future—unless the Court finds for the District.

## I. The United States May Not Charge Late Payment Penalties When Payment Was Delayed Due to the United States' Own Breach of Contract.

The Secretary of the Interior ("Secretary") is contractually obligated to fix operation and maintenance ("O&M") charges annually and timely notify the District of the final decision. The Secretary has not delegated this duty to anyone in the BIA's Western Regional Office or the Project.[9] Therefore, tentative budgets or O&M charges recommended by Project staff or local BIA officials do not "fix" the final O&M charges. Annual charges are "fixed" when the District receives the contractual notice of the Secretary's final decision. Logically, contractually, and as a matter of law, the District has no obligation to assess or collect charges from its landowners until the Secretary has informed the District of what those charges are.

By failing to fix the FY 2005 O&M charge by the contractual deadline of July 1, 2003, the BIA precluded the District from collecting and paying the charges in a timely manner. In spite of its own contractual breach, the BIA punitively assessed a late payment penalty against the District and coerced payment of the illegitimate penalty with threats to terminate water

---

[6] FOF ¶¶ 114-115.

[7] *Id.* ¶¶ 116-122; SFOF ¶ 20.

[8] The Project Irrigation Manager has stated that the Project retained the money in order to earn interest on the surplus. It also appears that the BIA's Western Regional Office never internally considered giving a credit to the District. SFOF ¶ 19.

[9] The Secretary of the Interior properly delegated authority to fix annual O&M charges to the Assistant Secretary, not local BIA or Project officers or staff. FOF ¶ 30. References herein to the Secretary's duty to fix the charges should be read to include a final decision by the Secretary or his proper delegates.

deliveries to the District's farmers. This action violated the District's contractual rights and clearly entitles the District to damages equal to the late payment penalty. It also negates the United States' self-serving argument that the District prepaid O&M charges in previous years.

### A. Proposals and Recommendations Regarding Future O&M Charges Do Not Meet the United States' Contractual Obligation to Timely "Fix" Final O&M Charges.

Both the Landowners' Agreement and the Repayment Contract require the Secretary to "fix" annual O&M charges in advance, based upon the Project's annual operation and maintenance costs.[10] The Repayment Contract requires the Secretary to "give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts."[11] Because Arizona law requires the District to file its annual assessment by July 1 of each year, the Secretary must fix the final charges and provide notice by July 1 of the year preceding the start of the fiscal year involved. For example, FY 2005 began on October 1, 2004. To satisfy the Repayment Contract, the Secretary should have fixed the final FY 2005 charge and notified the District by July 1, 2003. This would have allowed the District to assess, collect, and pay the charges by May 15, 2004 under the tax assessment procedures of Arizona law.[12]

The common meaning of "fix" is to "decide or settle on," to "assign or determine for legal purposes."[13] The term inherently denotes finality and certainty.[14] Thus, in requiring the Secretary to "fix" O&M charges, the Repayment Contract requires a *final* decision by a certain date.

---

[10] FOF ¶¶ 13 and 18.
[11] *Id.* ¶ 18.
[12] *Id.* ¶¶ 40-44.
[13] Oxford College Dictionary (2nd ed.), at 518 (Oxford University Press, Inc. 2007).
[14] *Culberson v. Watkins*, 119 S.E. 319, 321-22 (Ga. 1923) (because the word "fix" implies finality, the "fixing" of a salary for a six-year term requires that the salary be decided upon and prohibits alteration of the salary once settled); *Bunn v. Kingsbury County*, 52 N.W. 673, 674 (S.D. 1892) ("To fix is to determine, to settle.").

This use of the term in an irrigation context is nothing new. Sixty years ago, a question arose regarding the propriety of a proposed contract between the Savage Irrigation District and the United States that left the district's future payment obligations to be computed annually under a formula described in the agreement. The Reclamation Project Act of 1939 required the district's contractual payment obligations to be "fixed by the Secretary." The United States Solicitor concluded that the contract failed to meet statutory requirements because it did not require the Secretary to "fix" the amount of the annual payments:

> It will be noted that the number and amounts of the annual installments payable by the contracting organization are to be "fixed by the Secretary." The language used by Congress on this point seems to be plain and unambiguous. The verb "to fix," when used in such a connection, means "To set or place definitely; to establish; * * * settle; * * * to assign precisely * * *." Hence, the "number" and "amounts" of the annual installments provided for in a contract are "fixed" if, and only if, the contracting parties know definitely how many annual installments are called for under the terms of the contract and how much money is involved in each installment. So long as uncertainty exists with respect to these matters, the "number" and "amounts" of the annual installments are not "fixed."[15]

The same principle applies here. Tentative proposals from the Project or local BIA staff regarding the FY 2005 charge did not provide the certainty required to fix the charge.

Neither the Project nor the BIA's Western Regional Office have authority to fix O&M charges. In his 1997 decision, the Acting Regional Director agreed that the role of Project staff in the O&M budget process is not to fix the O&M charge but to conduct studies regarding the necessity of rate adjustments and report their findings, conclusions, and recommendations.[16] Nor does anyone at the Western Regional Office have authority to fix O&M charges applicable to the District, despite the United States' arguments to the contrary.[17] Only the Secretary may "fix" the O&M charges for the District pursuant to the repayment contract.

---

[15] *Proposed Contract-Savage Irr. Dist.*, 60 Int. Dec. 150, 150-51 (1948) (citation excluded).

[16] SFOF ¶ 2.

[17] U.S. Response, at 12 (citing 25 C.F.R. §§ 171.1(e) & (g)). The United States has misinterpreted these regulations. The delegation of authority in 25 C.F.R. § 171.1(e) applies only to the Indian Works of the Project, not the District. The District's rights and obligations are governed by the Repayment Contract and Joint Works Order, which are not amended or modified by the delegation of authority in Section 171.1(e). *See* 25 C.F.R. § 171.1(g).

The Western Regional Director also did not purport to fix the FY 2005 O&M charges in his June 6, 2003 “notice” letter to the District, as the United States argues. Rather, the Director clearly recognized the limits of his own authority and the need for the Secretary’s final decision:

> Please be advised that the request to publish the proposed rate in the Federal Register was transmitted to the Assistant Secretary for Indian Affairs on June 6, 2003. . . . [The District] will be given a formal opportunity to submit comments in accordance with the instructions in the Federal Register notice. Final action on whether to increase the rate will be made by the Assistant Secretary for Indian Affairs after the Federal Register notice is published and the comment period is completed.[18]

O&M charges for FY 2005 were not finally fixed until the Secretary rendered the final decision in April 2004, ten months after the July 1 deadline. This was also two months after payment for FY 2005 would have originally been due under the 1924 Act.[19] The United States clearly has no basis to argue that the 2005 O&M charges were fixed by July 1, 2003.

**B. Budget Proposals by Project Staff or the Western Regional Office Do Not Provide Constructive Notice of Final O&M Charges.**

The BIA can manage the schedule for fixing O&M charges such that the District receives timely notice—it has done so in the past. The Government has offered no reason for failing to timely fix the charges in recent years. Instead, it attempts to avoid what should be a relatively simple contractual duty with arguments that tentative budgets and recommended charges from local BIA and Project staff constitute sufficient contractual notice. These arguments lack merit because: (1) the BIA’s own Regional Director rejected the idea of constructive notice; (2) proposals from Project or BIA staff can, and often do, change before the Secretary finally fixes the O&M charges; and (3) the District never agreed to accept anything less than a decision from the Secretary as contractual notice.

In 1995, the Secretary published notice fixing the O&M charges for FY 1995 and subsequent seasons at $30 per acre. In challenging the charges for FY 1998, the District argued that the charges had to be fixed annually, not based on a blanket decision governing multiple

---

[18] FOF ¶ 58 and Exhibit 27.
[19] FOF ¶ 44.

years, and that the charge for FY 1998 was unreasonable. The Project Engineer informed the District on June 27, 1996 that the FY 1998 charges would remain at the level set in 1995. Deciding the District's appeal of that administrative decision, the Acting Regional Director concluded that the June 27 notice, dated just days before the July 1 deadline for notifying the District of the FY 1998 charges, was not "consistent with our obligation in the [Repayment] Contract to give [the District] notice of the amount of charges to be paid annually in sufficient time to permit [the District] to make the annual tax levies and to comply with the laws of the State of Arizona relating to the levy and collection of taxes by irrigation districts."[20] Similarly, the Regional Director's June 6, 2003 "notice" letter regarding charges for FY 2005, also dated just days before the July 1 deadline, did not satisfy the Secretary's contractual obligations.

The District cannot depend upon proposals by local BIA or Project staff as notice of future O&M charges because those proposals often change substantially before the Secretary actually fixes the final charge. For example, the deadline for the United States to fix the O&M charges for FY 2006 was July 1, 2004, with those charges originally due on March 1, 2005. In June of 2004, Project staff agreed with the District that a charge of $15 per acre was reasonable and proposed that charge to the Western Regional Director for FY 2006. In July 2004, the District assessed its landowners based upon that recommendation and in good-faith reliance upon assurances that the recommendation would be accepted by the Secretary. Three months later, the Western Regional Director rejected staff's proposal and unilaterally decided that the FY 2006 charge would be $30 per acre.[21] Under the United States' position in this case, the District should have been entitled to rely upon the $15 per acre proposal in assessing its landowners in July 2004. Yet the United States still held the District accountable for the full $30 per acre

---

[20] SFOF ¶ 2.
[21] FOF ¶¶ 83-92.

assessment and threatened to terminate water deliveries when the full assessment was not paid when due.[22]

The District has not agreed to a schedule under which recommendations by local BIA or Project staff suffice for contractual notice, as the United States contends.[23] Although the District agreed to a schedule in 1997 for negotiating O&M charges, that schedule only went so far as to require a final *recommendation* on the charges by May 28. It did not address the deadline for the Secretary's final decision approving or altering the recommended O&M charges.[24] Furthermore, the District has consistently complained since that time that the United States was not meeting its obligation to fix the O&M charges by the July 1 deadline, so the Government cannot claim it was justified in relying on this schedule.[25]

By incorporating Arizona law, the Repayment Contract sets up a process for the Secretary to fix the O&M charges in time for the District to collect and pay the charges before the Project's fiscal year begins. There is no reason the United States cannot follow those procedures to avoid disrupting a contractually-required schedule. The District should not be forced to guess what the Secretary's decision will be or suffer penalties because the United States cannot meet a simple deadline. The District is entitled to a final decision on O&M charges from the Secretary, not tentative recommendations from lower ranking staff members.

---

[22] FOF ¶¶ 111-123. Other examples abound. For instance, in June 2004 the United States proposed that the charge for FY 2008 would be $26 per acre. FOF ¶ 83. By October 2004, the proposed charge had risen to $30 per acre. FOF ¶ 93. The Secretary ultimately fixed the charge at $21 per acre. FOF ¶¶ 114-121.

[23] U.S. Response, at 15-17.

[24] SFOF ¶ 3 (proposed schedule stops with recommendation of proposed O&M charges to the Western Regional Director, who has no authority to fix the charges).

[25] SFOF ¶¶ 4-6. Mr. Shaw's sworn statement that he "does not recall" complaints from the District regarding the schedule he used to prepare budgets (DA 146) can only mean that he never bothered to read the District's written comments year after year and was not paying attention to similar complaints voiced in meetings with the Project.

### C. The BIA Had no Right to Assess Penalties Against the District Because the District's Payment of FY 2005 Charges Was Not Late.

The United States claims that any charges paid by the District that are not used during the fiscal year are retained in the Project's surplus account as a pre-payment on future O&M.[26] If that is true, then the BIA had no right to exact a late payment penalty from the District for FY 2005 because the District had already "pre-paid" charges for the year.[27]

When the BIA assessed the late payment penalty in March 2005, it knew that the Project had over $1.8 million in surplus cash, with projected additional income of nearly $400,000 for the fiscal year—not counting FY 2005 O&M charges.[28] Furthermore, the BIA knew that the total of surplus cash on hand and projected income—$2 .2 million—was more than enough to cover the Project's remaining budget obligations for FY 2005.[29] Under the United States' argument, one half of the cash surplus should have been attributed to the District as a "pre-payment" of O&M charges.[30] If, as the United States asserts, the FY 2005 O&M charge was pre-paid by surpluses left over from previous years, the penalty assessed by the United States in March 2005 was unreasonable, unjustified, and in breach of the Repayment Contract and the covenant of good faith and fair dealing.

---

[26] U.S. Response, at 18-19.

[27] In March 2005, the BIA alleged that the District was one year late in paying the FY 2005 O&M charge and assessed a $47,500 late penalty against the District. FOF ¶¶ 76-82.

[28] FOF ¶ 81.

[29] The BIA had projected it would incur total obligations for FY 2005 of $3.0 million. The Project actually spent only $1.25 million between March 2005 and the end of the fiscal year, $1.0 million less than projected. *Id.* ¶¶ 73 and 81.

[30] Furthermore, the Project ended FY 2005 with over $4 million in surplus cash. FOF ¶ 75. Thus, even if the District had not paid FY 2005 charges of $1.5 million in March 2005, the Project still would have ended the fiscal year with over $2.5 million in surplus cash after paying all of its obligations for the year.

**D. Notice After July 1 Does not Provide the District Time to Assess and Collect O&M Charges for the Particular Fiscal Year Involved Under Arizona Statutes Governing the District.**

The Repayment Contract expressly incorporates the tax assessment and collection statutes governing the District under Arizona law. As a legal and practical matter, the procedures under these statutes require the District to have the Secretary's final decision in hand by July 1 to include the charges as part of the District's tax assessment against the farmers.[31]

The supplemental assessment procedures cited by the United States are irrelevant.[32] Arizona law contains specific statutory requirements with regard to the District' collection of assessments due under contracts with the United States:

> All payments due or to become due to the United States under any contract between the district and the United States . . . shall be paid, unless otherwise provided by contract, by revenue derived from *annual assessments*, apportioned as prescribed by this article and levies therefore, upon real property within the district assessable for district purposes under the laws of the state. . . . The board of directors shall include in its annual estimate all amounts necessary to meet all payments to the United States when due as provided in the contract.[33]

Thus, Arizona law requires the District to collect O&M charges from its landowners through the annual assessment process, not supplemental assessments as the United States alleges.

It is true that the District need only provide an estimate of its anticipated obligations to the County Assessor by July 1.[34] But regardless of the District's obligations under State law, the Secretary remains contractually obligated to "fix" the O&M charges by July 1. The District is entitled by contract to know precisely what it must assess to cover Project O&M and the District's landowners are entitled to an assessment that includes all necessary charges for Project O&M each year. The District's ability under State law to estimate its total obligations and expenditures (which are not limited just to Project O&M charges) does not, however, permit the United States to meet its contractual obligations with mere estimates and recommendations.

---

[31] FFOF ¶¶ 40-44.
[32] U.S. Response, at 14 (citing 48 Ariz. Rev. Stat. § 3151).
[33] Ariz. Rev. Stat. § 48-3096(A).
[34] FOF ¶ 40.

**E. Having Elected to Fix O&M Charges Through the Federal Register, the United States Is Bound by the Accompanying Obligations of that Decision.**

The District does not assert, as the United States claims, that it is entitled to notice of O&M charges solely through publication in the Federal Register. The Repayment Contract requires only that the Secretary provide timely notice of the decision fixing the O&M charges. It was the United States who made the decision to begin publishing notice of the Secretary's decision in the federal register.[35] Having elected to follow that procedure, however, the United States must live with the consequences of an administrative process under which proposals and recommendations from Project or BIA staff do not constitute final notice of O&M charges.

The United States' "constructive notice" argument not only contradicts its contractual obligations, it contradicts the procedural rights and obligations inherent in the administrative process that the BIA uses in publishing notice in the Federal Register. The BIA first publishes a notice of proposed rate making in regard to the O&M charges.[36] The notice states that interested parties may submit comments, which will be "carefully assessed and fully considered before publication of a final notice."[37] The BIA later publishes notice of the Secretary's final decision fixing the O&M charges, which purportedly is based on a review of the comments received.[38]

If, as the United States contends, the District must rely upon proposals or recommendations from Project or BIA staff, then the notice and comment procedure set up by the Federal Register notices is a sham. Submission of comments to the Secretary is futile because the decision has already been made. If, however, these procedures have meaning, then

---

[35] FOF ¶¶ 36-39. The BIA Irrigation Handbook expressly states that notice of "orders fixing O&M charges" must be published in the Federal Register. *Id.* ¶ 37.

[36] *See, e.g.*, BIA, *Rate Adjustments for Indian Irrigation Projects*, 68 Fed. Reg. 56302 (September 30, 2003) (proposing O&M charge for FY 2005).

[37] *Id.* at 56306. The Project's own supervisor agrees that proposed rates are subject to change based on comments received from interested parties and that the Secretary's office makes the final decision fixing O&M charges. SSOF ¶ 34.

[38] *See, e.g.*, BIA, *Rate Adjustments for Indian Irrigation Projects*, 69 Fed. Reg. 23805 (April 30, 2004) (finalizing FY 2005 O&M charges). The District submitted comments on each proposed rate for each fiscal year at issue here. *See* FOF ¶¶ 55, 102, and 127.

the District is entitled to a reasonable expectation that the Secretary might read its comments and modify the charges in his final decision. The District should not have to rely on proposals from BIA and Project staff if the BIA has decided to follow an administrative procedure in fixing the charges that provides the District with procedural rights in addition to its contractual rights.

**F. The Repayment Contract Did Not Modify or Waive the Payment Deadline in the 1924 Act.**

The 1924 Act states only that O&M charges are to be paid "annually in advance not later than March 1st."[39] The Act does not discuss penalties for late payment, nor does it describe how the charges are to be determined or how they are to be communicated to non-Indian landowners within the Project. These details are left to the Secretary under Section 5 of the 1924 Act.[40]

The Repayment Contract, executed by the Secretary under authority of the 1924 Act, provides the detail that the Act lacks in regard to how O&M charges are to be fixed, collected, and paid. The District does not assert that these contractual obligations, including the duty to timely fix charges, altered the payment date established in the 1924 Act.[41] Rather, these contractual obligations established the remedies available to the United States for the District's failure to meet the deadline contained in the 1924 Act. As a matter of *contract* law, the BIA cannot penalize the District in situations where the Secretary's failure to timely fix the charge caused the late payment.[42]

The Secretary agreed in the First Supplement to the Repayment Contract that the District could pay O&M charges as late as May 15 without penalty.[43] The United States does not and cannot contend that the First Supplement contradicts the 1924 Act, even though it directly effects

---

[39] FOF ¶ 9.

[40] SFOF ¶ 1 ("The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of the Act into full force and effect . . . .").

[41] U.S. Response, at 6-7.

[42] *Williams v. Nall*, 420 P.2d 988, 992 (Ariz. App. 1966) ("one who prevents performance of a contract may not complain of such nonperformance.").

[43] U.S. Response, at 12.

payment by the March 1 deadline. Similarly, the District's arguments in this case do not require the Court to ignore statutory mandates in enforcing the parties' contractual obligations.

The United States' argument, taken to its logical conclusion, creates an absurd result. Under the argument that the March 1 deadline is the sole consideration in assessing penalties for late payment, the District is required to pay O&M charges by March 1 of each year even if the United States has not yet fixed the charges for the fiscal year at issue.[44] The 1924 Act should not be interpreted to require payment of a debt that has not been reduced to a sum certain.[45]

## II. O&M Charges for FY 2005-2007 Were Excessive and Were Not Based Upon a Reasonable Estimate Derived from Facts Available at the Time.

The United States agrees that the Government must fix "O&M charges annually based upon a reasonable consideration of the cost experience and maintenance needs known to the Government at the time the rate is set."[46] But for FY 2005 through 2007, the United States failed to make good faith estimates of its expected O&M costs, charging the District and its landowners $500,000 more each year than the Project needed. This conclusion is not based on hindsight, as the United States suggests. Both at the time proposed budgets and charges were prepared, and at the time of the Secretary's decisions fixing the charges, the United States had sufficient information at its disposal to know, using good faith, that the proposed and final charges for these years were excessive and unreasonable. It chose to ignore the facts, however, in breach of its contractual obligations and in abuse of its discretion to fix a key contractual term.

---

[44] This happened for FY 2006, when the Secretary did not fix the O&M charge until August 2005, six months after payment was due under the Government's argument. FOF ¶ 103.

[45] *Western Elec. Co., Inc. v. United States*, 564 F.2d 53, 66 (Ct. Cl. 1977) (if a particular construction of a statute produces inequity and injustice, such a construction is to be avoided if another and more reasonable interpretation is perceived); *Pitsker v. Office of Personnel Mgmt.*, 234 F.3d 1378, 1383 (Fed. Cir. 2000) (interpretation of statute that causes absurd results is to be avoided if at all possible); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1355 (Fed. Cir. 2003) (a court is not to be guided by a single sentence or member of a sentence in a statute, but looks to the provisions of the whole law, and to its object and policy).

[46] U.S. Response, at 23.

**A. The United States Violated Its Contractual Obligations, Including the Implied Duty of Good Faith and Fair Dealing, By Failing to Fix O&M Charges Using Reasonable Estimates of Project Income and Obligations.**

The Government may not choose an unreasonable methodology for determining O&M charges.[47] In *Orange Cove Irr. Dist. v. United States*, beneficiaries of a federal irrigation project claimed that the Bureau of Reclamation had improperly penalized certain landowners for filing required forms after the deadline. The Bureau argued it had discretion under its contract with the project beneficiaries to set and enforce filing deadlines. The court explained the standard that applies when one party controls the determination of an essential contract term, as the United States does in this case with regard to fixing O&M charges:

> When one party has the authority to exercise discretion to determine an essential term of a contract, as here, the covenant of good faith and fair dealing requires that the exercise of that discretion be reasonable. This requires that what is done "be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of such power."[48]

The court further held that the Bureau's actions violated the parties' contract, including the covenant of good faith and fair dealing, because the Bureau had abused its discretion:

> In this case, it is not the setting of a deadline *per se* that is unreasonable. What the Court finds troubling is the timing of the administrative decision and the manner in which the decision was conveyed to [the irrigation district]. The Bureau, in its contractual capacity, had the power to enforce the forms requirement imposed by federal reclamation law at any time by setting a reasonable deadline by which the landholders were to return their forms. With this power, however, came an obligation to exercise that discretion in good faith. . . . the Bureau's decision to impose the May 2, 1988, deadline and to bill [the irrigation district] full cost for 1987 water delivered to late filing landholders, coupled with the lack of notice given to [the irrigation district], was unreasonable and suggested a lack of good faith on the part of the Bureau.[49]

Here, the BIA abused its discretion and its obligation of good faith and fair dealing when it fixed excessive and unreasonable O&M charges with full knowledge of millions in surplus cash reserves that could have been used to offset O&M costs and reduce the charges.

---

[47] *See San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d 1557, 1567 (Fed. Cir. 1997) ("the government, while obligated . . . to use advance estimates of future costs, may not choose an unreasonable methodology for selecting the rate used . . . .").

[48] 28 Fed. Cl. 790, 800-801 (1993) (citations deleted).

[49] *Id.* at 801.

To demonstrate a violation of the duty of good faith and fair dealing, the District need not meet the irrefragable proof standard cited by the United States.[50] That standard only applies if a government official is accused of fraud or criminal wrongdoing.[51] Instead, the District need only demonstrate that the BIA abused its discretion based on a lack of substantial evidence, gross error, or similar circumstances:

> When a government official acts under a duty to employ discretion, granted formally by law, regulation, or contract, and a lack of good faith is alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, clear and convincing evidence is not needed to rebut the presumption [of good faith]. Instead, this may be inferred from a lack of substantial evidence, gross error, or the like. And when the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application.[52]

Substantial evidence has been presented by the District that the BIA violated its contractual duty to prepare budgets based upon a reasonable estimate of the Project's income and needs by setting O&M charges at unreasonable levels that lacked support in the facts available to the agency at the time of its decisions. The willful decision to ignore the available facts and rely upon unreasonable and contrived estimates of costs and income was an abuse of discretion that demonstrates a lack of good faith and fair dealing.

### B. The United States' Decisions Were Unreasonable and an Abuse of Discretion Based upon Facts Available at the Time the United States Provided Notice of the O&M Charges.

It does not take hindsight to find fault with the United States' decisions on O&M charges for FY 2005 through 2007. A review of information available at the time of the decisions clearly shows that the United States ignored key facts in fixing the charges each year, most important of which was the fact that unnecessarily large cash surpluses were being carried forward each year.

---

[50] U.S. Response, at 41-42.

[51] *Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005).

[52] *Id.* at 769. *See also Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 529 (Fed. Cl. 2007) (the "Government's long touted desideratum that 'irrefragable proof' is needed to demonstrate the absence of good faith in the administration of government contracts has been given its last rites.").

**1. The BIA Ignored Millions of Dollars in Surplus Cash in Preparing its Budgets and Fixing O&M Charges.**

As justification for raising the FY 2005 O&M charge to $30 per acre, the BIA asserted in June 2003 that it had made an accounting error of $2 million dollars, such that cash reserves shown in the Project's budgets actually did not exist.[53] Even today, the United States asserts that the Project operated at a deficit between 1998 and 2004, thereby depleting reserve funds by the end of FY 2002.[54] The United States' position then and now is wholly unsupported by the facts.

The FY 2005 budget proposed by the BIA in June 2003 does not depict a $2 million error and does not show that reserves were exhausted. Indeed, that budget shows that the Project would have surplus cash on hand totaling up to $3.9 million at the start of FY 2003; $3.2 million at the start of FY 2004; and $3.7 million at the start of FY 2005.[55] When the Secretary actually fixed the FY 2005 O&M charges in April 2004, he knew the Project had started FY 2004 with over $3.9 million in surplus cash, belying any belief that reserve funds had been exhausted.[56]

These figures render absurd the United States' argument that the $30 per acre O&M charge was reasonably based upon the history of O&M costs from FY 1999—2002.[57] Even if Project costs averaged $3.0 million per year during that time, those costs are just part of the picture. At the time the budget was prepared and finalized, the Project's account held over $3.0 million in surplus cash that could have been used to help offset FY 2005 costs. The United States completely ignored this surplus in calculating available funds for FY 2005.

---

[53] FOF ¶¶ 53-54 and 59.

[54] U.S. Response, at 27.

[55] SFOF ¶ 9.

[56] SFOF 13. In fact, at the time of the Secretary's decision in April 2004, the Project's account contained over $3.0 million dollars. SFOF ¶ 11. Mr. Shaw's sworn statement (DA 147) that the Project was operating at a deficit, such that reserve funds had been exhausted by FY 2003, is clearly contradicted by the United States' own figures.

[57] U.S. Response, at 27.

Like FY 2005, the BIA projected FY 2006 O&M expenses of $3.0 million based on the Project's recent cost history,[58] but it again refused to consider using its enormous cash surpluses to offset those costs.[59] As described in detail in the District's motion, Project staff recommended a $15 per acre O&M charge for FY 2006.[60] The Western Regional Director rejected that proposal and unilaterally raised the charge to $30 per acre. The Director attempted to justify the change with references to outstanding maintenance issues, even though the Director had no information before him indicating how much the maintenance would cost, whether it was necessary, or whether a $30 per acre charge was appropriate to cover the maintenance issues cited.[61] The United States now asserts that the Director was proven correct, because FY 2006 expenses totaled nearly $3.0 million with the last-minute inclusion of work on China Wash Flume.[62] This ignores the fact, however, that the Director knew at the time of his decision that the Project had at least $2.5 million in surplus funds to cover maintenance costs,[63] so there was no need to add those costs to the O&M charge for FY 2006.[64]

Clearly, the Western Regional Director directed his staff to revise the budget to justify the higher charge. Amazingly, the United States argues that Mr. Kaskalla and his subordinate Mr. Christensen, who revised the budget, were not ordered to support a $30 per acre charge,

---

[58] U.S. Response, at 34.

[59] When the Project Manager recommended a $15 per acre charge in September 2004, he stated his expectation that unobligated cash to begin FY 2005 would total about $2.6 million. FOF ¶¶ 85-56.

[60] FOF ¶ 83.

[61] FOF ¶¶ 87-92.

[62] U.S. Response, at 34-36. The United States asserts that the obligation of costs for China Flume during FY 2006 was legitimate, even though the work was not conducted until FY 2007. Regardless of the technical legitimacy of the Government's handling of this contract, it is notable that the work was contracted for just before the end FY 2006, only a few weeks after the District filed the complaint in this case.

[63] FOF ¶¶ 85-56.

[64] The Project actually began FY 2006 with over $4.0 million in surplus funds. FOF ¶ 75.

despite the facts.[65] Mr. Kaskalla was intimately involved in the decision to double the FY 2006 charge and no doubt exists that the charge was predetermined before the budget was prepared.[66]

For FY 2007, the United States estimated expenses at $3.5 million, with purported maintenance totaling nearly $1.5 million.[67] But the United States again ignored the fact that it had surplus cash more than sufficient to cover even these unreasonable and unnecessary costs.[68] Furthermore, the Secretary did not actually fix those charges at $30 per acre until April 2006.[69] By that time, the Secretary knew that the Project had ended FY 2005 with over $4.0 million in surplus cash.[70] He also knew that the Project currently had over $4.7 million in surplus cash and that the Project's FY 2006 costs would be far lower than anticipated.[71] Thus, it was completely unreasonable and a lack of good faith for the Secretary to fix FY 2007 charges at $30 per acre.[72]

The Acting Regional Director has previously admonished the BIA for manipulating budget numbers to justify excessive charges, in disregard of the facts:

> Based on the foregoing, it does not appear that the Project's FY 1998 O&M charges have been fixed based on an estimate of the total annual cost of the O&M of the Project. Rather, it appears that the Project first estimated what its annual income will be in FY 1998 based on the $30/acre assessment and other projected revenues and then projected budget expenditures, in both its normal budget categories and in its newly created budget category for special projects, to spend down the projected revenues.[73]

Despite this decision, the BIA has continued to intentionally distort the budget figures to justify O&M charges it does not need to operate the Project.

---

[65] U.S. Response, at 38.
[66] FOF ¶¶ 87-93. Mr. Kaskalla authored the October 1, 2004 letter from the Western Regional Director directing his staff to revise the budget. Mr. Kaskalla also authored the September 29, 2004 email informing his superiors in Washington that the FY 2006 charge would remain at $30 per acre. This email was transmitted a month before Mr. Kaskalla's revised budget was prepared. *Id.* and Exhibits 46-47; SFOF ¶ 33.
[67] U.S. Response, at 39; Exhibit 35.
[68] FOF ¶ 68 (FY 2005 began with over $2.5 million in unobligated cash reserves).
[69] FOF ¶ 128.
[70] FOF ¶ 75.
[71] FOF ¶ 122.
[72] The Project ended FY 2006 with $4.5 million in unobligated cash. FOF ¶ 110.
[73] FOF ¶ 46.

During the years cited by the United States as the basis for its cost estimates, surplus cash at the start of the fiscal year never fell below $2.5 million.[74] Past history should be used to estimate future income and expenses, but a reasonable person must consider the entire history, not just those portions that support a desired outcome. The BIA knew it had millions of dollars in surplus cash when it prepared the budgets for FY 2005 through 2007. If, as the United States now asserts, those cash surpluses represent pre-payments of O&M costs, then those surpluses should have been used to offset projected costs.

### 2. The BIA Failed to Include FY 2006 O&M Charges as Project Income in its FY 2005 Budget.

The BIA also knowingly underestimated income for FY 2005 by millions of dollars. In the June 2003 budget, O&M collections for the next fiscal year were excluded from the Project FY 2005 income stream, purportedly because the FY 2006 O&M charges had not yet been determined.[75] As a result, the proposed budget projected total income for FY 2005 at just $70,500, a figure preposterous on its face.[76] Even a cursory review of the facts demonstrates that the BIA easily could have better estimated the FY 2005 O&M charges:

- The United States has routinely projected O&M charges several years into the future in preparing its budgets.[77]
- The United States had estimated just two months earlier that FY 2006 charges would be set at $33 per acre, resulting in additional Project income of $3.3 million.[78]
- The United States relied upon previous years' cost history to estimate O&M costs for FY 2005, and could have just as easily relied upon previous years' income history to estimate charges to be collected during the year. Even excluding the collection of O&M charges, Project income from FY 1999 to FY 2002 averaged over $550,000.[79]

Thus, based on information available to the BIA at the time it prepared the FY 2005 budget, a reasonable estimate of Project income would have far exceeded $70,500. The decision

---

[74] SFOF ¶ 16.
[75] U.S. Response at 30; SFOF ¶ 10.
[76] *Id.*
[77] SFOF ¶ 7.
[78] SFOF ¶ 8.
[79] U.S. Response at 30.

to exclude O&M income from the budget was at the very least arbitrary and capricious, and quite probably was a knowing attempt to wrongly justify a $30 per acre charge by underestimating available Project income.

### 3. The BIA Excluded Reasonably Estimable Interest Income in its Projections.

The BIA included no interest income in the FY 2005 budget, supposedly because interest-earning cash reserves had been exhausted.[80] The purported basis for this decision has no basis in the facts because the BIA knew by April 2004 that cash reserves were not depleted and that it would earn interest on those reserves comparable to previous years.

The BIA also underestimated interest income for FY 2006, based on the illogical premise that millions in interest-earning cash reserves would be spent between October 2004 (when the budget was prepared) and September 2006 (the end of FY 2006) on required maintenance.[81] Actually, the BIA had allocated no funds for maintenance in FY 2004[82] and only about $410,000 was allocated for land, structures, and maintenance-related sinking funds for FY 2005.[83] With over $2.5 million in cash reserves, not counting O&M income, and less than $500,000 allocated for maintenance during this period, the United States' argument that the BIA believed it would receive little or no interest income in FY 2006 makes no sense.

### 4. O&M Charges Included Unauthorized or Unreasonable Costs.

The unauthorized cost of an archaeological survey at San Carlos Reservoir also artificially inflated the Project's costs. In response to objections from the District, the United States had previously justified these charges to the District as necessary to the defense of litigation brought by the Tribe, and it makes similar arguments in its response.[84] Although the

---

[80] U.S Response at 30; SFOF ¶ 10.
[81] U.S. Response at 38; SFOF ¶ 12.
[82] U.S. Response, at 34-35.
[83] SFOF ¶ 12.
[84] FOF ¶ 106; U.S. Response at 33 (citing *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860 (D. Ariz. 2003), *aff'd* 417 F.3d 1091 (9th Cir. 2005)).

court in that litigation did find that the Reservoir covered archaeological sites of significance to the San Carlos Apache Tribe, the United States fails to mention that the court rejected each of the Tribe's claims that the United States had a duty to survey or protect archaeological remains at the Reservoir due to daily Project operations.[85] Furthermore, the court's decision was filed on July 9, 2003, months before the Secretary fixed the FY 2005 O&M charges in April 2004. Thus, the United States knew then and knows now that it has no legal obligation to conduct archaeological work at San Carlos Reservoir and, therefore, no reasonable basis to charge the District for this work as O&M.

Charges for the well replacement program in the FY 2006 and FY 2007 budgets were not based upon a reasonable assessment of the need for those wells, as the United States asserts.[86] The District had objected in previous years that this program was unnecessary.[87] The "study" conducted by the Project Engineer and relied upon by the United States as evidence of the Government's rational consideration of this program was nothing more than a tally of when wells had been drilled over the life of the Project. There is no evidence in the record now, just as there was no evidence when the FY 2006 budget was prepared, that any of the Project's wells should be replaced. A well's age, by itself, is not an accurate indicator of whether the well needs to be replaced. In fact, the BIA's own well expert recommended that no wells be scheduled for replacement unless and until they failed and could not be repaired.[88] The program was never necessary and the BIA never spent a dime on the program.[89] Not surprisingly, however, the District was never refunded or credited the hundreds of thousands of dollars that it was charged for the program.

---

[85] *San Carlos*, 272 F. Supp. 2d at 884 ("The day to day operation of the dam is not a final agency action reviewable under the APA."). The court rejected the Tribe's claims based upon the National Historic Preservation Act (*id.* at 885); the Archaeological Resources Protection Act and the Native American Graves Protection and Repatriation Act (*id.* at 886-894); and breaches of the United States' trust responsibilities to the Tribe (*id.* at 894-897).

[86] U.S. Response, at 36-37.

[87] SFOF ¶¶ 4-5.

[88] FOF ¶ 88; SFOF ¶¶ 24.

[89] FOF ¶ 118.

The District agrees that budget estimates must be prepared through reasoned consideration of the Project's future needs and its income and obligation history. This did not happen for the years at issue, however. The BIA underestimated income, overestimated costs, and refused to consider the use of millions in surplus cash to offset O&M costs. These actions violated the United States' contractual obligations and the covenant of good faith and fair dealing, were an abuse of the Government's discretion to fix a key contract term, and were clearly unreasonable and unjustified not just in hindsight, but on the facts available to the BIA at the time of its decisions.

### C. The United States' Arguments Regarding Future Credits Are Contrived.

The BIA may charge landowners only what is reasonably needed to operate and maintain the Project for the year in question. If the BIA knowingly overcharges the District's landowners for a given year in violation of its contractual duties, the landowners have an immediate claim for damages. The BIA has no right to keep the money indefinitely, based on false promises that it will some day provide a credit in a manner and at a time of its own choosing.[90]

There is no precedent in the Federal Circuit requiring the United States to apply overcharges as a future credit, as the United States contends.[91] *San Carlos Irrigation and Drainage District v. United States*[92] does not dictate the sole remedy for the District to recover overcharges paid to the United States based upon unreasonable estimates of future O&M expenses. Nor does it preclude the District from obtaining damages in this case, as the United States asserts. At most, *San Carlos* stands for the proposition that the United States may apply electrical power overcharges as a credit against O&M expenses in future years.[93]

---

[90] *Elliott v. United States*, 877 F. Supp. 1569, 1581-82 (M.D.Ga. 1992) (the United States is not entitled to a reduction in damages against it based upon the value of "speculative and unknown" medical benefits that "the government 'may' provide in the future.").

[91] U.S. Response, at 18-19.

[92] 111 F.3d 1557 (Fed. Cir. 1997).

[93] The *San Carlos* court apparently believed the United States would act reasonably and provide credits in the future. That belief was obviously erroneous.

Nevertheless, the District has never opposed using surplus cash reserves to provide a credit on future years against Project O&M costs. Unfortunately, the United States repeatedly refused to provide a credit to the District for the years at issue, leaving the District with no recourse but to sue for relief.

**1. The BIA Has Refused to Provide a Credit in the Past.**

Between FY 1996 and FY 2007, the Project never ended the year with less than $2.1 million in surplus cash,[94] yet the BIA adamantly refused to use those funds to finance purported Project needs as a means to reduce O&M charges. No credit was provided in FY 2005 to help offset a rate increase of $10 per acre, even though the BIA knew it held millions in surplus cash when the charges were fixed.[95] Adding insult to injury, the BIA charged late payment penalties on the basis that the District had not paid the FY 2005 charges on time.[96] If, as the United States now asserts, that surplus cash represent pre-payments of O&M costs for future years, no penalties should have been assessed.

The same is true for FY 2006 and 2007. The BIA refused to use surplus cash reserves to help offset the Director's unilateral decision to double the FY 2006 O&M charge, after the District and Project staff had agreed $15 per acre was sufficient.[97] It also refused to apply a credit for FY 2007 to help offset $1.5 million in purported maintenance needs.[98] In February 2006, the District submitted a letter to the Western Regional Director specifically requesting that the BIA provide a credit for FY 2006 and reduce the FY 2007 charge (which had not yet been fixed by the Secretary) from $30 to $20 per acre to help spend down the surplus cash reserves. The Western Regional Director rejected the District's letter out of hand, citing the need to

---

[94] SFOF ¶ 16.
[95] SFOF ¶ 11.
[96] FOF ¶¶ 76-81.
[97] FOF ¶¶ 113-121.
[98] *Id.*

finance future maintenance needs as the basis for retaining the existing cash reserves and maintaining the existing $30 per acre charge.[99]

Thus, the BIA has repeatedly rejected the District's requests to provide a credit from overcharges paid in previous years, in clear contradiction of the Government's position in this case. The BIA never provided a credit in past years and it never intended to do so before the District filed its complaint.[100]

**2. The District Will Not Receive a Credit for FY 2008-2009.**

The District's damages will not be offset by a purported credit for FY 2008 and 2009, as the United States would have the Court believe.[101] The only evidence in the record that the Secretary fixed the $21 per acre charge with the intent of providing a credit against surplus cash reserves is the unsupported opinion of Mr. Shaw.[102] No document exists to such effect and no one from the United States, BIA, or Project ever informed the District that the O&M charge was being reduced with the intent of providing a credit to the District for previous overpayments.[103] Nor does the Federal Register notice of the Secretary's final decision mention the concept of a credit.[104]

Even if the United States did intend to provide a credit to the District, numerous facts should have made it clear that the BIA's proposed budgets would not meet that goal:

- The budget was based on O&M obligations totaling approximately $3.0 million per year through FY 2011, even though the BIA knew that, under the Arizona Water Settlements Act, it would be handing over control of most of the Joint Works to the Joint Control

---

[99] *Id.*

[100] SFOF ¶¶ 16 and 18. The United States may attempt to claim that a credit is being given for FY 2008 and 2009 because the BIA's budget shows that unobligated cash reserves will dwindle to $25,255 by the end of FY 2011. *See* SFOF ¶ 32. The BIA has made a practice of manipulating the budget to show depleted cash reserves in future years in order to justify larger O&M charges. SFOF ¶¶ 28-31. In actuality, the cash reserves have never fallen below $2.1 million since 1996. SFOF ¶ 16.

[101] U.S. Response, at 19-20.

[102] DA 158-59 ("Adoption of the $21 per acre rate would require the Project to make up a budget deficit for the year by spending down cash that had accumulated.").

[103] SFOF ¶ 21.

[104] BIA, *Rate Adjustments for Indian Irrigation Projects*, 76 Fed. Reg. 19950 (April 20, 2007).

Board no later than FY 2009, thereby greatly reducing its O&M costs.[105]

- The budget included only $100,000 in income from excess pumping, even though year-end figures presented in the budget indicated that excess pumping income averaged twice that amount over the previous seven years.[106]

- The budget included only $100,000 in interest income, even though the budget projected that the Project would end each year through FY 2010 with over $4.0 million in interest-earning surplus cash.[107]

- The budget allocated $307,000 to the heavy equipment sinking fund through 2011, even though the BIA would not be maintaining most of the Joint Works after 2009, thereby eliminating the need for major purchases of new equipment.[108]

Thus, the BIA should have known when it prepared the budget for FY 2008 and 2009 that the proposed O&M charge likely would not result in any significant reduction in cash reserves.

That is what the BIA knew then. But the United States is arguing that the District's claim in this case is somehow offset by this purported credit, so what we know now is even more important. On July 8, 2008, the Project provided the District a summary of income and costs to date for FY 2008. Through the end of June, with three-quarters of FY 2008 gone, the Project had spent only $1.8 million on O&M costs. Furthermore, the Project's cash reserves have actually *doubled* since FY 2008 began, from $2.1 million in September 2007 to $4.2 million in July 20008.[109] Assuming spending trends hold through the end of the fiscal year in September, the Project will spend only $2.1 to $2.2 million, not the $3.0 million the BIA had projected. This means the O&M charge of $21 per acre will cover all or most of the Project's costs for the year, with no reduction in surplus cash.

Based on these numbers, the United States' assertion that the District will be compensated by credits applied in FY 2008 and 2009 clearly lacks merit.[110] The District is still

---

[105] R. Shaw, *Irrigation Division Budget, Draft 2* (April 20, 2006) (Exhibit 76).

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] SFOF ¶ 15.

[110] It is highly unlikely the Project will incur over $3.0 million in costs during FY 2009, as the United States projected, because the Joint Control Board will take over operation and maintenance of most Joint Works facilities before the end of the third quarter of FY 2009. U.S.

paying its full share of the Project's actual O&M costs while the cash surpluses remain untouched and under BIA control. The only way the District will ever be properly compensated for past overpayments is for the Court to award the District its damages in this litigation.

**3. The Transfer of Remaining Project Reserves to the Joint Control Board Will not Compensate the District for Past Overcharges.**

The District will not be adequately compensated if and when the Project's remaining cash reserves are turned over to the Joint Control Board under the Arizona Water Settlements Act, as the Government contends.[111] First, the transfer of money from the Project to the Joint Control Board does not equate to the payment of a credit, refund, or damages to the District. The Board will be an independent organization controlled, in part, by representatives of the Gila River Indian Community. Neither the District nor its landowners will have full authority over the disposition of funds transferred to the Board, as they would over funds transferred to the District. The transfer of funds to a third party does not make the District and its landowners whole.

Second, the United States would have the Court assume that all of the reserves will transfer to the Board. That is doubtful. The United States has only agreed to transfer financial reserves that are not "necessary to accomplish the continuing responsibilities of the United States . . . ."[112] The United States has offered no proposals or estimates of how much money it will claim necessary to the continued operation of the irrigation works remaining under its control, such as Coolidge Dam. Given past history, there is ample reason to believe that the United States will find that it needs to keep a substantial portion of the cash reserves, such that there is not enough transferred to the Board to offset the District's previous overpayments.[113] Thus, the

---

Response, at 20. At most, the Government's assertions regarding a credit for FY 2009 are speculative and unsupported by the facts of this case.

[111] U.S. Response, at 20-21.

[112] *Id.* at 20; DA 14.

[113] The BIA recently attempted to spend the cash reserves on a new $8.0 million office building, before withdrawing its proposal in response to the District's objections. FOF ¶ 130.

United States' argument is based on speculative future events that do not directly compensate the District and its landowners for the damages claimed in this case.

The Project has carried over massive cash surpluses for at least the last twelve years.[114] Despite repeated requests for credits or refunds from the District, the BIA refused to provide a credit and no evidence exists that it will happen in the future. The United States has no authority to assess unreasonable O&M charges that far exceed the Project's needs in the year at issue, then keep those funds indefinitely. The District and its landowners have been damaged by these excessive charges and vague promises of a credit in future years are not an adequate remedy.

## III. The United States' Accounting Practices Are Inaccurate and Misleading.

The District has described in its motion the numerous flaws in the BIA's accounting practices and the resultant difficulty in understanding exactly what the agency is doing with the money paid by the District's landowners.[115] The fact that the Project provides monthly budget updates does not help the District reconcile the numerous inaccuracies, inconsistencies, and contradictions that appear in the BIA's budgets and financial data each year. The fact that the United States generates tons of paper through its accounting and budget system does not mean that the documentation provided to the District represents a "full and accurate" account of the Project's finances.

The District is not seeking to "exploit the abundance of information that the Project provides."[116] Although the information that the BIA provides may be abundant, there is no basis for claiming that the information is accurate. Quantity does not imply quality. The District's complaint is with the abundance of *inaccurate information*. Whether intentional or not, the inaccurate and misleading information provided by the BIA continually misrepresented the need for higher O&M charges during the years at issue.

---

[114] SFOF ¶ 16.

[115] *See, e.g.*, District Motion, at 23-25; FOF ¶¶ 129, 131, and 135.

[116] U.S. Response, at 43.

Although the United States criticizes the District accounting expert, Mr. Larry Field, the United States presents no expert of its own to defend its practices. The only support it can muster is a conclusory opinion from Mr. Shaw that the budget is prepared in accordance with the laws and contracts governing the Project and a statement from Mr. Shaw that he relies upon financial data generated by the Federal Finance System in preparing budgets.[117] Mr. Shaw is an engineer, not an accountant.[118] His opinion regarding the legitimacy of the Government's records is entitled to little deference.

On the other hand, the opinion of the District's expert cannot be discounted, as the United States suggests. The United States distorts the record in an attempt to discredit Mr. Field, providing selected portions of Mr. Field's deposition to support an argument that "Mr. Field admitted that he did not know anything about the documents that he reviewed."[119] What Mr. Field actually said was, although he did not know why particular documents were prepared in the first place, he did know that they ultimately were provided to the District in support of Project budgets and O&M charges.[120] This second use of the documents is what Mr. Field based his opinion upon. Why the BIA prepared certain documents is irrelevant. The issue is whether the documents provided to the District, regardless of their original purpose, were correct representations of Project finances and whether the information provided, as a whole, portrayed an accurate and complete picture of the basis for the BIA's budget decisions. Clearly, it did not.

Furthermore, the District did not need to obtain an expert on the Federal Finance System to demonstrate the flaws in the Project's records. The United States criticizes Mr. Field as lacking expertise regarding the Federal Finance System, but knowledge of that system is irrelevant. The financial reports provided to the District and reviewed by Mr. Field were not Federal Finance System records, but were spreadsheets and tables prepared by engineers and

---

[117] U.S. Response, at 45.
[118] DA 142.
[119] U.S. Response, at 45.
[120] SFOF ¶ 27. The United States left clarifying language out of its selection from Mr. Field's deposition.

other non-accountants that were presented to the District as an accurate reflection of the Project's finances. As Mr. Field states, under *any* reasonable standard of accounting, the records provided by the BIA and Project are not "reliable, relevant, and representationally faithful."[121] His years of experience as a forensic accountant and certified public accountant qualify him to assess whether the Project records provided to the District to justify budgets and O&M charges were reasonable under basic and universal accounting standards.

Of course, the Court need not take Mr. Field's word alone. As the District has pointed out, the Acting Regional Director with authority over the Project concluded over ten years ago that the United States' records contained "huge unexplained variations" and that the Government had failed to explain inconsistencies and variations in its budgets.[122] Just two years ago, the General Accounting Office reviewed the Project's operations and concluded that: (1) "Turnover of BIA staff and lack of water user inclusion in project decisionmaking impedes effective communication;" and (2) "BIA lacks accountability to water users in terms of how it spends operations and maintenance fees."[123] Thus, the United States' conclusory and unsupported statements that its accounting practices are reasonable and accurate cannot withstand scrutiny in the face of opinions to the contrary from an outside accounting expert, the General Accounting Office, and the BIA's own Regional Director.

## CONCLUSION

The United States has admitted that it has a duty to fix O&M charges based upon a reasonable estimate of the Project's actual needs. It has admitted that the Project accumulated huge cash surpluses because its O&M charges exceeded the Project's needs and that those cash surpluses should be treated as prepayments of O&M expenses by the District. The Government also has admitted that it has never given a credit or refund to the District in the past, but promises to do so at some uncertain point in the future. Taken as a whole, the United States' pleadings are

[121] FOF ¶ 135.
[122] FOF ¶ 22.
[123] SFOF ¶ 26.

an admission that it owes the District for past overpayments that have resulted in the buildup of millions of dollars in surplus cash in the Project's hands.

Given these admissions, this dispute should have been resolved long ago. But for whatever reason—be it fear of an unfavorable precedent, bureaucratic intransigence, or some other reason unknown to the District the Government refuses to return the money that it admits it owes. Unfortunately, in attempting to defend the indefensible, the United States has been forced to rely on a series of arguments and positions that are not only internally inconsistent, but are completely contradictory to the BIA's past actions and the undisputed facts of this case.

The United States breached its contractual obligations by failing to timely fix the O&M charge for FY 2005-2007. When that breach prevented the District from paying the FY 2005 charge on time, the BIA tacked on a late payment charge, even though the Government now argues that the District had actually pre-paid the charge with overpayments in previous years. The United States has not explained the contradiction between its position in 2005 and its position now. The only defense the Government can offer is that the District was timely "notified" of the charge by preliminary budget proposals from local BIA and Project staff. The Repayment Contract does not require the District to rely on preliminary assessments of the Project's future needs that are subject to change or outright rejection by higher ranking officials. The Contract requires the Secretary of the Interior to notify the District that the O&M charge has been fixed so that the District and its landowners will know what those costs are as they plan their own budgets for the coming year.

The United States also breached its contractual obligations, including the implied covenant of good faith and fair dealing, in fixing O&M charges at unreasonably high levels far in excess of the Project's actual needs. Whether viewed in light of the facts known at the time or in hindsight, the Government's budgets and O&M charges were unreasonable; ignored material facts that significantly impacted the BIA's projections and estimates; and were based on records and data that lacked basic financial integrity. Most importantly, the budgets and charges were prepared without taking into account millions of dollars in surplus cash that

could have been used to offset Project costs. As of the filing of this brief, the United States still holds over $4.0 million in surplus cash that it accumulated by overcharging the District.

The United States has never given the District a credit or refund for overpayments in the past and it has no intention of doing so today. The promise of future credits is unsubstantiated and contrived, a litigation position and nothing more. The United States abused its discretion and violated contractual obligations by overcharging the District for O&M and then refusing to refund or credit overpayments. The material facts are not in dispute and the District is entitled to its claimed damages of $1,547,500 as a matter of law.

DATED this 24th day of July, 2008.

By:

Riney B. Salmon II
SALMON, LEWIS & WELDON, P.L.C.
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016
(602) 801-9060 (office)
(602) 801-9070 (facsimile)
*Attorneys for Plaintiff*

Certificate of Filing

I certify that on July 24, 2008, a copy of the foregoing "PLAINTIFF'S REPLY AND RESPONSE TO DEFENDANT'S CROSS-MOTION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ RINEY B. SALMON
Riney B. Salmon