**Case No. 1:06-cv-00576-LB** **Electronically filed 07/24/08**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 06-576C<br>(Judge Block)<br><br>Plaintiff's Supplemental Proposed Findings of Uncontroverted Fact |

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, the San Carlos Irrigation and Drainage District ("District") submits Supplemental Proposed Findings of Uncontroverted Fact in support of its Reply and Response to the Defendant's Cross-Motion, filed concurrently herewith.

**The 1924 Act**

1. Section 5 of the San Carlos Project Act of June 7, 1924 states "The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of the Act into full force and effect . . . ."[1]

**The Acting Regional Director's 1997 Decision**

2. In regard to whether notice of the FY 1998 O&M charge was proper, the Acting Regional Director stated in his 1997 decision:[2]

> 1. The Contract provides that O&M charges for the Joint Works shall be fixed annually by the Secretary. Based on the following, I do not believe that reliance on the 1995 Federal Register Notice issued by the Assistant Secretary for Indian Affairs setting the O&M assessment rate for the 1995 irrigation season and subsequent seasons is consistent with this Contract provision.

---

[1] San Carlos Project Act of June 7, 1924, 43 Stat. 475-76 (Exhibit 4).

[2] *Decision of the Acting Area Director Regarding Notice of Appeal of the FY 1998 San Carlos Irrigation Project O&M Assessment Submitted by the San Carlos Irrigation and Drainage District*, at 13-16 (January 10, 1997) (Exhibit 18).

This contract provision is an outgrowth of the Secretary's authority in the 1924 Act “to perform any and all acts . . . as may be necessary and proper for the purpose of carrying out the terms of the Act,” and further defines the duty of the Secretary set forth in the Landowners’ Agreement to fix the operation and maintenance charges from time to time.

Attached to Exhibit 5 of SCIDD’s Statement of Reasons is a copy of the January 23, 1995, Federal Register Notice of the Assistant Secretary for Indian Affairs regarding the project’s O&M assessment rate. The introductory paragraph of the Notice states that the BIA is decreasing the Project’s Joint works O&M assessment rate from $35 to $30 per assessable acre <u>for the 1995 irrigation season and subsequent seasons</u> (emphasis added). In a subsequent paragraph the Notice states that the basic assessment rate for the operation and maintenance of the Joint Works only <u>for FY 1995</u> (emphasis added) is hereby fixed at $30 per assessable acre of land, and reference is made to the 1924 Act, the 1931 Repayment Contract, and the 1938 Joint Works Order.

Regardless of the disparity within the Notice on this point, the record reflects that the Project interprets the Notice to establish an O&M rate of $30 per acre for an indefinite period of years, contrary to the requirement in the Contract. In the Memorandum to the Project Engineer from the project’s Supervisory Civil Engineer dated November 7, 1996, and submitted to this office in response to the Appeal, the Project’s Supervisory Civil Engineer states that the project:

> “meets with the water users formally at Fact Finding meetings during the year to discuss mutual concerns . . . . Assessment rates are rarely discussed since they remain constant and do not vary year to year. Assessment rates are not set or adjusted by the SCIP Project Engineer nor by the Phoenix Area Director.”

On page 7 of the same Memorandum, the project's Supervisory civil Engineer reiterates:

> “The project does not set the per acre assessment each year. . . . Based upon recommendations from the project, the Secretary of the Interior from time to time sets the assessment per acre for operation and maintenance of the Joint Works, as per applicable laws, agreements, and regulations applicable to the Project.”

The project's Supervisory civil Engineer goes on to point out that the authority to set or adjust Project O&M rates has been delegated by the Secretary of the Interior down only to the Assistant Secretary for Indian Affairs.

The project has accurately stated the authority within the Department to fix the project's O&M rates. However, I do not believe that the issuance of a Federal Register Notice purporting to fix the O&M charges for the 1995 irrigation season “and subsequent seasons” complies with our obligation under the Contract to fix the O&M charges annually. It is my view that immediate steps should be taken to prepare a Federal Register Notice for approval by the Assistant Secretary for Indian Affairs that would supersede the January 23, 1995, Notice and would propose to fix the O&M assessment rate for FY 1998 only. It is further my view that the O&M assessment rate be fixed by annual notice rather than by a notice which continues indefinitely into future years.

With regard to the Project's role in the establishment of the annual O&M assessment rate, I concur with the statement of the Acting Project Engineer that the project's "role in fixing the Project's assessment is limited to the conduct of studies to determine if rate adjustments should be undertaken, and the reporting of findings, conclusions and recommendations."

2. The Contract requires the Secretary to give notice to SCIDD of the amount of charges to be paid annually in sufficient time to permit SCIDD to make the annual tax levies and to comply with the laws of the state of Arizona relating to the levy and collection of taxes by irrigation districts. Based on the following, it is my view that the Project's final recommendation to this office regarding the FY 1998 O&M assessment rate and budget is not consistent with this Contract provision.

Exhibit 3 of SCIDD's Statement of Reasons is a June 26, 1996, letter from SCIDD informing the Project that on June 25, 1996, SCIDD's Board approved a $20 per acre assessment for FY 1998. SCIDD's action was based on:

* SCIDD's dissatisfaction with the Project's May 7, 1996, response (Project Exhibit 3) to SCIDD's April 9, 1996, comments (SCIDD's Exhibit 1) on the March 6, 1996, Fact Finding meeting about the proposed O&M budget for FY 1998;

* the Project's failure to address SCIDD's June 12, 1996, comments (SCIDD's Exhibit 2) on the May 22, 1996, Fact Finding meeting about the FY 1998 proposed O&M budget; and

* the Project's failure to respond to SCIDD's proposal for an O&M budget for FY 1998 based on a $20 per acre assessment as set forth in SCIDD's June 12, 1996, letter to the project.

SCIDD's June 26 letter also reminded the Project of SCIDD's duty to make landowners' assessments by July 1 in order to allow sufficient time for the county assessor to process and collect the landowner payments.

Exhibit 4 of SCIDD's Statement of Reasons is a one page letter from the Project Engineer to SCIDD dated June 27, 1996, (stamped "hand delivered") informing SCIDD that the Project concluded the FY 1998 Joint Works O&M assessment should remain at $30 per acre. Exhibit 5 of SCIDD's Statement of Reasons contains a one page letter dated June 28, 1996, from the Project to SCIDD in response to SCIDD's June 12 and June 26, 1996, letters regarding the FY 1998 O&M assessment, as well as a copy of the January 23, 1995, Federal Register Notice, a revised O&M budget for FY 1998 prepared by the project, and a Memorandum from the Project to my office setting forth the basis for the project' s recommendation that the O&M assessment remain at $30 per acre for FY 1998. The Project's June 28, 1996, letter states that draft minutes of the two Fact Finding meetings would be available within one week but the administrative record does not include these draft minutes or any final minutes.

Consistent with my decision above that the O&M charges should be fixed annually, it is my view that notice to SCIDD regarding the project's final recommendation to this office on the FY 1998 O&M assessment rate and budget, which is dated less than a week prior to July 1 and was provided to SCIDD after the date of its June Board meeting, is not consistent with our obligation in the Contract to give SCIDD notice of the amount of charges to be paid annually in sufficient time to

permit SCIDD to make the annual tax levies and to comply with the laws of the State of Arizona relating to the levy and co11ection of taxes by irrigation districts.

3. Following the issuance of the Acting Regional Director's decision, the Project Engineer forwarded a schedule for establishing the FY 2000 budget. The last action item in that schedule reads "Send/submit recommendations and proposed final FY 2000 Budget package to Phoenix Area Director. Complete May by 28, 1998 (*sic*)."[3]

**The District's Previous Comments on the Deadline for Fixing the O&M Charge**

4. The District filed comments on November 26, 2003 regarding the proposed $30 per acre charge for FY 2005. In Section III (*Timing of the Budget Review Process*) of those comments, the District made the same basic argument regarding the Secretary's duty to timely fix O&M charges that it is making in this litigation.[4] The District also requested that the Project spend no funds on well replacement for FY 2003 through FY 2005.[5]

5. On April 1, 2005, the District filed comments on the proposed O&M charge for FY 2006. In those comments, the District repeated its argument regarding the Secretary's duty to timely fix O&M charges.[6] The District also complained that funds allocated for well replacement had not been adequately explained or justified.[7]

6. The District filed comments on the proposed budget and O&M charge for FY 2007 on December 1, 2005, again arguing that the Secretary's failure to timely fix the O& charge was in breach of contract.[8]

**The Project's Budget Proposals and Summaries**

7. The BIA routinely estimates Project income several years into the future in preparing budget proposals and spreadsheets.[9]

---

[3] Letter from Ralph Esquerra to Douglas Mason (December 1, 1997) (Defendant's Appendix 1).
[4] Letter from Riney B. Salmon II to Jeff Lowman, Acting Director, BIA Office of Trust Responsibilities, at 23-24 (November 26, 2003) (Exhibit 30).
[5] *Id.* at 15.
[6] Letter from Riney B. Salmon II to Arch Wells, at 18 (April 1, 2005) (Exhibit 52).
[7] *Id.* at 14-15.
[8] Letter from Riney B. Salmon II to Arch Wells, at 7 (December 1, 2005) (Exhibit 69).

8. On April 1, 2003, the BIA prepared a budget spreadsheet for FY 2005 that projected FY 2006 charges would be fixed at $33 per acre.[10]

9. On June 6, 2003, the BIA prepared a budget spreadsheet for FY 2005.[11] This was the data used by the BIA in proposing a $30 per acre charge to the Secretary.[12] This spreadsheet projects that the Project would have surplus cash on hand totaling approximately $3.9 million at the start of FY 2003; $3.2 million at the start of FY 204; and $3.7 million at the start of FY 2005.[13]

10. The June 6, 2003 budget also shows no income from O&M charges or interest income during FY 2005. Total projected income for FY 2005 is projected at $70,500.[14]

11. On May 8, 2004, the Project prepared a monthly budget summary showing the Project's income and expenses. This summary indicates that unobligated cash at the end of March totaled $3,097,327.[15]

12. On October 28, 2004, the BIA prepared a budget spreadsheet that project interest income of $19,000 for FY 2006. This spreadsheet included an allocation of $410,000 for land and structures during FY 2006.[16]

13. On December 12, 2006, the BIA prepared a budget spreadsheet that depicted actual year-end figures from 1999 to 2006. This spreadsheet shows that the Project ended FY 2003 with over $3.9 million in surplus cash.[17]

---

[9] *See, e.g.*, R. Kaskalla, C. Christensen, *Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 35) (projecting income through FY 2010); C. Christensen, *Irrigation Division Budget* (June 22, 2004) (Exhibit 44) (projecting income through FY 2008); Budget Spreadsheet (April 20, 2006) (Exhibit 76) (projecting income through 2011).

[10] C. Christensen, *Irrigation Division Budget* (April 1, 2004) (Exhibit 31).

[11] R. Shaw, C. Christensen, R. Kaskalla, *Proposed Irrigation Division Budget* (June 6, 2003) (Exhibit 34).

[12] Affidavit of Randy Shaw, ¶ 15 (June 10, 2008) (Defendant's Appendix 4, at 142).

[13] R. Shaw, C. Christensen, R. Kaskalla, *Proposed Irrigation Division Budget* (June 6, 2003) (Exhibit 34).

[14] *Id.*

[15] Carl Christensen, *FY 2004 Irrigation Budget* (May 8, 2004) (Exhibit 78) (Plaintiff's Supplemental Appendix ("PSA"), at 1).

[16] R. Kaskalla, C. Christensen, *Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 35).

[17] A. Riggs, *Operation and Maintenance Budget* (December 12, 2006) (Exhibit 74).

14. The December 12, 2006 budget spreadsheet projects O&M costs of approximately $3.0 million through 2011. Interest income is projected at $100,000 each year, as is income from excess pumping. The spreadsheet allocates $307,000 to the heavy equipment sinking fund between FY 2008 and FY 2011. The spreadsheet projects that the Project would end each year through FY 2010 with over $4.0 million in cash reserves.[18]

15. On or around July 8, 2008, the BIA provided the District with a budget summary for the Project through June 2008.[19] That summary indicated that the Project's unobligated cash on June 30, 2008 totaled $4,244,392. This total does not include $2.1 million in O&M assessments due from the District and Indian lands for FY 2009. Total Project obligations through June 30, 2008 totaled $1,807,171, or 54 percent of projected obligations under the approved budget.[20]

16. Attached to the summary budget was a table depicting the surplus cash in the Project's account on a monthly basis from September 1996 to June 2008. The lowest monthly total was $1.2 million and the highest was monthly total was $6.8 million. Between FY 1996 and FY 2007, the Project never ended the year with less than $2.1 million in surplus cash. Between 1999 and 2004, surplus cash at the start of the fiscal year never fell below $2.5 million. The average amount of surplus cash at year's end over those twelve years was $3.8 million.[21]

**The BIA's Irrigation Handbook**

17. The BIA's Irrigation Handbook states:

> It is recommended that all projects use table 2 to estimate the amount of funds that should be maintained in the project reserve account at all times. The guidelines in table 2 provide a range of values. At their discretion, the Regional Director and/or the Official in-Charge of any project may determine that, due to unusual circumstances, project reserves should be maintained at a higher amount. If this is determined, the proposed amount and supporting documentation should be provided in writing and kept on file at the irrigation project. The O&M reserve requirement should be supported by a supplementary schedule and be factored into the rate calculations that are entered into FPP-6.

---

[18] *Id.*

[19] Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) (Exhibit 79) (PSA 2).

[20] *Id.*

[21] *Id.*

The referenced Table 2 indicates that the Project should maintain a reserve of $700,000 to $900,000.[22] The Project Irrigation Manager has stated that the Irrigation Handbook is followed without deviation in O&M budget preparation and analysis.[23]

**Credit for District Overpayments**

18. Carl Christensen, the current Project Irrigation Manager, has stated the following in regard to the Project giving a credit from previous overpayments by the District:

> Q. Well, if, for one year, you budget $2 million, let's say, for operation and maintenance charges, and that's a part of your basis for establishing your rate, and you don't spend 2 million, you spend a million and a half, that's a half-a-million savings. Do you understand?
>
> A. Yes.
>
> Q. Okay. Why isn't that half a million dollars carried forward to reduce the next year's projected or budgeted operation and maintenance expense?
>
> A. We have never done that at the San Carlos Irrigation Project.[24]

19. Mr. Christensen later explained that, in his opinion, the District's landowners were better off letting the United States keep their money because it earned interest in the Treasury account that would be used to benefit the Project.[25]

20. In regard to the Regional Director's February 2006 decision to reject the District's proposal for providing a credit from the Project's cash surpluses, Catherine Wilson, Supervisory Water Rights Specialist for the BIA's Western Regional Office, stated:

> Q. And Mr. Anspach is, I believe -- my interpretation is that he's setting forth reasons as to why SCIDD cannot be given a credit for -- from one year's assessment collection. Do you see that in that paragraph?
>
> A. Yes.
>
> Q. Okay. Now, he gives examples in the last two or three sentences. Do you see where he starts out "for example"?
>
> A. Yes.

---

[22] BIA, *Irrigation Handbook*, Chapter 12, "Financial Management," at 95-96 (May 2002) (Exhibit 13A).
[23] Deposition of Carl Christensen, at 10-12 (October 1, 2007) (Exhibit 80) (PSA 6-8).
[24] Deposition of Carl Christensen, at 115 (October 1, 2007) (Exhibit 80) (PSA 9).
[25] *Id.* at 124-127.

Q. Okay. “. . . project’s O & M activities include a well replacement program.” What’s your understanding as to what that reference means? A. The project has 98 irrigation wells that provide a significant portion of the water supply to the project when surface supply is short. And we have a well replacement program to make sure that we are able to respond when -- if and when one of our wells goes down.

Q. Now, was there such a well replacement program in effect at this time?

A. Yes.

Q. Has, to your knowledge, to the present date, any money been spent on that well placement program?

A. The well replacement program has been modified in response to SCIDD’s and possibly other water user comments to us, I think a year ago June. And the well replacement program is as it was approximately June 2006, as discussed with the water users in June 2006.

Q. But has any money been spent on that well replacement program yet?

A. Not that I’m aware of.

Q. And so what is the arrangement, if I may use that word, with respect to the implementation in the future, I guess, of the well replacement program?

A. My last recollection of what that is, is in the June 2006 spreadsheet O & M budget, where there are several worksheets that describe the status of the wells, cost to replace, possible locations, and how the project would propose reserving enough funds for that. And I would just defer to that spreadsheet because I don’t recall all the specifics of it.

Q. Okay. Was that a spreadsheet that was perhaps prepared by Randy Shaw?

A. Yes.

Q. And was, perhaps, Randy Shaw’s conclusion that the well replacement program was not necessary at the time or could be delayed? Something of that nature?

A. In his assessment as of June 2006 or thereabouts, is that what you're referring to?

Q. Yes.

A. After we had those extensive fact-finding meetings with the water users and discussion of Randy’s extensive research on well replacement issues, I believe the project accepted his recommendations about what that well replacement program should look like. And, again, I refer you back to that spreadsheet and all the work tabs for the details.

Q. Okay. What is the current intention, if you can tell me, of the project with respect to the well replacement program?

A. I don’t know the answer to that question.

Q. And who would know the answer to that question?

A. I assume the project engineer -- the irrigation engineer would be the first place to start.

Q. Okay. Mr. Anspach also refers to a well abandonment project in here, Cathy. Can you tell me what is your understanding of this well abandonment program?

A. My understanding of the well abandonment program is that we have a number of wells -- project wells that used to provide irrigation water but have been abandoned over the years, which are just still out in the fields.
And we -- the project has, on its list of things to do, go out and GPS-identify these sites and take care of them so they're not a safety problem or so that they're properly abandoned.

Q. Has that been done yet?

A. No.

Q. What is the schedule for that to be done?

A. The latest schedule that I've heard is, hopefully, in fiscal year 2008. The project is relying on regional staff to help with that effort due to staff shortages at the project. So we have regional staff in my office who are planning to try to take care of that project this year.

Q. I see. Okay. Mr. Anspach also refers to ". . . a condition assessment study discussed" -- excuse me – "directed by the Assistant Secretary" -- initial caps -- "for Indian Affairs . . ." -- initial caps, close quotes. Do you see that?

A. Yes.

Q. What is your understanding of this condition assessment study?

A. My understanding of the condition assessment study is that the assistant secretary for Indian affairs has asked the Central Office irrigation staff to calendar in condition assessment studies for every revenue-generating irrigation project in BIA.

Q. Is this a SOD program?

A. No.

Q. And why isn't it a SOD program?

A. It's a condition assessment study for the irrigation project, which in SCIP's case would include Coolidge Dam and reservoir but isn't a safety program; it's a condition assessment for the irrigation facilities.

Q. Has that ever been done -- a study?

A. Not at SCIP, no.

Q. And do you know why?

A. I don't know why.

Q. What is the current intention, if you know?

A. I believe it's still on the plans to accomplish at some point.

Q. I see.[26]

21. The District was never informed by the BIA or the Project, in writing or verbally, that the United States intended to provide a credit against District overpayments in previous years when it fixed the O&M charge for FY 2008 and FY 2009 at $21 per acre.[27]

**Well Replacement Program**

22. Project wells installed during the 1950s through the 1980s were installed to increase pumping capacity and were generally paid for with appropriated funds, not O&M charges.[28]

23. The District opposed the BIA's well replacement program primarily because the BIA was proposing to replace wells based on age, even if the well was working well and producing at an adequate capacity. The District also was opposed to installation of new wells without removing any old wells from service, as such action represents a betterment, not O&M, for which the District cannot be charged without its approval.[29]

24. In discussions regarding the FY 2008 budget, the District requested that Randy Shaw discuss well replacement with the Project's well expert, Gary Weenser. Mr. Weesner advised the Project to wait to replace a well until it actually fails and cannot be repaired. Mr. Weesner advised against a well replacement program based solely on the age of the well.[30]

25. The District has experienced well failures at newer wells in its system, while older wells continued to pump at capacity. This indicates that age alone does not determine whether a well should be replaced.[31]

---

[26] Deposition of Catherine Wilson, at 51-55 (October 2, 2007) (Exhibit 81) (PSA 14).
[27] Affidavit of Douglas Mason (July 21, 2008) (Exhibit 82) (PSA 24).
[28] *Id.* (PSA 25).
[29] *Id.*
[30] *Id.*
[31] *Id.*

**Project Audit**

26. In 2006, the General Accounting Office issued a report to the United States Senate regarding, among other things, shortcomings in the BIA's management of its irrigation projects. That report included a profile of the Project. Among the GAO's conclusions were that: (1) "Turnover of BIA staff and lack of water user inclusion in project decisionmaking impedes effective communication;" and (2) "BIA lacks accountability to water users in terms of how it spends operations and maintenance fees."[32]

**Expert Testimony**

27. In regard to the purpose and use of budget documents supplied to the District by the Project, Mr. Fields stated the following:

> Q. Wouldn't you need to know the purpose for each – for which each document you looked at was prepared in order to know whether they all should be consistent?
>
> A. I don't think I need to know that, no.
>
> Q. Why not?
>
> A. Because you asked me the purpose for which they were prepared. I don't know the purpose for which they were prepared. I know that these documents ultimately ended up in SCIDD's hand as a part of a discussion of ongoing discussion about assessment rates. So I know it was used for that purpose. You asked me if I knew how it was originally prepared. I don't know.[33]

**BIA Projections of Future Cash Surpluses**

28. In a budget prepared April 1, 2003, the BIA projected that the Project's surplus cash at the end of FY 2004 would total $1,072, 144.[34] Total surplus cash at year's end actually totaled $2,597,348.[35]

29. In that same April 1, 2003 budget, the BIA projected that the Project's surplus cash at the end of FY 2005 would total only $90,776.[36] A week later, the BIA revised the budget,

---

[32] General Accounting Office, Publication No. GAO-06-314, *Indian Irrigation Projects: Numerous Issues Need to be Addressed to Improve Project Management and Financial Sustainability*, at 47 (February 2006) (Exhibit 83) (PSA 29).

[33] Deposition of Lawrence Field, at 128 (January 17, 2008) (Exhibit 85) (PSA 38).

[34] R. Shaw, *Irrigation Division Budget, San Carlos Irrigation Project* (April 1, 2003) (Exhibit 23).

[35] Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) Exhibit 79 (PSA 2).

[36] R. Shaw, *Irrigation Division Budget, San Carlos Irrigation Project* (April 1, 2003) (Exhibit 23).

projecting that the Project would end FY 2005 with only $31,776.[37] In October 2004, after FY 2005 had started, the BIA projected it would end the year with $203,344 in surplus cash.[38] Actual surplus cash at the end of FY 205 totaled over $4.0 million.[39]

30. In October 2004, the BIA projected that the Project would end FY 2006 with only $872,813 in surplus cash.[40] The actual total was approximately $3.4 million.[41]

31. In October 2004, the BIA projected that the Project would end FY 2007 with a deficit of $238,976.[42] The Project actually ended the year with $4.1 million in surplus cash.[43]

32. In its April 20, 2006 budget proposal, the BIA projected that cash reserves would be depleted over future years, such that surplus cash at the end of FY 2011 would total only $25,255.[44]

**BIA Revision of the FY 2006 Budget**

33. Mr. Kaskalla, a civil engineer on the staff of the Western Regional Office in 2004, has testified that he authored the September 29, 2004 email directing that the BIA publish a proposed rate of $30 per acre for FY 2006 and the subsequent October 1, 2004 memorandum from the Western Regional Director directing the Project to revise the budget.[45]

**The O&M Budget Approval Process**

34. Ms. Wilson, Supervisor of the Division of Natural Resources for the BIA's Western Regional Office with direct authority over the Project, has stated in regard to the process of publishing proposed and final notices of annual O&M charges for the Project:

> Q. I see. Okay. How about the fixing of the O & M charges for the project for particular fiscal years? What's your involvement with that?

---

[37] Randy Shaw, *FY 2005 Budget Draft 3* (April 10, 2003) (Exhibit 32).

[38] R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).

[39] Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) Exhibit 79 (PSA 3).

[40] R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).

[41] Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) Exhibit 79 (PSA 3).

[42] R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).

[43] Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) Exhibit 79 (PSA 3).

[44] R. Shaw, *Irrigation Div. Budget, Draft 2* (April 20, 2006) (Exhibit 76).

[45] Deposition of Russell Kaskalla, at 38-40 and 52-54 (October 3, 2007) (Exhibit 84) (PSA 31-36).

A. The annual O & M rate for the project -- for all of our revenue-generating projects are developed originally at the project level, by staff, whether it's SCIP or other revenue-generating projects. And a recommendation is made by the project staff on what the annual rate should be. It is sent through our regional office and then on to the assistant secretary for Indian affairs office for publication in the Federal Register as a proposed rate --

Q. Uh-huh.

A. -- for public comment. And eventually, then the assistant secretary for Indian affairs will set the final rate for all of the revenue-generating projects nationwide.

. . .

Q. What is your understanding as to the purpose of a proposed rate being published in the Federal Register?

A. It's my understanding that the purpose of a proposed rate being published in the Federal Register is to provide the public or the affected water users the chance to review and comment to the assistant secretary on the proposed rate.[46]

DATED this 24th day of July, 2008.

By: /s/ RINEY B. SALMON
Riney B. Salmon II
SALMON, LEWIS & WELDON, P.L.C.
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016
(602) 801-9060 (office)
(602) 801-9070 (facsimile)
*Attorneys for Plaintiff*

[46] Deposition of Catherine Wilson, at 12 and 37 (October 2, 2007) (Exhibit 81) (PSA 15-16).

Certificate of Filing

I certify that on July 24, 2008, a copy of the foregoing "PLAINTIFF'S SUPPLEMENTAL PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ RINEY B. SALMON
Riney B. Salmon

I