Case No. 1:06-cv-00576-LB Electronically Filed 07/24/08

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 06-576C<br>(Judge Block)<br><br>APPENDIX TO PLAINTIFF'S REPLY AND RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, the San Carlos Irrigation and Drainage District ("District") submits this Appendix to the Supplemental Proposed Findings of Uncontroverted Fact in support of its Reply and Response to the Defendant's Cross-Motion, filed concurrently herewith.

DATED this 24th day of July, 2008.

By: /s/ RINEY B. SALMON

Riney B. Salmon II
SALMON, LEWIS & WELDON, P.L.C.
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016
(602) 801-9060 (office)
(602) 801-9070 (facsimile)
*Attorneys for Plaintiff*

**Index to Appendix**


| | Page |
|---|---|
| Ex. 78 – Carl Christensen, *FY 2004 Irrigation Budget* (May 8, 2004). | 1 |
| Ex. 79 – Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008). | 2 |
| Ex. 80 – Deposition of Carl Christensen (October 1, 2007). | 4 |
| Ex. 81 – Deposition of Catherine Wilson (October 2, 2007). | 14 |
| Ex. 82 – Affidavit of Douglas Mason (July 21, 2008). | 24 |
| Ex. 83 – General Accounting Office, Publication No. GAO-06-314, *Indian Irrigation Projects: Numerous Issues Need to be Addressed to Improve Project Management and Financial Sustainability* (February 2006). | 26 |
| Ex. 84 – Deposition of Russell Kaskalla (October 3, 2007). | 30 |
| Ex. 85 – Deposition of Lawrence Field (January 17, 2008). | 37 |

Certificate of Filing

I certify that on July 24, 2008, a copy of the foregoing "APPENDIX TO PLAINTIFF'S REPLY AND RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ RINEY B. SALMON
Riney B. Salmon

EXHIBIT 78

# FY 2004 IRRIGATION BUDGET

Prepared by: Carl Christensen
Date: 05/08/04
Months Elapsed This Fiscal Year: 7 = 58%

| | Draft 4 Budget | March | Income & Obligations As Percent of Budget |
|---|---|---|---|
| Unobligated Cash: Beginning | 3,324,119 | 3,097,327 | |
| Unobligated Cash: Ending | 3,047,644 | 3,025,972 | |
| Summation Income: | | | |
| Indian Works (Overpumping) | | 463,282 | |
| Interest | 71,000 | 24,069 | 34 |
| Miscellaneous | 51,500 | 57,033 | 111 |
| Total Income | 122,500 | 544,384 | 444 |
| Balance Undelivered Orders: | | | |
| FY 2002 Services | | 43,157 | |
| FY 2003 Services | | 45,238 | |
| Total Undelivered Orders | | 88,395 | |
| Summation Obligations: | | | |
| Personnel | 894,000 | 448,928 | 50 |
| Benefits | 208,000 | 115,566 | 56 |
| Travel | 7,000 | 420 | 6 |
| Utilities | 65,000 | 19,855 | 31 |
| Power for Pumping | 435,000 | 114,034 | 26 |
| Services | 522,600 | 242,075 | 46 |
| Water Commissioner-Initial | 356,400 | 95,099 | 27 |
| Water Commissioner-Revised | 459,561.66 | | |
| Supplies | 199,000 | 65,520 | 33 |
| Equipment | 32,000 | 535 | 2 |
| Other | 2,000 | -0- | -0- |
| Total Obligations | 2,721,000 | 1,102,033 | 41 |
| Sinking Funds & Revenue | 677,975 | 677,975 | |

EXHIBIT 79

# FY 2008 IRRIGATION BUDGET

Prepared by: Carl Christensen
Date: 7/01/08
Months Elapsed This FY: 75%

| | Budget | June | FY Summation | Income & Obligations As Percent of Budget |
|---|---|---|---|---|
| Unobligated Cash: Beginning | 4,134,904 10/1/07 | | 3,490,956 5/31/08 | |
| Unobligated Cash: Ending | 4,292,356 9/30/08 | | 4,255,392 6/30/08 | |
| **Summation Income:** | | | | |
| Indian Works (Overpumping) | 100,000 | | | |
| Interest | 100,000 | | 127,713 | 128% |
| Miscellaneous | 60,000 | 5 | 18,414 | 31% |
| O&M Assessment* | 2,100,000 | 1,050,000 | 2,100,000 | 100% |
| Total Income | 2,360,000 | | 2,246,127 | 95% |
| **Balance Undelivered Orders:** | | | | |
| FY 2007 Services | | | 245,359 | |
| **Summation Obligations:** | | | | |
| Personnel | 1,147,000 | 90,335 | 725,341 | 63% |
| Travel | 6,000 | 1,392 | 1,392 | 23% |
| Utilities + Rent + Equipment | 59,000 | 2,223 | 28,918 | 49% |
| Power for Pumping | 619,000 | | 214,910 | 35% |
| Services | 627,000 | 251,986 | 653,639 | 104% |
| Water Commissioner | 465,000 | | 107,867 | 23% |
| Supplies | 159,000 | 19,292 | 71,435 | 45% |
| Equipment | 12,000 | | 3,669 | 31% |
| Land & Structure | 250,000 | | | 0% |
| Subtotal Obligations | 3,344,000 | 365,228 | 1,807,171 | 54% |

* 2008 Assesment:
IW PAID $1,050,000 on 06/06/2008
SCIDD PAID $1,050,000 on 02/29/2008

2009 Assessment:
IW Owes $1,050,000 - Due 10/01/2008
SCIDD Owes $1,050,000 Due 03/01/2008

| | Cash |
|---|---|
| 5/31/2008 | 3,490,956 |
| Obligation | (159,326) |
| Income | 1,050,005 |
| Disbursement | (126,243) |
| 6/30/2008 | 4,255,392 |

# Irrigation Division - Unobligated Cash

| | FY 1996 | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 | FY 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash | Unobligated Cash |
| **September** | 4,373,099 | 2,600,123 | 4,047,697 | 5,018,352 | 5,248,467 | 4,677,772 | 4,501,241 | 3,827,873 | 2,597,348 | 2,586,687 | 4,053,255 | 4,558,612 | 2,134,904 |
| **October** | 4,087,906 | 2,666,370 | 4,621,890 | 6,185,337 | 5,353,454 | 4,505,835 | 4,342,848 | 3,798,786 | 2,464,801 | 2,464,007 | 4,028,008 | 4,446,509 | 1,610,75[illegible] |
| **November** | 3,846,090 | 2,529,480 | 4,518,021 | 6,015,349 | 5,253,978 | 4,347,710 | 4,092,340 | 3,427,756 | 3,324,194 | 2,357,167 | 3,838,638 | 4,345,160 | 1,406,80[illegible] |
| **December** | 3,554,743 | 2,593,101 | 4,378,700 | 5,837,829 | 4,915,626 | 4,453,995 | 3,988,815 | 3,320,093 | 3,191,633 | 2,063,024 | 3,523,999 | 4,142,294 | 1,208,6[illegible] |
| **January** | 3,291,153 | 2,389,395 | 5,075,787 | 5,528,652 | 4,529,920 | 4,412,561 | 3,720,047 | 3,134,584 | 2,943,254 | 1,981,864 | 4,922,108 | 4,258,532 | 3,173,8[illegible] |
| **February** | 3,224,021 | 2,260,487 | 4,800,532 | 5,532,555 | 4,344,681 | 5,293,544 | 4,459,766 | 2,926,173 | 2,847,866 | 1,814,575 | 4,789,338 | 5,478,737 | 4,133,1[illegible] |
| **March** | 3,104,654 | 3,682,278 | 4,667,891 | 5,307,254 | 4,089,778 | 5,042,326 | 4,227,756 | 2,804,115 | 3,097,327 | 2,823,229 | 6,185,813 | 5,229,759 | 4,222,072 |
| **April** | 3,003,917 | 3,690,228 | 4,508,415 | 5,276,513 | 4,071,809 | 4,978,827 | 4,062,288 | 2,791,049 | 3,025,972 | 3,090,023 | 6,032,932 | 5,144,275 | 3,706,502 |
| **May** | 2,644,665 | 5,130,953 | 4,367,667 | 6,825,208 | 4,892,897 | 5,383,288 | 4,929,908 | 2,636,102 | 3,943,316 | 4,963,669 | 5,998,065 | 5,056,622 | 3,490,95[illegible] |
| **June** | 2,602,887 | 4,721,069 | 5,319,308 | 6,140,746 | 4,754,545 | 5,099,137 | 4,393,401 | 3,375,437 | 3,371,997 | 4,590,746 | 5,792,200 | 5,171,496 | 4,255,39[illegible] |
| **July** | 2,443,994 | 4,559,762 | 5,167,802 | 5,877,896 | 5,467,374 | 4,965,184 | 4,267,473 | 3,144,307 | 3,248,253 | 4,279,377 | 5,531,968 | 4,827,821 | |
| **August** | 2,143,580 | 4,145,267 | 5,417,339 | 5,536,047 | 5,179,536 | 4,580,456 | 4,022,981 | 3,038,332 | 2,992,919 | 4,184,173 | 5,255,122 | 4,478,190 | |
| **September** | 2,600,123 | 4,047,697 | 5,018,352 | 5,248,467 | 4,677,772 | 4,501,241 | 3,827,873 | 2,597,348 | 2,586,687 | 4,051,569 | 4,558,612 | 2,134,904 | |

EXHIBIT 80


IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 06-576C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF CARL ALAN CHRISTENSEN

Phoenix, Arizona

October 1, 2007

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)

# I N D E X


| WITNESS | | PAGE |
|---|---|---|
| CARL ALAN CHRISTENSEN | | |
| | Examination by Mr. Salmon | 4 |


## EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 1 | United States Government Memorandum from Robert E. Carolin to Office of the Regional Director, dated 9-15-04 | 91 |
| 2 | United States Government Memorandum from Western Regional Director to Project Manager, San Carlos Irrigation Project, dated 10-1-04 | 93 |
| 3 | Letter from Barry Welch to Riney B. Salmon, II, dated 1-10-97, with attachment | 120 |
| 4 | Letter from Western Regional Director to Globe Equity, dated 11-26-04 | 130 |
| 5 | Letter from Susan B. Montgomery to Wayne Nordwall, dated 12-29-2004, with attachment | 130 |
| 6 | San Carlos Irrigation Project - Joint Works, Irrigation Division Operation & Maintenance Budget | 135 |
| 7 | FY 2007 Irrigation Budget, dated 9-9-07 | 157 |

training.

Q. Well, describe for me any kind of written materials that you would use at these training sessions.

A. The written material that we would use would be a record that is shown on the software of what the budget was in previous years. It also would show actual amounts for previous years. It shows projected budgets for future years.

Q. But I want you to describe for me the written materials that you used in the meetings, aside from what you received from the computer that you had been using. Handouts, information sheets, things of this nature.

A. I don't recall that any handouts were provided for the budget process.

Q. So you received nothing in writing at any of these training sessions with respect to the budget process and analysis?

A. Not that I recall.

Q. Were you referred to any written information or documents to study up and review?

A. As I recall, the only documentation could be what was shown in a National Irrigation Handbook that has been put together by the IPSOD group.

Q. You say an irrigation handbook. Is that correct?

A. Yes.

Q. And what edition or what date would that be?
A. As I recall, it would have been in the time period 2000 to maybe 2004.
Q. And why do you recall that, that way?
A. The reason I recall it as being 2000 to 2004, I believe that is when we received a copy at the San Carlos Irrigation Project.
Q. And as I understand, that irrigation handbook is what you were instructed to follow in making your budget preparation and analysis?
A. The handbook provides guidelines --
Q. Okay.
A. -- basically following the same procedure that has been used at San Carlos Irrigation Project for at least 15 to 20 years and maybe longer.
Q. So you're saying that the guidelines contained in the irrigation handbook is what the San Carlos Irrigation Project has been following for -- What did you say, 10 to 15 years?
A. I believe I said 15 to 20 years.
Q. I'm sorry. 15 to 20 years. Is that correct?
A. Yes.
Q. So those guidelines have been followed for a long time?
A. Yes.

Q. And those are the guidelines that you have followed in your preparation of budget and analysis, correct?

A. Yes.

Q. Can you recall any specific deviations from the guidelines contained in that handbook, by you, in the preparation of budgets?

A. No.

Q. Can you recall any conversations with anybody about deviating from those guidelines contained in the handbook with respect to budget preparation and analysis?

A. No.

Q. Can you think of any good reasons for any deviation from the guidelines contained in that irrigation handbook in your budget preparation and analysis?

A. No.

Q. Now, you've identified the irrigation handbook. Are there any other written materials that you have been instructed to use with respect to your budget preparation and analysis?

A. As I recall, from time to time we may receive comments in regard to budget preparation from an office or offices higher up in the BIA, above San Carlos Irrigation Project.

Q. When you say "higher up," who are you referring

in the money that's set aside in the sinking funds -- in other words, that money is not spent -- is that money ever credited towards the next fiscal year's O & M budgetary expense for sinking funds?

MR. MANHARDT: Objection. It was asked and answered. You can go ahead.

BY MR. SALMON:

Q. Or is it like what you've just described: always carried forward into the cash balance?

A. It's carried forward as a cash balance, which that cash balance varies every month throughout the year. It's not necessarily -- reflect what you anticipate you'll have for cash in a certain year because of the point in time at which the water users make their payments.

Q. Well, if, for one year, you budget $2 million, let's say, for operation and maintenance charges, and that's a part of your basis for establishing your rate, and you don't spend 2 million, you spend a million and a half, that's a half-a-million savings. Do you understand?

A. Yes.

Q. Okay. Why isn't that half a million dollars carried forward to reduce the next year's projected or budgeted operation and maintenance expense?

A. We have never done that at the San Carlos Irrigation Project.

Q. It was well after this time, was it not?
A. I don't think so.
Q. You don't think so?
Okay. So your best recollection is that the sinking funds program was created at this particular time in January of 1997? Is that your testimony?
A. No. I believe the sinking funds were created prior to that date.
Q. Okay. The sinking funds that are included in your annual budgets?
A. Yes.
Q. Now, look down at paragraph 36 -- excuse me -- footnote 36 on page 10. That footnote refers to a project memorandum. And I'm skipping to where I'm quoting, ". . . wherein it is conceded that the unobligated cash balance funds that have accumulated should be shown either as a credit to the water users in future years or used to address other critical needs of the Project." Do you see that?
A. I see it.
Q. Have you ever had any thought or any conversation with anybody about giving a credit to the water users in future years on O & M budgets rather than rolling it over into the cash balance account?
A. I don't recall I've ever had any conversation

with anybody.

Q. Have you ever had any thought, in preparing a budget, in doing that?

A. No.

Q. And why not?

A. I don't see any reason to do anything like that.

Q. And why don't you see any reason to do anything like that?

A. It doesn't make any sense.

Q. And why doesn't it make any sense?

A. Because it would be -- it would not be a prudent way to operate and maintain the system, to try to go in and give some type of credit to a water user based on a particular amount of cash balance that you may have at any point in time.

Q. Wouldn't that depend upon the amount of money you have in your cash balance?

A. No.

Q. And why not?

A. The amount wouldn't have any effect on it.

Q. In other words, it's your opinion that the cash balances that the project carries, there's no limit on them? They can go as high as is desired?

A. In certain times, there's a large benefit to having a large cash balance when you're drawing interest

on that money that you have as a cash balance. There isn't an expense for the project to carry a cash balance. There's a benefit in that you receive interest on that money.

Now, prior to 1983, we didn't receive interest on our money that was held by the Treasury. But effective in about the fall of 1983 -- I believe it was the beginning of the fiscal year 1984 when we received the benefit of any interest. And some of the interest we received was fairly high interest at that point in time because we had -- as well as having money invested in the normal overnight accounts, we had some long-term investments that had a high rate of return.

Q. So you are saying that there is a benefit to maintaining high cash balances because you earn more interest?

A. That's one of the benefits.

Q. And that's a benefit to the project, that's your opinion?

A. That's a benefit to the project as well as to the water users.

Q. Well, wouldn't the water users, in some occasions, at least, prefer to have the money back rather than the interest earned on their money? Is it possible?

A. It's possible.

Q. Probable?

A. Improbable.

Q. And why improbable?

A. I don't know how you would refund money to the water users. They pay it on their taxes.

Q. Couldn't you do it in the way that is suggested by this January 10, 1997, letter: Give them a credit in future years? Wouldn't that be a sufficient way of doing it?

A. I don't believe it would be. It would be -- I don't believe it would work very well. I don't see -- Would you give them a credit one year? Or would you spread it over five years? Or you do it over 10 years? There hasn't ever -- that I know of, that's ever been done, where you give a credit to the water users for money that's raised off -- through the property taxes through the county whereby somehow they get a reduction in the following years. I don't know if you reduce their taxes, or do you send them each a refund check? As far as I know, it's never been done at the project.

Q. What does a refund of the landowners' or the water users' property taxes have to do with a credit from the project for overpayment of operation and maintenance expenses in a year?

A. It depends on the definition of a "credit." And

EXHIBIT 81



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 06-576C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF CATHERINE WILSON

Phoenix, Arizona

October 2, 2007

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
(Copy) Certification No. 50503

review that and make a recommendation or set up the formal paperwork for him to either concur or not concur with the recommendation of the project manager.

Q. I see.

Okay. How about the fixing of the O & M charges for the project for particular fiscal years? What's your involvement with that?

A. The annual O & M rate for the project -- for all of our revenue-generating projects are developed originally at the project level, by staff, whether it's SCIP or other revenue-generating projects. And a recommendation is made by the project staff on what the annual rate should be. It is sent through our regional office and then on to the assistant secretary for Indian affairs office for publication in the Federal Register as a proposed rate --

Q. Uh-huh.

A. -- for public comment. And eventually, then the assistant secretary for Indian affairs will set the final rate for all of the revenue-generating projects nationwide.

Q. You used the term "revenue-generating projects." What does that mean?

A. It means that the irrigation project sets O & M rates and collects the revenues to run the project, from

ever requested that a rate be changed either up or down?
A. I don't recall ever -- You mean after it's already been established?
Q. Yes.
A. I don't recall that we've ever done it after it's already been established, either up or down.
Q. By your answer, perhaps it has been done with respect to a proposed rate?
A. Perhaps. I don't know of a specific situation, but perhaps.
Q. What is your understanding as to the purpose of a proposed rate being published in the Federal Register?
A. It's my understanding that the purpose of a proposed rate being published in the Federal Register is to provide the public or the affected water users the chance to review and comment to the assistant secretary on the proposed rate.
Q. Okay. Now, what is your understanding -- Well, strike that.
Drop down to the next paragraph, and you can read it if you wish. It refers to a "Failure by SCIDD to make its assessment payment for 2005 subjects the Project to a potential violation of the Anti-Deficiency Act."
Do you see that?
A. Yes.

that it's somewhat memorialized in our letter of February 28th.

Q. I see.

Okay. So you basically relied upon your letter of February 28th for your recollection of the entire situation at that time?

A. That would be the most accurate memorialization of the discussions.

Q. That kind of shortens my questions, Cathy.

Now, let me direct your attention to page 2, first full paragraph. Starts out "Second," capital S-e-c-o-n-d. Do you see that?

A. Yes.

Q. And Mr. Anspach is, I believe -- my interpretation is that he's setting forth reasons as to why SCIDD cannot be given a credit for -- from one year's assessment collection. Do you see that in that paragraph?

A. Yes.

Q. Okay. Now, he gives examples in the last two or three sentences. Do you see where he starts out "for example"?

A. Yes.

Q. Okay. ". . . project's O & M activities include a well replacement program." What's your understanding as to what that reference means?

A. The project has 98 irrigation wells that provide a significant portion of the water supply to the project when surface supply is short. And we have a well replacement program to make sure that we are able to respond when -- if and when one of our wells goes down.

Q. Now, was there such a well replacement program in effect at this time?

A. Yes.

Q. Has, to your knowledge, to the present date, any money been spent on that well placement program?

A. The well replacement program has been modified in response to SCIDD's and possibly other water user comments to us, I think a year ago June. And the well replacement program is as it was approximately June 2006, as discussed with the water users in June 2006.

Q. But has any money been spent on that well replacement program yet?

A. Not that I'm aware of.

Q. And so what is the arrangement, if I may use that word, with respect to the implementation in the future, I guess, of the well replacement program?

A. My last recollection of what that is, is in the June 2006 spreadsheet O & M budget, where there are several worksheets that describe the status of the wells, cost to replace, possible locations, and how the project

would propose reserving enough funds for that. And I would just defer to that spreadsheet because I don't recall all the specifics of it.

Q. Okay. Was that a spreadsheet that was perhaps prepared by Randy Shaw?

A. Yes.

Q. And was, perhaps, Randy Shaw's conclusion that the well replacement program was not necessary at the time or could be delayed? Something of that nature?

A. In his assessment as of June 2006 or thereabouts, is that what you're referring to?

Q. Yes.

A. After we had those extensive fact-finding meetings with the water users and discussion of Randy's extensive research on well replacement issues, I believe the project accepted his recommendations about what that well replacement program should look like. And, again, I refer you back to that spreadsheet and all the work tabs for the details.

Q. Okay. What is the current intention, if you can tell me, of the project with respect to the well replacement program?

A. I don't know the answer to that question.

Q. And who would know the answer to that question?

A. I assume the project engineer -- the irrigation

engineer would be the first place to start.

Q. Okay. Mr. Anspach also refers to a well abandonment project in here, Cathy. Can you tell me what is your understanding of this well abandonment program?

A. My understanding of the well abandonment program is that we have a number of wells -- project wells that used to provide irrigation water but have been abandoned over the years, which are just still out in the fields. And we -- the project has, on its list of things to do, go out and GPS-identify these sites and take care of them so they're not a safety problem or so that they're properly abandoned.

Q. Has that been done yet?

A. No.

Q. What is the schedule for that to be done?

A. The latest schedule that I've heard is, hopefully, in fiscal year 2008. The project is relying on regional staff to help with that effort due to staff shortages at the project. So we have regional staff in my office who are planning to try to take care of that project this year.

Q. I see.

Okay. Mr. Anspach also refers to ". . . a condition assessment study discussed" -- excuse me -- "directed by the Assistant Secretary" -- initial caps --

"for Indian Affairs . . ." -- initial caps, close quotes.
Do you see that?
A. Yes.
Q. What is your understanding of this condition assessment study?
A. My understanding of the condition assessment study is that the assistant secretary for Indian affairs has asked the Central Office irrigation staff to calendar in condition assessment studies for every revenue-generating irrigation project in BIA.
Q. Is this a SOD program?
A. No.
Q. And why isn't it a SOD program?
A. It's a condition assessment study for the irrigation project, which in SCIP's case would include Coolidge Dam and reservoir but isn't a safety program; it's a condition assessment for the irrigation facilities.
Q. Has that ever been done -- a study?
A. Not at SCIP, no.
Q. And do you know why?
A. I don't know why.
Q. What is the current intention, if you know?
A. I believe it's still on the plans to accomplish at some point.
Q. I see.

Okay. And the repair of China Wash Flume, I've already discussed with Mr. Christensen.

MR. SALMON: Well, can we take a break right now, folks? And perhaps -- surprise, surprise -- I might be done.

(An off-the-record discussion ensued.)

(A recess ensued.)

MR. SALMON: I'm done.

(The deposition was concluded at 10:55 a.m.)

CATHERINE WILSON

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Reporter of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; pursuant to request, notification was provided that the deposition is available for review and signature; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this day of , 2007.

Gerard T. Coash, RMR
Certified Reporter #50503

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 06-576C<br>(Judge Block)<br><br>**AFFIDAVIT OF DOUGLAS D. MASON** |

STATE OF ARIZONA )
) ss:
County of Maricopa )

Douglas D. Mason, being first duly sworn upon his oath, deposes and says:

1. I am the General Manager of the San Carlos Irrigation and Drainage District, located in Pinal County, Arizona.

2. As General Manager, I was involved in discussions with officials and staff of the Bureau of Indian Affairs ("BIA") and the San Carlos Irrigation Project ("Project") regarding the budget and operation and maintenance ("O&M") charge for fiscal years ("FY") 2008 and 2009. I also reviewed budget spreadsheets, summaries, and related data provided by the BIA and Project in support of their proposals.

3. To the best of my knowledge, no one from the BIA or the Project has ever stated, verbally or in writing, that FY 2008 and 2009 O&M charges were fixed with the intention of providing a credit or refund to the District out of the Project's surplus cash prior to the filing of the complaint in this case.

4. To the best of my knowledge, Project wells constructed during the 1950s through the 1980s were installed to increase pumping capacity and were generally paid for with appropriated funds, not O&M charges.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

5. The District opposed the BIA's well replacement program primarily because the BIA was proposing to replace wells based on age, even if the well and related equipment were working and the well was producing at or near capacity. Based on my experience as General Manager of the District, the need to replace a well cannot be determined based upon the age of the well alone. The District did not believe it was reasonable to spend hundreds of thousands of dollars to replace a well that was still functioning properly, just because it was an older well. The District also was opposed to installation of new wells without removing any old wells from service, as such action represents a betterment, not O&M, for which the District cannot be charged without its approval under the Repayment Contract

6. In discussions regarding the FY 2008 budget, the District requested that Randy Shaw discuss well replacement with the Project's well expert, Gary Weenser. Mr. Weesner advised the Project to wait to replace a well until it actually fails and cannot be repaired. Mr. Weesner advised against a well replacement program based solely on the age of the well.

7. The District has experienced well failures at newer wells in its system, while older wells continued to pump at capacity.

DATED this 21 th day of July, 2008.

By: Douglas Mason

Douglas Mason
General Manager
San Carlos Irrigation and Drainage District

SUBSCRIBED AND SWORN TO before me this 21 day of July, 2008.

NOTARY PUBLIC
STATE OF ARIZONA
Pinal County
SANDRA C. KIRK
My Commission Expires July 16, 2011

Sandra C. Kirk
Notary Public

My Commission Expires:
July 16, 2011

EXHIBIT 83

United States Government Accountability Office

GAO

Report to the Chairman, Subcommittee on Interior and Related Agencies, Committee on Appropriations, U.S. Senate

February 2006

# INDIAN IRRIGATION PROJECTS

# Numerous Issues Need to Be Addressed to Improve Project Management and Financial Sustainability

GAO
Accountability ★ Integrity ★ Reliability

GAO-06-314

February 2006

GAO
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-06-314, a report to the Chairman, Subcommittee on Interior and Related Agencies, Committee on Appropriations, U.S. Senate

# INDIAN IRRIGATION PROJECTS

# Numerous Issues Need to Be Addressed to Improve Project Management and Financial Sustainability

## Why GAO Did This Study

The Department of the Interior's Bureau of Indian Affairs (BIA) manages 16 irrigation projects on Indian reservations in the western United States. These projects, which were generally constructed in the late 1800s and early 1900s, include water storage facilities and delivery structures for agricultural purposes. Serious concerns have arisen about their maintenance and management.

GAO was asked to examine (1) BIA's estimated deferred maintenance cost for its 16 irrigation projects, (2) what shortcomings, if any, exist in BIA's current management of its irrigation projects, and (3) any issues that need to be addressed to determine the long-term direction of BIA's irrigation program.

## What GAO Recommends

GAO recommends that BIA (1) provide the necessary level of technical support to project managers, (2) require project managers to meet at least twice annually with water users, and (3) conduct studies to determine the financial sustainability of the projects.

Although we requested comments from the Department of the Interior on our findings and recommendations, none were provided in time to be included as part of this report.

www.gao.gov/cgi-bin/getrpt?GAO-06-314.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Robin M. Nazzaro at (202)512-3841 or nazzaror@gao.gov.

## What GAO Found

BIA estimated the cost for deferred maintenance at its 16 irrigation projects at about $850 million for 2005, although the agency is in the midst of refining this estimate. BIA acknowledges that this estimate is a work in progress, in part, because some projects incorrectly counted new construction items as deferred maintenance. To further refine its estimate, BIA plans to hire engineering and irrigation experts to conduct thorough condition assessments of all 16 irrigation projects to correctly identify deferred maintenance needs and costs.

BIA's management of some of its irrigation projects has serious shortcomings that undermine effective decisionmaking about project operations and maintenance. First, under BIA's organizational structure, officials with the authority to oversee irrigation project managers generally lack the technical expertise needed to do so effectively, while the staff that have the expertise lack the necessary authority. Second, despite federal regulations that require BIA to consult with project stakeholders in setting project priorities, BIA has not consistently provided project stakeholders with the necessary information or opportunities to participate in project decisionmaking.

The long-term direction of BIA's irrigation program depends on the resolution of several larger issues. Of most importance, BIA does not know to what extent its irrigation projects are capable of financially sustaining themselves, which hinders its ability to address long-standing concerns regarding inadequate funding. Information on financial sustainability, along with accurate deferred maintenance information, are two critical pieces of information that are needed to have a debate on the long-term direction of BIA's irrigation program. Once this information is available, the Congress and interested parties will be able to address how the deferred maintenance will be funded and whether entities other than BIA could more appropriately manage some or all of the projects.

**Deferred Maintenance at the Crow Irrigation Project (March 2005)**





Source: GAO.

Abandoned Car in Canal

Crumbling Concrete Structure

**Figure 14: Pictures of the San Carlos Joint Works Irrigation Project (June 2005)**



Source: GAO.

Deteriorating China Wash Flume

Concrete that Fell from Flume

Weeds in Irrigation Canal

## Key Operations and Maintenance Concerns Expressed During Our Site Visit

- Lack of certainty in BIA's ability to deliver requested water to all water users has led some to purchase additional water from outside of the project.
- Silt removal from irrigation canals and ditches is a recurring problem, leading BIA to purposefully over-excavate the main canal each year in an attempt to catch excess silt that can clog culverts and prevent water delivery impairments.
- Repair of China Wash Flume is an expensive undertaking, but the flume's failure could jeopardize water deliveries for much of the project.
- Removal of weeds to prevent clogged culverts is a recurring problem for the project.

## Key Management Concerns Expressed During Our Site Visit

- 2007 turnover to water users is under way but not finalized.
- Lawsuit against BIA's increase in operations and maintenance fees resulted in some water delivery delays while the lawsuit is pending.
- Contracting delays within BIA have resulted in postponed project maintenance.

- Turnover of BIA staff and lack of water user inclusion in project decisionmaking impedes effective communication.
- BIA lacks accountability to water users in terms of how it spends operations and maintenance fees.

## Wapato Irrigation Project

The Wapato Irrigation Project is one of the oldest and largest of BIA's 16 revenue-generating irrigation projects with 96,443 acres being assessed operations and maintenance fees (and 145,000 acres authorized for irrigation). It was authorized for construction in 1904, but construction was never completed. The project is located in Yakima, Washington on the Yakama Reservation, home of the Confederated Tribes and Bands of the Yakama Nation. About 60 percent of the project land is owned by either the tribe or individual tribal members, and about 40 percent is owned by individual non-Indians. BIA currently estimates the project's total deferred maintenance costs to be $183,128,886. See figure 15 for pictures of the Wapato Irrigation Project.

**Figure 15: Pictures of the Wapato Irrigation Project (April 2005)**





Source: GAO.

Weed Clearing Machine

Irrigation Canal with Crumbling Concrete Lining

EXHIBIT 84



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 06-576C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF RUSSELL KASKALLA

Phoenix, Arizona

October 3, 2007

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)

$15 per acre, correct?
A. Correct.
Q. Do you recall if these meetings were in the latter part of September, since this memorandum was dated September 15?
A. I don't recall.
Q. Or would it have been in October?
A. I don't recall.
Q. It would have been in September or October, would it not, of 2004 -- these meetings?
A. Yes.
Q. I take it, then, that you didn't help prepare this memorandum to the office of the regional director, dated September 15, 2004, did you?
A. I didn't.
Q. Okay. Now, at the time you were instructed by Cathy Wilson to help Carl with the budget, I believe you testified that you were not aware of -- Well, strike that.
Let me hand you what is marked as Exhibit 2 to Carl Christensen's deposition and ask you if you have ever seen that before?
A. Yes.
Q. Okay. And when was the first time?
A. When was the first time?

Q. You saw it.
A. I wrote it.
Q. You wrote this?
A. Right.
Q. Okay. So you wrote this for the signature of Wayne Nordwall?
A. Yes.
Q. Okay. And who told you to write it?
A. I don't think anybody did.
Q. You just wrote it on your own? Didn't you discuss it with anybody?
A. I don't recall specifics.
Q. You wrote a letter for the signature of the western regional director, Wayne Nordwall, and you don't recall the specifics of why you wrote it?
A. The specifics would have been that I reviewed the budget and -- I mean, it's outlined there what was left out.
Q. Okay. But I'm just asking you what authority did you have to write this letter for the signature of Wayne Nordwall, the regional director?
A. That is part of my -- Like I explained to you before, part of what my duties in that position were: to review the budgets and to recommend to the regional director whether or not to approve the budget.

Q. Okay. Did you have a conversation with the director about --

A. I don't recall.

Q. Did you have in a conversation with anyone else about the budget at this point in time, October 1st, 2004?

A. I'm sure I talked with Cathy Wilson about it.

Q. Okay. All right. You're sure you talked with Cathy Wilson.

Okay. Tell me what you and Cathy said to each other.

A. I don't recall.

Q. Did Cathy tell you to come up with a $30 rate per acre and not a $15 rate per acre?

A. No.

Q. Did anyone tell you to come up with a $30 rate per acre?

A. No.

Q. Did you discuss this letter with the western regional director, Mr. Wayne Nordwall?

A. I don't recall.

Q. Was this memorandum sent by the Bureau of Indian Affairs down to the project manager of the San Carlos Irrigation Project?

A. To the best of my knowledge, yes.

Q. And did you send it? Did you authorize sending

A. Yes.
Q. And was that, indeed, faxed on October 1, 2004, to Gary Hansen?
A. As far as I know.
Q. Who is Gary Hansen?
A. Gary Hansen at the time was, I believe, a consultant for the Gila River Tribe.
Q. I see.
When -- do you recall -- After you faxed this memorandum to Gary Hansen, did you discuss the memorandum with him?
A. I can't recall.
Q. Why did you send it to him?
A. Because he asked for it.
Q. How did he find out about it?
A. I don't know.
Q. Did you tell him about it?
A. I can't recall.
Q. Do you have any idea who did tell him?
A. I can't recall.
(Deposition Exhibit 11 was marked for identification.)
BY MR. SALMON:
Q. After you get through reviewing this, are these e-mails by you to Mr. Ross Mooney, as they purport to be?

A. Yes.

Q. Okay. And when you sent this one e-mail to Ross, you're telling Ross, are you not, that you're keeping the 2006 rate for the Joint Works at $30 per acre? Do you see that?

A. I'm telling him to publish -- publish it as a proposed rate.

Q. As a proposed rate, right?

A. Right.

Q. And the date of this e-mail is what, Russell?

A. September 29th, 2004.

Q. That's one day prior to this October 1st, 2004, memorandum that we've been discussing, isn't it?

A. Yes.

Q. Here you've already decided, have you not, that the rate is going to be $30 per acre for 2006?

A. No.

Q. Aren't you here telling him to go ahead and publish the proposed rate at $30?

A. Yes.

Q. Okay. So you've already made up your mind as to what the proposed rate is going to be?

A. That's what I told him to publish, and it's a proposed rate, it's not the final rate.

Q. I know. I know that. But at least you had made

up your mind at this point in time that the proposed rate was going to be $30 per acre?

A. And that is a proposed rate. Like I said, it is not the final rate. Carl and I were still working on the budget at this time. Ross Mooney publishes at that time, and this continues with the way that the BIA publishes their O & M rates.

All of the irrigation projects that charge an O & M rate in BIA are published at one time, all of the proposed rates. And basically, they are proposed rates. They can change from the time they're published as proposed until they're published as final.

Q. Can you ever remember, Russell, a proposed rate of the Bureau of Indian Affairs for the San Carlos Irrigation Project ever being changed before it's published finally?

A. I don't recall.

Q. Now, does this e-mail correctly show the copies that you sent first to Ross Mooney?

Well, the e-mail is directed to Ross Mooney, but the copy is to Barry Welch. Who is Barry Welch?

A. He was the assistant regional director at the time.

Q. Carl Christensen, we know who Carl is, right?

A. Yes. Yes.

EXHIBIT 85

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 06-576C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF LAWRENCE FIELD

Phoenix, Arizona

January 17, 2008

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)

that they're pretty much set. They don't change quarter to quarter. They don't change six months to six months. There may be some tweaking of them occasionally, some changes in them. But rules or principles that govern the production of accounting information and financial statements are pretty set rules that stay in place.

So if there was some rule that governs this information that is being presented from SCIP to SCIDD, and unless those rules are changing ever three to six to nine months, then those rules, by definition, aren't being followed, because the basis of these numbers are changing.

Q. Wouldn't you need to know the purpose for each -- for which each document you looked at was prepared in order to know whether they all should be consistent?

A. I don't think I need to know that, no.

Q. Why not?

A. Because you asked me the purpose for which they were prepared. I don't know the purpose for which they were prepared.

I know that these documents ultimately ended up in SCIDD's hand as a part of a discussion of ongoing discussion about assessment rates. So I know it was used for that purpose. You asked me if I knew how it was originally prepared. I don't know.

Q. Just before the conclusion of your report you