Case No. 1:06-cv-00576-LB Electronically filed 07/24/08

**IN THE UNITED STATES FEDERAL COURT OF CLAIMS**

| | |
|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 06-576C<br>(Judge Block)<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT** |

Plaintiff San Carlos Irrigation Project ("Project"), by and through undersigned counsel, submits its Response to Defendant's *Proposed Findings of Uncontroverted Fact*, dated June 23, 2008.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTESTED FACT**

1. In 1924, Congress authorized construction of the Coolidge Dam across the Gila River as part of the San Carlos Irrigation Project ("Project"). Act of June 7, 1924, ch. 288, 43 Stat. 475. Pl. Ex. 4.1

**Response: Agree.**

2. The stated purposes of the Act were to provide "water for the irrigation of lands allotted to Pima Indians on the Gila River Indian Reservation, Arizona, now without an adequate water supply and, second, for the irrigation of such other lands in public or private ownership, as in the opinion of the Secretary [of the Interior] can be served with water impounded by said dam without diminishing the supply necessary for said Indian lands…." Pl. Ex. 4 (Sec. 1).

**Response: Agree.**

3. In authorizing construction of the Coolidge Dam, Congress further provided that

> the total cost of the project shall be distributed equally per acre among the lands in Indian ownership and the lands in public or private ownership that can be served from the waters impounded by said dam.

Pl. Ex. 4 (Sec. 1).

**Response: Agree.**

4. The Act provides that lands within the Project are required to pay the United States a proportionate share of the annual operation and maintenance cost of the Project by a date certain. Specifically, the Act provides that

> The operation and maintenance charges on account of land in private ownership or of land in Indian ownership operated under lease shall be paid annually in advance not later than March 1st …

Pl. Ex. 4 (Sec. 3).

**Response: Agree.**

5. In addition to these provisions, the Act provides that

> No part of the sum provided for herein shall be expended for construction on account of any lands in private ownership until an appropriate repayment contract in accordance with the terms of this Act and, in form approved by the Secretary of the Interior, shall have been properly executed by a district organized under State law, embracing the lands in public or private ownership irrigable under the project....

Pl. Ex. 4 (Sec. 4).

**Response: Agree.**

6. After passage of the Act, the Secretary of the Interior entered into a Landowners' Agreement with owners of private lands to be included within the San Carlos Project. Pl. Ex. 5. Among other things, the Landowners Agreement transferred landowners' water rights to the United States in exchange for inclusion in the irrigation project. Through the Agreement, landowners agreed to organize the plaintiff district as called for by the 1924 Act:

> Said owners furthermore agree and promise that they will, as soon as possible, and under the general direction of the Secretary of the Interior, organize themselves into such a district as the Secretary of the Interior shall direct, so as to handle and control the privately owned distributing systems leading from said project canals and be able to act as a unit in all dealings with the said Secretary....

Pl. Ex. 5 at 12.

**Response: Agree.**

7. In the Agreement, landowners made an express commitment to pay the project's operation

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

and maintenance charges:

> The undersigned and all owners of private lands under the said San Carlos project hereby agree that the construction and operation and maintenance charges for said San Carlos project shall be payable, and they agree to pay the same, in accordance with the last-mentioned act of Congress. [the 1924 Act]

Pl. Ex. 5 at 13.

**Response: Agree.**

8. In the Agreement, landowners also agreed that

> every owner of private lands under said San Carlos project shall also pay for the irrigation of his lands ... an operation and maintenance charge to be fixed from time to time by the Secretary of the Interior, based upon the total annual cost of the operation and maintenance of the said San Carlos project, and such charge shall be uniform throughout said project and made upon a per acre or acre-foot basis unless otherwise provided by agreement with said district and with the approval of the Secretary of the Interior. The said operation and maintenance charges as far as the works of the said San Carlos project are concerned ... shall be payable as is provided by the said last-mentioned act of Congress and the rules and regulations of the Secretary of the Interior which shall be made there under and under this agreement....

Pl. Ex. 5 at 15.

**Response: Agree.**

9. Under the express terms of the 1924 Act, and as required by the Landowners' Agreement, landowners organized the plaintiff district in 1928. Pl. Ex. 16. In 1931, the United States executed the Repayment Contract with plaintiff the District. Pl. Ex. 1.

**Response: Agree.**

10. The Repayment Contract states that the 1924 Act required the formation of the District and that the requirements of the 1924 Act have been "assented to ... all owners or claimants of private lands whose property might come within the San Carlos Project." Pl. Ex. 1 at 1-2 (Explanatory Recitals).

**Response: Agree.**

11. The Repayment Contract further provides

> Operation and maintenance for the reserved works and maintenance charges for works operated, but not maintained, by

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

> the District shall be fixed annually by the Secretary of the Interior and paid to the United States by the District. The Secretary of the Interior will give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts.

Pl. Ex. 1 at 8.

**Response: Agree.**

12. Under the heading "Date of Beginning Payment, Operation and Maintenance," the Repayment Contract provides that

> In addition to its proportion of the charge for the whole cost of said Project, the District shall also pay an operation and maintenance charge to begin one year after the issuance of the public notice and to be fixed from time to time in advance by the Secretary of the Interior, based upon the annual cost of the operation and maintenance of the San Carlos Project. Operation and maintenance charges shall be paid annually, in advance, not later than March 1st…"

Pl. Ex 1 at 16.

**Response: Agree.**

13. The Repayment Contract also provides

> <u>District To Use Taxing Power</u>
>
> Pursuant to the provisions of the laws of the State of Arizona, and of the United States, and regulations established thereunder, the District will cause to be levied and collected all necessary assessments against the tracts of land now or hereafter included in the District designated by the Secretary of the Interior, to meet the terms of this agreement, and will use all the powers and resources of the District, including the taxing power and the power to withhold the delivery of water, to collect and pay to the United States all charges authorized under this agreement in full on or before the day that the same become due.

Pl. Ex. 1 at 18.

**Response: Agree.**

14. In addition, the Repayment Contract states,

> <u>All Benefits Conditional Upon Payment</u>
>
> Should any assessment or assessments, authorized by the terms of this agreement and levied against any tract of land in the District be held illegal or void,....then such tract shall have no right to any of the benefits of this contract and no water furnished through any works constructed by the United States shall be delivered to or for such tract, or tracts of land, until

> construction and operation and maintenance charges on the terms and conditions provided for herein shall have been paid by the landowners. It is further agreed and understood that the payment of construction and operation and maintenance charges on the terms and conditions provided for herein is a prerequisite to the right to receive water from any of the works constructed by the United States and no irregularity in levying assessments by the District, or lack of authority in the District, whether affecting the validity of District assessments or not, shall be of any effect to authorize any landowner of the District to demand to receive water made available through irrigation works constructed by the United States unless construction and operation and maintenance charges, on the terms and conditions provided herein, have been paid by such landowner.
>
> Pl. Ex. 1 at 19-20.

**Response: Agree.**

15. The Repayment Contract also contains a provision that states

> To every installment of money required to be paid under this agreement, which shall remain unpaid after the same shall have become due, there shall be added at once a penalty of one-half of one per centum thereof, and thereafter a like penalty of one-half of one per centum on the first day of each month so long as such default shall continue and the District hereby agrees to pay said penalty.
>
> Pl. Ex. 1 at 20-21.

**Response: Agree.**

16. In 1935, the parties executed the First Supplement to the Repayment Contract and provided that

> Since by the terms of the San Carlos Act, operation and maintenance charges must be paid in advance and not later than on March 1 of each year, and since under Arizona law the second half of the tax payments are not delinquent until the first Monday in May, and since at that time the irrigation season is not far advanced and the District is only able to collect such charges generally as when the farmers request water, and so is placed in default with the United States on March 1 for any delinquent amount, and must pay a penalty under the June 8, 1931 Repayment Contract, it is agreed that the penalty provision of that Repayment Contract, in so far as operation and maintenance charges or assessments are involved, is hereby modified to provide that hereafter a penalty of one-half of one percent per month shall attach for each and every month or fraction thereof during which any installment of part thereof of the operation and maintenance charges or assessments remain due and unpaid on and after May 15 of each year.

Pl. Ex. 7 at ¶ 7(c).



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

**Response: Agree.**

17. Department of Interior regulations provide that the BIA Area Director or his designee may administer the Secretary's "rights, obligations and responsibilities for the operation and maintenance" of the Project. 25 C.F.R. § 171.1(g). The regulation states that the Area Director is authorized "to fix as well as to announce, by notice published in the Federal Register, the annual operation and maintenance assessment rates for the irrigation projects or units within his area of responsibility." In the case of the San Carlos Irrigation Project the area director is the Western Regional Area Director. DA11O-11.

**Response: Agree in part, disagree in part, but immaterial.**

The District agrees with the last sentence in Paragraph 17. The District disagrees with the first two sentences of Paragraph 17, but the disagreement is an issue of law, not fact.

The quoted language in Paragraph 17 is from 25 C.F.R. § 171.1(e), not Section 171.1(g). The latter regulation actually states:

> "San Carlos Irrigation Project, Arizona. The administration, rights, obligations and responsibilities for the operation and maintenance of this project are set forth in the Repayment Contract dated June 8, 1931 as supplemented or amended, between the San Carlos Irrigation and Drainage District and the United States as authorized by the Act of June 7, 1924 (43 Stat. 457-476) and the Secretarial Order of June 15, 1938, title 'Order Defining Joint, District and Indian Works of the San Carlos Federal Irrigation Project: Turning Over Operation and Maintenance of District Works to the San Carlos Irrigation and Drainage District.' The regulations appearing in this subchapter apply only to the Indian lands works and in the San Carlos Irrigation Project unless specified otherwise, and should not be interpreted or construed as amending or modifying the District Contract or Secretarial Order."

The quoted language from 25 C.F.R. § 171(e) in Paragraph 17 is irrelevant and does not apply to the District because the last sentence of Section 171.1(g) expressly recognizes that the District's rights and obligations will continue to be governed by the Repayment Contract and Joint Works Order, not the preceding subparagraphs of Section 171.1. Thus, 25 C.F.R. § 171.1(e) does not delegate authority for fixing Project O&M charges to the Western Regional Area Director.[1]

---

[1] *See Plaintiff's Reply and Response to Defendants' Cross-Motion*, at 4 (July 24, 2008) ("*District's Reply*").



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Although the District disagrees with the United States' proposed finding, this disagreement is a matter of regulatory interpretation, not of material fact, and may be decided by the Court as a matter of law.

18. The District has relied upon an annual property tax levy to collect O&M charges from landowners. Pl. Ex. 6 at 2.

**Response: Agree.**

19. The July 1 date invoked by the District does not appear in the Repayment Contract. Pl. Ex. 1.

**Response: Agree.**

20. The July 1 date has its source in Arizona law, which mandates that the "board of directors [of the District], not later of July 1 each year, shall estimate the amount of money required to meet the obligations of the district for the next fiscal year" and transmit that estimate "to the board of supervisors of each county in which any lands of the district are located...." Arizona Revised Code § 48-3112(A) and (C). PPFUF ¶ 40.

**Response: Agree.**

21. Arizona Revised Statutes, Section 48-3151 (A) provides

> In addition to authorized taxes, the board of directors may, at a regular or special meeting, notice of which shall be given for at least ten days previous by posting in three public places within the district levy an assessment for the purpose of paying or refunding district indebtedness, repairing, improving, extending, maintaining and operation existing irrigation work, installing new works or systems or meeting emergencies.

An assessment in excess of $2.50 per acre per year must be approved by a "majority vote of the qualified electors of the district." A.R.S. § 48-3153(A).

**Response: Agree, but immaterial.**

The District agrees that the United States has accurately portrayed the language of the cited statutes in Paragraph 20, but the proposed finding of fact is immaterial. District assessments required pursuant to contracts with the United States are governed by A.R.S. § 48-3096(A), not the



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

statutes cited in Paragraph 21.[2]

22. In 1997, then Acting Area Director of the Phoenix Area Office of the Bureau of Indian Affairs stated that a practice of fixing O&M rates to apply for an indefinite term of years did not satisfy the Secretary's duty to fix O&M charges annually. Pl. Ex. 18.

**Response: Agree.**

23. In a letter dated December 1, 1997, the San Carlos Irrigation Project Engineer stated to the District,

> The San Carlos Irrigation Project (SCIP), the San Carlos Irrigation and Drainage District (SCIDD) and the Indian Works have discussed the need for a process that will accomplish the goal of establishing annual budgets and fixing the annual operation and maintenance assessment in a timely manner. To this end, I am transmitting for the SCIDD Board of Directors' review and comment, the attachment which includes a list of action items associated with the FY 2000 Budget Formulation and Assessment Rate Setting Process.

DA1.

**Response: Agree.**

24. In a letter dated December 8, 1997, the District's General Manager stated to the Project Engineer,

> At the December 3, 1997 Board meeting you passed out an Actions Items list with associated dates for the Fiscal Year 2000 Budget Formulation And Assessment Rate. I realize that we can not do now but next year we should include the expenditures for previous year's budget by December 1, 1997. Outside of that comment the goals and timetables look pretty decent. They may have to move one way or he other because of conflicts and times, but they look like acceptable goals at this time.

DA4.

**Response: Agree.**

25. The Action Items discussed in the correspondence between the Project and the District dated December 1 and December 8, 1997, outlined a rate setting process that followed a series of steps, from December through the spring of the ensuing year. DA2-4. Among other items, the action items included steps by which the Project would prepare a draft budget (4), share that

---

[2] *See District's Reply*, at 9.

budget with the District (5), conduct a fact finding meeting with the District (6), receive written comments (7), and, ultimately "Send/Submit recommendations and proposed final FY 2000 Budget package to Phoenix Area Director. Complete May by 28, 1998." DA3. The Project has followed this rate setting process for nearly a decade. Shaw Aff. ¶ 13 (DA146).

**Response: Agree, but immaterial.**

The United States has accurately portrayed the contents of the cited letter, but the letter is immaterial. The schedule for negotiating O&M charges between the U.S. and the District went only so far as to set a deadline for a final *recommendation* regarding the O&M charges. The schedule did not address the deadline for the Secretary's final decision fixing the O&M charges, which is the material factor at issue. The District never agreed that the recommendations provided pursuant to this schedule fixed the O&M charges under the Repayment Contract or that these recommendations constitute adequate contractual notice of the final fixed charges.[3]

26. The District has agreed that projections or estimates rendered in the Project budgets can reasonably vary from actual results. DA98. The District's general manager has explained that the timing of the budget process "means you have to guess" and expressed the opinion that "you still should be able to do a lot better and closer job of guesstimating work projects two years out than what we do." DA97-97A.

**Response: Agree.**

27. The Project budget's are prepared in accordance with the laws and contracts that govern the Project. Shaw Aff. ¶ 5 (DAI43). The budgets rely upon financial data generated from the Federal Finance System. Shaw Aff. ¶ 8, 11 (DAI44-45). Among the reports relied upon, the BIA 700 report provides data on all funds held by the Department of the Treasury for the benefit of the Project. Other reports track the disposition of funds. Id.

**Response: Agree in part, disagree in part, but immaterial.**

The District agrees with the last three sentences of Paragraph 27, but they are immaterial

[3] *See District's Reply*, at 7.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

because the ultimate source of this information is not in dispute. The material issue is whether the information provided to the District, whatever its source, adequately represented the actual financial condition of the Project and whether the BIA acted reasonably in relying upon select portions of that information in preparing annual budgets and O&M charges.

The District agrees that the cited affidavit from Randy Shaw supports the first sentence in Paragraph 27, but disagrees with the statement because it represents Mr. Shaw's personal opinion on a legal issue to be decided by the Court. Whether the United States' actions comply with the governing statutes and contracts is a matter of law for the Court to decide.

28. For fiscal year 2005, the San Carlos Irrigation Project Engineer prepared a draft budget dated April 1, 2003. Pl Ex. 23; Shaw Aff. ¶ 15 (DA147).

**Response: Agree.**

29. The Project shared its draft budget with the District at a meeting with the District's board of directors on April 10, 2003. Shaw Aff. ¶ 35 (DA155).

**Response: Agree.**

30. The Project revised the proposed FY2005 and conducted a fact finding meeting with the District on May 23, 2003. Pl Ex. 6 at 2-3; Shaw Aff. ¶ 36 (DA155).

**Response: Agree.**

31. The District was on notice from at least May 23, 2003 that the Project would recommend that the FY2005 annual O&M charge be fixed at $30 per acre. Pl. Ex. 6 at 2-3; Pl. Ex. 26.

**Response: Agree, but immaterial.**

The District agrees that this sentence is factually correct, but the date that notice of recommended charges was provided is immaterial because the BIA's draft budgets do not fix the O&M charges. The material issue is when the Secretary provided notice to the District of the final decision that actually fixed the charge.

32. By letter dated, June 6, 2003, the Western Regional Director notified the District of the $30 O&M charge and forwarded notice of the $30 O&M rate to the Assistant Secretary for Indian Affairs for publication in the Federal Register. 25 C.F.R. 171.1(e). Pl. Ex. 27.

**Response: Agree in part, disagree in part, but immaterial.**

The District agrees that the Western Regional Director informed the District of the $30 per acre for FY 2006 by letter dated that June 6, 2003 and that he forwarded the proposed rate to the Assistant Secretary. The District disagrees with any implication arising from the proposed statements of fact that the Western Regional Director's action actually fixed the O&M charge or constituted contractual notice of the charge.[4] The actions described in the proposed statement of fact is immaterial because the issue of whether the United States satisfied its contractual obligations must be decided based upon actions taken by the Secretary, not the Western Regional Director.

33. On June 12, 2003, the District transmitted its estimate of funds needed for the year that included the Project's FY2005 O&M charge to the Pinal County Board of Supervisors. DA5. The District assessed its landowners $51 per acre, which included $20 per acre for the Project O&M rate. P1 Ex. 6 at 3 (¶ 14); DA5.

**Response: Agree.**

34. The District made no O&M payment to the Project during calendar year 2004. DA46, 107-08.

**Response: Agree, but immaterial.**

The proposed statement of fact is factually accurate, but immaterial, because the District's contractual obligations at issue in this case are not affected by whether payment was made during a particular calendar year.

35. The District paid the Project's FY200S O&M charge of $1.5 million in twoinstallments, in March and April, 2005. Pl. Ex. 6 ¶ 15.

**Response: Agree.**

36. For the years FY1998-2004, the O&M charge for the Project was $20 per acre. Shaw Aff. ¶ 14 (DA147).

**Response: Agree.**

37. The FY2005 Project O&M charge was $30 per acre. 69 Fed. Reg. 23805 (April 30, 2004).

---

[4] *See District's Reply*, at 4-5.



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Pl. Ex. 2

**Response: Agree.**

38. The FY2006 Project O&M charge was $30 per acre. 70 Fed. Reg. 47740 (Aug. 8, 2005). P1. Ex. 53.

**Response: Agree.**

39. The FY2007 Project O&M charge was $30 per acre. 71 Fed. Reg. 17131 (April 5, 2006). PL. Ex. 70.

**Response: Agree.**

40. Project engineer Randy Shaw developed the first draft of FY2005 project budget in April 2003. Shaw Aff. ¶ I5, 34 (DA147, 154). That budget went through several revisions. Id. at ¶¶ 35-37 (DA155-56).

**Response: Agree.**

41. The budget Mr. Shaw prepared was presented to the District in an Excel workbook. Shaw Aff. ¶ 10 (DA145); Pl. Ex 34. In addition to a single page budget summary, the work book contained work pages that provided additional detail regarding the items reflected in the budget summary. Id. Mr. Shaw organized the budget under the major categories of income, obligations, sinking funds and reserves. Shaw Aff. ¶ 16 (DA147); Pl Ex. 34.

**Response: Agree.**

42. The Project's income is primarily a function of the O&M assessment to be determined. Shaw Aff. ¶ 22 (DA 149). It also includes amounts for interest received on funds held for the Project by the Department of the Treasury, miscellaneous income derived from the sale of permits, and income obtained from the sale of water in years when the Gila River Indian Community pumps excess water from irrigation wells. Id.

**Response: Agree, with a qualification.**

The District agrees with the proposed statements of fact, but the list of factors is incomplete. Project income for a given year also includes the surplus cash on hand at the start of the year, which

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

is a significant factor in the budget process that the United States ignored.[5]

43. To determine the Project's obligations or current operating expenses, Mr. Shaw documented costs incurred by the project over the prior years. Shaw Aff. ¶ 9, 11 (DA145). Mr. Shaw developed a factual baseline for the expenses regularly incurred by the Project and a reasonable basis for estimating what those costs would be in FY2005. Id. Budget obligations include costs for personnel, supplies and service contracts.

**Response: Agree in part, disagree in part, but immaterial.**

The District agrees with the first and third sentences of this paragraph. The District agrees that the cited affidavit from Randy Shaw supports the second sentence of the paragraph, but disagrees with the statement because it represents Mr. Shaw's personal opinion on a legal issue. Whether the United States' costs estimates were reasonable is a matter of law for the Court to decide.

44. The Project may also obligate funds for maintenance work. Shaw Aff. ¶ 29 (DA151). The budget category "Land & Structures" refers to non-routine maintenance of land and structures within the Project. Id. As project engineer in 2003, looking forward to FY2005, Mr. Shaw surveyed the maintenance needs of the project and anticipated what maintenance projects would likely be undertaken in FY 2005. Id.

**Response: Agree.**

45. In 2003, Mr. Shaw anticipated that the Project would perform maintenance on the China Wash flume during FY2005. Shaw Aff. ¶ 29 (DAI51-52). The China Wash Flume is a concrete structure that carries water over a dry river bed. Shaw Aff. ¶ 30 (DA 153). The Project discussed the China Wash Flume work with the District and the District agreed the work was required. DA99, 106.

**Response: Agree.**

[5] *See District Reply*, at 15-18.



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

46. Due to the estimated cost of the China Wash Flume work, the Project anticipated collecting $117,000 in funds for the effort yearly from FY2002-2004 and that it would maintain those funds in a Sinking Fund until the work was performed. Shaw Aff. ¶ 30 (DA 153). In 2003, the project engineer estimated that $351,000 set aside for maintenance of the China Wash flume by FY2005 would be obligated for expense in 2005 as reflected in the FY2005 budget category of "Land & Structures". Id; Pl. Ex. 34.

**Response: Agree.**

47. In total, the FY2005 budget, prepared in the spring of 2003, estimated that the Project would obligate $3,151,000 in FY2005. Pl. Ex. 34.

**Response: Agree.**

48. The actual obligations incurred by the Project from FY1999-2002 were:

| | |
|---|---|
| FY1999 | $3,335,416 |
| FY2000 | $3,507,679 |
| FY2001 | $3,164,958 |
| FY2002 | $3,098,319 |

PL. Ex. 76; DA42.

**Response: Agree.**

49. The FY2005 assessment of $30 per acre reflected an increase of the annual assessment from a rate of $20 per acre that had prevailed from FY1998-2004. Shaw Aff. ¶ 14 (DA147). Because obligations had exceeded $3 million from FY1999-2002, the Project had operated at an annual deficit in those years which had been covered with reserve funds that were exhausted by FY2002. Shaw Aff. ¶ 14 (DA147); Pl. Ex. 76; DA42.

**Response: Agree in part, disagree in part.**

The District agrees with the first sentence of the paragraph. The District disagrees with the second sentence of this paragraph. The Project's total income exceeded its O&M obligations



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

during FY 1999 and FY 2004.[6] From FY 2000 to FY 2003, the Project's O&M obligations did exceed its total income, but the Project never began any of those years with less than $3.9 million in surplus cash.[7] Thus, the Project never operated at a "deficit" during those years because the Project's available income includes surplus cash carried over from the previous year, not just income received during the year at issue. Although the Project may have reduced its surplus cash somewhat during the years of $20 per acre assessments, it was in no danger of bankrupting the Project because total cash and income for FY 1999 exceeded $8.6 million.[8]

Furthermore, the Project's reserves could not have been "exhausted" by the end of FY 2002, because the Project began FY 2003 with $3.9 million in surplus cash.[9] Although their reasoning is not explained, Mr. Shaw's cited testimony and the second sentence of this paragraph apparently allege that the Project's reserves were exhausted because the BIA shows a negative number for end-of-year cash in FY 2002. That negative balance is an accounting trick that misrepresents the Project's actual financial condition. The BIA arrived at the negative balance by: (1) subtracting amounts "reserved" for maintenance items;[10] and (2) backing out money already collected for the coming fiscal year.[11] This trick has been used repeatedly by the BIA in an attempt to justify higher O&M charges, but since 1996 the Project has never ended the year with less than $2.1 million in surplus cash and the average year-end total over the last twelve years was $3.8 million.[12]

The FY2005 budget proposed by the United States in June 2003 also contradicts the United States claims that the BIA believed the Project's funds were exhausted. The June 2003 budget

---

[6] *See* DA42.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] To claim that the reserves were exhausted, the BIA subtracted $1.7 million in maintenance-related reserves from income for FY 2002, excluding the emergency reserve fund. That is more than the Project spent on these maintenance-related items for the eight years between 1999 and 2007, including the recent maintenance on China Wash Flume. Plaintiff's Findings of Proposed Uncontroverted Facts ("FOF"), ¶ 131.
[11] *Id.*
[12] Plaintiff's Supplemental Findings of Proposed Uncontroverted Facts ("SFOF"), ¶ 16.

projected that the Government would have unobligated cash on hand totaling up to $3.9 million at the start of FY2003; $3.2 million at the start of FY2004; and $3.7 million at the start of FY2005.[13]

50. In addition to current obligations, the FY2005 budget developed by supervisory civil engineer Shaw identified unobligated funds in the possession of the Project. Shaw Aff. ¶ 17-21 (DA147-49). Some of those funds were held as sinking funds (for planned maintenance projects), some funds were held as an emergency reserve, and any remaining funds were also identified. Id.

**Response: Agree, with a qualification.**

The District agrees that the Shaw Affidavit states that Mr. Shaw "identified" the fact that the Project possessed millions of dollars of surplus cash. Mr. Shaw does not state, however, that he considered the availability of that surplus cash in formulating the FY 2005 budget or that he considered providing a credit or refund to the District from that surplus cash by lowering the O&M charge for FY 2005. As a result, the Project's cash surpluses increased over the course of FY 2005 by roughly the same amount that the District paid in O&M charges for the year.[14]

51. For fiscal year 2005, the budget included sinking funds categories of heavy equipment, well replacement, and China Wash Flume Rehab/Replacement. Shaw Aff. ¶ 30 (DA152-53); Pl. Ex 34. For fiscal year 2005, the budget did not set aside any new funds for the China Wash Flume. Id. In addition, the Project acceded to comments from the District and did not set aside any funds for well replacement. Id. The total sinking fund allocation in FY 2005 was less than $10,000 for heavy equipment. Pl. Ex. 34.

**Response: Agree.**

52. For FY2005, the Project budgeted an emergency reserve of $600,000. Shaw Aff. ¶ 31 (DA153); Pl. Ex 34. This reserve was consistent with BIA guidelines and the District concurred with its purpose. DA93; PL. Ex. 13 at 96.

---

[13] *See* Plaintiff's Exhibit 34; *see also* SFOF ¶¶ 8-11.

[14] The Project began FY 2005 with surplus cash of over $2.5 million. By the end of FY 2005, the Project's surplus cash totaled $4.0 million. *See* FOF, ¶¶ 51-60, 68 and 75.



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

**Response: Agree.**

53. By letter dated June 6, 2003, the BIA Western Regional Director provided to the District the Project budget that was relied upon to set the FY2005 O&M charge of $30 per acre. Pl Ex. 27, 34. That budget estimated that the Project would have unobligated cash on hand on October 1, 2004 of $3,674,619 and after adding income anticipated during FY2005, estimated that the project would have total funds available to it in the amount of $3,780,119 during fiscal year 2005. P1 Ex. 34. The same budget estimated that the project would incur obligations of $3,151,000 during FY2005, leaving a balance of $629,119, which reflected the emergency reserve of $600,000 and a sinking fund for heavy equipment of $9,844. PL. Ex. 34.

**Response: Agree, with a qualification.**

Although this paragraph accurately reflects the details of the BIA's June 6, 2003 budget, it does not explain that the projected year-end balance of $629,199 was an unreasonable estimate that misrepresented the Project's financial picture. The primary reason for the artificially low ending balance was that the BIA included no collections of O&M charges in the Project's projected income.[15]

54. For the years FYI999-FY2002, the Project generated the following income:

| | Interest | Excess Pumping | Miscellaneous |
|---|---|---|---|
| FY1999 | $431,228 | $0 | $217,631 |
| FY2000 | $352,334 | $248,723 | $ 70,437 |
| FY2001 | $289,681 | $281,520 | $ 2,312 |
| FY2002 | $ 76,642 | $0 | $263,618 |

PL. Ex. 76; DA42.

**Response: Agree.**

55. Excess pumping income is generated when the Gila River Indian Community is permitted to run well pumps to obtain excess water. The circumstance is highly dependent upon the weather, and, consequently, as an income source, it is highly uncertain. Shaw Aff. ¶ 23 (DA149-50).

---

[15] *See District's Reply*, at 18-19.



Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

**Response: Agree in part, disagree in part, but immaterial.**

The District does not dispute the first sentence. The District, however, disagrees with the second sentence, which is the opinion of Mr. Shaw, not a material fact. The proposed finding of fact is immaterial, however, because it is for the Court to decide whether Mr. Shaw's estimates were reasonable as a matter of law.

56. In June 2003, the Project had no approved estimate for FY2006 O&M charges (that would be payable in FY2005 under the 1924 Act). Shaw Aff. ¶ 38 (DA156). In accord with parties' agreed upon rate setting process and the requirement to fix O&M charges annually, two years in advance, that FY2006 O&M charge would not be known until 2004. Id.

**Response: Agree.**

57. The FY2005 budget estimated that the Project would obligate $53,045 in "Services" for an archeological study during that year. Pl. Ex. 34 at 11.

**Response: Agree.**

The District does not dispute this proposed finding of fact. The District does dispute as a matter of law, however, any implication that the cost of the archeological study is a contractually authorized O&M item chargeable to the District.[16]

58. The United States District Court for the District of Arizona has found:

> Prior to inundation of the Lake [San Carlos Reservoir] in 1928, the lake-bed was the site of the town of "old" San Carlos where the Apache Tribe resided. Additionally, the waters impounded behind Coolidge Dam cover tribal cemeteries, graves, and archeology sites that contain and protect human remains, private homes, a grain mill, and many other historical sites, many of which have significant spiritual and cultural meaning to the Apache Tribe.

San Carlos Apache Tribe v. United States, 272 F. Supp. 2d 860 (D. Ariz. 2003), aff'd, 417 F.3d 1091 (9th Cir. 2005).

**Response: Agree.**

The District does not dispute that the quotation accurately reflects statements by the court in

[16] *See District's Reply*, at 19-20.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

the cited case. The District disputes as a matter of law, however, that the case can be interpreted to require the archaeological study for which the District is being charged, because the court in that case held that the Project has no legal obligation to survey or protect archaeological remains at the Reservoir due to daily Project operations.[17]

59. The National Historic Preservation Act, 16 U.S.C. § 470 et seq. ("NHPA") encourages the preservation of sites and structures of historic, architectural or cultural significance. San Carlos Apache Tribe v. United States, 417 F.3d at 1093-94. Pursuant to NHPA, the Project has a duty to "take into account the effect of [its] undertakings on 'any district, site, building, structure or object that is included in or eligible for inclusion in the National Register" Id. at 1094, and the Project has a statutory duty to establish a preservation program for the protection of historic properties. 16 U.S.C. § 470h-2(a)(1)-(2). The Project is responsible for the protection of Native American human remains and objects pursuant to the Native American Graves Protection and Repatriation Act, 24 U.S.C. § 3001 et seq. San Carlos Apache Tribe v. United States, 272 F. Supp. 2d at 886-94.

**Response: Agree in part, disagree in part, but immaterial.**

The District agrees that the quotations and paraphrased language from the cited Ninth Circuit Court of Appeals decision correctly reflects the language of the court. The District disputes the remainder of this paragraph, which constitutes immaterial legal arguments and interpretations by Defendant's counsel, not a material statement of fact.

60. From 1999-2004 the Project incurred the following obligations:

| | |
|---|---|
| FY1999 | $3,355,416 |
| FY2000 | $3,507,679 |
| FY2001 | $3,164,958 |
| FY2002 | $3,098,319 |
| FY2003 | $2,594,929 |
| FY2004 | $2,564,940 |

PL. Ex. 76; DA42.

**Response: Agree.**

---

[17] *Id.*

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

The District agrees that this proposed finding of fact accurately portrays the Project's obligations for the years listed, based on the cited document. The District would add, however, that these figures alone provide an incomplete picture of the Project's financial situation in fiscal years 1999 through 2004. A more representative account would also include the fact that, at the start of each fiscal year from 1999 to 2004, the United States' unobligated cash exceeded the United States' obligations for that fiscal year:[18]

1999: $5,182,352
2000: $5,581,310
2001: $5,044,294
2002: $4,570,317
2003: $3,944,172
2004: $2,597,248

61. In the years FY2003 and FY2004, the Project performed no significant maintenance work as the obligated amounts for "Land & Structures and & Special Projects" were $0 in those years. Pl. Ex 76; DA42.

**Response: Agree.**

62. According to a memorandum dated October 1, 2004, the BIA Western Regional Director reviewed a proposed Project budget for FY2006 that would have allowed imposition of a $15 per acre O&M rate. Pl. Ex. 46. The regional director rejected that recommendation and identified specific maintenance items that would have been unfunded or underfunded in such a budget. Id; PPFUF ¶ 87-91.

**Response: Agree.**

The District does not dispute that this paragraph accurately reflects the referenced events, based on the documents cited. The District disputes as a matter of law, however, that the Director's actions and conclusions in rejecting the $15 O&M rate were reasonable or satisfied the United States' contractual obligations.

63. The FY2006 Project budget that was relied upon to determine the FY2006 O&M charge of

---

[18] *See* Plaintiff's Exhibit 76.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

$30 per acre is dated October 28, 2004. PPFUF ¶ 99-100; Pl. Ex. 45 at 4; Pl. Ex. 35; Shaw Aff ¶ 39 (DA156); DA113-14.

**Response: Agree.**

64. The FY2006 budget included an anticipated obligation of $640,000 for well replacement under the category Land & Structures. Pl. Ex. 35. In May 2002, the Project Engineer had conducted a study and found that: (1) wells had been drilled in every decade of the Project, from the 1930's through the 1980's, (2) by 2004, 26 of the Project wells were more than 60 years old, and (3) no new wells had been drilled in 20 years. Shaw Aff. ¶ 30 (DA 152-53). Based upon this information, the Project determined that it should anticipate the need for replacement of wells used to supplement the delivery of water from the San Carlos Reservoir. Id. No funds were set aside for the well replacement sinking fund in FY2003 through FY2005 due to financial constraints. Id. In 2004, the Project redirected $500,000 in funds that had been previously set aside for well replacement to cover expenses not met by the then FY2004 assessment rate of $20 per acre. Id. For FY2006, the Project planned to reestablish a well replacement fund. Pl. Ex. 35.

**Response: Agree.**

The District agrees that this paragraph accurately reflects the BIA's actions in regard to the well replacement program. The District disagrees as a matter of law, however, with any implication that these actions were reasonable. Whether the United States' projected obligations were reasonable is a question of law for the Court to decide.

65. For the FY2006 budget, the Project reviewed the various heavy equipment, vehicles and trucks used by the Project and determined the Project's needs through the development of a replacement schedule based upon a survey of that equipment. DA 119-21.

**Response: Agree.**

The District agrees that this paragraph accurately reflects the BIA's actions in regard to heavy equipment. The District disagrees as a matter of law, however, with any implication that these actions were reasonable. Whether the United States' projected obligations were reasonable

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

is a question of law for the Court to decide.

66. The award of a contract for the China Wash Flume was delayed and the funds for the work were not obligated as anticipated in FY2005. Shaw Aff. ¶ 30 (DA153). Funds for the China Wash Flume rehabilitation were obligated to a contract in FY2006. DA87-89. The work was performed in FY2007. Shaw Aff. ¶ 30 (DA153).

**Response: Agree.**

67. In developing the FY2006 Project budget, project engineers recommended that the O&M charge be set at $30 per acre based upon their evaluation of the Project's needs. DA112, 119-21. The engineers were never asked to support a particular rate assessment. DA112, 122.

**Response: Agree in part, disagree in part, but immaterial.**

The District agrees with the first sentence of this paragraph. The District agrees that the cited documents support the statement in the second sentence, but dispute the truth of the statement. According to the United States' own documentation, Mr. Kaskalla, civil engineer for the Project, wrote the decision documents that set the proposed O&M charge at $30 per acre. Because Mr. Kaskalla also supervised the subsequent preparation of the budget supporting that $30 per acre charge, he did not have to be "asked to support a particular rate assessment." Whether or not the engineers were requested to support a particular budget is immaterial, however, because their budget was unreasonable as a matter of law.[19]

68. Because the FY2006 budget cycle was prolonged until December 2004, the Project determined the FY2007 budget at the same time as it finalized the FY2006 budget. DA113-14. The FY2007 budget was included in a fact finding meeting with the District on December 16, 2004. Id.

**Response: Agree.**

69. The BIA commented upon the FY2007 budget cycle in a notice published in the Federal Register. That notice states,

---

[19] *See District's Reply*, at 16-17.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

> [a]s early as December 16, 2004, at a Fact Finding Meeting, BIA provided the District with a budget and rate projection for the period 2006-2010, indicating that the annual O&M rate was projected to remain at $30.acre for this time period. BIA staff met with the District Board ten times during CY 2005 at which time BIA provided Project budget, expenditure, cash balance, income, and rate information, and reiterated BIA's projection that the $30/acre O&M rate was likely to remain constant from 2006-2010 in order for BIA to operate the Project adequately, maintain a sufficient reserve account for emergencies, and to build up a sinking fund for major capital projects that need to be funded in the future, such as well replacements.

71 Fed. Reg. 17132 (April 4, 2006) (Pl. Ex. 70).

**Response: Agree.**

70. The Project estimated its annual operating expenses and maintenance needs for FY2007 in the budget dated October 28, 2004. Pl. Ex. 35. The Project provided a copy of that budget to the District at a meeting in December 2004. PPFUF ¶ 98-99; DA112-13; Pl. Ex. 35.

**Response: Agree.**

71. The FY2007 budget estimated that the Project's obligations would exceed $3.5 million in FY2007 as it had in FY1999 and FY2000. PL. Ex. 35; DA42. The FY2007 budget estimated that $650,000 would be obligated for well replacement during the year and that an additional $330,000 would be placed in a sinking fund for well replacement during FY2007. Pl. Ex. 35. The Project anticipated continuing to fund reserves for heavy equipment. Pl. Ex. 35.

**Response: Agree.**

72. The Project incurred actual obligations of more than $3 million in FY2007. Pl. Ex. 72.

**Response: Agree.**

73. The District is "agreeable to replacing wells when they need to be replaced" but did not agree with the Project's "program approach to the replacement of the wells." DA104-06. After considering the District's views, in 2006, the Project accepted the District's approach and adopted a plan for replacing wells as they fail, rather than under a scheduled well replacement program. Shaw Aff. ¶ 43-44 (DA157-58); DA105-06.

**Response: Agree.**

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

74. In September 2007, the Project identified an obligation of $2 million of O&M funds to planned building construction. Pl. Ex. 72. On November 29, 2007, the BIA Acting Regional Director responded to the District's objection to this use of funds for that purpose and stated that "[u]pon further consideration, the Project has revised its proposed building plans and will not use Project irrigation O&M collections for this purpose." Pl. Ex. 68.

**Response: Agree.**

75. In addition to receiving budgets for upcoming fiscal years, the District also receives monthly reports prepared by the project engineer. Pl. Ex. 36, 37, 41, 49, 57, 59, 72, 73; Shaw Aff. ¶ 12 (DA146).

**Response: Agree.**

76. The project engineer's monthly reports provide information regarding the Project's actual receipts and expenditures. DA 100-03. According to the District, these reports present "the expenses and what they're [the Project] doing now, not what is projected." DA100.

**Response: Agree.**

77. The District's accounting expert, Lawrence Field has never audited a Government program, or an irrigation project, has never worked with the Federal Finance System, has never worked with reports generated from the Federal Finance System and has no experience or training in Federal appropriations law. DA124-28

**Response: Agree, but immaterial.**

Mr. Field does not need the listed qualifications in order to provide an expert opinion on the reasonableness, accuracy, and quality of the Project's financial records.[20]

78. Mr. Field has stated that he has no knowledge of the purpose for which the documents he relied upon to form his opinion in this case were prepared. DA129-35.

**Response: Agree, but immaterial.**

Although the District agrees that the finding of fact represents a portion of Mr. Field's

---

[20] *See District's Reply* at 27-28.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

testimony, the United States omitted clarifying language provided by Mr. Field in his deposition. What Mr. Field actually said was, although he did not know why particular documents were prepared in the first place, he did know that they ultimately were provided to the District in support of Project budgets and O&M charges and that, as such, they were misleading and inaccurate. The proposed finding of fact is immaterial in any event, because the original purpose of these documents is irrelevant. The issue is whether they accurately reflected the Project's financial condition when the BIA provided them to the District for that purpose.[21]

79. Mr. Field stated that he did not know what documents were actually used by the Project to determine the annual O&M assessment. DA129-35.

**Response: Disagree, but immaterial.**

The District disagrees with the proposed finding of fact because it misrepresents the cited testimony of Mr. Field. In the cited deposition, Defendant's counsel was referencing only the multiple drafts of budgets for various fiscal years produced by the BIA. What Mr. Field stated was that, out of the numerous budget drafts presented to the District for a given fiscal year, he did not know which one the BIA actually relied on to make a budget recommendation to the Secretary. Until the United States provided that information in this litigation, know one for the District knew exactly which budget formed the basis for the Secretary's decisions regarding the O&M charges at issue because of the confusing and incomplete manner in which the BIA provides financial information to the District. The proposed finding of fact is immaterial in any event, however, because the O&M charges at issue were unreasonable and in violation of the United States' contractual obligations as matter of law, regardless of which budget the Secretary based the decisions on.

80. Mr. Field does not dispute any of the historical data that was actually relied upon by the Project to determine the O&M charges for FY2005-07. DA129-35.

**Response: Agree.**

---

[21] *Id.*

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

The District agrees with this proposed finding of fact, but notes that the data relied upon by the BIA was unreasonably limited and did not take into account other material factors, such as the millions of dollars in cash surpluses that the Project carried over each year.[22]

81. In explaining how he would expect an O&M rate to be determined, Mr. Field stated:

> Q. But is it your opinion that they [the budget preparer] should be relying upon - that the budget preparer should be relying upon historical information?
>
> A. [Mr. Field] Plus known changes, yes.
>
> Q. Plus known changes.
>
> A. That's correct.
>
> Q. If the preparer possessed, for the 2005 budget, that data from fiscal year 1999 through year 2002 and that was the only data it possessed, because that budget was prepared in spring 2003, is it the 1999 through 2002 data that the preparer should rely upon?
>
> A. Is that a hypothetical?
>
> Q. Yes.
>
> A. In a hypothetical sense, they should rely on that data and then roll that data forward for known changes, yes.

DA137-38.

**Response: Agree.**

82. Mr. Field did not render any opinion upon whether the Project's O&M rates for FY2005-2007 were too high. DA139-41.

**Response: Agree.**

The District notes, however, that Mr. Field did render an opinion on the current financial condition of the Project.[23]

83. By 2006, the Project had accumulated O&M funds in excess of current obligations. DA42.

**Response: Agree.**

---

[22] *See District's Reply*, at 15-18.
[23] *See* FOF 131.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

84. For FY2008 the Project estimated that it would incur obligations of $3,179,000 and maintain Sinking Funds and Reserves of $689,000 for a "Total Obligations and SF&R [Sinking Funds and Reserve] Cash" of $3,868,000. DA42.

**Response: Agree.**

85. The FY2008 Project O&M charge is $21 per acre. Pl. Ex. 62 (72 Fed. Reg. 19950 (April 20, 2007).

**Response: Agree.**

86. The FY2008 budget anticipates that the difference between the O&M charge of $21 per acre ($2,100,000) and anticipated needs for those years will be covered by the funds accumulated in prior years. Shaw Aff. ¶ 48 (DA158-59).

**Response: Agree in part, disagree in part, but immaterial.**

The District does not dispute that this proposed finding of fact accurately reflects Mr. Shaw's statement in the cited affidavit. However, this belief was never communicated to the District, and is not supported by material facts.[24] The proposed finding is immaterial in any event, however, because what the BIA may have anticipated in regard to a credit in FY 2008 is irrelevant. If the United States is asserting the purported credit should offset the District's damages in this case, it is the actual fact of whether a credit will be received, not the BIA's projections, that is material.

87. For FY2009, the Project estimated that it would incur obligations of $2,921,000 and hold Sinking Funds and Reserves of $1,008,000 for a "Total Obligations and SF&R [Sinking Funds and Reserve] Cash" of $3,929,000. DA42.

**Response: Agree.**

88. The FY2009 Project O&M charge is $21 per acre. PL. Ex. 62 (72 Fed. Reg. 19950 (April 20, 2007).

**Response: Agree.**

---

[24] *See District's Reply*, at 21-26.

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

89. The FY2009 budget anticipates that the difference between the O&M charge of $21 per acre ($2,100,000) and anticipated needs for those years will be covered by the funds accumulated in prior years. Shaw Aff. ¶ 48 (DA158-59).

**Response: Agree in part, disagree in part, but immaterial.**

The District does not dispute that this proposed finding of fact accurately reflects Mr. Shaw's statement in the cited affidavit. However, this belief was never communicated to the District, and is not supported by material facts.[25] The proposed finding is immaterial in any event, however, because what the BIA may have anticipated in regard to a credit in FY 2009 is irrelevant. If the United States is asserting the purported credit should offset the District's damages in this case, it is the actual fact of whether a credit will be received, not the BIA's projections, that is material.

90. The Arizona Water Settlements Act ("Settlements Act") authorizes the settlement of certain water rights and provides for rehabilitation and operation and maintenance of the San Carlos Irrigation Project. 118 Stat. 3478, 3499 (2004).

**Response: Agree.**

91. The Settlements Act authorized the Secretary of the Interior to execute an agreement called the Gila River agreement and directed the Secretary to execute exhibit 20.1 to the Gila River agreement, known as the Joint Control Board agreement 118 Stat. at 3499-500 (Sec. 203).

**Response: Agree.**

92. Responsibility for certain operation and maintenance of the Project will transfer from the BIA to the District and the Gila River Indian Community to be administered through a Joint Control Board ("JCB") appointed by the District and the Community. DA10-41.

**Response: Agree.**

93. In the Joint Control Board Agreement, the United States has agreed that it shall:

> Transfer to the JCB any and all financial reserves, materials and equipment that it holds for the operation and maintenance of the Project Joint Works, less any funds, materials and equipment necessary to accomplish the continuing responsibilities of the United States ....

---

[25] *See District's Reply*, at 21-26.

DA14.

**Response: Agree.**

94. The transfer called for in the Joint Control Board agreement is expected to occur on or about July 13, 2009. 72 Fed. Reg. 71143 (Dec. 14, 2007); DA20.

**Response: Agree.**

95. The summary budget worksheet dated December 12, 2006, Pl. Ex. 74, is not a complete budget workbook and it was not used to develop or support any proposed O&M assessment rate. Shaw. Aff. ¶ 51 (DA159).

**Response: Agree.**

RESPECTFULLY SUBMITTED this 24th day of July, 2008

By: /s/ RINEY B. SALMON

Riney B. Salmon II
SALMON, LEWIS & WELDON, P.L.C.
2850 E. Camelback Rd., Suite 200
Phoenix, Arizona 85016
(602) 801-9060 (office)
(602) 801-9070 (facsimile)
*Attorneys for Plaintiff*

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Certificate of Filing

I certify that on July 24, 2008, a copy of the foregoing "PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ RINEY B. SALMON
Riney B. Salmon

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Salmon, Lewis & Weldon, P.L.C.
2850 E. Camelback Road, Suite 200
Phoenix, Arizona 85016

Certificate of Filing

I certify that on July 24, 2008, a copy of the foregoing "PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ RINEY B. SALMON
Riney B. Salmon