IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-576C
(Judge Lawrence J. Block)

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KIRK T. MANHARDT
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-0541
Facsimile: (202) 514-8640

OF COUNSEL:

WILLIAM W. QUINN
Field Solicitor
Phoenix Field Office
Office of the Solicitor
U.S. Department of the Interior

August 26, 2008

Attorneys for Defendant

## TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. The District Was Properly Assessed A Late Payment Penalty For FY2005 ..... 2

A. The District's Payment Was Late ..... 2

B. The Government Did Not Cause The District's Late Payment ..... 3

II. The District Is Not Entitled To Damages Based Upon The FY2005-07 O&M Charges ..... 8

A. The San Carlos Decision Precludes The District's Claim ..... 9

B. The FY2005-2007 O&M Charges Were Reasonable ..... 11

III. The District Misstates The Standard Governing Its Claim Of Breach Of Good Faith ..... 15

IV. The District's Attack Upon The Project's Budget Process Must Be Rejected ..... 18

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

## CASES

**PAGE(S)**

Burnside-Ott Aviation Training Center v. Dalton,
107 F.3d 854 (Fed. Cir. 1997) .......... 15

Butler v. Principi,
244 F.3d 1337 (Fed. Cir. 2001) .......... 15

Carolina Tobacco Co. V. Bureau of Customs & Border Protection,
402 F.3d 1345 (Fed. Cir. 2005) .......... 15

Casitas Municipal Water District v. United States,
72 Fed. Cl. 746 (2006) appeal pending, No. 2007-5133 (Fed. Cir.) .......... 14

Chapman Law Firm v. United States,
90 F.3d 934 (Fed. Cir. 2007) .......... 15

Davis v. Department of Homeland Security,
239 Fed. Appx. 586 (Fed. Cir. 2007) .......... 15

Erinys Iraq Ltd. v. United States,
78 Fed. Cl. 518 (2007) .......... 16

Gonzales v. Def. Logistics Agency,
772 F.2d 887 (Fed. Cir. 1985) .......... 15

Jennings v. Mansfield,
509 F.3d 1362 (Fed. Cir. 2007) .......... 15

Nampa & Meridian Irr. Dist. v. Bond,
268 U.S. 50 (1925) .......... 14

San Carlos Apache Tribe v. United States,
417 F.3d 1091 (9th Cir. 2005) .......... passim

San Carlos Irrigation and Drainage District v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... passim

San Carlos Irrigation and Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) .......... 14

South Corp. v. United States,
690 F.2d 1368 (Fed. Cir. 1982) ..... 9

T&M Distribs., Inc. v. United States,
185 F.3d 1279 (Fed. Cir. 1999) ..... 16

Tecom, Inc. v. United States,
66 Fed. Cl. 736 (2005) ..... 16

United States v. Armstrong,
517 U.S. 456 (1996) ..... 15

Weyerhauser v. United States,
92 F.3d 1148 (Fed. Cir. 1996) ..... 9

## STATUTES

16 U.S.C. § 470 (National Historic Preservation Act) ..... 13

24 U.S.C. § 3001 (Native American Graves Protection Act) ..... 14

25 C.F.R. § 171.1(e) ..... 7

25 C.F.R. § 171.1(g) ..... 7

56 Fed. Reg. 43984 (Sept. 5, 1991) ..... 6

58 Fed. Reg. 43990 (Aug. 18, 1993) ..... 6

60 Fed. Reg. 4499 (Jan. 23, 1995) ..... 6

63 Fed. Reg. 12818 (March 16, 1998) ..... 6

76 Fed. Reg. 19950 (April 20, 2007) ..... 10

Ariz. Rev. Stat. § 48-3096(A) ..... 4, 5

San Carlos Irrigation Project Act of 1924, 43 Stat. 475-76 ..... 2

The Arizona Water Settlements Act, 118 Stat. 3478 ..... 10

## MISCELLANEOUS

1935 Federal Gila Decree, www.gilawater.org ........ 15

Proposed Contract - Savage Irrigation District, 60 Interior Dec. 150 (1948)
1948 WL 5067 (DOI) ........ 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND, DRAINAGE DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-576C (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT
OF CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of this Court ("RCFC"), defendant, the United States, respectfully requests that the Court grant the Government's cross-motion for summary judgment and deny the motion for summary judgment of plaintiff, San Carlos Irrigation and Drainage District ("SCIDD" or the "District"). The briefs filed by the parties demonstrate that there are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor.

INTRODUCTION

The District's first claim, regarding the assessment of a penalty fee for the District's late payment of operation and maintenance ("O&M") charges for FY2005, must be rejected because the Repayment Contract required the payment of a late fee when the District failed to pay the charges that were due on March 1, 2004, until a year later, even though the District timely collected funds from landowners for the FY2005 payment. The District's second claim, regarding the amount of O&M charges assessed from FY2005-2007, must also be rejected

because it is barred by San Carlos Irrigation and Drainage District v. United States, 111 F.3d 1557, 1568 (Fed. Cir. 1997) ("San Carlos") and because the O&M charges assessed were reasonable.

ARGUMENT

I. The District Was Properly Assessed A Late Payment Penalty For FY2005

The District was properly assessed a late penalty for FY2005 because the District failed to pay its FY2005 O&M assessment by March 1, 2004, the date required by the San Carlos Irrigation Project Act of 1924, 43 Stat. 475-76 (1924) ("1924 Act") (Pl. Ex. 4) and the parties' Repayment Contract (Pl. Ex. 1).[1] In addition, it is uncontroverted that the Department of the Interior, Bureau of Indian Affairs, San Carlos Irrigation Project (the "Project" and the BIA's Western Regional Director provided the District with notice of the recommended FY2005 O&M rate in the spring of 2003 in accord with the parties agreement, that notice was sufficient to allow the District to estimate its expenses under Arizona law, and finally, the District actually collected funds for payment to the United States, and simply withheld that payment until it was late. As we demonstrate below, the Districts' attempt to excuse its own conduct by blaming the Government must be rejected.

A. The District's Payment Was Late

The District has admitted, as it must, that the 1924 Act mandates that operation and

---

[1] "Pl. Resp. Br. __" refers to plaintiff's reply and response to our cross-motion; "Pl. Ex. __" refers to plaintiff's exhibits in support of its motion for summary judgment filed on April 9, 2008, as supplemented by the appendix to plaintiff's reply and response; "Def. Br. __" refers to our cross-motion; "DA __" refers to defendant's appendix to our cross motion for summary judgment, as supplemented by the appendix to this reply;"PPFUF ___" refers to plaintiff's proposed findings of uncontroverted fact; "Pl. Supp. PFUF __" refers to plaintiff's supplemental proposed findings and, "DPFUF __" refers to our proposed findings of uncontroverted fact.

maintenance charges shall be paid by landowners, through the District, by March 1 in advance of the year for which the charges are due. Pl. Ex. 4 (43 Stat. at 476). PPFUF ¶ 9. The 1924 Act further required that the Repayment Contract incorporate the March 1 payment date, Pl. Ex. 4 (Sec. 4). The District's failure to make payment on time established its delinquency and required application of the parties' agreed-upon penalty provision. Pl. Ex. 1 at 20-21.

The District's response brief, despite its rhetoric, does not dispute that for FY2005, the District received sufficient information, within sufficient time, to meet its obligations under Arizona law. In fact, almost a month earlier than required, on June 12, 2003, the District transmitted its estimate of funds needed for FY2005 to the Pinal County Board of Supervisors. DA5. The District collected funds from its landowners, PPFUF ¶ 6, and then, with knowledge of its statutory and contractual duties, the District simply withheld payment of its FY2005 O&M assessment for a year. Pl. Resp. To DPFUF ¶¶ 34, 35. Consequently, the District was properly assessed a delinquent payment penalty of $47,500 for FY2005.

B. <u>The Government Did Not Cause The District's Late Payment</u>

Disregarding its own conduct, the statute, and the parties' agreement, the District argues that it should not be held responsible for its late payment. Pl. Resp. Br. 2-11. Contrary to the District's arguments, the contract does not define how the Secretary must fix the annual O&M assessment or when the Government must give notice of the assessment. The District's reliance upon a 60 year old Solicitor's legal opinion to define the term "fix" does not support its case. Pl. Resp. Br. 4. The issue in the opinion, Proposed Contract - Savage Irrigation District, 60 Interior Dec. 150 (1948), 1948 WL 5067 (DOI), involved a different contract and addressed the absence of clear due dates and amounts. Here, the 1924 Act and the parties' contract mandated the

District's payment date of March 1 and the District was advised of a sum certain "in sufficient time," in accordance with the contract, to allow it to estimate its expenses under state law. Moreover, to the extent the District wanted to await the publication of the final Federal Register notice, that notice was published on April 30, 2004, Pl. Ex. 22, in time for the District to pay its FY2005 O&M assessment by May 15, 2004 and avoid triggering the contract's late penalty. Pl. Ex. 1 at 20, Pl Ex. 7. Instead, the District disregarded its obligations. It is the District that now seeks to convert its requirement to pay the FY2005 O&M assessment into some kind of floating obligation.

Notwithstanding the District's attempt to excuse its failure, the contract provides for notice of O&M charges "in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts," Pl. Ex. 1 at 8. The contract also requires the District to "use all the powers and resources of the District, including the taxing power and the power to withhold the delivery of water, to collect and pay to the United States all charges authorized under this agreement in full on or before the day that the same become due." Pl. Ex 1 at 18. The uncontroverted record demonstrates that the District received sufficient notice for FY2005 that allowed it to timely collect funds for FY2005. Def. Br. 16-17. In its effort to refute this simple fact, the District misconstrues the contract, the Acting Director's 1997 decision upon which it seeks to rely, and, the District's own agreement.

First, as we have demonstrated, the Repayment contract does not incorporate Arizona law and it does not require notice by July 1. Def. Br. 13. The Arizona statute upon which the District attempts to rely to limit its obligation to collect payments due to the United States, Ariz. Rev.

Stat. §48–3096(A) has no application to the United States and cannot change the agreement the District made with the United States. In any event, the statute posed no constraint in FY2005 as the District met its obligations under state law and, as we have demonstrated, simply chose not to pay the United States on time.

Second, the District's attempt to portray the Government's position as at variance with the 1997 Acting Director's decision is flatly contradicted by that very decision. The Acting Director's decision faulted the Project for making its final recommendation concerning an annual O&M assessment "less than a week prior to July 1" and after the District's June board meeting. Pl. Ex. 18 at 16. In contrast, for FY2005, fact finding meetings were held with the District in April and May and the District received both the Project's recommendation and the Director's determination by June 6, 2003.

Moreover, the District has misread the Acting Director's decision. In the 1997 decision, the Acting Director's proposed solution to the timing issue was expressly to "remand" to the Project, in consultation with the District and the Indian Works, . . . "the task of adopting an appropriate and specific schedule and deadline for this activity." Id. Following that direction, the Project developed the very schedule directed by the Acting Director, DA1-4, the District agreed with that schedule, and the schedule was followed for FY2005. Shaw Aff. ¶¶ 34-37 (DA154-55); PPFUF ¶¶ 53, 55-58.

Finally, the District's argument that it did not agree with the budget schedule is contradicted by its contemporaneous agreement (DA4) and the testimony of its General Manager,

Douglas Mason, on behalf of the District in this case. DA163-65.[2] Moreover, the District's attempt to limit the schedule's significance, and its contention that it has complained about the schedule, mischaracterize the record. With regard to the schedule's significance, the Acting Director's decision itself demonstrates that the schedule was designed to fulfill the terms of the parties' contract and was adopted at the District's urging. Pl. Ex. 18 at 16. As for the District's complaints, they began well after the FY2005 budget fact finding process had been completed and thus are not relevant to the parties' conduct in FY2005. See Pl. Supp. PFUF ¶¶ 4-6. Plainly, the District's criticism of the budget development process is a post hoc attack upon the process motivated by its dissatisfaction with the amount, not the timing, of the FY2005 assessment.

The District's other arguments are equally flawed. First, the contention that the District may ignore the Project's O&M recommendation, and the Regional Director's acceptance of that recommendation, to await the publication of a final Federal Register notice before it needs to pay its O&M assessment has no support. No principle of law allows the District to disregard information provided to it, particularly where the District agreed to the very process at issue. Moreover, the argument that the District need not collect funds and prepare to pay its O&M assessment because the amount due is subject to change is irresponsible and irrelevant to FY2005

[2] In testifying as the representative of the District, Mr. Mason explained that the schedule "works" when, as for FY2005, the Project recommendation is accepted by the regional office and the Secretary. DA163-65. Although Mr. Mason also attempted to limit the agreement's reach by referring to a change in timing of Federal Register notices from prior years, the contention is factually incorrect. None of the final Federal Register notices that set annual O&M rates from FY1993 through FY2005 were issued by the July 1 date the District advocates in this case. See 56 Fed. Reg. 43984 (Sept. 5, 1991); 58 Fed. Reg. 43990 (Aug. 18, 1993); 60 Fed. Reg. 4499 (Jan. 23, 1995); 63 Fed. Reg. 12818 (March 16, 1998); Def. Br. 27, n. 11, and Pl. Ex. 17. Instead, the simple truth is that the District agreed to rely upon the Project recommendation in 1997 and it has relied upon that recommendation regularly both before and after it made its agreement to do so.

because, in fact, the amount for FY2005 did not change.[3]

Finally, the argument that the District's payment was not late because the project held surplus cash is wrong as a matter of law and as a matter of fact. Pl. Resp. Br. 8. The 1924 Act mandates that operation and maintenance charges "shall be paid annually in advance not later than March 1." Pl. Ex. 4, Sec. 3. The District's argument violates that statutory payment requirement. In addition, the District's argument ignores that factually there was not a known "surplus" of funds when the rate was determined, and, as we explain in section II below, the District's characterization of unobligated cash as surplus is improper. Shaw Aff. ¶¶ 17-19 (147-48).

In sum, the District purposefully chose to pay its FY2005 O&M assessment a full year after that payment was required to be paid under the 1924 Act and the parties' contract. Consequently, the District was properly assessed a late penalty.[4]

---

[3] The District's attempt to identify examples in which the O&M assessment changed after the Project shared its recommendation with the District does not support its case. Pl. Resp. Br. 6-7. Although it is true that the FY2006 assessment changed after July 1, 2004, no penalty fee was assessed for the FY2006 year. In FY2008, there was no change following the fact finding sessions and the determination of the Project recommendation in the spring of calendar year 2006.

[4] Contrary to the District's argument, Pl. Resp. Br. 4 n. 17, we have not misinterpreted BIA regulations. The regulation cited by the District, 25 C.F.R. § 171.1(g), provides that Section 171.1, applies to the San Carlos Irrigation Project "unless specified otherwise" and merely provides that the regulations should not be construed to amend or modify the Repayment Contract. The delegation of authority to set O&M rates (25 C.F.R. § 171.1(e)), does not modify the Repayment Contract, but rather is a matter of internal administration within the Government, authorized by the Repayment Contract: "There is given and reserved to the Secretary of the Interior the right to make regulations and to modify the same in his discretion, in general harmony, however, with the Land Owners' Agreement and this contract, to the end that the true intent of the law and of this contract and that agreement shall be carried into full effect." Pl. Ex. 1 at 22. In any event, as we explained in our cross-motion, notwithstanding the authority delegated by regulation, for the years FY2005-2007, the Western Regional Director forwarded

II. The District Is Not Entitled To Damages Based Upon The FY2005-07 O&M Charges

The District's claim regarding the FY2005-2007 O&M charges rests primarily upon arguments that the Project's estimate of expenses and income in those years was incorrect.[5] As we explained in our cross-motion, the Court of Appeals for the Federal Circuit has already determined that such a claim is not supported by the parties' contract. San Carlos Irrigation and Drainage District v. United States, 111 F.3d 1557, 1568 (Fed. Cir. 1997) ("San Carlos"). Although the District first seeks to limit San Carlos to its facts, Pl. Resp. Br. 21, and then attempts to address its significance by focusing upon the notion of a "credit," Pl. Resp. Br. 21-26, the District fails to address the holding of San Carlos: the District may not recover as damages overcharges retained by the Project for the benefit of the District. As we demonstrated in our cross-motion, the FY2008 and FY2009 O&M assessments, as well as the Joint Control Board ("JCB") agreement, demonstrate that the funds the District seeks to claim as damages here are funds that are held for, and used for, the benefit of the irrigation project and, therefore, the District. Consequently, the District's claim cannot survive the holding of San Carlos.

We are also entitled to summary judgment because the $30 per acre O&M charges assessed for FY2005-2007 were reasonable estimates of the funds necessary to operate and maintain the Project during those years. The District's response brief virtually ignores the undisputed, O&M expense history of the Project. As we explain below, the District's arguments

---

the assessment rate to the Assistant Secretary for Indian Affairs for final approval. DA110-11; Pl. Ex. 3 at 8.

[5] In its latest brief, the District appears to shift its position to place emphasis upon a contention that the Project ignored the funds within its possession when setting the budgets. As we explain below, the documentary record demonstrates the falsity of that argument.

also disregard controlling precedent regarding the presumptions of regularity and good faith and misconstrue Project records to falsely characterize unobligated funds as surplus. Pl. Resp. Br. 15. Although the District attempts to cloud the issue, the uncontroverted facts are that the Project incurred an average of more than $3 million in annual O&M expenses from FY1999 through FY2007 and reasonably assessed O&M charges of $30 per acre in FY2005-2007 to cover expenses anticipated in those years.

A. The San Carlos Decision Precludes The District's Claim

Although the District asks the Court to construe the holding of San Carlos narrowly, Pl. Resp. Br. 21, the Court of Appeals explicitly decided that case based upon its interpretation of the Repayment Contract. As the Court itself explained, "[o]n the issue of the charge for estimated rather than actual power usage, the terms of the Contract again cover resolution . . . ." Id. at 1568. The Court found the Repayment Contract barred the District's recovery on a claim based upon proof that actual expenses did not match estimated expenses because the contract "provides for charges in advance of use, necessarily implicating the use of estimates." Id. The District's claim that it was damaged by collection of an O&M rate that proved to have overestimated actual expenses (and underestimated income), where, as here, the funds are retained for use by the Project for the benefit of the District, has already been considered and rejected by the Federal Circuit and that holding is binding upon this Court. Weyerhauser v. United States, 92 F.3d 1148, 1151 (Fed. Cir. 1996) citing South Corp. v. United States, 690 F.2d 1368 (Fed. Cir. 1982) (en banc).

The District's argument that it did not receive a cash "credit" does not distinguish the present dispute from San Carlos. The District did not receive a cash credit in San Carlos yet its

claim was rejected as barred by the Repayment Contract's terms. Just as it failed to do in San Carlos, here too, the District fails to address central governing principles of the Repayment Contract. Specifically, as the Court of Appeals recognized, the contract "contemplates advance assessment of charges based upon estimates" because "the project needs funds to cover current operating expenses" and those assessments are made two years in advance. San Carlos, 111 F.3d at 1568. Although the District would prefer to have cash remitted to it whenever a year's estimate proves, two years later, to be different than actual expenses, the District's preference does not define the contract's terms. Instead, consistent with the contract, the Project reasonably estimated its needs for FY2005-2007, and then relied upon O&M funds collected but not spent over that period, when in 2006, the Project set the O&M rate for FY2008 and FY2009 at $21 per acre, a rate well below its latest estimate of future expenses. Shaw Aff. ¶ 48 (DA158-59); DA42, 84-86; 76 Fed. Reg. 19950 (April 20, 2007), Pl. Ex. 62. Consequently, this case is controlled by the Federal Circuit's decision in San Carlos, 111 F.3d at 1568.

The Arizona Water Settlements Act, 118 Stat. 3478 (2004) and the parties' agreement under that statute, further preclude any claim of injury by the District. The issue is not, as the District argues, what cash will be provided to the District upon the assumption of duties by the Joint Control Board. Pl. Resp. Br. 25-26. Rather, consistent with San Carlos, the significance of the Settlements Act and the Joint Control Board agreement is that they provide that reserve O&M funds will continue to be held for the benefit of the District and the irrigation project. Thus, the District's damages claim is barred by the holding of the Court of Appeals in San

Carlos, 111 F.3d at 1568.[6]

B. The FY2005-2007 O&M Charges Were Reasonable

Although the District presents a variety of arguments attacking the FY2005-2007 O&M assessments, the District concedes the facts critical to the disposition of the issue. Specifically, the information available to the Project at the time it determined the FY2005 O&M rate of $30 per acre was the expense and financial history known in the spring of 2003, specifically the data covering FY1999-2002, which incontrovertibly establishes that O&M expenses had exceeded $3 million in those years in which the Project collected just $2 million per year in O&M assessments. Moreover, the information contained in the Project budget transmitted to the District in June 2003 was the information relied upon to set the FY2005 rate of $30 per acre. Pl. Resp. to DPFUF ¶ 53.[7] These uncontroverted facts dispose of the District's claim for FY2005 and similarly uncontroverted facts govern FY2006 and FY2007.

As featured in its response brief, the District's primary argument against the FY2005-

---

[6] As part of the Arizona Water Settlements Act, the United States is also providing $52,396,000 to the District to rehabilitate certain irrigation features of the Project. 118 Stat. 3478, 3500-01 (2004) Section 203(d)(4)(B) and DA170-75. Under the terms of the Settlements Act and its implementing agreements, the District's maximum reimbursement liability is $12 million spread over 40 years. DA174. The District's contention that the United States breached the repayment contract by overcharging for annual O&M from FY2005-2007 ignores the broader context in which the parties function.

[7] The District's contention that the Court should judge the Project budget against facts that could only have been known a year later, in April 2004, when the final Federal Register notice applicable to FY2005 was issued, Pl. Resp. Br. 15, is inconsistent with other positions taken by the District. On the one hand, the District claims a right to have the assessment determined two years in advance Pl. Resp. Br. 2, and, as convenient, the District blames the Project for not using more recent data. Pl. Resp. Br. 15. In San Carlos, the Court of Appeals rejected the District's self-serving approach when it recognized that the Repayment Contract establishes a procedure under which assessments are reasonably determined based upon estimates made two years in advance.

2007 O&M assessments is its contention that the Project held surplus funds that the District argues were not considered in the rate setting process. Pl. Resp. Br. 15. To make this argument, the District misreads the Project budgets and ignores the unchallenged affidavit of Randy Shaw. As the documents and Mr. Shaw's explanation plainly demonstrate, the budget item that the District argues is "surplus" is actually all of the Project's "Unobligated Cash." Unobligated cash is not surplus. Shaw Aff. ¶¶ 17-19, 33 (DA147-48, 154). As Mr Shaw explained, unobligated cash means funds that have not been obligated in the Federal Finance System. Shaw Aff. ¶ 19 (DA148). Unobligated cash includes statutorily mandated advance O&M payments received by the Project which cannot be spent in the current year. Id. Unobligated cash also includes emergency reserve funds and reserves or sinking funds for significant maintenance work. Id. To portray these funds as "surplus" is a gross mischaracterization.[8]

The District's "surplus" argument is even more egregious when read in concert with Mr. Shaw's explanation of how the Project's budget actually identifies excess or surplus cash, an explanation not challenged by the District. As Mr. Shaw explained, the FY2005 budget contains a section labelled "End of Year Unobligated Cash." Shaw Aff. ¶ 33 (DA154). That budget section subtracts the Project's estimated "Total Obligations" for a given year from the estimated "Total Funds Available" in that year. Within the "End of Year" data, the budget also subtracts sinking fund and reserves balances from the Total Funds Available in order to isolate the funds possessed by the Project that constitute advance O&M payments and excess cash. Thus, in flat contradiction to the District's arguments, the record demonstrates that the Total Funds Available

[8] The District's litigating position that these funds are "surplus," also conflicts with its own factual admission that it is appropriate for the Project to maintain reserves. DA36.

to the Project were fully considered in the determination of the O&M assessments.

The District's other attacks upon the reasonableness of the Project budgets, including the absence of an FY2006 assessment amount in the June 2003 budget, the interest income anticipated as of June 2003, the anticipation of expenses for an archeological survey and the Project's well replacement plan, are equally incredible. At their base, all of the District's arguments seek to exploit changes in data over the length of the Project's two year budget cycle. Essentially, while the District argues that the two year budget cycle is mandated by the contract, when convenient for its litigating position, it urges the Court to ignore the necessary practical consequences of that same budget cycle. As we have demonstrated, the Federal Circuit has already rejected the District's inconsistent arguments.

As we explained in our cross-motion, in the FY2005 Project budget, prepared in June 2003, the FY2006 assessment payment was not included because the assessment amount was not yet known. Def. Br. 30; Shaw Aff. ¶ 38 (DA156). Moreover, the inclusion of an amount for FY2006 in the budget prepared in June 2003 would not have altered the financial projections for FY2005 because FY2006 assessments could not be used for Project expenses before the commencement of the FY2006 fiscal year. Similarly, as we explained in our cross-motion, the June 3, 2003 FY2005 budget included a reasonable estimate of the interest income the Project expected to receive in that year based upon the amount of funds the Project anticipated it would possess at that time. Def. Br. 30-31.

The District's arguments regarding the archeological survey of the San Carlos reservoir are similarly misguided. The District appears to argue that the United States should disregard requirements the of National Historic Preservation Act, 16 U.S.C. § 470 et seq. ("NHPA") and

the Native American Graves Protection and Repatriation Act, 24 U.S.C. § 3001 et seq. because the Government prevailed in a case involving whether the statutes are enforceable through a private right of action. Pl. Resp. Br. 20. In so arguing, the District wholly ignores the duties required by the statutes themselves and the Ninth Circuit's recognition that an "aggrieved party [under NHPA] may pursue its remedy under the APA." San Carlos Apache Tribe v. United States, 417 F.3d 1091, 1099 (9th Cir. 2005). The anticipated survey expenses were reasonable O&M expense because those funds were to be used, and were used, to comply with Federal law "for the purpose of overcoming injurious consequences arising from the normal and ordinary operation" of the irrigation system. Nampa & Meridian Irr. Dist. v. Bond, 268 U.S. 50, 53 (1925); Casitas Municipal Water District v. United States, 72 Fed. Cl. 746, 751 (2006) appeal pending, No. 2007-5133 (Fed. Cir.).

Finally, the District's continued attack upon the Project's well replacement plan should be rejected as another effort at misdirection. It is undisputed that the Project did not expend any funds for well replacement during the years at issue. Instead, the Project deferred to the District's judgment with regard to this aspect of operation and maintenance. Shaw Aff. ¶¶ 31, 42-44 (DA152-53, 157-58). There is no evidence to support the argument that the Project's initial plan to replace wells prior to their absolute failure given the age of the system was unreasonable and there is nothing unreasonable about the Project's decision to adopt the District's preferred approach. These are decisions that the Repayment Contract commits to the discretion of the BIA. San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 960 (Fed. Cir. 1989) ("[t]he plain language of the Repayment Contract convinces us that the government contracted to keep the entire Joint Works . . . in a state of repair and to safeguard

against their failure."); Burnside-Ott Aviation Training Center v. Dalton, 107 F.3d 854, 859-60 (Fed. Cir. 1997); see San Carlos Irrigation and Drainage District v. United States, 111 F.3d at 1558.[9]

## III. The District Misstates The Standard Governing Its Claim Of Breach Of Good Faith

The District's response brief misstates the law regarding the presumption of regularity and the controlling Federal Circuit precedent governing its allegation of a breach of the duty of good faith and fair dealing. Pl. Resp. Br. 13-14. It is controlling law that "[a] presumption of regularity applies to 'official acts of public officers,' and allows us [the Court] '[i]n the absence of clear evidence to the contrary' to 'presume[] that public officers have properly discharged their official duties." Jennings v. Mansfield, 509 F.3d 1362, 1367 (Fed. Cir. 2007), citing Butler v. Principi, 244 F.3d 1337, 1340 (Fed. Cir. 2001) and cases cited therein; Carolina Tobacco Co. V. Bureau of Customs & Border Protection, 402 F.3d 1345, 1350 (Fed. Cir. 2005) (citing United States v. Armstrong, 517 U.S. 456, 464 (1996) ("Government officials are presumed to do their duty, and one who contends they have not done so must establish that defect by 'clear evidence.'"). As the Court of Appeals recently reiterated, "[t]here is a presumption that administrative actions are correct and the 'government officials act in good faith' in discharging their duties." Davis v. Department of Homeland Security, 239 Fed. Appx. 586, 590-91 (Fed. Cir. 2007) citing, Gonzales v. Def. Logistics Agency, 772 F.2d 887, 892 (Fed. Cir. 1985). The District fails to cite this authority, just as it fails to cite Chapman Law Firm v. United States, 90

---

[9] Critical to the context of the District's complaints is that the District nowhere alleges a failure by the Project to perform two of the most important duties derived from the 1924 Act: 1) proper maintenance of project works to assure water delivery; and 2) operation of the project works to deliver water in compliance with the 1935 Federal Gila Decree. See www.gilawater.org, 1935 Decree, Articles V, VI and VII at. pp. 12-105.

F.3d 934, 940 (Fed. Cir. 2007) which explicitly relies upon T&M Distribs., Inc. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999)("Government officials are presumed to act in good faith and 'it requires 'well-nigh irrefragable proof' to induce a court to abandon the presumption of good faith.").

Rather than address three opinions of the Court of Appeals issued in 2007 that approve the clear and convincing and well-nigh irrefragable proof standards, the District mistakenly attempts to rely upon two decisions of this Court, Erinys Iraq Ltd. v. United States, 78 Fed. Cl. 518. 519 (2007) and Tecom, Inc. v. United States, 66 Fed. Cl. 736 (2005) to argue against the application of the presumptions. Those decisions could not and did not change the controlling law. As we have explained, the United States is entitled to a presumption that its officers acted in good faith in the discharge of their duties and the presumption cannot be "defeat[ed] . . . with just bald assertions and speculations of wrongful conduct." T & M Distrib., Inc., 185 F.3d at 1285.

Ignoring Federal Circuit law and invoking nothing but allegations and aspersions, the District argues that the BIA Western Regional Director "directed his staff to . . . justify" a $30 O&M charge for FY2006. Pl. Resp. Br. 16. Contrary to the District's bald assertions, Pl. Resp. Br. 16, there is no evidence to support the false allegation that the FY2006 O&M charge was "predetermined."

Without contradiction, Mr. Kaskalla and Mr. Christensen testified that the FY2006 O&M rate of $30 per acre was the product of their "bottom up" development of the Project budget, based upon the operation and maintenance needs of the irrigation project. DA112, 119-21. Expressly refuting the District's unsupported allegation, Mr. Kaskalla explained under oath that,

at the time a proposed FY2006 rate was submitted for publication in the Federal Register, he had not decided that a $30 per acre would be appropriate for FY2006. Pl. Ex. 84 (Kaskalla Dep. 53). Mr. Kaskalla testified explicitly, "that is a proposed rate. Like I said, it is not the final rate. Carl [Mr. Christensen] and I were still working on the budget at this time." Pl. Ex. 84 (Kaskalla Dep. 54).

Mr. Christensen's testimony should also have laid the District's irresponsible assertions to rest.[10] When expressly asked whether he was directed to create a budget for a "target rate" of $30, Mr. Christensen flatly rejected such a notion:

> Q. [Counsel] So as I'm understanding, the target rate was $30, which had been the previous year's rate?
>
> A. [Mr. Christensen] Well, not the "target rate." The target rate was what we needed to meet our needs. So our target was to let's first go through and put together a budget, and, once we put that budget together, that will give us a rate. I mean, we didn't start with – we did not start with 30 bucks and work backwards.
>
> First, we went through and determined how much money we needed to put into each sinking fund to accomplish the work that needed to be done in the future years and - - But then eventually, after quite a bit of discussion, we said "Well, maybe we can do it for 30. Let's just try to hold it at 30."
>
> Q. [Counsel] When the $15 rate was rejected, weren't you told to support a $30 rate?
>
> A. [Mr Christensen] I don't believe anybody ever said, "Support a $30 rate."
>
> Q. [Counsel] You're quite sure?
>
> A. [Mr. Christensen] I'm quite sure.

DA112. The District's bald assertions of wrongful conduct are unsupported and wholly

---

[10] Contrary to the District's unsupported statement, Pl. Resp. Br. 16, Mr. Christensen was not Mr. Kaskalla's subordinate.

improper. The law in this Circuit compels the dismissal of the District's claim of a breach of good faith.

IV. The District's Attack Upon the Project's Budget Process Must Be Rejected

As we demonstrated in our cross-motion, the Project follows a reasonable and sound process for determining annual O&M charges. In response, the District's attempt to rehabilitate the work of its accountant, Lawrence Field, and its reliance upon a report of the Government Accountability Office ("GAO") to criticize the Project, fail to undermine the Project's work. As we demonstrated in our cross-motion, and as he effectively admitted, Mr. Field had no background upon which to base his review of the Project's work. Def. Br. 45-46. Mr. Field never even learned which budget documents were actually used to determine the FY2005-2007 O&M rates. DA129-35. Tellingly, Mr. Field's expert report cites a number of Project documents but omits mention of the actual documents that were the basis for the FY2005-2007 assessments. Compare Pl. Exs. 34 (FY2005, dated June 6, 2003) and 35 (FY2006 and FY2007, dated October 28, 2004) with Pl. Ex. 71 (Ex 4). Fatally, Mr. Field analyzed O&M expenses from 2003-2007, Pl. Ex. 71 (Ex. 11) and not the data that was actually relevant to the budget work of the Project engineers in 2003 and 2004.

Similarly, the District's attempt to rely upon a report of the Government Accountability Office ("GAO") to support its attack upon the Project is unfounded. In fact, the District misrepresents conclusions of the report by quoting statements taken from an appendix to the report in which GAO explained it was reporting, not conclusions, but "concerns expressed to us by BIA officials, tribal officials, or water users during our site visits." DA183. Among the GAO's actual conclusions is the statement that BIA's projects "are in a serious state of disrepair"

because the BIA "has not had adequate funds to operate and maintain the projects . . . ." DA180. That conclusion provides no support for the District's claim that the amount of the FY2005-2007 O&M charges constituted a breach of contract.

## CONCLUSION

For the reasons explained in our cross-motion, and, in this reply, we respectfully request that the Court deny plaintiff's motion for summary judgment, grant our cross-motion for summary judgment and dismiss the complaint.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

OF COUNSEL:

WILLIAM W. QUINN
Field Solicitor
Phoenix Field Office
Office of the Solicitor
U.S. Department of the Interior

s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-0541
Facsimile: (202) 514-8640

August 26, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on August 26, 2008, a copy of foregoing "DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kirk Manhardt
Kirk Manhardt