IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-576C |
| THE UNITED STATES, | ) | (Judge Block) |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**<u>SUPPLEMENTAL PROPOSED FINDINGS OF UNCONTROVERTED FACT</u>**

In accordance with Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following response to plaintiff's "Supplemental Proposed Findings Of Uncontroverted Fact," dated July 24, 2008.

**The 1924 Act**

1. Section 5 of the San Carlos Project Act of June 7, 1924 states "The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of the Act into full force and effect...."[1]

<u>Response</u>: Agrees.

**The Acting Regional Director's 1997 Decision**

[1] San Carlos Project Act of June 7, 1924, 43 Stat. 475-76 (Exhibit 4).

2. In regard to whether notice of the FY 1998 O&M charge was proper, the Acting Regional Director stated in his 1997 decision:[2]

> 1. The Contract provides that O&M charges for the Joint Works shall be fixed annually by the Secretary. Based on the following, 1 do not believe that reliance on the 1995 Federal Register Notice issued by the Assistant Secretary for Indian Affairs setting the O&M assessment rate for the 1995 irrigation season and subsequent seasons is consistent with this Contract provision.
>
> This contract provision is an outgrowth of the Secretary's authority in the 1924 Act "to perform any and all acts...as may be necessary and proper for the purpose of carrying out the terms of the Act," and further defines the duty of the Secretary set forth in the Landowners' Agreement to fix the operation and maintenance charges from time to time.
>
> Attached to Exhibit 5 of SCIDD's Statement of Reasons is a copy of the January 23, 1995, Federal Register Notice of the Assistant Secretary for Indian Affairs regarding the project's O&M assessment rate. The introductory paragraph of the Notice states that the B1A is decreasing the Project's Joint works O&M assessment rate from $35 to $30 per assessable acre for the 1995 irrigation season and subsequent seasons (emphasis added). In a subsequent paragraph the Notice states that the basic assessment rate for the operation and maintenance of the Joint Works only for FY 1995 (emphasis added) is hereby fixed at $30 per assessable acre of land, and reference is made to the 1924 Act, the 1931 Repayment Contract, and the 1938 Joint Works Order.
>
> Regardless of the disparity within the Notice on this point, the record reflects that the Project interprets the Notice to establish an O&M rate of $30 per acre for an indefinite period of years, contrary to the requirement in the Contract. In the Memorandum to the Project Engineer from the project's Supervisory Civil Engineer dated November 7, 1996, and submitted to this office in response to the Appeal, the Project's Supervisory Civil Engineer states that the project:

---

[2] Decision of the Acting Area Director Regarding Notice of Appeal of the FY 1998 San Carlos Irrigation Project O&M Assessment Submitted by the San Carlos Irrigation and Drainage District, at 13-16 (January l 0, 1997) (Exhibit 18).

> "meets with the water users formally at Fact Finding meetings during the year to discuss mutual concerns .... Assessment rates are rarely discussed since they remain constant and do not vary year to year. Assessment rates are not set or adjusted by the SCIP Project Engineer nor by the Phoenix Area Director."

On page 7 of the same Memorandum, the project's Supervisory civil Engineer reiterates:

> "The project does not set the per acre assessment each year.... Based upon recommendations from the project, the Secretary of the Interior from time to time sets the assessment per acre for operation and maintenance of the Joint Works, as per applicable laws, agreements, and regulations applicable to the Project."

The project's Supervisory civil Engineer goes on to point out that the authority to set or adjust Project O&M rates has been delegated by the Secretary of the Interior down only to the Assistant Secretary for Indian Affairs.

The project has accurately stated the authority within the Department to fix the project's O&M rates. However, I do not believe that the issuance of a Federal Register Notice purporting to fix the O&M charges for the 1995 irrigation season "and subsequent seasons" complies with our obligation under the Contract to fix the O&M charges annually. It is my view that immediate steps should be taken to prepare a Federal Register Notice for approval by the Assistant Secretary for Indian Affairs that would supersede the January 23, 1995, Notice and would propose to fix the O&M assessment rate for FY 1998 only. It is further my view that the O&M assessment rate be fixed by annual notice rather than by a notice which continues indefinitely into future years.

With regard to the Project's role in the establishment of the annual O&M assessment rate, I concur with the statement of the Acting Project Engineer that the project's "role in fixing the Project's assessment is limited to the conduct of studies to determine if rate adjustments should be undertaken, and the reporting of findings, conclusions and recommendations."

2. The Contract requires the Secretary to give notice to SCIDD of the amount of charges to be paid annually in sufficient time to permit SCIDD to make the annual tax levies and to comply with the laws of the state of Arizona relating to the levy and collection of taxes by irrigation districts. Based on the following, it is my view that the Project's final recommendation to this office regarding the FY 1998 O&M assessment rate and budget is not consistent with this Contract provision.

Exhibit 3 of SC1DD's Statement of Reasons is a June 26, 1996, letter from SCIDD informing the Project that on June 25, 1996, SCIDD's Board approved a $20 per acre assessment for FY 1998. SCIDD's action was based on:

* SCIDD's dissatisfaction with the Project's May 7, 1996, response (Project Exhibit 3) to SCIDD's April 9, 1996, comments (SC1DD's Exhibit 1) on the March 6, 1996, Fact Finding meeting about the proposed O&M budget for FY 1998;

* the Project's failure to address SCIDD's June 12, 1996, comments (SCIDD's Exhibit 2) on the May 22, 1996, Fact Finding meeting about the FY 1998 proposed O&M budget; and

* the Project's failure to respond to SCIDD's proposal for an O&M budget for FY 1998 based on a $20 per acre assessment as set forth in SCIDD's June 12, 1996, letter to the project.

SCIDD's June 26 letter also reminded the Project of SCIDD's duty to make landowners' assessments by July 1 in order to allow sufficient time for the county assessor to process and collect the landowner payments.

Exhibit 4 of SCIDD's Statement of Reasons is a one page letter from the Project Engineer to SCIDD dated June 27, 1996, (stamped "hand delivered") informing SCIDD that the Project concluded the FY 1998 Joint Works O&M assessment should remain at $30 per acre. Exhibit 5 of SCIDD's Statement of Reasons contains a one page letter dated June 28, 1996, from the Project to SCIDD in response to SCIDD's June 12 and June 26, 1996, letters regarding the FY 1998 O&M assessment, as well as a copy of the January 23, 1995, Federal Register Notice, a revised O&M budget for FY 1998 prepared by the project, and a Memorandum from the Project to my office setting forth the basis for the project' s recommendation that the O&M assessment remain at $30 per acre for FY 1998. The Project's June 28, 1996, letter states that draft minutes of the two Fact Finding meetings would be available within one week but the administrative record does not include these draft minutes or any final minutes.

Consistent with my decision above that the O&M charges should be fixed annually, it is my view that notice to SC1DD regarding the project's final recommendation to this office on the FY 1998 O&M assessment rate and budget, which is dated less than a week prior to July 1 and was provided to SCIDD after the date of its June Board meeting, is not consistent with our obligation in the Contract to give SCIDD notice of the amount of charges to be paid annually in sufficient time to permit SCIDD to make the annual tax levies and to comply with the laws of the State of Arizona relating to the levy and collection of taxes by irrigation districts.

Response: Agrees, although the cited text omits footnotes contained in the original document.

3. Following the issuance of the Acting Regional Director's decision, the Project Engineer forwarded a schedule for establishing the FY 2000 budget. The last action item in that schedule reads "Send/submit recommendations and proposed final FY 2000 Budget package to Phoenix Area Director. Complete May by 28, 1998 (sic)."[3]

Response: Agrees.

**The District's Previous Comments on the Deadline for Fixing the O&M Charge**

4. The District filed comments on November 26, 2003 regarding the proposed $30 per acre charge for FY 2005. In Section III (*Timing of the Budget Review Process*) of those comments, the District made the same basic argument regarding the Secretary's duty to timely fix O&M charges that it is making in this litigation.[4] The District also requested that the Project spend no funds on well replacement for FY 2003 through FY 2005.[5]

Response: Agrees with the first two sentences. Agrees with the third sentence and adds that the reasons expressed by the District in the letter include a dispute over the location of new wells and then existing drought conditions, not the reasons

[3] Letter from Ralph Esquerra to Douglas Mason (December 1, 1997) (Defendant's Appendix 1).

[4] Letter from Riney B. Salmon II to Jeff Lowman, Acting Director, BIA Office of Trust Responsibilities, at 23-24 (November 26, 2003) (Exhibit 30).

[5] Id. at 15.

advanced in this litigation.

5. On April 1, 2005, the District filed comments on the proposed O&M charge for FY 2006. In those comments, the District repeated its argument regarding the Secretary's duty to timely fix O&M charges.[6] The District also complained that funds allocated for well replacement had not been adequately explained or justified.[7]

Response: Agrees.

6. The District filed comments on the proposed budget and O&M charge for FY 2007 on December 1, 2005, again arguing that the Secretary's failure to timely fix the O& charge was in breach of contract.[8]

Response: Agrees.

**The Project's Budget Proposals and Summaries**

7. The BIA routinely estimates Project income several years into the future in preparing budget proposals and spreadsheets.[9]

Response: Agrees.

---

[6]Letter from Riney B. Sahnon II to Arch Wells, at 18 (April 1,2005) (Exhibit 52).

[7] *Id*. at 14-15

[8]Letter from Riney B. Salmon II to Arch Wells, at 7 (December 1, 2005) (Exhibit 69).

[9]See, e.g., R. Kaskalla, C. Christensen, Proposed FY 2006 Budget (October 28, 2004) (Exhibit 35) (projecting income through FY 2010); C. Christensen, Irrigation Division Budget (June 22, 2004) (Exhibit 44) (projecting income through FY 2008); Budget Spreadsheet (April 20, 2006) (Exhibit 76) (projecting income through 2011).

8. On April 1,2003, the BIA prepared a budget spreadsheet for FY 2005 that projected FY 2006 charges would be fixed at $33 per acre.[10]

Response: Agrees, although footnote 10 incorrectly identifies the author and date of plaintiff's exhibit 31.

9. On June 6, 2003, the BIA prepared a budget spreadsheet for FY 2005. [11] This was the data used by the BIA in proposing a $30 per acre charge to the Secretary.[12] This spreadsheet projects that the Project would have surplus cash on hand totaling approximately $3.9 million at the start of FY 2003; $3.2 million at the start of FY 20[0]4; and $3.7 million at the start of FY 2005.[13]

Response: Agrees with the first two sentences. Disagrees with the third sentence because the term "surplus" does not appear on the document cited and plaintiff's argument is based upon a misreading of the document because plaintiff apparently equates unobligated cash with surplus cash. However, unobligated cash includes next year's O&M assessment payment and sinking fund and emergency reserves which are not "surplus." See. DA147-56 (Shaw Aff. ¶¶ 15-38).

---

[10] C. Christensen, *Irrigation Division Budget* (April 1,2004) (Exhibit 31).

[11] R. Shaw, C. Christensen, R. Kaskalla, *Proposed Irrigation Division Budget* (June 6, 2003) (Exhibit 34).

[12] Affidavit of Randy Shaw, ¶ 15 (June I0, 2008) (Defendant's Appendix 4, at 142)

[13] R. Shaw, C. Christensen, R. Kaskalla, *Proposed Irrigation Division Budget* (June 6, 2003) (Exhibit 34).

10. The June 6, 2003 budget also shows no income from O&M charges or interest income during FY 2005. Total projected income for FY 2005 is projected at $70,500.[14]

Response: Disagrees with the first sentence because it is contradicted by the document cited. Although we agree that the June 3, 2003 budget does not show income from FY2006 O&M charges during FY2005, the June 3, 2003 document does show interest income for FY2005 of $19,000. The June 6, 2003 budget did not show income from FY2006 O&M charges because the amount of the FY2006 assessment had not yet been determined at the time the document was prepared. Agrees with the second sentence.

11. On May 8, 2004, the Project prepared a monthly budget summary showing the Project's income and expenses. This summary indicates that unobligated cash at the end of March totaled $3,097,327. [15]

Response: Agrees.

12. On October 28, 2004, the BIA prepared a budget spreadsheet that project[s] interest income of $19,000 for FY 2006. This spreadsheet included an allocation of $410,000 for land and structures during FY 2006.[16]

---

[14] *Id.*

[15] Carl Christensen, *FY 2004 Irrigation Budget* (May 8, 2004) (Exhibit 78) (Plaintiff's Supplemental Appendix ("PSA"), at 1).

[16] R. Kaskalla, C. Christensen, *Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 35).

Response: Agrees.

13. On December 12, 2006, the BIA prepared a budget spreadsheet that depicted actual year-end figures from 1999 to 2006. This spreadsheet shows that the Project ended FY 2003 with over $3.9 million in surplus cash.[17]

Response: Agrees with the first sentence, although, as explained previously, the document contains errors and was never used to determine an O&M assessment. DA159-60 (Shaw Aff. ¶¶ 51-52). Disagrees with the second sentence because the document cited does not support the proposed finding. The document shows that FY2003 end of year cash as $2.7 million, which includes FY2004 assessments received in FY2003 and the Project's sinking fund and emergency reserves. When FY2004 O&M assessment payments are subtracted, the year end cash was $1.7 million and when reserves are accounted for, the year end cash shows a deficit of $319,840.

14. The December 12, 2006 budget spreadsheet projects O&M costs of approximately $3.0 million through 2011. Interest income is projected at $100,000 each year, as is income from excess pumping. The spreadsheet allocates $307,000 to the heavy equipment sinking fund between FY 2008 and FY 2011. The spreadsheet projects that the Project would end each year through FY 2010 with over $4.0 million in cash reserves.[18]

---

[17] A. Riggs, *Operation and Maintenance Budget* (December 12, 2006) (Exhibit 74).

[18] *Id.*

Response: Agrees with the first sentence to the extent that plaintiff intends by the term "O&M costs" to refer O&M obligations. Agrees with the second sentence. Disagrees with the third sentence because it mistakenly adds together the year end amounts projected to be contained in the heavy equipment sinking fund and is not a calculation of the amounts allocated to that fund over the years cited. The projection made in 2006 of the amounts to be added to, and expended from, the heavy equipment sinking fund from 2008 to 2011 are found in the workbook of the May 19, 2006 budget. DA60. Disagrees with the fourth sentence because the document cited does not support the proposed finding. The subtotals for sinking fund and reserves funds are $1 million or less for the cited years. Moreover, as explained previously, the cited document contains errors and was not used to determine any O&M assessment. DA159-60 (Shaw Aff. ¶¶ 51-52). The Project budget dated May 19, 2006 reflects that the Project anticipated that end of year cash less next year's assessment payments and sinking fund and emergency reserves, would decline from $1,495,255 in 2008 to $41,255 in 2010. DA42.

15. On or around July 8, 2008, the BIA provided the District with a budget summary for the Project through June 2008.[19] That summary indicated that the Project's unobligated cash on June 30, 2008 totaled $4,244,392. This total does not include $2.1 million in O&M assessments due from the District and Indian lands for FY 2009. Total Project obligations through June 30, 2008 totaled $1,807,171, or 54 percent of projected obligations under the

[19]Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) (Exhibit 79) (PSA 2).

approved budget.[20]

Response: Agrees with the correction that the number in the second sentence should be $4,255,392.

16. Attached to the summary budget was a table depicting the surplus cash in the Project's account on a monthly basis from September 1996 to June 2008. The lowest monthly total was $1.2 million and the highest was monthly total was $6.8 million. Between FY 1996 and FY 2007, the Project never ended the year with less than $2.1 million in surplus cash. Between 1999 and 2004, surplus cash at the start of the fiscal year never fell below $2.5 million. The average amount of surplus cash at year's end over those twelve years was $3.8 million.[21]

Response: Disagrees because the document cited does not support the proposed finding. Specifically, the document cited does not include the term “surplus cash.” The document does use the term “unobligated cash,” which has a completely different meaning from “surplus” because it includes next year’s O&M assessment payments and sinking fund and emergency reserves. DA147-48 (Shaw Aff.¶¶ 17-19).

**The BIA's Irrigation Handbook**

17. The BIA's Irrigation Handbook states:

[20] *Id.*

[21] *Id.*

> It is recommended that all projects use table 2 to estimate the amount of funds that should be maintained in the project reserve account at all times. The guidelines in table 2 provide a range of values. At their discretion, the Regional Director and/or the Official in-Charge of any project may determine that, due to unusual circumstances, project reserves should be maintained at a higher amount. If this is determined, the proposed amount and supporting documentation should be provided in writing and kept on file at the irrigation project. The O&M reserve requirement should be supported by a supplementary schedule and be factored into the rate calculations that are entered into FPP-6.

The referenced Table 2 indicates that the Project should maintain a reserve of $700,000 to $900,000.[22] The Project Irrigation Manager has stated that the Irrigation Handbook is followed without deviation in O&M budget preparation and analysis.[23]

Response: Agrees with the first two sentences. Disagrees with the third sentence regarding the statement of the Project Irrigation Manager because it is not supported by the cited testimony.

**Credit for District Overpayments**

18. Carl Christensen, the current Project Irrigation Manager, has stated the following

---

[22]BIA, *Irrigation Handbook*, Chapter 12, "Financial Management," at 95-96(May 2002) (Exhibit 13A).

[23]Deposition of Carl Christensen, at 10-12(October 1, 2007) (Exhibit 80) (PSA 6-8).

in regard to the Project giving a credit from previous overpayments by the District:

> Q. Well, if, for one year, you budget $2 million, let's say, for operation and maintenance charges, and that's a part of your basis for establishing your rate, and you don't spend 2 million, you spend a million and a half, that's a half-a-million savings. Do you understand?
>
> A. Yes.
>
> Q. Okay. Why isn't that half a million dollars carried forward to reduce the next year's projected or budgeted operation and maintenance expense?
>
> A. We have never done that at the San Carlos Irrigation Project.[24]

Response: Agrees that the proposed finding accurately recites the cited testimony.

19. Mr. Christensen later explained that, in his opinion, the District's landowners were better off letting the United States keep their money because it earned interest in the Treasury account that would be used to benefit the Project.[25]

Response: Disagrees because the proposed finding is not supported by the cited testimony. Mr. Christensen testified that the accrual of interest, which did not occur in earlier years of the Project, benefitted the Project and water users.

20. In regard to the Regional Director's February 2006 decision to reject the District's proposal for providing a credit from the Project's cash surpluses, Catherine Wilson, Supervisory Water Rights Specialist for the B1A's Western Regional Office, stated:

---

[24]Deposition of Carl Christensen, at 115 (October 1, 2007) (Exhibit 80) PSA 9).

[25]*Id. at 124-127.*

Q. And Mr. Anspach is, I believe -- my interpretation is that he's setting forth reasons as to why SCIDD cannot be given a credit for – from one year's assessment collection. Do you see that in that paragraph?

Yes.

Q. Okay. Now, he gives examples in the last two or three sentences. Do you see where he starts out "for example"?

A. Yes.

Q. Okay. "... project's O & M activities include a well replacement program." What's your understanding as to what that reference means? A. The project has 98 irrigation wells that provide a significant portion of the water supply to the project when surface supply is short. And we have a well replacement program to make sure that we are able to respond when -- if and when one of our wells goes down.

Q. Now, was there such a well replacement program in effect at this time?

A. Yes

Q. Has, to your knowledge, to the present date, any money been spent on that well placement program?

A. The well replacement program has been modified in response to SCIDD's and possibly other water user comments to us, I think a year ago June. And the well replacement program is as it was approximately June 2006, as discussed with the water users in June 2006.

Q. But has any money been spent on that well replacement program yet?

A. Not that I'm aware of.

Q. And so what is the arrangement, if I may use that word, with respect to the implementation in the future, I guess, of the well replacement program?

A. My last recollection of what that is, is in the June 2006 spreadsheet O & M budget, where there are several worksheets that describe the status of the wells, cost to replace, possible locations, and how the project would propose reserving enough funds for that. And I would just defer to that spreadsheet because I don't recall all the specifics of it.

Q. Okay. Was that a spreadsheet that was perhaps prepared by Randy Shaw?

A. Yes.

Q. And was, perhaps, Randy Shaw's conclusion that the well replacement program was not necessary at the time or could be delayed? Something of that nature?

A. In his assessment as of June 2006 or thereabouts, is that what you're referring to?

Q. Yes.

A. After we had those extensive fact-finding meetings with the water users and discussion of Randy's extensive research on well replacement issues, I believe the project accepted his recommendations about what that well replacement program should look like. And, again, I refer you back to that spreadsheet and all the work tabs for the details.

Q. Okay. What is the current intention, if you can tell me, of the project with respect to the well replacement program?

A. I don't know the answer to that question.

Q. And who would know the answer to that question?

A. I assume the project engineer -- the irrigation engineer would be the first place to start.

Q. Okay. Mr. Anspach also refers to a well abandonment project in here, Cathy. Can you tell me what is your understanding of this well abandonment program?

A. My understanding of the well abandonment program is that we have a number of wells -- project wells that used to provide irrigation water but have been abandoned over the years, which are just still out in the fields. And we -- the project has, on its list of things to do, go out and GPS-identify these sites and take care of them so they're not a safety problem or so that they're properly abandoned.

Q. Has that been done yet?

A. No.

Q. What is the schedule for that to be done?

A. The latest schedule that I've heard is, hopefully, in fiscal year 2008. The project is relying on regional staff to help with that effort due to staff shortages at the project. So we have regional staff in my office who are planning to try to take care of that project this year.

Q. I see. Okay. Mr. Anspach also refers to "... a condition assessment study discussed" -- excuse me -"directed by the Assistant Secretary" -- initial caps -- "for Indian Affairs..." -- initial caps, close quotes. Do you see that?

A. Yes.

Q. What is your understanding of this condition assessment study?

A. My understanding of the condition assessment study is that the assistant secretary for Indian affairs has asked the Central Office irrigation staff to calendar in condition assessment studies for every revenue-generating irrigation project in BIA.

Q. Is this a SOD program?

A. No.

Q. And why isn't it a SOD program?

A. It's a condition assessment study for the irrigation project, which in SCIP's case would include Coolidge Dam and reservoir but isn't a safety program; it's a condition assessment for the irrigation facilities.

Q. Has that ever been done -- a study?

A. Not at SCIP, no.

Q. And do you know why?

A. I don't know why.

Q. What is the current intention, if you know?

A. I believe it's still on the plans to accomplish at some point.

Q. I see.[26]

Response: Agrees that the proposed finding accurately recites testimony of Ms. Wilson.

Disagrees with introductory characterization of the cited testimony because the

[26]Deposition of Catherine Wilson, at 51-55(October 2, 2007) (Exhibit 81) (PSA 14).

testimony does not involve discussion of cash surpluses.

21. The District was never informed by the BIA or the Project, in writing or verbally, that the United States intended to provide a credit against District overpayments in previous years when it fixed the O&M charge for FY 2008 and FY 2009 at $21 per acre.[27]

Response: Disagrees. The Project discussed the FY2008 and FY2009 budgets with the District on March 27 and April 20, 2006. DA159 (Shaw Aff. ¶ 48). On June 13, 2006, the Western Regional Director advised the District that the budget dated May 19, 2006 would serve as the basis for the proposed O&M assessment rates to be published in the Federal Register for FY2008 and FY2009. DA159 (Shaw Aff. 50). That budget demonstrates that the O&M charges for FY2008 and FY2009 would not cover anticipated obligations for those years. DA42.

**Well Replacement Program**

22. Project wells installed during the 1950s through the 1980s were installed to increase pumping capacity and were generally paid for with appropriated funds, not O&M charges.[28]

Response: Defendant is without sufficient information to respond to this proposed finding, but the statement is irrelevant to this litigation because the current well replacement

[27] Affidavit of Douglas Mason (July 21, 2008)(Exhibit 82) (PSA24).

[28] *Id*. (PSA 25)

plan involves only the maintenance of existing well capacity.

23. The District opposed the BIA's well replacement program primarily because the BIA was proposing to replace wells based on age, even if the well was working well and producing at an adequate capacity. The District also was opposed to installation of new wells without removing any old wells from service, as such action represents a betterment, not O&M, for which the District cannot be charged without its approval.[29]

Response: Agrees that the proposed finding states objections made by the District. However, there is no evidence that the Project ever proposed to replace a well that was working well and producing an adequate supply of water. The Project regularly incurs expenses to maintain existing wells and projected that it would incur more than $340,000 in expenses annually from 2005-2011 to service existing wells. DA54.

24. In discussions regarding the FY 2008 budget, the District requested that Randy Shaw discuss well replacement with the Project's well expert, Gary Weenser. Mr. Weesner advised the Project to wait to replace a well until it actually fails and cannot be repaired. Mr. Weesner advised against a well replacement program based solely on the age of the well.[30]

Response: Agrees.

---

[29] *Id.*

[30] *Id.*

25. The District has experienced well failures at newer wells in its system, while older well continued to pump at capacity. This indicates that age alone does not determine whether a well should be replaced.[31]

Response: Agrees, but the proposed finding is based upon a mischaracterization of the Project's position. There is no evidence that the Project's initial plan would have replaced wells based solely upon the chronological age of each well.

**Project Audit**

26. In 2006, the General Accounting Office issued a report to the United States Senate regarding, among other things, shortcomings in the BIA's management of its irrigation projects. That report included a profile of the Project. Among the GAO's conclusions were that: (1) "Turnover of BIA staff and lack of water user inclusion in project decision making impedes effective communication;" and (2) "BIA lacks accountability to water users in terms of how it spends operations and maintenance fees."[32]

Response: Disagrees because the cited quotation does not reflect conclusions of the GAO with regard to the Project. Instead, as the report states explicitly, the text quoted by plaintiff from Appendix II of the report describes "concerns expressed to us by BIA officials, tribal officials, or water users during our site visits." DA 183. The

[31] *Id.*

[32] General Accounting Office, Publication No. GAO-06-314, *Indian Irrigation Projects*: *Numerous Issues Need to be Addressed to Improve Project Management and Financial Sustainability,* at 47 (February 2006) (Exhibit 83) (PSA 29).

GAO's conclusions appear in the main body of the report and those conclusions do not make specific reference to the Project. DA180-81.

**Expert Testimony**

27. In regard to the purpose and use of budget documents supplied to the District by the Project, Mr. Fields stated the following:

> Q. Wouldn't you need to know the purpose for each - for which each document you looked at was prepared in order to know whether they all should be consistent?
>
> A. I don't think I need to know that, no.
>
> Q. Why not?
>
> A. Because you asked me the purpose for which they were prepared. I don't know the purpose for which they were prepared. I know that these documents ultimately ended up in SCIDD's hand as a part of a discussion of ongoing discussion about assessment rates. So I know it was used for that purpose. You asked me if I knew how it was originally prepared. I don't know.[33]

Response: Agrees that the cited testimony demontrates that Mr. Field admitted he did not know what documents were used to determine O&M assessments and could not distinguish the documents relied upon to determine annual O&M assessments from the body of information shared by the Project throughout the year in draft form or for informational purposes.

**BIA Projections of Future Cash Surpluses**

---

[33] Deposition of Lawrence Field, at 128 (January 17, 2008) (Exhibit 85) (PSA 38).

28. In a budget prepared April 1, 2003, the BIA projected that the Project's surplus cash at the end of FY 2004 would total $1,072, 144.[34] Total surplus cash at year's end actually totaled $2,597,348.[35]

Response: Agrees with the first sentence that the document cited projected that the Project would have end of year cash, after subtracting sinking fund and emergency reserves, of $1,072,144. Disagrees because the document cited does not support the proposed findings; the document does not use the term "surplus cash" and plaintiff's legal argument misuses data from the category "unobligated cash" which is not surplus because it includes the next year's O&M assessment payment and funds held for emergency and sinking fund reserves. DA147-48 (Shaw Aff. ¶¶ 17-19).

29. In that same April 1, 2003 budget, the BIA projected that the Project's surplus cash at the end of FY 2005 would total only $90,776.[36] A week later, the BIA revised the budget, projecting that the Project would end FY 2005 with only $31,776.[37] In October 2004, after FY

[34]R. Shaw, *Irrigation Division Budget, San Carlos Irrigation Project* (April 1, 2003) (Exhibit 23).

[35]Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) Exhibit 79 (PSA 2).

[36]R. Shaw, *Irrigation Division Budget, San Carlos Irrigation Project* (April 1, 2003) (Exhibit 23).

[37]Randy Shaw, *FY 2005 Budget Draft 3* (April 10, 2003) (Exhibit 32).

2005 had started, the BIA projected it would end the year with $203,344 in surplus cash.[38] Actual surplus cash at the end of FY 205 totaled over $4.0 million.[39]

Response: Agrees with the first sentence that the document cited projected that the Project would have end of year cash in FY2005, after subtracting sinking fund and emergency reserves, of $90,776. Agrees with the second sentence that the document cited projected that the Project would have end of year cash in FY2005, after subtracting scheduled reserves, of $31,776. Agrees with the third sentence that the document cited projected that the Project would have end of year cash in FY2005, after subtracting scheduled reserves and next year's assessment, of $203,344. Disagrees with the fourth sentence because the document cited does not support the proposed findings; the document does not use the term "surplus cash" and plaintiff's legal argument misuses data from the category "unobligated cash" which is not surplus because it includes the next year's O&M assessment payment and funds held for emergency and sinking fund reserves. DA147-48 (Shaw Aff. ¶¶ 17-19).

30. In October 2004, the BIA projected that the Project would end FY 2006 with only

---

[38]R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).

[39]Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) Exhibit 79 (PSA 3).

$872,813 in surplus cash.[40] The actual total was approximately $3.4 million.[41]

Response: Agrees with the first sentence that the document cited projected that the Project would have end of year cash in FY2006, after subtracting emergency and sinking fund reserves, and the next year's assessment, of $872,812, not $872,813. Disagrees with the second sentence because the document cited does not support the proposed findings; the document does not use the term "surplus cash" and plaintiff's legal argument misuses data from the category "unobligated cash" which is not surplus because it includes the next year's O&M assessment payment and funds held for emergency and sinking fund reserves. DA147-48 (Shaw Aff. ¶¶ 17-19).

31. In October 2004, the BIA projected that the Project would end FY 2007 with a deficit of $238,976.[42] The Project actually ended the year with $4.1 million in surplus cash.[43]

Response: Agrees with the first sentence that the document cited projected that the Project would have end of year cash in FY2007, after subtracting emergency and sinking fund reserves, and the next year's assessment, of $238,976. Disagrees with the second sentence because the document cited does not support the proposed

[40]R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).

[41]Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) Exhibit 79 (PSA 3).

[42]R. Kaskalla, C. Christensen, *San Carlos Irrigation Project, Proposed FY 2006 Budget* (October 28, 2004) (Exhibit 11).

[43]Carl Christensen, *FY 2008 Irrigation Budget* (July 1, 2008) Exhibit 79 (PSA 3).

findings; the document does not use the term "surplus cash" and plaintiff's legal argument misuses data from the category "unobligated cash" which is not surplus because it includes the next year's O&M assessment payment and funds held for emergency and sinking fund reserves. DA147-48 (Shaw Aff. ¶¶ 17-19).

32. In its April 20, 2006 budget proposal, the BIA projected that cash reserves would be depleted over future years, such that surplus cash at the end of FY 2011 would total only $25,255.[44]

Response: Agrees that the document cited projected that the Project would have end of year cash in FY2011, after subtracting emergency and sinking fund reserves, and the next year's assessment, of $25,255.

**The O&M Budget Approval Process**

34. Ms. Wilson, Supervisor of the Division of Natural Resources for the BIA's Western Regional Office with direct authority over the Project, has stated in regard to the process of publishing proposed and final notices of annual O&M charges for the Project:

Q. I see. Okay. How about the fixing of the O & M charges for the project for particular fiscal years? What's your involvement with that?

A. The annual O & M rate for the project -- for all of our revenue-generating projects are developed originally at the project level, by staff, whether it's SCIP or other revenue-

[44]R. Shaw, *Irrigation Div. Budget, Draft 2* (April 20, 2006) (Exhibit 76).

generating projects. And a recommendation is made by the project staff on what the annual rate should be. It is sent through our regional office and then on to the assistant secretary for Indian affairs office for publication in the Federal Register as a proposed rate --

Q. Uh-huh.

A. -- for public comment. And eventually, then the assistant secretary for Indian affairs will set the final rate for all of the revenue-generating projects nationwide.

Q. What is your understanding as to the purpose of a proposed rate being published in the Federal Register?

A. It's my understanding that the purpose of a proposed rate being published in the Federal Register is to provide the public or the affected water users the chance to review and comment to the assistant secretary on the proposed rate.[45]

Response: Disagrees with the characterization that Ms. Wilson has direct authority over the Project because the proposed finding is not supported by the document cited and is incorrect. Agrees that Ms. Wilson testified as recited in the proposed finding.

[45]Deposition of Catherine Wilson, at 12 and37 (October 2, 2007) (Exhibit 81) (PSA15-16).

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

OF COUNSEL:

WILLIAM W. QUINN
Field Solicitor
Phoenix Field Office
Office of the Solicitor
U.S. Department of the Interior

s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

August 26, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on August 26, 2008, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kirk Manhardt