IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-576C (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

APPENDIX TO DEFENDANT'S REPLY
IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KIRK T. MANHARDT
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 353-0541
Facsimile: (202) 514-8640

Attorneys for Defendant

Index to Appendix

Deposition of San Carlos Irrigation and Drainage District Pursuant to Rule 30 (b)(6) (Douglas Dean Mason), (excerpts) dated October 4, 2007 . . . . . . . . . . . . . . . . . . . . . . . 161

Agreement Pursuant to Section 203 of Arizona Water Settlement Act 118 Stat. 3478, 3500 (excerpts) (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

Indian Irrigation Projects, U.S. Government Accountability Office (GAO-06-314) (February 2006) (excerpts). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,

Plaintiff,

vs. No. 06-576C

THE UNITED STATES,

Defendant.

30(b)(6) DEPOSITION OF

SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT

Phoenix, Arizona

October 4, 2007

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

(Copy)



Coash & Coash
PHOENIX DEPOSITION REPORTERS & VIDEOCONFERENCING

09:51:36
09:53:08
09:53:31
09:53:42
):53:58

they're going to have on the budget, anywhere from December through as late as June, to let us know what the budget will be. After that process, then -- we would then make comments to the project of our objections or whatever they would make. Sometimes they will have another fact-finding meeting, and other times they just say, "This is what it is." And then they recommend that to the area regional office.

Q. I'm going to mark -- Just let me know when you're ready and if I can go ahead?

A. Go ahead.

Q. There are four, actually, pieces of paper stapled here. The fourth one is a discrete letter signed by you, Doug Mason, on December 8, 1997?

A. No.

Q. Is that not right?

A. The letter I have here is signed --

Q. No, the fourth one. The fourth page. I'm sorry. I have done this backward.

Basically, I'm just trying to point out that there are basically what may be two documents stapled together here. The first is a three-page document, a letter of December 1 with two pages of attachments, it appears, and the fourth page is a different letter.

A. I recognize the letter.

Q. Okay.
A. And I recognize my signature.
Q. Okay. Do you remember the exchange of these letters?
09:54:10 A. Sure. I remember why we did it.
Q. Okay. Can you explain what that is?
A. The reason this was -- We were having problems on getting a timely -- what schedules did we have to meet to set the budget. This was put forth as a timetable and
09:54:23 asked if we could agree to it as setting the rates for the budget.
Q. And did you agree?
A. I think we said it would -- the timetable looks like it would work.
09:54:42 Q. And this was in 1997. Was this timetable, as transposed to 2003, which would be the year of the 2005 SCIP budget process -- would this timetable also have been acceptable in the same way?
A. Well, there's been a lot of things that have
09:55:07 happened since then. And at this point in time, no, it won't be, because we still have notice -- final notice when this thing is. This just says when they're going to transfer it to the regional office. This does not, then, give us a set amount that's going to be approved by the
09:55:27 secretary.

Q. And was that different in 1997?
A. There's been a lot of things happen since 1997, yes. It's different than from what happened in 1997.
Q. Was the Federal Register publication process one of the things that has changed?
09:55:41
A. The appeal process that we thought we had in place at this time was when the secretary -- when they sent their appeal to the regional office that we could appeal at that point in time. We've been notified that that is not the appeal process. The appeal process starts with a federal notification now, so that, then, changes when this -- this letter --
09:55:57
Q. How would that make a difference?
A. Well, okay. If they're going to send a -- a letter to the -- a recommendation to the regional office, and the regional is going to rubber-stamp and the secretary is going to rubber-stamp it, then this works.
09:56:18
If the regional office is going to change what the project is going to do, and the secretary is going to agree with that change, then it doesn't work for me setting the budget by July 1st. That's what's changed. And I think we still have to have the review process and appeal process in place to get what we need out of this process, and that's the change.
09:56:33
(Deposition Exhibit 4 was marked for

identification.)

BY MR. MANHARDT:

Q. And, again, if you look at this exhibit now, I think it's Exhibit 4, on the third page -- well, the second and third page list out a series of sequence of events in terms of development of the budget. And the 13th one, which appears on the second page of that attachment, says, "Send/submit recommendations and proposed final FY 2000 Budget package to Phoenix Area Director," with a complete date.

So the process in '97 was -- what this would culminate in was a recommendation process.

A. Right.

Q. And you knew that then. It's just sort of the dynamic of what happens with that recommendation that, in your view, has changed?

A. Well, one other thing is, when they would send these in, they would get the Federal Register notice out a lot quicker than they had been lately. The Federal Register notice now is being lumped together all in one lump sum. If you take a look back at '97, they would actually have a San Carlos Irrigation Project Federal Registry notice. Now they lump us in with all the other Indian irrigation facilities. That's a different change that happened about four or five years ago.

Final Execution Draft
October 21, 2005

EXHIBIT 20.1

AGREEMENT
AMONG THE GILA RIVER INDIAN COMMUNITY,
THE UNITED STATES OF AMERICA,
AND THE SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT

This Agreement is entered into as of the date executed below, by and among the Gila River Indian Community, the San Carlos Irrigation and Drainage District and the United States of America.

**1.0 RECITALS**

**1.1** Proceedings to determine the nature and extent of the rights to water of the Community, the District, the United States, and other claimants are pending in the Gila River Adjudication Proceedings and actions regarding the interpretation and enforcement of the Globe Equity Decree are pending before the Globe Equity Enforcement Court.

**1.2** Recognizing that final resolution of these proceedings may take many years, entail great expense, prolong uncertainty concerning the availability of water supplies, and seriously impair the long-term economic well-being of all Parties to the Settlement Agreement, the Community, the District and the United States have agreed to settle the disputes that are among them, including their respective water rights claims and concerns and differences involving the management and operation of the San Carlos Irrigation Project.

1.3 In fulfillment of its trust responsibility to Indian tribes and to promote tribal sovereignty and economic self-sufficiency, it is the policy of the United States to settle water rights claims of Indian tribes without lengthy and costly litigation.

1.4 The Act provides for the settlement of water rights claims of the Community and the District, and for agreement among the Community, the District, the United States, and certain other named parties.

1.5 Accordingly, the Parties have agreed to settle permanently water rights and other claims of the Community and the United States on behalf thereof, as provided for in the Settlement Agreement and to resolve permanently any disputes between the Community, the District and the United States over management and operation of the Project, as set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises contained in this Agreement and other valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Community, the District, and the United States agree as follows:

legal title to (but not the beneficial interest in) the Water Rights as described in articles V and VI of the Globe Equity Decree (but not on behalf of the San Carlos Apache Tribe pursuant to article VI(2) of the Globe Equity Decree) on behalf of the Project; (iii) as owner and operator of the Project; and, (iv) in no other capacity except where expressly stated otherwise herein.

**2.34** "1938 Order" shall mean the Order of the Department of the Interior dated June 15, 1938, entitled "ORDER DEFINING JOINT, DISTRICT AND INDIAN WORKS OF THE SAN CARLOS FEDERAL IRRIGATION PROJECT: TURNING OVER OPERATION AND MAINTENANCE OF DISTRICT WORKS TO THE SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT".

**3.0 ATTACHMENTS**

Following is a list that constitutes the attachments to this Agreement:

| Attachment | Description |
|---|---|
| 2.5 | Map Depicting CRR Project Joint Delivery Facilities |
| 2.6 | Map Depicting CRR Project Delivery Facilities |
| 2.9 | Map Depicting DRR Project Delivery Facilities |
| 2.10 | Map Depicting DRR Project Joint Delivery Facilities |
| 2.11 | Map Depicting DRR Other Project Delivery Facilities |
| 2.13 | Map Depicting Florence-Casa Grande Canal |

| | |
|---|---|
| 2.14 | JCB Agreement |
| 2.20 | Map Depicting Pima Canal |
| 4.1 | Joint stipulation and proposed order effectuating the undertakings set forth in Subparagraph 4.1 |
| 4.2 | Complaint filed June 29, 1988, by the Community and the United States in Globe Equity 59 |
| 6.1 | Project Composite Cost Allocation |
| 6.2 | Third Supplemental Repayment Contract |
| 6.5.1 | Funding schedule and conditions for funding of CRR Delivery Facilities and CRR Project Joint Delivery Facilities |
| 6.5.2 | Funding schedule and conditions for funding DRR Project Delivery Facilities, the DRR Project Joint Delivery Facilities, and the DRR Other Project Delivery Facilities |
| 6.6.1 | Composite Rehabilitation Cost Exceedance Allocation |

**4.0 WAIVER OF CLAIMS**

**4.1** Within thirty (30) calendar days following the Enforceability Date, the Community joined by the United States shall file the stipulation and dismissal with prejudice of all claims previously filed or pending in the Globe Equity Enforcement Court by the Community against the District and the District's landowners as set forth in No. 31-59 TUC-SRB aka Globe Equity 59. Such stipulation shall forever waive and release all such claims previously filed or pending in the original Complaint filed June 29, 1988, a copy of which is

Final Execution Draft
October 21, 2005

ATTACHMENT 6.2

# THIRD SUPPLEMENTAL REPAYMENT CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND THE SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT PROVIDING FOR REHABILITATION OF PORTIONS OF THE SAN CARLOS PROJECT

Table of Contents


| Article | Title | Page |
|---|---|---|
| | Table of Contents | 1 |
| 1 | Preamble | 2 |
| 2 | Explanatory Recitals | 3 |
| 12 | Definitions | 4 |
| 27 | Exhibits | 6 |
| 28 | Contract Purpose | 7 |
| 29 | Construction Funding and Oversight Contract | 7 |
| 30 | Establishment, Composition, Costs and Function of Engineering Board | 8 |
| 31 | Use of Conserved Water | 9 |
| 32 | Repayment by Contractor | 10 |
| 33 | Standard Articles | 11 |
| | Signature Page | 14 |

Final Execution Draft
October 21, 2005

**THIRD SUPPLEMENT TO THE REPAYMENT CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND THE SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT PROVIDING FOR REHABILITATION OF PORTIONS OF THE SAN CARLOS PROJECT**

**Preamble**

**1.0** THIS THIRD SUPPLEMENT to the San Carlos Irrigation and Drainage District REPAYMENT CONTRACT of June 8, 1931, made and entered into this ______ day of __________, 2005, between the UNITED STATES OF AMERICA, hereinafter referred to as the "United States," acting through the Secretary of the Interior, and the SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT, a public corporation of Pinal County, organized and existing by virtue of the laws of the State of Arizona, hereinafter called the "District" and also referred to as the "Contractor," with its principal place of business in Coolidge, Arizona.

**Explanatory Recitals**

WITNESSETH, THAT:

**2.0** **WHEREAS**, through an act of Congress dated June 7, 1924 (43 Stat. 475-476), commonly called the San Carlos Act, and through subsequent acts, Congress provided that, among other things, the Secretary of the Interior shall construct, operate, and maintain the San Carlos Irrigation Project; and

**3.0** **WHEREAS**, on June 8, 1931, the United States and the Contractor entered into a Repayment Contract, whereby the United States would construct, with funds advanced by the United States, a Project storage, diversion and delivery system to

transport Gila River water to the eligible lands within the Contractor's service area, which Repayment Contract was supplemented twice by agreements dated November 12, 1935 and May 29, 1947; and

**4.0** **WHEREAS**, construction of certain portions of the Project distribution system was completed over 60 years ago through contracts awarded by and through the Bureau of Indian Affairs, many of those Project facilities have reached or exceeded their useful life and are in need of rehabilitation; and

**5.0** **WHEREAS**, the Contractor has submitted the District Facilities Feasibility Report to the Bureau of Reclamation, Department of the Interior, setting forth a plan and estimated cost for rehabilitating District-operated Project facilities; and

**6.0** **WHEREAS**, the District Facilities Feasibility Report and recent studies estimate that the rehabilitation of District facilities would conserve an estimated forty-eight thousand (48,000) acre-feet of water per year; and

**7.0** **WHEREAS**, the United States, the District, the Gila River Indian Community and others have negotiated the Settlement Agreement to resolve certain disputes regarding the rights of the United States, the District, the Community and others to the waters of central Arizona, including the waters of the Gila River, which provides, among other things, for the United States to fund the rehabilitation of certain Project facilities; and

**8.0** **WHEREAS**, the Secretary and the District have agreed upon the use of water to be conserved by rehabilitation of the DRR Project Delivery Facilities through reductions in seepage and operational losses; and,

**9.0** **WHEREAS**, Congress has enacted the Act, which, in section 203(d)(4)(B),

among other things, provides the Secretary with the authority to execute and implement this THIRD SUPPLEMENT TO THE REPAYMENT CONTRACT and in section 203(d)(5) of the Act directs that the Bureau of Reclamation shall be designated as the lead agency for oversight of the construction and rehabilitation of the San Carlos Irrigation Project; and,

**10.0** **WHEREAS**, pursuant to the acts of Congress cited in Articles 2 and 10, above, the Secretary of the Interior is willing and authorized to contract with the Contractor for performance by the Contractor of portions of the Project rehabilitation and work, to advance Federal funds to the Contractor for such work under conditions hereinafter set forth, and to secure repayment.

**NOW THEREFORE**, in consideration of the covenants herein contained, it is agreed as follows:

**Definitions**

**11.0** Capitalized terms in this Agreement not specifically defined herein shall have the same meaning as set forth in exhibit 20.1 to the Settlement Agreement.

**11.1** "Act" shall mean shall mean the Arizona Water Settlements Act of 2004, P.L. 108-451.

**11.2** "Article" shall mean an article of this contract.

**11.3** "Conserved Water" shall have the meaning set forth in Article 15.3.

**11.4** "Contracting Officer" shall have the meaning ascribed to it in Article 1.0.

**11.5** "Desilting Basin" shall mean a facility to be built at or near the Ashurst-Hayden Diversion Dam on the Florence-Casa Grande Canal to remove suspended solids

**Repayment by Contractor**

**17.0** Of the Conserved Water, only the quantities available to the Contractor pursuant to Subarticle 16.2.2 constitute new water supplies usable by the Contractor. The Contractor will be responsible for repaying a percentage of that portion of the total construction costs associated with rehabilitating District facilities, as determined pursuant to Exhibit 15.0, said repayment percentage to be the same percentage as the quantity of water determined to be available to the Contractor pursuant to Subarticle 16.2.2 bears to the total quantity of water conserved through rehabilitation of District facilities as determined pursuant to Article 15.3; provided, however, that the District repayment obligation established pursuant to this Contract shall not exceed twelve million dollars ($12,000,000) in January 1, 2000 dollars, as such amount is increased or decreased, as appropriate, based on ordinary fluctuations in construction cost indices applicable to the types of construction involved in the rehabilitation; provided further that the amount of twelve million dollars ($12,000,000) set forth in the previous clause shall be reduced to four million dollars ($4,000,000,000) in January 1, 2000 dollars, as such amount is increased or decreased, as appropriate, based on ordinary fluctuations in construction cost indices applicable to the types of construction involved in the rehabilitation, if the United States exercises the option to exchange provided under Subarticle 16.2.2. Repayment shall be accomplished in forty (40) equal annual installments with the first installment to be paid by December 31st of the calendar Year following one (1) full calendar Year after issuance of the Notice of Substantial Completion pursuant to Article 39.0 of Exhibit 15.0.

**17.1** Any funds expended under this Contract that are in excess of those to be repaid pursuant to Article 17.0 shall be non-reimbursable pursuant to section

Contractor is reimbursed for the allowable costs of developing and implementing the proposal and the Government shall retain forty-five percent (45%) of such savings in the form of reduced expenditures.

**Cost Estimates and Construction Cost Overruns**

**24.0** The United States shall not be responsible nor bear any financial responsibility under this Contract, should the cost of Project rehabilitation under this Contract exceed $52,396,000 in January 1, 2000 dollars, as such amount may be increased or decreased, as appropriate, based on ordinary fluctuations since January 1, 2000, in construction cost indices applicable to the types of construction involved in the rehabilitation. The Gila River Indian Community has agreed to pay an additional amount of $18,158,000 in January 1, 2000 dollar in accordance with the cost allocation described in attachment 6.1 to the SCIDD Agreement. Any costs in excess of $70,554,000 in January 1, 2000 dollars, as such amount may be increased or decreased, as appropriate, based on ordinary fluctuations since January 1, 2000, in construction cost indices applicable to the types of construction involved in the rehabilitation, are the responsibility of the District, except as provided for in subparagraph 6.6 of the SCIDD Agreement.

**Approval of Schedules, Plans and Specifications**

**25.0** The United States shall advance funds for construction to the Contractor pursuant to Articles 31.0 through 33.0 following the Contractor's submittal, and the Contracting Officer's approval of engineering plans and specifications for the construction work, and master and quarterly work schedules for such work. The Contractor shall

United States Government Accountability Office

GAO

Report to the Chairman, Subcommittee on Interior and Related Agencies, Committee on Appropriations, U.S. Senate

February 2006

# INDIAN IRRIGATION PROJECTS

## Numerous Issues Need to Be Addressed to Improve Project Management and Financial Sustainability

GAO
Accountability * Integrity * Reliability

GAO-06-314

SC 03035

February 2006

GAO
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-06-314, a report to the Chairman, Subcommittee on Interior and Related Agencies, Committee on Appropriations, U.S. Senate

# INDIAN IRRIGATION PROJECTS

## Numerous Issues Need to Be Addressed to Improve Project Management and Financial Sustainability

### Why GAO Did This Study

The Department of the Interior's Bureau of Indian Affairs (BIA) manages 16 irrigation projects on Indian reservations in the western United States. These projects, which were generally constructed in the late 1800s and early 1900s, include water storage facilities and delivery structures for agricultural purposes. Serious concerns have arisen about their maintenance and management.

GAO was asked to examine (1) BIA's estimated deferred maintenance cost for its 16 irrigation projects, (2) what shortcomings, if any, exist in BIA's current management of its irrigation projects, and (3) any issues that need to be addressed to determine the long-term direction of BIA's irrigation program.

### What GAO Recommends

GAO recommends that BIA (1) provide the necessary level of technical support to project managers, (2) require project managers to meet at least twice annually with water users, and (3) conduct studies to determine the financial sustainability of the projects.

Although we requested comments from the Department of the Interior on our findings and recommendations, none were provided in time to be included as part of this report.

www.gao.gov/cgi-bin/getrpt?GAO-06-314.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Robin M. Nazzaro at (202)512-3841 or nazzaror@gao.gov.

### What GAO Found

BIA estimated the cost for deferred maintenance at its 16 irrigation projects at about $850 million for 2005, although the agency is in the midst of refining this estimate. BIA acknowledges that this estimate is a work in progress, in part, because some projects incorrectly counted new construction items as deferred maintenance. To further refine its estimate, BIA plans to hire engineering and irrigation experts to conduct thorough condition assessments of all 16 irrigation projects to correctly identify deferred maintenance needs and costs.

BIA's management of some of its irrigation projects has serious shortcomings that undermine effective decisionmaking about project operations and maintenance. First, under BIA's organizational structure, officials with the authority to oversee irrigation project managers generally lack the technical expertise needed to do so effectively, while the staff that have the expertise lack the necessary authority. Second, despite federal regulations that require BIA to consult with project stakeholders in setting project priorities, BIA has not consistently provided project stakeholders with the necessary information or opportunities to participate in project decisionmaking.

The long-term direction of BIA's irrigation program depends on the resolution of several larger issues. Of most importance, BIA does not know to what extent its irrigation projects are capable of financially sustaining themselves, which hinders its ability to address long-standing concerns regarding inadequate funding. Information on financial sustainability, along with accurate deferred maintenance information, are two critical pieces of information that are needed to have a debate on the long-term direction of BIA's irrigation program. Once this information is available, the Congress and interested parties will be able to address how the deferred maintenance will be funded and whether entities other than BIA could more appropriately manage some or all of the projects.

Deferred Maintenance at the Crow Irrigation Project (March 2005)





Source: GAO.

Abandoned Car in Canal

Crumbling Concrete Structure

Case 1:06-cv-00576-LB Document 23-2 Filed 07/24/2008 Page 5 of 39

# Contents


| | | |
|---|---|---|
| **Letter** | | 1 |
| | Results in Brief | 3 |
| | Background | 6 |
| | BIA Estimates the Cost of Deferred Maintenance at about $850 Million, but the Estimate Is Being Refined | 13 |
| | Shortcomings in BIA's Management of Some Irrigation Projects Undermine Effective Decisionmaking | 20 |
| | Long-Term Direction of BIA's Irrigation Program Depends on Resolution of a Number of Larger Issues | 25 |
| | Conclusions | 30 |
| | Recommendations for Executive Action | 31 |
| | Agency Comments and Our Evaluation | 32 |
| **Appendixes** | | |
| Appendix I: | **Objectives, Scope, and Methodology** | 34 |
| Appendix II: | **Profiles of the Nine Irrigation Projects GAO Visited** | 36 |
| | Blackfeet Irrigation Project | 36 |
| | Colorado River Irrigation Project | 37 |
| | Crow Irrigation Project | 39 |
| | Fort Belknap Irrigation Project | 41 |
| | Pine River Irrigation Project | 42 |
| | San Carlos Indian Works Irrigation Project (Pima) | 44 |
| | San Carlos Joint Works Irrigation Project (Coolidge) | 45 |
| | Wapato Irrigation Project | 47 |
| | Wind River Irrigation Project | 48 |
| Appendix III: | **GAO Contact and Staff Acknowledgments** | 51 |
| **Tables** | Table 1: Tribe(s) Served and Year Authorized for BIA's 16 Irrigation Projects | 9 |
| | Table 2: Land Ownership for BIA's 16 Irrigation Projects | 11 |
| **Figures** | Figure 1: Location of BIA's 16 Irrigation Projects by Region | 8 |
| | Figure 2: Example of an Irrigation Project Operated by BIA | 10 |
| | Figure 3: Examples of Deferred Maintenance on BIA's Irrigation Projects (c. 2005) | 15 |
| | Figure 4: Fiscal Year 2005 Cost Estimate of Deferred Maintenance by Irrigation Project | 17 |

| | | |
|---|---|---|
| Figure 5: | Fiscal Year 2005 Cost Estimate of Deferred Maintenance by Type | 19 |
| Figure 6: | Misalignment of Expertise and Authority for a Typical BIA Irrigation Project | 21 |
| Figure 7: | Opportunities for Water Users to Meet with BIA Varies by Project | 24 |
| Figure 8: | Pictures of the Blackfeet Irrigation Project (July 2005) | 36 |
| Figure 9: | Pictures of the Colorado River Irrigation Project (June 2005) | 38 |
| Figure 10: | Pictures of the Crow Irrigation Project (March 2005) | 39 |
| Figure 11: | Pictures of the Fort Belknap Irrigation Project (July 2005) | 41 |
| Figure 12: | Pictures of the Pine River Irrigation Project (August 2005) | 43 |
| Figure 13: | Pictures of the San Carlos Indian Works Irrigation Project (June 2005) | 44 |
| Figure 14: | Pictures of the San Carlos Joint Works Irrigation Project (June 2005) | 46 |
| Figure 15: | Pictures of the Wapato Irrigation Project (April 2005) | 47 |
| Figure 16: | Pictures of the Wind River Irrigation Project (July 2005) | 49 |

## Abbreviations

BIA Bureau of Indian Affairs

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

water users would be an option where water users share similar interests and have positive working relationships, as well as the desire to organize an irrigation district or association.

Any successful alternative management option would have to consider the sometimes disparate interests and priorities among water users. In some cases, a combination of the various alternative management options may be beneficial and feasible. This type of arrangement is currently being considered for the Flathead Irrigation Project, where BIA is currently in the process of turning over the operation and management of the project to a collaborative management group that may include the tribe, individual Indian water users, and non-Indian water users. However, regardless of the alternative management option, water users and tribal officials repeatedly stated that they would not be willing or able to take over project operations and maintenance unless the deferred maintenance had already been addressed or adequate funding was available to address the deferred maintenance needs.

## Conclusions

Since BIA historically has not had adequate funds to operate and maintain the projects, the projects are in a serious state of disrepair. BIA is in the process of implementing its plan to develop an accurate list and estimate of the deferred maintenance needs for each project. However, some of the projects also have day-to-day management shortcomings regarding technical support and stakeholder involvement that need to be addressed. BIA's decentralized organizational structure combined with the difficulty in attracting and retaining highly qualified project managers at remote Indian reservations led to some poor decisionmaking at some of the projects. It is critically important that project managers, especially those with less than desirable qualifications, have the necessary level of technical support to prevent poor decisions from being made in the future.

A lack of adequate stakeholder involvement at some projects has also seriously undermined project accountability. Unlike most other BIA programs, the operations and maintenance of the irrigation projects are funded almost entirely by the project beneficiaries—the water users, many of whom are non-Indian. Consequently, BIA is accountable to these water users and these water users expect to have an active voice in project operations and maintenance. Some projects have not fulfilled their obligations to regularly meet with project stakeholders, creating an adversarial environment in which BIA and project water users do not trust each other. This failure to involve stakeholders in the management of their

own projects means that BIA does not benefit from water user expertise and has resulted in widespread feelings that BIA is non-responsive and evasive, alienating many water users who feel disenfranchised. Moreover, this failure has limited the ability of stakeholders to hold BIA accountable for its decisions and actions.

In addition to some shortcomings with BIA's ongoing day-to-day management of some of the projects, we also found that information on the financial sustainability of the projects is needed to help address the long-term direction of BIA's irrigation program. BIA's 16 irrigation projects were generally built in the late 1800s and early 1900s to further the federal government's Indian policy of assimilation. The government made the decision to build these projects to support and encourage Indians to become farmers. This decision was generally not based on a thorough analysis designed to ensure that only cost effective projects were built. As a result, the financial sustainability of some of the projects has always been questionable, ultimately creating tension between BIA and its water users. BIA is under constant pressure to raise annual operations and maintenance fees to collect adequate funds to maintain the projects, while many water users contend that they do not have the ability to pay higher fees. Without a clear understanding of the financially sustainability of the projects, BIA does not know whether it is practical to raise operation and maintenance fees, or whether alternative sources of financing should be pursued. Information on financial sustainability, along with accurate deferred maintenance information, are both critical pieces of information needed to have a debate on the long-term direction of BIA's irrigation program. Once this information is available, the Congress and interested parties will be able to address how the deferred maintenance will be funded and whether entities other than BIA could more appropriately manage some or all of the projects.

## Recommendations for Executive Action

We recommend that the Secretary of the Interior take the following three actions.

To improve the ongoing management of the projects in the short-term, we recommend that the Secretary direct the Assistant Secretary for Indian Affairs to

- provide the necessary level of technical support for project managers who have less than the desired level of engineering qualifications by putting these projects under the direct supervision of regional or central



SC 03069

irrigation office staff or by implementing more stringent protocols for engineer review and approval of actions taken at the projects; and

- require, at a minimum, that irrigation project management meet twice annually with all project stakeholders—once at the end of a season and once before the next season—to provide information on project operations, including budget plans and actual annual expenditures, and to obtain feedback and input.

To obtain information on the long-term financial sustainability of each of the projects, we recommend that the Secretary direct the Assistant Secretary for Indian Affairs to conduct studies to determine both how much it would cost to financially sustain each project, and the extent to which water users on each project have the ability to pay these costs. This information will be useful to congressional decisionmakers and other interested parties in debating the long-term direction of BIA's irrigation program.

## Agency Comments and Our Evaluation

We provided the Department of the Interior with a draft of this report for review and comment. However, no comments were provided in time to be included as part of this report.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the Secretary of the Interior, the Assistant Secretary for Indian Affairs, as well as to appropriate Congressional Committees, and other interested Members of Congress. We also will make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report.

# Profiles of the Nine Irrigation Projects GAO Visited

This appendix contains brief profiles of the nine irrigation projects we visited. Each project profile begins with a short overview of basic facts about the project, followed by a set of bullet points describing the key operations and maintenance concerns and the key management concerns expressed to us by BIA officials, tribal officials, or water users during our site visits.

## Blackfeet Irrigation Project

The Blackfeet Irrigation Project was authorized for construction in 1907, but construction was never completed. It consists of 38,300 acres being assessed operations and maintenance fees (and 113,100 acres authorized for irrigation). The project is located in Browning, Montana on the Blackfeet Indian Reservation of Montana, home of the Blackfeet Tribe. About 60 percent of the project's land is owned by either the tribe or individual tribal members, and about 40 percent is owned by non-Indians. BIA currently estimates the project's total deferred maintenance costs to be $29,130,222. See figure 8 below for pictures of the Blackfeet Irrigation Project.

**Figure 8: Pictures of the Blackfeet Irrigation Project (July 2005)**





Source: GAO.

Deteriorating Canal Lining

Leaking Check Gate

### Key Operations and Maintenance Concerns Expressed During Our Site Visit

- Fees are insufficient to cover the costs of project operations and maintenance.

## Key Operations and Maintenance Concerns Expressed During Our Site Visit

- Inefficiency in water delivery results in fewer water users being able to receive water, leading to idle acreage in some cases.
- Clearing tumbleweeds and other vegetation that can clog culverts are a recurring problem and represents a large part of the project's spending on operations and maintenance.
- Erosion is a continuing problem, in part, because the canal is used for both water deliveries as well as drainage.
- BIA staff has a "wish list" of items that would bring the project into top condition, extending beyond the basic deferred maintenance.
- Project infrastructure may not have the capacity to deliver water to all potential water users.

## Key Management Concerns Expressed During Our Site Visit

- 2007 turnover to water users is still underway.
- Insufficient reserve funds means that project staff may not have enough money to conduct needed maintenance towards the end of the year.
- Vacancies are a constant problem at the project, leaving too few staff to conduct project maintenance.
- BIA is too slow to respond to water users' requests for repairs.

# San Carlos Joint Works Irrigation Project (Coolidge)

The San Carlos Joint Works Irrigation Project was authorized for construction in 1924, but construction was never completed. It provides water to non-Indian irrigators as well as the San Carlos Indian Works Irrigation Project. It consists of 100,000 acres being assessed operations and maintenance fees (and 100,546 acres authorized for irrigation), with 50 percent of the land owned by non-Indian irrigators and 50 percent owned by Indian irrigators (in the form of the San Carlos Indian Works Irrigation Project). The project is located in Coolidge, Arizona. BIA currently estimates Coolidge's total deferred maintenance costs to be $5,775,427. See figure 14 for pictures of the San Carlos Joint Works Irrigation Project.

**Figure 14: Pictures of the San Carlos Joint Works Irrigation Project (June 2005)**



Deteriorating China Wash Flume



Source: GAO.

Concrete that Fell from Flume



Weeds in Irrigation Canal

## Key Operations and Maintenance Concerns Expressed During Our Site Visit

- Lack of certainty in BIA's ability to deliver requested water to all water users has led some to purchase additional water from outside of the project.
- Silt removal from irrigation canals and ditches is a recurring problem, leading BIA to purposefully over-excavate the main canal each year in an attempt to catch excess silt that can clog culverts and prevent water delivery impairments.
- Repair of China Wash Flume is an expensive undertaking, but the flume's failure could jeopardize water deliveries for much of the project.
- Removal of weeds to prevent clogged culverts is a recurring problem for the project.

## Key Management Concerns Expressed During Our Site Visit

- 2007 turnover to water users is under way but not finalized.
- Lawsuit against BIA's increase in operations and maintenance fees resulted in some water delivery delays while the lawsuit is pending.
- Contracting delays within BIA have resulted in postponed project maintenance.

- Turnover of BIA staff and lack of water user inclusion in project decisionmaking impedes effective communication.
- BIA lacks accountability to water users in terms of how it spends operations and maintenance fees.

## Wapato Irrigation Project

The Wapato Irrigation Project is one of the oldest and largest of BIA's 16 revenue-generating irrigation projects with 96,443 acres being assessed operations and maintenance fees (and 145,000 acres authorized for irrigation). It was authorized for construction in 1904, but construction was never completed. The project is located in Yakima, Washington on the Yakama Reservation, home of the Confederated Tribes and Bands of the Yakama Nation. About 60 percent of the project land is owned by either the tribe or individual tribal members, and about 40 percent is owned by individual non-Indians. BIA currently estimates the project's total deferred maintenance costs to be $183,128,886. See figure 15 for pictures of the Wapato Irrigation Project.

**Figure 15: Pictures of the Wapato Irrigation Project (April 2005)**





Source: GAO.

Weed Clearing Machine

Irrigation Canal with Crumbling Concrete Lining

CERTIFICATE OF FILING

I hereby certify that on August 26, 2008, a copy of the foregoing "APPENDIX TO DEFENDANT'S REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/KIRK T. MANHARDT