# In the United States Court of Federal Claims

No. 06-576C
(Filed December 3, 2008)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * *　* | |
| | *　Contracts; breach of contract; |
| **SAN CARLOS IRRIGATION AND** | *　cross-motions for summary |
| **DRAINAGE DISTRICT,** | *　judgment; <u>San Carlos Irrigation</u> |
| | *　<u>and Drainage District v. United</u> |
| Plaintiff, | *　<u>States</u>, 111 F.3d 1557 (Fed. Cir. |
| | *　1997); contract interpretation; |
| v. | *　breach of contract provision to |
| | *　maintain accounts; breach of |
| **THE UNITED STATES,** | *　implied covenant of good faith |
| | *　and fair dealing; sufficiency of |
| Defendant. | *　responses to statements of |
| | *　proposed material fact; triable |
| * * * * * * * * * * * * * * * * * * * * * | *　issues of fact. |

<u>Riney B. Salmon, II</u>, Phoenix, AZ, for plaintiff.

<u>Kirk T. Manhardt</u>, Washington, DC, with whom was <u>Assistant Attorney General</u> <u>Gregory G. Katsas</u>, for defendant.  <u>William W. Quinn</u>, U.S. Department of Interior, Phoenix Field Office, of counsel.

## MEMORANDUM OPINION AND ORDER

<u>**MILLER,**</u> Judge.

This case, before the court after argument before the transferee judge on cross-motions for summary judgment, concerns the Government's contractual obligations to plaintiff San Carlos Irrigation and Drainage District ("plaintiff" or the "District") in charging operation and maintenance assessments for the District's use of the irrigated water from San Carlos Irrigation Project (the "Project"), which is operated by the Bureau of Indian Affairs (the "BIA"), an agency of the United States Department of Interior ("Interior").  The issues to be resolved are whether the Government has a contractual duty to provide final notice of operation and management charges before levying the annual assessment and whether final notice is a necessary element triggering the District's obligation to pay; whether the decision of the United States Court of Appeals for the Federal Circuit in <u>San Carlos Irrigation and</u> <u>Drainage District v. United States</u>, 111 F.3d 1557 (Fed. Cir. 1997) ("<u>San Carlos</u>"), applies

to relieve the Government of liability for breach of contract when it accumulates surplus cash reserves for three consecutive years without crediting the District for the overestimated charges; or, alternatively, if <u>San Carlos</u> does not apply, whether the Government unreasonably exceeded actual operation and management expenses for years 2005 through 2007 by not fairly representing the actual financial status of the Project when preparing projected annual budgets that calculate the yearly operation and management rates.

**FACTS**

The following facts are undisputed.

1. <u>Background</u>

In 1924 Congress authorized construction of the Coolidge Dam across the Gila River as part of the San Carlos Irrigation Project. Act of June 7, 1924, ch. 288, 43 Stat. 475 (the "1924 Act"). The stated purposes of the 1924 Act were to "provid[e] water for the irrigation of lands allotted to Pima Indians on the Gila River Reservation, Arizona" and "for the irrigation of such other lands in public or private ownership, as in the opinion of the said Secretary [of Interior] can be served with water impounded by said dam without diminishing the supply necessary for said Indian lands." <u>Id.</u> § 1. The total cost of the Project was to be "distributed equally per acre among the lands in Indian ownership and the lands in public or private ownership that can be served from the waters impounded" by the dam. <u>Id.</u> § 2. The 1924 Act specified that the operation and maintenance ("O&M") costs of the land "in private ownership or . . . in Indian ownership operated under lease shall be paid annually in advance not later than March 1st . . . ." <u>Id.</u> § 3.

Pursuant to the passage of the 1924 Act, the Secretary of Interior (the "Secretary"), on June 7, 1924, also executed a Landowners' Agreement with private landowners governing use of the Project. In exchange for use of the Project, the landowners relinquished and transferred their water rights to the United States under the Agreement. In accordance with the 1924 Act, the landowners agreed to organize a district, as directed by the Secretary, "to handle and control the privately-owned distributing systems leading from [the] project canals and be able to act as a unit in all dealings with" the Secretary. Pl.'s Br. filed Apr. 9, 2008, Ex. 5 at 12. The landowners committed to pay the Project's O&M charges. According to the Agreement, the O&M charges are based on the "total annual cost of the operation and maintenance" of the Project, and the charges "shall be uniform throughout said project and made upon a per acre or acre-foot basis unless otherwise provided by agreement with said district and with the approval of the Secretary." <u>Id.</u> at 15.

Pursuant to the terms of the 1924 Act and the Landowners' Agreement, landowners organized the San Carlos Irrigation and Drainage District in 1928.  Plaintiff is organized under the laws of, Ariz. Rev. Stat. Ann. § 48-3256 (2008), and is a political subdivision of Arizona, Ariz. Rev. Const. art. XIII, § 7 (2008); Ariz. Rev. Stat. Ann. § 48-2901 (2008). Plaintiff is located in Pinal County, Arizona, and includes 50,000 acres of irrigable public and private land within the confines of the Project.  On June 8, 1931, the United States and plaintiff executed the Repayment Contract, which refers to and incorporates the provisions of the Landowners' Agreement.  The relevant sections of a Repayment Contract provided: 1) O&M charges shall be fixed annually by the Secretary and paid to the United States; 2) the Secretary is to give notice to plaintiff "of the amount of charges to be paid annually in sufficient time to permit" plaintiff to tax or toll its district and comply with the laws of Arizona "relative to the levy and collection of taxes by irrigation districts," Pl.'s Br. filed Apr. 9, 2008, Ex. 1 at 8; 3) plaintiff must pay its proportion of the whole cost of the Project plus O&M charges, due before March 1 every year; 4) pursuant to the laws of Arizona and the United States, plaintiff will use its taxing power to collect and pay the "United States all charges authorized under this agreement in full on or before the day" the charges come due, id. at 18; 5) plaintiff agrees and understands that payment of construction and O&M charges are a prerequisite to the right to receive water from the Project; and 6) a penalty of one-half of one percent (0.5%) will be assessed on any delinquent payments by plaintiff.

On June 15, 1938, the Secretary executed a Joint Works Order (the "Order") defining the Joint Works to include the Coolidge Dam and the San Carlos Reservoir and electrical power generating, transmission, and distribution system and allocating the responsibility of operating and maintaining the structures.  The Order stipulated that the "cost of maintaining and operating the Joint Works shall be paid equally [between the Indian Lands, and the public and private lands] on account of the Indian lands and the public and private lands at a per acre rate to be established by order of the Secretary annually . . . ."  Pl.'s Br. filed Apr. 9, 2008, Ex. 8 at 7.  The rate should reflect "the amount necessary to meet . . . the proportionate share of the expense required by the Project to maintain and operate the Joint Works."  Id.  The Joint Works Order stipulated that the O&M expenses be paid by the Project landowners as provided for in the Landowners' Agreement and the Repayment Contract.

On November 12, 1938, reciting plaintiff's "considerable difficulty" and "additional expense in complying" with the March 1 due date for the annual payment of O&M charges, the parties executed the First Supplement to the Repayment Contract, providing that the one-half-of-one-percent penalty would not be assessed on delinquent payments until May 15 of each year.  Pl.'s Br. filed Apr. 9, 2008, Ex. 7 at 4.

2.  The operation and management budget process

The Project is operated by the BIA, an agency of Interior.  69 Fed. Reg. 23,805 (Apr. 30, 2004).  The Natural Resources Division of the Western Regional Office of the BIA,

located in Phoenix, Arizona, acts as a liaison between the Project and the BIA's main office in Washington, D.C.  Plaintiff is a representative district comprising of the non-Indian landowners' specified water rights under the Project.  The Secretary delegated authority to set charges for O&M under the 1924 Act to the Assistant Secretary for Indian Affairs.  The Project staff prepares a proposed budget and recommends the annual O&M rate for a given fiscal year.  Deposition of Catherine Wilson, Oct. 2, 2007, at 12.

The proposed budget accrues for projected income and obligations over several future fiscal years.  The budget values are based on financial data generated from the Federal Financial System.  Affidavit of Randy Shaw, June 10, 2008, ¶¶ 8, 11.  The budget accrues for the following main categories: Unobligated Cash, Income, Total Funds Available, Obligations, Sinking Funds and Reserve Balances, Total Obligations with Sinking Funds and Reserves, and End of Year Unobligated Cash.  Shaw Aff. ¶ 16.  The sum of Unobligated Cash and Income equals the Total Funds Available; Unobligated Cash represents cash not earmarked for a particular purpose; and Income is comprised principally of annual assessments for O&M charges, but includes other miscellaneous items, such as interest income, excess pumping fees, and sale of equipment.  The "Obligations" description reflects funds that are earmarked for specific purposes, including maintenance work, non-routine maintenance of land and structures, personnel costs, and energy costs related to the Project.  The Sinking Fund and Reserves category shows costs associated with projects, such as the China Wash Flume and Well Replacement.  The Project then calculates two net values: the first nets Total Funds Available and Total Obligations; the second nets Total Funds Available and Obligations, but does not back out the Sinking Fund and Reserves expenses.  The O&M charges are estimated from this budget and calculated as a cost-per-acre basis.

By letter dated December 1, 1997, the Project's Project Engineer advised plaintiff of "the need for a process that will accomplish the goal of establishing annual [O&M] budgets and fixing the annual [O&M] assessment in timely manner."  Def.'s App. at 1.  The Project Engineer enclosed with the letter an "Action Items" time line (the "Action Items time line" or "Action Items agreement") outlining a rate-setting process that set forth a series of steps for the Project and plaintiff to follow each fiscal year.  Id. at 2.  As per the Action Items time line, after the Project estimates and prepares a budget for the upcoming fiscal year, the Project provides plaintiff and the Project's other water users 1/ with an estimated budget, "including data, justifications, cost estimate, and finding of proposed [] O&M assessment rate."  Def.'s App. at 2.  The Project then holds a fact-finding meeting with the water users to discuss the budget, after which water users may submit "written

---

1/ The Project's water users are comprised of plaintiff, the Indian Works, and the Gila River Indian Community.

comments/recommendations" on the estimated budget.  Def.'s Proposed Findings of Uncontroverted Fact filed June 23, 2008, ¶ 25 (quoting Def.'s App. at 2).  Plaintiff and the Project have "followed this rate setting process for nearly a decade." Id.  (citing Def.'s App. at 146, Shaw Aff. ¶ 13).

Following the fact-finding meeting, the Project forwards its proposal and recommended O&M rate, along with supporting documentation, to the Regional Director at the BIA's Western Regional Office.  Upon approval by the Regional Director, the proposed budget and O&M rate are submitted to the Office of Assistant Secretary for Indian Affairs for publication in the Federal Register as a proposed rate for public comment.  After the comment period, the Assistant Secretary makes the final decision that sets the O&M rate for that fiscal year.

The Project estimates its O&M budget approximately two years before the actual fiscal year begins, and its fiscal year does not follow the calendar year.  Chart 1 below captures the important dates and deadlines for fiscal years 2005 through 2007.

Chart 1: Time line for fiscal years 2005 through 2007

| Fiscal Year | Date the Project's Fiscal Year begins | Notice Date of O&M rate as per Arizona law | Due date of final O&M charges as per 1924 Act | Date when penalties start to accrue on late payments as per First Supplement to the Repayment Contract |
|---|---|---|---|---|
| 2005 | 10/1/2004 | 7/1/2003 | 3/1/2004 | 5/15/2004 |
| 2006 | 10/1/2005 | 7/1/2004 | 3/1/2005 | 5/15/2005 |
| 2007 | 10/1/2006 | 7/1/2005 | 3/1/2006 | 5/15/2006 |

Under the financial provisions of Arizona's special taxing laws for irrigation and water conservation districts, plaintiff must estimate the amount of money required to meet its obligations for the next fiscal year by July 1.  Ariz. Rev. Stat. Ann. § 48-3112 (2008).  According to Douglas D. Mason, General Manager of plaintiff San Carlos Irrigation and Drainage District, the Pinal County Board of Supervisors charges include O&M rates in its property tax rate-setting and assessment process.  Affidavit of Douglas D. Mason, Apr. 7, 2008, ¶ 9 ("Mason Aff. I").  The County's tax assessor notifies taxpaying landowners of the charges through the annual property tax bill.  The taxpayers are required to pay taxes in two installments in November and May of each year.  Mr. Mason explained that "[t]he County holds the funds and the District draws upon the funds to pay its obligations.  The District [plaintiff] uses these funds to pay the Project O&M charges to the United States by the contractual deadline." Mason Aff. I, ¶ 10; see Ariz. Rev. Stat. Ann. § 48-3112(C) (stating that "the estimate shall be entered in full upon the records of the district and a certified copy thereof transmitted to the board of supervisors of each county in which any lands of the

district are located"). Any payments that plaintiff is obligated to pay under contracts with the United States are governed by Ariz. Rev. Stat. Ann. § 48-3096(A) (2008), which provides that any financial obligations "shall be paid, unless otherwise provided by contract, by revenue derived from annual assessments, apportioned as prescribed by this article."

Plaintiff must also estimate its financial obligations for the next fiscal year and provide the County's

> board of directors, not later than July 1 each year, [an] estimate [of] the amount of money required to meet the obligations of the district for the next fiscal year, including maturing bonds and interest, maintenance and operating and current expenses, together with such additional amount necessary to meet any deficiency in the payment of items of expense incurred during any previous year, and to provide funds for purchases of lands sold for delinquent taxes. The board may include in the estimate the amount of money required for the repayment of all or any part of district taxes paid for any preceding year in any case in which the district taxes remaining unpaid for such year have been cancelled as provided in § 48-3125.

Ariz. Rev. Stat. Ann. § 48-3112(A).

The process that the Project and plaintiff generally follow begins when the Project provides plaintiff with the final O&M rate by July 1, fifteen months in advance of the Project's fiscal year; plaintiff then provides the County's board of directors an estimate of its expenses; and plaintiff pays the O&M charges to the Project by March 1 of the following year, or seven months before the Project's fiscal year begins.

3. Fiscal Year 2005

During fiscal years 1998 through 2004, the O&M rate was established as $20.00 per acre. On April 1, 2003, plaintiff prepared a proposed budget for FY 2005 based on a $20.00-per-acre assessment. By letter dated April 18, 2003, the BIA notified plaintiff that, due to a "double-accounting error," the 2005 O&M rate would increase from $20.00 to $30.00 per acre. Pl.'s Br. filed Apr. 9, 2008, Ex. 24 at 1. The BIA announced that comments concerning the rate must be submitted by May 16, 2003.

Plaintiff responded to the BIA by letter dated May 16, 2003, putting forward numerous suggestions on how the BIA could reduce the O&M rate to $15.00 per acre instead of increasing it to $30.00. Plaintiff recommended that the BIA reduce employee overhead, commenting that the BIA is overstaffed, and suggested that the BIA "do a better job at

accounting for all of its expenses, services, and equipment . . . [as] the proposed FY 2005 budget, garbage pickup and fire protection from the City of Coolidge appear[ed] twice, in the utilities section and in the services section." Pl.'s Br. filed Apr. 9, 2008, Ex. 25 at 6. Plaintiff commented that "[i]t is this same lack of attention to detail that allowed the 'double-accounting' error to occur and persist." Id. Plaintiff also took issue with a number of projects for which the BIA accrued, such as an Apache Tribe archaeology study, litigation defense costs, the Well Replacement program, and China Wash Flume Rehabilitation and Replacement. On June 6, 2003, the Western Regional Director for the BIA responded to plaintiff's suggestions and informed plaintiff that, after holding a fact-finding meeting on May 23, 2003, the BIA determined to keep the proposed O&M rate at $30.00, which it would submit to the Assistant Secretary as the proposed 2005 rate. The Director stated:

> [T]he assessment rate was reduced from a $30.00 per acre average during 1985 to 1997 to $20.00 per acre in 1998; and, also shows the rate was held at $20.00 per acre through FY 2004. For the past five years, the rate reduction was possible as the Project operated with a budget supplemented by a cash reserve which had accumulated over a period of time. The past reductions in the assessment rate were done with [plaintiff's] full knowledge and support . . . . The rate increase is necessary as the Project no longer has the extra cash reserves. Therefore, we must now charge a rate that accurately reflects the true annual O&M costs . . . .

Pl.'s Br. filed Apr. 9, 2008, Ex. 27 at 1-2. The Director explained that "[t]he accounting error resulted in artificially low assessment rates for several years. The water users benefitted greatly during the years the rate was set at $20.00." Id. at 3. The Director also informed plaintiff that an increase in 2006 to $35.00 per acre would be likely. Affidavit of Mason Douglas D. Mason, Nov. 23, 2003, ¶ 3 ("Mason Aff. II").

During July 2003 plaintiff provided the Pinal County Board of Supervisors with an assessed rate of $20.00 for FY 2005. According to plaintiff's General Manager, Mr. Mason, plaintiff anticipated that the BIA eventually would adjust the rate back to $20.00. Several times in the past the BIA had proposed a higher rate, although later determining a lower final rate.

On September 30, 2003, Interior published notice in the Federal Register that the proposed O&M rate was $30.00 per acre and setting a December 1, 2003 deadline for submission of comments. 68 Fed. Reg. 56,302, 56,306. Plaintiff objected to the rate by letter dated November 26, 2003. On April 30, 2004, the Assistant Secretary published notice that the final 2005 O&M rate was established at $30.00 per acre. Consequently, Interior published the final rate notice ten months after the July 1 deadline prescribed by state statute.

7

As of March 1, 2005, plaintiff had not paid the O&M charges for fiscal year 2005. By letter dated February 10, 2005, the Acting Project Manager for the BIA threatened to terminate plaintiff's water service "if payment in the amount of $1,500,000.00 plus accumulated interest and penalties since May 15, 2004 is not received by the close of business March 1, 2005." Pl.'s Br. filed Apr. 9, 2008, Ex. 38 at 1. The letter stated that plaintiff could appeal the Acting Project Manager's decision to terminate water delivery to the Regional Director pursuant to 25 C.F.R. Part 2.

Plaintiff requested by letter dated February 23, 2005, that the Regional Director stay the Acting Project Manager's decision pending the outcome of plaintiff's appeal. Plaintiff stated that it was withholding "a portion of the Project assessment for Fiscal Year 2005 because of disagreements with the Project regarding the assessment rate" and the BIA's "operation and management of the Project." Pl.'s Br. filed Apr. 9, 2008, Ex. 39 at 1. Plaintiff submitted that since December 2004 it repeatedly had requested review of the Project's records relating to the O&M rate and the Project's operations "to determine if any basis exists for the current assessment rate" increase. Id. Plaintiff reminded the BIA that both the Repayment Contract and the BIA's rate assessment notice in the Federal Register afforded plaintiff the opportunity to review "the Project's 'accounts and the books showing them, and also all records, maps, plans, estimates, budgets and engineering data'" concerning the project. Pl.'s Br. filed Apr. 9, 2008, Ex. 39 at 1 (quoting Ex. 2 at 19) (hereinafter cited as "Repayment Contract"). Plaintiff stated that the BIA incorrectly had denied requests to inspect the records made under the Freedom of Information Act, (5 U.S.C. § 552 (2000)), and protested termination of water services absent allowing plaintiff to exercise its rights to inspect the Project's accounting records. Id. at 2. Plaintiff requested the Regional Director to "immediately stay any action by the Project on the Acting Project Manager's decision until this matter has been settled or the appeal process has been exhausted." Id.

Shortly thereafter, on March 1, 2005, the Regional Director affirmed the Project Manager's decision allowing plaintiff two days to pay charges of $1 million and another thirty days to pay the remaining $500,000.00. "[U]nder protest for the O&M assessment," plaintiff paid the first $1 million O&M charges, plus $47,500.00 in penalties, on March 1, 2005. Pl.'s Br. filed Apr. 9, 2008, Ex. 42 at 1-2. Plaintiff paid the remaining balance during the following month.

4. Fiscal Year 2006

On June 29, 2004, plaintiff attended a fact-finding meeting held by the Project discussing the Project's future years' budgets. The Project's civil engineer proposed a $15.00 O&M rate for 2006 and submitted the recommendation to the Regional Director on September 15, 2004. On July 6, 2004, following the June fact-finding meeting, plaintiff

submitted a rate assessment to the County reflecting a $20.00 O&M rate for 2006. Plaintiff explained that it planned to use the $5.00 spread to replenish a portion of its reserve funds that it used to pay the increased O&M charges for 2005.

On September 29, 2004, the Civil Engineer for the Western Regional Office e-mailed the Chief, Branch of Irrigation Power, Safety of Dams, at Interior's head office reaffirming that the 2006 O&M rate was $30.00 and directing the BIA not to accept the proposed $15.00 rate. By letter dated October 1, 2004, the Regional Director communicated to the Project that the BIA was denying the proposed $15.00 rate for 2006, explaining that the budget did not include work for deferred maintenance items or the well replacement program and that it under-accrued the China Wash Flume repair funding. The Regional Director further stated that, "[w]hen the 2005 budget was formulated, the Heavy Equipment Replacement Fund was reduced to help mitigate an error in the 2004 budget which over estimated [sic] the amount of carryover funds available by $2,000,000. This fund will have to be reestablished." Pl.'s Br. filed Apr. 9, 2008, Ex. 46 at 1. The Regional Director requested that the Project submit a revised proposal accounting for all costs discussed in the denial.

On December 9, 2004, the Project Manager sent a memorandum to the Regional Director announcing a fact-finding meeting on December 16, 2004, to discuss the reasons for increasing the 2006 O&M rate from $15.00 to $30.00. Plaintiff first learned in that same month of the rate increase. During the fact-finding meeting, the Project gave plaintiff a copy of the revised budget, prepared on October 28, 2004, that incorporated the $30.00 rate. The Project Manager issued a memorandum to the Regional Director dated January 18, 2006, that summarized the main topics discussed at the December 14, 2004 fact-finding meeting, stating that during the "meeting it was stressed [] that the Assessment would not be less than $30.00 per acre for the period of FY 2006 through FY 2010, but due to unforeseen circumstances, the assessment may have to be raised higher than $30.00 per acre." Pl.'s Br. filed Apr. 9, 2008, Ex. 48 at 1. On February 1, 2005, the BIA published in the Federal Register its intent to establish the rate at $30.00 per acre. 70 Fed. Reg 5,210, 5,217. The final rate was published on August 8, 2005, as $30.00 per acre. 70 Fed. Reg. 45,740, 45,744. Consequently, the rate was established thirteen months after the July 1 deadline.

By letter dated February 2, 2006, the Acting Western Regional Director of the BIA warned plaintiff that water service would be terminated on March 2, 2006, if plaintiff failed to pay the 2006 O&M charges by March 1, 2006. The Regional Director stated that, "[o]n January 30, 2006, the U.S. Department of the Interior issued" an invoice to plaintiff "for the 2006 O&M assessment owed to [the Project], reflecting the Repayment Contract due dates of March 1, 2005, and the alternate due date of March 1, 2006. Penalties in the amount indicated in the Repayment Contract will begin to accrue if the 2006 O&M assessment is not paid by the alternate due date of March 1, 2006." Pl.'s Br. filed Apr. 9, 2008, Ex. 58 at 1.

Plaintiff's failure to pay "would place the Project at risk.  The Project's irrigation operations are funded one-half by assessments collected from [plaintiff] and one-half from the Project Indian Works."  Id.  Furthermore, the deficient assessment would "place the Project in a position to violate the Anti-Deficiency Act . . . . [I]f the Project does not have sufficient funds to operate in 2006, Project water deliveries to the Indian Works and the associated Indian trust lands . . . may be impaired."  Id.

On February 13, 2006, pursuant to plaintiff's request, the Regional Director met with plaintiff to discuss the O&M budget process and the decision to terminate water services. During the meeting the Director requested that plaintiff submit a proposal to the BIA to address the District's general concerns and payment of the 2006 O&M charges.  Plaintiff's proposal of February 17, 2006, suggested that the Project use its cash surplus to credit plaintiff for overpayments, thereby reducing future O&M charges.  On February 28, 2006, the Regional Director rejected plaintiff's proposal, demanding that plaintiff immediately pay FY 2006 O&M charges to avoid termination of water services.  On March 1, 2006, plaintiff paid the O&M assessment for FY 2006, again "under protest."  Pl.'s Br. filed Apr. 9, 2008, Ex. 64 at 1-2.

5.  Fiscal Year 2007

On October 4, 2005, the BIA published the 2007 proposed rate as $30.00 per acre. 70 Fed. Reg. 57,889, 57,893.  On December 1, 2005, plaintiff submitted to the Acting Deputy Director for the BIA's Office of Trust Services in Washington, D.C., plaintiff's comments and objections to the 2007 O&M rate.  By memorandum dated January 18, 2006, the Acting Regional Director of the BIA explained to the Project Manager that "[a] special Fact Finding Meeting to discuss only the FY 2007 [O&M rates] was not held in the Spring of 2005 because . . . [t]he FY 2007 rate was thoroughly discussed at the December 16, 2004 meeting" and, until the lawsuit filed by plaintiff against the Project is resolved, "no changes could be made to what was proposed on December 16, 2004."  Pl.'s Br. filed Apr. 9, 2008, Ex. 48 at 1.  The final rate was published on April 5, 2006, as $30.00 per acre.  71 Fed. Reg. 17,131, 17,134.  Plaintiff paid the 2007 O&M charges "under protest" on February 27, 2007. Pl.'s Br. filed Apr. 9, 2008, Ex. 75.

6.  Procedural history

On August 8, 2006, plaintiff filed its complaint in the United States Court of Federal Claims.  The case was assigned to Judge Lawrence J. Block.  The first count of the complaint alleges breach of contract due to the BIA's failure to provide timely notice of the charges for 2005 through 2007, see Compl. filed Aug. 8, 2006,  ¶¶ 26, 29, 32, and failure to estimate O&M rates based on a reasonable estimate of the Project's actual expenses, id. ¶ 35.  The

second count charges that Interior, by and through the BIA, beached its implied duty of good faith and fair dealing under the Landowners' Agreement and the Repayment Contract by failing to cooperate with plaintiff, to perform its duties reasonably and in good faith, and to refrain from actions that are detrimental to plaintiff's contractual rights by estimating the O&M budgets based on "unreasonable, unjustifiable, and unauthorized . . . rate-setting practices." Id. ¶¶ 49-50.

Plaintiff argues that it should recover the penalties in the amount of $47,500.00 that it paid to the BIA in FY 2005. Additionally, plaintiff calculates that the BIA improperly held approximately $4,003,905.00 in unobligated cash as of FY 2008. Taking into account $650,000.00 in emergency reserves for unforeseen events, plaintiff estimates that its one-half share of the excess cash is $1,650,000.00. Thus, plaintiff seeks total damages in the amount of $1,697,500.00.

Judge Block entered a scheduling order requiring completion of all discovery by September 15, 2007. The court granted defendant's unopposed motion on December 19, 2007, to extend the expert discovery period to January 25, 2008.

Pursuant to a scheduling order entered on February 6, 2008, plaintiff moved for summary judgment on April 6, 2008, and defendant cross-moved on June 23, 2008. Briefing was completed on August 26, 2008. Plaintiff seeks judgment on both counts; defendant's cross-motion reciprocally seeks judgment that plaintiff has proved no breach and that the O&M rate set by Interior was reasonable. Following the submission of the briefs, the case was transferred to the undersigned on September 12, 2008, and oral argument was held thereafter.

## DISCUSSION

I. Summary judgment standards

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The legal issues before the court may be resolved on summary judgment. Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1243-44 (Fed. Cir. 2007).

"The moving party in a summary judgment motion has the burden to show 'that there is an absence of evidence to support the nonmoving party's case.'" Crown Operations Int'l v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir. 2002) (quoting Celotex Corp. v. Catrett, 477

11

U.S. 317, 325 (1986)).  The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments").  In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter.  See Anderson, 477 U.S. at 255.

Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact.  See Celotex, 477 U.S. at 322-24. In the capacity of opposing each other's motion, plaintiff and defendant have the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists.  Celotex, 477 U.S. at 322, 324.  "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts."  Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987); see also Promac, Inc. v. West, 203 F.3d 786, 788 (Fed. Cir. 2000) (stating that on cross-motions for summary judgment each party's motion is evaluated on its merits, making all reasonable inferences against party whose motion is under consideration).

## II.  Breach of contract

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  San Carlos Irrigation and Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); see also Citizens Fed. Bank v. United States, 474 F.3d 1314, 1318 (Fed. Cir. 2007) (selecting as appropriate causation standard "substantial factor" or "but for" theory "depends upon the facts of the particular case and lies largely within the trial court's discretion"); Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (stating that "[d]amages for a breach of contract are recoverable where (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty.").

The Landowners' Agreement and the Repayment Contract contractually bound the parties.  Plaintiff formulates three contractual duties that Interior breached:  first, that Interior is required to give notice of the yearly O&M rate by July 1, which the BIA failed to do in fiscal years 2005 through 2007; second, that the BIA has a contractual duty not to

accumulate surplus cash; and third, that the BIA must discharge its contractual duty of using reasonable accounting methods to estimate future power costs.  Plaintiff contends that it suffered damages as a result of the BIA's breach of these contractual duties.  To determine "whether a contract creates a duty is a legal question of contract interpretation."  San Carlos, 877 F.2d at 959.  Because plaintiff presents different arguments with respect to each of these claims, the court will address them separately.

### 1.  Notice of the final 2005 operation and maintenance rate

Plaintiff charges that Interior abrogated plaintiff's contractual right to receive final notice of the O&M rate by "July 1 of the year preceding the start of the Project's fiscal year (which starts on October 1)."  Pl.'s Br. filed Apr. 9, 2008, at 5.  Plaintiff seeks an award of $47,500.00 for breach damages, which represents the penalty that plaintiff paid as a consequence of the late O&M payment in FY 2005.  Plaintiff argues that it was not contractually required to take any action until the BIA "first met its obligation to fix the O&M charges and notify [plaintiff] of its final decision.  Id. at 9.  Defendant counters that both statute and the Repayment Contract obligated plaintiff to pay the O&M charges by March 1 irrespective of whether the BIA gave plaintiff notice of the final rate.

Plaintiff invokes the parties' agreement to require that "[t]he contracts between the United States and [plaintiff] establish a process and deadlines for the United States to fix annual O&M charges and for [plaintiff] to collect the charges from its landowners and pay the charges to the United States for the coming fiscal year."  Pl.'s Br. filed Apr. 9, 2008, at 6.  Plaintiff points to the Repayment Contract as the source of its right to notice.  Defendant counters that neither the Landowners' Agreement nor the Repayment Contract obligates the BIA to publish final O&M rates in the Federal Register by July 1 of the preceding fiscal year.  According to defendant, the only requirement binding on Interior is to provide notice (not final notice) of O&M charges with sufficient time to allow plaintiff to collect the money from its taxpayers.  Defendant relegates the July 1 deadline to "its source in Arizona law," rather than any agreement made by the parties.  Def.'s Br. filed June 23, 2008, at 13.

The Federal Circuit has instructed: "In resolving disputes involving contract interpretation, we begin by examining the plain language of the contract."  M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004); see also Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (stating that contract interpretation starts by examining plain language of agreement).  "In contract interpretation, the plain and unambiguous meaning of a written agreement controls."  Hercules, Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002) (quoting Craft Machine Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991)); see also Banknote Corp. of Am., Inc. v. United States, 365

F.3d 1345, 1353 (Fed. Cir. 2004) (contract "is ambiguous only if its language is susceptible to more than one reasonable interpretation").

Plaintiff relies on the language of the Landowners' Agreement and the Repayment Contract in arguing that final notice must be given by July 1 each year:  annual O&M charges are to be "fixed from time to time in advance by the Secretary of Interior, based upon the annual cost of the operation and maintenance of the San Carlos Project." Pl.'s Br. filed Apr. 9, 2008, Ex. 5 at 15 (Landowners' Agreement). The applicable provision of the Repayment Contract requires that O&M rates must be

> fixed annually by the Secretary of the Interior and paid to the United States by the District.  The Secretary of the Interior will give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charge, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts.

Repayment Contract at 8.  Plaintiff emphasizes that the words "fixed" and "annually" establish that notice must be fixed, i.e., final, so that the District can comply with Arizona law "requir[ing] the District to collect the Project O&M charges through the county tax assessment process . . . [and] submit the [O&M] charges to the Pinal County Board of Supervisors by July 1 each year . . . ." Pl.'s Br. filed Apr. 9, 2008, at 7 (citing Ariz. Rev. Stat. § 48-3112).

Plaintiff cites to a decision by Interior to support its argument that the use of the term "fix" in "the Repayment Contract requires a final decision by a certain date." Pl.'s Br. filed July 24, 2008, at 3 (emphasis omitted). See Proposed Contract – Savage Irr. Dist., 60 Int. Dec. 150 (Mar. 15, 1948).  Interior stated that "[t]he language used by Congress . . ." in the Repayment Contract with Savage Irrigation District is "plain and unambiguous.  The verb 'to fix,' when used in such a connection, means 'To set or place definitely; to establish . . . .'" Savage Irr. Dist., 60 Int. Dec. at 150.  Plaintiff continues that, pursuant to the Repayment Contract, only the Secretary has the authority to "fix" or set the final O&M rates." Pl.'s Br. filed July 24, 2008, at 4.  Therefore, any "notice" given to plaintiff either by the Project or the BIA regarding the 2005 O&M rate did not absolve the Secretary from its duty under the Repayment Contract to set a final rate by July 1.

Plaintiff's reading of the Repayment Contract is belied by its terms.  Plaintiff seeks to conflate the requirement for the Secretary to "fix[] [O&M charges] annually" with the following language of the Repayment Contract that the "Secretary of the Interior will give notice to the District of the amount of charges to be paid annually in sufficient time to permit

14

the District to make the annual tax levies . . . ."  Repayment Contract at 8.  As defendant accurately extrapolates from these provisions:  "[t]he sole reference to timing of the O&M charges in the Repayment Contract provides that the Secretary is to 'give notice' of O&M charges within sufficient time to permit [plaintiff] to comply with Arizona law . . . . The Government made no binding commitment to fix O&M charges within a discr[ete] time frame."  Def.'s Br. filed June 23, 2008, at 13.  2/  Furthermore, plaintiff neglects to address defendant's argument that the "laws of the State of Arizona," as referenced by the Repayment Contract, only require that plaintiff provide "an *estimate* of the amount of money it requires for the next fiscal year to the Pinal County Board of Supervisors by July 1." Def.'s Br. filed June 23, 2008, at 13 (citing Ariz. Rev. Stat. Ann. § 48-3112(A)).

Defendant argues that the BIA provided notice to plaintiff on April 18, 2003, when it notified plaintiff that the 2005 O&M rate would increase to $30.00 per acre.  Again, on June 6, 2003, after plaintiff objected to the increased rate, the BIA informed plaintiff that it would recommend, to the Assistant Secretary, $30.00 as the proposed 2005 rate.  Plaintiff conceded that it had "sufficient time," Pl.'s Br. filed Apr. 9, 2008, at 7, to prepare its estimated O&M charges for 2005.  In fact, plaintiff already was preparing a proposed budget for fiscal year 2005 on April 1, 2003, which is prior to its having received notice of the proposed rate.  Pl.'s Proposed Findings of Fact filed Apr. 9, 2008, at ¶¶ 52-62.  Tellingly, plaintiff does not point to any provision of any agreement or contract between the parties that either expressly states or implies that final notice is a precondition to plaintiff's obligation to pay the yearly O&M fees.

Plaintiff's argument does not address the crux of this dispute.  The issue is not whether the Secretary has to "fix" a final O&M rate each fiscal year; rather, the issue is what act or actions satisfy the requirement to "give notice."  See Repayment Contract at 8. Plaintiff argues that the only means for the BIA to give "notice," as the term is used in the Repayment Contract, is for the Secretary to publish the final rate in the Federal Register. Defendant parries that the only obligation "the United States agreed to do was to give information to allow [plaintiff] to comply with Arizona law."  See Transcript of Oral Argument at 38, San Carlos Irrigation and Drainage Dist. v. United States, No. 06-576C (Fed. Cl. Oct. 30, 2008) ("Tr.").  Plaintiff's obligation is to use its authority to collect taxes

---

2/  Defendant disputes plaintiff's use of the term "fix" to define the Secretary's act of setting or establishing a final O&M rate for a given fiscal year.  Defendant charges that the term as used in the Repayment Contract is not defined and maintains that "whether publication in the Federal Register 'fixes' the rate for purposes of the Repayment Contract is a legal conclusion to which no response is required."  Def.'s Resp. to Pl.'s Proposed Findings of Fact filed June 23, 2008, ¶ 35.

sufficient to pay its portion of the O&M fees.  Plaintiff collected the taxes, but did not pay the Government.  Defendant continues that, as evidenced by "the parties' agreed-upon application of the contract, the Government was satisfying the terms of the contract, per the [Action Items] agreement. . . ."  Id.  Notice is "satisfied by the project recommendation, the recommendation of the project to the western or regional director. . . ."  Id.  The Secretary is not required to set a final rate to satisfy the notice requirement.  Id.; see Def.'s App. at 1-5. 3/

On the other hand, defendant's reference to "the parties' agreed-upon application of the contract," as support for its argument, is not self-referential and does not give substance to the meaning of notice.  The Action Items time line simply sets forth actions to be taken; it does not attach any significance or meaning to such actions. 4/  Furthermore, accepting defendant's interpretation of the contract would seem to render its obligation illusory, because plaintiff never would receive the benefit of any type of effective notice that would allow plaintiff to plan and assess its landowners accordingly.  And, if plaintiff does not receive notice of the final rate until after May 15, plaintiff would be forced to pay O&M charges based on a non-final, estimated rate or withhold payment and incur penalties.

Neither defendant nor plaintiff has met its burden to justify entry of summary judgment on this issue.  Although contract interpretation is a question of law, the case is at an impasse because the parties have not adduced facts that resolve the issue of what notice means in the context of all the governing agreements.

2.  The Project's accumulation of surplus cash

Defendant argues that the Federal Circuit in San Carlos Irrigation and Drainage Dist. v. United States, 111 F.3d 1557 (Fed. Cir. 1997) ("San Carlos"), precludes plaintiff's claim

---

3/ Defendant also points out that none of the Federal Register notices that set the final O&M rates in fiscal years 1993 through 2005 was issued before July 1.  Def.'s Br. filed Aug. 26, 2008, at 6 & n.2 (citing 56 Fed. Reg. 43,984 (Sept. 5, 1991)); 58 Fed. Reg. 43,990 (Aug. 18, 1993); 60 Fed. Reg. 4,499 (Jan. 23, 1995); 63 Fed. Reg. 12,818 (March 16, 1998); Pl.'s Br. filed Apr. 9, 2008, Ex. 17.  Defendant characterizes this as evidence that plaintiff agreed to rely on the procedures set forth in the Action Items time line and that plaintiff's narrow interpretation of notice is opportunistic.

4/  Plaintiff also disputes defendant's interpretation of the Action Items agreement. See Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact filed July 24, 2008, ¶ 25 (stating that "schedule for negotiating O&M charges . . . went only so far as to set a deadline for a final *recommendation* regarding the O&M charges").

16

for "contract damages where the Project's estimate of O&M charges can be proven to have overestimated actual expenses."  Def.'s Br. filed June 23, 2008, at 18.  Plaintiff rejects <u>San Carlos</u> as pretermitting its claim because the holding does not establish that the sole remedy for overcharges paid to the Government is a credit for future use.  According to plaintiff, "[a]t most, <u>San Carlos</u> stands for the proposition that the United States may apply electrical power overcharges as a credit against O&M expenses for future years."  Pl.'s Br. filed July 24, 2008, at 21.  Plaintiff comments that, although it never objected to using surplus cash reserves to provide a credit for future use, the BIA refused to provide a credit to plaintiff for the years at issue.

Not disputing that the Project accumulated cash reserves during the years 2003 through 2005, defendant argues that the excess funds were estimated to be credited to plaintiff in fiscal years 2008 and 2009.  The Project set annual O&M rates in fiscal years 2008 and 2009 "below the level of projected expenses for those years to spend down accumulated funds."  Def.'s Br. filed June 23, 2008, at 18.  Thus, defendant argues that plaintiff is precluded from any relief for overcharges, because plaintiff "is receiving the express credit anticipated by the Federal Circuit when it decided <u>San Carlos</u>."  <u>Id.</u>

Evaluating the validity of the parties' arguments and the applicability of <u>San Carlos</u> to the case at bar requires a review of <u>San Carlos</u> and its holding.

The primary issue in <u>San Carlos</u> implicated Interior's obligations under the Repayment Contract to provide water to the San Carlos Irrigation and Drainage District (the "District") and the appropriate cost of the rates charged for use of the water.  111 F.3d at 1561.  On October 1, 1983, a storm caused the Coolidge Dam to breach and the San Carlos Reservoir to spill over the spillways.  Any additional water in the Reservoir that otherwise would have been saved was lost when the spillway gates did not function properly.  While forced to shut down power operations, the Project continued to provide the District with water by purchasing preferred-rate federal hydro-power (the "Parker-Davis rate") from the dams on the Colorado River and from the Arizona Public Services Company.  From 1984 to 1990, the pumping power rates charged to the District were based on estimates of the cost to provide water from the Coolidge Dam and to purchase additional power.  From 1991 to 1992, the rates primarily were based on the Parker-Davis rate.

The District filed suit on July 28, 1986, seeking damages for the loss of water and hydroelectric power.  The trial court dismissed the complaint, <u>San Carlos Irrigation & Drainage Dist. v. United States</u>, 15 Cl. Ct. 197 (1988) ("<u>SCIDD I</u>"), <u>5/</u> and the Federal

---

<u>5/</u>  The Federal Circuit used these acronyms as short citations in <u>San Carlos</u>.

Circuit reversed, ruling that the Government had a contractual duty to keep the Dam, spillways, and power generation system in good repair.  San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 960 (1989) ("SCIDD II").  On remand the trial court ruled that Interior breached the "Repayment Contract by failing to operate and maintain the Joint Works," San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl. Ct. 276, 287 (1991) ("SCIDD III"), but also absolved Interior of liability for any loss of stored water, noting that the Government had conceded that the District was entitled to "at-cost" pumping power, San Carlos Irrigation & Drainage Dist. v. United States, 26 Cl. Ct. 229, 230 (1992) ("SCIDD IV").  The trial court awarded the District $667,021.00 in damages.  San Carlos Irrigation & Drainage Dist. v. United States, 32 Fed. Cl. 200, 202 (1994) ("SCIDD V"). After revision, final judgment was entered for the District for $770,900.00.  San Carlos Irrigation and Drainage District v. United States, No. 460-86L (Fed. Cl. Feb. 24, 1995).

Both parties appealed the final award of damages entered for the District.  San Carlos, 111 F.3d at 1561.  The District argued on appeal that the BIA's "projection of pumping power costs (incorporated into the O&M charges) was excessive." Id. at 1564.  Conceding that although Interior has an obligation to provide power at "cost," defendant contended that the O&M rate, as set by the BIA, determines what "cost" is.  Id.  Defendant characterized the District's objection as a challenge to a governmental agency's decision in setting rates and argued that the District should be barred from seeking a judicial remedy because it did not exhaust its administrative remedies.  Id.

Although the Federal Circuit in its 1997 San Carlos decision acknowledged that rate-making is generally a "policy decision better left to an agency," the court recognized the District's claim as alleging a breach of its contractual right to receive pumping power at cost, which is "amenable to judicial resolution." Id.  Thus, the issue devolved to whether the BIA could charge the District at all when the Dam was no longer generating power because of the flood.  Id. at 1564-65.

The District had urged the Federal Circuit to hold that it had an "expectation interest in the continued operation of the power plant sufficient to provide pumping power and adequate economic return to meet its operating expenses." Id. at 1565. Any loss from non-operation of the Project should be absorbed by the Government.  Id.  Unpersuaded by the District's argument, the court concluded that the discretionary power granted to the Secretary to set the price for power to users other than the District under the 1928 Act 6/ "evidences

---

6/  The 1928 Act provides:

[T]he Secretary of the Interior is authorized to sell surplus power developed

18

that the statute does not assure that there will be sufficient revenue to provide for free pumping power." Id. at 1566.  Nothing in the 1928 Act and Repayment Contract obligates the Government to provide the District free power by off-setting its costs with the revenues generated from sales from outside users.  Id.  The Repayment Contract obligates only three contractual rights:  that

> (i) power be provided at cost, (ii) any revenue from the sale of power be applied to reduce the costs for the pumps . . . , (iii) in return for participation in the payment of construction costs (a requirement later essentially forgiven by legislation), that the government provide the pumps and irrigation system.

San Carlos, 111 F.3d at 1566.  Defendant also contended that, if the BIA is entitled to charge the District for pumping at cost, the District cannot contest the charges, because the court must defer to the BIA's choice of method for estimating the projected cost of power.  In response to that bold proposition, the Federal Circuit ruled that the BIA cannot choose an unreasonable method in estimating the rate, even if deference is accorded to that rate.  Id. at 1567.

The District had taken its argument one step further, arguing that, even if the Secretary used the correct rate to determine the costs of power, the calculation of damages should have been based on the actual power use, not the estimated power use.  Id.  Thus, the BIA could not refund the money "that fell short of the advance estimates." Id.  Defendant's riposte was that, even if the Project had accumulated surplus cash for pumping, overcharges are permitted under 25 U.S.C. § 385c (1994), which permits the BIA to keep reserves to finance major repairs.  According to defendant, the District failed to show that the BIA had improperly allocated or unlawfully spent the funds.  Id.

The Federal Circuit in San Carlos rejected plaintiff's argument, stating that the Repayment Contract "clearly contemplates advance assessment of charges based upon

---

6/ (Cont'd from page 18.)

> at the Coolidge Dam in such a manner and upon such terms and for such prices as he shall think best, and the net revenues from such and all sales of power at that plant shall be devoted, first, to reimbursing the United States for the cost of developing such electrical power as that cost shall be determined by the Secretary of Interior.

Act of June 30, 1928, § 1, 45 Stat. 200, 211.

estimates." Id. at 1569.  As "long as power is only charged for as used, the proper balance of such funds remains credited to [the District] for its future use." Id.  The court therefore ruled that the calculation of damages based on an estimated rate was proper and that the BIA was not required to utilize the actual rate by which the District ultimately was charged.

Because plaintiff will recoup its losses in future years, defendant embraces this holding to foreclose plaintiff from claiming any damages for overcharges that it paid in prior years for O&M expenses.  Plaintiff distinguishes the right that it is attempting to vindicate as holding the BIA to account for the unreasonable accounting practices and subsequent refusal to credit plaintiff for overestimating expenses.

Defendant is correct in that San Carlos stands for the proposition that the Project can use estimates to calculate costs of power usage; if overcharges result because estimates prove higher than the actual cost, then plaintiff is refunded the surplus money in the form of future credits.  However, the Federal Circuit in San Carlos did not address the facts presented by this case.  Plaintiff's claim is one of breach of contract.  As plaintiff argues, the BIA not only failed to credit plaintiff for the overpaid fees, but the BIA also breached its contractual duty to use a reasonable rate-making methodology in estimating O&M rates.  Thus, San Carlos does not foreclose plaintiff from claiming damages for breach of contract.

3.  Reasonableness of the Project's rate-setting method.

Plaintiff alleges that, during fiscal years 2005 through 2007, the Project failed to employ reasonable methods to estimate O&M charges.  Through plaintiff's expert Lawrence Field, C.P.A., plaintiff seeks to establish that the financial budgets prepared by the Project "are not presented in accordance with any specific set of rules or principles and fails to meet the foundational basis for accounting information which requires that it be reliable, relevant and representationally faithful." Pl.'s Br. filed Apr. 9, 2008, Ex. 71 at 4.  Defendant counters that the question of reasonableness " . . . is not a question of accounting . . ."; the Project satisfies the duty of reasonableness "as long as [] estimates are explained [and] have a rational basis . . . ." Tr. 67.

The Repayment Contract provides, in relevant part:

[F]ull and accurate accounts shall be kept at all time by both the United States and The District of all receipts and expenditures and other fiscal operations in connection with the Project, and such accounts and the books showing them, and also all records, maps, plans, estimates, budgets, and engineering data of the United States concerning said Project, at all reasonable times, shall be open to the inspection of the United States and its agents, and of the District . . . .

20

Repayment Contract at 19. The Project contractually is obligated to keep "full and accurate accounts." 7/ Implicit in this duty is to assure that some species of reasonable and general principles of accounting is applied. Additionally, as defendant concedes, San Carlos established that the Project must use reasonable accounting methods when estimating O&M rates. Def.'s Br. filed June 23, 2008, at 29 (citing San Carlos, 111 F.3d at 1568). Plaintiff has made numerous allegations extrapolating specific examples of how the Project failed to properly maintain its accounts. Plaintiff has produced sworn testimony, through its expert Mr. Field, stating that the Project did not employ any reasonable or ascertainable accounting standard when preparing the estimates for fiscal years 2005, 2006, and 2007.

Defendant indirectly responds to plaintiff's allegations when it argues that the Project satisfied its duty by making available to plaintiff all of the numbers, sources, and estimates used in preparing the budgets for O&M charges during fiscal years 2005 through 2007. Defendant argues that, "while the contract includes the obligation that each party shall keep accounts, it doesn't say anything more than that . . . ." Tr. 79. The Project satisfied its duty to keep accounts by providing plaintiff "a full exposition of the accounts of the program." Tr. 79-80 (citing Def.'s App. at 42-73).

Plaintiff proffers that Mr. Field establishes that the Project breached its duty to use reasonable accounting methods when estimating O&M fees. Plaintiff requested that Mr. Field focus his opinion "on the propriety, accuracy and completeness of financial presentations being provided to [plaintiff] by" the BIA for the Project. Pl.'s Br. filed Apr. 9, 2008, Ex. 71 at 2. Mr. Field relied on various sources in forming his opinion, including an interview with Mr. Mason; "documents summarizing budget and financial presentations

---

7/  Plaintiff also cites to Yuma County Water Users' Ass'n v. Schlecht, 275 F. 885, 888-89 (9th Cir. 1921), and United States v. Cantrall, 176 F. 949 (1910), in support of its argument that the Project must base O&M rates on "careful computations" and reasonable estimates. Pl.'s Br. filed Apr. 9, 2008, at 1, 13-14. Neither case is on point. In Yuma County the United States Court of Appeals for the Ninth Circuit affirmed the trial court's dismissal of a complaint seeking an injunction against the Government. The plaintiffs had contracted with Interior to pay the construction costs associated with the Laguna Dam in exchange for water use. When the actual costs of construction proved higher than originally estimated, the plaintiffs filed a complaint in federal district court to prevent the Government from charging the higher costs. Although the case discussed estimates as based on "careful computations," it did not address the accounting involved in preparing the estimates. 275 F. at 888. In Cantrall the dispute concerned which party, the Government or landowners, should bear the O&M costs during the construction of an irrigation project in Klamath County, Oregon.

as prepared by the BIA related to the Project," Pl.'s Br. filed Apr. 9, 2008, Ex. 71 at 5; and documents produced by defendant pursuant to plaintiff's discovery request to produce "all documents used in the preparation" of the Project's budget and assessment rates for 2005, 2006, and 2007, Tr. 76.   Plaintiff included excerpts of Mr. Field's report in its Proposed Findings of Uncontroverted Fact filed Apr. 9, 2008, ¶¶ 131-32, 135. 8/

Mr. Field highlighted several examples as evidence that the Project failed to meet "the most basic foundational requirements for accounting information." Pl.'s Br. filed Apr. 9, 2008, Ex. 71 at 16.  Through his interview with Mr. Mason, Mr. Field learned that "interest income" represents interest earned on the Project's cash balances.  Id. at 11.  In evaluating fiscal years 1999 through 2007, Mr. Field pointed out that the Project's financial statements evidenced that fiscal year 2004 was the lowest interest-earning year: the Project earned $39,214.00 in interest income and averaged an annual interest rate of 1.5%.  In fiscal year 1999, the Project had the highest interest-earning year: the Project earned $431,228.00 in interest income and averaged an annual interest rate of 8.4%.  Mr. Field stated that he could not discern what interest rate the Project earned on its interest balances.  The "average interest rate earned on the Project's funds inexplicably range from 3.9% over the three month T-Bill rate to 1.3% below the three month T-Bill rate," which leaves one to conclude that the Project did not prepare its financials "in good faith." 9/  Id. at 11.

Mr. Field also noted that unobligated cash for a given fiscal year "does not tie out to ending unobligated cash from the end of the prior fiscal year." Id. at 8.  An end-of-year cash balance should be the same number as the beginning-of-year cash balance for the next fiscal

---

8/  Defendant made a two-fold attack on Mr. Field's report.  First, defendant faulted Mr. Field's report because he did not analyze the relevant years in forming his opinion. Defendant states that Mr. Field only "studied budget information from the years 2003 to 2007 . . . .  His report essentially has nothing to do with the choices made applicable to this project in Fiscal Years 2005 through 2007." Tr. 58.  Yet, in light of plaintiff's discovery request and Mr. Field's statement about what he relied on in preparing his report, it is not apparent why Mr. Field's testimony is not relevant or helpful in evaluating the parties' claims.  Second, deposition excerpts attacking Mr. Field's knowledge and familiarity with the Project's budgeting process go to the weight of evidence.  Def.'s App. at 124-41; see Anderson, 477 U.S. at 255 (when deciding motion for summary judgment, court may neither make credibility determinations nor weigh evidence and seek to determine truth of matter).

9/  Defendant admits, through its affiant Mr. Shaw, that the Project uses the T-Bill rate to calculate interest.  Mr. Shaw explains that the Project earns interest income "on all funds held for its benefit," the funds are held by the Department of Treasury, and it earns interest based on the rates fixed by the Department of Treasury.  Shaw Aff. ¶ 24.

year.  For example, the cash balance for fiscal year ending on September 30, 2005 was $4.090 million, and cash on the first day of the next fiscal year -- October 1, 2005 -- was $4.559 million.  Mr. Field opined that this type of error is one which is "so blatant, significant and obvious that a reasonable preparer of this financial presentation would have to know that the information was inaccurate, incomplete and misleading . . . ." Id. at 8-9.  Mr. Field provided several other examples of inaccurate and misleading accounting.

In response to the excerpts of the expert report included in plaintiff's proposed findings of uncontroverted fact, defendant only stated that it "[a]grees that the statements are contained in the cited expert report." Def.'s Response to Pl.'s Proposed Findings of Uncontroverted Fact filed June 23, 2008, ¶ 131.  Defense counsel explained that defendant responded to the expert report in this manner because it did not consider Mr. Field to be a fact witness.  Tr. 58.  Moreover, defendant rejects Mr. Field as capable of sponsoring or asserting any facts because he did not perform work on the Project.  Id.

Through the affidavit of Mr. Shaw, Supervisory Civil Engineer for the Project, defendant seeks to establish that the Project based O&M rates on reasonable estimates of the annual total cost and income of the Project.  Mr. Shaw's affidavit provides a high-level explanation of the Project's budgeting process, including the rationale behind some of the challenged itemized expenses accrued for during fiscal years 2005, 2006, and 2007.

Defendant argues that the Project based the fiscal year 2005 O&M rate on a reasonable projection of all expenses and income.  As explained by Mr. Shaw, the Project considers historical data and anticipates needs when preparing estimates.  In fiscal year 2005, the Project estimated that it needed to assess plaintiff an O&M rate of $30.00 to generate the $3 million needed to cover an anticipated budget deficit.  See Shaw Aff. ¶¶ 17, 22-33, 35.  The anticipated deficit in 2005 was a result of the Project's operating on a deficit during fiscal years 1998 through 2004.  See id. ¶ 14.  Mr. Shaw explained that the Project was able to use excess cash from prior years to off-set the deficit.  Id.  However, although the excess cash was depleted by fiscal year 2002, the Project did not realize this fact until it prepared the budgets for fiscal years 2003 and 2005.  Id.

Defendant maintains that the "reasonableness of the Government's estimate [for fiscal year 2006 is] borne out by actual events." Def.'s Br. filed June 23, 2008, at 35.  Defendant argues that the actual O&M obligations estimated for 2006 were "nearly the exact amount collected" in assessments for that year.  Id.  Plaintiff's attack on the Project's inclusion of funds for the China Wash Flume is deemed an example of the type of unsubstantiated attacks by plaintiff that are based on "factual error" or plaintiff's "willful failure to comprehend Government fiscal law as it defines obligations." Id.  Defendant states that the China Wash funds were obligated in 2006 and expended in 2007, see Shaw Aff. ¶ 30, and asserts the

23

timing of deferred maintenance "lies at the heart of the District's complaints regarding the FY 2006 budget." Def.'s Br. filed June 23, 2008, at 36. Defendant also discounts plaintiff's attack on the Project's budgeting for heavy equipment and well replacement during fiscal year 2007, because estimates for these needs were "rationally based upon the Project's expense history and planned maintenance activities." Id. at 40; see also Shaw Aff. ¶¶ 42-44.

The court is not compelled to find for one side or the other as a matter of law merely because both parties moved for summary judgment. Mingus, 812 F.2d at 1391. "The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient." Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984). When filing a summary judgment motion, the moving party "concedes that no issue of fact exists under the [] theory" advanced, but does not concede that issues remain on the opposing party's theory. Mingus, 812 F.2d at 1391 (quoting Nafco Oil & Gas, Inc. v. Appleman, 380 F.2d 323, 324-25 (10th Cir. 1967)).

The court could find in plaintiff's favor all the proposed facts excerpted from Mr. Field's expert report (sworn to as an affidavit, see Affidavit of Lawrence Field, Apr. 7, 2008, Pl.'s Br. filed Apr. 9, 2008, Ex. 71 at 1-2) to which defendant gave a response of *nolo contendere*. However, because the proposed findings from Mr. Field's expert report do not constitute a statute or other writing that "speaks for itself," defendant's response was technically insufficient. Ultimately, the court is guided by its discretion to proceed to trial when the consequences of defendant's litigation strategy are so preclusive and the facts found by default do not give a full picture of the Project's accounting practices.

Summary judgment cannot serve to determine whether the BIA discharged its duty to use reasonable accounting methods when calculating costs. On one hand, defendant argues that the Project satisfied its duty to keep accounts by providing to plaintiff "a full exposition of the accounts of the program." Tr. 79-80 (citing Def.'s App. at 42-73). This conclusory argument by defendant, without more, does not entitle defendant to judgment as a matter of fact and law. See RCFC 56(a). The proffered deconstruction of the budgeting and estimating process does not suffice as evidence of reasonable accounting methods. Plaintiff attacks the integrity of the Project's numbers and the accounting methods underlying the budgeting process. The parties' counter-arguments are akin to ships passing in the night, and they are "at best ambiguous." C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc., 911 F.2d 670, 675 (Fed. Cir. 1990). Moreover, no inferences reasonably could be drawn from the facts presented to justify summary judgment for either party on this issue. See id.

IV.  Plaintiff's alternative claim for breach of contract.

1.  Breach of the covenant of good faith and fair dealing

Plaintiff charges that Interior, by and through the BIA, breached its duty of good faith and fair dealing by unfairly collecting O&M charges before giving notice of the final rate and by using an unreasonable process to calculate estimated O&M rates.

Every contract includes the implied covenant of good faith and fair dealing.  Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); see also Restatement (Second) of Contracts § 205 (1981).  The covenant of good faith and fair dealing "imposes obligations . . . that include the duty not to interfere with the other party's performance." Centex Corp., 395 F.3d at 1304.  The covenant also imposes obligations of diligence, cooperation, and forthrightness, and a breach of these obligations is a contractual breach.  Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988).  Furthermore, evasive behavior and interference with performance of a contract can rise to the level of material breach that would excuse a party's duty to perform.  Id.

The duty not to hinder performance requires a party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex Corp., 395 F.3d at 1304. The contracting party is prohibited from doing anything that will prevent, hinder, or delay performance. Lewis-Nicholson, Inc. v. United States, 550 F.2d 26, 32 (Ct. Cl. 1977).  The Government must not only refrain hindering performance, but must do what is necessary to enable the contracting party to be able to perform.  Id.  The specifics of the parties' duties under this covenant are dependent on the particular circumstances of the case.  See Milmark Servs., Inc. v. United States, 731 F.2d 855, 859 (Fed. Cir. 1984).

The Government breaches these duties when it acts unreasonably under the circumstances, viz., if it unreasonably delays the contractor or unreasonably fails to cooperate.  See C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1542 (Fed. Cir. 1993) ("The government must avoid actions that unreasonably cause delay or hindrance to contract performance."); Commerce Int'l Co. v. United States, 338 F.2d 81, 86 (Ct. Cl. 1964) (determining what actions cause "breach of [the] obligation of reasonable cooperation" depends upon "particular contract, its context, and its surrounding circumstances").

Defendant invokes the presumption that government officials are presumed to discharge their duties in good faith and faults plaintiff for not overcoming it.  Defendant cites Asco Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595 (1994), as supporting resolution on summary judgment, because plaintiff has not alleged facts, "which if proved

would constitute malice or an intent to injure." Id. at 604; see also Def.'s Br. filed June 23, 2008, at 42.  Government agents are presumed to discharge their duties in good faith.  See, e.g., Spezzaferro v. FAA, 807 F.2d 169, 173 (Fed. Cir. 1986); Kalvar Corp. v. United States, 543 F.2d 1298 (Ct. Cl. 1976).  To rebut such a presumption when a contractor alleges that the Government terminated a contract in bad faith, the United States Court of Claims required a showing of "irrefragable proof" of acts of bad faith.  Kalvar Corp., 543 F.2d at 1301-02.  But see Tecom, Inc. v. United States, 66 Fed. Cl. 736, 758-69 (2005) (order denying summary judgment on point) (postulating that presumption of good faith does not extend to government actors).  10/  However, as the Federal Circuit has not modified the standard, the court notes that bad faith is not the sole means to prove a breach of good faith and fair dealing; plaintiff also can satisfy its burden by proving a lack of diligence or failure to cooperate with plaintiff in its performance of the contract.  See Malone, 849 F.2d at 1445.

As an alternative theory, plaintiff has argued that collecting O&M fees before giving the District final notice and failing to use reasonable methods to establish O&M fees constitutes a breach of the BIA's duty of good faith and fair dealing.  Plaintiff's alternative theory does not supplant its principal theory supporting a breach, although both would implicate the reasonableness of the BIA's actions.  In these circumstances, plaintiff's claim for breach of good faith and fair dealing does not give rise to another separate and distinct cause of action because the contract documents establish an express contractual duty, as recognized by the Federal Circuit in San Carlos:  "[T]he government, while obligated . . . to use advance estimates of future power costs, may not choose an unreasonable methodology for selecting the [O&M] rate used, even if deference is accorded to its chosen rate."  111 Fed. F.3d. at 1567.

---

10/  Defendant is correct that the decisions issued by the Court of Federal Claims do not displace binding precedent.  The issue, however, is whether the case law relied on by defendant dictates the legal standard that governs the facts of the instant case.  Judge Wolski's discussion in Tecom, while not yet examined by the Federal Circuit, sets forth a compelling analysis of the law to the end that the binding precedent does not require that a plaintiff show bad faith in a situation paralleling the facts in the case at bar.  See also Abcon Assoc., Inc. v. United States, 49 Fed. Cl. 678, 688 (2001) (stating that evidence establishing that Government failed to negotiate and make payment was sufficient to establish breach of duty to cooperate under Malone) (citing Libertatia Assocs., Inc. v. United States, 46 Fed. Cl. 702, 707 (2000) (arguing standard "irrefragable proof" is misleading because it can never be satisfied and that "evidence of some specific intent to injure" or "actuated by animus" towards plaintiff would be more accurate) (citations omitted)).

The factual inquires of whether the BIA failed to cooperate with plaintiff, to perform its duties reasonably and in good faith, and to refrain from actions that were detrimental to plaintiff's contractual rights by estimating the O&M budgets based on "unreasonable, unjustifiable, and unauthorized . . . rate-setting practices," Compl. ¶¶ 49-50, arise as elements of the breach of express contract provisions.  If plaintiff establishes by a preponderance of evidence that the challenged actions were unreasonable, the Government cannot elude liability by augmenting plaintiff's burden to prove personal animus on the part of BIA employees.  Incompetence will be sufficient.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1.  The parties cross-motions for summary judgment are denied.

2.  An order scheduling trial entered separately on November 10, 2008.


s/ Christine O.C. Miller

_____
**Christine Odell Cook Miller**
Judge